## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| John Scatchell, Sr., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: 2018-CV-03989 |
| | ) | |
| v. | ) | Judge John F. Kness |
| | ) | |
| Village of Melrose Park, an Illinois | ) | Magistrate Judge Jeffrey |
| Municipal Corporation; Ronald M. Serpico; | ) | Cummings |
| Sam C. Pitassi; Michael Castellan; and | ) | |
| Steven Rogowski, | ) | |
| | ) | |
| Defendants. | ) | Jury Trial Demanded |

## FIRST AMENDED COMPLAINT

Plaintiffs, JOHN SCATCHELL, SR. ("Scatchell"), by his attorneys, Gianna R. Scatchell, Esq., LAW OFFICES OF GIANNA SCATCHELL, and Cass T. Casper, Esq., TALON LAW, LLC, complain against the Defendants, Village of Melrose Park, Ronald M. Serpico, Sam C. Pitassi, Michael Castellan, and Steven Rogowski, as follows:

## NATURE OF ACTION

1. Plaintiff John Scatchell, Sr. seeks redress for actions taken against him by the Defendants related to the exercise of his rights under the First Amendment (Speech and Association), his rights under 42 U.S.C. § 1981 via 42 U.S.C. § 1983, as well as for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

## JURISDICTION AND VENUE

2. This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case arises under federal law, specifically, the First Amendment of the United States Constitution,

1

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*., 28 U.S.C. § 1343(a)(4), 42 U.S.C. §§ 1981, 1983, and attorneys' fees under 42 U.S.C. § 1988.

3.  Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b). On information and belief, all Defendants reside in this judicial district, and the events giving rise to the claims asserted herein occurred within the district.

## **PARTIES**

4.  Plaintiff John Scatchell, Sr. ("Scatchell, Sr." or "Lt. Scatchell") is a resident of Melrose Park. He was employed as a full-time Melrose Park police officer from February 15, 1985 until his retirement as a lieutenant on June 7, 2018, as part of the events underlying this Complaint.

5.  Defendant Village of Melrose Park ("Melrose," "Village," or "MP") is a municipality incorporated in the State of Illinois and the employer of the defendants. Melrose has indemnification obligations for wrongful acts committed by its officials, employees, and agents. See 745 ILCS §§ 10/1-202 and 9-102. It is responsible for the challenged actions of the individual defendants and the Village.

6.  Defendant Ronald M. Serpico ("Serpico"), is an elected official serving as Mayor of the Village of Melrose Park. He is a final policymaker for the Village of Melrose Park, Illinois. He engaged in the conduct complained of while acting under the color of law. He is sued in his individual capacity.

7.  Defendant Sam C. Pitassi ("Pitassi"), is the Director of Police and acted as an agent of the Village of Melrose Park. He engaged in the conduct complained of while acting under the color of law. He is sued in his individual capacity.

8. Defendant Michael Castellan ("Castellan") is one of two Melrose Park Deputy Chiefs of Police and acted as an agent of the Village. He engaged in the conduct complained of while acting under the color of law. He is sued in his individual capacity.

9. Defendant Steve Rogowski ("Rogowski") is one of two Melrose Park Deputy Chiefs of Police and acted as an agent of the Village. He engaged in the conduct complained of while acting under the color of law. He is sued in his individual capacity.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10. All administrative remedies for purposes of the Title VII claim have been exhausted. All conditions precedent to the institution of this lawsuit have been fulfilled including receipt of the right-to-sue letter issued by the EEOC on March 9, 2018. A copy of the Right to Sue letter is attached hereto as Exhibit A.

## FACTUAL ALLEGATIONS

### I. Background

11. Plaintiff's family has been a pillar of the Melrose Park community, having dedicated over 100 years serving the Village through a long line of public servants since 1960. This tradition of public service began with Scatchell, Sr.'s father-in-law who served as a firefighter and rose through the ranks as the fire chief until his retirement in 1997. Scatchell Sr.'s brothers-in-law, numerous relatives, and close family friends have devoted themselves to the safety and protection of Melrose Park by serving on both the fire and police departments.

12. Scatchell, Sr. was employed by the Melrose Park Police Department for over 33 years. He performed his job duties as a police officer with skill, competence, and professionalism.

13. Scatchell, Sr. also served as the President of the Fraternal Order of Police, Lodge 19 ("FOP"), MPPD's exclusive bargaining agent, from approximately 2008 to 2017.

## II. Scatchell, Sr. Opposes VMP's Racially Discriminatory Action Against Its Only African-American Police Officer

14. Melrose requires its police officers, firefighters, and other employees to live within Village limits unless the employee is exempt pursuant to MP Ordinance §2.52.090.

15. On or about May 1, 2016, Melrose selectively enforced its residency requirement by requiring Kyll Lavalais ("Lavalais"), the only fill-time African American officer at VMP PD, to move back into Melrose Park, even though he was originally hired under an affirmative action plan that, as an African American, allowed him to live outside of Melrose Park.

16. VMP's order requiring Lavalais to reestablish residency had an adverse impact on the diversity of the VMP police force in that it required the only African-American full-time VMP officer, Lavalais, who was hired under an affirmative action plan, to relocate his residency within the Village limits, causing him personal hardship and undermining the affirmative action and diversity purpose behind his hiring.

17. Lavalais filed a union grievance over the residency order, and, on or about October 1, 2016, as president of the FOP, Scatchell, Sr., received Lavalais' request to arbitrate the residency issue in his grievance.

18. On or about October 30, 2016, the FOP retained an attorney, Gianna Scatchell, for guidance on Lavalais' grievances and pending disciplinary matter.

19. Gianna Scatchell is the Plaintiff's daughter, a fact which was at all times known to Mayor Serpico, and Defendants Pitassi, Castellan, and Rogowski.

20. On or about November 10, 2016, Scatchell, Sr., for the FOP, took the position that the FOP opposed the order requiring Lavalais to reestablish residency, and that it would contemplate arbitration of Lavalais' grievance due to the hardship caused by the residency order on the VMP's police force's sole full-time African-American officer, Lavalais, and because the

4

residency requirement was being inconsistently and disparately enforced, particularly as to the sole black officer.

21. Scatchell took the foregoing position verbally to Pitassi in Pitassi's office after receiving Lavalais' grievance, and also through his attorney and daughter, Gianna Scatchell, in her November 10, 2016 letter to Village attorneys Jeffrey Fowler and James Vasselli.

22. Vasselli and Fowler subsequently advised Serpico, Castellan, Rogowski, and Pitassi of Scatchell's and the FOP's position on the grievance.

23. Pitassi was also aware of Scatchell's opposition to the Lavalais order and his support of the grievance and arbitration through Scatchell's in-person meeting with him about it.

24. All of the individual Defendants were also made aware of Scatchell's support of Lavalais because of FOP meetings regarding Lavalais' grievance and arbitration that were held at the station, postings about such meetings on station bulletin boards, through talk at the station, and through Lieutenant DiMaio, who vigorously opposed the grievance and arbitration.

### III. Scatchell, Sr.'s Surprise Promotion to Deputy Chief

25. On November 11, 2016, the day after Gianna Scatchell sent her letter to the Village's attorneys expressing Scatchell's and the FOP's position in support of Lavalais, Melrose distributed its bi-monthly Village meeting agenda, which included a surprise promotion: "*Lt. Scatchell will be promoted to deputy chief until 01/15/2017.*"

26. Scatchell, Sr. was out of town when this promotion was announced. He learned about this promotion from people who had seen the agenda and called to congratulate him.

27. None of the Melrose administrators called Scatchell, Sr. to tell him about his promotion.

28. On November 11, 2016, Gianna Scatchell called Melrose Park attorney, James Vasselli ("Vasselli"), to learn about Scatchell's promotion to Deputy Chief, and during that

5

conversation Vasselli stated that the "01/15/2017" date was a typo and that the promotion would be through the end of Serpico's next term.

29. Later in the day on November 11, 2016, Melrose posted a Revised Agenda that removed the January 15, 2017 "typo" to read: *Lt. Scatchell will be promoted to deputy chief.*

30. Based upon a long history of similar conduct, John Scatchell surmised that the promotion was designed to entice Scatchell Sr. to oppose Lavalais' grievance going to arbitration.

31. The FOP and Scatchell did not drop its support of Lavalais' grievance going to arbitration and otherwise to entice Scatchell to drop support of Lavalais' opposition, even in light of the anticipated promotion of John Scatchell, Sr.

