# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JOHN SCATCHELL, Sr., | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  18-cv-3989 |
| | ) | |
| v. | ) | Honorable John F. Kness |
| | ) | |
| VILLAGE OF MELROSE PARK, RONALD M. | ) | Honorable Jeffrey Cummings |
| SERPICO, SAM C. PITASSI, MICHAEL | ) | |
| CASTELLAN, and STEVE ROGOWSKI, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

## DEFENDANTS' PITASSI, CASTELLAN AND ROGOWSKI'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S AMENDED COMPLAINT

NOW COMES Defendants SAM C. PITASSI, MICHAEL CASTELLAN and STEVE ROGOWSKI ("Defendants"), by and through its undersigned counsel, and for their Answer and Affirmative Defenses to Plaintiff's Amended Complaint states:

1.     Plaintiff John Scatchell, Sr. seeks redress for actions taken against him by the Defendants related to his exercise of his rights under the First Amendment (Speech and Association), his rights under 42 U.S.C. § 1981 via 42 U.S.C. § 1983, as well as for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*.

**ANSWER:**     **Defendants admit that Plaintiff seeks to maintain claims for relief under the Statutes cited in this paragraph, but deny any violations of the Statutes, deny any suggestion that Plaintiff is entitled to relief and deny the remaining allegations contained in Paragraph 1 of Plaintiff's  Amended Complaint. Answering further, Defendants deny that Plaintiff's name includes "Sr." but admits that the term is often used to differentiate Plaintiff from his son, John A. Scatchell, who is likewise often referred to as "Jr."**

2.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case arises under federal law, specifically, the First Amendment of the United States

Constitution, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*., 28 U.S.C. § 1343(a)(4), 42 U.S.C. §§ 1981, 1983, and attorneys' fees under 42 U.S.C. § 1988.

**ANSWER:** **Defendants admit this Court's jurisdiction pursuant to the cited Statutes but deny any violation of those Statutes.**

      3.      Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b). On information and belief, all Defendants reside in this judicial district, and the events giving rise to the claims asserted herein occurred within the district.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 3 of Plaintiff's Amended Complaint except Defendants deny the allegations relating to "the events giving rise to the claims asserted herein" to the extent not admitted in this Answer.**

      4.      The Plaintiff, John Scatchell, Sr. ("Scatchell, Sr." or "Lt. Scatchell") is a resident of Melrose Park. He was employed as a full-time Melrose Park Police Officer from February 15, 1985 until his retirement as a lieutenant on June 7, 2018, as part of the events underlying this Complaint.

**ANSWER:** **Defendants admit that Plaintiff, John Scatchell, is a resident of Melrose Park and was employed as a full-time Melrose Park police officer from February 15, 1985 until his retirement as a lieutenant on June 7, 2018. Defendants deny the remaining allegations in this paragraph.**

      5.      Defendant Village of Melrose Park ("Melrose", "Village", or "MP") is a municipality incorporated in the State of Illinois and the employer of the defendants. Melrose has indemnification obligations for wrongful acts committed by its officials, employees, and agents. See 745 ILCS §§ 10/1-202 and 9-102. It is responsible for the challenged actions of the individual defendants and the Village.

**ANSWER:** **Defendants admit that the Village is a municipality and employed the individual Defendants and further admit that the Village has certain indemnification obligations under 745 ILCS § 10/1-202 and 9-102 relating to the actions taken by the individual Defendants. Defendants deny the remaining allegations contained in paragraph 5.**

6.      Defendant Ronald M. Serpico ("Serpico"), is an elected official serving as Mayor of the Village of Melrose Park. He is a final policymaker for the Village of Melrose Park, Illinois. He engaged in the conduct complained of while acting under the color of law. He is sued in his individual capacity.

**ANSWER:**      **Defendants admit that Mayor Serpico is an elected official serving as Mayor of the Village of Melrose Park, and that for some issues he is a policymaker for the Village of Melrose Park. Defendant further admits that Mayor Serpico acted under color of law and within the scope of his employment as to the actions expressly admitted herein.  Defendants deny the remaining allegations contained in Paragraph 6 of Plaintiff's Amended Complaint.**

7.      Defendant Sam C. Pitassi ("Pitassi"), is the Director of Police and acted as an agent of the Village of Melrose Park. He engaged in the conduct complained of while acting under the color of law. He is sued in his individual capacity.

**ANSWER:**      **Defendants admit that Defendant Sam Pitassi is the Director of Police and acted as an agent of the Village of Melrose Park and that he acted under color of law regarding some of the actions expressly admitted herein. Defendants deny the remaining allegations contained in Paragraph 7 of Plaintiff's Amended Complaint.**

8.      Defendant Michael Castellan ("Castellan") is one of two Melrose Park Deputy Chiefs of Police and acted as an agent of the Village. He engaged in the conduct complained of while acting under the color of law. He is sued in his individual capacity.

**ANSWER:**      **Defendants admit that Defendant Michael Castellan (who is now retired) was one of two Melrose Park Deputy Chiefs of Police and sometimes acted as an agent of the Village and that he acted under color of law regarding some of the actions expressly admitted herein.  Defendants deny the remaining allegations contained in Paragraph 8 of Plaintiff's Amended Complaint.**

9.      Defendant Steve Rogowski ("Rogowski") is one of two Melrose Park Deputy Chiefs of Police and acted as an agent of the Village. He engaged in the conduct complained of while acting under the color of law. He is sued in his individual capacity.

**ANSWER:**      **Defendants admit that Defendant Steve Rogowski is one of two Melrose Park Deputy Chiefs of Police and sometimes acted as an agent of the Village and**

**that he acted under color of law regarding some of the actions expressly admitted herein. Defendants deny the remaining allegations contained in Paragraph 9 of Plaintiff's Amended Complaint.**

10. All administrative remedies for purposes of the Title VII claim have been exhausted. All conditions precedent to the institution of this lawsuit have been fulfilled including receipt of the right-to-sue letter issued by the EEOC on March 9, 2018. A copy of the Right to Sue letter is attached hereto as Exhibit A.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 10 of Plaintiff's Amended Complaint.**

11. Plaintiff's family has been a pillar of the Melrose Park community, having dedicated over 100 years serving the Village through a long line of public servants since 1960. This tradition of public service began with Scatchell, Sr.'s father-in-law who served as a firefighter and rose through the ranks as the fire chief until his retirement in 1997. Scatchell Sr.'s brothers-in-law, numerous relatives, and close family friends have devoted themselves to the safety and protection of Melrose Park by serving on both the fire and police departments.

**ANSWER:** **Defendants admit that Plaintiff and some of his family members have served the Village for many years, Plaintiff's father-in-law served as a firefighter and rose through the ranks to become the fire chief until his retirement in 1997 and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 11 of Plaintiff's Amended Complaint.**

12. Scatchell, Sr. was employed by the Melrose Park Police Department for over 33 years. He performed his job duties as a police officer with skill, competence, and professionalism.

**ANSWER:** **Defendants admit that Plaintiff was employed by the Melrose Park Police Department for over 33 years and that he usually performed his job duties as a police officer with skill, competence and professionalism, and deny the remaining allegations contained in Paragraph 12 of Plaintiff's Amended Complaint.**

13. Scatchell, Sr. also served as the President of the Fraternal Order of Police, Lodge 19 ("FOP"), MPPD's exclusive bargaining agent, from approximately 2008 to 2017.

**ANSWER:**     **Defendants admit that Scatchell served as the president of the Fraternal Order of Police, Lodge 19, MPPD's exclusive bargaining agent, but lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 13 of Plaintiff's Amended Complaint.**

14.     Melrose requires its police officers, firefighters, and other employees to live within Village limits unless the employee is exempt pursuant to MP Ordinance §2.52.090.

**ANSWER:**     **Defendants admit that the Village requires its police officers to live within Village limits pursuant to the terms of a CBA between the Village and the FOP, admits that firefighters and other employees and required to live within the Village limits unless an employee is exempted pursuant to Village Ordinance § 2.52.090, and deny the remaining allegations in this paragraph.**

15.     On or about May 1, 2016, Melrose selectively enforced its residency requirement by requiring Kyll Lavalais ("Lavalais"), the only fill-time [sic] African American officer at VMP PD, to move back into Melrose Park, even though he was originally hired under an affirmative action plan that, as an African American, allowed him to live outside of Melrose Park.

**ANSWER:**     **Defendants admit that on September 1, 2016, the Village issued an Order to Lavalais to reestablish residency within the Village, pursuant to the CBA, within one year, and admit further that at that time, Lavalais was the only full-time African American officer at VMP PD, and admit further that at the time Lavalais was hired there was a Consent Decree in effect, but the Village denies the remaining allegations contained in Paragraph 15 of Plaintiff's Amended Complaint.**

16.     VMP's order requiring Lavalais to reestablish residency had an adverse impact on the diversity of the VMP police force in that it required the only African-American full-time VMP officer, Lavalais, who was hired under an affirmative action plan, to relocate his residency within the Village limits, causing him personal hardship and undermining the affirmative action and diversity purpose behind his hiring.

**ANSWER:**     **Defendants admit that on September 1, 2016, the Village issued an Order to Lavalais to reestablish residency within the Village, pursuant to the CBA, within one year, and deny the remaining allegations contained in Paragraph 16 of Plaintiff's Amended Complaint.**

17.     Lavalais filed a union grievance over the residency order, and, on or about October

1, 2016, as president of the FOP, Scatchell, Sr., received Lavalais' request to arbitrate the residency

issue in his grievance.

**ANSWER:     Defendants admit that Lavalais submitted a grievance regarding the order to
reestablish residency within one year, but the Village lacks knowledge or
information sufficient to form a belief as to the truth of the remaining
allegations contained in Paragraph 17 of Plaintiff's Amended Complaint.**

18.     On or about October 30, 2016, the FOP retained an attorney, Gianna Scatchell, for

guidance on Lavalais' grievances and pending disciplinary matter.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the
truth of the allegations contained in Paragraph 18 of Plaintiff's Amended
Complaint.**

19.     Gianna Scatchell is the Plaintiff's daughter, a fact which was at all times known

to Mayor Serpico, and Defendants Pitassi, Castellan, and Rogowski.

**ANSWER:     Defendants admit the allegations contained in Paragraph 19 of Plaintiff's
Amended Complaint.**

20.     On or about November 10, 2016, Scatchell, Sr., for the FOP, took the position that

the FOP opposed the order requiring Lavalais to reestablish residency, and that it would

contemplate arbitration of Lavalais' grievance due to the hardship caused by the residency order

on the VMP's police force's sole full-time African-American officer, Lavalais, and because the

residency requirement was being inconsistently and disparately enforced, particularly as to the

sole black officer.

**ANSWER:     Defendants deny the allegations contained in Paragraph 20 of Plaintiff's
Amended Complaint.**

21.      Scatchell took the foregoing position verbally to Pitassi in Pitassi's office after

receiving Lavalais' grievance, and also through his attorney and daughter, Gianna Scatchell, in

her November 10, 2016 letter to Village attorneys Jeffrey Fowler and James Vasselli.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 21 of Plaintiff's Amended Complaint.**

22. Vasselli and Fowler subsequently advised Serpico, Castellan, Rogowski, and Pitassi of Scatchell's and the FOP's position on the grievance.

**ANSWER:** **Defendants object to the allegations in this paragraph as seeking to invade the attorney/client privilege. Answering further, and without waiving any privilege as to any communications, Defendants deny the allegations in this paragraph.**

23. Pitassi was also aware of Scatchell's opposition to the Lavalais order and his support of the grievance and arbitration through Scatchell's in-person meeting with him about it.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 23 of Plaintiff's Amended Complaint.**

24. All of the individual Defendants were also made aware of Scatchell's support of Lavalais because of FOP meetings regarding Lavalais' grievance and arbitration that were held at the station, postings about such meetings on station bulletin boards, through talk at the station, and through Lieutenant DiMaio, who vigorously opposed the grievance and arbitration.

