**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN SCATCHELL, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-3989 |
| | ) | |
| v. | ) | Honorable John F. Kness |
| | ) | |
| VILLAGE OF MELROSE PARK, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**THE VILLAGE OF MELROSE PARK'S MEMORANDUM OF**
**LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**<u>TABLE OF CONTENTS</u>**

FACTUAL BACKGROUND ..................................................................................................1

DISCUSSION ....................................................................................................................7

    I.     Counts I, II & IV.......................................................................................7

    II.    Count III Fails Because There is No Basis for *Monell* Liability ...........................7

          1     There Was No Express Policy of Retaliation ...........................................9

          2     There Was No Widespread Practice of Retaliation...................................9

          3     There Was No Constitutional Injury Caused by a Policymaker ...............10

    III.   Plaintiff's Title VII Retaliation Claim Fails......................................................11

          1     No Evidence of Causation ....................................................................12

          2     No Adverse Employment Actions..........................................................16

          3     Plaintiff Cannot Show that the Decisions Were Pretextual ....................21

CONCLUSION..................................................................................................................22

<u>**TABLE OF CASES**</u>

**Cases**

*Anderson v. City of Rockford,* 932 F.3d 494, 511 (7th Cir. 2019)................................19

*Auriemma v. Rice*, 957 F.2d 397, 400 (7th Cir. 1992) ...................................................9

*Ballard v. Children's Aid Soc'y*, 781 F. Supp. 2d 198, (S.D.N.Y. 2011) ....................18

*Banks v. Chicago Bd. of Ed*., Slip Op. No. 11C7101, 2013 U.S. Dist. LEXIS 33611 *25 (N.D. Ill. Mar. 12, 2013) ........................................................................................17

*Bless v. Cook County Sheriff's Office*, Slip Op. 13C4271, 2020 BL 289578 (N.D. Ill. Aug. 3, 2020)....................................................................................................7, 19

*Boss v. Castro*, 816 F.3d 910 (7th Cir. 2016)..............................................................16

*Burks v. Wis. DOT*, 464 F.3d 744, 758 (7th Cir. 2006)..........................................14, 21

*Burlington N. and Santa Fe Ry. Co. v. White, 548* U.S. 53, 67 (2006)........................12

*City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ..........................................10

*Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 540 (7th Cir. 2007) ........................20, 21

*Frett v. Howard Univ.*, 2016 U.S. Dist. LEXIS 15061 n.3 (D.C. Dist. 2016) ............18

*Gernetzke v. Kenosha Unified Sch. Dist. No.* 1, 274 F.3d 464, 468 (7th Cir. 2001) ...............8, 10

*Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 530 (7th Cir. 2003) ...........................20

*Henn v. Nat'l Geographic, Soc.*, 819 F.2d 824, 828 (7th Cir. 1987)...........................13

*Jordan v. City of Gary, Ind.*, 396 F3d 825, 834 (7th Cir. 2005)..................................20

*Keeton v. Morningstar, Inc.*, 667 F.3d 877, 885-86 (7th Cir. 2012)......................16, 18

*Kralka v. Bd. of Trustees of Comm. College Dist. No. 508*, 75 F. Supp. 3d 909, 915 (N.D. Ill. 2014)............................................................................................................20

*LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir. 1995).....................19

*Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 729 (7th Cir. 2009) ......................17

*Malec v. Klatzco*, 101 F. Supp 2d 1066, 1075 (N.D. Ill. 2000)...............................9, 10

*Manley v. Daniels*, 2012 U.S. Dist. LEXIS 161622 * (N.D. Ind. Nov. 2, 2012) ........16

*McGreal v. V'ge of Orland Park*, 850 F.3d 308, 313 (7th Cir. 2017) .........................13

*McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995)......................................8

*Mercer v. Cook Cty.*, Slip Op. No. 15C7262, 2017 U.S. Dist. LEXIS 142191 *9 (N.D. Ill. Aug. 31, 2017) ........................................................................................................12

*Milestone v. City of Monroe*, 665 F.3d 774, 780 (7th Cir. 2011) ..................................7

*Monell v. N.Y. City Dep't Soc. Servs*., 436 U.S. 658, 691 (1978)..................................7

*Moore v. Abbot Labs*, 780 F. Supp. 2d 600, 620 (S.D. Oh. 2011)................................18

*O'Leary v. Accretive Health, Inc*., 657 F.3d 625 (7th Cir. 2011)..................................... 14, 19, 21

*Outley v. City of Chicago*, 354 F. Supp. 3d 847, 872 (N.D. Ill. 2019) ........................ 7, 8, 12, 21

*Patterson v. Ind. Newspapers, Inc*., 589 F.3d 357, 365-66 (7th Cir. 2009) ................................20

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) ..........................................................10

*Rao v. Gondi*, Slip Op. 14C66, 2017 US Dist. LEXIS 86152 *74-75 (N.D. Ill. June 5, 2017) ....16

*Raymond v. Ameritech Corp*., 442 F.3d 600, 610-11 (7th Cir. 2006)..........................................20

*Rhodes v. IDOT*, 359 F.3d 498, 505 (7th Cir. 2004)...................................................................12

*Robertson v. Wis. Dep't of Health Servs.*, 949 F.3d 371 (7th Cir. 2020) ..............................11, 21

*Scatchell v. Vge. Of Melrose Park*, 2020 IL App (1st) 191414-U, Pet. for Leave to App. Denied, 2020 Ill. LEXIS 1032 (Nov. 18, 2020) ......................................................................5

*Stanek v. St. Charles Cmty Unit Sch. Dist. #103*, 783 F.3d 634, 641 (7th Cir. 2015) .................15

*Sumi Cho v. Perea*, Slip Op. No. 18C8117, 2019 U.S. Dist. LEXIS 162564, *29 .....................17

*Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009).....................................8

*Thompson v. North Am. Stainless, L.P.*, 562 U.S. 170, 174 (2011).............................................15

*Tibbs v. Admin. Office of the Ill. Courts*, 860 F.3d 502, 506 (7th Cir. 2017)..............................21

*Waters v. City of Chicago*, 580 F.3d 575, 581 (N.D. Ill. 2009)......................................... 8, 10, 11

*White v. Burlington Norther & Santa Fe R. Co*., 548 U.S. 53, 71 (2006) ...................................17

*Whittaker v. Northern Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005)...........................................11

iii

The key issue here is whether Plaintiff can maintain claims that he was retaliated against (he cannot), and if so, whether there is a basis for liability against the Village of Melrose Park ("Village"), which there is not. Plaintiff was not retaliated against for any protected activity, there is no causal connection to the actions Plaintiff complains about, and even if there is some arguable basis for concluding there was a causal link, Plaintiff cannot show pretext. Accordingly, the Village is entitled to summary judgment on each of Plaintiff's claims.

