**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN SCATCHELL, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-3989 |
| | ) | |
| v. | ) | Honorable John F. Kness |
| | ) | |
| VILLAGE OF MELROSE PARK, | ) | Magistrate Judge Jeffrey Cummings |
| ROANLD M. SERPICO, SAM C. PITASSI, | ) | |
| MICHAEL CASTELLAN and STEVE | ) | JURY TRIAL DEMANDED |
| ROGOWSKI, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' JOINT RULE 56.1 STATEMENT OF UNDISPUTED FACTS**
**IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT**

NOW COME the Defendants, VILLAGE OF MELROSE PARK, by and through its attorney, JEFFREY S. FOWLER of LANER MUCHIN, LTD.; RONALD M. SERPICO by and through his attorney, K. AUSTIN ZIMMER of DELGADO LAW GROUP, LLC.; and, SAM C. PITASSI, MICHAEL CASTELLAN and STEVE ROGOWSKI, by and through their attorney, MICHAEL D. BERSANI of HERVAS, CONDON & BERSANI, P.C., and for their joint Rule 56.1 statement of undisputed facts in support of their respective motions for summary judgment, state as follows:

**PARTIES**

1.      John Scatchell (hereinafter "Scatchell" or "Scatchell Sr.") was employed as a police officer with the Village of Melrose Park Police Department from February 15, 1985 through the date of his retirement on June 8, 2018. (Scatchell Dep., p. 9)

2.      Scatchell was promoted to lieutenant in 2011.  (Scatchell Dep. 81, 305)

3.      The Village of Melrose Park is an Illinois municipal corporation. (Dkt. No. 76 ¶2)

4.      Ronald Serpico is the Mayor of the Village of Melrose Park. (Serpico Dep., p. 23)

5.      Scatchell has known Serpico for fifty years and considered him to be a friend. (Scatchell Dep. 251, 253)

6.      Sam Pitassi is the Director of Police for the Village of Melrose Park. (Pitassi Dep., pp. 11-12, Pitassi Aff. ¶ 1)

7.      Steve Rogowski became a police lieutenant in 2004 and is currently a Deputy Chief of Police in charge of Investigations. (Rogowski Dep., p. 10, 12; Rogowski Aff. ¶ 1)

8.      Michael Castellan was a Deputy Chief of Police in charge of the Patrol Division and was required to retire in December of 2019 at the age of 62 pursuant to Village ordinance mandating that all police officers retire at the age of 62 if they have 30 years or more of service. (Castellan Dep., pp. 9-10; Castellan Aff. ¶¶ 1-4; Ord. No. 2190)

9.      The Village's Police Department has about 70 officers, and in 2016 there were 5-8 patrol officers on duty per shift.  (Castellan Dep. 11; Rogowski Dep. 39, 68)

## RESIDENCY REQUIREMENT

10.      In 2016, the Village of Melrose Park had an ordinance that required police officers to reside within the jurisdictional boundaries of the Village. (Scatchell Dep., pp. 14-15; Pitassi Dep. Ex. 7,  Melrose Park Ord. no. 2.52.090)

11.      The Collective Bargaining Agreement ("CBA") between the Village and the Fraternal Order of Police Lodge 19 ("FOP") required police officers to reside within the Village limits. (Scatchell Dep., p. 15; Serpico Dep. Ex. 3, Collective Bargaining Agreement ("CBA"), p. 173 § 2.3)

12.      Scatchell negotiated and signed the CBA on behalf of the FOP.  (Serpico Dep. pp, 131-32; Serpico Dep. Ex. 3, CBA, p.181)

13.      The CBA was adopted by the Village Board, by Ordinance.  (Rogowski Dep. Ex. 1, Ord. 1783)

14.     In about 2015, the Village became aware that some of its employees were violating the residency requirement and the Village initiated investigations and then enforcement actions. (Serpico Dep. 120-22, 216; Scatchell Dep. 14, 327-28)

15.     As of September 1, 2016, some Village employees had been discharged as a result of residency violations.  For example, on August 25, 2016, Firefighter John Cannici was discharged by the Village's Board of Fire & Police Commissioners for violating the Village's Residency Ordinance; Cannici, who is Caucasian, was not given the opportunity to resume residency to avoid termination.  (Piemonte Aff. ¶3; *Cannici v. Village of Melrose Park*, 2019 IL App (1st) 181422; *Figueroa v. Bd of Fire & Police Comm'rs of the Village of Melrose Park*, 2020 IL App (1st) 181708-U)

16.     As of September 1, 2016, Sergeant Kyll Lavalais (who is African American) did not reside within the Village limits. (Scatchell Dep., p. 15; Pitassi Dep., pp. 102-104, 111)

17.     On September 1, 2016, Director Pitassi and Deputy Chief Castellan ordered Sergeant Lavalais to establish residency within the Village limits within one year. (Scatchell Dep., pp. 15-18; Pitassi Dep., p. 104; Castellan Dep., pp. 127-128; Castellan Dep. Ex. 2, Lavalais Residency Order)

18.     Lavalais is the only employee who was given the opportunity to reestablish residency.  (Serpico Dep. 120; Pitassi Dep. 270, 272)

19.     Lavalais filed grievances pursuant to the CBA stating that he was exempt from the residency requirement pursuant to a 1987 federal consent decree, and the grievances were denied. (Pitassi Dep., pp. 104-105)

20.     Lavalais requested that the FOP file for grievance arbitration pursuant to the CBA. (Scatchell Dep., p. 16)

21.     Scatchell was the President of the FOP Board of Trustees. (Scatchell Dep., p. 15)

22.     Before Lavalais' request was presented to the FOP Board, Scatchell spoke with Pitassi in Pitassi's office about the grievance but Scatchell did not express any personal viewpoint or opinion about the grievance.  Pitassi responded, "either way you go, you're going to get sued. You're in a bad position."  Scatchell understood Pitassi's statement to mean that the FOP had no choice but to investigate whether there were grounds to go to arbitration.  (Scatchell Dep. pp. 28, 30-32)

