# LIDO GRAZIANI
# TRANSCRIPT AND EXHIBITS

**Page 1**

```
 1       IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
 2               EASTERN DIVISION
 3
    JOHN SCATCHELL,            )
 4                            )
            Plaintiff,  )
 5                            )
        vs.           ) No. 18-CV-03989
 6                            )
    VILLAGE OF MELROSE PARK, an    )
 7  Illinois Municipal Corporation;  )
    RONALD M. SERPICO; SAM C.      )
 8  PITASSI; MICHAEL CASTELLAN;      )
    and STEVEN ROGOWSKI,            )
 9                            )
            Defendants.   )
10
11
12
13       The deposition of LIDO A. GRAZIANI,
14  taken pursuant to the Federal Rules of Civil
15  Procedure of the United States District Court
16  pertaining to the taking of depositions, taken
17  before LINDA SNODGRASS SABOR, CSR, RMR, CRR, a
18  Notary Public within and for the County of Cook,
19  State of Illinois, and a Certified Shorthand
20  Reporter of said state, CSR No. 84-1850, at
21  Suite 195, 333 Pierce Road, Itasca, Illinois,
22  on the 5th day of February, 2020, at 2:24 p.m.
23
24
```

**Page 2**

```
 1  PRESENT:
 2
 3     TALON LAW, LLC
         105 West Madison Street - Suite 1350
 4       Chicago, Illinois  60602
         Phone 312/351-2478 by:
 5       MR. CASS T. CASPER
         CTC@TalonLaw.com
 6
             -and-
 7
    LAW OFFICES OF GIANNA SCATCHELL
 8       360 West Hubbard Street - Suite 1404
         Chicago, Illinois  60654
 9       Phone 312/248-3303 by:
         MS. GIANNA SCATCHELL
10       Gia@LawFirm.gs
11          appeared on behalf of the Plaintiff;
12
    LANER MUCHIN
13       515 North State Street - Suite 2800
         Chicago, Illinois  60654
14       Phone 312/467-9800 by:
         MR. JEFFREY S. FOWLER
15       JFowler@LanerMuchin.com
16          appeared on behalf of Defendant
            Village of Melrose Park;
17
18  DEL GALDO LAW GROUP, LLC
         1441 South Harlem Avenue
19       Berwyn, Illinois  60402
         Phone 708/222-7000 by:
20       MR. K. AUSTIN ZIMMER
         Zimmer@DLGLawGroup.com
21
            appeared on behalf of Defendant
22          Ronald M. Serpico;
23
24
```

**Page 3**

```
 1  PRESENT:  (Continued)
 2
 3     HERVAS, CONDON & BERSANI, PC
         333 Pierce Road - Suite 195
 4       Itasca, Illinois  60143
         Phone 630/773-4774 by:
 5       MR. MICHAEL D. BERSANI
         MBersani@HCBAttorneys.com
 6
            appeared on behalf of Defendants
 7          Sam C. Pitassi, Michael Castellan,
            and Steven Rogowski.
 8
 9
10
    ALSO PRESENT:
11
12     MS. CHRISTINA SABATER, Paralegal,
         Law Offices of Gianna Scatchell;
13
       MR. JOHN SCATCHELL, SR.;
14
       MR. SAM C. PITASSI;
15
       MR. MICHAEL CASTELLAN;
16
       MR. STEVEN ROGOWSKI.
17
18
19
20
21
22
23
    REPORTED BY:  LINDA SNODGRASS SABOR, CSR, RMR, CRR,
24          CSR No. 84-1850.
```

**Page 4**

```
 1       (WHEREUPON, the witness was duly
 2       sworn.)
 3       LIDO A. GRAZIANI,
 4  called as a witness herein, having been first duly
 5  sworn, was examined and testified as follows:
 6          EXAMINATION
 7  BY MR. BERSANI:
 8     Q.   Please state your full name and spell it
 9  for the record.
10     A.   Lido A. Graziani, L-i-d-o, middle A.,
11  Adam, last name is G-r-a-z-i-a-n-i.
12     MR. BERSANI:  Okay.  Let the reflect that this
13  is the deposition of Officer Lido Graziani, taken
14  pursuant to the Federal Rules of Civil Procedure,
15  the local rules for the U.S. District Court for the
16  Northern District of Illinois, and this deposition
17  is taken pursuant to subpoena.
18       My name is Mike Bersani.  I represent
19  Defendants Sam Pitassi, Mike Castellan, and
20  Steven Rogowski, who are also present here at the
21  deposition.
22       And I'd ask other counsel to introduce
23  themselves and their clients, if present.
24     MR. ZIMMER:  Austin Zimmer on behalf of
```

LIDO A. GRAZIANI
SCATCHELL vs VILLAGE OF MELROSE PARK

February 05, 2020

5—8

Page 5

1 Mayor Serpico.
2    MR. FOWLER:  Jeffrey Fowler on behalf of the
3 Village.
4    MS. SCATCHELL:  Gianna Scatchell on behalf of
5 the Plaintiff.
6    MR. CASPER:  Cass Thomas Casper, C-a-s-s
7 C-a-s-p-e-r, also on behalf of Plaintiff.
8    MR. BERSANI:  And you have two other
9 individuals present.
10    MR. CASPER:  Oh.
11    MS. SABATER:  Christina Sabater, paralegal.
12    MR. CASPER:  And Plaintiff is also present.
13    MR. BERSANI:  Okay.  Thank you.
14 BY MR. BERSANI:
15    Q.   Now, Mr. Graziani, you don't have counsel
16 present, correct?
17    A.   No, I don't.
18    Q.   Okay.  And I told counsel before the
19 start of the deposition that I've represented you in
20 the past, in a prior federal civil rights lawsuit
21 filed by a citizen regarding an on-duty incident.
22       Correct?
23    A.   Yes.
24    Q.   Okay.  I have not represented you since

Page 6

1 then, correct?
2    A.   Correct.
3    Q.   And we've had no contact since that
4 lawsuit was resolved, correct?
5    A.   Correct.
6    Q.   Okay.  And that was probably at least
7 six, seven years ago?
8    A.   Correct.
9    Q.   Okay.  All right.  Your current
10 occupation is a police officer for Melrose Park?
11    A.   Yes.
12    Q.   How long have you been employed by
13 Melrose Park?
14    A.   20 years and four months.
15    Q.   What's your current rank?
16    A.   Patrolman.
17    Q.   Have you held any other rank with the
18 Melrose Park Police Department?
19    A.   No.
20    Q.   And what's your current assignment,
21 patrol?
22    A.   Patrol.
23    Q.   Patrol division?
24    A.   Uh-huh.  Yes, yes.

Page 7

1    Q.   Okay.  And have you ever held any other
2 assignments in your 20-plus years as a police
3 officer at Melrose Park?
4    A.   No.
5    Q.   All right.  And have you worked in any
6 other -- with any other law enforcement agencies
7 besides Melrose Park in your lifetime?
8    A.   I have, yes.
9    Q.   Where have you worked?
10    A.   Elmwood Park Police.
11    Q.   When did you work for Elmwood Park?
12    A.   March of '97 through June of '99.
13    Q.   Was your next employment after that with
14 Melrose Park?
15    A.   Yes.
16    Q.   Did you work with any law enforcement
17 agencies other than Melrose Park and Elmwood Park?
18    A.   No.
19    Q.   You currently work a shift?
20    A.   Yes.
21    Q.   What shift do you work?
22    A.   8:00 a.m. to 4:00 p.m.
23    Q.   Okay.  Who's your supervisor?
24    A.   Joseph Urso.