### IV. Scatchell, Sr.'s Promotion is "Tabled"

32. On November 14, 2016, Vasselli contacted Gianna Scatchell to advise her that the promotion would be tabled later that day, even though the meeting had not yet occurred nor did the vote on tabling it yet occur.

33. At Village Board Meeting on November 14, 2016, Mayor Serpico, without any justification or explanation, moved to "table Lt. John Scatchell's promotion." The Motion carried, and Scatchell Sr.'s promotion was tabled.

34. In at least ten years of Village Board meetings, there was not one Village Trustee who has ever voted against a single ordinance, resolution, or proclamation proposed by Serpico, making the democratic process a sham.

35. Serpico tabled the promotion to retaliate against Scatchell, Sr. for his positions perceived as "adverse" to the Village, *to wit*, advocating for Lavalais, supporting Lavalais' grievance, opposing the Village's order requiring the sole African-American officer (Lavalais) to reestablish residency, and supporting the grievance and the arbitration.

## V. Scatchell, Sr. is Accused of Taking Two "Adverse" Positions to Melrose Park Through His Daughter and Attorney Gianna Scatchell

36. Under the current Melrose Park regime, a culture of disparate treatment and ad hoc policy-making has flourished at the Melrose Park Police Department ("MPPD"). On the one hand, MPPD's Brass trivializes or ignores certain rule violations and even criminal misconduct when favored personnel are involved. On the other hand, other officers have falsified intra-departmental correspondence and created rules after the fact to punish lower-ranking or disfavored personnel.

37. On or about November 2016, Scatchell, Sr. found himself in the latter category after he allegedly took "two adverse positions against the Village of Melrose Park" as explained below.

38. On November 22, 2016, Village Attorney, Michael DelGaldo confirmed the retaliatory motive:

> [you] the purported attorney for the FOP, have [sic] taken ___an adverse___
> ___position___ to the village and ___have twice threatened suit___ against
> the Village over ___two separate matters___. (emphasis added)

39. Scatchell, Sr. refused to back down from the FOP's position, which triggered an ongoing campaign of harassment from the Defendants.

40. On information and belief, following these two "adverse actions", defendants Serpico, Pitassi, Castellan, Rogowski, and others agreed to retaliate against Scatchell and others for his position, preparing a verbal hit list of Village employees who were to suffer adverse employment actions as punishment for their actual or perceived support of Scatchell, Sr.

## VI. Scatchell, Sr. is Passed up for his Promotion

41. On or about November 24 or 25, 2016, Melrose distributed its bi-weekly agenda for the November 28, 2016 board meeting.

42. The Agenda stated that Rogowski would be promoted to deputy chief instead of Scatchell, Sr.

43. Melrose promoted Rogowski even though Scatchell, Sr. ranked the third highest in seniority on the MPPD; his promotion was still "tabled"; and Melrose's 2017 Budget allocated funds for one (1) deputy chief in addition to the existing deputy chief.

44. Rogowski was improperly appointed to the position because the Village never fulfilled the condition precedent, that is, selection and approval for such appointment to Deputy Chief by the Personnel Board.[1]

45. No other Melrose employee has been placed on the Agenda to receive a promotion only to have that promotion "tabled" and then subsequently passed up, as happened with Scatchell without any explanation or justification.

## VII.    Additional Relevant Events

46. On November 29, 2016, the FOP filed its demand for arbitration on behalf of Lavalais.

47. On December 8, 2016, FOP Lodge 19 held its annual election, and Scatchell, Sr. lost the election to Raul Rodriguez ("Rodriguez"). Many of the new FOP Board members and supporters became hostile to Scatchell after he supported Lavalais' arbitration and lost the election.

48. On December 16, 2016, a patrol officer on Scatchell, Sr.'s shift left Roll Call without permission. The following text exchange between the Officer and Scatchell ensued:

Officer:         *I feel like shit I'm going home*

Scatchell, Sr.  *Ok next time wait for me to come in do not walk out of roll call!*

Officer:         *I'll respect when I get respect.*

---

[1] [A]ll members of the police department … shall be officers of the village and shall be appointed by the board of fire and police commissioners of the village. The appointments shall be concurred in by the president and board of trustees, voting jointly.

8

| | |
|---|---|
| Scatchell, Sr. | *Walk out of my roll call again, and you will be in the station until further notice.* |
| Officer | *Shut the fuck up* |
| Scatchell, Sr. | *Really you could write a to from to that then, or meet me in the Chiefs [sic] office in the morning.* |

**49.** Said officer never complied with the direct order to write a to/from memorandum.

**50.** Scatchell, Sr. wrote a to/from to Deputy Chief Castellan explaining the insubordination.

**51.** Castellan responded to Scatchell, Sr.'s to/from that the officer would not be disciplined or investigated, despite that the aforementioned conduct demonstrated gross insubordination and rule and policy violations. The case was closed without any further action taken, despite Scatchell's requsts.

### VIII.   Scatchell, Sr.'s House Is Hit With 3-Quarter Sticks of Dynamite

**52.** On December 16, 2016, at or about 2:30 a.m., someone threw three ¼ sticks of dynamite at Scatchell, Sr.'s house near three vehicles on his driveway.

**53.** Scatchell, Sr. called the Melrose Park Police Department to report this crime.

**54.** Scatchell, Sr. discovered that some of the newly-elected FOP Board and other off-duty officers were attending a party a couple blocks from Scatchell, Sr.'s house.

**55.** The responding officer, Cacciatore went to that off-duty officer's residence to see if anyone had seen or heard anything. That produced negative results.

**56.** Shortly after that, the off-duty officer called Cacciatore and threatened him by stating:

*Who the fuck are you to come ring my doorbell at my house? You come to my house again you motherfucker and I'll destroy you" … "you ring my doorbell again and I will come after you with everything I have and you can bring John [Scatchell, Sr.] with you*

57. Rogowski deviated from policy by failing to investigate the incident thoroughly and objectively as illustrated below:

    **a)** No additional watches were put on Scatchell, Sr.'s house (as is customary with any threats to officer safety);

    **b)** Administratively locked the two reports so that no one could access them;

    **c)** Never interviewed the complaining witnesses, such as Scatchell Sr.'s wife or his son, John Scatchell, Jr., nor the person who reported the explosion to 911, Panzini;

    **d)** Never inspected or collected the dynamite fragments found on the property;

    **e)** Never responded to Scatchell, Sr.'s text messages;

    **f)** Never interviewed neighbors who were present the same night and heard the explosion;

    **g)** Took no blast or gunpowder residue off of Scatchell's driveway or neighboring lawn;

    **h)** Several days after the explosion, Rogowski emailed Scatchell, Sr. that he closed the matter due to insufficient evidence.

## IX. The New FOP Board is Installed

58. On January 8, 2017, the FOP filed its revised demand for arbitration on behalf of Lavalais.

59. On or about January 10, 2017, the new FOP Board was sworn in.

60. The new FOP board deviated from its established protocol by, before even being sworn in, proposing, voting, and acting on new business: namely, to terminate Ms. Scatchell as the FOP attorney, to hire a new attorney, and to withdraw Lavalais' demand for arbitration and end his grievance.

61. Rodriguez said that he terminated Ms. Scatchell because of "differences with her father."

## X. Scatchell, Sr. is Constructively Demoted and Transferred to Station Supervisor

62. On or about April 15, 2017, Scatchell, Sr. attended a Melrose Park Pension Board meeting and opposed the Board's directive to allow Peter Caira, a lateral transfer, to transfer his pension to the MPPD's pension. Scatchell, Sr. opposed this pension transfer because MPPD's pension is less than 30% funded.

63. Two weeks later, on or about April 26, 2017, Scatchell Sr. was notified that he would be involuntarily transferred from "Shift Supervisor" to "Station Supervisor," resulting in him losing direct command of all subordinate officers that were under his supervision as Shift Supervisor.

64. Pitassi notified Scatchell, Sr. of his "Assignment Change" by a letter that said:

> Effective May 8, 2017, you will [sic] assigned to 4-12 shift station supervisor. Your duties will be outlined at a later date. Your days off are Saturday and Sunday and will receive holidays off.

65. Unsolicited assignment transfers rarely, if ever, occur mid-shift without some extenuating circumstance.

66. When Scatchell asked why he was being transferred, Pitassi responded that "Mayor Serpico ordered it."

67. Defendants significantly diminished and restricted Scatchell, Sr.'s job responsibilities and retaliated against him by:

   a) Transferring Scatchell, Sr., mid-shift, to a permanent 4-12 shift with no defined scope, no budget, and no opportunity for overtime and no opportunity for career advancement.

   b) Moving him from a shared office with other supervisors to an unfavorable location—a secluded office known among MPPD officers as "the hole."[2] The walls were filthy, and the ceiling tiles were missing. There were no blinds on the windows for weeks.