**ANSWER:** **Defendants deny the contained in Paragraph 24 of Plaintiff's Amended Complaint.**

25. On November 11, 2016, the day after Gianna Scatchell sent her letter to the Village's attorneys expressing Scatchell's and the FOP's position in support of Lavalais, Melrose distributed its bi-monthly Village meeting agenda, which included a surprise promotion: "*Lt. Scatchell will be promoted to deputy chief until 01/15/2017.*"

**ANSWER:** **Defendants deny the allegation that Gianna Scatchell's November 10, 2016 email (not letter) expressed Plaintiff's or the FOP's position in support of Lavalais and deny that the allegation has accurately quoted the language in the meeting agenda, but admit the remaining allegations contained in Paragraph 25 of Plaintiff's Amended Complaint.**

26. Scatchell, Sr. was out of town when this promotion was announced. He learned about this promotion from people who had seen the agenda and called to congratulate him.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26 of Plaintiff's Amended Complaint.**

27.     None of the Melrose administrators called Scatchell, Sr. to tell him about his promotion.

**ANSWER:** **Defendants admit that they did not call Scatchell to tell him about his promotion and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 27 of Plaintiff's Amended Complaint.**

28.     On November 11, 2016, Gianna Scatchell called Melrose Park attorney, James Vasselli ("Vasselli"), to learn about Scatchell's promotion to Deputy Chief, and during that conversation Vasselli stated that the "01/15/2017" date was a typo and that the promotion would be through the end of Serpico's next term.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28 of Plaintiff's Amended Complaint.**

29.     Later in the day on November 11, 2016, Melrose posted a Revised Agenda that removed the January 15, 2017 "typo" to read: *Lt. Scatchell will be promoted to deputy chief.*

**ANSWER:** **Defendants admit that on November 10, 2016, a corrected Agenda was posted containing the statement, "Lieutenant John Scatchell to Deputy Chief" and omitting the words, "until January 15, 2017", but deny the remaining allegations contained in Paragraph 29 of Plaintiff's Amended Complaint.**

30.     Based upon a long history of similar conduct, John Scatchell surmised that the promotion was designed to entice Scatchell Sr. to oppose Lavalais' grievance going to arbitration.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 30 of Plaintiff's Amended Complaint.**

31.     The FOP and Scatchell did not drop its support of Lavalais' grievance going to arbitration and otherwise to entice Scatchell to drop support of Lavalais' opposition, even in light of the anticipated promotion of John Scatchell, Sr.

**ANSWER:**   **Defendants deny the allegations in this paragraph because at that point the FOP had not determined that it would support Lavalais' grievance going to arbitration, and because Scatchell testified in his deposition that he remained neutral on the grievance and arbitration.**

32.     On November 14, 2016, Vasselli contacted Gianna Scatchell to advise her that the promotion would be tabled later that day, even though the meeting had not yet occurred nor did the vote on tabling it yet occur.

**ANSWER:**   **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 32 of Plaintiff's Amended Complaint.**

33.     At Village Board Meeting on November 14, 2016, Mayor Serpico, without any justification or explanation, moved to "table Lt. John Scatchell's promotion." The Motion carried, and Lt. Scatchell's Sr.'s promotion was tabled.

**ANSWER:**   **Defendants admit that the promotion was tabled without an explanation being given, but denies the remaining allegations contained in Paragraph 33 of Plaintiff's Amended Complaint.**

34.     In at least ten years of Village Board meetings, there was not one Village Trustee who has ever voted against a single ordinance, resolution, or proclamation proposed by Serpico, making the democratic process a sham.

**ANSWER:**   **Defendants deny the allegations contained in Paragraph 34 of Plaintiff's Amended Complaint.**

35.     Serpico tabled the promotion to retaliate against Scatchell, Sr. for his positions perceived as "adverse" to the Village, to wit, advocating for Lavalais, supporting Lavalais' grievance, opposing the Village's order requiring the sole African-American officer (Lavalais) to reestablish residency, and supporting the grievance and the arbitration.

**ANSWER:**   **Defendants deny the allegations contained in Paragraph 35 of Plaintiff's Amended Complaint.**

36.     Under the current Melrose Park regime, a culture of disparate treatment and ad hoc policymaking has flourished at the Melrose Park Police Department ("MPPD"). On the one hand, MPPD's Brass trivializes or ignores certain rule violations and even criminal misconduct when favored personnel are involved. On the other hand, other officers have falsified intra-departmental correspondence and created rules after the fact to punish lower-ranking or disfavored personnel.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 36 of Plaintiff's Amended Complaint.**

37.     On or about November 2016, Scatchell, Sr. found himself in the latter category after he allegedly took "two adverse positions against the Village of Melrose Park" as explained below.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 37 of Plaintiff's Amended Complaint.**

38.     On November 22, 2016, Village Attorney, Michael DelGaldo confirmed the retaliatory motive:

> [you] the purported attorney for the FOP, have [sic] taken ***an adverse position*** to the village and ***have twice threatened suit*** against the Village over ***two separate matters***. (emphasis added)

**ANSWER:** **Defendants admit that on or about November 22, 2016, Village Attorney, Michael Del Galdo, sent an email to Gianna Scatchell containing the quoted text because her conduct was inconsistent with her role as having been retained by the FOP for legal work, but deny any suggestion that the email was directed to the Plaintiff and deny all of the remaining allegations in this paragraph suggesting that the email evidenced a retaliatory motive.**

39.     Scatchell, Sr. refused to back down from the FOP's position, which triggered an ongoing campaign of harassment from the Defendants.

**ANSWER:** **Defendants deny the allegations in this paragraph since Plaintiff testified in his deposition that he had not taken a position at that time and therefore there was no basis for him to "back down" from a position.**

40.     On information and belief, following these two "adverse actions", defendants Serpico, Pitassi, Castellan, Rogowski, and others agreed to retaliate against Scatchell and others for his position, preparing a verbal hit list of Village employees who were to suffer adverse employment actions as punishment for their actual or perceived support of Scatchell, Sr.

**ANSWER:     Defendants deny the allegations contained in Paragraph 40 of Plaintiff's Amended Complaint.**

41.     On or about November 24 or 25, 2016, Melrose distributed its bi-weekly agenda for the November 28, 2016 board meeting.

**ANSWER:     Defendants admit the allegations contained in Paragraph 41 of Plaintiff's Amended Complaint.**

42.     The stated that Rogowski would be promoted to deputy chief instead of Scatchell, Sr.

**ANSWER:     Defendants admit that the Agenda for the Board's November 28, 2016 meeting indicated "Lieutenant Steve Rogowski Promoted to Deputy Chief" and denies the remaining allegations in this paragraph.**

43.     Melrose promoted Rogowski even though Scatchell, Sr. ranked the third highest in seniority on the MPPD; his promotion was still "tabled"; and Melrose's 2017 Budget allocated funds for one (1) deputy chief in addition to the existing deputy chief.

**ANSWER:     Defendants admit that Rogowski was promoted to Deputy Chief based upon his qualifications for the position, admit that promotion to Deputy Chief is not made based on seniority, that Plaintiff ranked third highest in seniority on the MPPD at that time (although Rogowski had more seniority as a Lieutenant) and that as of November 28, 2016, the issue of Plaintiff's promotion to Deputy Chief remained tabled from the November 14, 2016 Board Meeting and that the 2017 budget as of that time allowed for two deputy chiefs.**

44. Rogowski was improperly appointed to the position because the Village never fulfilled the condition precedent, that is, selection and approval for such appointment to Deputy Chief by the Personnel Board.[1]

**ANSWER:** **Defendants deny the allegations in this paragraph but lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the footnote to Paragraph 44 of Plaintiff's Amended Complaint because Plaintiff does not provide a citation to the source of the statement.**

45. No other Melrose employee has been placed on the Agenda to receive a promotion only to have that promotion "tabled" and then subsequently passed up, as happened with Scatchell without any explanation or justification.

**ANSWER:** **Defendants deny the allegation in paragraph 45 of Plaintiff's Amended Complaint.**

46. On November 29, 2016, the FOP filed its demand for arbitration on behalf of Lavalais.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 46 of Plaintiff's Amended Complaint.**

47. On December 8, 2016, FOP Lodge 19 held its annual election, and Scatchell, Sr. lost the election to Raul Rodriguez ("Rodriguez"). Many of the new FOP Board members and supporters became hostile to Scatchell after he supported Lavalais' arbitration and lost the election.

**ANSWER:** **Defendants admit that Raul Rodriguez was elected FOP Lodge 19 president at its annual election on or about December 8, 2016 but lack knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 47 of Plaintiff's Amended Complaint.**

48. On December 16, 2016, a patrol officer on Scatchell, Sr.'s shift left Roll Call without permission. The following text exchange between the Officer and Scatchell ensued:

Officer:     *I feel like shit I'm going home*

---

[1]  [A]ll members of the police department ... shall be officers of the village and shall be appointed by the board of fire and police commissioners of the village. The appointments shall be concurred in by the president and board of trustees, voting jointly.

> Scatchell, Sr. O*k next time wait for me to come in do not walk out of roll call!*
> Officer: *I'll respect when I get respect.*
> Scatchell, Sr. *Walk out of my roll call again, and you will be in the station until further notice.*
> Officer *Shut the fuck up*
> Scatchell, Sr. *Really you could write a to/from to that then, or meet me in the Chiefs [sic] office in the morning.*

**ANSWER:** **Defendants admit that the statements listed in this paragraph were a portion of the text exchange between the officer and Plaintiff but deny that this was accurately quoted or complete.**

49. Said officer never complied with the direct order to write a to/from memorandum.

**ANSWER:** **Defendants admit that the officer did not write a to/from memorandum because the referenced text exchange did not contain a direct order requiring compliance and because any potential compliance with such an order was excused because the officer immediately thereafter began an authorized FMLA leave.**

50. Scatchell, Sr. wrote a to/from to Deputy Chief Castellan explaining the insubordination.

**ANSWER:** **Defendants admit that Deputy Chief Castellan received a "to/from" from "Lieutenant Joseph Urso #5/Lieutenant John Scatchell #7" relating to the officer's alleged insubordination and denies the remaining allegations in this paragraph.**

51. Castellan responded to Scatchell, Sr.'s to/from that the officer would not be disciplined or investigated, despite that the aforementioned conduct demonstrated gross insubordination and rule and policy violations. The case was closed without any further action taken, despite Scatchell's requsts [sic].

**ANSWER:** **Defendants deny the allegation that the officer's conduct demonstrated gross insubordination but admit that the officer was not punished for the incident because he immediately commenced a terminal FMLA leave. Defendants deny the remaining allegations in this paragraph.**

52. On December 16, 2016, at or about 2:30 a.m., someone threw three 1/4 sticks of dynamite at Scatchell, Sr.'s house near three vehicles on his driveway.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 46 of Plaintiff's Amended Complaint.**

53.     Scatchell, Sr. called the Melrose Park Police Department to report this crime.

**ANSWER:** **Defendants admit that Lt. Scatchell called the Melrose Park Police Department to report fireworks but denies the remaining allegations contained in Paragraph 53 of Plaintiff's Amended Complaint.**

54.     Scatchell, Sr. discovered that some of the newly-elected FOP Board and other off-duty officers were attending a party a couple blocks from Scatchell, Sr.'s house.

**ANSWER:** **Defendant lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

55.     The responding police officer, Cacciatore went to that off-duty officer's residence to see if anyone had seen or heard anything. That produced negative results.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 55 of Plaintiffs' Amended Complaint.**

56.     Shortly after that, the off-duty officer called Cacciatore and threatened him by stating:

> Who the fuck are you to come ring my doorbell at my house? You come to my house again you motherfucker and I'll destroy you" ... "you ring my doorbell again and I will come after you with everything I have and you can bring John [Scatchell, Sr.] with you

**ANSWER:** **Defendants admit that the off-duty officer called Cacciatore and accused Cacciatore of harassing him, and that the officer's statements included the quoted text, that the incident was investigated, and the officer was thereafter disciplined for making the referenced statements.**

57.     Rogowski deviated from policy by failing to investigate the incident thoroughly and objectively as illustrated below:

a)      No additional watches were put on Scatchell, Sr.'s house (as is customary with any threats to officer safety);

b)      Administratively locked the two reports so that no one could access them;

c)      Never interviewed the complaining witnesses, such as Scatchell Sr.'s wife or his son, John Scatchell, Jr., nor the person who reported the explosion to 911, Panzini;

d)      Never inspected or collected the dynamite fragments found on the property;

> e)  Never responded to Scatchell, Sr.'s text messages;
>
> f)  Never interviewed neighbors who were present the same night and heard the explosion;
>
> g)  Took no blast or gunpowder residue off of Scatchell's driveway or neighboring lawn;
>
> h)  Several days after the explosion, Rogowski emailed Scatchell, Sr. that he closed the matter due to insufficient evidence.