## FACTUAL BACKGROUND[1]

1. <u>**The Parties**</u>: Plaintiff, John J. Scatchell, is a former Village police officer; he was promoted to Lieutenant in 2011 and retired in 2018. (JSOF ¶2)[2] Plaintiff has known the Village Mayor Ronald Serpico for fifty years and considered him to be a friend (JSOF ¶5). Sam Pitassi is the Director of Police (JSOF ¶6); Michael Castellan was a Deputy Chief of Police (JSOF ¶8); and Steven Rogowski became a Lieutenant in 2004 and is currently a Deputy Chief (JSOF ¶7).

2. The incidents which Plaintiff claims support his claims:

   a. <u>**The Decision to Table Plaintiff's Promotion**</u>: Promotions to Deputy Chief must be approved by the Village. In the Fall of 2016, Mayor Serpico and Plaintiff had an understanding that Plaintiff would become Deputy Chief (JSOF ¶48) and then retire shortly after, because the promotion would give Plaintiff an enhanced pension and that was important to Plaintiff (JSOF ¶49). It would have been beneficial for the Village because the salary in 2017 for Lieutenants was about $108,000 per year, more than double the salary of a junior police officer (JSOF ¶52). Therefore, the Village Board's November 14, 2016, meeting agenda proposed

---

[1] The multiple Defendants have submitted a Joint R.56.1 Statement of Material Facts.

[2] "JSOF __" refers to the Defendants' Local Rule 56.1 Statement of Undisputed Material Facts and the paragraph number(s) supporting the statement(s) in the corresponding sentence.

promoting Plaintiff to Deputy Chief (JSOF ¶50). But then, Plaintiff's attorney called to ask about an employment contract for Plaintiff and Mayor Serpico believed that Plaintiff was reneging on retiring (JSOF ¶53). Accordingly, at the Village Board meeting on November 14, 2016, Serpico asked the Village Board to table the promotion (JSOF ¶55) and on November 28, 2016, Rogowski, not Plaintiff, was promoted to Deputy Chief (JSOF ¶57).

        b.    **Plaintiff's Claimed Protected Speech**:  The Village has a residency requirement for employees, also applicable to its police officers (JSOF ¶¶10-11). In about 2015, the Village became aware that some of its employees were not residents and the Village investigated and took disciplinary actions, including discharges (JSOF ¶14). On September 1, 2016, Sgt. Kyll Lavalais (African American) was ordered to reestablish residency (JSOF ¶16); Lavalais objected and filed a variety of claims, including grievances pursuant to the CBA (JSOF ¶19). When the Village denied Lavalais' grievance, Lavalais asked the Fraternal Order of Police Lodge ("FOP") to take the grievance to arbitration (JSOF ¶20). The issue was considered at FOP meetings on September 30, October 11, and November 1, 2016 (JSOF ¶¶23-24). None of the Individual Defendants attended those meetings (JSOF ¶30). In the meantime, Plaintiff, who was then President of the FOP Lodge (JSOF ¶21), sought advice from Director of Police Pitassi who responded, "either way you go, you're going to get sued. You're in a bad position," which Plaintiff understood meant the FOP had no choice but to investigate whether there were grounds for arbitration (JSOF ¶22). In that conversation, Plaintiff did not express any personal opinion or viewpoint about Lavalais' grievance, and throughout November and December of 2016, Plaintiff "remained neutral" regarding Lavalais' grievance (JSOF ¶25). In short, as of the date Plaintiff's name was "tabled" for promotion, Plaintiff had not taken any public position regarding Lavalais' grievance and none of the Individual Defendants knew of any alleged protected speech or

association. (JSOF ¶30-32) On January 5, 2017, and March 3, 2017, Plaintiff signed statements relating to Lavalais' claims (concerning the residency requirement), but there is no evidence that the Individual Defendants knew of it (JSOF ¶¶40-43).

        c.    **The Fireworks Incident**:  On December 16, 2016, Plaintiff heard a loud bang outside his home; police were called and the arriving officer found "debris of spent fireworks that were set off in [Plaintiff's] driveway." (JSOF ¶¶ 127-129) Plaintiff now characterizes this incident as someone throwing dynamite at his home and criticized the investigation into the incident [Dkt. No. 71 ¶157], stating that he "would appreciate a little common courtesy as a fellow officer."

        d.    **Reassigning Plaintiff to the Station Supervisor Position in May 2017**: Prior to 2017, the Police Department frequently had lieutenants assigned as Station Supervisors, but through attrition, as of early 2017 there were no Station Supervisors (JSOF ¶ 68) even though some shifts had multiple lieutenants, including Plaintiff, who was the junior lieutenant on his shift. In May 2017 Pitassi assigned Lt. DiMaio and Plaintiff as Station Supervisors (JSOF ¶70), sharing an office but with DiMaio assigned to day shift and Plaintiff assigned to the evening shift, which was Plaintiff's preference (JSOF ¶72). There were no changes to Plaintiff's rank (Lieutenant), salary or benefits (JSOF ¶74). Plaintiff was no longer assigned to work weekends and holidays, but instead worked a Monday-Friday schedule, and he was even given flexibility to adjust his schedule (JSOF ¶86-87). DiMaio welcomed the assignment, testifying that it "was such a sweet deal that [he] came back two months early" from an injury leave (JSOF ¶80). Nor does Plaintiff contend that the DiMaio assignment was retaliatory.