23.     On September 30, 2016, the FOP Executive Board held an emergency meeting to discuss Lavalais' request for grievance arbitration but did not vote on the request and instead discussed requesting an extension to obtain proper documentation. (Scatchell Dep., p. 16; Natale Dep., p. 81; Natale Dep. Ex. 5, FOP Minutes, 9/30/16; Natale Dep. Ex. 5 p. 409)

24.     On October 11, 2016, November 1, 2016, and December 13, 2016, the FOP Board and membership met, and the minutes from the meetings do not reflect any vote on Lavalais' grievance arbitration request or any positions taken by Plaintiff concerning the request. (Natale Dep. Ex. 5, FOP Minutes, 10/11/16 (VMP-JJS 3354-3358), 11/1/16 (Natale Dep. Ex. 5, p. 953), and 12/13/16 (Natale Dep. Ex. 5, final page)

25.     Scatchell remained neutral and did not make any statement for or against Lavalais' grievance arbitration at any FOP meeting. (Scatchell Dep., pp. 27, 38; FOP Minutes. 9/30/16, 10/11/16, 11/1/16, and 12/13/16)

26.     Mayor Serpico had no recollection of receipt of a copy of Lavalais' grievance or of any conversations with Pitassi, Castellan, or Rogowski about it when it was filed. (Serpico Dep. pp. 100-107)

27.     Mayor Serpico had no recollection of ever discussing the Lavalais' grievance with

Scatchell Sr. (Serpico Dep. p. 135)

28.     Mayor Serpico has never attended any FOP meeting including in more than 23 years with the Village. (Serpico Dep. p. 146)

29.     In 2016, Mayor Serpico was not even aware Scatchell Sr.'s daughter represented the FOP. (Serpico Dep. p. 159)

30.     Defendants Pitassi, Castellan, and Rogowski were not present at any of the FOP meetings, and were not aware of any statements made by Scatchell relating to the Kyll Lavalais residency order, grievance, or grievance arbitration. (Pitassi Aff. ¶ 2, 3; Castellan Aff. ¶ 5; Rogowski Aff. ¶ 2, 3)

31.     Scatchell did not express any personal viewpoint or opinion to Pitassi, Castellan, or Rogowski about Lavalais' grievance arbitration request. (Scatchell Dep., pp. 33-35, 117; Pitassi Aff. ¶ 8; Castellan Aff. ¶ 8; Rogowski Aff. ¶ 5)

32.     Pitassi, Castellan and Rogowski are not aware of any statements, opinions, or viewpoints made by Scatchell, at any time, about or opposing race discrimination in the enforcement of the Village's ordinance mandating that police officers establish residency in the Village limits (Pitassi Aff., ¶¶ 4-5; Castellan Aff., ¶¶ 6-8; Rogowski Aff., ¶¶ 3-5).

33.     On November 10, 2016, an FOP attorney wrote an email on behalf of the FOP and Lavalais to the Village attorneys demanding that the Village rescind the September 1, 2016 Lavalais residency order. (Scatchell Dep. Ex. 2, 11/10/16 Email)

34.     Nothing in the November 10, 2016 email referenced any position taken by Scatchell personally regarding the Lavalais residency order. (Scatchell Dep., pp. 40-45; Scatchell Dep. Ex. 2, 11/10/16 Email)

35.     On November 22, 2016, the Village Attorney responded by email to the FOP

attorney's November 10, 2016 email, stating among other things: "You, as the purported attorney for the FOP, have taken an adverse position to the village and have twice threatened suit against the Village over two separate matters" (Scatchell Dep., p. 68); Scatchell Dep. Ex. 3).

36.     Scatchell admitted that the reference to "an adverse position" in the November 22nd email was in reference to the position taken by the FOP, and he did not know what the statement "twice threatened suit over two separate matters" was referring to (Scatchell Dep, pp. 68-74).

37.     Scatchell admitted in his deposition that he believed that the individual Defendants did not decide to retaliate against him until November 22, 2016, which was after the topic of Scatchell's promotion to deputy chief was tabled by the Village Board of Trustees.  (Scatchell Dep. pp. 74-75)

38.     On December 13, 2016, the FOP membership elected new officers. (Natale Dep. Ex. 5, final page, FOP Minutes, 12/13/16)

39.     Raul Rodriguez was elected the FOP President; Dennis Natale was elected secretary; and Steve Pesce was elected treasurer, and they took office starting in January of 2017. (Scatchell Dep., p. 18; Natale Dep., pp. 18-19)

40.     On January 5, 2017, Scatchell signed a declaration relating to litigation filed by Lavalais against the Village in federal court. (Scatchell Dep., p. 109; Scatchell Dep. Ex. 5, January 5, 2017 Declaration)

41.     Scatchell never spoke with Pitassi, Castellan or Rogowski about the January 5, 2017 declaration. (Scatchell Dep., pp. 117-119)

42.     On March 3, 2017, Scatchell signed an affidavit relating to litigation filed by Lavalais and the FOP before the Illinois Labor Relations Board. (Scatchell Dep., pp. 123-124; Scatchell Dep. Ex. 6, March 3, 2017 Affidavit)

43.     Scatchell did not personally know if Pitassi, Castellan or Rogowski knew about the March 3, 2017 affidavit. (Scatchell Dep., pp. 127-128)

44.     Serpico, Pitassi, Castellan and Rogowski did not know about the January 5, 2017 or March 3, 2017 declaration or affidavit until they attended Scatchell's deposition in 2019. (Serpico Dep., p. 213; Pitassi Dep., pp. 305-306; Rogowski Dep., pp. 134-136; Pitassi Aff. ¶ 6; Castellan Aff. ¶ 9; Rogowski Aff. ¶ 6)

45.     The arbitration hearing never took place because the Village reached a settlement with Lavalais before the arbitration began. (Pitassi Aff. ¶16; *Lavalais v. Village of Melrose Park*, Case No. 16-cv-10454, Dkt. Entry No. 39, attached as Ex. A)

## DEPUTY CHIEF PROMOTION

46.     Mayor Serpico is responsible for recommending individuals for promotion or appointment to the position of deputy chief of police and his recommendations are put to a vote to the Village Board of Trustees. (Piemonte Dep., pp. 16-17, 22-23, 140-141; Serpico Dep. 54; Scatchell Dep., p. 50)

47.     As of the Fall of 2016, Scatchell planned to retire from his position as a police lieutenant in early 2017.  (Scatchell Dep., pp. 269-70, 336-37)

48.     In the Fall of 2016, Mayor Serpico and Scatchell had an understanding that Scatchell would be promoted to Deputy Chief and that he would retire after the first of the year. (Serpico Dep., p. 59; Scatchell Dep., pp. 267-69)

49.     Being promoted to Deputy Chief would have given Plaintiff an enhanced pension because pension payments are 75% of the individual's last salary, and that was important to Scatchell. (Serpico Dep., pp. 60, 200-206; Scatchell Dep., pp. 10-11)

50.     An agenda for the November 14, 2016 Village Board of Trustees meeting included the potential promotion of Scatchell to Deputy Chief. (Scatchell Dep., pp. 46-47; Serpico Dep., p.