Page 8

1    Q.   In the time frame of 2016 to 2018 do you
2 recall what shift you worked?
3       I know there were rotating shifts in
4 there.
5    A.   We were flip-flopping, yeah.
6    Q.   Right.
7       Okay.  So you worked -- you rotated
8 shifts in that time period.
9    A.   Correct.
10    Q.   At some point the department went to
11 permanent shifts, correct?
12    A.   Yes.
13    Q.   Okay.  Do you recall when you went to a
14 permanent shift?
15    A.   Permanent shift --
16    Q.   Yeah.
17    A.   -- would be -- we started this two years
18 ago, I believe.
19    Q.   Okay.  That sounds about right.
20       In the 2016 to 2018 time period was
21 Lieutenant Urso your lieutenant, your shift
22 lieutenant?
23    A.   Yes.
24    Q.   And so how long has he been your shift

Page 9

1 lieutenant?
2    A.   Probably four years now.
3    Q.   Okay.  Have you ever worked on a shift
4 where John Scatchell, Senior, was your supervising
5 lieutenant?
6    A.   Yes.
7    Q.   When was that?
8    A.   Prior to his retirement, he was under
9 Joseph Urso's shift as lieutenant.
10   Q.   So there was a period time -- or, strike
11 that.
12        You're aware that in May of 2017
13 John Scatchell, Senior, was assigned to the station
14 supervisor position.
15        You're aware of that?
16   A.   Yes.  A brief time, I believe.
17   Q.   Okay.  And so prior to that,
18 Lieutenant Scatchell and Lieutenant Urso were your
19 shift lieutenants?
20   A.   Well, it was more Lieutenant Urso then.
21   Q.   More Urso?
22   A.   Yeah.
23   Q.   Okay.  Okay.  But Lieutenant Scatchell
24 was on the same shift as Urso --

Page 10

1    A.   Yes.
2    Q.   -- and you, correct?
3    A.   Yes.
4    Q.   Okay.  And you believe that was for about
5 a four-year period of time?
6    A.   As far as four years -- I think between
7 '16 until maybe '18.
8        I'm a little mixed up with the numbers as
9 far as how many years ago it was.
10   Q.   Okay.
11   A.   I just --
12   Q.   Understood.  That's fine.
13   A.   It was a couple years when I switched
14 shifts.
15   Q.   Okay.  It's accurate to say, though, that
16 when John Scatchell, Senior, was assigned to the
17 station supervisor position, he ceased to be your
18 direct supervisor.
19        That's correct?
20   A.   I believe the station supervisor is a
21 little different than who would be your patrol
22 supervisor.
23   Q.   Okay.
24   A.   So I would answer to Lieutenant Urso.

Page 11

1    Q.   Okay.
2    A.   If Lieutenant Scatchell was the station
3 supervisor, I would answer to Lieutenant Urso.
4    Q.   Okay.  And if Lieutenant Urso wasn't
5 present, but Lieutenant Scatchell was present as
6 station supervisor, then you would -- you would
7 report to him?
8    A.   Yes.
9    Q.   Okay.
10   A.   Or the acting sergeant.
11   Q.   Or the acting sergeant.
12        Okay.  Now, how long have you known
13 John Scatchell, Senior?
14   A.   Most of my career.
15   Q.   20-plus years?
16   A.   Maybe about 18.
17   Q.   Okay.  And did you grow up in
18 Melrose Park?
19   A.   No, I did not.
20   Q.   Where did you grow up?
21   A.   Elmwood Park.
22   Q.   Elmwood Park.
23        Okay.  Did you know him while you --
24 growing up in Elmwood Park?

Page 12

1    A.   No.
2    Q.   So the first time you met him was when
3 you started working for Melrose Park?
4    A.   Yes.
5    Q.   Okay.  Do you consider John Scatchell,
6 Senior, to be a friend of yours?
7    A.   Well, I mean, you know, acquaintance --
8    Q.   Do you socialize --
9    A.   -- friends.
10   Q.   -- with him?
11   A.   Not, like, on a daily basis.  If, you
12 know, come in contact, hi, bye, how's it going.
13   Q.   Prior to his retirement, did you
14 socialize with him at all?
15   A.   I'm sure via text or -- yeah.
16   Q.   Things like going out to dinner or --
17   A.   Oh.  No, no, no.
18   Q.   -- you know, going to his house or him
19 coming to your house --
20   A.   No.
21   Q.   -- things like that?
22   A.   No, no, no, no, no.
23   Q.   No?
24   A.   No.

LIDO A. GRAZIANI
SCATCHELL vs VILLAGE OF MELROSE PARK

February 05, 2020
13–16

Page 13

1    Q.    Okay.  Were you active at all in the FOP?
2    A.    No.
3    Q.    Do you know what this present lawsuit is
4 about?
5    A.    I have an idea.  Not, you know --
6    Q.    What's your idea?
7    A.    I mean -- I mean, I don't really want to
8 say much because I don't know much about what's
9 really going on here.  Why I'm really here, I don't
10 know.
11    Q.    Okay.
12    A.    I really don't know why I'm here.
13    Q.    Do you know any details about
14 John Scatchell, Senior's allegations made in the
15 present lawsuit?
16    A.    I don't.
17    Q.    Okay.  Have you spoken to his attorneys
18 at all about his lawsuit --
19    A.    No.
20    Q.    -- or today's deposition?
21    A.    No.
22    Q.    Okay.  How about with John Scatchell,
23 Senior, directly?  Have you ever spoken to him about
24 any allegations or claims he's making in this

Page 14

1 lawsuit?
2    A.    No.
3    Q.    Okay.  All right.  So I'm going to hand
4 you what we're going to mark as Deposition Exhibit
5 No. 1.
6            (WHEREUPON, a certain document was
7            marked Graziani Exhibit 1, for
8            identification, as of 2/5/2020.)
9 BY MR. BERSANI:
10    Q.    Okay.  So this is a report, a narrative,
11 of an incident that took place on December 16, 2016,
12 at approximately 1:11 a.m.  It appears to be
13 authored by you.
14        Why don't you take a look at it, and I've
15 got some questions for you about this report and
16 about the incident in general.
17            (WHEREUPON, there was a short
18            pause.)
19 BY THE WITNESS:
20    A.    Okay.  Yeah.
21 BY MR. BERSANI:
22    Q.    Okay.  Have you had a chance to read it?
23    A.    Yeah.
24    Q.    Okay.  And, now, do you remember this

Page 15

1 incident, independent of looking at the report?
2    A.    I do.
3    Q.    Okay.  Does this report -- do you
4 remember all the details of the incident or do you
5 need this report to help, you know, answer
6 questions?
7    A.    I remember.  Yeah, I remember.
8    Q.    Okay.  Well, we'll keep it in front of
9 you, and so if there's any point in time that you
10 don't remember something and you want to refer to
11 the report, let us know that, and we will take a
12 look at it.
13    A.    Okay.
14    Q.    And if it helps you remember, then tell
15 us that.
16        Okay?
17    A.    Okay.
18    Q.    All right.  So tell us what you remember,
19 kind of starting at the beginning, about this
20 particular incident.
21    A.    I just remember the call coming over the
22 air of the radio that night of shots fired in the
23 area, and I responded to the immediate area.  And
24 when I got there, I was flagged down by

Page 16

1 Lieutenant Scatchell at the time.  He advised me
2 that someone had discharged some fireworks in his
3 driveway.  There was, in fact, debris.
4    Q.    Okay.  Let me stop you right there.
5        I know there's more to your report, but
6 let me ask you a few questions about what you've
7 testified to so far.
8    A.    Uh-huh.
9    Q.    You were, in fact, dispatched to this
10 shots fired call, correct?
11    A.    I believe so.  I was there.
12    Q.    And by "dispatched," meaning that the
13 communication center specifically dispatched you to
14 respond to this call, correct?
15    A.    Yeah.
16    Q.    And were you alone?
17    A.    No.
18    Q.    Okay.  Was there a -- was this a -- do
19 you have a single-officer car?
20    A.    Yes.
21    Q.    Okay.  But there were other officers on
22 duty?
23    A.    Yes.
24    Q.    And do you recall as you sit here today

LIDO A. GRAZIANI
February 05, 2020
SCATCHELL vs VILLAGE OF MELROSE PARK
17—20

Page 17

1 all the officers that responded to this call?
2    A.    There were other officers that arrived on
3 the scene.  I don't remember who was there exactly.
4    Q.    The ones that are in some of the reports
5 I've seen are Nikole Spatafora --
6    A.    Okay.
7    Q.    Do you recollect her being on this call?
8    A.    She could have.  I don't recall who
9 exactly was.
10    Q.    What about Gene Cacciatore?
11    MR. CASPER:  Object.  Asked and answered.
12 BY MR. BERSANI:
13    Q.    If you remember.
14        Do you remember him being on this call?
15    A.    Yes, him, I do.
16    Q.    Okay.  Do you remember anybody else that
17 responded to this call?
18    A.    No, I don't remember who else was there.
19 I remember Gene, though.
20    Q.    Do you recall if this came across as a
21 911 call?
22    A.    I don't recall if it came across 911, but
23 I -- I know I was sent there.
24    Q.    Okay.  It looks like in your report, if

Page 18

1 this helps refresh your recollection --
2    A.    Okay.
3    Q.    -- the second to the last line says
4 Officer -- "Off-duty Police Officer Panzani made the
5 first call via 911."
6        Does that help refresh your recollection?
7    A.    Okay.  Yes, it does.
8    Q.    Okay.  And you said that it was a -- came
9 across from the dispatcher as a shots fired call,
10 correct?
11    A.    Yes.
12    Q.    Okay.  And when you responded to the
13 scene, you were flagged down by John Scatchell,
14 Senior?
15    A.    Yes.
16    Q.    And where was he when he flagged you
17 down?
18    A.    In front of his residence.
19    Q.    And his residence is on Winston Avenue --
20 or, Winston Drive, rather?
21    A.    No.  No, it wasn't.  No, no, no.  Strike
22 that.
23    Q.    What street does he live on?
24    A.    I believe -- did you say what street he