---

[2] The "hole" is where the MPPD Brass put supervisors who fall out of favor with them as punishment.

11

Scatchell, Sr. washed the walls and paid for and installed blinds on the windows out of his own pocket despite that he requested that the Village reimburse him.

**c)** Excluding Scatchell, Sr. from supervisor meetings to preclude him from being involved in policy discussions about department operations. Rogowski and/or Castellan scheduled such meetings.

**d)** Diminishing Scatchell Sr.'s standing as a senior staff member and contributing to a loss of responsibilities (he went from supervising 15 officers to zero (0) officers).

**e)** Depriving Scatchell, Sr. of proper resources, making it difficult to produce deliverables. For instance, Pitassi ignored or denied several building code violations and repairs that Scatchell, Sr. reported.

**f)** Cutting off his access to administrative support services. Scatchell, Sr. lost access to the office computer and the Internet. On various occasions, he informed the IT staff, but his requests were ignored.

**g)** Castellan boasting to other officers that Scatchell, Sr. has been "demoted, sentenced to the 'hole' and stripped of all his responsibilities."

**h)** Scrutinizing Scatchell, Sr.'s work, and attendance more closely than other officers and without justification. Pitassi even warned him that the "eyes of Texas were on him."

**i)** Ordering Scatchell, Sr. to remain in the office, while the daytime station supervisor freely came and went from the office and continued to respond to police calls. Scatchell, Sr. risked discipline if he did the same.

**68.** This reassignment was a step backward for Scatchell Sr. professionally because it was a non-supervisory role with non-substantive duties.

69. Pitassi provided him no scope, no job description, no budget, and no legitimate work assignments.

70. Pitassi initially intended to have Scatchell, Sr. audit clothing overages for sworn officers, a job that was previously performed by non-sworn, civilian personnel, and barely involved enough work to fill a single shift, much less a full time position. However, Scatchell was never actually tasked with even this assignment by Pitassi.

71. Scatchell, Sr. was effectively on "house arrest" in retaliation for having "taken adverse positions" to Melrose.

72. Scatchell Sr. remained in this position until he retired in June 2018 as a result of the ongoing, hostile retaliatory work environment.

### XI. Individual Defendants Try to Pin a False Case on Scatchell, Sr.

73. On August 9, 2017, Lavalais' arbitration was scheduled as a result of an agreement that Lavalais reached with the FOP in Illinois Labor Relations Board litigation against the FOP. Scatchell, Sr. was going to testify on Lavalais' behalf.

74. On August 30, 2017, on information and belief, as retribution for taking another "position adverse to the Village" the Individual Defendants directly, personally, and in concert, attempted to pin a false case on Scatchell, Sr.

75. At approximately 11:25 p.m. Scatchell, Sr. was backing out of his driveway when a driver "swerved around his truck at a high rate of speed and drove up on his driveway apron and then re-entered the roadway from the parkway." A NestCam recorded the entire incident.

76. Scatchell, Sr. believed that the driver was impaired, so he pulled the driver over, and requested officer assistance.

77. Upon arrival, two of the officers subsequently corroborated Scatchell, Sr.'s position that the driver was driving erratically, disobeying traffic signals, and talking on his phone. The driver was issued citations for the traffic infractions.

78. The police report was written the next day by Castellan's godchild, Anzaldi and nephew, Castellan, Jr. and the day after the citizen's complaint was filed, indicating that they wrote their reports to conform to the citizen complaint.

79. On or about September 1, 2017, the driver's parents Emailed Mayor Serpico to complain about Scatchell, Sr. (hereinafter "Morales Complaint").

80. On September 5, 2017, Rogowski responded to Morales' parents by attaching a blank Citizen's Complaint form to the following Email:

Please ask your son to be as detailed as possible, such as descriptions of the involved officer(s), name(s) of the involved officer(s) if known. What was said in detail. A full description of any and all force used by the officer(s). As an example "pulled me my right arm".

You or your son can feel free to contact me on my cell phone ▓▓▓▓ ▓▓▓▓ you have any questions or would like to meet with me to assist in filing the complaint.

I will continue to investigate this matter but the information you may supply is crucial to me seeking corrective actions against the officer(s) if the allegations are sustained.

Thank you for your help in this matter and please accept my apology that your contact with our Department resulted in a negative interaction.

81. On September 18, 2017, Rogowski again deviated from protocol by offering to appear on behalf of Mr. Morales at the upcoming hearing. Rogowski is not an attorney.

On September 18, 2017 at 10:58 AM Steven Rogowski <srogowski@melroseparkpd.com> wrote:

Mr. Morales,

When I responded last week to your question about your son attending the hearing for the citations issued I didn't realize that the initial court date was this week. Please tell him he doesn't have to appear this Tuesday the 19th. On the initial date the hearing officer justs assigns a trial date. I will appear on his behalf and request a hearing date. Hopefully as a result of my investigation a hearing may not be needed. But if required I will provide the proper date.

Sorry for the misunderstanding.

Steve Rogowski

**82.** Rogowski never informed Scatchell, Sr. of the September 19, 2017 court date.

**83.** While Scatchell, Sr. was under an "internal investigation," the Defendants took the following

actions:

   **a)** Administratively locked the police reports relating to this incident;

   **b)** Not informing Scatchell, Sr. he was being investigated;

   **c)** Not interviewing Scatchell, Sr.;

   **d)** Never reviewing the NestCam footage;

   **e)** Denying several FOIA requests under the guise that the records were part an "active

     criminal investigation" and any disclosure would "interfere with the investigation," even

     though there was no basis to consider it criminal or administrative by Rogowski's own

     admission.

### XII.   Defendants Retaliate against Scatchell, Sr. for Filing his EEOC Charge

**84.** On September 15, 2017, Scatchell, Sr. filed a complaint with the Equal Employment

Opportunity Office ("EEOC") for retaliation, but that only made things worse.

**85.** On or about October 25, 2017, Defendants received Scatchell, Sr.'s EEOC Charge.

**86.** Within days of the Defendants learning about the EEOC complaint, Defendants retaliated

against Scatchell, Sr. in violation of 42 U.S.C. 2000e-3(a) in the following ways:

**a)** On or about September 20, 2017, Pitassi informed Scatchell that he received two anonymous letters accusing Scatchell of a myriad of misconduct, but Pitassi stated that he shredded one of them.

**b)** Defendant Pitassi was observed saying: "If they want a war, we'll give them a war." Scatchell, Sr. perceived this to be a threat.

**c)** On October 26, 2017, one day after receiving the EOC Charge, Melrose Park's director of human resources called Scatchell Sr. asking if his security company would hire her brother (a convicted felon). Scatchell, Sr. does not own a security company. His cousin, John Scatchell does. On information and belief, this was another retaliatory act designed to see if Scatchell, Sr. violated the Village's secondary employment disclosure requirement.

**d)** On October 26, 2017, one day after receiving the EOC Charge, two months after the Morales Incident, Rogowski launched an informal investigation against Scatchell, Sr. and requested that the officers and supervisor on scene write to/from memos. Scatchell, Sr. and Scatchell, Jr. were not asked to write one even though both were on scene.

**e)** On October 26, 2017, one day after receiving the EOC Charge, Castellan's nephew, Giovanni Castellan and his godson, Robert Anzaldi, Jr. both wrote to/from memos that were completely different from the original police report that Anzaldi Jr. had written two months before. Each to/from contained new and unsubstantiated allegations.

**f)** On December 11, 2017, Melrose revised its ordinances to retire police officers and firefighters at age 62 automatically if they have 30 years on.[3]

---

[3] Ordinance No. 2190 - Amending the Melrose Park Municipal Code by Adopting § 2.60.180 and § 2.64.180 Establishing a Mandatory Retirement Age for Police Officers and Firefighters Employed by the Melrose Park.

87. Scatchell, Sr. was harassed into an early retirement on or about June 7, 2018, before he was 62 years old.

88. On July 6, 2018, Ms. Piemonte, sent Scatchell, Sr. a certified letter demanding that he return a laundry list of purported police property within 24 hours to Defendants Castellan or Pitassi or the MPPD "may pursu[e] civil charges for conversion and/or criminal charges for theft." This was an unprecedented act as some of the items were more than 10 years old.