**ANSWER:**   **Defendants deny each of the allegations contained in Paragraph 57 of Plaintiff's Amended Complaint.**

58.  On January 8, 2017, the FOP filed its revised demand for arbitration on behalf of Lavalais.

**ANSWER:**   **Defendants admit that on or about January 8, 2017, Gianna Scatchell apparently submitted an arbitration demand on behalf of Lavalais and the FOP to the American Arbitration Association; the Village was thereafter notified of the arbitration demand on January 18, 2017, and Defendants deny the remaining allegations in this paragraph.**

59.  On or about January 10. 2017, the new FOP Board was sworn in.

**ANSWER:**   **Defendants admit the allegations contained in Paragraph 59 of Plaintiff's Amended Complaint.**

60.  The new FOP board deviated from its established protocol by, before even being sworn in, proposing, voting, and acting on new business: namely, to terminate Ms. Scatchell as the FOP attorney, to hire a new attorney, and to withdraw Lavalais' demand for arbitration and end his grievance.

**ANSWER:**   **Defendants admit that at some point after January 10, 2017, the FOP withdrew the arbitration demand because it determined that Lavalais' grievance lacked any merit, but Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 60 of Plaintiff's Amended Complaint.**

61.  Rodriguez said that he terminated Ms. Scatchell because of "differences with her father."

**ANSWER:**   **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 61 of Plaintiff's Amended Complaint.**

62.     On or about April 15, 2017, Scatchell, Sr. attended a Melrose Park Pension Board meeting and opposed the Board's directive to allow Peter Caira, a lateral transfer, to transfer his pension to the MPPD's pension.  Scatchell, Sr. opposed this pension transfer because MPPD's pension is less than 30% funded.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 62 of Plaintiff's Amended Complaint.**

63.     Two weeks later, on or about April 26, 2017, Scatchell, Sr. was notified that he would be involuntarily transferred from "Shift Supervisor" to "Station Supervisor," resulting in him losing direct command of all subordinate officers that were under his supervisions as Shift Supervisor.

**ANSWER:** **Defendants admit that on or about May 1, 2017, Scatchell was sent a memo stating among other things that "effective May 8, 2017, you will [sic] assigned to 4-12 shift Station Supervisor, and deny the remaining allegations contained in Paragraph 63 of Plaintiff's Amended Complaint.**

64.     Pitassi notified Scatchell, Sr.of his ˉAssignment Change" in a letter that said:

*Effective May 8, 2017, you will [sic] assigned to 4-12 shift station supervisor. Your duties will be outlined at a later date. Your days off are Saturday and Sunday and will receive holidays off.*

**ANSWER:** **Defendants admit the allegations contained in Paragraph 64 of Plaintiff's Amended Complaint.**

65.     Unsolicited assignment transfers rarely, if ever, occur mid-shift without some extenuating circumstance.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 65 of Plaintiff's Amended Complaint.**

66.     When Scatchell asked why he was being transferred, Pitassi responded that "Mayor Serpico ordered it".

**ANSWER:** **Defendants deny the allegations contained in Paragraph 66 of Plaintiff's Amended Complaint.**

67.     Defendants significantly diminished and restricted Scatchell, Sr.'s job responsibilities and retaliated against him by:

a)     Transferring Scatchell, Sr., mid-shift, to a permanent 4-12 shift with no defined scope, no budget, and no opportunity for overtime and no opportunity for career advancement.

b)     Moving him from a shared office with other supervisors to an unfavorable location—a secluded office known among MPPD officers as "the hole."[2] The walls were filthy, and the ceiling tiles were missing. There were no blinds on the windows for weeks. Scatchell, Sr. washed the walls and paid for and installed blinds on the windows out of his own pocket despite that he requested that the Village reimburse him.

c)     Excluding Scatchell, Sr. from supervisor meetings to preclude him from being involved in policy discussions about department operations. Rogowski and/or Castellan scheduled such meetings.

d)     Diminishing Scatchell Sr.'s standing as a senior staff member and contributing to a loss of responsibilities (he went from supervising 15 officers to zero (0) officers).

e)     Depriving Scatchell, Sr. of proper resources, making it difficult to produce deliverables. For instance, Pitassi ignored or denied several building code violations and repairs that Scatchell, Sr. reported.

f)     Cutting off his access to administrative support services. Scatchell, Sr. lost access to the office computer and the Internet. On various occasions, he informed the IT staff, but his requests were ignored.

g)     Castellan boasting to other officers that Scatchell, Sr. has been "demoted, sentenced to the 'hole' and stripped of all his responsibilities."

h)     Scrutinizing Scatchell, Sr.'s work, and attendance more closely than other officers and without justification. Pitassi even warned him that the "eyes of Texas were on him."

i)     Ordering Scatchell, Sr. to remain in the office, while the daytime station supervisor freely came and went from the office and continued to respond to police calls. Scatchell, Sr. risked discipline if he did the same.

**<u>ANSWER:</u>     Defendants deny the allegations contained in Paragraph 67 of Plaintiff's Amended Complaint.**

68.     This reassignment was a step backwards for Scatchell Sr. professionally because it is a non-supervisory role with non-substantive duties.

**<u>ANSWER:</u>     Defendants deny the allegations contained in Paragraph 68 of Plaintiff's Amended Complaint.**

69.     Pitassi provided him no scope, no job description, no budget and no legitimate work assignments.

---

[2] The "hole" is where the MPPD Brass put supervisors who fall out of favor with them as punishment.

**ANSWER:**     **Defendants admit that Pitassi did not provide Plaintiff with a specific job description or budget for the Station Supervisor role at that time and deny the allegations contained in Paragraph 69 of Plaintiff's Amended Complaint.**

70.     Pitassi initially intended to have Scatchell, Sr. audit clothing overages for sworn officers, a job that was previously performed by non-sworn, civilian personnel, and barely involved enough work to fill a single shift, much less a full time position. However, Scatchell was never actually tasked with even this assignment by Pitassi.

**ANSWER:**     **Defendants admit that one of Plaintiff's initial responsibilities was managing uniform allowances. Those responsibilities were previously performed by prior sworn station supervisors and non-sworn civilian employees. Defendants deny the remaining allegations in this paragraph.**

71.     Scatchell, Sr. was effectively on "house arrest" in retaliation for having "taken adverse positions" to Melrose.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 71 of Plaintiff's Amended Complaint.**

72.     Scatchell, Sr. remained in this position until he retired in June 2018 as a result of the ongoing hostile retaliatory work environment.

**ANSWER:**     **Defendants deny the allegations of any ongoing hostile retaliatory work environment but admits the remaining allegations contained in Paragraph 72 of Plaintiff's Amended Complaint.**

73.     On August 9, 2017, Lavalais' arbitration was scheduled as a result of an agreement that Lavalais reached with the FOP in Illinois Labor Relations Board litigation against the FOP. Scatchell, Sr. was going to testify on Lavalais' behalf.

**ANSWER:**     **Defendants admit that Lavalais' arbitration was scheduled but lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 73 of Plaintiff's Amended Complaint.**

74.     On August 30, 2017, on information and belief, as retribution for taking another "position adverse to the Village" the Individual Defendants directly, personally, and in concert, attempted to pin a false case on Scatchell, Sr.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 74 of Plaintiff's Amended Complaint.**

75.     At approximately 11:25 p.m., Lt. Scatchell, Sr. was backing out of his driveway when a driver "swerved around his truck at a high rate of speed and drove up on his driveway apron and then re-entered the roadway from the parkway." A NestCam recorded the entire incident.

**ANSWER:**     **Defendants admit that a camera recorded the view of Plaintiff's driveway and street and shows Plaintiff backing into and stopping in the street, blocking the lanes, and that another vehicle passed Plaintiff's vehicle by slightly driving on the apron of Plaintiff's driveway, and Defendants admit further that the incident occurred on or about 11:25 p.m. on August 30, 2017. Defendants deny the remaining allegations contained in Paragraph 75 of Plaintiff's Amended Complaint.**

76.     Scatchell, Sr. believed that the driver was impaired, so he pulled the driver over, and requested officer assistance.

**ANSWER:**     **Defendants admit that Plaintiff pulled over a driver at about 11:25 p.m. on August 30, 2017 and requested that other officers come to the scene. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 76 of Plaintiff's Amended Complaint.**

77.     Upon arrival, two of the officers subsequently corroborated Scatchell, Sr.'s position that the driver was driving erratically, disobeying traffic signals, and talking on his phone. The driver was issued citations for the traffic infractions.

**ANSWER:**     **Defendants admit that upon arrival two other officers observed that the driver was then speaking on his phone and that the driver was issued citations for traffic citations, and deny the remaining allegations contained in Paragraph 77 of Plaintiff's Amended Complaint.**

78.     The police report was written the next day by Castellan's godchild, Anzaldi and nephew, Castellan, Jr. and the day after the citizen's complaint was filed, indicating that they wrote their reports to conform to the citizen complaint.

**ANSWER:     Defendants admit that a police report was written the next day by Ofc. Anzaldi, Officer Castellan is Deputy Chief Castellan's nephew, a citizen's complaint was received on August 31, 2017, relating to Plaintiff's conduct, and Defendants deny the remaining allegations in this paragraph.**

79.     On or about September 1, 2017, the driver's parents Emailed Mayor Serpico to complain about Scatchell, Sr. (hereinafter "Morales Complaint").

**ANSWER:     Defendants admit the allegations contained in Paragraph 79 of Plaintiff's Amended Complaint.**

80.     On September 5, 2017, Rogowski responded to Morales' parents by attaching a blank Citizen's Complaint form to the following Email:

> Please ask your son to be as detailed as possible, such as descriptions of the involved officer(s), name(s) of the involved officer(s) if known. What was said in detail. A full description of any and all force used by the officer(s). As an example "pulled me my [sic] my right arm".
>
> You or your son can feel free to contact me on my cell phone [words blocked out] you have any questions or would like to meet with me to assist in filing the complaint.
>
> I will continue to investigate this matter but the information you may supply is crucial to me seeking corrective actions against the officer(s) if the allegations are sustained.
>
> Thank you for your help in this matter and please accept my apology that your contact with our Department resulted in a negative interaction.

**ANSWER:     Defendants admit that on September 1, 2017, Deputy Chief Rogowski wrote to Mr. Morales and the email included the quoted text but denies that this is a complete quote of the writing.**

81.     On September 18, 2017, Rogowski again deviated from protocol by offering to appear on behalf of Mr. Morales at the upcoming hearing.  Rogowski is not an attorney.

> On September 18, 2017 at 10:58 AM Steven Rogowski <srogowski@melroseparkpd.com> wrote:

Mr. Morales,

When I responded last week to your question about your son attending the hearing for the citations issued I didn't realize that the initial court date was this week. Please tell him he doesn't have to appear this Tuesday the 19th. On the Initial date the hearing officer justs [sic] assigns a trial date. I will appear on his behalf and request a hearing date. Hopefully as a result of my Investigation a hearing may not be needed. But if required I will provide the proper date.

Sorry for the misunderstanding.

Steve Rogowski

**ANSWER:** **Defendants admit that Deputy Chief Rogowski sent the referenced email to Mr. Morales on September 18, 2017, admit the text of the e-mail and that Deputy Chief Rogowski is not an attorney but deny the remaining allegations in this paragraph.**

82.     Rogowski never informed Scatchell, Sr. of the September 19, 2017 court date.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 82 of Plaintiff's Amended Complaint but note that such a notification was not necessary because the court date was printed on the traffic citations.**

83.     While Scatchell, Sr. was under an "internal investigation," the Defendants took the following actions:

   a)     Administratively locked the police reports relating to this incident;
   b)     Not informing Scatchell, Sr. he was being investigated;
   c)     Not interviewing Scatchell, Sr.;
   d)     Never reviewing the NestCam footage;
   e)     Denying several FOIA requests under the guise that the records were part an "active criminal investigation" and any disclosure would "interfere with the investigation," even though there was no basis to consider it criminal or administrative by Rogowski's own admission.