        The Station Supervisors' Office has two exterior windows, had been assigned to many other Station Supervisors previously, and the most recent occupant had been Deputy Chief

Rogowski (JSOF ¶¶93-94). Once assigned, Plaintiff had a free hand in decorating the office, bringing in a leather recliner chair, 40" television, refrigerator, curtains and his own artwork and he was reimbursed by the Village for new blinds (JSOF ¶¶ 100-102).

e.    **"Eyes of Texas"**:   On or about August 2017, an anonymous complaint was made that Plaintiff "is supposed to be working evening hours but he is never there. I've personally seen him driving like a maniac, in uniform and in his black 'Rambo' pickup truck. He is shopping at Target, enjoying dinners at restaurants, and spending a ridiculous amount of time at home." (JSOF ¶117-118) Pitassi told Plaintiff about the complaint but did not investigate nor initiate discipline of any kind (JSOF ¶121); instead, he cautioned Plaintiff to be mindful of his actions, because apparently the "eyes of Texas were upon him." (JSOF ¶119)

f.    **The Traffic Stop Incident**:   On August 30, 2017, at about 11:30 p.m., Plaintiff was pulling out of his driveway in his personal truck after taking a break at home when he observed a traffic violation. Plaintiff gave chase, and when the vehicle stopped, Plaintiff caused the driver to be issued multiple traffic citations. When the Village received a complaint about Plaintiff's conduct, Deputy Chief Rogowski was assigned to investigate (JSOF ¶¶123-124). Rogowski attempted to mediate the issue, including by causing the traffic citations to be dismissed, but he never completed the investigation because Plaintiff went on sick leave and ultimately retired. (JSOF ¶125) Plaintiff was never disciplined as a result of the incident. (JSOF ¶126)

g.    **Plaintiff's Retirement**:   In October 2017 Plaintiff went on sick leave. (JSOF ¶125) From October 2017 through the date of his retirement on June 8, 2018, Plaintiff was off work. (JSOF ¶116) Even though Plaintiff had repeatedly testified that he had planned to retire in January 2017, he claims that his decision to retire in 2018 was largely caused by the

"humiliation" he felt at the hands of the new FOP Board (which had taken office in January 2017). In addition, he was concerned about "getting set up for some complaint like the citizen's complaint that was over – over-investigated, never informed of, represented by a deputy chief that should have informed his lieutenant and conducted the proper protocol and respect, which was never done."

        h.    **Plaintiff's Son**:  As Plaintiff is fully aware, Village police officers are prohibited from abusing sick leave; indeed, on May 8, 2008, Plaintiff signed a memorandum recommending a three-day suspension to another officer (Negron) for working a school event when he had called in sick. (JSOF ¶157)

On November 13, 2017, Castellan received an anonymous note reporting that Plaintiff's son, Ofc. John A. Scatchell ("Junior"), was "calling in sick when, in fact, he is not" and that he was "out HUNTING every morning." (JSOF ¶159) Ofc. Peter Anthony Caira was assigned to investigate, but importantly, he was not assigned to look into what Junior had been doing prior to November 13, 2017, and instead, he was assigned to investigate Junior's current activities. (JSOF ¶¶160-162) Caira did so and reported his findings to Deputy Chief Castellan and Director Pitassi. (JSOF ¶163) As part of the investigation, Junior was questioned about his activities, including going hunting in November 2017 while on medical leave, engaging in a hunting business with a convicted felon, allowing a convicted felon to possess and use a firearm in Junior's presence, and not reporting contact with law enforcement relating to the felon's possession and use of a firearm. (JSOF ¶¶165-171) As a result of the investigation, Pitassi and Castellan issued a Statement of Charges against Junior. (JSOF ¶173) Ultimately, the Board[3]

---

[3] The Charges were heard by a Board designated by the Village for hiring and termination issues relating to policemen and firefighters; the Board is formally known as the Village's Personnel Board but it functions under the name of the "Board of Fire and Police Commissioners", and just last month Junior's challenges to the Board's authority were rejected. *Scatchell v. Vge. Of Melrose Park*, 2020 IL App (1st)

found against Junior and discharged him. (JSOF ¶177) Notably, when Junior was deposed in this action, he asserted his *Fifth Amendment* rights 136 times for questions relating to his medical condition, his hunting activities in 2017, and allowing the convicted felon to possess and use a shotgun. (JSOF ¶179) Of course, those actions were key to the Board's decision to terminate his employment.

3. **Plaintiff's EEOC Charges and First Amended Complaint**: On September 11, 2017, Plaintiff filed an EEOC Charge complaining of retaliation concerning the November 2016 promotion issue, the fireworks issue and his May 1, 2017 assignment as Station Supervisor. (JSOF ¶192) On September 25, 2017, Plaintiff filed an Amended EEOC Charge, claiming additional retaliation of being "erroneously accused of rule violations and acting outside the mission of the Department." (JSOF ¶193) On March 6, 2018, the EEOC issued a "Dismissal and Notice of Rights," stating that "[b]ased upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes." (JSOF ¶198)

4. **Village Policies**: The Village prohibits discrimination on the basis of any protected characteristic (including race); moreover, the Village encourages employees to bring any "concerns about any type of discrimination" to their supervisor or Human Resources, and the Policy expressly provides that "Employees can raise concerns and make reports without fear of reprisal." (JSOF ¶188) While the Director of Police was given authority to implement rules and procedures relating to the operations of the Police Department, Pitassi did not have authority to deviate from these Policies enacted by the Village Board of Trustees, including its non-discrimination, non-retaliation policies and many other personnel-related Village Policies; indeed, even the Mayor does not have the authority to modify or deviate from those Village

---

191414-U, Pet. for Leave to App. Denied, 2020 Ill. LEXIS 1032 (Nov. 18, 2020).

policies. (JSOF ¶190) Finally, the Police Department also has an express policy on employee speech – "Nothing in this policy is intended to prohibit or infringe upon any communication, speech or expression that is protected or privileged under law. This includes speech and expression protected under state or federal constitutions as well as labor or other applicable laws."