57)

51.     Mayor Serpico approved the placement of Scatchell's promotion on the agenda with the understanding after talking to Scatchell that he planned on retiring from the police department in January of 2017 and could obtain more money if promoted first. (Scatchell Dep., p. 270; Serpico Dep., pp. 57-60)

52.     It was Mayor Serpico's intent to promote Scatchell until January of 2017 when he said he would retire because he liked Scatchell and wanted to give him the opportunity to earn extra money in retirement. (Serpico Dep., pp. 200, 205-206) In addition, the retirement incentive would benefit the Village because it would allow the Village to replace Scatchell's position with a lower paid police officer; in particular, the lieutenant salary in 2017 was about $108,000 per year, more than double the salary of a junior police officer.  (Piemonte Aff. ¶ 2; Scatchell Dep., p. 10; Scatchell Dep. Ex. 9, p.2850; Serpico Dep., p. 201)

53.     Prior to the Board meeting on November 14, Scatchell's attorney called the Village's attorney to ask about an employment contract for Scatchell in the new position and Serpico believed that Scatchell would renege on their discussion and that if he were promoted to Deputy Chief, he would not retire after the first of the year as they had discussed.  (Scatchell Dep., pp. 60, 262-63; Serpico Aff. ¶7)

54.     Scatchell is not aware of any other Deputy Chiefs who had employment contracts. (Scatchell Dep., p. 263)

55.     At the November 14, 2016 Village Board meeting, the Village Board voted to table the promotion of Scatchell. (Serpico Dep., p. 62; Village Board Minutes, 11/14/16, VMP-JJS 3371-3375)

56.     Pitassi, Castellan and Rogowski were not involved with Scatchell's potential

promotion or the tabling of his promotion. (Scatchell Dep., pp. 58-59, 62-63, 68; Pitassi Dep., p. 197; Rogowski Dep., p. 130; Castellan Dep., p. 23)

57.     On November 28, 2016, Mayor Serpico recommended the promotion of Lieutenant Steve Rogowski to Deputy Chief of Police, and the recommendation was approved by the Village Board of Trustees. (Scatchell Dep., pp. 78-79; Serpico Dep., pp. 49, 54-55, 202; Minutes, 11/28/16, VMP-JJS 3379-3385)

58.     Mayor Serpico recommended Rogowski because of his reputation as the smartest person in the police department. (Serpico Dep., pp. 50-52)

59.     Mayor Serpico did not expect Rogowski to retire because he didn't have 30 years of service. (Serpico Dep., p. 206)

60.     Rogowski had been in the lieutenant's position longer than Scatchell. (Scatchell Dep., pp. 80-81)

61.     Pitassi, Castellan and Rogowski were not involved in the decision to promote Rogowski. (Scatchell Dep., p. 80; Serpico Dep., p. 49; Pitassi Dep., p. 196; Rogowski Dep., pp. 116-123; Piemonte Dep., pp. 19, 24-25)

## PENSION BOARD MEETING

62.     Scatchell attended a pension board meeting on April 17, 2017, and verbally opposed the pension board's directive to allow Officer Peter Anthony (aka "Tony") Caira a lateral transfer to Melrose Park Police Department. (Scatchell Dep., pp. 128-131; Scatchell Dep. Ex.7)

63.     The written minutes from the pension board meeting do not reflect Scatchell's verbal comments. (Scatchell Dep., p. 131; Scatchell Dep. Exhibit 7).

64.     Pitassi, Castellan and Rogowski did not attend the meeting (Scatchell Dep., p. 131; Pitassi Dep., pp. 275-276; Pitassi Aff. ¶ 7; Castellan Aff. ¶ 10; Rogowski Aff. ¶ 7)

65.     Scatchell testified that he spoke with Pitassi and Castellan after the pension meeting and he told them that he just didn't think the transfer was right because the pension was underfunded. (Scatchell Dep., pp. 134-138)

66.     Scatchell never spoke with Rogowski about the Caira transfer or the statements he made at the pension board meeting. (Scatchell Dep., p. 138, Rogowski Aff. ¶8)

### RESTRUCTURING THE PATROL SHIFT

67.     In January of 2017, Director Pitassi and Deputy Chief Castellan decided to restructure the patrol division by instituting permanent shifts, changing shifts from 8 to 8 ½ hours, instituting a new scheduling system, eliminating the need for two lieutenants on a shift to one lieutenant and one sergeant per shift, and appointing station supervisors. (Pitassi, Dep., pp. 205-206, 210-211; Castellan Dep., pp. 16, 130-132; Pitassi Aff. ¶ 12)

68.     Prior to 2017, the Melrose Park Police Department had lieutenants assigned as Station Supervisors, but through attrition, as of early 2017, there were none.  (Scatchell Dep., pp. 192-193; DiMaio Dep. pp.14-15; Pitassi Dep., p. 210; Pitassi Aff., ¶ 12)

69.     As part of the restructuring, Pitassi wanted to assign one lieutenant and one sergeant to each patrol shift so there would be a clear chain of command. (Pitassi Aff., ¶ 9 )

70.     As part of the restructuring, on May 1, 2017, Pitassi reassigned Lt. Dino DiMaio and Lt. John Scatchell to station supervisors positions. (Pitassi Dep., pp. 205-206, 251-252, 286; VMP-JJS 2842, DiMaio Memo, dated 5/1/17; VMP-JJS 927, Scatchell Memo., dated 5/1/17)