Page 19

1 lives on?
2    Q.    Yeah.
3    A.    I believe it's on Norwood.
4    Q.    Norwood?
5    A.    Is it Norwood?  I'm not -- I'm not sure
6 what --
7    Q.    So as you sit here today, you recall
8 him -- he was in front of his house or in his
9 driveway when he flagged you down?
10    A.    I don't -- I don't recall if it was in
11 front of the house or the driveway.  I -- I don't.
12 I was just reading over it.
13    Q.    Okay.  Let me ask you this.
14        According to your report, you write in
15 your -- this is your report, correct?
16    A.    Yes.
17    Q.    Okay.  This is your narrative.  You
18 authored this Exhibit No. 1?
19    A.    Yes.
20    Q.    Okay.  According to your report, it says
21 upon arrival in the area, r/o -- which is reporting
22 officer -- that's you, correct?
23    A.    Yes.
24    Q.    (Continuing) -- was flagged down by the

Page 20

1 caller, who stated they heard what appeared to be
2 three shots, approximately three of them heard on
3 9th and Winston.
4        Do you see this?
5    A.    Yes.
6    Q.    So I'm trying to understand who exactly
7 told you this, if you recall.
8        In other words, who was the caller?
9    A.    Did I -- like I say, I remember seeing
10 Lieutenant Scatchell there.  He could have
11 possibly -- he may have flagged me down at 9th and
12 Winston.  It's -- it was a while ago.  I can't
13 really recall too much on it.  But --
14    Q.    Okay.
15    A.    -- I know he was there.
16    Q.    Well, again, your report says -- and,
17 again, just use your memory of this.
18        Your report says upon arrival you were
19 flagged down by the caller.  So who was the caller
20 that flagged you down?  Was that John Scatchell,
21 Senior, or was it somebody else?
22    A.    No.  It was -- it was
23 Lieutenant Scatchell.
24    Q.    Okay.  Now, he called over his -- over

LIDO A. GRAZIANI
SCATCHELL vs VILLAGE OF MELROSE PARK

February 05, 2020
21–24

Page 21

1 his radio or cell phone or what? Do you know?
2     MR. CASPER: Object to foundation.
3 BY MR. BERSANI:
4     Q.    If you know.
5     A.    I don't recall.
6     Q.    But he was not the 911 caller. The 911
7 caller was Panzani, correct?
8     MR. CASPER: Object to foundation.
9 BY THE WITNESS:
10    A.    I don't know who it was.
11 BY MR. BERSANI:
12    Q.    Okay. So your report goes on to say
13 that the caller stated they heard what appeared to
14 be gunshots, approximately three of them heard on
15 the -- near 9th and Winston.
16       Do you see that?
17    A.    Yes.
18    Q.    Who is "they," if you remember?
19    A.    Well, the caller would be "they."
20    Q.    So that would be John Scatchell, Senior,
21 made that statement to you?
22    A.    I would assume, yes.
23    Q.    Okay. And when you write here the three
24 of them heard gunshots, do you know who he was

Page 22

1 referring to when he made that statement to you?
2     MR. CASPER: Object to foundation.
3 BY THE WITNESS:
4     A.    No, I don't -- I don't recall.
5 BY MR. BERSANI:
6     Q.    Okay. The next sentence says upon
7 further investigating the area, off-duty PO -- which
8 is police officer, correct?
9     A.    Yes.
10    Q.    (Continuing) -- Scatchell, along with
11 off-duty Lieutenant Scatchell, advised via net radio
12 that the incident occurred in front of -- and then
13 there's a space there -- being Scatchell's
14 residence.
15       Do you see that?
16    A.    Yes.
17    Q.    Okay. So as you sit here today, do you
18 recall being advised via radio by Scatchell and/or
19 his -- I assume his son -- right? Is that right?
20    A.    Correct.
21    Q.    (Continuing) -- being advised that the
22 incident occurred in front of their residence?
23    A.    Correct.
24    Q.    Okay. So, then, is it accurate to say

Page 23

1 that you had a conversation with both Scatchell,
2 Junior, and Scatchell, Senior, in front of his
3 residence in which they told you that the incident
4 occurred in front of their house?
5     A.    Correct. Yes.
6     Q.    Okay. You said earlier that when you had
7 this conversation with Lieutenant Scatchell, being
8 Scatchell, Senior, that he told you that someone had
9 discharged fireworks in the driveway.
10       Correct?
11    A.    Yes.
12    Q.    And he used the words "fireworks,"
13 correct?
14    A.    I don't recall.
15    Q.    You can't recall --
16    A.    He may have.
17    Q.    -- what words he used to describe what he
18 heard?
19    MR. CASPER: Objection. Asked and answered.
20 BY THE WITNESS:
21    A.    No, I don't remember what it was.
22 BY MR. BERSANI:
23    Q.    He never used the word "dynamite," did
24 he?

Page 24

1     MR. CASPER: Objection. Asked and answered.
2 BY THE WITNESS:
3     A.    No, I don't recall. I don't know.
4 BY MR. BERSANI:
5     Q.    I mean, "dynamite" would be a pretty -- a
6 pretty dramatic -- it's a pretty dramatic term.
7       You'd agree with that?
8     MR. CASPER: Objection. Argumentative.
9 BY THE WITNESS:
10    A.    Yeah, I would agree to that. Sure.
11 BY MR. BERSANI:
12    Q.    As opposed to mere fireworks.
13    MR. CASPER: Objection. Argumentative.
14 BY THE WITNESS:
15    A.    Right.
16 BY MR. BERSANI:
17    Q.    So if someone used the word "dynamite,"
18 that's something that would -- that would stick in
19 your memory, correct?
20    MR. CASPER: Same objection.
21 BY THE WITNESS:
22    A.    I mean --
23 BY MR. BERSANI:
24    Q.    Well, let me ask you this.

LIDO A. GRAZIANI
SCATCHELL vs VILLAGE OF MELROSE PARK
February 05, 2020
25—28

Page 25

1    If someone said somebody -- somebody
2  discharged dynamite in my driveway, that would be
3  something, as a police officer, you would put in
4  your report, correct?
5    MR. CASPER: Objection. Argumentative. Asked
6  and answered.
7  BY THE WITNESS:
8    A.  I wouldn't be able to go off of
9  somebody's -- I wouldn't be able to just say, oh,
10  this was a piece of dy -- this was a stick of
11  dynamite. It would have to be something -- I
12  would -- it would have to be investigated to see
13  what kind of explosive it was --
14  BY MR. BERSANI:
15    Q.  Right.
16    A.  -- you know, the amount of damage and
17  stuff.
18    Q.  You said that you witnessed --
19    A.  I mean, fireworks are fireworks.
20    Q.  Right.
21      And that's what you witnessed on the
22  driveway --
23    A.  Right.
24    Q.  -- was debris --

Page 26

1    A.  Debris.
2    Q.  -- of fireworks, right?
3    A.  Correct.
4    MR. CASPER: Objection. Asked and --
5  BY MR. BERSANI:
6    Q.  Not debris of dynamite, correct?
7    MR. CASPER: Objection. Foundation.
8  BY THE WITNESS:
9    A.  I would say fireworks. I don't know what
10  dynamite debris looks like.
11  BY MR. BERSANI:
12    Q.  Okay. If John Scatchell, Senior, has
13  said that three sticks of dynamite were blown off in
14  his driveway, is that something that is consistent
15  with what you observed in his driveway?
16    MR. CASPER: Objection. Foundation.
17  BY THE WITNESS:
18    A.  No, I wouldn't think that.
19  BY MR. BERSANI:
20    Q.  Okay. Your report goes on to say that,
21  "We spoke with immediate neighbors, who awoken to
22  the noise and were standing at their front door, who
23  stated that they heard several loud bangs, almost
24  like gunfire, going off in front of their home."