### XIII.   Defendants' Pre-textual Investigation of Scatchell, Sr.'s Son as Retaliation

89. On November 13, 2018, approximately 18 days after Defendants received Scatchell, Sr.'s EEOC complaint, and in furtherance of their conspiracy to retaliate against Scatchell Sr. for his protected and oppositional conduct, the individual Defendants then targeted John Scatchell Jr., for an investigation based on an anonymous letter that he was abusing his sick leave despite that Scatchell, Jr. had only been off of work for four days at the time VMP started its investigation.[4]

90. Castellan claimed that an anonymous officer "slid [a letter] under his office door."

91. Despite the extensive camera system in the police station, Defendants never viewed the cameras to determine who the anonymous person was and the videos from that date have been destroyed.

92. Further, the letter was unsworn and contained no dates, no times, no locations, nor any other information that would rise to a "reasonable suspicion" that Scatchell, Jr. was abusing his sick

---

[4] This violates the union contract, specifically, § 5.3 of the CBA, covering a police officer's use of sick leave that requires that:

A three-panel Review Board shall oversee the application of the Sick Leave Policy … provided that the Review Board **shall not inquire into any particular case until the officer has been on sick leave for at least one (1) month.** (Emphasis added)

17

leave. More was required. *Sharud Din v. City of Chicago*, 883 F.Supp. 270, 273 (N.D. Ill. 1995); *See Anderson v. Human Rights Com'n*, 314 Ill. App. 3d 35, 42–46, 246 Ill. Dec. 843, 731 N.E.2d 371 (1st Dist. 2000) (documents should not be admitted when the witness testifying about them does not have the personal knowledge to establish a proper foundation).

93. Within hours of receiving this letter, Defendants acted in concert with Caira—the officer that Scatchell Sr. opposed at the pension meeting—to give him the "full resources of the department" to carry out a 219-hour of surveillance of Scatchell, Jr. during a one-month span.

94. As a full-time police officer covered by the Collective Bargaining Agreement ("CBA"), Scatchell could not be relieved from duty, suspended, discharged, or disciplined in any manner without the Village of Melrose Park having established just cause.

95. Additionally, the MPPD follows a progressive discipline approach to discipline.

96. Prior to this investigation, Scatchell, Jr. had an unblemished record. Scatchell, Jr. was never warned or disciplined. In fact, the first time that Scatchell, Jr. was on notice that Defendants took issue with his behavior was when he was served with a notice of interrogation.

### XIV. Defendants' 219 Hour Witch Hunt Against Scatchell, Sr.'s Son

97. Scatchell, Jr.'s investigation was unlike any that had been done of any other police officer in the Village's history, that included, but was not limited to: Sending *ex parte* communications to Scatchell, Jr.'s treating physician, to "make him aware of his obligations pursuant to 430 ILCS 65/8/1(d)[5]" when there was no indication that he was a threat to himself or others; subjecting him to fitness-for-duty examinations; forcing him to ride with other officers when he was medically cleared to work; improperly disclosing significant personal information (e.g. social security number, home address, phone number, and driver's license number) to third

---

[5] Trying to revoke his FOID card following Scatchell Jr.'s treatment in an unrelated Officer Involved Shooting

parties, including to a convicted felon; sending such sensitive information over an unencrypted network connection to non-governmental Email addresses; improperly obtaining his mother's TollPass records in an attempt to determine his location on certain dates; trivializing or ignoring his grievances; deviating from the SOP's and protocol involving Officer Involved Shooting incidents; improperly using LEADS and Soundex reports to effectuate their investigation; violating the Open Meetings Act; failing to consider mitigating evidence; failing to provide discovery pursuant to SOP 1020; failing to consider progressive discipline; engaging in disparate treatment and favoritism towards other employees but not Scatchell, Jr.; using an "anonymous letter" as the basis to investigate Scatchell, Jr., then withdrawing the only charge in the Statement of Charges that mentioned the anonymous letter; deviating from established policy and the Illinois' Uniform Peace Officers' Disciplinary Act; relying on speculation that was contrary to the undisputed evidence; misrepresenting the evidence; and investigating and seeking Scatchell, Jr.'s termination based on ginned-up, trumped-up, trivial bases that were pretextual litigation figments to justify firing him as retaliation.

98. Melrose spent over $200,000 of taxpayer money to prosecute these trumped up charges against Scatchell, Jr..

99. In addition, VMP had special audiovisual equipment installed in the Police Board hearing room especially for John Scatchell, Jr.'s hearing.

### XV.    Defendants Terminate Scatchell, Sr.'s Son As Retaliation For Scatchell, Sr.'s

100.    On December 6, 2018, in complete disregard of Scatchell Jr.'s status as a full-time police officer, and the express terms of the CBA, the Board issued a final decision and order terminating Scatchell, Jr. from his position of police officer with Defendant Village.

101.    The Board proceeding was a total sham, however, and would never have occurred but-for the other Defendants' hell-bent determination to punish Plaintiff John Scatchell, Sr. for daring to challenge them in the Lavalais residency matter.  The Board proceeding was retribution upon the son of the malice Defendants at all times have harbored against the father.

102.    Nothing in the Statement of Charges supports the conclusion that Scatchell's "conduct constitutes some substantial shortcoming which renders his continuance and employment in some way detrimental to the discipline and efficiency of the public service and something which the law and sound public opinion recognize as good cause for him to no longer occupy his position."

103.    Throughout Scatchell, Jr.'s proceedings at the Board of Fire and Police Commissioners, phone records show that there were substantial and repeated communications between the individual Defendants and members of the Police Board on key Scatchell, Jr. hearing dates and otherwise.

104.    At all times, Plaintiff Scatchell, Jr. never distanced himself from his father's actions, never denounced his father's actions, and refused to disavow his father's right and lawful actions.

105.    After Defendants terminated Scatchell, Jr., they have continued their retaliatory conduct in the following ways:

   a)  Breaking the lock on his locker without contacting his counsel to open the lock or to be present when it was opened (no policy that he lost his expectation of privacy);

   b)  Refusing to compensate Scatchell, Jr. for his vacation and comp time (MPPD officers work 2018 for 2019 vacation and comp time), despite his demand;

   c)  Filing a report against Scatchell, Jr. with the Illinois Law Enforcement Training and Standards Board to prevent him from ever being hired as a police officer. Even though

other police officers have been terminated, this is the first time that Defendants filed such a report. Defendants did not even wait for the decision to be "final" and appeal rights to be exhausted. 50 ILCS 705/6.2;

    **d)** Failing to send Scatchell, Jr. general notice or notice upon a qualifying event pursuant to Consolidated Omnibus Budget Reconciliation Act (COBRA) rights within 30 days of separation (after the January 1, 2019 deadline to get insurance coverage) and even though other police officers who were terminated received the option for COBRA coverage;

    **e)** Denying and/or rescinding John Scatchell, Jr. his COBRA rights entirely; and,

    **f)** Failing to send Scatchell, Jr. the Illinois Department of Employment Security rights within five (5) days of separation.

**106.** Defendant Pitassi did nothing to stop the retaliation as he was required to do by Department policy. By allowing the retaliation against Scatchell, Sr. to continue unabated Director Pitassi condoned, ratified, encouraged, and agreed to the retaliation.

**107.** Throughout most of these key dates, Scatchell, Sr. alleges that Serpico, Pitassi, Rogowski, and Castellan engaged in extensive conversations via their personal or Village-issued cell phones in furtherance of their conspiracy.

### XVI. Comparators Show That Melrose Park, Illinois Does Not Discipline For The Allegations Raised Against Scatchell, Sr.'s Son

**108.** Defendant VMP operates a dysfunctional disciplinary system that is flawed at all levels based on its de facto policy, practice and/or custom of concealing certain officers' misconduct.

**109.** The concealment and suppression of the existence of misconduct includes: failure to sufficiently investigate allegations of misconduct; failure to accept complaints from citizens against police officers; the failure to investigate criminal conduct where off or on duty officers are involved; failure to promptly identify or record witness statements or to preserve evidence;

fabrication of exculpatory evidence or destruction of evidence; and failure to initiate prompt disciplinary procedures related to the alleged misconduct, even when the allegation of misconduct has obvious merit, and failure to properly supervise or train police officers.

110.    To that end, Defendants trivialize, ignore, and impose arbitrary and capricious penalties upon employees for alleged misconduct without any regard for consistency in recommending or imposing discipline and/or what level of discipline to institute.

### A.    Defendants' Pitassi's and Castellan's Double-Standard Disciplinary Policy

111.    Defendants Pitassi and Castellan have family members on the MPPD. Defendant Pitassi's son is Sam Pitassi Jr. and Defendant Castellan's nephew is Giovanni Castellan.