**ANSWER:** **Defendants admit the allegations in a-d but deny the characterization "administratively locked." Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph 83(e) of Plaintiff's Amended Complaint.**

84.     On September 15, 2017, Scatchell, Sr. filed a complaint with the Equal Employment Opportunity Office ("EEOC") for retaliation, but that only made things worse.

**ANSWER:** **Defendants deny the allegation that filing an EEOC charge "made matters worse" and lack knowledge or information sufficient to form a belief as to**

**the truth of the remaining allegations contained in Paragraph 84 of Plaintiff's Amended Complaint.**

85.     On or about October 25, 2017, Defendants received Scatchell, Sr.'s EEOC Charge.

**ANSWER:     Defendants deny the allegations contained in paragraph 85 of Plaintiff's Amended Complaint.**

86.     Within days of the Defendants learning about the EEOC complaint, Defendants

retaliated against Scatchell, Sr. in violation of 42 U.S.C. 2000e-3(a) in the following ways:

a)     On or about September 20, 2017, Pitassi informed Scatchell that he received two anonymous letters accusing Scatchell of a myriad of misconduct, but Pitassi stated that he shredded one of them.

b)     Defendant Pitassi was observed saying: "If they want a war, we'll give them a war." Scatchell, Sr. perceived this to be a threat.

c)     On October 26, 2017, one day after receiving the EOC Charge, Melrose Park's director of human resources called Scatchell Sr. asking if his security company would hire her brother (a convicted felon). Scatchell, Sr. does not own a security company. His cousin, John Scatchell does. On information and belief, this was another retaliatory act designed to see if Scatchell, Sr. violated the Village's secondary employment disclosure requirement.

d)     On October 26, 2017, one day after receiving the EOC Charge, two months after the Morales Incident, Rogowski launched an informal investigation against Scatchell, Sr. and requested that the officers and supervisor on scene write to/from memos. Scatchell, Sr. and Scatchell, Jr. were not asked to write one even though both were on scene.

e)     On October 26, 2017, one day after receiving the EOC Charge, Castellan's nephew, Giovanni Castellan and his godson, Robert Anzaldi, Jr. both wrote to/from memos that were completely different from the original police report that Anzaldi Jr. had written two months before. Each to/from contained new and unsubstantiated allegations.

f)     On December 11, 2017, Melrose revised its ordinances to retire police officers and firefighters at age 62 automatically if they have 30 years on.[3]

**ANSWER:     Defendants deny the allegations that Plaintiff was subjected to any retaliation or violation, and responds to the subparts of this paragraph as follows:  a) Defendants admit that Pitassi received two anonymous notes alleging misconduct relating to Plaintiff and denies the remaining allegations; b) Defendants admit that Pitassi made the quoted statement and denies the remaining allegations: c) Defendants lack knowledge sufficient to form a belief as to the truth of the remaining allegations but deny any act of**

---

[3] Ordinance No. 2190 - Amending the Melrose Park Municipal Code by Adopting § 2.60.180 and § 2.64.180 Establishing a Mandatory Retirement Age for Police Officers and Firefighters Employed by the Melrose Park.

**retaliation; d) Defendants admit that Rogowski investigated the Morales incident at Pitassi's direction, and Defendants deny the remaining allegations; e) Defendants admit that as part of Rogowski's investigation, on October 26, 2017, Ofc. Anzaldi and Ofc. Castellan wrote to/from memos elaborating on their observations from the Morales incident, and denies the remaining allegations; f) Defendants admit the allegations in this subpart and admits further that it adversely affected D/C Castellan.**

87. Scatchell, Sr. was harassed into an early retirement on or about June 7, 2018, before he was 62 years old.

**ANSWER:** **Defendants admit that Scatchell retired on June 7, 2018, before he was 62 years of age, and deny the remaining allegations in this paragraph.**

88. On July 6, 2018, Ms. Piemonte, sent Scatchell, Sr. a certified letter demanding that he return a laundry list of purported police property within 24 hours to Defendants Castellan or Pitassi or the MPPD "may pursu[e] civil charges for conversion and/or criminal charges for theft." This was an unprecedented act as some of the items were more than 10 years old.

**ANSWER:** **Defendants admit that as is customary with terminating/retiring officers, the Village sought return of the Village's property that had been assigned to Plaintiff and that Ms. Piemonte sent Plaintiff a letter dated July 6, 2018, asking that the property be returned within 24 hours, to Deputy Chief Castellan or Director Pitassi, after his receipt of the letter because Plaintiff had retired one month prior and had not returned any of the Village property during that one-month period, but Defendants deny that the text of the letter is accurately quoted in this paragraph and denies the remaining allegations in this paragraph.**

89. On November 13, 2018, approximately 18 days after Defendants received Scatchell, Sr.'s EEOC complaint, and in furtherance of their conspiracy to retaliate against Scatchell Sr. for his protected and oppositional conduct, the individual Defendants then targeted John Scatchell Jr., for an investigation based on an anonymous letter that he was abusing his sick

leave despite that Scatchell, Jr. had only been off of work for four days at the time VMP started its investigation.[4]

**ANSWER:** **Defendants admit that an investigation was initiated on November 13, 2016, by Deputy Chief Castellan, pursuant to an instruction from Director Pitassi, based upon an anonymous note by someone who expressed fear of retaliation from Plaintiff, and denies the remaining allegations contained in Paragraph 89 (including the footnote) of Plaintiff's Amended Complaint.**

90.     Castellan claimed that an anonymous officer "slid [a letter] under his office door."

**ANSWER:** **Defendants admit that an anonymous letter was slid under Castellan's office door but lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

91.     Despite the extensive camera system in the police station, Defendants never viewed the cameras to determine who the anonymous person was and the videos from that date have been destroyed.

**ANSWER:** **Defendants admit that a security camera system exists in the police station, that Defendants did not view the video to determine who put the anonymous letter under the door, and that the footage was automatically taped over after 30 days due to the system's storage capacity.**

92.     Further, the letter was unsworn and contained no dates, no times, no locations, nor any other information that would rise to a "reasonable suspicion" that Scatchell, Jr. was abusing his sick leave. More was required. *Sharud Din v. City of Chicago*, 883 F.Supp. 270, 273 (N.D. Ill. 1995); *See Anderson v. Human Rights Com'n*, 314 Ill. App. 3d 35, 42–46, 246 Ill. Dec. 843, 731 N.E.2d 371 (1st Dist. 2000) (documents should not be admitted when the witness testifying about them does not have the personal knowledge to establish a proper foundation).

---

[4] This violates the union contract, specifically, § 5.3 of the CBA, covering a police officer's use of sick leave that requires that:

> A three-panel Review Board shall oversee the application of the Sick Leave Policy ... provided that the Review Board **shall not inquire into any particular case until the officer has been on sick leave for at least one (1) month**.
> (Emphasis added)

**ANSWER:** **Defendants admit that the letter was unsworn and contained no dates or locations and denies the remaining allegations in this paragraph.**

93.     Within hours of receiving this letter, Defendants acted in concert with Caira—the officer that Scatchell Sr. opposed at the pension meeting—to give him the "full resources of the department" to carry out a 219-hour of surveillance of Scatchell, Jr. during a one-month span.

**ANSWER:** **Defendants admit that Castellan assigned Ofc. Caira to look into the allegations in the note, pursuant to Director Pitassi's instruction, and denies the remaining allegations in this paragraph.**

94.     As a full-time police officer covered by the Collective Bargaining Agreement ("CBA"), Scatchell could not be relieved from duty, suspended, discharged, or disciplined in any manner without the Village of Melrose Park having established just cause.

**ANSWER:** **Defendants admit the allegations contained in paragraph 94 of Plaintiff's Amended Complaint.**

95.     Additionally, the MPPD follows a progressive discipline approach to discipline.

**ANSWER:** **Defendants admit that for minor infractions, it follows a progressive discipline approach to discipline but deny that progressive discipline is always used or is always appropriate.**

96.     Prior to this investigation, Scatchell, Jr. had an unblemished record. Scatchell, Jr. was never warned or disciplined. In fact, the first time that Scatchell, Jr. was on notice that Defendants took issue with his behavior was when he was served with a notice of interrogation.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 96 of Plaintiff's Amended Complaint**.

97.     Scatchell, Jr.'s investigation was unlike any that had been done of any other police officer in the Village's history, that included, but was not limited to: Sending *ex parte* communications to Scatchell, Jr.'s treating physician, to "make him aware of his obligations pursuant to 430 ILCS 65/8/1(d)5" when there was no indication that he was a threat to himself or others; subjecting him to fitness-for-duty examinations; forcing him to ride with other officers

when he was medically cleared to work; improperly disclosing significant personal information (e.g. social security number, home address, phone number, and driver's license number) to third parties, including to a convicted felon; sending such sensitive information over an unencrypted network connection to non-governmental Email addresses; improperly obtaining his mother's TollPass records in an attempt to determine his location on certain dates; trivializing or ignoring his grievances; deviating from the SOP's and protocol involving Officer Involved Shooting incidents; improperly using LEADS and Soundex reports to effectuate their investigation; violating the Open Meetings Act; failing to consider mitigating evidence; failing to provide discovery pursuant to SOP 1020; failing to consider progressive discipline; engaging in disparate treatment and favoritism towards other employees but not Scatchell, Jr.; using an "anonymous letter" as the basis to investigate Scatchell, Jr., then withdrawing the only charge in the Statement of Charges that mentioned the anonymous letter; deviating from established policy and the Illinois' Uniform Peace Officers' Disciplinary Act; relying on speculation that was contrary to the undisputed evidence; misrepresenting the evidence; and investigating and seeking Scatchell, Jr.'s termination based on ginned-up, trumped-up, trivial bases that were pretextual litigation figments to justify firing him as retaliation.

**ANSWER:** **Defendants admit that every investigation is unique and depends upon the nature of the allegations and the evidence available, and admit that as the investigation developed, Ofc. Scatchell's misconduct was unlike any prior officer misconduct and much more extensive. Defendants admit further that the investigation included: obtaining toll pass records relating to the vehicle Ofc. Scatchell was using to go hunting while he was on medical leave, using LEADS information to confirm the vehicles he was using, and initiating the inquiry based upon an anonymous note. Defendants deny each of the remaining allegations in this paragraph because Plaintiff has conflated post-investigation issues into the investigation itself.**

98. Melrose spent over $200,000 of taxpayer money to prosecute these trumped up charges against Scatchell, Jr.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 98 of Plaintiff's Amended Complaint.**

99.     In addition, VMP had special audiovisual equipment installed in the Police Board hearing room especially for John Scatchell, Jr.'s hearing.

**ANSWER:**     **Defendants admit that the Village used audio/visual equipment in the Police Board hearing room because some of the evidence provided by Plaintiff were videos, and Defendants deny the remaining allegations in this paragraph.**

100.     On December 6, 2018, in complete disregard of Scatchell Jr.'s status as a full-time police officer, and the express terms of the CBA, the Board issued a final decision and order terminating Scatchell, Jr. from his position of police officer with Defendant Village.

**ANSWER:**     **Defendants admit that on December 6, 2018, after a multi-day hearing with multiple witnesses, the Board issued its final decision terminating Ofc. Scatchell's employment as a police officer with the Village and deny the remaining allegations in this paragraph.**

101.     The Board proceeding was a total sham, however, and would never have occurred but-for the other Defendants' hell-bent determination to punish Plaintiff John Scatchell, Sr. for daring to challenge them in the Lavalais residency matter. The Board proceeding was retribution upon the son of the malice Defendants at all times have harbored against the father.

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 101 of Plaintiff's Amended Complaint.**

102.     Nothing in the Statement of Charges supports the conclusion that Scatchell's "conduct constitutes some substantial shortcoming which renders his continuance and employment in some way detrimental to the discipline and efficiency of the public service and something which the law and sound public opinion recognize as good cause for him to no longer occupy his position."

**ANSWER:**     **Defendants deny the allegations contained in Paragraph 102 of Plaintiff's Amended Complaint.**

103.     Throughout Scatchell, Jr.'s proceedings at the Board of Fire and Police Commissioners, phone records show that there were substantial and repeated communications between the individual Defendants and members of the Police Board on key Scatchell, Jr. hearing dates and otherwise.