Plaintiff has no direct evidence of any policy, practice or custom at the Village to retaliate against employees for protected speech or association. (JSOF ¶191) Nevertheless, Plaintiff believes that he was retaliated against "for Lavalais and with the FOP" decision to go to arbitration. However, each of the Individual Defendants have denied any such retaliation, and denied further that the Village has any policy, practice or custom of retaliating against employees for protected speech.

## DISCUSSION

### I. Counts I, II & IV

Count I of the Amended Complaint seeks to maintain a §1983 claim against "all Defendants." Plaintiff seeks to maintain Count II under §1981 as a separate cause of action in addition to his §1983 claim, and Count IV seeks to maintain a §1983 Conspiracy/First Amendment claim attributable to the Village through the indemnification claim in Count VI. On each of these claims, the Village adopts and incorporates by reference the arguments made by the Individual Defendants in their Motions for Summary Judgment to supplement the points made in the Village's Motion.

### II. Count III Fails Because There is No Basis for *Monell* Liability

In addition to the lack of Constitutional injury and lack of causation demonstrated in the Individual Defendants' Motions for Summary Judgment, the *Monell* claim against the Village in Count III fails because Plaintiff "has failed to establish a triable issue of fact against any of the

Individual Defendants … , he has 'no viable *Monell* claim based on the same allegations.'" *Bless v. Cook County Sheriff's Office*, Slip Op. 13C4271, 2020 BL 289578 (N.D. Ill. Aug. 3, 2020). However, even if there is some basis for §1983 claims against the Individual Defendants, which there is not, Plaintiff must do much more to assert that the Village is also liable under §1983. In order to maintain a §1983 claim against the Village, Plaintiff cannot simply rely upon the actions having been done by a municipal official. *E.g. Milestone v. City of Monroe*, 665 F.3d 774, 780 (7th Cir. 2011) ("Not every municipal official with discretion is a final policy maker; authority to make final policy in a given area requires more than mere discretion to act").

Under *Monell v. N.Y. City Dep't Soc. Servs.*, 436 U.S. 658, 691 (1978), in order to pursue a §1983 claim against the Village, there must first be a constitutional injury. *Outley v. City of Chicago*, 354 F. Supp. 3d 847, 872 (N.D. Ill. 2019). Most of the things Plaintiff complains about do not constitute constitutional injuries, but even if there is such an injury, under *Monell*, a municipality is not liable under §1983 unless the deprivation of constitutional rights is caused by a municipal policy or custom. *See Monell*, 436 U.S. at 694; *Waters v. City of Chicago*, 580 F.3d 575, 581 (N.D. Ill. 2009). Specifically, a plaintiff may establish municipal liability by showing: 1) an express policy causing a constitutional deprivation when enforced; 2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or 3) causation of the constitutional injury by a person with final policymaking authority. *Waters*, 580 F.3d at 581. *See also McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995). In order to show causation, Plaintiff must show that the "'governmental custom … not only causes but is the moving force behind the deprivation of constitutional rights.'" *Outley*, 354 F. Supp. 3d at 872, citing *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009). The "doctrine of respondeat superior may not be used to fasten liability on a local government in a suit under

section 1983." *Gernetzke v. Kenosha Unified Sch. Dist. No.* 1, 274 F.3d 464, 468 (7th Cir. 2001). Plaintiff must show that the Village "itself, which is to say the officials or official boards that constitute the relevant final decision making authority (legislative or executive) within the [Village] was directly responsible for the deprivation." *Id.* "This requirement distinguishes acts of the municipality from acts of employees of the municipality, and thereby makes clear that municipal liability is limited to action for which the municipality is actually responsible. Misbehaving employees are responsible for their own conduct; units of local government are responsible only for their policies rather than misconduct by their workers." *Waters*, 580 F.3d at 581 (citations omitted).

A.  **There Was No Express Policy of Retaliation**

"In order to hold the municipality liable … the agent's action must implement rather than frustrate the government's policy." *Auriemma v. Rice*, 957 F.2d 397, 400 (7th Cir. 1992). Here, the Village's express policy prohibits employment discrimination and retaliation and expressly recognizes protected speech. If any of the Individual Defendants retaliated against Plaintiff, which they did not, "they violated rather than implemented the policy of" the Village. *See id.* at 401. *See also Malec v. Klatzco*, 101 F. Supp 2d 1066, 1075 (N.D. Ill. 2000) ("Unless Oak Brook had a policy of retaliating against protected speech – and Malec makes no showing that it did – then Oak Brook cannot be liable"). As such, Plaintiff cannot prevail on a §1983 claim on the basis of an express policy.

B.  **There Was No Widespread Practice of Retaliation**

"To demonstrate that [his] injuries were caused by a widespread practice or custom [of retaliation, Plaintiff] must show that there was 'some knowledge or awareness – actual or imputed – of the custom and its consequences showing the municipality's approval,

acquiescence, or encouragement of the alleged constitutional violation." *Durkin v. City of Chicago*, 199 F. Supp. 2d 836, 843 (N.D. Ill. 2002). Here, just as in the *Durkin* case, Plaintiff's claimed "evidence of a 'widespread practice' relates to" the actions toward him and his son that he complains about, and just as in the *Durkin* case, that is insufficient because there is no evidence regarding how other people were treated who did not engage in protected activity.