71.     Mayor Serpico did not direct Pitassi's restructuring of the department. (Serpico Dep. p. 178)

72.     Pitassi assigned DiMaio to station supervisor for the day shift (8am to 4pm), and Scatchell to the afternoon shift (4pm to midnight), which was Plaintiff's preference, with weekends and holidays off, effective May 8, 2017.  (Scatchell Dep., pp. 138-139, 160-161, 192-93; Pitassi

Dep., p. 194, 210; VMP-JJS 2842, DiMaio Memo, 5/1/17; VMP-JJS 927, Scatchell Memo., 5/1/17)

73.     As of May 1, 2017, DiMaio and Scatchell had the same rank, both had served as shift supervisors, and both had over 30 years of service. (DiMaio Dep., pp. 104-105)

74.     DiMaio and Scatchell's salary, rank, and benefits did not change with the assignment to station supervisor. (Scatchell Dep., pp. 140-141)

75.     Prior to May 1, 2017, Lt. DiMaio was a shift supervisor on the morning shift but he had been on sick leave since early January of 2017, and Sergeant Maiello was in charge of that shift in his absence. (Pitassi Aff., ¶ 10)

76.     In restructuring the patrol shifts, Maiello was promoted to lieutenant on the day shift and, as part of the restructuring, Director Pitassi assigned Lt. DiMaio to the station supervisor position on that shift so that there would not be two lieutenants directly in charge of patrol and Pitassi believed that Scatchell would prefer the later shift since that was his then current patrol shift. (Pitassi Aff., ¶ 11)

77.     Prior to May 1, 2017, the afternoon patrol shift had two lieutenants, Lt. Joe Urso and Lt. John Scatchell. (Pitassi Dep., pp. 252-253)

78.     In restructuring the patrol shifts, Pitassi eliminated the need for two lieutenants on the afternoon shift and assigned Scatchell to station supervisor because Urso had seniority as lieutenant over Scatchell. (Pitassi Dep., pp. 252-253; Pitassi Aff. ¶ 11)

79.     Lt. DiMaio was happy about the reassignment to Station Supervisor because it was an easy position and he could work straight days with weekends and holidays off. (DiMaio Dep., pp. 14, 21, 106, 116)

80.     Lt. DiMaio returned from sick leave two months early in August of 2017 because

the station supervisor position was "such a sweet deal." (DiMaio Dep. pp. 99, 103-104, 116-17)

81.     Pitassi did not give DiMaio and Scatchell any written job duties and informed them that their duties would be outlined at a later date. (Pitassi Dep., pp. 214, 251; Castellan Dep., pp. 133, 135; VMP-JJS 2842, DiMaio Memo., 5/1/17; VMP-JJS 927, Scatchell Memo., 5/1/17; DiMaio Dep., pp. 105-106)

82.     According to Scatchell, when he asked Pitassi about his job duties, Pitassi said "Don't worry about it.  It's going to be the easiest job of your life."  (Scatchell Dep., p. 148)

83.     As station supervisors, DiMaio and Scatchell served as backup shift supervisors if the scheduled shift supervisor was absent due to time off, injury, or vacation. (Pitassi Dep., p. 211; Castellan Dep., p. 22; DiMaio Dep., p. 17)

84.     Scatchell and DiMaio were treated the same way with respect to overtime. (Scatchell Dep., pp. 142-143)

85.     At Scatchell's request, Pitassi permitted him to start his shift as station supervisor later in the afternoon because Scatchell ran a private plumbing business during the day. (Scatchell Dep., pp. 156-157, 191)

86.     According to Plaintiff, when he asked if his hours could be flexible, Pitassi agreed, saying "whatever's good for you.  If it would be good for your plumbing business, that's fine." (Scatchell Dep., pp. 156-57, 191)

87.     Pitassi informed Scatchell that he could start and end his shift when he wanted, so long as he put in eight hours. (Scatchell Dep., pp. 156-157, 191)

88.     Scatchell could have but did not ask Pitassi to be assigned as the station supervisor for the day shift because working the evening shift accommodated his ability to run his private plumbing business during the daytime hours. (Scatchell Dep., pp. 191-193)

89.     Pitassi permitted Scatchell to conduct two depositions in the station supervisor office relating to a private lawsuit involving his plumbing business (Scatchell Dep., pp. 193-196).

90.     As part of his job duties as station supervisor, Scatchell inspected the building conditions and recommended repairs to Pitassi. (Scatchell Dep., pp. 152-156; Castellan Dep., p. 133).

91.     As part of his job duties, DiMaio took care of car repairs and reported building conditions and equipment. (DiMaio Dep., pp. 33-36, 106)

92.     As station supervisors, DiMaio and Scatchell shared the same office. (Scatchell Dep., pp. 159-160; DiMaio Dep. p. 25)

93.     The station supervisor office was 10' by 12' in size, and had windows. (Scatchell Dep., pp. 162-163)

94.     The station supervisor office was previously occupied by Deputy Chief Rogowski when he was appointed Deputy Chief in November of 2016 and occupied the office until February of 2017. (Rogowski Dep., pp. 50-53)

95.     The station supervisor office was also previously occupied by an animal control officer, as well as previous station supervisors. (Scatchell Dep., pp. 187-190; Pitassi Dep., pp. 213-214, 274; Rogowski Dep., pp. 50-53)

96.     When Deputy Rogowski occupied the office, the carpeting and ceiling tiles were in similar condition as carpeting and ceiling tiles throughout the upper floor of the police department, and the window blinds were missing some slats. (Rogowski Dep., pp. 63-65)

97.     On May 8, 2017, the station supervisor office had filthy walls and carpet, missing ceiling tile, and missing window blinds, a few cabinets, old fax machine, and a desk but not desk chair. (Scatchell Dep., pp. 164-166)

98.    The office that Scatchell previously occupied in his prior assignment as a shift supervisor also had filthy walls and carpet and a leaking ceiling, and he co-occupied that office with shift sergeants. (Scatchell Dep., pp. 166-168)