Page 27

1    Do you recall the neighbors that you
2  spoke to?
3    A.  I don't recall them. No, I don't recall.
4    Q.  Did any of those neighbors -- based on
5  your recollection, did any of those neighbors that
6  you spoke to describe the noise as dynamite being
7  discharged or three sticks of dynamite, either one,
8  being discharged?
9    A.  No, I don't -- I don't recall that.
10    Q.  If they did, that would be something that
11  you would put in your report, correct?
12    MR. CASPER: Objection. Argumentative.
13  BY MR. BERSANI:
14    Q.  Because that would be more significant
15  than merely blowing off fireworks, correct?
16    MR. CASPER: Objection. Argumentative.
17  BY THE WITNESS:
18    A.  Correct.
19  BY MR. BERSANI:
20    Q.  Is it accurate to say -- excuse me.
21      Is it accurate to say, Officer Graziani,
22  that you're there to investigate the call? Correct?
23    A.  Yes.
24    Q.  And part of your investigation is talking

Page 28

1  to people that heard or saw what happened, correct?
2    A.  Yes.
3    Q.  And you did conduct an investigation,
4  correct?
5    A.  Correct.
6    Q.  You spoke to John Scatchell, Junior, and
7  Senior, correct?
8    A.  Yes.
9    Q.  You spoke to some neighbors who were out
10  there that claim they heard the noise, correct?
11    A.  Correct.
12    Q.  You spoke to Officer Panzani, correct?
13    A.  I don't recall.
14    Q.  Okay. You looked at the driveway to see
15  what could have made this noise, correct?
16    A.  Yes.
17    Q.  You observed debris of fireworks,
18  correct?
19    MR. CASPER: Objection. Misstates --
20  BY THE WITNESS:
21    A.  Yes.
22    MR. CASPER: -- testimony.
23  BY MR. BERSANI:
24    Q.  During the course of your

LIDO A. GRAZIANI
SCATCHELL vs VILLAGE OF MELROSE PARK

February 05, 2020
29–32

Page 29

1 investigation -- or, strike that.
2       Did you conduct any other investigation
3 that you recall other than what we just spoke of?
4       A.   No.
5       Q.   During the course of your investigation,
6 did you make any determination or finding as to who
7 discharged the fireworks?
8       A.   No.
9       Q.   Did anyone collect any of the debris and
10 preserve the debris that was in the driveway that
11 you observed?
12      A.   I don't recall.
13      Q.   Do you recall if anyone took any
14 photographs of the debris?
15      A.   I don't recall that.
16      Q.   Okay.  Certainly you and others on shift
17 had the capability of collecting the debris and
18 taking photographs.
19           Correct?
20      A.   Correct.
21      Q.   Isn't Nikole Spatafora an evidence
22 technician?
23      A.   Yes.
24      Q.   She was at the time, correct?

Page 30

1       A.   I believe so.  I'm not sure.
2       Q.   Do you know whether she collected any of
3 the debris or took any photographs?
4       A.   I don't recall if she did or not.
5       Q.   At any point in time did
6 Lieutenant Scatchell -- or, strike that.
7           Lieutenant Scatchell, being a lieutenant
8 in your chain of command, was your supervisor,
9 correct?
10      A.   Yes.
11      Q.   At any point in time did
12 Lieutenant Scatchell direct you or any other officer
13 who responded to the incident to collect the debris
14 that you observed in the driveway or to take any
15 photographs?
16      A.   I don't recall.
17      Q.   If he did, that would be something that
18 would be significant enough to put in your report,
19 correct?
20      MR. CASPER:  Objection.  Argumentative.
21 BY THE WITNESS:
22      A.   It would be in my report, correct.
23 BY MR. BERSANI:
24      Q.   Right.

Page 31

1       And it's not.
2       A.   It's not.
3       Q.   Likely, then, it didn't happen.
4       MR. CASPER:  Objection.  Argumentative.
5 BY THE WITNESS:
6       A.   I'm not saying it didn't happen.
7 Whatever is in my report would be -- if I collected
8 that, then I would list it in my report.
9 BY MR. BERSANI:
10      Q.   Okay.
11      A.   The evidence tech has a different report.
12      Q.   Right.
13           My question was a little different.
14           Had Lieutenant Scatchell directed you or
15 any other responding officer --
16      A.   Okay.
17      Q.   -- to collect the debris or take
18 photographs, that would be something that you would
19 put in your report, correct?
20      A.   Correct.
21      Q.   That's a significant fact in your
22 investigation, correct?
23      A.   Correct.
24      MR. CASPER:  Objection.  Form.

Page 32

1 BY MR. BERSANI:
2       Q.   And he never did that, did he?
3       A.   I don't recall.  It wasn't --
4       Q.   Do you recall whether he gave any orders
5 at all to anybody who responded?
6       A.   It's very vague.  I don't recall, like --
7       Q.   Do you recall him directing you or the
8 other officers who responded to go speak with some
9 off-duty officers, Chiappetta, Natale, Nocita, and
10 Espinosa, who were at another house --
11      A.   I recall --
12      Q.   -- a block over?
13      A.   -- that, yes.
14      Q.   Do you recall Lieutenant Scatchell,
15 Senior, directing you or the other responding
16 officers to go speak to them and ask them whether
17 they heard anything?
18      A.   Yes.
19      Q.   And so Lieutenant Scatchell, Senior, did
20 give an order that you recall.
21      A.   Yes.
22      Q.   Okay.  And you guys followed that order,
23 correct?
24      A.   Yes.

LIDO A. GRAZIANI
SCATCHELL vs VILLAGE OF MELROSE PARK

February 05, 2020
33–36

Page 33

1    Q.   Did you go over there and speak to those
2  officers?
3    A.   No, I did not.
4    Q.   Okay.  Do you recall who did that?
5    A.   It was Cacciatore at the time --
6    Q.   Okay.  And --
7    A.   -- I believe.
8    Q.   -- so you weren't present, so you don't
9  know what was said between Cacciatore and any of
10  those officers?
11   A.   No.
12   Q.   Okay.  Are you aware of a verbal
13  altercation between Cacciatore and Chiappetta that
14  evening?
15   A.   Yes.
16   Q.   You're aware of that now.
17   A.   Through talk.
18   Q.   Okay.  It's not something that you
19  personally heard or observed.
20   A.   Right.
21   Q.   Okay.  And what are you aware of?
22   A.   Cacciatore went to question, and from
23  what I understand, he was given a hard time, I don't
24  know by whom, but I vaguely remember that.

Page 34

1    Q.   All right.  And do you recall any
2  specific words that were exchanged between
3  Cacciatore and this -- and this other person?
4    A.   No.  No.
5    Q.   Now, obviously you know Sam Pitassi,
6  Mike Castellan, and Steve Rogowski.
7         Correct?
8    A.   Yes.
9    Q.   They weren't present at all for this
10  incident, correct?
11   A.   Correct.
12   Q.   They weren't present for any part of your
13  investigation, correct?
14   A.   Correct.
15   Q.   Okay.  Have you had any conversations
16  since that date with any of them about this
17  incident?
18   A.   No.
19   Q.   All right.  Are you aware that
20  Steve Rogowski investigated the fireworks incident,
21  at, you know, a later date?
22   A.   I don't recall that.  I don't know.
23   Q.   Okay.
24   A.   He very well may have.  I don't remember

Page 35

1  that.
2    Q.   If Steve Rogowski came to the conclusion
3  that there were no known witnesses to the incident
4  and closed the investigation, that would be
5  consistent with what you found when you investigated
6  the incident, correct?
7        MR. CASPER:  Objection.  Foundation.
8  BY THE WITNESS:
9    A.   Correct.
10       MR. CASPER:  Argumentative.
11  BY MR. BERSANI:
12   Q.   Are you aware that Steve Rogowski
13  investigated the verbal -- a verbal altercation
14  between Cacciatore and Sam Chiappetta?
15   A.   I'm sorry.  Can you repeat that?
16   Q.   Sure.
17       Are you aware that Steve Rogowski
18  investigated the verbal altercation between
19  Cacciatore and Sam Chiappetta?
20   A.   I don't recall.
21   Q.   Okay.  You don't recall.
22       Would anything refresh your recollection?
23   A.   Possibly.
24   Q.   Okay.  Can you think of something right

Page 36

1  now?
2    A.   No.
3    Q.   Do you recall if you were contacted and
4  interviewed by Steve Rogowski about the verbal
5  altercation between Cacciatore and Chiappetta?
6    A.   I don't believe so.
7    Q.   Do you have any reason to dispute that
8  Steve Rogowski conducted a full and fair
9  investigation of both the fireworks incident and the
10  altercation between Cacciatore and Chiappetta?
11       MR. CASPER:  Object to form.  Foundation.
12  BY THE WITNESS:
13   A.   Can you repeat that?
14  BY MR. BERSANI:
15   Q.   Sure.
16       Do you have any reason to dispute that
17  Steve Rogowski conducted a full and fair
18  investigation of both of those incidents, the
19  fireworks incident and then the altercation between
20  Cacciatore and Chiappetta?
21       MR. CASPER:  Same objection.
22  BY THE WITNESS:
23   A.   I don't believe so.
24  BY MR. BERSANI:

LIDO A. GRAZIANI
SCATCHELL vs VILLAGE OF MELROSE PARK

February 05, 2020
37—40

Page 37

1    Q.    You believe that -- to your knowledge,
2 you believe he conducted a full and fair
3 investigation of both incidents?
4    A.    I would assume so, yes.
5    Q.    Right.
6         And you, yourself, conducted the best you
7 could that evening a full and fair investigation --
8    A.    Yeah.
9    Q.    -- correct?
10   A.    Yes.
11        MR. BERSANI:  Okay.  I have nothing further.
12        Thanks.
13                EXAMINATION
14 BY MR. ZIMMER:
15   Q.    You know Mayor Serpico, correct?
16   A.    Yes.
17   Q.    Was Mayor Serpico present during your
18 investigation of the firework incident?
19   A.    No.
20   Q.    Did Mayor Serpico, to your knowledge,
21 have any involvement in the investigation of the
22 firework incident?
23   A.    I would have to say no.
24   Q.    Okay.  Did you ever speak to him about

Page 38

1 your investigation?
2    A.    No.
3        MR. ZIMMER:  Nothing further.
4                EXAMINATION
5 BY MR. FOWLER:
6    Q.    During the course of your, I'm going to
7 call it, on-scene investigation, who was the senior
8 on-duty officer from Melrose Park who was there?
9    A.    I'm not sure.  The shift roster was
10 where -- I would have to say, if anybody,
11 Cacciatore.
12   Q.    Was Cacciatore present when you first got
13 there or did he come in later?
14   A.    He was on scene.
15   Q.    Aside from on duty or not, who did you
16 believe was in charge of the scene that evening?
17   A.    The acting shift commander.
18   Q.    And who was that?
19   A.    I don't know exactly.
20   Q.    Did Lieutenant Scatchell have authority
21 to direct the officers on duty on that scene?
22        MR. CASPER:  Object to form.  Legal conclusion.
23 BY MR. FOWLER:
24   Q.    You can answer.

Page 39

1    A.    I would listen to him because of his
2 authority.
3    Q.    And if what he said made sense, you would
4 do it.
5    A.    Correct.
6        MR. FOWLER:  That's all.
7                EXAMINATION
8 BY MR. CASPER:
9    Q.    All right.  Officer Graziani, my name is
10 Cass Casper.  I'm one of the attorneys representing
11 the Plaintiff in this matter.  I have a few
12 follow-up questions for you.
13        Safety and security of the Village of
14 Melrose Park is within part of your responsibilities
15 as a patrol officer, would you agree?
16   A.    Yes.
17   Q.    All right.  And threats on citizens is
18 a matter of serious concern to the Village of
19 Melrose Park Police Department, would you agree?
20   A.    Yes.
21   Q.    All right.  And as a uniformed police
22 officer of the Village of Melrose Park, a threat on
23 an officer of the Village of Melrose Park is also
24 something that is a serious concern of yours, is

Page 40

1 that correct?
2    A.    Yes.
3    Q.    All right.  And in the last five years,
4 how many times have you responded to a call of a
5 potential threat on a Melrose Park police officer?
6    A.    I don't recall.
7    Q.    Okay.  Now, you did respond to the
8 12/16/2016 call of shots fired on 9th Avenue and
9 Winston Drive, correct?
10   A.    Yes.
11   Q.    We've been talking about this.
12        All right.  Now, you wrote in your
13 report, Graziani 1, quote, "Off-Duty PO Panzani made
14 the first call via 911 advising dispatch of the
15 occurrence."
16        You wrote that, correct?
17   A.    Yes.
18   Q.    Now, you learned about that call from
19 dispatch, correct?
20   A.    Yes.
21   Q.    You didn't actually talk to Panzani
22 yourself at any time on 12/16, correct?
23   A.    I don't recall.
24   Q.    And do you recall what the exact

LIDO A. GRAZIANI                                      February 05, 2020
SCATCHELL vs VILLAGE OF MELROSE PARK                  41–44

Page 41

1 communication you had with dispatch was about this
2 call?
3    A.   I don't recall.
4    Q.   All right.  But did you hear the words
5 "shots fired" prior to your arriving at 9th and
6 Winston at any point?
7    A.   Yes.
8    Q.   All right.  So is it safe to assume that
9 the dispatch that you received was -- contained the
10 words "shots fired" in it?
11        Is that correct?
12   A.   Correct.
13   Q.   All right.  You didn't hear the term
14 "shots fired" from anybody else prior to your
15 arriving on scene, correct?
16   A.   Yes.
17   Q.   Yes, you didn't hear --
18   A.   No.
19   Q.   -- that from anybody?
20   A.   Yes, I did not hear that from anyone
21 else.
22   Q.   All right.  So how many -- are shots
23 fired calls in Melrose Park -- would you say they're
24 common, uncommon, or something else?

Page 42

1    A.   Common.
2    Q.   Okay.  When you hear a shots fired call,
3 is that something that requires an immediate
4 response by you, as a patrol officer?
5    A.   Yes.
6    Q.   Does that require all available police
7 officers to respond?
8    A.   Depending how many calls come in about
9 the same area.
10   Q.   All right.  So it depends on officer
11 availability to respond to the call?
12   A.   That too, yeah.
13   Q.   Okay.  And when you arrived on scene, you
14 observed -- if I understood your testimony,
15 Lieutenant Scatchell was already in the driveway,
16 correct?
17   A.   Yes.
18   Q.   And his son, Officer Scatchell, was also
19 in the driveway, is that correct?
20   A.   I don't recall.
21   Q.   Now, did you observe -- again, as you're
22 arriving on scene, did you observe any other police
23 units already on the scene?
24   A.   I don't recall that.

Page 43

1    Q.   Okay.  So I think you testified you did
2 see Gene Cacciatore at the scene, but you can't
3 recall any other officers who might have been there.
4    Correct?
5    A.   Right.
6    Q.   Gene Cacciatore, did he arrive before or
7 after you arrived on scene?
8    A.   I -- I don't recall.
9    Q.   Did you interact with Gene Cacciatore on
10 scene at any -- at any time?
11   A.   I don't recall.
12   Q.   Did you have any conversation with
13 Gene Cacciatore on scene at any time?
14   A.   I don't recall that.
15   Q.   Did you have any conversation with any
16 other officers on scene at any time -- I mean, any
17 other on-duty officers on scene at any time?
18   A.   I may have.  I'm not sure.
19   Q.   All right.  And you write in your
20 Graziani Exhibit 1 that the neighbors -- wait a
21 second -- were standing at their front door.  Do you
22 see that?
23        That's in the second paragraph, second
24 sentence.

Page 44

1    A.   Yes.
2    Q.   Were they already outside when you
3 arrived on scene?
4    A.   I don't recall.
5    Q.   Did you have to go up and knock on their
6 door to get them to come out?
7    A.   I don't recall.
8    Q.   Where did you speak with them?
9    A.   I, myself, don't recall speaking with
10 neighbors.  It could have been other officers that
11 were on scene that spoke with neighbors.  And I put
12 in there, in my report, "we spoke," meaning we, as a
13 shift.
14   Q.   So, in other words, you can't
15 specifically recall if you spoke to any neighbors at
16 all.
17   A.   I don't recall that night very much, no.
18   Q.   Okay.  And you were never asked by
19 Deputy Chief Castellan to do any follow-up
20 investigation of this incident, is that correct?
21   A.   Correct.
22   Q.   And you were never asked by Sam Pitassi
23 to do any follow-up to this investigation, is that
24 correct?

LIDO A. GRAZIANI
SCATCHELL vs VILLAGE OF MELROSE PARK

February 05, 2020
45–48

Page 45

1    A.    Correct.

2    Q.    And you were never asked to do -- you
3  were never asked by Steven Rogowski to do any
4  follow-up to this incident, correct?

5    A.    Correct.

6    Q.    The same answer with respect to the
7  Mayor, correct?

8    A.    Correct.

9    Q.    So after you arrived on scene and left
10  the scene, that was the end of your involvement with
11  this incident, is that -- is that true?

12    A.    Yes.

13    Q.    Now, you must have written this report,
14  Graziani 1, at some point after the incident.

15        Is that correct?

16    A.    Yes.

17    Q.    Now, there's a date at the top that says,
18  "Entered:  12/16/2016 2:16."

19        Do you see that?

20    A.    Yes.

21    Q.    Does that mean -- does that mean that
22  this report was entered around 2:16 a.m. on
23  12/16/2016?

24    A.    Yes.

Page 46

1    Q.    All right.  So you wrote this report at
2  that time, is that true?

3    A.    Yes.

4    Q.    And you wrote this report, correct?

5    A.    Correct.

6    Q.    And this is a true and accurate copy of
7  the report that you wrote?

8    A.    Yes.

9    Q.    And what did you do with this report
10  after writing it?

11    A.    Turned it in to my supervisor.

12    Q.    Which would have been who at this time?

13    A.    I don't recall who it was.

14    Q.    Did you ever complete any other written
15  reports relative to this incident other than
16  Graziani 1?

17    A.    I don't recall.

18    Q.    How many times have you responded to
19  Lieutenant Scatchell's residence for calls relating
20  to shots fired?