112.    Defendants Pitassi and Castellan claim that their relatives on the MPPD are held to a "higher standard" of conduct than other police officers. On belief, the opposite is true.

113.    Pitassi Jr. and Giovanni Castellan have been responsible for several major SOP infractions.

114.    In fact, on or about December 23, 2017, the *Sun Times* published an article, *Melrose Park police brass faced with disciplining cop relatives*, which questioned Defendants Pitassi and Castellan's double standard regarding the disciplinary process as applied to their relatives.

### i.    *Defendant Castellan's Nephew: Giovanni Castellan*

115.    Defendant Giovanni Castellan has been an MPPD officer for approximately three years.

116.    In that time, Giovanni racked up several SOP violations including, on belief:

a) Stalking a Victim: Giovanni inappropriately contacted the victim of domestic violence matter. She went to the police department to make a complaint, but the matter was whitewashed by a Supervisor. *Discipline imposed*: None.

b) Arrest for Disorderly Conduct while on Probation: Giovanni was arrested, while off duty, for disorderly conduct in another town. He was accused of driving his car at a female

22

pedestrian in an aggressive manner. Giovanni was also accused of taunting the woman by walking past her and making pig noises. *Discipline imposed*: Giovanni only forfeited two vacation days with the opportunity for them to be reinstated even though he was on probation and should have been automatically terminated.

c)  <u>Violating the Residency Policy</u>: When Giovanni was arrested, he listed his home address in Oak Brook—in violation of the residency policy. *Discipline imposed*: None.

d)  <u>Castellan's Nephew's Excessive Force Complaint</u>: In late 2019, while on a traffic stop, Giovanni used physical force and broke the suspect's arm. *Discipline imposed*: None

e)  <u>"Unintentionally" Shooting at an Unarmed African American Suspect</u>: Two weeks later, Giovanni responded to a call of retail theft in progress. The suspect ran away, and Giovanni began a foot pursuit that culminated with him "unintentionally" shooting at the unarmed African American suspect during the "heat of the moment and the chase."[6] Giovanni knew, or should have known, that deadly force would never have been justified on a retail theft. *Discipline imposed*: On belief, none.

f)  <u>Fired from Working Security at the District 89</u>. The Superintendent of District 89 School fired Giovanni from working security at the District's schools. On belief, after being terminated, he pulled over the Superintendent to annoy her and to harass her.

ii.  *Defendant Pitassi's son, Sam Pitassi Jr.*

**117.**  Defendant Pitassi's son, Sam Pitassi Jr. ("Pitassi Jr.") has been an MPPD officer for approximately seven years.

---

[6] https://chicago.suntimes.com/crime/2019/11/27/20984574/melrose-park-officer-gun-discharge-jewel-osco-shoplifting-suspect.

118. <u>Chief Pitassi's Son Negligently Fires Duty Weapon in a Bathroom Stall</u>: Pitassi Jr. negligently fired his gun while in a bathroom stall during a break from a training session at another police department. *Discipline imposed*: He was required to take education courses to avoid forfeiting two days of vacation time.

119. <u>Chief Pitassi's Son Rear-Ends Civilian while Driving Squad Car</u>: Later in 2017, Pitassi, Jr. "negligently" rear-ended a civilian's vehicle with his squad car. The police report blamed the accident on the civilian driver — even though rear-end collisions are almost always the striking vehicle's fault. The woman Pitassi Jr. rear-ended was hospitalized. He was not immediately tested for drugs or alcohol, which is against policy. *Discipline imposed*: He forfeited two vacation days with the opportunity for them to be reinstated. Instead, Pitassi Jr. was transferred to a specialty assignment in the tactical unit, which would be considered a promotion.

120. <u>Chief Pitassi's Son's Vehicle Collides with a Skateboarder</u>: On September 21, 2019 Pitassi Jr., while on sick leave, was involved in another traffic incident. This time, the police report alleges that a minor child on a Skateboard struck Pitassi Jr.'s truck. On belief, Pitassi Jr. was not immediately tested for drugs or alcohol or investigated for leaving the house while on sick leave. *Discipline imposed*: On belief, none.

121. <u>Working at the Local Marijuana Dispensary</u>: On belief, on January 1, 2020, Pitassi Jr. began moonlighting at one of the cannabis dispensaries, despite that marijuana is still prohibited under federal law.

### iii.    **Disparate Treatment: The MPPD Officers' Tolerated Misdeeds**

122. MPPD's culture reveals a troubling pattern of misconduct among similarly situated MPPD officers who have not faced extensive investigations or disciplinary actions for conduct that clearly violates the MPPD's policies and practices, which perpetuates a code of silence.

123.    This Code of Silence is an implicit understanding between and among members of the MPPD resulting in a refusal or failure to report instances of misconduct of which they are aware despite their obligation to do so as sworn peace officers to protect themselves or their fellow officers from discipline, criminal prosecution, or civil liability.

124.    This failure to discipline engendered the firm understanding among MPPD Officers, that they are above the law and can act with impunity without the fear of consequences.

125.    The Municipal policymakers, Serpico and the Village Board of Trustees, are aware, condone, or facilitate the enforcement of this "code of silence," which is neither manifestly job-related nor consistent with business necessity.

126.    In the rare instances when complaints of misconduct are sustained, discipline is haphazard and unpredictable and is meted out based on rank and internal connections, which does little to deter misconduct.

127.    The examples below provide a small snapshot of the capriciousness of MPPD's disciplinary process:

  a)    <u>Removed Shell Casings from Crime Scene</u>: Two MPPD officers were at a bar when allegedly one or both of them shot off their weapons. Shell casings were removed from the crime scene. *Discipline imposed*: None.

  b)    <u>Improper Overtime Payments</u>: On at least two paychecks, Ofc. Gene Cacciatore was paid for overtime that he did not work. Cacciatore reported this overpayment to Defendant Castellan who did not order him to return the money. *Discipline imposed*: None. He was promoted to sergeant.

  c)    <u>Stolen Police Car:</u> Lt. DiMaio left his marked squad car unlocked and running while he responded to a call. The woman who called the police stole the squad car. It was the ISP,

not DiMaio, who reported the vehicle as stolen. The ISP notified the MPPD that one of its squads was traveling at a high rate of speed on an expressway. *Discipline imposed*: Forfeited three vacation days and was removed as shift commander for one week.

**d)** <u>Stolen Vehicle:</u> A few years later, Station Supervisor Lt. DiMaio's personal vehicle was left running unattended and was stolen off of his driveway costing the MPPD more time and resources. *Discipline imposed*: None.

**e)** <u>Battering a Resident</u>: On belief, Lt. DiMaio, as Station Supervisor, left his post and went to a call where he punched one of the residents. The resident filed a sworn citizen's complaint and requested an investigation. *Discipline imposed*: None.

**f)** <u>Threatening another officer and a supervisor</u>: Sam Chiapetta threatened Sgt. Cacciatore and his supervisor, Scatchell Sr. stating: "Who the fuck are you to come ring my doorbell at my house? You come to my house again you motherfucker and I'll destroy you" … "you ring my doorbell again and I will come after you with everything I have and you can bring John [Scatchell Sr.] with you." *Discipline imposed*: No discipline after an informal investigation. Chiapetta was promoted to lieutenant six (6) months later.

**g)** <u>Stolen golf cart</u>: On belief, two officers, while drunk stole, destroyed, and hid a golf cart belonging to a local business owner. *Discipline imposed*: Neither officer was disciplined.

**h)** <u>Sick Leave Abuse</u>: Castellan's godchild, Anzaldi Jr. was a lateral transfer from Berkeley. His personnel file indicates that he violated the sick leave policy several times.

**i)** <u>Squad Accident without a Drug Test</u>: In 2018, Anzaldi Jr. was involved in an accident with his squad car. Similar to Pitassi Jr., Anzaldi Jr. was not immediately tested for drugs or alcohol as is required by the SOP's. *Discipline imposed*: None.

**j)** <u>Not Properly Searching a Prisoner</u>: The Cook County Department of Corrections rejected a prisoner held in MPPD's lock-up because the MPPD officers did not properly search the prisoner and drugs were found in his pocket. *Discipline imposed*: None.

**k)** <u>Prisoner Dying in Holding Cell:</u> In December 2018, a prisoner died in the MPPD holding cell, without any meaningful investigation or disicpline. *Discipline imposed*: None.

**l)** <u>Writing Bogus Parking Tickets</u>: On belief, officer Nikole Spatafora wrote around $10,000 worth of bogus parking tickets to the same vehicle over the course of several weeks. On further belief, the DMV suspended the vehicle owner's driver's license because of the bogus tickets. *Discipline imposed:* 30-day Suspension.