**ANSWER:**     **Defendants deny any suggestion that the Defendants had any ex parte communications with members of the Board of Fire and Police Commissioners relating to the substance of the charges against Ofc. Scatchell, and admit further that there are and have been extensive interactions between police officials and members of the Board of Fire and Police Commissioners on many issues other than officer discipline and admit the remaining allegations in this paragraph.**

104.     At all times, Plaintiff Scatchell, Jr. never distanced himself from his father's actions, never denounced his father's actions, and refused to disavow his father's right and lawful actions.

**ANSWER:**     **Defendants lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

105.     After Defendants terminated Scatchell, Jr., they have continued their retaliatory conduct in the following ways:

a)     Breaking the lock on his locker without contacting his counsel to open the lock or to be present when it was opened (no policy that he lost his expectation of privacy);

b)     Refusing to compensate Scatchell, Jr. for his vacation and comp time (MPPD officers work 2018 for 2019 vacation and comp time), despite his demand;

c)     Filing a report against Scatchell, Jr. with the Illinois Law Enforcement Training and Standards Board to prevent him from ever being hired as a police officer. Even though other police officers have been terminated, this is the first time that Defendants filed such a report. Defendants did not even wait for the decision to be "final" and appeal rights to be exhausted. 50 ILCS 705/6.2;

d)     Failing to send Scatchell, Jr. general notice or notice upon a qualifying event pursuant to Consolidated Omnibus Budget Reconciliation Act (COBRA) rights within 30 days of separation (after the January 1, 2019 deadline to get insurance coverage) and even though other police officers who were terminated received the option for COBRA coverage;

e)     Denying and/or rescinding John Scatchell, Jr. his COBRA rights entirely; and,

f)     Failing to send Scatchell, Jr. the Illinois Department of Employment Security rights within five (5) days of separation.

**ANSWER:** **Defendants deny any retaliatory conduct and answers further: a) Defendants admit that after Plaintiff's counsel repeatedly denied that the locker at issue was Plaintiff's, and when police officials could not identify any other individual who admitted using the locker, the lock was removed and the contents of the locker were inventoried in a manner to avoid any suggestion of tampering, and when the contents were determined to be Plaintiff's (despite his attorney's repeated denials that the locker was Plaintiff's), the contents were turned over to Plaintiff; b) Defendants admit that John Scatchell Jr. contested the amount of vacation and comp time and denies the remaining allegations in this subpart; c) Defendants admit that it filed a report relating to John Scatchell Jr.'s termination with the Illinois Law Enforcement Training and Standards Board as it was required to do, admits that this was the first discharge from the Police Department that required such notification and denies the remaining allegations in this subpart; d-f) admits that it did not send COBRA or IDES notices because John A. Scatchell was not eligible for COBRA or IDES benefits due to his discharge for misconduct. Defendants deny the remaining allegations in this paragraph.**

106.     Defendant Pitassi did nothing to stop the retaliation as he was required to do by Department policy. By allowing the retaliation against Scatchell, Sr. to continue unabated Director Pitassi condoned, ratified, encouraged, and agreed to the retaliation.

**ANSWER:** **Defendants deny the allegation of retaliation and therefore denies the allegations contained in Paragraph 106 of Plaintiff's Amended Complaint.**

107.     Throughout most of these key dates, Scatchell, Sr. alleges that Serpico, Pitassi, Rogowski, and Castellan engaged in extensive conversations via their personal or Village-issued cell phones in furtherance of their conspiracy.

**ANSWER:** **Defendants admit that without any basis whatsoever, Plaintiff alleges such conversations and admit that Pitassi and Rogowski had separate conversations regarding many different issues impacting the Village and the Police Department via their personal or Village issued cell phones and deny the remaining allegations in this paragraph.**

108.     Defendant VMP operates a dysfunctional disciplinary system that is flawed at all levels based on its de facto policy, practice and/or custom of concealing certain officers' misconduct.

**ANSWER:**    **Defendants deny the allegations contained in Paragraph 108 of Plaintiff's Amended Complaint.**

109.    The concealment and suppression of the existence of misconduct includes: failure to sufficiently investigate allegations of misconduct; failure to accept complaints from citizens against police officers; the failure to investigate criminal conduct where off or on duty officers are involved; failure to promptly identify or record witness statements or to preserve evidence; fabrication of exculpatory evidence or destruction of evidence; and failure to initiate prompt disciplinary procedures related to the alleged misconduct, even when the allegation of misconduct has obvious merit, and failure to properly supervise or train police officers.

**ANSWER:**    **Defendants deny the allegations contained in Paragraph 109 of Plaintiff's Amended Complaint.**

110.    To that end, Defendants trivialize, ignore, and impose arbitrary and capricious penalties upon employees for alleged misconduct without any regard for consistency in recommending or imposing discipline and/or what level of discipline to institute.

**ANSWER:**    **Defendants deny the allegations contained in Paragraph 110 of Plaintiff's Amended Complaint.**

111.    Defendants Pitassi and Castellan have family members on the MPPD. Defendant Pitassi's son is Sam Pitassi Jr. and Defendant Castellan's nephew is Giovanni Castellan.

**ANSWER:**    **Defendants admit the allegations contained in Paragraph 111 of Plaintiff's Amended Complaint.**

112.    Defendants Pitassi and Castellan claim that their relatives on the MPPD are held to a "higher standard" of conduct than other police officers. On belief, the opposite is true.

**ANSWER:**    **Defendants deny the allegations contained in Paragraph 112 of Plaintiff's Amended Complaint.**

113.    Pitassi Jr. and Giovanni Castellan have been responsible for several major SOP infractions.

**ANSWER:**    **Defendants admit that Giovanni Castellan has been disciplined for SOP infractions and deny the remaining allegations in this paragraph.**

114.    In fact, on or about December 23, 2017, the *Sun Times* published an article, *Melrose Park police brass faced with disciplining cop relatives*, which questioned Defendants Pitassi and Castellan's double standard regarding the disciplinary process as applied to their relatives.

**ANSWER:**    **Defendants admit that said article was published but deny the accusations of any double standard suggested in the article.**

115.    Defendant Giovanni Castellan has been an MPPD officer for approximately three years.

**ANSWER:**    **Defendants deny that Giovanni Castellan has been an MPPD police officer since July 11, 2016 and deny the remaining allegations in this paragraph.**

116.    In that time, Giovanni racked up several SOP violations including, on belief:

a)    <u>Stalking a Victim</u>: Giovanni inappropriately contacted the victim of domestic violence matter. She went to the police department to make a complaint, but the matter was whitewashed by a Supervisor. Discipline imposed: None.

b)    <u>Arrest for Disorderly Conduct while on Probation</u>: Giovanni was arrested, while off duty, for disorderly conduct in another town. He was accused of driving his car at a female pedestrian in an aggressive manner. Giovanni was also accused of taunting the woman by walking past her and making pig noises. Discipline imposed: Giovanni only forfeited two vacation days with the opportunity for them to be reinstated even though he was on probation and should have been automatically terminated.

c)    <u>Violating the Residency Policy</u>: When Giovanni was arrested, he listed his home address in Oak Brook—in violation of the residency policy. Discipline imposed: None.

d)    <u>Castellan's Nephew's Excessive Force Complaint</u>: In late 2019, while on a traffic stop, Giovanni used physical force and broke the suspect's arm. Discipline imposed: None

e)    <u>"Unintentionally" Shooting at an Unarmed African American Suspect</u>: Two weeks later, Giovanni responded to a call of retail theft in progress. The suspect ran away, and Giovanni began a foot pursuit that culminated with him "unintentionally" shooting at the unarmed African American suspect during the "heat of the moment and the chase."[5] Giovanni knew, or should have known, that deadly force would never have been justified on a retail theft. Discipline imposed: On belief, none.

f)    <u>Fired from Working Security at the District 89</u>. The Superintendent of District 89 School fired Giovanni from working security at the District's schools. On belief, after being terminated, he pulled over the Superintendent to annoy her and to harass her.

---

5    https://chicago.suntimes.com/crime/2019/11/27/20984574/melrose-park-officer-gun-discharge-jewel-osco-shoplifting-suspect.

**ANSWER:**     Defendants deny that Giovanni Castellan "racked up several SOP violations." As to each subpart of paragraph 116, (a) Defendants lack sufficient knowledge or information to admit or deny the truth of this allegation; (b) Defendants admit that on November 1, 2017, while he was on probation, Ofc. Castellan was charged with disorderly conduct in another town and was accused of driving on the roadway "toward" a female pedestrian while "holding the horn down," and that even though the disorderly conduct charges were dismissed, Ofc. Castellan received a two-day suspension (by forfeiting vacation days) and was required to undergo additional training; (c) Defendants admit that Officer Castellan listed his home in Oak Brook but deny that this was a violation of the residency policy because Officer Castellan was a probationary officer at the time and did not have to establish residency in the Village during the probationary period; (d) Defendants lack sufficient knowledge or information to admit or deny the truth of this allegation; (e) Defendants admit further that on November 24, 2019, Ofc. Castellan responded to a call of retail theft in progress and as he was exiting his vehicle his weapon unintentionally discharged into the ground near Ofc. Castellan (and not in the direction of the fleeing African American subject) "during the heat of the moment and the chase"; and that Ofc. Castellan knew that deadly force was not authorized at that point and he was therefore disciplined by receiving (and accepting) a three-day suspension and was required to attend additional training; and, (f) Defendants admit that Castellan was let go from working a private security job at District 89 and that he stopped a school official but deny the remaining allegations.  Defendants deny the remaining allegations in this paragraph.

117.     Defendant Pitassi's son, Sam Pitassi Jr. ("Pitassi Jr.") has been an MPPD officer for approximately seven years.

**ANSWER:**     Defendants admit that Sam Pitassi Jr. has been an MPPD officer since October 1, 2012.

118.     <u>Chief Pitassi's Son Negligently Fires Duty Weapon in a Bathroom Stall</u>: Pitassi Jr. negligently fired his gun while in a bathroom stall during a break from a training session at another police department. Discipline imposed: He was required to take education courses to avoid forfeiting two days of vacation time.

**ANSWER:**     Defendants admit that on or about May 8, 2017, Officer Sam Pitassi, Jr. (Director Pitassi's son) removed his firearm from its holster to use the restroom and when he re-holstered the weapon, it accidently discharged into the floor when the front sight caught on the lip of the holster and his clothing was bunched up near the trigger guard, and that he was disciplined for that incident by a two-day suspension and was required to undergo additional

**firearms training. Defendants deny the remaining allegations in this paragraph.**

119.     <u>Chief Pitassi's Son Rear-Ends Civilian while Driving Squad Car</u>: Later in 2017, Pitassi, Jr. "negligently" rear-ended a civilian's vehicle with his squad car. The police report blamed the accident on the civilian driver — even though rear-end collisions are almost always the striking vehicle's fault. The woman Pitassi Jr. rear-ended was hospitalized. He was not immediately tested for drugs or alcohol, which is against policy. Discipline imposed: He forfeited two vacation days with the opportunity for them to be reinstated. Instead, Pitassi Jr. was transferred to a specialty assignment in the tactical unit, which would be considered a promotion.

**<u>ANSWER:</u>     Defendants admit that Officer Pitassi rear-ended another vehicle with his squad car for which he was disciplined. Defendants deny the remaining allegations in this paragraph.**

120.     <u>Chief Pitassi's Son's Vehicle Collides with a Skateboarder</u>: On September 21, 2019 Pitassi Jr., while on sick leave, was involved in another traffic incident. This time, the police report alleges that a minor child on a Skateboard struck Pitassi Jr.'s truck. On belief, Pitassi Jr. was not immediately tested for drugs or alcohol or investigated for leaving the house while on sick leave. Discipline imposed: On belief, none.

**<u>ANSWER:</u>     Defendants admit that Officer Pitassi's vehicle, while he was off duty on sick leave, was struck by a minor child on a skateboard and further admit that Officer Pitassi was not tested for drugs or alcohol or investigated or disciplined because he was off duty, testing was not required and he did not violate the sick leave policy.**

121.     <u>Working at the Local Marijuana Dispensary</u>: On belief, on January 1, 2020, Pitassi Jr. began moonlighting at one of the cannabis dispensaries, despite that marijuana is still prohibited under federal law.