C.     **There Was No Constitutional Injury Caused by a Policymaker**

Finally, even without a policy or custom, a municipality may be liable under §1983 if the constitutional injury is caused by a final policymaker. A person's status as a final policymaker under §1983 is a question of state or local law. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). Final policymaking authority may be granted directly by statute or delegated or ratified by an official having policymaking authority. *See id.* As the court explained in *Auriemma*:

> Any city acts exclusively through agents; the city is just a name for a complex of persons. If it were enough to point to the agent whose act was the final one in a particular case, we would have vicarious liability. Action in the course of one's duty is the basis of vicarious liability. That a particular agent is the apex of a bureaucracy makes the decision "final" but does not forge a link between "finality" and "policy". The President, a cabinet officer, or his delegate makes the final decision in the implementation of the laws without changing the fact that the President executes rather than makes law. One may doubt the footing of *Monell*, but that decision is not to be sabotaged by calling the chief bureaucrat who signs off on a particular action the city's "policymaker" for that action. 957 F.2d at 400 (citations omitted).

The key question is whether the actor "was at the apex of authority for the action in question." *Gernetzke v. Kenosha Unified Sch. Dist. No.* 1, 274 F.3d 464, 468 (7th Cir. 2001).

"The authority to *set* policy—i.e., to adopt rules for the conduct of government— distinguishes a 'final policymaker,' whose decisions may subject a municipality to §1983 liability, from an official who merely possesses 'authority to *implement* pre-existing rules.'" *Waters*, 580 F.3d at 582 (emphasis in original). "When an official's discretionary decisions are

constrained by policies not of that official's making, those policies … are the act of the municipality." *Id.*, quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). *See also Malec*, 101 F. Supp 2d at 1075 ("That Klatzco was Chief of Police and Veitch is Village Manager does not affect application of the *Monell* principle").

It is not enough to simply show that a policymaker intentionally performs an act that results in a constitutional violation; "a §1983 plaintiff must prove culpability, i.e., that the policymaker intentionally deprived him of a constitutional right." *Waters*, 580 F.3d at 583. In particular, in a First Amendment retaliation claim, "the plaintiff must prove that his speech 'was the 'reason' that the employer decided to act." *Id.*

"The setting of personnel policy for any municipality is a highly important matter." *Waters*, 580 F.3d at 583. *Waters* is on point here. Here, just as in *Waters*, personnel policy was set by the Village Board. As such, decisions relating to personnel matters, including relating to Plaintiff, "were constrained by policies not of [the Individual Defendants'] making, those policies are the act of the municipality." *Id.* at 582. And, just as *s*, because the Individual Defendants' decisions were constrained by the Village's personnel rules, they were not decisions that support liability against the Village under §1983. In this case, none of the Individual Defendants are policy makers as that term is used under §1983 because none of them have the authority to set policy regarding discrimination, retaliation or speech.

For all of the foregoing reasons, the Village is entitled to summary judgment on Plaintiff's *Monell* claim in Count III.

## III.   **Plaintiff's Title VII Retaliation Claim Fails**

In Count V Plaintiff seeks to maintain a retaliation claim under Title VII. In this claim, an employer's conduct "will be actionable … if it would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Whittaker v. Northern Ill. Univ.*, 424 F.3d

640, 648 (7th Cir. 2005). In *Robertson v. Wis. Dep't of Health Servs.*, 949 F.3d 371 (7th Cir. 2020), the court recently held:

> Ms. Robertson must show that Ms. Evans's actions would have been materially adverse to a reasonable employee, such that a reasonable employee would have been deterred from making or supporting an investigation of discrimination. … our previous cases indicate that challenged actions involving the reassignment of job responsibilities are typically not materially adverse unless there is a "significant alteration to the employee's duties, which is often reflected by a corresponding change in work hours, compensation, or career prospects." We judge each case "from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' *Id.* at. 382-383 (citations omitted).

The Seventh Circuit held further: "'[S]nubbing by supervisors and coworkers'" is not actionable. Similarly, '[u]nfair reprimands or negative performance reviews, unaccompanied by tangible job consequences, do not suffice ....' In other words, 'Title VII protects against discrimination, not 'personal animosity or juvenile behavior.'" 949 F.3d at 382-383 (citations omitted).

Thus, Title VII "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Outley*, 354 F. Supp. 3d at 869, citing *Burlington N. and Santa Fe Ry. Co. v. White, 548* U.S. 53, 67 (2006). "Not everything that makes an employee unhappy qualifies as an adverse action for Title VII." *Rhodes v. IDOT*, 359 F.3d 498, 505 (7th Cir. 2004) (reassignment and actions that had only negligible impact on plaintiff's income "did not cause her material harm"); *Mercer v. Cook Cty.*, Slip Op. No. 15C7262, 2017 U.S. Dist. LEXIS 142191 *9 (N.D. Ill. Aug. 31, 2017) ("the mere fact that a myriad of employees that worked with Mercer may not have liked her and had personal animosity towards her is not a basis to sue under Title VII").

A. **No Evidence of Causation**

Most of Plaintiff's Title VII arguments fail because there is simply no evidence that the actions he complains of were done to retaliate against him for protected activity; in other words, he cannot show causation. Some of the claims are based purely on his speculation, such as

12

Plaintiff's claim that Christine Piemonte called him about a job for her brother to try to trap him into some form of admission. [See Dkt. 71 ¶86(c)]

As to the fireworks incident, Plaintiff cannot show that it had any connection to his employment, let alone that any Defendant participated in that incident. As the court held in *Mercer,* 2017 U.S. Dist. LEXIS 142191 *8, plaintiff "fails to point to evidence to indicate that such an occurrence, even if true, was the product of some hidden conspiracy against [him]. Every employee who gets a flat tire at work from running over screws or other objects is not necessarily being secretly persecuted by coworkers. [Plaintiff] cannot proceed to trial and ask the trier of fact to speculate blindly on such matters."

Plaintiff also complains about the decision to table his promotion to Deputy Chief, and at first blush, that would seem to be adverse, but it was not. The promotion possibility was nothing other than an incentive for early retirement, although "early" is not particularly accurate since Plaintiff testified that he had been planning to retire then anyway. An "offer of incentives to retire early is a benefit to the recipient, not a sign of discrimination." *Henn v. Nat'l Geographic, Soc*., 819 F.2d 824, 828 (7th Cir. 1987). Here, it was obvious that Plaintiff did not accept the retirement incentive when his attorney called to inquire about an employment contract, essentially a rejection of the "deal." Thus, tabling the promotion was not an adverse action at all, it was simply the consequence of Plaintiff rejecting the retirement incentive as originally proposed.