99.    Scatchell Deposition Group Exhibit 10A through 10C depict the condition of the station supervisor office on May 8, 2017. (Scatchell Dep., pp. 170-173; Scatchell Dep. Group Ex. 10A-10C, Station Supervisor Office Photos)

100.    Pitassi told Scatchell that it was his office, and he could do what he wanted with it. (Scatchell Dep., p. 179)

101.    Starting on May 8, 2017, Scatchell made improvements to the station supervisor office. (Scatchell Dep., pp. 173-174)

102.    Scatchell Deposition Group Exhibit 10D through 10J fairly and accurately depict the improvements that Scatchell made to the office starting on May 8, 2017, including installation of Hawaiian blinds, a recliner chair, a refrigerator, and a 40-inch flat screen television. (Scatchell Dep., pp. 173-182)

103.    The office also had a computer, phone, and cable TV service. (Scatchell Dep., pp. 181-182)

104.    Scatchell claims that he did not have access to the computer; however, he did not follow up with IT about it after the first two weeks. (Scatchell Dep., pp. 186-87)

105.    DiMaio did not report any issues using the computer in the Station Supervisor's office and instead testified about his use of the computer after he was given the login information from IT.  (DiMaio Dep., pp. 25-26; Pitassi Aff. ¶17)

106.    Scatchell was reimbursed for the cost of the blinds by the police department, and everything else he paid for on his own and took with him when he retired. (Scatchell Dep., p. 180)

107.    As station supervisor, Scatchell could leave the building and respond to calls on the street or to buy supplies or go home for dinner. (Scatchell Dep., pp. 196-198, 208-209; Pitassi Dep., p. 285; Castellan Dep., 22)

108.    As station supervisor, DiMaio could leave the building and respond to calls on the street and eat breakfast or lunch outside of the station. (DiMaio Dep., pp. 32-34, 37-38)

109.    DiMaio did not view the reassignment to station supervisor, or the condition of the office, as any type of adverse employment action or demotion or punishment. (DiMaio Dep., pp. 106, 108-109)

110.    DiMaio welcomed the reassignment and never complained about it or the lack of defined duties. (DiMaio Dep., p. 106)

111.    As a station supervisor, DiMaio did not attend shift supervisor meetings conducted by Castellan between May of 2017 and June of 2018. (DiMaio Dep., pp. 113-114, 116)

112.    As station supervisor, Scatchell was assigned a department vehicle but chose to drive his own personal truck while on duty. (Scatchell Dep., pp. 211-215)

113.    As station supervisor, DiMaio was assigned a 2012 unmarked Ford Tauras. (DiMaio Dep., pp. 22-24)

114.    DiMaio was a vocal objector to the FOP filing grievance arbitration on the Lavalais matter. (Scatchell Dep., pp. 37-38)

115.    Scatchell did not work from mid-October of 2017 through the date of his retirement in June of 2018. (Scatchell Dep., pp. 218, 241-242, 337-338)

116.    Scatchell took sick leave beginning in mid-October 2017 through January of 2018 at which point he was released back to work but thereafter used his accrued vacation time through the date of his retirement in June of 2018. (Scatchell Dep., pp. 217-218, 337-340)

15

## COMPLAINTS AGAINST SCATCHELL

117.    In September of 2017, Pitassi called Scatchell into his office and discussed a sworn citizen's complaint concerning a traffic stop and an anonymous letter that Pitassi had received from the Mayor's secretary. (Pitassi Dep., pp. 216-218; Scatchell Dep. Ex. 12, Morales Sworn Citizen's Complaint, dated 8/30/17; Scatchell Dep. Ex. 11, Anonymous Letter)

118.    The anonymous letter accused Scatchell of not being at the station during work hours in the evening, and seeing him drive his personal pickup truck in uniform, shopping at Target, enjoying dinner with others at restaurants, and spending time at home. (Pitassi Dep., p. 218; Scatchell Dep. Ex. 11, Anonymous Letter)

119.    Pitassi remarked to Scatchell that "the eyes of Texas are on you" which was in reference to a song.[1] (Pitassi Dep., pp. 216-220)

120.    Pitassi just wanted to let Scatchell know what he had received and that somebody was apparently watching him, but he did not make the comment as a threat or warning. (Pitassi Dep., pp. 218-220)

121.    Pitassi did not investigate the anonymous letter, had no concerns about it, was not watching Scatchell, had no problems with the job Scatchell was doing, had no reason to discipline him, and didn't think much of the anonymous letter. (Pitassi Dep., p. 219)

122.    Scatchell decided to stop responding to calls on the street after he was informed by Pitassi that someone had anonymously complained about him not reporting to work. (Scatchell Dep., pp. 198-201)

---

[1]    The "Eyes of Texas" is a fight song for University of Texas at Austin. https://en.wikipedia.org/wiki/The_Eyes_of_Texas#:~:text=The%20lyrics%20are%20said%20to,William%20Lambdin%20(Colonel)%20Prather.&text=The%20Eyes%20of%20Texas%20was,at%20El%20Paso%20(UTEP).

123.    The sworn citizen's complaint ("Morales Complaint"), dated August 30, 2017, accused Scatchell of racial profiling and other misconduct during a traffic stop. (Scatchell Dep., pp. 221-234; Pitassi Dep., pp. 63-65; Rogowski Dep., pp. 183-184, 189; Scatchell Dep. Ex. 12, Morales Complaint)

124.    Pitassi assigned Deputy Chief Rogowski to investigate the citizen's complaint. (Pitassi Dep., p. 63-64; Rogowski Dep., p. 182)

125.    Deputy Chief Rogowski received to/from memos from officers at the scene about the Morales traffic stop, but he never completed his investigation because Scatchell went on sick leave in mid-October 2017 through the date of his retirement in June of 2018. (Rogowski Dep., pp. 190, 216-219, 228)

126.    Scatchell was not disciplined or brought up on any charges as a result of the Morales incident or investigation. (Scatchell Dep., p. 243)

## FIREWORKS INCIDENT

127.    On December 16, 2016, at 1:11 a.m., Officer Lido Graziani responded to a 911 "shots fired" call and was flagged down by Scatchell, who was off duty, in front of his residence. (Graziani Dep. pp. 15-16; Graziani Dep. Ex. 1, Graziani Report, 12/16/16)