21    A.    None.

22    Q.    How many times have you responded to
23  another Melrose Park police officer's residence for
24  a shots fired call?

Page 47

1    A.    None that I can recall.

2    Q.    Did you know that this was
3  John Scatchell, Senior's residence at the time you
4  responded on 12/16/2016?

5    A.    I was familiar with the address, yes.

6    Q.    So you knew it was John Scatchell,
7  Senior's address, correct?

8    A.    Yes.

9    Q.    All right.  And were you ever interviewed
10  by Castellan, Rogowski, or Pitassi regarding this
11  incident?

12    A.    I don't recall.

13    Q.    Were you ever interviewed by anyone after
14  you left the scene about this incident?

15    A.    I don't believe so.

16    Q.    So let me get this clear.

17        You didn't collect any physical evidence
18  at the scene, right?

19    A.    Right.

20    Q.    You don't know if any other officers
21  collected any physical evidence at the scene, right?

22    A.    Correct.

23    Q.    You didn't yourself interview any
24  neighbors at the scene, correct?

Page 48

1    MR. BERSANI:  Objection.  Misstates his
2  testimony.

3  BY THE WITNESS:

4    A.    I don't recall.

5  BY MR. CASPER:

6    Q.    And --

7    A.    I may have.  I don't recall.

8    Q.    Do you recall interviewing
9  John Scatchell, Junior, at the scene?

10    A.    I don't recall.

11    Q.    Do you recall interviewing
12  Mrs. Scatchell, Laura Scatchell, at the scene?

13    A.    I don't recall.

14    Q.    Do you know if she was home during this
15  incident?

16    A.    Not sure.

17    Q.    Are there any video cameras on the street
18  around 9th Avenue and Winston Drive that are
19  maintained by Melrose Park?

20    A.    I don't believe so.

21    Q.    Did you investigate any security camera
22  footage from private residences or in the area?

23    A.    No, I did not.

24    Q.    Did you ask Lieutenant Scatchell if he

LIDO A. GRAZIANI                                    February 05, 2020
SCATCHELL vs VILLAGE OF MELROSE PARK                 49–52

Page 49

1 had a nest camera or any kind of video camera on his
2 residence?
3     A.    I don't recall that.
4     Q.    And so you wrote in your report that you
5 responded at approximately 1:11 a.m., correct?
6     A.    Yes.
7     Q.    And do you know how long you were at the
8 scene?
9     A.    Not sure.
10    Q.    Was it more than an hour or less than an
11 hour?
12    A.    I would say less than an hour for sure.
13    Q.    Less than 30 minutes?
14    A.    Possibly.
15    Q.    Less than ten minutes?
16    A.    I don't re -- I don't know if it was less
17 than that.
18    Q.    Do you recall anything else that you did
19 at the scene that you haven't already been asked
20 about today?
21    A.    No, I don't.
22    Q.    All right.  And did you ever discuss with
23 Gene Cacciatore what he talked about with those
24 other officers, Espinosa and the other ones we

Page 50

1 listed, Chiappetta and the other one?
2     A.    No, I didn't.
3     Q.    Okay.  And did you incur any overtime
4 responding to this incident or writing your report
5 about it?
6     A.    No.
7     Q.    All right.  Do you know if any of your --
8 the other responding officers incurred any overtime
9 relative to this incident?
10    A.    I'm unaware.
11    Q.    All right.  Do you know an officer named
12 Peter Caira?
13    A.    I do.
14    Q.    All right.  And do you know what his rank
15 is?
16    A.    No, I don't.
17    Q.    Okay.  Do you know John -- you do know
18 John Scatchell, Junior, correct?
19    A.    Yes.
20    Q.    And do you know that he was terminated
21 from the Village of Melrose Park?
22    A.    From what I heard, yes.
23    Q.    Do you know anything about the
24 allegations?

Page 51

1     A.    No.
2     Q.    All right.  And do you know how many
3 overtime hours Peter Caira -- strike that question.
4 Strike the question.  I'll ask it again.
5           Okay.  Just a second here.
6           You stated that Nikole Spatafora,  I
7 think, might have completed an evidence -- or, some
8 other kind of report about the Scatchell incident.
9 I think that was your testimony.  Was it?
10    A.    Yes.
11    Q.    And do you know what that report would be
12 called?
13    A.    A supplement report.
14    Q.    A supplement report.  That's the official
15 title on that report?
16    A.    Yes.
17    Q.    Have you ever seen that report?
18    A.    Yes.
19    Q.    And were there any other officers who
20 completed reports that you're aware of about the
21 bomb incident?
22    MR. BERSANI:  Object to the form.
23 Mischaracterizes the testimony.  He never said
24 "bomb."

Page 52

1 BY THE WITNESS:
2     A.    I don't.
3 BY MR. CASPER:
4     Q.    Okay.  Did you, yourself, ever ascertain
5 what kinds of explosives were used in this incident?
6     MR. BERSANI:  Object to the form, "explosives."
7 He never characterized it that way.
8 BY THE WITNESS:
9     A.    No, I...
10 BY MR. CASPER:
11    Q.    Okay.  And did you, yourself, ever
12 ascertain -- now -- strike that question.
13          Have you ever set off a firecracker in
14 your life?
15    A.    Yes.
16    Q.    Okay.  And did you see any, like, spent
17 firecracker casings at the scene?
18    A.    At the -- at the scene of --
19 Lieutenant Scatchell's scene?
20    Q.    Yeah.
21    A.    Yes.
22    Q.    Okay.  And how many of those did you see?
23    A.    I don't recall.  A couple --
24    Q.    How big were there?

LIDO A. GRAZIANI
SCATCHELL vs VILLAGE OF MELROSE PARK

February 05, 2020
53–56

Page 53

1    A.    -- pieces, maybe.
2    I don't know exactly.
3    Q.    Okay.  Did you see any blackening on the
4    asphalt around where this explosion occurred?
5    A.    I don't recall.
6    Q.    All right.  So do you ever recall being
7    woken up by a firecracker being set off in your
8    vicinity?
9    A.    I've never personally had an issue.
10   Q.    All right.  Now, it would have to be --
11   you'd agree with me it'd have to be a pretty big
12   firecracker for it to wake up two people in
13   Scatchell's residence and the neighbors, wouldn't
14   you -- and to result in a shots fired call, wouldn't
15   it?
16   MR. BERSANI:  Object to form.  Vague.
17   BY THE WITNESS:
18   A.    Well, given the time of night, yeah,
19   that's very -- it could be loud.
20   BY MR. CASPER:
21   Q.    All right.
22   A.    Anything minor could be loud.
23   Q.    Okay.
24   A.    It's --

Page 54

1    Q.    But --
2    MR. BERSANI:  Let him finish.
3    BY THE WITNESS:
4    A.    I don't know exactly what was discharged
5    that night.  I didn't collect any evidence.
6    BY MR. CASPER:
7    Q.    Do people set off fire -- fireworks
8    during the 4th of July or on New Year's Eve in
9    Melrose Park?
10   A.    Yes.
11   Q.    Did you work last New Year's Eve?
12   A.    I don't recall.  I -- I don't think I
13   did.  I don't -- I don't remember.
14   Q.    Did you work the last 4th of July?
15   A.    I don't recall that.
16   Q.    All right.  Do you recall how many shots
17   fired calls you got on -- the last time you worked
18   during the 4th of July or New Year's Eve?
19   A.    I'm not sure.
20   Q.    All right.  Now, you testified that --
21   early on in your examination that at some point you
22   were aware John Scatchell, Senior, was transferred
23   to station supervisor, correct?
24   A.    Yes.

Page 55

1    Q.    Did you ever visit -- strike that.
2    After that, did his office change?
3    A.    Yes.
4    Q.    Okay.  And what office was he moved to
5    when he became station supervisor?
6    A.    It was on the second floor, down the
7    hall.
8    Q.    And have you ever heard that office
9    referred to as anything?
10   A.    Not that I recall.
11   Q.    Have you ever heard that office referred
12   to as the hole?
13   A.    I don't recall that.
14   Q.    Did you ever visit John Scatchell,
15   Senior, in that office?
16   A.    I did.
17   Q.    Okay.  At any point did you stop visiting
18   him in that office before his retirement?
19   A.    Well, we're really not allowed to be in
20   the station unless it's for report reasons and
21   whatnot, so I...
22   Q.    Do you ever recall any verbal orders
23   being given by anyone not to visit John Scatchell,
24   Senior, in his office?