**m)** <u>Relocating another Officer's Breast Milk</u>: Lt. Maiello unplugged a mini refrigerator that contained a female police officer's breast milk from the break room and moved it into the hallway. *Discipline imposed*: Forfeited an unknown number of compensatory days.

**n)** Officer Raul Rodriguez used a harness that was inventoried as evidence to saddle a rookie officer. He then pretended to ride this rookie while pointing his service weapon at the ceiling. Defendant Pitassi testified that this behavior was "a problem." *Discipline Imposed*: None. Rodriguez was recently promoted to Assistant to the Deputy Chief.



**o)** <u>Off-duty Fight</u>: Officer Panzini was involved in an off-duty fight at the local Target store where he allegedly beat up another patron. *Discipline imposed*: Unknown suspension.

**p)** <u>Catch and Release Tactics</u>: Officer Panzini detained an anti-abortion activist. Panzini dropped him off in Maywood even though he was never arrested. Panzini berated the protestor by stating: "This isn't an arrest, so shut up with your bullshit and go show this garbage to somebody in fucking Wheaton."[7] *Discipline imposed*: On belief, none.

**q)** <u>Hiring a Racially Insensitive Police Officer</u>: Frank Fazio, on belief, was hired to fill Scatchell Jr.'s vacancy. The BOFPC hired Fazio even though he resigned from the Glen Ellyn police department to avoid being terminated for using an ethnic slur against Mexicans by calling them "beaners." The BOFPC claimed it was unaware of Fazio's misconduct and blamed Glen Ellyn for not informing them of Fazio's background.[8] Yet, the VMP could not even confirm if it had reviewed Fazio's personnel file or if it followed

---

[7] https://chicago.suntimes.com/2019/1/17/18363963/anti-abortion-activist-says-melrose-park-cop-chastised-and-left-him-in-maywood.

[8] https://chicago.suntimes.com/2019/7/19/20698300/melrose-park-police-ethnic-slur-frank-fazio-iii-ron-serpico

up on Fazio's response on his MPPD employment application about his time with Glen
Ellyn: "I was asked to resign."

r)   <u>False police report</u>: An officer lied in a police report by saying that a car accident occurred
     in the VMP when it happened elsewhere. *Discipline imposed*: None.

s)   <u>Battering a Suspect</u>: Two MPPD officers battered a suspect. One of the officers put the
     handcuffed suspect in a chokehold while the other officer sat on him and repeatedly hit
     him with her handcuffs. This incident was also captured on video and provided to the
     MPPD supervisors. *Discipline imposed*: None. Both officers are now field training
     officers who train and mentor new MPPD police officers.

t)   <u>Shooting and Killing an African American</u>: An off-duty MPPD officer, Vito Migliore
     went to Maywood, Illinois and shot and killed one African American male, inside a private
     residence, and wounded another. *Discipline imposed*: On belief, notwithstanding his gross
     misconduct and potential criminal activity, Migliore was allowed to keep working for the
     MPPD as a law enforcement officer. In January 2020, Migliore was allowed to return to
     full duty, and, despite that, a month later had another improper conduct incident and has
     not been terminated.

u)   <u>Roommates with a Dangerous Convicted Felon</u>: Darrell Farmer, a part time MPPD officer
     lived with a convicted felon who allegedly kidnapped his girlfriend, raped her, and
     brought her back to his Melrose Park home that he shares with Farmer.

128.   The only thing that the aforementioned officers have in common is that none of them filed
a civil rights charge against any of the individual Defendants, nor do they associate with anyone
who did, such as Scatchell Jr. or Scatchell Sr.

### B.  **The BOFPC's Arbitrary and Capricious Disciplinary Standard**

129.    The BOFPC's disciplinary system fails to provide clear guidance on appropriate, fair, and consistent penalty ranges.

130.    The BOFPC ultimately carried out the individual Defendants' retaliation by terminating Scatchell for his first alleged acts of misconduct, while turning a blind eye when other preferred officers were accused of substantially similar or more egregious misconduct.

131.    On belief, the BOFPC never terminated a police officer for abusing the sick leave policy, much less an officer who had never previously violated the sick leave policy.

132.    Instead, when the BOFPC sustained charges of sick leave abuse, it failed to punish the officer or punished them with an unpaid suspension. For example:

    a)  The BOFPC suspended—not terminated—Officer Negron for violating the sick leave policy even though he had a prior disciplinary history, which included at least five prior sick leave violations, insubordinate behavior, and conduct unbecoming of a police officer.

    b)  The BOFPC also did not suspend or terminate Defendant Serpico's son, former Melrose Park fire fighter, Michael Serpico even though he violated at least six (6) direct orders and had not shown up to work in some time. On belief, the charges against Michael Serpico were withdrawn and he voluntarily resigned.

133.    In similar fashion, the BOFPC did not terminate Melrose Park fire fighter Tim Ude, who while off duty, walked into the emergency room of Loyola Hospital and stole medical supplies. When he was confronted by a hospital employee, Ude lied and said that the fire department needed the medical supplies. The MPPD arrested him. Ude was brought before the BOFPC, but was allowed to voluntarily resign nearly five (5) months after his arrest.

134.    The BOFPC allowed other police officers the chance to resign (Ofc. Pretzie and Ofc. Espinosa) prior to being terminated.

135. Scatchell Jr. was never given the option to resign.

136. As noted, the individual Defendants were in constant contact with the Board's members on key dates in Scatchell's case.

### C. Defendants History of Third-Party Retaliation

137. As a matter of widespread practice so prevalent as to comprise municipal policy, those who have dared to oppose the Serpico Administration have experienced retaliation in a manner similar to that alleged by Plaintiff. For example, and on belief:

138. *Trombetta v. Board of Education*, 2003 WL 23685091

   a) District 89 School District terminated Generoso Trombetta ("Trombetta") in retaliation for exercising his First Amendment rights to manage and support his cousin's opposing mayoral campaign against Defendant Serpico.

   b) After a 14-day trial, in just three hours, the jury found in favor of Trombetta holding that Defendant Serpico retaliated against Trombetta and other "political enemies" by persuading and influencing the school board to terminate Trombetta's contract and to investigate his five-year old niece even though Serpico was not on the school board. The jury awarded Trombetta $1 million in punitive damages against Serpico.

139. *Figueroa v. Village of Melrose Park and Sam C. Pitassi*, 1:13-cv-3026

   a) Blanca and Anthony Figueroa are siblings. The VMP hired Anthony as a firefighter and Blanca as a police officer. Blanca sued the MPPD and Defendant Pitassi alleging gender discrimination. The case ultimately settled sometime around the end of 2015. Less than two years later, in April 2017, the BOFPC brought charges against Anthony Figueroa for his purported residency violation. He was ultimately terminated even though several other firefighters live outside of the VMP in violation of the residency policy.

## COUNT I – 42 U.S.C. § 1983 DEPRIVATION OF FIRST AMENDMENT RIGHTS OF SPEECH AND ASSOCIATION
Plaintiff v. All Individual Defendants

140.    The Plaintiff realleges all other paragraphs of this First Amended Complaint and incorporates them by reference as if fully set forth herein.

141.    The First Amendment to the United States Constitution guarantees the Plaintiff's rights to speak on matters of public concern free from retaliation.

142.    As described more fully above and incorporated by reference herein, Plaintiff engaged in extensive protected speech on matters of public concern, including, but not limited to publicly opposing race discrimination in the Lavalais matter, advocating for union and labor rights on behalf of a fellow officer, to wit, Kyll Lavalais, and opposing questionable pension spending.

143.    Scatchell, Sr. had no job purpose for his speech and associational activity, no self-interest for his speech and associational activity, and his speech and associational activity occurred through acts outside of the line of duty, including as a private citizen in signing the Declarations on behalf of Lavalais, acting as President of a labor organization (the FOP Lodge), voting in favor of Lavalais' grievance over his residency going to arbitration, retaining counsel and his daughter, Gianna Scatchell, to communicate his opposition of the Lavalais residency order, entertaining Lavalais' grievance for arbitration at a public FOP membership meeting and in FOP Executive Board meetings, holding meetings with fellow Melrose Park officers and the FOP regarding sending Lavalais' grievance to arbitration, meeting with Chief Pitassi regarding Lavalais' grievance, and serving as President of an FOP Lodge that approved Lavalais' grievance for arbitration and sent it for arbitration

144.    The foregoing activities had nothing to do with Scatchell's official job duties as a Village of Melrose Park, Illinois Police Lieutenant, as Scatchell's work with the FOP, his support of

32

Lavalais' opposition to the residency order, his support of Lavalais' grievance, and his support of Lavalais' arbitration, both personally and through his daughter Gianna Scatchell, did not owe their existence to his Lieutenant work with the Village, but rather through his private actions and actions as FOP President and supporter of Lavalais' actions.