**<u>ANSWER:</u>     Defendants admit that Officer Pitassi worked secondary employment at a cannabis dispensary consistent with policy. Defendants deny the remaining allegations in this paragraph.**

122. MPPD's culture reveals a troubling pattern of misconduct among similarly situated MPPD officers who have not faced extensive investigations or disciplinary actions for conduct that clearly violates the MPPD's policies and practices, which perpetuates a code of silence.

**ANSWER:** **Defendants deny the allegations contained in paragraph 122 of Plaintiff's Amended Complaint.**

123. This Code of Silence is an implicit understanding between and among members of the MPPD resulting in a refusal or failure to report instances of misconduct of which they are aware despite their obligation to do so as sworn peace officers to protect themselves or their fellow officers from discipline, criminal prosecution, or civil liability.

**ANSWER:** **Defendants deny the allegations contained in paragraph 123 of Plaintiff's Amended Complaint.**

124. This failure to discipline engendered the firm understanding among MPPD Officers, that they are above the law and can act with impunity without the fear of consequences.

**ANSWER:** **Defendants deny the allegations contained in paragraph 124 of Plaintiff's Amended Complaint.**

125. The Municipal policymakers, Serpico and the Village Board of Trustees, are aware, condone, or facilitate the enforcement of this "code of silence," which is neither manifestly job-related nor consistent with business necessity.

**ANSWER:** **Defendants deny the allegations contained in paragraph 125 of Plaintiff's Amended Complaint.**

126. In the rare instances when complaints of misconduct are sustained, discipline is haphazard and unpredictable and is meted out based on rank and internal connections, which does little to deter misconduct.

**ANSWER:** **Defendants deny the allegations contained in paragraph 126 of Plaintiff's Amended Complaint.**

127.    The examples below provide a small snapshot of the capriciousness of MPPD's disciplinary process:

a)    <u>Removed Shell Casings from Crime Scene</u>: Two MPPD officers were at a bar when allegedly one or both of them shot off their weapons. Shell casings were removed from the crime scene. *Discipline imposed*: None.

b)    <u>Improper Overtime Payments</u>: On at least two paychecks, Ofc. Gene Cacciatore was paid for overtime that he did not work. Cacciatore reported this overpayment to Defendant Castellan who did not order him to return the money. *Discipline imposed*: None. He was promoted to sergeant.

c)    <u>Stolen Police Car</u>: Lt. DiMaio left his marked squad car unlocked and running while he responded to a call. The woman who called the police stole the squad car. It was the ISP, not DiMaio, who reported the vehicle as stolen. The ISP notified the MPPD that one of its squads was traveling at a high rate of speed on an expressway. *Discipline imposed*: Forfeited three vacation days and was removed as shift commander for one week.

d)    <u>Stolen Vehicle</u>: A few years later, Station Supervisor Lt. DiMaio's personal vehicle was left running unattended and was stolen off of his driveway costing the MPPD more time and resources. *Discipline imposed*: None.

e)    <u>Battering a Resident</u>: On belief, Lt. DiMaio, as Station Supervisor, left his post and went to a call where he punched one of the residents. The resident filed a sworn citizen's complaint and requested an investigation. *Discipline imposed*: None.

f)    <u>Threatening another officer and a supervisor</u>: Sam Chiapetta threatened Sgt. Cacciatore and his supervisor, Scatchell Sr. stating: "Who the fuck are you to come ring my doorbell at my house? You come to my house again you motherfucker and I'll destroy you" ... "you ring my doorbell again and I will come after you with everything I have and you can bring John [Scatchell Sr.] with you." *Discipline imposed*: No discipline after an informal investigation. Chiapetta was promoted to lieutenant six (6) months later.

g)    <u>Stolen golf cart</u>: On belief, two officers, while drunk stole, destroyed, and hid a golf cart belonging to a local business owner. *Discipline imposed*: Neither officer was disciplined.

h)    <u>Sick Leave Abuse</u>: Castellan's godchild, Anzaldi Jr. was a lateral transfer from Berkeley. His personnel file indicates that he violated the sick leave policy several times.

i)    <u>Squad Accident without a Drug Test</u>: In 2018, Anzaldi Jr. was involved in an accident with his squad car. Similar to Pitassi Jr., Anzaldi Jr. was not immediately tested for drugs or alcohol as is required by the SOP's. *Discipline imposed*: None.

j)    <u>Not Properly Searching a Prisoner</u>: The Cook County Department of Corrections rejected a prisoner held in MPPD's lock-up because the MPPD officers did not properly search the prisoner and drugs were found in his pocket. *Discipline imposed*: None.

k)    <u>Prisoner Dying in Holding Cell</u>: In December 2018, a prisoner died in the MPPD holding cell, without any meaningful investigation or discipline [sic]. *Discipline imposed*: None.

l)    <u>Writing Bogus Parking Tickets</u>: On belief, officer Nikole Spatafora wrote around $10,000 worth of bogus parking tickets to the same vehicle over the course of several weeks. On further belief, the DMV suspended the vehicle owner's driver's license because of the bogus tickets. *Discipline imposed*: 30-day Suspension.

m)    <u>Relocating another Officer's Breast Milk</u>: Lt. Maiello unplugged a mini refrigerator that contained a female police officer's breast milk from the break room and moved it into the hallway. *Discipline imposed*: Forfeited an unknown number of compensatory days.

n)    Officer Raul Rodriguez used a harness that was inventoried as evidence to saddle a rookie officer. He then pretended to ride this rookie while pointing his service weapon at the ceiling. Defendant Pitassi testified that this behavior was "a problem." *Discipline Imposed*: None. Rodriguez was recently promoted to Assistant to the Deputy Chief.



o)    <u>Off-duty Fight</u>: Officer Panzini was involved in an off-duty fight at the local Target store where he allegedly beat up another patron. *Discipline imposed*: Unknown suspension.

p)    <u>Catch and Release Tactics</u>: Officer Panzini detained an anti-abortion activist. Panzini dropped him off in Maywood even though he was never arrested. Panzini berated the protestor by stating: "This isn't an arrest, so shut up with your bullshit and go show this garbage to somebody in fucking Wheaton."[6] *Discipline imposed*: On belief, none.

q)    <u>Hiring a Racially Insensitive Police Officer</u>: Frank Fazio, on belief, was hired to fill Scatchell Jr.'s vacancy. The BOFPC hired Fazio even though he resigned from the Glen Ellyn police department to avoid being terminated for using an ethnic slur against Mexicans by calling them "beaners." The BOFPC claimed it was unaware of Fazio's misconduct and blamed Glen Ellyn for not informing them of Fazio's background.[7] Yet, the VMP could not even confirm if it had reviewed Fazio's personnel file or if it followed up on Fazio's response on his MPPD employment application about his time with Glen Ellyn: "I was asked to resign."

r)    <u>False police report</u>: An officer lied in a police report by saying that a car accident occurred in the VMP when it happened elsewhere. *Discipline imposed*: None.

---

[6]    https://chicago.suntimes.com/2019/1/17/18363963/anti-abortion-activist-says-melrose-park-cop-chastised-and-left-him-in-maywood.

[7]    https://chicago.suntimes.com/2019/7/19/20698300/melrose-park-police-ethnic-slur-frank-fazio-iii-ron-serpico

s)     Battering a Suspect: Two MPPD officers battered a suspect. One of the officers put the handcuffed suspect in a chokehold while the other officer sat on him and repeatedly hit him with her handcuffs. This incident was also captured on video and provided to the MPPD supervisors. *Discipline imposed*: None. Both officers are now field training officers who train and mentor new MPPD police officers.

t)     Shooting and Killing an African American: An off-duty MPPD officer, Vito Migliore went to Maywood, Illinois and shot and killed one African American male, inside a private residence, and wounded another. Discipline imposed: On belief, notwithstanding his gross misconduct and potential criminal activity, Migliore was allowed to keep working for the MPPD as a law enforcement officer. In January 2020, Migliore was allowed to return to full duty, and, despite that, a month later had another improper conduct incident and has not been terminated.

u)     Roommates with a Dangerous Convicted Felon: Darrell Farmer, a part time MPPD officer lived with a convicted felon who allegedly kidnapped his girlfriend, raped her, and brought her back to his Melrose Park home that he shares with Farmer.

**ANSWER:     Defendants deny the allegation that the Village's disciplinary process is capricious, and responds to the subparts of paragraph 127 as follows:**

> **a)     Defendants admit that two off duty officers were involved in an off duty shooting at a bar in another town; that the Illinois State Police conducted an independent investigation and did not make any findings of illegal or unprofessional conduct by either officer. Defendants deny the remaining allegations.**

> **b)     Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations but admits that Cacciatore was promoted to sergeant by the Board of Fire and Police Commissioners following a competitive testing process.**

> **c)     Defendants admit that Lt. DiMaio responded to an emergency call involving a woman who claimed she was being held against her will; that he parked his squad car in the alley of the home and inadvertently left his keys in the car; that unbeknownst to him, the woman left from a back door and drove away in the squad car; that DiMaio self-reported the incident, prepared an incident report, and took responsibility for his conduct; that then Chief Pitassi immediately placed DiMaio on administrative leave pending an investigation and ultimately disciplined him by taking away three vacation days. d) Defendants admit that Lt. DiMaio's personal vehicle was stolen off his driveway and that no discipline was imposed because no violation of policy occurred. Defendants deny the remaining allegations.**

> **e)     Defendants lack knowledge or information sufficient to form a belief as to the truth of this allegation.**

f)      **Defendants admit that on December 16, 2016, Ofc. Chiapetta made the foregoing statements to another officer and that he received (and accepted) a four-day suspension and was required to undergo additional training and denies the remaining allegations in this subpart.**

g)      **Defendants lacks knowledge or information sufficient to form a belief as to the truth of these allegations.**

h)      **Defendants admit that Anzaldi was hired laterally from the City of Berkeley but denies the remaining allegations.**

i)      **Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations.**

J)      **Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations.**

k)      **Defendants admit that a detainee died in the MPPD holding cell, that the Illinois State Police and Illinois Department of Corrections independently investigated the incident and made no findings adverse to the MPPD or officers and therefore no discipline was imposed.**

l)      **Defendants admit that it believes that in 2018 Ofc. Spatafora wrote multiple citations to two vehicle owners that contained incorrect information, and that Ofc. Spatafora accepted responsibility for her conduct and agreed to a thirty-day suspension and a Last Chance Agreement, and Defendants deny the remaining allegations in this paragraph.**

m)      **Defendants admit the allegations.**

n)      **Defendants admit that at some point prior to 2017, Officer Raul Rodriguez and another officer were "horsing around" and he used a saddle on another officer and pretended to ride him while pointing a training pistol at the ceiling, and admits that when shown the photo Defendant Pitassi testified that he wanted to know if it was a real gun and stated further that this behavior was "a problem." Defendants admit that Rodriguez was recently assigned to commander of administrative services. Defendants deny the remaining allegations.**

o)      **Defendants deny the allegation because there is no Officer Panzini employed at the MPPD. Defendants admit that Officer Panzani was involved in an off-duty disturbance and was disciplined for his conduct.**

p) **Defendants deny the allegation because there is no Officer Panzini employed at the MPPD. Defendants admit that Officer Panzani was involved in an incident and was disciplined.**

q) **Defendants deny that Officer Fazio was hired to fill Scatchell Jr.'s vacancy. Defendants admit that Fazio was hired by the Board of Fire and Police Commissioners after competitive testing and denies knowledge of the allegations of him using a racially derogatory term while employed by the Village of Glen Ellyn at the time of his hiring.**

r) **Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations.**

s) **Defendants lacks knowledge or information sufficient to form a belief as to the truth of these allegations.**

t) **Defendants admit that on or about August 28, 2019, Ofc. Migliore was off duty and was involved in a shooting in a private building in Maywood where an African American male died and another was wounded, that Ofc. Migliore was never charged with wrongdoing but was nevertheless placed on administrative leave while the appropriate authorities investigated the incident, and that he was returned to work on Modified Duty on October 7, 2019, and full duty on January 7, 2020, and went on medical leave in April of 2020. Defendants admit further that Ofc. Migliore has not been disciplined for the incident because there is no basis to believe that he engaged in misconduct at this time, and Defendants deny the remaining allegations in this subpart.**

u) **Defendants deny the allegation that Darrell Farmer was a sworn officer and otherwise lacks knowledge or information sufficient to form a belief as to the truth of these allegations.**

**Defendants deny any remaining allegations not expressly admitted above.**

128. The only thing that the aforementioned officers have in common is that none of them filed a civil rights charge against any of the individual Defendants, nor do they associate with anyone who did, such as Scatchell Jr. or Scatchell Sr.