More importantly though, where the decisionmaker did not know of any alleged protected speech, tabling the promotion could not have been motivated by any claimed protected speech. *E.g. Waters*, 580 F.3d at 584; *McGreal v. V'ge of Orland Park*, 850 F.3d 308, 313 (7th Cir. 2017) (to show that an adverse action was "motivated by his protected speech, [plaintiff]

must first demonstrate that the defendants knew of the protected speech"). Here, there is simply no basis for Plaintiff's claim that the decision to table the promotion was motivated by protected speech because there is no evidence that he engaged in any protected speech as of the date the promotion was tabled (November 14, 2016); Plaintiff claims that during the FOP meetings during that period, he did not take a position on Lavalais' grievance. Since there was no protected speech as of November 14, 2016, Defendants could not possibly have had knowledge of it. And, even if Plaintiff had taken a position regarding Lavalais' grievance, there is no basis for claiming that any of the Individual Defendants knew of it. Because there was no causal connection between any protected speech and the November 14, 2016 decision to table the promotion, this claim fails for this reason as well.

Next, as to the Station Supervisor assignment in May 2017, even if the Court were to construe the reassignment as adverse, that claim likewise fails because Plaintiff cannot show a causal connection between any protected speech and that decision either. Plaintiff will likely argue that the interval between his alleged support for Lavalais and his reassignment to Station Supervisor shows causation, but he is wrong. The Seventh Circuit has explicitly held that:

> suspicious timing will "'rarely be sufficient in and of itself to create a triable issue.'" The reason is obvious: "[s]uspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment." Accordingly, for a suspicious-timing argument alone to give rise to an inference of causation, the plaintiff must demonstrate that "an adverse employment action follows close on the heels of protected expression, and the plaintiff [must] show that the person who decided to impose the adverse action knew of the protected conduct."
>
> There can be no set legal rule for determining whether an adverse employment action falls "close on the heels" of protected activity because such a determination "depends on context." Of course, "[t]he closer two events are, the more likely that the first caused the second." But it is clear from our case law that the time period between the protected activity and the adverse action must be "very close." For an inference of causation to be drawn solely on the basis of a suspicious-timing argument, we typically allow no more than a few days to elapse between the

protected activity and the adverse action. *Kidwell v. Eisenhower*, 679 F.3d 957, 966 (7th Cir. 2012) (emphasis added).

*See also O'Leary v. Accretive Health, Inc*., 657 F.3d 625 (7th Cir. 2011). In *Burks v. Wis. DOT*, 464 F.3d 744, 758 (7th Cir. 2006), the court noted, "'[t]he mere fact that one event preceded another does nothing to prove that the first event caused the second'; the plaintiff also must put forth other evidence that reasonably suggests that her protected speech activities were related to her employer's [adverse action decisions]." 464 F.3d at 758-59 (citations omitted). Because the time between Plaintiff's alleged protected speech and his Station Supervisor assignment was two to six months, there is no causation for summary judgment purposes.

Aside from the lack of timing-based causation, summary judgment is also appropriate because the Village treated DiMaio, who did not engage in protected speech, the same as it treated Scatchell. This consistent treatment prevents Plaintiff clearing the high "but for" hurdle in order to survive summary judgment on his retaliation claim. *E.g. Lord v. High Voltage Software, Inc*., 839 F.3d 556, 565 (7th Cir. 2016); *Durkin*, 199 F. Supp. 2d at 846 (retaliation claim requires a showing that "only [plaintiff], and not any otherwise similarly situated employee who did not complain, was … subjected to an adverse employment action").

Finally, Plaintiff claims that the Village retaliated against him by investigating his son's misconduct and ultimately discharging his son, citing *Thompson v. North Am. Stainless, L.P.*, 562 U.S. 170, 174 (2011) ("a reasonable worker might be dissuaded from engaging in protected activity if she knew that her fiancé would be fired"). This theory does not apply to Plaintiff though.  In *Stanek v. St. Charles Cmty Unit Sch. Dist. #103*, 783 F.3d 634, 641 (7th Cir. 2015), the Court addressed such a claim and held that the alleged retaliatory action must be addressed at the Plaintiff for the actions of the Plaintiff. *Id.* at 641 (plaintiff's "allegation focuses on actions the District took against his parents…. Crucially, [plaintiff] does not say that the District

retaliated against him based on any protected action that *he* took. Without such an allegation, he has not stated a claim for retaliation).

Moreover, there is no evidence of causation. The investigation relating to Junior's misconduct started on November 13, 2017. Plaintiff had filed his EEOC Charges in September 2017, two months before the investigation started, and that interval does not support causation. *Kidwell v. Eisenhower*, 679 F.3d 957, 966 (7th Cir. 2012) ("we typically allow no more than a few days to elapse between the protected activity and the adverse action"). But, that interval itself does not even apply because none of the Individual Defendants knew of the EEOC Charge as of November 13, 2017. The first to learn of the EEOC Charge was Pitassi on November 14, 2017, the day after the investigation was begun. *See Rao v. Gondi*, Slip Op. 14C66, 2017 US Dist. LEXIS 86152 *74-75 (N.D. Ill. June 5, 2017) (timing of the protected activity was not significant where investigations found misconduct and there was no evidence decision makers were aware of plaintiff's protected activity at the time the investigation was commenced). Moreover, there is no dispute that an anonymous note triggered the son's investigation, there is no fact linking any Defendant to that event.