128.    Scatchell told Graziani that someone had discharged fireworks in his driveway. (Graziani Dep., p. 15-16, 22-23)

129.    Graziani observed fireworks debris on Scatchell's driveway. (Graziani Dep., pp. 25-26)

130.    Officers Nicole Spatafora and Gene Cacciatore also responded to the call. (Graziani Dep., p. 17)

131.    Scatchell was at home when he heard an explosion, but he did not see the explosion or see who did it. (Scatchell Dep., pp. 84-89)

132.    Scatchell's wife and son were also at home and heard the explosion but did not see who did it. (Scatchell Dep. pp. 98-99)

133.    Scatchell's son testified that debris on the driveway showed that the explosion was within about three feet of his truck but there was no damage to his truck. (Scatchell Jr. Dep. p. 58)

134.    Officer Graziani investigated the incident and determined that fireworks, not dynamite, had been discharged on Scatchell's driveway. (Graziani Dep., pp. 63-64)

135.    Officer Graziani spoke with potential witnesses but was unable to identity who did it. (Graziani Dep., pp. 26-29; Scatchell Dep., pp. 95-98)

136.    Even though Scatchell was Graziani's and Spatafora's supervisor, and Spatafora was an evidence technician, at no time did Scatchell order or direct Graziani or Spatafora to collect and preserve the debris, take any evidentiary photographs, or view his in-home security camera system. (Graziani Dep., pp. 29-32, 61-63) Pitassi, Castellan and Rogowski were not present for or otherwise involved in the fireworks incident. (Scatchell Dep., p. 94; Graziani Dep., p. 34)

137.    Rogowski was the Deputy Chief in charge of investigations, and he conducted an investigation of the incident per Pitassi's direction. (Scatchell Dep., pp. 98; Rogowski Dep., p. 144)

138.    Rogowski wrote a true and accurate investigation report documenting that he met with the 9-1-1 caller, met with Scatchell, attempted to meet with Scatchell's neighbors, and closed the case due to lack of new leads. (Scatchell Dep., pp. 99-100; VMP/JJS 2567, Rogowski Report; Rogowski Dep., pp. 148-16)

139.    Rogowski's conclusion was consistent with Officer Graziani's on-scene investigation and findings. (Graziani Dep., p. 35)

140.     Rogowski informed Scatchell by email on January 23, 2017, that the case was inactive due to no evidence or known witnesses. (Scatchell Dep., p. 106; Rogowski Dep., pp. 161-165;, VMP/JJS 2583, Rogowski Email)

141.     Per Pitassi's direction, Rogowski also investigated a verbal altercation that occurred between Officers Cacciatore and Chiapetta. (Pitassi Dep., pp. 310-311; Rogowski Dep., pp. 143-145, 148-161)

142.     Officer Chiapetta was disciplined as a result of the verbal altercation. (Pitassi Dep., p. 311)

## OFFICER NELLO BARONE INCIDENT

143.     Scatchell testified that one of his subordinates, Officer Nello Barone, swore at him and Lt. Urso, left work without permission, and called an ambulance to his house. (Scatchell Dep., p. 119)

144.     Deputy Chief Castellan received a memorandum from Lt. Scatchell and Lt. Urso about the incident. (Castellan Aff., ¶ 12)

145.     Officer Barone went on medical leave after the incident and never returned to work and eventually resigned from employment after receiving a non-duty disability pension. (Castellan Aff., ¶ 13)

146.     As a result, Deputy Chief Castellan did not conduct any internal investigation into Barone's conduct because he never returned to work. (Castellan Aff., ¶ 14)

147.     The incident did not cause Scatchell any injury or harm. (Scatchell Dep., p. 122)

## SCATCHELL'S RETIREMENT

148.     Scatchell was paid all accrued earnings and benefits upon retirement. (Scatchell Dep., p. 10)

149. Scatchell's rank at the time of his retirement was lieutenant, and his salary was $111,000 per year. (Scatchell Dep., pp. 9-10)

150. Scatchell retired with a lifetime pension of $80,000 per year plus 3% annual increases on the annual anniversary date of his retirement. (Scatchell Dep., pp. 11-12)

151. Scatchell was 61 years old when he retired. (Scatchell Dep., p. 12)

152. As of the date of his retirement, Village Ordinance mandated the immediate retirement of all police officers at age 62 if they had 30 years of service. (Scatchell Dep., p. 13; Castellan Aff., ¶ 4)

153. Per the Village Ordinance, Scatchell would have had to retire from his position as a police lieutenant when he turned 62 in December of 2018. (Scatchell Dep., p. 13)

## JOHN SCATCHELL, JR

154. John A. Scatchell (aka "Junior") is Plaintiff's son. (Scatchell Dep., pp. 244, 305)

155. Junior was employed by the Melrose Park Police Department ("MPPD") as a police officer. (Junior Dep. pp. 10-11)

156. Village police officers are prohibited from abusing sick leave. (Pitassi Aff. ¶ 18; Junior Dep. pp. 144-45; VMP/JJS 583, 1562)

157. On May 8, 2008, Scatchell signed a memorandum recommending a three-day suspension to another officer, Phil Negron, for working a secondary security job while on medical leave from his employment with the Melrose Park Police Department. (Scatchell Dep., p. 301; Pitassi Dep. Ex. 16, p.461)

158. On November 9, 2017, Junior submitted a doctor's note stating that he had been advised to "rest at home" as a result of an injury to his lower neck/upper back. (VMP/JJS 1557, 2144; R649, 1122)

159.    On November 13, 2017, Castellan received an anonymous note reporting that Junior was abusing sick leave by going hunting every day. (Castellan Dep., pp. 75-77; Castellan Dep. Ex. 8, Anonymous Note; Pitassi Aff. ¶ 13; Castellan Aff., ¶ 15)

160.    That same day, November 13, 2017, Director Pitassi directed Deputy Chief Castellan to have Officer Peter Anthony Caira look into the note, and Caira was assigned by Deputy Chief Castellan to conduct surveillance on Junior to determine if there was any merit to the anonymous note. (Caira Dep., pp. 26-28, 40, 83; Pitassi Aff. ¶14; Castellan Aff. ¶15)