Page 56

1    A.    No.
2    Q.    And you at some -- at some point
3    Lieutenant Kyll -- or, strike that.
4    At some point Sergeant Kyll Lavalais was
5    your supervisor, correct?
6    A.    Yes.
7    Q.    Do you know what time period that was?
8    A.    It could have been a couple of -- a
9    couple years back.  I'm not sure of the exact dates.
10   It's -- I'm not good with dates and...
11   Q.    And at some point you had a preventable
12   acc -- a preventable accident, where you ran a squad
13   car accidentally into some kind of concrete near the
14   station, is that true?
15   A.    Yes.
16   Q.    All right.  And you reported that to
17   Sergeant Lavalais, is that correct?
18   A.    Yes.
19   Q.    And at that time Sergeant Lavalais was
20   the only black sergeant in Melrose Park
21   Police Department, is that correct?
22   A.    Yes.
23   Q.    In fact, he was the only black officer in
24   Melrose Park Police Department during the time of

LIDO A. GRAZIANI
SCATCHELL vs VILLAGE OF MELROSE PARK

February 05, 2020
57—60

Page 57

1 that accident, is that correct?
2　A.　Yes.
3　Q.　And Sergeant Lavalais, he determined that
4 the accident was nonpreventable that you were in, is
5 that correct?
6　A.　Yes.
7　Q.　So he defended you from discipline
8 because he determined it to be nonpreventable, is
9 that correct?
10　A.　Yes.
11　Q.　All right.　And then after that, you were
12 actually issued discipline relative to that
13 accident, is that correct?
14　A.　Yes.
15　Q.　And that was issued to you by whom?
16　A.　Deputy Chief Castellan at the time.
17　Q.　And do you remember the year -- the month
18 and year you were issued that discipline?
19　A.　I don't.
20　Q.　And --
21　A.　It may have been summertime.
22　Q.　Do you know what year?　Was it in the
23 last three years?
24　A.　I would say in the last three, yeah.

Page 58

1　Q.　And what level of discipline did
2 Mr. Cas -- did Deputy Chief Castellan give you?
3　A.　I believe two personal days taken.
4　Q.　And did you file a union grievance over
5 that?
6　A.　No.
7　Q.　Do you know why Lavalais concluded the
8 accident was nonpreventable and then Castellan
9 concluded it was preventable?
10　　　MR. BERSANI: Objection.　Lack of foundation.
11 BY MR. CASPER:
12　Q.　If you know.
13　A.　I -- I don't know.
14　Q.　What did you consider the accident to be,
15 preventable or nonpreventable?
16　A.　Tough to say.
17　Q.　And were you friendly with
18 Sergeant Lavalais, by which I mean were you friends
19 with him?
20　A.　I try to get along with everyone.
21　Q.　Did you ever hang out with
22 Sergeant Lavalais outside of work?
23　A.　No.
24　Q.　Did you ever text with him outside of

Page 59

1 work about nonwork-related matters?
2　A.　No.
3　Q.　Did you ever attend any union meetings
4 with Sergeant Lavalais?
5　A.　No.
6　Q.　Did you ever attend any union meetings at
7 all?
8　A.　Not very many.
9　Q.　All right.　Were you present during any
10 conversations with Lavalais and Castellan regarding
11 that accident?
12　A.　No.
13　Q.　Did John Scatchell, Sen -- sorry to go
14 back to this.
15　　　Did John Scatchell, Senior, appear to you
16 to be visibly upset in any way when you arrived on
17 scene on 12/16/2016?
18　A.　Yes.
19　Q.　And can you describe how he appeared to
20 you?
21　A.　Upset, as if he was woken up out of a
22 sleep.
23　Q.　Did he -- so he seemed -- did he seem
24 distressed to you?

Page 60

1　　　MR. BERSANI: Object to the form.　Vague.
2 BY MR. CASPER:
3　Q.　You can answer.
4　A.　Somewhat.
5　Q.　John Scatchell, Junior, did he appear
6 distressed to you?
7　A.　I don't recall.
8　Q.　And did you ever learn through any source
9 who was responsible for setting the dynamite off at
10 John Scatchell, Senior's home?
11　　　MR. BERSANI: Object to the form.
12 Mischaracterizes his testimony.　He never said
13 "dynamite."
14 BY THE WITNESS:
15　A.　I'm sorry.　Can you repeat that?
16　　　MR. CASPER: Can you read back the question?
17　　　　(WHEREUPON, the record was read
18　　　　by the reporter as requested.)
19 BY THE WITNESS:
20　A.　No, I was not.
21　　　MR. CASPER: Anything else?
22　　　Off the record.
23　　　　(WHEREUPON, discussion was had off
24　　　　the record.)

LIDO A. GRAZIANI
SCATCHELL vs VILLAGE OF MELROSE PARK

February 05, 2020
61—64

Page 61

1    MR. CASPER:  All right.  Back on the record.
2        Okay.  I have no further questions for
3  you, Officer.
4        Thank you.
5    THE WITNESS:  Okay.
6    MR. BERSANI:  You guys have anything?
7        I just have a few questions for you.
8            FURTHER EXAMINATION
9  BY MR. BERSANI:
10   Q.   You said that John Scatchell, Senior, was
11  visibly upset and somewhat distressed when you
12  arrived on scene on December 16, 2016, correct?
13   A.   Yes.
14   Q.   But at no point did he direct, order you,
15  or even suggest that you collect and preserve the
16  debris of fireworks on his driveway, did he?
17   A.   Not me personally, no.
18   Q.   At no point did he direct you or any
19  other officers to collect that evidence, to your
20  recollection.
21   A.   I don't recall.
22   Q.   And at no point did he ever direct you or
23  any other officer to take photographs, to your
24  recollection, correct?

Page 62

1    A.   Correct.
2    Q.   At no point did he tell you that he had a
3  nest camera or a private security camera that
4  pointed outward to the front of his house, did he?
5    A.   I would have listed it in my report.
6    Q.   So the answer is he never told you that.
7    A.   I don't recall if he did, if he didn't.
8    Q.   If he told you that, you'd want to see
9  that, to see if it showed who set up the fireworks
10  in the driveway, right?
11   A.   I would assume.
12   Q.   That would be important information as
13  part of your investigation, correct?
14   A.   Right.
15   Q.   And if he was so upset and distressed
16  about what happened, you'd think that he would tell
17  you, "Hey, I've got a camera that may point into
18  that driveway and tell us who did this," right?
19   MR. CASPER:  Objection.  It calls for
20  speculation.
21       You can answer.
22  BY MR. BERSANI:
23   Q.   You would think, right?
24   A.   Correct.

Page 63

1    Q.   But he never did that, did he?
2    A.   I don't believe -- I don't believe he
3  did, or else I would -- I would have noted it in my
4  report, that there was video.
5    Q.   Right.
6        But you didn't.
7    A.   Right.
8    Q.   And you'd agree that -- or, strike that.
9        You said that you observed a couple
10  pieces of debris in the driveway, correct?
11   A.   Correct.
12   Q.   "A couple" meaning less than three?
13   A.   Yeah.
14   Q.   Okay.  You would agree that fireworks
15  being discharged at 1:00 a.m. could sound like shots
16  fired, correct?
17   A.   Yes.
18   MR. CASPER:  Form.
19  BY MR. BERSANI:
20   Q.   And as a result of your investigation,
21  you determined that fireworks was discharged in his
22  driveway, correct?
23   A.   Yes.
24   Q.   Not dynamite, correct, or a bomb?

Page 64

1    A.   That would be pretty extent.
2    Q.   Right.
3        That would be what?  I'm sorry?
4    A.   Like pretty -- like, I would say --
5    Q.   Extensive?
6    A.   Extensive.
7    Q.   Right.
8        There would be more debris, more damage,
9  there'd be some other evidence that would be more
10  dramatic than just merely fireworks present that
11  you would observe if it was dynamite or a bomb,
12  correct?
13   MR. CASPER:  Object to foundation.
14  BY MR. BERSANI:
15   Q.   Is that right?
16   A.   Correct.
17   Q.   And you didn't observe any of that, did
18  you?
19   A.   No.
20   MR. BERSANI:  Okay.  Thank you.
21       Nothing further.
22   MR. ZIMMER:  No, nothing.
23   MR. FOWLER:  One more.  Sorry.
24   THE WITNESS:  That's okay.