145. Scatchell, Sr. further alleges that Melrose Park retaliated against him for exercising his rights under Title VII by signing two declarations on behalf of Lavalais, holding union meetings about Lavalais' residency grievance going to arbitration, supporting Lavalais' grievance, voting to arbitrate Lavalais' residency issue, approving Lavalais' grievance for arbitration, submitting declarations in behalf of Lavalais' federal lawsuit and Illinois Labor Relations Board case, offering to testify at Lavalais' arbitration, and for filing his own EEOC Charge.

146. Scatchell, Sr. was retaliated against, harassed, transferred, constructively demoted, and constructively terminated for engaging in constitutionally protected speech and expressive conduct, including by at least the following actions:

a) Being offered the position of Deputy Chief as an effort by Mayor Serpico to cause Scatchell to oppose Lavalais' grievance going to arbitration;

b) Having his offer of Deputy Chief retracted and tabled when Scatchell and his daughter, Gianna Scatchell on his and the FOP's behalf, expressed support for Lavalais' position, grievance, and arbitration, despite the offer for a Deputy Chief position;

c) Having his son, John Scatchell, Jr., investigated in an investigation that accumulated 219 overtime hours, charged with misconduct, sent for a police board hearing seeking his termination, and ultimately terminated based upon trumped-up allegations and alleged policy violations not enforced against other similarly-situated officers;

**d)** Being transferred and constructively demoted from a shift Lieutenant to a Station Supervisor, a position having no written job description, having no officers directly reporting to it, having an inferior office in the rear of the police station, and intending to be given job duties formerly held by a civilian, non-sworn employee, *to wit*, monitoring employee uniform overages having nothing to do with sworn police work and being degrading in nature;

**e)** Having dynamite thrown at his personal residence without any meaningful investigation being performed as to such incident, including no forensic evidence being taken or examined, interviews not being conducted or meaningfully, and Scatchell being administratively locked out of access to all reports about the incident and kept in the dark about its progress and outcome; and,

**f)** The other actions alleged in the foregoing section.

147.   Scatchell, Sr. carried out his job duties competently and professionally, but Defendants penalized him for exercising his First Amendment protected rights in supporting Lavalais' grievance and position that Lavalais should not have to reestablish residency.

148.   As a result of Scatchell, Sr.'s exercise of protected speech, Defendants Village of Melrose Park, Mayor Serpico, Director Pitassi, Castellan, and Rogowski, retaliated against Plaintiff in the manner described in the preceding paragraphs.

149.   As a result of the aforementioned deprivations, Plaintiff has suffered damages, including loss of pay that he would have received as Deputy Chief, pension differential, emotional distress, reputational damage, and general compensatory damages.

WHEREFORE, for the foregoing reasons, Plaintiff John Scatchell, Sr. requests that this Court enter judgment in his favor and against the individual Defendants in an amount to be proved

34

at trial, including for lost pay and benefits, general compensatory damages, emotional distress and reputational harm, for attorneys' fees under 42 U.S.C. § 1988, as well as order Melrose Park, Illinois to reinstate John Scatchell, Sr. to his position and benefits with full make-whole relief, and for all such other relief to which he is entitled, and the Court deems just and proper.

## COUNT II – 42 U.S.C. § 1983 CLAIM OF RETALIATION FOR DEPRIVATION OF RIGHTS UNDER § 1981
### Plaintiff v. All Individual Defendants

150.    The Plaintiff realleges all other paragraphs of this First Amended Complaint and incorporates them by reference as if fully set forth herein.

151.    42 U.S.C. § 1981 provides, in pertinent part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." *See Campbell v. Forest Preserve Dist. of Cook County, Ill.*, 752 F.3d 665, 667 (7th Cir. 2014) (holding that public sector entities may be liable for 42 U.S.C. § 1981 violations via 42 U.S.C. § 1983).

152.    The United States Supreme Court has held that retaliation claims are cognizable under Section 42 U.S.C. § 1981, including claims by individuals who suffer retaliation for having tried to help another. *See CBOCS West, Inc. v. Humphries*, 128 S.Ct. 1951, 1958 (2008).

153.    Scatchell engaged in conduct protected by 42 U.S.C. § 1981 and by Title VII when he supported, both personally and through his attorney and daughter Gianna Scatchell, Lavalais' position opposing the residency order, his grievance, and his arbitration that would have required Lavalais to reestablish residency in the Village of Melrose Park, Illinois despite that

35

he was the sole black officer on the force and hired under an affirmative action-based consent decree.

154.    Scatchell also engaged in conduct protected by 42 U.S.C. § 1981 and by Title VII when he opposed Lavalais' having to move back into Melrose Park in order to remain on the police force, and expressed his opposition to the order personally and via his daughter and attorney, Gianna Scatchell in October, November, and December 2016, and thereafter.

155.    At all times, Defendants knew that Scatchell supported Lavalais' grievance and opposed Lavalais' having to reestablish residency because they were all aware of the grievance and arbitration, that Scatchell and his daughter Gianna Scatchell opposed Lavalais having to reestablish residency and supported the grievance arbitration, and were in constant communication with Village attorneys regarding the order that Lavalais reestablish residency, his grievance over it, his arbitration over it, and his subsequent legal actions regarding it.

156.    At all times, Plaintiff was performing his Lieutenant position in a satisfactory manner, having no prior discipline, and a good record of performance.

157.    No similarly-situated employee who did not complain of discrimination against Lavalais, and who did not oppose Lavalais having to reestablish residency, was denied a promotion, transferred to an unfavorable position without defined job duties and that lacked subordinates, had a family member investigated and terminated, and had dynamite thrown at their home subjected to a poor, unserious, and inadequate investigation.

158.    As a proximate result of Scatchell's support for Lavalais, and for Scatchell's opposition to discrimination against the sole African-American officer having to reestablish residency despite being hired under affirmative action, Defendants personally and directly retaliated against Scatchell in the foregoing manner and in violation of 42 U.S.C. § 1981.

159.     Plaintiff has endured substantial financial loss, suffering, humiliation, emotional distress, and other damages in the past and the future.

WHEREFORE, for the foregoing reasons, Plaintiff requests that this Court enter judgment in his favor and against Defendants in an amount to be proved at trial, including for lost pay and benefits, general and special compensatory damages, for emotional distress and reputational harm, for attorneys' fees under at least 42 U.S.C. § 1988, as well as order Melrose Park to reinstate John Scatchell, Sr. to his position with full back pay and benefits and make-whole relief, and for all such other relief to which he is entitled, as the Court deems just and proper.

## COUNT III- *MONELL* CLAIM FOR DEPRIVATION OF FIRST AMENDMENT RIGHTS
### Plaintiff v. Defendant Melrose Park, Illinois

160.     The Plaintiff realleges all other paragraphs of this First Amended Complaint and incorporates them by reference as if fully set forth herein.

161.     Defendant Serpico, as the Mayor of the Village of Melrose Park, Illinois is a final policymaker.

162.     The Defendant Serpico, by express actions, took action against Scatchell, Sr. for his protected First Amendment conduct in opposition to the administration throughout the Lavalais situation.

163.     Scatchell Sr. alleges that Serpico, as a final policymaker for Melrose Park, retaliated agaisnt Scatchell Sr. for exercising his rights under Title VII, by signing a Declaration on behalf of Lavalais, supporting Lavalais' position opposing the residency order, supporting Lavalais' grievance, holding union meetings about the grievance, voting to arbitrate Lavalais' residency issue, and potentially testifying at Lavalais' arbitration, all through either his own actions or those of his daughter, Gianna Scatchell, on his and the FOP's behalf.

164.    When Scatchell Sr. refused to back down, he was retaliated against as described herein, including by revocation of an appointment to Deputy Chief, transfer and constructive demotion to Station Supervisor, through a third-party reprisal, *to wit*, investigation, charging, and termination of his son, Scatchell, Jr., and the other adverse actions outlined herein.

165.    That the retaliation against Plaintiff was part of systemic express acts espoused by the Village, through Serpico as a final policymaker, to punish officer Scatchell Sr.. for exercising his First Amendment rights and taking positions "adverse to the Village" as described throughout this Complaint.

166.    That as a result of employing the foregoing express acts espoused by Melrose Park through Serpico, a final policymaker, to retaliate against Plaintiff, Plaintiff suffered harm including, without limitation, substantial loss of income and benefits, loss of earnings potential, loss of enjoyment of life, and severe emotional distress.

WHEREFORE, for the foregoing reasons, Plaintiff requests that this Court enter judgment in his favor and against Defendants in an amount to be proved at trial, including for lost pay and benefits, general compensatory, special, consequential damages, for emotional distress and reputational harm, for attorneys' fees under 42 U.S.C. § 1988, as well as order Melrose Park, Illinois to reinstate Plaintiff to his position and benefits with full make-whole relief, and for all such other relief to which he is entitled and the Court deems just and proper.

## COUNT IV –42 U.S.C. § 1983 *CONSPIRACY* TO DEPRIVE OF FIRST AMENDMENT RIGHTS
### Plaintiff v. All Individual Defendants

167.    The Plaintiff realleges all other paragraphs of this First Amended Complaint and incorporates them by reference as if fully set forth herein.

168.　　On information and belief, defendants Serpico, Pitassi, Castellan, and Rogowski reached a mutual understanding to commit acts in retaliation against Scatchell, Sr. for his perceived opposition. In furtherance of that agreement, Defendants conspired to retaliate and embarrass Plaintiff Scatchell, Sr. and then to target his son, Scatchell, Jr. for termination.

169.　　The object of the conspiracy was to retaliate against Scatchell, Sr. for his support of Lavalais throughout the residency order, grievance, and arbitration by committing numerous adverse actions against Scatchell, Sr., and his son as part of a third-party reprisal against Scatchell, Sr. *See Thompson v. North American Stainless, LP*, 131 S.Ct. 863, 867-868 (2011) ("We think it obvious that a reasonable worker might be dissuaded from engaging in protected activity if she knew that her fiancé would be fired"); *Zamora v. City of Houston*, 798 F.3d 326 (5th Cir. 2015) (City retaliated against a police officer after his father sued the City of EEO violations).

170.　　Plaintiff was deprived of his First Amendment constitutional rights in the manner described in the preceding paragraphs, including the right to speak and associate freely on matters of public concern, such as opposition to race discrimination or disruption of an affirmative action plan intended to promote diversity on a police force.

171.　　That in furtherance of the conspiracy, Defendants committed overt acts in retaliation against Plaintiff for his protected and oppositional conduct relative to Lavalais, including by depriving him of a promotion to Deputy Chief, transferring him and constructively demoting him to station supervisor, investigating, charging, and terminating his son, John Scatchell, Jr., failing to meaningfully investigate dynamite thrown at Scatchell's residence, constructively terminating him, and the other adverse actions included above.

172.    That the misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

173.    As a result of the aforementioned deprivation of federal rights, Plaintiff has suffered injuries including, but not limited to, lost pay and benefits, a lost promotion, reputation damage, and emotional distress.

WHEREFORE, for the foregoing reasons, Plaintiff requests that this Court enter judgment in his favor and against Defendants in an amount to be proved at trial, including for lost pay and benefits, general compensatory, special, consequential damages, emotional distress and reputational harm, for attorneys' fees under 42 U.S.C. § 1988, as well as order Melrose Park, Illinois to reinstate Plaintiff to his position with full back pay and benefits and with full make-whole relief, and for all such other relief to which he is entitled and the Court deems just and proper.

### COUNT V – TITLE VII VIOLATION, 42 U.S.C. § 2000e(3)(a)
### BASED ON RETALIATION
Plaintiff v. Village of Melrose Park, Illinois

174.    The Plaintiff realleges all other paragraphs of this First Amended Complaint and incorporates them by reference as if fully set forth herein.

175.    At all times relevant, Defendant Village of Melrose Park, Illinois has been an Employer within the meaning of Title VII of the Civil Rights Act, 42 U.S.C. 2000e, *et seq.*, in that it has been in an industry affecting commerce employing fifteen or more employees for each working day for each of twenty or more calendar weeks in the year prior to this Complaint being filed.

176.    At all times relevant, Plaintiff John Scatchell, Sr. has been an employee within the meaning of Title VII and an employee of the Village of Melrose Park, Illinois.

40

177.    At all times relevant, Plaintiff John Scatchell, Sr. engaged in conduct protected by Title VII, including, but not limited to, opposing unlawful and discriminatory practices toward the Village of Melrose Park, Illinois' only African-American police sergeant, *to wit*, Kyll Lavalais.

178.    Plaintiff John Scatchell, Sr. has suffered a severe and/or pervasive hostile work environment by his actions in support of the sole African-American police sergeant as stated in the other paragraphs and Counts of this First Amended Complaint, including by transferring him to station supervisor and removing all officers from his command, offering him and then retracting a promotion to Deputy Chief, investigating, charging, and terminating his son, John Scatchell, Jr., based on trumped-up, false, discriminatory, and selectively-targeted allegations, and failing to properly and meaningfully investigate Scatchell's allegations that dynamite was thrown at his personal residence.

179.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff John Scatchell, Sr. has suffered economic and non-economic damages, including lost pay, benefits, promotional opportunities, reputational damage, emotional distress, and general compensatory damages, all as a result of Defendant Village of Melrose Park's unlawful actions.

WHEREFORE, for the foregoing reasons, Plaintiff John Scatchell, Sr. requests that this Court enter judgment in his favor and against Defendant Village of Melrose Park, Illinois in an amount to be proved at trial, including for lost pay and benefits, compensatory damages up to and including $300,000, for emotional distress and reputation harms, and order Melrose Park to reinstate John Scatchell, Sr. to his position and benefits with full make-whole relief, and for all such other relief to which he is entitled and the Court deems just and proper.

### COUNT VI – INDEMNIFICATION AGAINST VILLAGE OF MELROSE PARK, ILLINOIS
Plaintiff v. Defendant Village of Melrose Park, Illinois

**180.** The Plaintiff realleges all other paragraphs of this First Amended Complaint and incorporates them by reference as if fully set forth herein.

**181.** As a municipality, the Village of Melrose Park, Illinois has indemnification obligations for wrongful acts committed by its officials, employees, and agents, including, here, the individual Defendants. See 745 ILCS §§ 10/1-202 and 9-102.

**182.** The Village is responsible for the challenged actions of the individual Defendants and the Village as a result of such indemnification obligations.

**183.** In addition, the Village's insurance coverage for this case was denied in *U.S. Insurance Co. v. Village of Melrose Park, Illinois, et al.*, 19-cv-05232 (J. Ellis, Memo. Op. and Order., April 21, 2020).

WHEREFORE, for the foregoing reasons, Plaintiff requests that this Court enter judgment in his favor and against Defendants and order Defendant Village of Melrose Park, Illinois to pay judgments entered and to indemnify the individual Defendants for judgments entered against them, and for such other relief as this Court deems proper.

## JURY TRIAL DEMAND

Plaintiff hereby requests a trial by jury on all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, JOHN SCATCHELL, SR., prays that this Honorable Court:

**A.** Conduct a mediated settlement conference or to refer the case to its court-annexed mediation program to assist the parties to bring about a settlement of this case;

**B.** Enter judgment in the Plaintiff's favor and against Defendants;

**C.** Order affirmative relief necessary to eradicate the effects of the Defendants' unlawful employment practices;

**D.** Award the Plaintiff actual damages suffered to the extent permissible by law to compensate the Plaintiff for injuries and losses caused by Defendants' conduct;

**E.** Award the Plaintiff compensatory damages to the extent permissible by law to compensate the Plaintiff for injuries and losses caused by Defendants' conduct;

**F.** Award Plaintiff punitive and/or exemplary damages to the extent permissible by law against the individual defendants only;

**G.** Award the Plaintiff prejudgment interest on these damages; and,

**H.** Grant such further relief as the Court deems necessary and proper under the circumstances.

Respectfully submitted,

LAW OFFICES OF GIANNA SCATCHELL

By: /s/ Gianna R. Scatchell

Gianna R. Scatchell

Gianna R. Scatchell ARDC No. 6300771
LAW OFFICES OF GIANNA SCATCHELL
Attorney for Plaintiffs
360 W. Hubbard Street, 1404
Chicago, Illinois 60654
(312) 248-3303
gia@lawfirm.gs

Respectfully submitted,

By: /s/ Cass T. Casper

Cass T. Casper

Cass T. Casper, ARDC No. 6303022
TALON LAW, LLC
Attorney for Plaintiffs
105 West Madison Street, Suite 1350
Chicago, Illinois 60602

43

(312) 351-2478
ctc@talonlaw.com

44