**ANSWER:** **Defendants deny the allegations contained in paragraph 128 of Plaintiff's Amended Complaint.**

129. The BOFPC's disciplinary system fails to provide clear guidance on appropriate, fair, and consistent penalty ranges.

**ANSWER:**     **Defendants deny the allegations contained in paragraph 129 of Plaintiff's Amended Complaint.**

130.     The BOFPC ultimately carried out the individual Defendants' retaliation by terminating Scatchell for his first alleged acts of misconduct, while turning a blind eye when other preferred officers were accused of substantially similar or more egregious misconduct.

**ANSWER:**     **Defendants admit that the BOFPC issued its decision to discharge Scatchell Jr. on December 6, 2018 and deny the remaining allegations in this paragraph.**

131.     On belief, the BOFPC never terminated a police officer for abusing the sick leave policy, much less an officer who had never previously violated the sick leave policy.

**ANSWER:**     **Defendants admit that Scatchell Jr.'s misconduct was far more substantial than any previous officer and that he was discharged on that basis, and that Defendants are not aware of any other officers who engaged in conduct similar to his conduct and therefore no other officers were discharged based upon similar conduct.  Answering further, Defendants deny any suggestion that other officers were not disciplined for less violations of the sick leave policy and deny any remaining allegations in this paragraph.**

132.     Instead, when the BOFPC sustained charges of sick leave abuse, it failed to punish the officer or punished them with an unpaid suspension. For example:

a)     The BOFPC suspended—not terminated—Officer Negron for violating the sick leave policy even though he had a prior disciplinary history, which included at least five prior sick leave violations, insubordinate behavior, and conduct unbecoming of a police officer.

b)     The BOFPC also did not suspend or terminate Defendant Serpico's son, former Melrose Park fire fighter, Michael Serpico even though he violated at least six (6) direct orders and had not shown up to work in some time. On belief, the charges against Michael Serpico were withdrawn and he voluntarily resigned.

**ANSWER:**     **Defendants deny the allegations in this paragraph and answers the subparts of paragraph 132 as follows:**

**a)     Defendants states that Director (then Chief of Police) Pitassi filed termination charges with the BOFPC against Ofc. Negron for abusing the Department's sick leave policy and the BOFPC held an evidentiary hearing and decided to suspend Negron for three days and denies the remaining allegations in this sub-paragraph.**

     **b)** **Defendants admit that Defendant's Serpico's son, former Melrose Park fire fighter, Michael Serpico, disobeyed several direct orders to appear for an interrogation and that he then resigned from his employment with the Village. Defendants deny that the matter had progressed to charges being filed with the BOFPC, and therefore denies that any such charges were withdrawn or that the BOFPC had any authority to address Michael Serpico's conduct and denies the remaining allegations in this subpart.**

133. In similar fashion, the BOFPC did not terminate Melrose Park fire fighter Tim Ude, who while off duty, walked into the emergency room of Loyola Hospital and stole medical supplies. When he was confronted by a hospital employee, Ude lied and said that the fire department needed the medical supplies. The MPPD arrested him. Ude was brought before the BOFPC but was allowed to voluntarily resign nearly five (5) months after his arrest.

**ANSWER:** **Defendants admit that the BOFPC did not terminate Ude's employment because he resigned on December 13, 2018, before charges were presented to the BOFPC, and therefore the BOFPC did not have authority to address his conduct. Defendants admit further that Ude was arrested and charged with stealing medical supplies from the emergency room of Gottlieb Hospital on or about October 1, 2018, and that when he was confronted by a Hospital employee, he stated that the fire department needed the medical supplies. Defendants deny the remaining allegations in this paragraph.**

134. The BOFPC allowed other police officers the chance to resign (Ofc. Pretzie and Ofc. Espinosa) prior to being terminated.

**ANSWER:** **Defendants deny the allegations in this paragraph, but admit that there have been other officers who resigned and that charges against them were either not submitted to the BOFPC, or the charges against them were withdrawn in light of their resignations, including Officer Pretzie, and that Espinosa submitted a retirement letter on December 12, 2016, before an investigation was completed regarding his residency.**

135. Scatchell Jr. was never given the option to resign.

**ANSWER:** **Defendants deny the allegations contained in paragraph 135 of Plaintiff's Amended Complaint.**

136. As noted, the individual Defendants were in constant contact with the Board's members on key dates in Scatchell's case.

**ANSWER:**   **Defendants deny the allegations in this paragraph and denies any suggestion that such contact constituted ex parte communications relating to the merits of any matters then before the Board, but, as noted above, the Village admit that the individual Defendants had separate conversations regarding many different issues impacting the Village and the Police Department.**

137.   As a matter of widespread practice so prevalent as to comprise municipal policy, those who have dared to oppose the Serpico Administration have experienced retaliation in a manner similar to that alleged by Plaintiff. For example, and on belief:

**ANSWER:**   **Defendants deny the allegations contained in paragraph 137 of Plaintiff's Amended Complaint.**

138.   *Trombetta v. Board of Education*, 2003 WL 23685091

a)   District 89 School District terminated Generoso Trombetta ("Trombetta") in retaliation for exercising his First Amendment rights to manage and support his cousin's opposing mayoral campaign against Defendant Serpico.

b)   After a 14-day trial, in just three hours, the jury found in favor of Trombetta holding that Defendant Serpico retaliated against Trombetta and other "political enemies" by persuading and influencing the school board to terminate Trombetta's contract and to investigate his five-year old niece even though Serpico was not on the school board. The jury awarded Trombetta $1 million in punitive damages against Serpico.

**ANSWER:**   **Defendants admit that Mayor Serpico was one of eight Defendants in the listed case, where the plaintiff alleged that he was retaliated for exercising his First Amendment rights to manage and support his cousin's opposing mayoral campaign against Defendant Serpico, the trial occurred over the course of seven days, on May 3, 2004, the jury verdict awarded $1,000,000 in punitive damages against Serpico, that the jury's decision was appealed and that the case was thereafter settled and dismissed. Defendants deny the remaining allegations in this paragraph.**

139.   *Figueroa v. Village of Melrose Park and Sam C. Pitassi*, 1:13-cv-3026 a) Blanca and Anthony Figueroa are siblings. The VMP hired Anthony as a firefighter and Blanca as a police officer. Blanca sued the MPPD and Defendant Pitassi alleging gender discrimination. The case ultimately settled sometime around the end of 2015. Less than two years later, in April 2017, the BOFPC brought charges against Anthony Figueroa for his purported residency violation. He was

ultimately terminated even though several other firefighters live outside of the VMP in violation of the residency policy.

**ANSWER:** **Defendants admit that Blanca and Anthony Figueroa are siblings, that Anthony was a VMP firefighter and Blanca was a police officer who sued the Village and Pitassi alleging gender discrimination on April 22, 2013, which was settled in November 2015. Defendants admit further that the Village's Fire Chief filed charges against Figueroa in April 2017, based upon his violations of the residency requirement, that the BOFPC thereafter conducted a full evidentiary hearing on the charges and decided, based upon the evidence presented at the hearing, to discharge Figueroa for violating the residency requirement, and that the BOFPC's decision was upheld on administrative review by the Circuit Court and then by the Illinois First District Appellate Court. Defendants deny the remaining allegations in this paragraph.**

## COUNT I – 42 U.S.C. § 1983 DEPRIVATION OF FIRST AMENDMENT RIGHTS OF SPEECH AND ASSOCIATION
### Plaintiff v. All Individual Defendants

140. The Plaintiff realleges all other paragraphs of this First [sic] Amended Complaint and incorporates them by reference as if fully set forth herein.

**ANSWER:** **Defendants incorporate and re allege their answers to Paragraphs 1 through 139 above as its answer to Paragraph 140 of Plaintiff's Amended Complaint.**

141. The First Amendment to the United States Constitution guarantees the Plaintiff's rights to speak on matters of public concern free from retaliation.

**ANSWER:** **Defendants admit that the First Amendment protects certain communications but deny any violation of Plaintiff's First Amendment rights and deny the remaining allegations in this paragraph.**

142. As described more fully above and incorporated by reference herein, Plaintiff engaged in extensive protected speech on matters of public concern, including, but not limited to publicly opposing race discrimination in the Lavalais matter, advocating for union and labor rights on behalf of a fellow officer, to wit, Kyll Lavalais, and opposing questionable pension spending.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 142 of Plaintiff's Amended Complaint**.

143.     Scatchell, Sr. had no job purpose for his speech and associational activity, no self-interest for his speech and associational activity, and his speech and associational activity occurred through acts outside of the line of duty, including as a private citizen in signing the Declarations on behalf of Lavalais, acting as President of a labor organization (the FOP Lodge), voting in favor of Lavalais' grievance over his residency going to arbitration, retaining counsel and his daughter, Gianna Scatchell, to communicate his opposition of the Lavalais residency order, entertaining Lavalais' grievance for arbitration at a public FOP membership meeting and in FOP Executive Board meetings, holding meetings with fellow Melrose Park officers and the FOP regarding sending Lavalais' grievance to arbitration, meeting with Chief Pitassi regarding Lavalais' grievance, and serving as President of an FOP Lodge that approved Lavalais' grievance for arbitration and sent it for arbitration [sic]

**ANSWER:** **Defendants deny that Plaintiff engaged in protected speech and associational activity, deny knowledge of any such protected speech and associational activity and, thus, deny the allegations in paragraph 143 of Plaintiff's Amended Complaint.**

144.     The foregoing activities had nothing to do with Scatchell's official job duties as a Village of Melrose Park, Illinois Police Lieutenant, as Scatchell's work with the FOP, his support of Lavalais' opposition to the residency order, his support of Lavalais' grievance, and his support of Lavalais' arbitration, both personally and through his daughter Gianna Scatchell, did not owe their existence to his Lieutenant work with the Village, but rather through his private actions and actions as FOP President and supporter of Lavalais' actions.

**ANSWER:** **Defendants deny the allegations contained in paragraph 144 of Plaintiff's Amended Complaint.**

145.     Scatchell, Sr. further alleges that Melrose Park retaliated against him for exercising his rights under Title VII by signing two declarations on behalf of Lavalais, holding union meetings about Lavalais' residency grievance going to arbitration, supporting Lavalais' grievance, voting to

arbitrate Lavalais' residency issue, approving Lavalais' grievance for arbitration, submitting declarations in behalf of Lavalais' federal lawsuit and Illinois Labor Relations Board case, offering to testify at Lavalais' arbitration, and for filing his own EEOC Charge.

**ANSWER:** Defendants deny the allegations contained in Paragraph 145 of Plaintiff's Amended Complaint.

146.     Scatchell, Sr. was retaliated against, harassed, transferred, constructively demoted, and constructively terminated for engaging in constitutionally protected speech and expressive conduct, including by at least the following actions:

a)     Being offered the position of Deputy Chief as an effort by Mayor Serpico to cause Scatchell to oppose Lavalais' grievance going to arbitration;

b)     Having his offer of Deputy Chief retracted and tabled when Scatchell and his daughter, Gianna Scatchell on his and the FOP's behalf, expressed support for Lavalais' position, grievance, and arbitration, despite the offer for a Deputy Chief position;

c)     Having his son, John Scatchell, Jr., investigated in an investigation that accumulated 219 overtime hours, charged with misconduct, sent for a police board hearing seeking his termination, and ultimately terminated based upon trumped-up allegations and alleged policy violations not enforced against other similarly-situated officers;

d)     Being transferred and constructively demoted from a shift Lieutenant to a Station Supervisor, a position having no written job description, having no officers directly reporting to it, having an inferior office in the rear of the police station, and intending to be given job duties formerly held by a civilian, non-sworn employee, to wit, monitoring employee uniform overages having nothing to do with sworn police work and being degrading in nature;

e)     Having dynamite thrown at his personal residence without any meaningful investigation being performed as to such incident, including no forensic evidence being taken or examined, interviews not being conducted or meaningfully, and Scatchell being administratively locked out of access to all reports about the incident and kept in the dark about its progress and outcome; and,

f)     The other actions alleged in the foregoing section.

**ANSWER:** Defendants deny the allegations contained in Paragraph 146 of Plaintiff's Amended Complaint.

147.     Scatchell, Sr. carried out his job duties competently and professionally, but Defendants penalized him for exercising his First Amendment protected rights in supporting Lavalais' grievance and position that Lavalais should not have to reestablish residency.

**ANSWER:** Defendants deny the allegations contained in Paragraph 147 of Plaintiff's Amended Complaint.

148.    As a result of Scatchell, Sr.'s exercise of protected speech, Defendants Village of Melrose Park, Mayor Serpico, Director Pitassi, Castellan, and Rogowski, retaliated against Plaintiff in the manner described in the preceding paragraphs.

**ANSWER:** Defendants deny the allegations contained in Paragraph 148 of Plaintiff's Amended Complaint.

149.    As a result of the aforementioned deprivations, Plaintiff has suffered damages, including loss of pay that he would have received as Deputy Chief, pension differential, emotional distress, reputational damage, and general compensatory damages.

**ANSWER:** Defendants deny the allegations contained in Paragraph 149 of Plaintiff's Amended Complaint.

## COUNT II – 42 U.S.C. § 1983 CLAIM OF RETALIATION FOR DEPRIVATION OF RIGHTS UNDER § 1981
### Plaintiff v. All Individual Defendants

150.    The Plaintiff realleges all other paragraphs of this First [sic] Amended Complaint and incorporates them by reference as if fully set forth herein.

**ANSWER:** Defendants incorporate and re allege their answers to Paragraphs 1 through 149 above as its answer to Paragraph 150 of Plaintiff's Amended Complaint.

151.    42 U.S.C. § 1981 provides, in pertinent part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." *See Campbell v. Forest Preserve Dist. of Cook County, Ill.*, 752 F.3d 665, 667 (7th Cir. 2014) (holding that public sector entities may be liable for 42 U.S.C. § 1981 violations via 42 U.S.C. § 1983).

**ANSWER:**     **Defendants admit the allegations in this paragraph but deny any violation of said statute or case law.**

152.     The United States Supreme Court has held that retaliation claims are cognizable under Section 42 U.S.C. § 1981, including claims by individuals who suffer retaliation for having tried to help another. *See CBOCS West, Inc. v. Humphries*, 128 S.Ct. 1951, 1958 (2008).

**ANSWER:**     **Defendants admit the allegations in this paragraph but deny any violation of said statute or case law.**

153.     Scatchell engaged in conduct protected by 42 U.S.C. § 1981 and by Title VII when he supported, both personally and through his attorney and daughter Gianna Scatchell, Lavalais' position opposing the residency order, his grievance, and his arbitration that would have required Lavalais to reestablish residency in the Village of Melrose Park, Illinois despite that he was the sole black officer on the force and hired under an affirmative action-based consent decree.

**ANSWER:**     **Defendants deny the allegations contained in paragraph 153 of Plaintiff's Amended Complaint.**

154.     Scatchell also engaged in conduct protected by 42 U.S.C. § 1981 and by Title VII when he opposed Lavalais' having to move back into Melrose Park in order to remain on the police force, and expressed his opposition to the order personally and via his daughter and attorney, Gianna Scatchell in October, November, and December 2016, and thereafter.

**ANSWER:**     **Defendants deny the allegations contained in paragraph 154 of Plaintiff's Amended Complaint.**

155.     At all times, Defendants knew that Scatchell supported Lavalais' grievance and opposed Lavalais' having to reestablish residency because they were all aware of the grievance and arbitration, that Scatchell and his daughter Gianna Scatchell opposed Lavalais having to reestablish residency and supported the grievance arbitration, and were in constant communication with Village attorneys regarding the order that Lavalais reestablish residency, his grievance over it, his arbitration over it, and his subsequent legal actions regarding it.

**ANSWER:**     **Defendants deny the allegations contained in paragraph 155 of Plaintiff's Amended Complaint.**

156.    At all times, Plaintiff was performing his Lieutenant position in a satisfactory manner, having no prior discipline, and a good record of performance.

**ANSWER:**     **Defendants deny the allegations contained in paragraph 156 of Plaintiff's Amended Complaint.**

157.    No similarly-situated employee who did not complain of discrimination against Lavalais, and who did not oppose Lavalais having to reestablish residency, was denied a promotion, transferred to an unfavorable position without defined job duties and that lacked subordinates, had a family member investigated and terminated, and had dynamite thrown at their home subjected to a poor, unserious, and inadequate investigation.

**ANSWER:**     **Defendants deny the allegations contained in paragraph 157 of Plaintiff's Amended Complaint.**

158.    As a proximate result of Scatchell's support for Lavalais, and for Scatchell's opposition to discrimination against the sole African-American officer having to reestablish residency despite being hired under affirmative action, Defendants personally and directly retaliated against Scatchell in the foregoing manner and in violation of 42 U.S.C. § 1981.

**ANSWER:**     **Defendants deny the allegations contained in paragraph 158 of Plaintiff's Amended Complaint.**

159.    Plaintiff has endured substantial financial loss, suffering, humiliation, emotional distress, and other damages in the past and the future.

**ANSWER:**     **Defendants deny the allegations contained in paragraph 159 of Plaintiff's Amended Complaint.**

### COUNT III- *MONELL* CLAIM FOR DEPRIVATION OF FIRST AMENDMENT RIGHTS
**Plaintiff v. Defendant Melrose Park, Illinois**

Defendants do not answer Count III of Plaintiff's Amended Complaint, because it is not directed against them.

### COUNT IV –42 U.S.C. § 1983 CONSPIRACY TO DEPRIVE OF FIRST AMENDMENT RIGHTS
**Plaintiff v. All Individual Defendants**

167. The Plaintiff realleges all other paragraphs of this First [sic] Amended Complaint and incorporates them by reference as if fully set forth herein.

**ANSWER:** **Defendants realleges their responses to all other paragraphs of Plaintiff's Amended Complaint and incorporate them by reference as if fully set forth herein.**

168. On information and belief, defendants Serpico, Pitassi, Castellan, and Rogowski reached a mutual understanding to commit acts in retaliation against Scatchell, Sr. for his perceived opposition. In furtherance of that agreement, Defendants conspired to retaliate and embarrass Plaintiff Scatchell, Sr. and then to target his son, Scatchell, Jr. for termination.

**ANSWER:** **Defendants deny the allegations contained in paragraph 168 of Plaintiff's Amended Complaint.**

169. The object of the conspiracy was to retaliate against Scatchell, Sr. for his support of Lavalais throughout the residency order, grievance, and arbitration by committing numerous adverse actions against Scatchell, Sr., and his son as part of a third-party reprisal against Scatchell, Sr. *See Thompson v. North American Stainless, LP*, 131 S.Ct. 863, 867-868 (2011) ("We think it obvious that a reasonable worker might be dissuaded from engaging in protected activity if she knew that her fiancé would be fired"); *Zamora v. City of Houston*, 798 F.3d 326 (5th Cir. 2015) (City retaliated against a police officer after his father sued the City of EEO violations).

**ANSWER:** **Defendants deny the allegations contained in paragraph 169 of Plaintiff's Amended Complaint.**

170. Plaintiff was deprived of his First Amendment constitutional rights in the manner described in the preceding paragraphs, including the right to speak and associate freely on matters of public concern, such as opposition to race discrimination or disruption of an affirmative action plan intended to promote diversity on a police force.

**ANSWER:** **Defendants deny the allegations contained in paragraph 170 of Plaintiff's Amended Complaint.**

171. That in furtherance of the conspiracy, Defendants committed overt acts in retaliation against Plaintiff for his protected and oppositional conduct relative to Lavalais, including by depriving him of a promotion to Deputy Chief, transferring him and constructively demoting him to station supervisor, investigating, charging, and terminating his son, John Scatchell, Jr., failing to meaningfully investigate dynamite thrown at Scatchell's residence, constructively terminating him, and the other adverse actions included above.

**ANSWER:** **Defendants deny the allegations contained in paragraph 171 of Plaintiff's Amended Complaint.**

172. That the misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:** **Defendants deny the allegations contained in paragraph 172 of Plaintiff's Amended Complaint.**

173. As a result of the aforementioned deprivation of federal rights, Plaintiff has suffered injuries including, but not limited to, lost pay and benefits, a lost promotion, reputation damage, and emotional distress.

**ANSWER:** **Defendants deny the allegations contained in paragraph 173 of Plaintiff's Amended Complaint.**

### COUNT V – TITLE VII VIOLATION, 42 U.S.C. § 2000e(3)(a)
### BASED ON RETALIATION
**Plaintiff v. Village of Melrose Park, Illinois**

Defendants do not answer Count V of Plaintiff's Amended Complaint because it is not directed against them.

### COUNT VI – INDEMNIFICATION AGAINST VILLAGE OF
### MELROSE PARK, ILLINOIS
**Plaintiff v. Defendant Village of Melrose Park, Illinois**

Defendants do not answer Count VI of Plaintiff's Amended Complaint because it is not directed against them.

### AFFIRMATIVE DEFENSES

1.      With respect to any claims for monetary relief, Defendants are entitled to a set-off from liability, if any, for sums earned by Plaintiff since his employment ceased.

2.      Plaintiff is obligated to mitigate his alleged damages with respect to claims for monetary relief; these claims should be barred, or in the alternative reduced, if Plaintiff failed to mitigate his alleged damages.

3.      Plaintiff's discrimination claims are barred to the extent that they exceed the scope of the Charges of Discrimination he filed with the U.S. Equal Employment Opportunity Commission.

4.      Plaintiff is precluded from recovery for any discriminatory acts alleged to have occurred more than 300 days prior to the filing of his Charge of Discrimination.

5.      Defendants did not violate any clearly established constitutional rights of which a reasonable person would have known thus entitling them to qualified immunity from suit.

WHEREFORE, Defendants, SAM C. PITASSI, MICHAEL CASTELLAN and STEVE ROGOWSKI,  deny that the Plaintiff is entitled to any judgment whatsoever against them and

request that this Honorable Court enter a judgment in their favor and allow for the costs of defending this lawsuit and such further and additional relief as the Court deems just and proper.

Respectfully submitted,

s/Michael D. Bersani
MICHAEL D. BERSANI, ARDC #06200897
Attorney for Defendants Sam C. Pitassi, Michael
Castellan and Steve Rogowski
HERVAS, CONDON & BERSANI, P.C.
333 W. Pierce Road, Suite 195
Itasca, IL 60143-3156
P: 630-773-4774
mbersani@hcbattorneys.com

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JOHN SCATCHELL, Sr., | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  18-cv-3989 |
| | ) | |
| v. | ) | Honorable John F. Kness |
| | ) | |
| VILLAGE OF MELROSE PARK, RONALD M. | ) | Honorable Jeffrey Cummings |
| SERPICO, SAM C. PITASSI, MICHAEL | ) | |
| CASTELLAN, and STEVE ROGOWSKI, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2020, I electronically filed the foregoing ***Defendants Sam Pitassi, Michael Castellan, and Steve Rogowski's Answer and Affirmative Defenses to Plaintiff's Amended Complaint*** with the Clerk of the U.S. District Court for the Northern District of Illinois, Eastern Division, using the CM/ECF system which will send notification of such filing to the following CM/ECF participants:

**TO:**  Gianna Rochelle Scatchell, Attorney at Law, 360 West Hubbard Street, Suite 1404, Chicago, IL 60654, gia@lawfirm.gs;

Cass T. Casper, TALON LAW, LLC, 105 West Madison Street, Suite 1350 Chicago, Il 60602, ctc@talonlaw.com;

Jeffrey Fowler, Laner Muchin, Ltd., 515 N. State Street #2800, Chicago, Illinois 60654, jfowler@lanemuchin.com;

K. Austin Zimmer, DelGaldo Law Group, 141 South Harlem Avenue, Berwyn, IL 60402, zimmer@dlglawgroup.com.

Respectfully submitted,


s/Michael D. Bersani
MICHAEL D. BERSANI, ARDC #06200897
Attorney for Defendants Sam C. Pitassi, Michael
Castellan and Steve Rogowski
HERVAS, CONDON & BERSANI, P.C.
333 W. Pierce Road, Suite 195
Itasca, IL 60143-3156 P: 630-773-4774
mbersani@hcbattorneys.com