B.    **No Adverse Employment Actions**

Even if there was some evidence as to causation, which there is not, the incidents that Plaintiff is unhappy about are not "adverse" actions. For example, Plaintiff complains about the fireworks incident and the investigation relating to it. Plaintiff's real issue is that he did not think that Rogowski showed him the courtesy of keeping Plaintiff appraised, but that argument fails too. *See Manley v. Daniels*, 2012 U.S. Dist. LEXIS 161622 * (N.D. Ind. Nov. 2, 2012) ("The Constitution isn't a code of civility"). *Cf. Boss v. Castro*, 816 F.3d 910 (7th Cir. 2016) ("Because Title VII does not set forth a general civility code for the American workplace, its anti-retaliation

16

provision does not protect against petty slights, minor annoyances, and bad manners").

Plaintiff is also not satisfied with how the citizen complaint against him from the August 2017 traffic stop was handled and the possibility of discipline, but that claim fails too. If there was misconduct, the Village could properly discipline Plaintiff for it without running afoul of §1983. *See Kidwell*, 679 F.3d at 967 ("an employee's complaint … does not immunize [him] from being subsequently disciplined or terminated for inappropriate workplace behavior"). But, the fact that there was no discipline as a result of the investigation dooms Plaintiff's claim. *E.g. Keeton v. Morningstar, Inc.*, 667 F.3d 877, 885-86 (7th Cir. 2012) ("affirming summary judgment for employer because there was "no evidence that the investigation was anything other than a legitimate attempt to discover" misconduct and "[m]ore importantly, no adverse action of any kind was taken against [plaintiff] as a result of the investigation and the investigation itself was not an adverse employment action"); *Sumi Cho v. Perea*, Slip Op. No. 18C8117, 2019 U.S. Dist. LEXIS 162564, *29 ("while 'the possibility of discipline can be stressful,' it is 'not enough to support a claim for retaliation'").

As to the reassignment to Station Supervisor, "'reassignment of job duties is not automatically actionable,' [the] standard for assessing such a reassignment is objective, rather than a subjective, one." *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 729 (7th Cir. 2009), citing *White v. Burlington Norther & Santa Fe R. Co.*, 548 U.S. 53, 71 (2006). "'A plaintiff must show more than an inconvenience or alteration of job responsibilities' in order to demonstrate an adverse employment action." *Banks v. Chicago Bd. of Ed.*, Slip Op. No. 11C7101, 2013 U.S. Dist. LEXIS 33611 *25 (N.D. Ill. Mar. 12, 2013). *See also Outley*, 354 F. Supp. 3d at 870-71 (granting summary judgment for employer on reassignment claim because "the conditions in which he worked were not 'changed in a way that subjected him to a humiliating, degrading,

17

unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment,' as contemplated by the retaliation framework"). In short, there is simply no evidentiary support for Plaintiff's claim that the reassignment to Station Supervisor was an adverse action, especially when: 1) there were two people reassigned to the same position and the other had not engaged in recognized protected activity; 2) the other individual was so happy with the assignment that he returned from sick leave early for it; 3) Plaintiff was given the working hours of his preference; and 4) there was no change in his rank, rate of pay, benefits or career prospects based on the reassignment, and any effect on his overall compensation was negligible.

As to the office assignment, Plaintiff seeks to castigate the decision by claiming that the office he was assigned to was nicknamed "the Hole." Here too though, the objective evidence simply does not support Plaintiff's argument. The office was the same office the other Station Supervisor (DiMaio) was to use, it had external windows and was large enough for Plaintiff to bring in his recliner, television, etc. Moreover, that is the same office that had been used by prior Station Supervisors and by a Deputy Chief. *E.g. Frett v. Howard Univ.*, 2016 U.S. Dist. LEXIS 15061 n.3 (D.C. Dist. 2016) (allegation that plaintiff was assigned to a "dirty" office did not result "objectively tangible harm"); *Ballard v. Children's Aid Soc'y*, 781 F. Supp. 2d 198, (S.D.N.Y. 2011) (with respect to a shared office with no phone or computer, "the Court is not persuaded that these are the type of actions that would have deterred a reasonable employee from engaging in protected activity"); *Moore v. Abbot Labs*, 780 F. Supp. 2d 600, 620 (S.D. Oh. 2011) (claim that plaintiff was assigned to a "paper closet" as an office).

Finally, even if the situation with Plaintiff's son could create a retaliation claim <u>for Plaintiff</u>, the claim nevertheless fails because in addition to the lack of any causal connection between the investigation and any protected activity by Plaintiff; the investigation of Plaintiff's

son is not an adverse action. *Keeton*, 667 F.3d at 885-86 ("affirming summary judgment for employer because there was "no evidence that the investigation was anything other than a legitimate attempt to discover" misconduct). In the same manner, the decision to issue charges may have been stressful, but it is not actionable, and that was the extent of Pitassi's and Castellan's authority.

Further, even if there was some evidence of a causal connection between Plaintiff's speech and 1) the decisions to investigate his son's misconduct, 2) the issuance of Charges based on the objective results of the investigation and then 3) the termination of his son's employment after a full hearing, Plaintiff's claim fails because Plaintiff cannot show that what happened to his son was improper. Junior was discharged after an evidentiary hearing where, according to the Circuit Court, the decision to discharge was "well supported by the evidence." Those were legitimate and non-retaliatory reasons for his discharge. *E.g. Bless, supra* (discharge for conduct including "disobeying his doctors' orders and, thus, prolonging the recovery necessary to return to work" and "neglecting to secure approval" of secondary employment). Moreover, the fact that Junior asserted his *Fifth Amendment* rights to questions relating to the Charges that led to his misconduct means this Court should draw an adverse inference regarding Junior's misconduct. *E.g. Anderson v. City of Rockford,* 932 F.3d 494, 511 (7th Cir. 2019); *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir. 1995). In addition though, Plaintiff testified that he has no personal knowledge of his son's hunting activities, and in light of Junior asserting the *Fifth Amendment* regarding his hunting activities, there is simply no evidence that Plaintiff can use to dispute Junior's misconduct. (Pl. Dep. 307) ("He has his friends. They went hunting. He went out…. I wouldn't say he was hunting. I didn't know that. I didn't go out with him"). While Plaintiff argues that discipline to his son was too harsh, the argument cannot support Plaintiff's

19

claims. In *O'Leary*, 657 F.3d 625, the court addressed that very argument: "O'Leary vigorously disputes the merits of these criticisms. But it is not for us to decide whether Tolan was right or wrong in finding his performance wanting. We do not sit as a super personnel department." *Id*. at 638.

Plaintiff next argues that his son was treated more harshly than other officers, but this argument fails because the other officers are not similarly situated to Plaintiff. "Similarly situated employees must be 'directly comparable to the plaintiff in all material respects, which includes showing that the coworkers engaged in comparable rule or policy violations.'" *Patterson v. Ind. Newspapers, Inc*., 589 F.3d 357, 365-66 (7th Cir. 2009) (internal citations omitted), quoting *Raymond v. Ameritech Corp*., 442 F.3d 600, 610-11 (7th Cir. 2006) and *Jordan v. City of Gary, Ind.*, 396 F3d 825, 834 (7th Cir. 2005). Courts generally consider "if the two employees deal with the same supervisor, are subject to the same standards, <u>and have engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them</u>." *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 540 (7th Cir. 2007) (emphasis added). Being "similarly situated" requires that the individual who allegedly received more favorable treatment must at least share a "comparable set of failings." *Haywood v. Lucent Techs., Inc*., 323 F.3d 524, 530 (7th Cir. 2003). "In disparate discipline cases, courts look to whether the alleged comparators 'engaged in comparable rule or policy violations and received more lenient discipline.'" *Kralka v. Bd. of Trustees of Comm. College Dist. No. 508*, 75 F. Supp. 3d 909, 915 (N.D. Ill. 2014).

Plaintiff cannot meet that showing because there were no other officers who engaged in comparable rule or policy violations. The only one who engaged in sick leave abuse, Phillip Negron, was put on charges which were recommended by Plaintiff because Negron had worked

a school function on one day of his sick leave, but there is no suggestion that Negron engaged in the same or similar conduct as Plaintiff's son – Negron did not fail to report contact with and provide false information to another law enforcement officer, violate State law by allowing a convicted felon to possess and use a shotgun, or refuse to obey a direct order. Accordingly, because Plaintiff cannot present evidence suggesting that his son's discharge was improper, that alone is dispositive of any claim relating to his son's discharge in this action.

### C.     Plaintiff Cannot Show that the Decisions Were Pretextual

Even if Plaintiff can establish a prima facie claim under Title VII, the Village may defeat it by articulating legitimate and non-retaliatory reasons for its actions and at that point Plaintiff loses unless he can present evidence of pretext. *Robertson*, 949 F.3d at 378; *Burks*, 464 F.3d at 758. Here, Plaintiff cannot prevail because he cannot show that the Defendants' explanations for their actions were pretextual. In *Robertson*, the court recently articulated the pretext standard: "In determining whether the employer's reason can be characterized as pre-textual, we do not evaluate whether the employer's proffered justification was accurate or even whether it was unfair. Our sole focus is on whether the employer's stated reason can be characterized as a falsehood rather than an honestly held belief." 949 F.3d at 378. *See also Outley*, 354 F. Supp. 3d at 866 ("Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phone reason for some action"), citing *Tibbs v. Admin. Office of the Ill. Courts*, 860 F.3d 502, 506 (7th Cir. 2017).

To show pretext, Plaintiff "must present evidence suggesting that the employer is dissembling." *O'Leary*, 657 F.3d at 635. In other words, the key question is "whether the employer honestly believed the reason it has offered to explain" the decision being challenged. *Id*. Courts "do not require that an employer rigidly adhere to procedural guidelines in order to

avoid an inference of retaliation. Instead, we look for pretext in the form of 'a dishonest explanation, a lie rather than an oddity or an error.'" *Kidwell*, 679 F.3d at 969. It is generally for an employer to interpret its own policies and "[w]hat is more, simply showing a violations of policy is not enough. [Plaintiff] must point to a 'dishonest explanation for deviating from policy, a lie rather than an oddity or an error.'" *Id.* at 971. *See also Fane*, 480 F.3d at 541 ("If [defendant] honestly believed the reasons it gave, [plaintiff] loses even if the reasons are foolish, trivial or baseless"). Because Plaintiff cannot show that any of the explanations for the decisions he complains about were a pretext for retaliation, he cannot prevail on Count VI, his Title VII retaliation claim.

## <u>CONCLUSION</u>

The bottom line here is that although Plaintiff sought to see how much spaghetti he could stick to the wall, none did. The Village of Melrose Park therefore respectfully requests that this Honorable Court enter summary judgment in its favor and against Plaintiff on each of his claims against the Village.

Dated: January 4, 2021                    VILLAGE OF MELROSE PARK

By:     /s Jeffrey S. Fowler     
One of Its Attorneys

Jeffrey S. Fowler (6205689)
Laner Muchin, Ltd.
515 North State Street, Suite 2800
Chicago, Illinois 60654
(312) 467-9800
(312) 467-9479 (fax)

## Certificate of Service

I, the undersigned attorney, hereby certify that a copy of the foregoing Memorandum of Law was served upon counsel of record on this 4th day of January, 2020 through the functions of the Court's e-filing system, to:

> Gianna Scatchell
> Disparti Law Group, PA
> 121 West Wacker Drive, Suite 2300
> Chicago, Illinois 60601
> Gia @dispartilaw.com
>
> Cass T. Casper, Esq.
> Disparti Law Group, PA
> 121 West Wacker Drive, Suite 2300
> Chicago, Illinois 60601
> ccasper@dispartilaw.com
>
> K. Austin Zimmer
> Del Galdo Law Group, LLC
> 1441 South Harlem Avenue
> Berwyn, Illinois 60402
> zimmer@dlglawgroup.co,
>
> Michael Bersani
> Hervas, Condon & Bersani, P.C.
> 333 W. Pierce Road, Suite 195
> Itasca, Illinois 60143-3156
> mbersani@hcbattorneys.com
>
> /s Jeffrey S. Fowler