161.    Caira had complete discretion on how he conducted the surveillance. (Castellan Dep., pp. 89-90; Caira Dep., pp. 37-38, 40-41, 44)

162.    Caira did not investigate the origin of the letter; rather, he conducted "forward looking" surveillance to determine if Junior was hunting while on sick leave. (Caira Dep., pp. 41, 57, 78-79, 82)

163.    Caria produced a report of his activities, including photographic and video evidence, and submitted it to Deputy Chief Castellan. (Caira Dep., pp. 50-53, 82-98; Caira Dep. Ex. 2)

164.    Caira's surveillance activities revealed activity indicating that Junior was hunting while on sick leave. (Caira Dep., p. 82)

165.    On January 9, 2018, Junior was given Garrity immunity and questioned about his conduct while he was on sick leave. (VMP/JJS 2151, 2199-2210, 2256-2258, 2368; R645-56, 923)

166.    Initially, Junior claimed that he was so inactive that he gained 50 pounds (VMP/JJS 2213; R659) but later admitted that he frequently went hunting during that period. (VMP/JJS 2230, 2232; R676, 678)

167. Junior admitted that he and his friend, Vito Scavo, operated a hunting guide business (VMP/JJS 2226-27; R672-73) and he had gone hunting on November 20, 2018, with Scavo. (VMP/JJS 2232-34; R678-80)

168. Junior knew Scavo was a convicted felon (VMP/JJS 2226; R672) and was not permitted to possess or use a firearm. (VMP/JJS 2228, 2235; R674, 681)

169. When an Illinois Department of Natural Resources policeman ("DNR Officer") confronted Scavo and Junior on November 20, 2017, Scavo admitted that he had been shooting, although he later asserted his Fifth Amendment rights. (VMP/JJS 2426-30; R984)

170. Junior told the DNR Officer that he did not see Scavo shooting (VMP/JJS 2426-30; R681-683) but the DNR Officer did not believe him. (VMP/JJS 2429-30; R984-985)

171. Junior did not report his contact with Scavo and the DNR Officer to his supervisors. (VMP/JJS 2237; R683)

172. The next day, on November 21, 2017, Junior wrote his physician that he still had "numbness in my right arm [that] comes and goes all day" and that he had not "been engaged in really any activity at all except stretches…" (VMP/JJS 2145; R1123)

173. Charges seeking Scatchell's discharge were filed with the Board of Fire and Police Commissioners ("BOFPC" or "Board"). (VMP/JJS 1566-1579)

174. At a hearing before the BOFPC, Dr. Maryam Sandoval testified about her communications with Junior and his medical records showing that he weighed 238 pounds on October 31, 2017 and the same weight on December 4, 2017. (VMP-JJS 2315-2318; 2138-2149; R886-9, 1116-1127)

175. On October 22, 2018, the Garrity notice was renewed and Junior was ordered to testify, but he refused and as a result, an Amended Statement of Charges was submitted, adding

disobeying a direct order on October 22, 2018, to take the stand and answer questions. (VMP/JJS 1952-1964, 2358-59, 2368, 2370; R707-719, 914-15, 923, 925)

176.     During the BOFPC hearing, the DNR Officer testified about what he saw on November 20, 2017, his conversations with Scavo and Junior and his conclusion that Junior's answers were not truthful. (VMP/JJS 2426, 2428-30; R981, 983-85)

177.     On December 6, 2018, the Board issued its Decision, finding against Junior on charges of abuse of sick leave, failing to report contact with and providing false information to the DNR Officer, false report, conduct unbecoming, violating State law, unauthorized secondary employment and refusing to obey a direct order.  As a result, the Board terminated his employment effective December 7, 2018. (VMP/JJS 2137; R829)

178.     Junior filed an action seeking administrative review of his termination decision, and on December 15, 2020, the Circuit Court issued an Order finding that Junior had been properly discharged for misconduct, a copy of which is attached as Exhibit B.

179.     When Junior was deposed in this action, he asserted his Fifth Amendment rights 136 times for questions relating to his medical condition, his hunting activities in 2017, allowing the convicted felon to possess and use a shotgun, and the statements that led the Board to conclude that he lied to his supervisors during his deposition.  (Junior Dep. 309 & Confidential Transcript 6-7)

180.     On September 16, 2020, Scavo plead guilty to a felony for possessing and firing a shotgun on November 20, 2017.  (A certified copy of the Guilty Plea is attached as Ex. C)

181.     The Village is not aware of any other police officers whose misconduct was similar to the misconduct found against Junior by the BOFPC which resulted in their decision to discharge him.  (Pitassi Aff. ¶19)

182.    The only instance, other than Scatchell Jr., that Pitassi recalled relating to known sick leave abuse by a Melrose police officer during his tenure as Chief of Police or Director of Police, was Officer Phil Negron. (Pitassi Aff. ¶20)

183.    In 2013, Plaintiff John Scatchell ("Scatchell Sr.") had recommended a three-day suspension for Negron because he (Negron) had worked as a security officer at a local school on one occasion while he was on sick leave from his employment with Melrose Park (Pitassi Aff, ¶ 20).

184.    At Pitassi's direction and delegation, Deputy Chief Castellan investigated the matter and, after the investigation was concluded, Castellan filed charges against Negron with the BOFPC for engaging in secondary employment while on medical leave. He was also charged with refusing to obey a direct order to identify other police officers who he (Negron) claimed had abused sick leave, and a separate violation for not following Department Procedure by writing a "C-ticket" for a non-valid driver (Pitassi Aff, ¶ 20).

185.    There was no suggestion that Negron failed to report contact with or provided false information to another law enforcement officer or violated State law by allowing a convicted felon to use a firearm.  Nevertheless, charges were issued against Negron with the BOFPC seeking his discharge, just as was done with Scatchell Jr., but the BOFPC decided that a thirty-day suspension was an appropriate level of discipline for Negron. (Pitassi Aff., ¶ 20).

186.    Even though termination charges were filed against both Negron and Scatchell Jr., Pitassi considered Scatchell Jr.'s misconduct to have been much worse than Negron's because Scatchell Jr.'s misconduct demonstrated a complete disrespect for the law and for another law enforcement officer. (Pitassi Aff. ¶20)

187.    Scatchell Jr. admitted that he had never heard Mayor Serpico have any conversation

about his father. (Scatchell Jr. Dep. pp. 131-132).

## OTHER ALLEGED DISCRIMINATION/RETALIATION ISSUES

188.    The Village's EEO Policy prohibits discrimination on the basis of any protected characteristic (including race); moreover, the Village encourages employees to bring any "concerns about any type of discrimination" to their supervisor or Human Resources, and the Policy expressly provides that "Employees can raise concerns and make reports without fear of reprisal." (Piemonte Dep. Ex. 3, p. 4098)

189.    The Village's EEO Policy was adopted by the Village's Board of Trustees. (Piemonte Aff. ¶ 4)

190.    While Department Heads, such as the Chief of Police/Director of Police have been given authority to implement some rules and procedures relating to the operations of their departments, they do not have authority to deviate from Policies enacted by the Village Board of Trustees, including its non-discrimination, non-retaliation policies and many other personnel-related Policies created by the Village; indeed, even the Mayor does not have the authority to modify or deviate from those Village policies. (Piemonte Aff. ¶ 5)

191.    Scatchell has no direct evidence of any policy, practice or custom at the Village to retaliate against employees for protected speech or association. (Scatchell Dep., pp. 296-298)

192.    On September 11, 2017, Scatchell filed an EEOC Charge complaining of retaliation concerning the November 2016 promotion issue, the December 2016 fireworks incident, and his May 1, 2017 assignment as Station Supervisor. (Scatchell Dep. Ex. 13)

193.    On September 25, 2017, Scatchell filed an Amended EEOC Charge, claiming additional retaliation of being "erroneously accused of rule violations and acting outside the mission of the Department." (Scatchell Dep. Ex. 14)

194.    According to Scatchell, the actions he claims were retaliatory between September 11, 2017 and September 25, 2017 (between his first and second EEOC Charges) related to actions of the FOP officers.  (Scatchell Dep., p. 316-318)

195.    Scatchell claims that the retaliatory action after September 25, 2017 was the "eyes of Texas" comment (Scatchell Dep., p. 321), although he testified that it was actually in August 2017, which was prior to either of his EEOC Charges. (Scatchell Dep., p. 201)

196.    Scatchell also claims retaliation against him based upon the investigation of Junior's misconduct and the ultimate decision to discharge Junior. (Dkt. No. 71 pp. 17-21)

197.    When Castellan and Pitassi decided to investigate Junior's alleged misconduct, they did not know that Plaintiff had filed an EEOC Charge or Amended EEOC Charge.  (Pitassi Aff. ¶ 15; Castellan Aff. ¶ 16)

198.    On March 6, 2018, the EEOC issued a "Dismissal and Notice of Rights," stating that "[b]ased upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes."  (Dkt. No. 71-1)

WHEREFORE, the Defendants, VILLAGE OF MELROSE PARK, RONALD M. SERPICO, SAM C. PITASSI, MICHAEL CASTELLAN and STEVE ROGOWSKI, submit their Rule 56.1 Statement of Undisputed Facts.

Respectfully submitted,

| | |
|---|---|
| s/Michael D. Bersani | s/Jeffrey S. Fowler |
| MICHAEL D. BERSANI, ARDC No. 06200897 | JEFFREY S. FOWLER (6205689) |
| Attorney for Defendants Sam C. Pitassi, | Attorney for Defendant Village of Melrose |
|   Michael Castellan and Steve Rogowski | Park |
| HERVAS, CONDON & BERSANI, P.C. | LANER MUCHIN, LTD. |
| 333 W. Pierce Road, Suite 195 | 515 N. State Street #2800 |
| Itasca, IL 60143-3156 | Chicago, Illinois 60654 |
| P: 630-773-4774 | 312-467-9800 |
| mbersani@hcbattorneys.com | jfowler@lanemuchin.com |

s/<u>K. Austin Zimmer</u>

K. AUSTIN ZIMMER
Attorney for Defendant Ronald M. Serpico
DEL GALDO LAW GROUP
141 South Harlem Avenue
Berwyn, IL 60402
P: 708-222-7000
zimmer@dlglawgroup.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN SCATCHELL, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-3989 |
| | ) | |
| v. | ) | Honorable John F. Kness |
| | ) | |
| VILLAGE OF MELROSE PARK, | ) | Magistrate Judge Jeffrey Cummings |
| ROANLD M. SERPICO, SAM C. PITASSI, | ) | |
| MICHAEL CASTELLAN and STEVE | ) | JURY TRIAL DEMANDED |
| ROGOWSKI, | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I, the undersigned attorney, hereby certify that on January 4, 2021, I electronically filed the foregoing ***Defendants' Joint Rule 56.1 Statement of Undisputed Facts in Support of their Motions for Summary Judgment*** with the Clerk of the U.S. District Court for the Northern District of Illinois, Eastern Division, using the Court's CM/ECF system which will send notification of such filing to the following CM/ECF participants:

Cass T. Casper, Esq., DISPARTI LAW GROUP, 121 W. Wacker Dr., Suite 2300, Chicago, Illinois 60601; 312-600-6000, ccasper@dispartilaw.com

Gianna Rochelle Scatchell DISPARTI LAW GROUP, 121 W. Wacker Dr., Suite 2300, Chicago, Illinois 60601; 312-600-6000; gia@dispartilaw.com

Michael D. Bersani, HERVAS, CONDON & BERSANI, P.C., 333 W. Pierce Rd., Ste. 195, Itasca, IL 60143-3156; 630-773-4774; mbersani@hcbattorneys.com

K. Austin Zimmer, Cynthia S. Grandfield, Timothy A Martin Woerner, DEL GALDO LAW GROUP, 141 South Harlem Ave., Berwyn, IL 60402; 708-222-7000; zimmer@dlglawgroup.com

s/ Jeffrey S. Fowler
JEFFREY S. FOWLER (6205689)
Attorney for the Village of Melrose Park
LANER MUCHIN, LTD.
515 N. State Street #2800
Chicago, Illinois 60654
312-467-9800
jfowler@lanemuchin.com