LIDO A. GRAZIANI
SCATCHELL vs VILLAGE OF MELROSE PARK

February 05, 2020
65–68

Page 65

1          FURTHER EXAMINATION
2 BY MR. FOWLER:
3      Q.   Did Lieutenant Scatchell ever say to you
4 that somebody had set off a bomb in his driveway?
5      A.   I don't recall.
6      MR. FOWLER:  Nothing further.
7      MR. CASPER:  I have a few things based on that.
8          FURTHER EXAMINATION
9 BY MR. CASPER:
10     Q.   So Lieutenant Scatchell appeared upset to
11 you when you arrived, correct?
12     A.   Yes.
13     Q.   And you agreed with me already he
14 appeared distressed to you, correct?
15     A.   Yes.
16     Q.   All right.  And based on that, could you
17 rely on Lieutenant Scatchell to think of everything
18 that might need to be done to preserve the scene?
19     A.   I -- I mean, I would think that somebody
20 who wasn't involved in the scene would have more of
21 a level mind, but somebody who is maybe woken up out
22 of a dead sleep with something occurring on their
23 property could be a little bit more upset.
24     Q.   And John Scatchell, Senior, was off-duty,

Page 66

1 right?
2          We covered that, I think.  He was
3 off-duty.
4      A.   Yes.
5      Q.   All right.  And you were the person who
6 was more level-headed who appeared on scene,
7 correct?
8      MR. BERSANI:  Object to the form.  It calls for
9 speculation.
10     MR. CASPER:  Are you saying he's not level --
11 never mind.
12          Sorry.
13 BY MR. CASPER:
14     Q.   You can answer.
15     A.   I would agree.
16     Q.   And --
17     MR. BERSANI:  Well, the way you asked it was
18 you compared it to somebody else, so that was my
19 objection.
20 BY MR. CASPER:
21     Q.   Is there a conflict-of-interest policy in
22 the police office -- in the police department's
23 general orders that you're aware of?
24     A.   I'm sorry.  What's that?

Page 67

1      Q.   Is there a conflicts-of-interest policy
2 in the police department's general orders that
3 you're aware of?
4      MR. BERSANI:  Object to the form.  Vague.
5 BY THE WITNESS:
6      A.   I'm not aware.
7 BY MR. CASPER:
8      Q.   All right.  Well, you've been a law man
9 for quite a number of years.  I think you said
10 eight -- did you say 18 years?
11     A.   That's all I've known
12 Lieutenant Scatchell.
13     Q.   Okay.  And you'd agree with me that it
14 would be inappropriate for an officer who is a
15 victim of a crime to investigate his own crime,
16 right?
17     A.   Yes.
18     Q.   Okay.  That would be against department
19 policy, wouldn't it?
20     MR. BERSANI:  Object to the form.  It calls for
21 speculation.
22 BY THE WITNESS:
23     Q.   I would have to see --
24     MR. BERSANI:  Lack of foundation.

Page 68

1 BY THE WITNESS:
2      A.   -- the department policy.  I don't
3 recall.
4 BY MR. CASPER:
5      Q.   All right.  So is there such a policy?
6      A.   I don't know.
7      Q.   Okay.  But just as -- your experience as
8 a career law man, would that be improper, for an
9 officer to investigate his own crime, in your view?
10     MR. BERSANI:  Same objections.
11 BY THE WITNESS:
12     A.   I would say yes.
13 BY MR. CASPER:
14     Q.   And if an officer is a victim of a crime,
15 would it be inappropriate, in your view, as a career
16 law man for him to investigate the crime that he's a
17 victim of?
18     MR. BERSANI:  Same objections.
19 BY THE WITNESS:
20     A.   Yes.
21 BY MR. CASPER:
22     Q.   Okay.  Now, you testified a number of
23 times today that if it -- in general, that if it
24 happened, it would have been in your report.

Page 69

1    Now -- but you wrote, "We spoke with
2 immediate neighbors who awoken to the noise." And
3 you didn't speak with the neighbors yourself, right?
4    MR. BERSANI: Objection. That's not what he
5 said, counsel. You mischaracterized his testimony.
6 BY THE WITNESS:
7    A.   "We" meaning as a shift.
8    MR. CASPER: Okay. All right. That's all.
9    MR. BERSANI: I have nothing further.
10    MR. FOWLER: Nothing further.
11    MR. CASPER: Thank you.
12    MR. FOWLER: Are you going to talk to him about
13 reserving signature?
14    MR. BERSANI: Yeah.
15      So at this point -- this deposition may
16 be typed up into a transcript form, and so you have
17 two options. One, you could get a copy of that
18 transcript, we'd provide it to you, you'd review it
19 to see if -- make sure the court reporter took down
20 everything accurately based on your recollection.
21 You can't change testimony, but you can at least
22 indicate, "No, I really said this as opposed to
23 this." That's called reserving your signature.
24      The other option is to waive your

Page 70

1 signature, meaning that you don't have an interest
2 in looking at it, you think that she probably did a
3 good job taking it down.
4      So I will tell you the last witness
5 waived the signature, so -- but it's entirely up to
6 you. If you want to look at it --
7    THE WITNESS: No.  I --
8    MR. BERSANI:  -- we'll make it available to
9 you.
10    THE WITNESS:  I can waive it.
11    MR. BERSANI:  Okay.  Very good.
12    MR. CASPER:  Thank you.
13    THE WITNESS:  Thank you.
14    MR. FOWLER:  Done.
15    MR. BERSANI:  Thank you very much.
16      FURTHER DEPONENT SAITH NOT
17      TIME NOTED:  3:22 p.m.
18
19
20
21
22
23
24

Page 71

1 STATE OF ILLINOIS )
2      ) SS:
3 COUNTY OF C O O K )
4
5      I, LINDA SNODGRASS SABOR, a Notary
6 Public within and for the County of Cook, State of
7 Illinois, and a Certified Shorthand Reporter of said
8 state, do hereby certify:
9      That previous to the commencement of
10 the examination of the witness, the witness
11 swore/affirmed to testify the whole truth concerning
12 the matters herein;
13      That the foregoing deposition transcript
14 was reported stenographically by me, was thereafter
15 reduced to typewriting under my personal direction
16 and constitutes a true record of the testimony given
17 and the proceedings had;
18      That before the conclusion of the
19 deposition, the witness has not requested a review
20 of this transcript pursuant to Rule 30(e)(1);
21      That I am not a relative or employee or
22 attorney or counsel, nor a relative or employee of
23 such attorney or counsel for any of the parties
24 hereto, nor interested directly or indirectly in the

Page 72

1 outcome of this action.
2      IN WITNESS WHEREOF, I do hereunto set
3 my hand and seal of office at Palatine, Illinois,
4 this 24th day of February, 2020.
5
6
7
8
9      _____
10      LINDA SNODGRASS SABOR, CSR, RMR, CRR,
11      Notary Public, Cook County, Illinois.
12      My commission expires December 2, 2023.
13
14
15
16 CSR Certificate No. 84-1850.
17
18
19
20
21
22
23
24

LIDO A. GRAZIANI
SCATCHELL vs VILLAGE OF MELROSE PARK

February 05, 2020
73

Page 73

1          I N D E X

2  WITNESS          EXAMINATION  FURTHER EXAM.

3  LIDO A. GRAZIANI

4     By Mr. Bersani      4       61

5     By Mr. Zimmer      37

6     By Mr. Fowler      38       65

7     By Mr. Casper      39       65

8

9

10

11

12

13

14

15

16          E X H I B I T S

17  EXHIBIT NUMBER                MARKED FOR ID

18  Graziani Exhibits

19     Exhibit 1              14

20

21

22

23

24

Administrative   Agency: Melrose Park PD     Incident #: 201600028440        Case_Nr:
Report No.  1    Entered:  12/16/2016 02:16    By Officer:  MP0082  Melrose Park PD Graziani

In summary: on 12-16-16 at approx. 01:11Melrose park units and myself were dispatched
to the area of 9th Ave and Winston Dr for a possible shots fired call. upon our arrival in
the area r/o was flagged down by the caller who stated they heard what appeared to be
gun shots approx. three of them heard on the near 9th and Winston. Upon further
investigating the area off duty p/o Scatchell along with off duty Lt Scatchell advised via
net radio that the incident occurred in front of                being Lt Scatchells
residence.

Upon arrival, I witnessed debris of spent fireworks that were set off in Lt Scatchells
driveway. We spoke with immediate neighbors who awoken to the noise and  were
standing at their front door who stated, that  they heard several loud bangs almost like
gunfire going off in front of their home.  Off duty p/o Panzani made the first call via 911
advising dispatch of the occurrence.  No further to report

GRAZiani  /

EXHIBIT
FOR I.D. 2/5/2020 GS

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER