1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN SCATCHELL, SR.,                    )
                                        )
            Plaintiff,                  )
                                        )
  vs                                    )  No.
                                        )  2018cv03989
VILLAGE OF MELROSE PARK, an             )
Illinois Municipal Corporation;         )
RONALD D. SERPICO; SAM C.               )
PITASSI; MICHAEL CASTELLAN; and         )
STEVEN ROGOWSKI,                        )
                                        )
            Defendants.                 )


            The discovery deposition of
 JOHN SCATCHELL, called by the Defendants, for
 examination, pursuant to notice, taken before
 LORI ANN ASAUSKAS, CSR, RPR, a notary public
 within and for the County of Cook and State
 of Illinois, at the Village of Melrose Park,
 1000 N. 25th Street, Melrose Park, Illinois,
 on Wednesday, August 5, 2020, scheduled to
 commence at 1:00 o'clock p.m.

John Scatchell, Jr.
August 5, 2020

---

**2**

```
 1  A P P E A R A N C E S :
 2  LAW OFFICES OF GIANNA SCATCHELL,
    360 West Hubbard Street
 3  Suite 1404
    Chicago, Illinois  60654
 4  (312) 248-3303
    gia@lawfirm.gs
 5  BY:  MS. GIANNA SCATCHELL,
 6      -and-
 7  TALON LAW, LLC,
    105 West Madison Street
 8  Suite 1350
    Chicago, Illinois  60602
 9  (312) 702-0627
    ctc@talonlaw.com
10  BY:  CASS T. CASPER,
11      Appeared on behalf of the Plaintiff;
12
13
    LANER MUCHIN, LTD.,
14  515 North State Street
    Suite 2800
15  Chicago, Illinois  60654
    (312) 467-9800
16  jeffrey.fowler@lanermuchin.com
    BY:  MR. JEFFREY S. FOWLER,
17
    HERVAS, CONDON & BERSANI, P.C.
18  333 Pierce Road
    Suite 195
19  Itasca, Illinois  60143
    (630) 773-4774
20  mbersani@hcbattorneys.com
    BY:  MR. MICHAEL BERSANI,
21
             -and-
22
23
24
```

---

**3**

```
 1  A P P E A R A N C E S :
 2
    DEL GADO LAW GROUP, LLC,
 3  1441 South Harlem Avenue
    Berwyn, Illinois  60402
 4  (708) 222-7000
    woerner@dglawgroup.com
 5  BY:  MR. TIMOTHY A.M. WOERNER,
 6      Appeared on behalf of the Defendants;
 7
 8
    LAW OFFICE OF CHRISTOPHER COOPER,
 9  79 West Monroe Street
    Suite 1213
10  Chicago, Illinois 60603
    (312) 473-2968
11  cooperlaw3234@gmail.com
    BY:  MR. CHRISTOPHER COOPER,
12
        Appeared on behalf of the Deponent.
13
14  ALSO PRESENT:
15  Mr. John Scatchell, Sr.
    Ms. Cristina Sabater
16  Mr. Michael Castellan
    Mr. Samuel Pitassi
17  Mr. Steven Rogowski
18
19
20
21
22
23
24
```

---

**4**

```
 1              I N D E X
 2  THE WITNESS:  JOHN SCATCHELL, JR.      PAGES
 3  Direct Examination by Mr. Fowler....... 6 - 231
 4  Cross-Examination by Mr. Casper........231 - 272
 5  Redirect Examination by Mr. Fowler.....273 - 285
 6  Cross-Examination by Mr. Casper........285 - 291
 7  Cross-Examination by Mr. Bersani.......291 - 293
 8
 9         E X H I B I T S
              Marked for
              Identification
10
11  Deposition Exhibit No. 1...............  151
12  Deposition Exhibit No. 3...............  152
13  Deposition Exhibit No. 4...............  163
14  Deposition Exhibit No. 5...............  165
15  Deposition Exhibit No. 6...............  166
16  Deposition Exhibit No. 7...............  165
17  Deposition Exhibit No. 8...............  170
18  Deposition Exhibit No. 9...............  171
19  Deposition Exhibit No. 10..............  172
20  Deposition Exhibit No. 11..............  173
21  Deposition Exhibit No. 12..............  174
22  Deposition Exhibit No. 13..............  174
23  Deposition Exhibit No. 14..............  175
24  Deposition Exhibit No. 15..............  175
```

---

**5**

```
 1         E X H I B I T S
              Marked for
 2            Identification
 3  Deposition Exhibit No. 17..............   176
 4  Deposition Exhibit No. 18..............   176
 5  Deposition Exhibit No. 19..............   178
 6  Deposition Exhibit No. 20..............   178
 7  Deposition Exhibit No. 21..............    20
 8  Deposition Exhibit No. 22..............    21
 9  Deposition Exhibit No. 23..............    23
10  Deposition Exhibit No. 24..............    24
11  Deposition Exhibit No. 25..............    25
12  Deposition Exhibit No. 26..............    26
13  Deposition Exhibit No. 30..............   184
14  Deposition Exhibit No. 33..............   193
15  Deposition Exhibit No. 34..............   193
16  Deposition Exhibit No. 35..............   190
17  Deposition Exhibit No. 36..............   149
18  Deposition Exhibit No. 36..............   149
19  Deposition Exhibit No. 40..............   146
20  Deposition Exhibit No. 41..............    36
21  Deposition Exhibit No. 43..............   228
22  Deposition Exhibit No. 44..............   228
23  Deposition Exhibit No. 47..............    75
24
```

L.A. Court Reporters, L.L.C.
312-419-9292

John Scatchell, Jr.
August 5, 2020

---

6

1          MR. FOWLER:  This deposition is
2   being taken pursuant to the Federal Rules
3   of Civil Procedure, notice to the parties
4   and subpoena to the witness.
5                Would you swear him in,
6   please?
7          THE COURT REPORTER:  Please raise
8   your right hand.
9          THE WITNESS:  (Witness complied.)
10         THE COURT REPORTER:  Do you solemnly
11  swear that the testimony you are about to give
12  will be the truth, the whole truth and nothing
13  but the truth, so help you God?
14         THE WITNESS:  I do.
15             (Witness sworn.)
16  WHEREUPON:
17      J O H N   S C A T C H E L L,
18  called as a witness herein, having been first
19  duly sworn, deposeth and saith as follows:
20      D I R E C T   E X A M I N A T I O N
21           by Mr. Fowler
22      Q.   Would you tell us your name, please?
23      A.   John A. Scatchell.
24      Q.   Have you ever had a deposition done

---

7

1   before?
2       A.   Not that I can recall.
3       Q.   The purpose of a deposition is to
4   give the lawyers in this case an opportunity
5   to ask you questions to see what you know
6   concerning the case itself.
7                In order for this process
8   to be useful at all, it's really important
9   for us all to follow a few ground rules.
10               One is that if you don't
11  hear a question that any of us ask you,
12  will you let us know that before you answer?
13      A.   Okay.
14      Q.   All right.  If you don't understand
15  a question that any of us ask you, will you
16  let us know that and give us an opportunity
17  to rephrase it before you answer?
18      A.   Yes.
19      Q.   If you answer a question, then
20  we'll all understand that you heard the
21  question, you understood it and you're
22  doing your best to answer it as truthfully
23  and accurately as you can, is that fair?
24      A.   Sounds fair.

---

8

1       Q.   If at any time you need to take
2   a break -- I don't know how long the
3   deposition is going to go today, but if
4   you need to take a break, just let us know
5   and we'll try to accommodate you.
6                The general rule is though
7   that you should answer a question that's
8   pending before you take a break.
9                Understand?
10      A.   Okay.
11      Q.   Do you understand the instructions
12  I've just given you?
13      A.   Yeah.
14      Q.   All right.  A couple of other quick
15  things that we all mess this up because this
16  is kind of an unusual process, what we say
17  is being taken down by a court reporter and
18  so because of that, there's a few things
19  that are different than in normal conversation.
20               Number one is that we have
21  to communicate in words.  Shaking a head,
22  nodding a head, uh-huh, huh-huh, that kind
23  of stuff doesn't really translate well.
24      A.   Okay.

---

9

1       Q.   And second it's really kind of
2   important to make sure that we don't speak
3   at the same time.  You let whoever is asking
4   questions finish the question before you
5   answer and then we, likewise, should try to
6   let you finish answering before we ask you
7   another question.
8                You're going to mess that
9   up.  It happens to everybody.  When we point
10  it out and ask you to repeat your answer,
11  don't feel like you're being chastised.  It's
12  just something that we're trying to make
13  sure that we have a good record.
14               Understand?
15      A.   Yes.
16      Q.   A few questions that I have to ask.
17  I ask it of everybody.  Please don't take
18  offense to it.
19               Have you taken any medication
20  or substance that would affect your ability
21  to give truthful and complete answers to the
22  questions that we ask you today?
23      A.   No.
24      Q.   Do you have any medical or

---

3 (Pages 6 to 9)

John Scatchell, Jr.
August 5, 2020

10

1  psychological condition that would affect
2  your ability to give truthful and complete
3  answers to the questions that we ask you
4  today?
5      A.  No.
6      Q.  Is there any reason at all why
7  you would not be able to give truthful and
8  complete answers to the questions that I
9  ask you today?
10      A.  No.
11      Q.  As my colleague Mr. Casper asks,
12  did you get a good sleep last night?
13      A.  Did I get a good sleep?
14      Q.  Yeah.
15      A.  Fairly decent.
16      Q.  Ever been convicted of a felony?
17      A.  No.
18      Q.  Have you been employed since December
19  of 2018?
20      A.  On and off, I did work for my sister's
21  law firm.
22      Q.  Any other job?
23      A.  No.
24      Q.  You became a police officer for the

11

1  Village of Melrose Park in 2012, right?
2      A.  Yes.
3      Q.  Prior to that, no experience as a
4  policeman anywhere?
5      A.  No.
6      Q.  You were hired by the Board of Fire
7  and Police Commissioners?
8      A.  I was.
9      Q.  And the members of the board when
10  you were hired are the same members that
11  were there in December of '18 --
12      A.  No.
13      Q.  -- is that true?
14      A.  No.
15      Q.  What was different?
16      A.  My commission card shows George Leoni.
17      Q.  Any other difference?
18      A.  That would be it, I think.
19      Q.  The three who were there in December
20  of '18 were also there when you were hired?
21      A.  Nope.
22      Q.  Your commission card doesn't say
23  anything?
24      A.  I don't believe Rauzi was, at least my

12

1  commission card doesn't say that.
2          Why would they give me a bad
3  commission card?
4      Q.  Did you go through an interview process
5  with the members of the Board of Fire and Police
6  Commission?
7      A.  That was so long ago.  I just remember
8  Commissioner Esposito being the only -- maybe
9  Commissioner Caputo was there, too, for the
10  earlier interview.
11      Q.  Okay.
12          MR. COOPER:  Hey, Jeff, I want
13  to interrupt just for a second.
14          Is there audio in this
15  room?
16          THE COURT REPORTER:  Yes.  I have
17  the audio.
18          MR. COOPER:  Not you.  Is there --
19  is there -- do we know?
20          MR. FOWLER:  I understand and
21  gave instructions that whatever
22  systems are in here were to be
23  turned off during periods of these
24  depositions.  So there's --

13

1          MR. COOPER:  The video -- the
2  video is going?
3          MR. FOWLER:  No.  The video is
4  off.
5          MR. COOPER:  Oh, the video is --
6  okay.  All right.  Thanks.
7          MR. FOWLER:  That's my instructions
8  and that's my understanding.
9          MR. COOPER:  No, I appreciate it.
10          MR. FOWLER:  Okay.
11  BY MR. FOWLER:
12      Q.  Throughout the time that you were
13  employed by the Village of Melrose, you were
14  a patrol officer?
15      A.  Yes.
16      Q.  You're right-handed?
17      A.  Yes.
18      Q.  You shoot with your right hand?
19      A.  Yes.
20      Q.  And if you're firing a shotgun
21  or a rifle, you do it on your right
22  shoulder?
23      A.  Most generally, yes.  I -- I've
24  done some competition shoots where I shoot

4 (Pages 10 to 13)

John Scatchell, Jr.
August 5, 2020

14

```
1   left-handed just for fun.
2       Q.   For waterfowl hunting, you're
3   doing it through your right shoulder?
4       A.   I would say most generally.
5       Q.   You're familiar with Vito Scavo?
6           MR. COOPER:  This is where
7   I indicated to you, Jeff, that
8       he's going to take the Fifth.  So
9       you're going to have to do that,
10      John.
11          THE WITNESS:  Okay.
12  BY MR. FOWLER:
13      Q.   So you're familiar with Vito Scavo?
14      A.   I am familiar with him.
15      Q.   And how are you familiar with him?
16      A.   Life-long family friend.
17      Q.   And, in fact, you consider him like
18  a second father, right?
19      A.   Yes.
20      Q.   Okay.  In 2000 -- at some point in
21  time -- well, strike that.
22              Are you familiar with a --
23  something called IDecoyem Guide Service?
24      A.   At this time I invoke my Fifth
```

15

```
1   Amendment right.
2       Q.   Are you going to invoke your Fifth
3   Amendment right with respect to any questions
4   that I ask you about IDecoyem Guide Service?
5       A.   Yes.
6           MR. FOWLER:  Counsel, is that
7       your understanding as well?
8           MR. COOPER:  Yeah, yeah.
9   BY MR. FOWLER:
10      Q.   And based upon that, you're going
11  to refuse to answer any questions at all
12  that I ask you about IDecoyem Guide Service?
13      A.   I'm not refusing.  I'm asserting
14  my Fifth Amendment right.
15      Q.   So let me ask it differently.
16              Based upon your assertion,
17  you are not going to answer any questions
18  that I ask you about IDecoyem Guide Service,
19  is that correct?
20      A.   My answer is that I'm taking the
21  Fifth Amendment.
22      Q.   You're familiar that Vito Scavo is
23  a convicted felon?
24      A.   Fifth Amendment.
```

16

```
1       Q.   During the period of the fall
2   of -- well, let me ask the question
3   differently.  I have a series of questions
4   that I'm going to ask about Vito Scavo.
5   You've answered one, that -- your
6   relationship.
7               Are there other questions
8   that you will answer about Vito Scavo or
9   are you going to assert the Fifth Amendment
10  right?
11      A.   It depends what particular questions
12  you have.
13      Q.   Okay.  Then I will go through them.
14              During the period of --
15  strike that.
16              When did Mr. Scavo get
17  convicted of a felony?
18      A.   Fifth Amendment.
19      Q.   During the period of time in
20  the fall of 2017, did you go hunting with
21  Mr. Scavo?
22      A.   Fifth Amendment.
23      Q.   In the -- in December -- strike
24  that.
```

17

```
1               In 2017, did you book a
2   trip to Mexico with Mr. Scavo?
3       A.   Fifth Amendment.
4       Q.   Did you go on a trip with Mr. Scavo
5   in December of 2017, hunting in Mexico?
6       A.   Fifth Amendment.
7       Q.   You're aware that the police
8   department has rules concerning the conduct
9   of police officers, right?
10      A.   Fifth Amendment.
11          MR. COOPER:  Well, I think
12      you can answer that question.
13      I'm not sure what's going to
14      follow.
15          THE WITNESS:  Okay.
16  BY THE WITNESS:
17      A.   I am aware that there are rules.
18  Also, I'm also aware that Vito Scavo promoted
19  Deputy Chief Castellan, Director Pitassi and
20  Deputy Chief Rogowski and hired Deputy Chief
21  Rogowski after he was forced to take a forced
22  resignation from CPD, just to give a little
23  foundation as to who we're talking about.
24
```

5 (Pages 14 to 17)

John Scatchell, Jr.
August 5, 2020

18

1    BY MR. FOWLER:
2        Q.   Anything else you would like to
3    say?
4        A.   Eh, over the course of the day
5    maybe.
6        Q.   The -- so now I'm a little confused.
7    You're willing to talk about what Vito Scavo
8    did, but when I ask you questions about --
9        A.   As police chief --
10       Q.   -- Vito Scavo, then you're asserting
11   the Fifth Amendment?
12       A.   Yes.
13       Q.   So are you going to answer questions
14   about Vito Scavo?
15       A.   I'll answer questions about when he
16   was chief, sure.
17       Q.   So you're drawing the line of as
18   soon as he was not police chief, then you're
19   not answering any questions?
20       A.   That's not where I'm drawing the
21   line. Go ahead and ask questions and I'll
22   give you my answer based on what you ask me,
23   Jeff.
24       Q.   So my question to you was you're

19

1    aware that the police department has rules
2    concerning the conduct of police officers,
3    right?
4            MR. CASPER:  Objection,
5        foundation.
6            MR. COOPER:  You could answer.
7    BY THE WITNESS:
8        A.   I am and they're not followed by
9    90 percent of the ranks.
10   BY MR. FOWLER:
11       Q.   You're aware that those rules are
12   often called SOPs?
13       A.   Yes.
14       Q.   And you received copies of the SOPs
15   periodically while you were employed by the
16   department, right?
17       A.   If you guys want to call that
18   received copies, that was more like here's
19   your copy, go read it whenever you have a
20   chance. You're rotating shifts. We don't
21   give a shit about you. Just go read it.
22           Here's 500 pages, we didn't
23   underline anything that was changed, but six
24   months before you come after me, you put in

20

1    a thing about convicted felons when every
2    one of them associates with convicted
3    felons and for the record, that's Pitassi
4    and Castellan especially.
5        Q.   Anything else you'd like to say?
6        A.   No.
7            (Document marked as Scatchell
8            Junior Exhibit No. 21 for
9            identification, 08/05/2020.)
10   BY MR. FOWLER:
11       Q.   If you would -- I've handed you
12   and your attorney a binder.
13           If you would take a look at
14   Tab 21, that's Deposition Exhibit 21.
15           (Document tendered
16           to the witness.)
17           MR. CASPER:  Just a point of
18       clarification, Jeff, as we have
19       been segregating the exhibits by
20       witness, is this going to be
21       Scatchell 21 or just 21?
22           MR. FOWLER:  We can call it
23       Scatchell 21.
24           MR. CASPER:  That would be

21

1        helpful.
2            MR. BERSANI:  Can we call it
3        Scatchell Junior 21?
4            MR. FOWLER:  That probably
5        makes sense.
6            MR. CASPER:  So all of these
7        exhibits will be Scatchell Junior?
8            MR. FOWLER:  Yes.
9    BY MR. FOWLER:
10       Q.   All right.  Have you had a chance
11   to review Scatchell Junior Exhibit 21?
12       A.   I have.
13       Q.   Is that your signature on the page?
14       A.   Appears to be.
15       Q.   And this has a date of August 31,
16   2012.
17           Do you see that?
18       A.   Yes.
19       Q.   Did you sign it on or about August 31,
20   2012?
21       A.   I would have to say I did.
22           (Document marked as Scatchell
23           Junior Exhibit No. 22 for
24           identification, 08/05/2020.)

6 (Pages 18 to 21)

John Scatchell, Jr.
August 5, 2020

22

1  BY MR. FOWLER:
2      **Q.   Taking a look at Scatchell Junior**
3  **Exhibit 22, do you see that?**
4          MR. COOPER:  Jeff, if you
5      have another copy, it would
6      probably go faster if I can
7      turn -- yeah, I was going to say
8      I don't want to be rude.
9          MR. FOWLER:  So I don't think
10     it matters, Chris, but the one you
11     have now is -- has the stickers on
12     it and just so we're all on the
13     same page, the one that the witness
14     has does not have the stickers.  It
15     has the tab marks.  You have the
16     stickers.
17         MR. COOPER:  We have stickers.
18     Do you want to switch?
19         MR. FOWLER:  Yeah, if we can.
20     Sorry.
21         MR. COOPER:  Who wants the
22     stickers?
23         MR. FOWLER:  Just give it to
24     the witness.

23

1          MR. COOPER:  Here you go.
2  BY MR. FOWLER:
3      **Q.   All right.  So looking at Scatchell**
4  **Exhibit 22, do you see that?**
5          **(Document tendered**
6          **to the witness.)**
7  BY THE WITNESS:
8      A.  I do.
9  BY MR. FOWLER:
10     **Q.   Do you recognize your signature --**
11 **strike that.**
12         **Whose handwriting is on the**
13 **lower left of that document?**
14     A.  Appears to be mine.
15     **Q.   And did you receive this on or about**
16 **September 26, 2012?**
17     A.  I would have to say yes.
18         (Document marked as Scatchell
19         Junior Exhibit No. 23 for
20         identification, 08/05/2020.)
21 BY MR. FOWLER:
22     **Q.   Take a look at Scatchell Junior**
23 **Exhibit 23.**
24

24

1          (Document tendered
2          to the witness.)
3  BY THE WITNESS:
4      A.  Okay.
5  BY MR. FOWLER:
6      **Q.   Is that your signature on the**
7  **officer signature line?**
8      A.  Yes.
9      **Q.   And your badge number is 23?**
10     A.  It was.
11     **Q.   Did you sign this on or about**
12 **August 21, 2015?**
13     A.   Given the document, I'd have to
14 say yes.
15         (Document marked as Scatchell
16         Junior Exhibit No. 24 for
17         identification, 08/05/2020.)
18 BY MR. FOWLER:
19     **Q.   Okay.  Take a look at Exhibit 24.**
20         **Is that your signature on**
21 **the officer's signature line?**
22         **(Document tendered**
23         **to the witness.)**
24

25

1  BY THE WITNESS:
2      A.  It is.
3  BY MR. FOWLER:
4      **Q.   Did you sign this on or about**
5  **June 8, 2016?**
6      A.  I'd have to say yes.
7          (Document marked as Scatchell
8          Junior Exhibit No. 25 for
9          identification, 08/05/2020.)
10 BY MR. FOWLER:
11     **Q.   Taking a look at Exhibit 25 -- and**
12 **by the way, if I refer to an exhibit, unless**
13 **I say otherwise, we can all understand it's**
14 **Scatchell Junior Exhibit, fair enough?**
15     A.  Okay.
16         MR. FOWLER:  Counsel?
17         MR. CASPER:  Yes.
18         MR. COOPER:  I agree.
19 BY MR. FOWLER:
20     **Q.   Taking a look at Exhibit 25, do you**
21 **recognize this form?**
22         **(Document tendered**
23         **to the witness.)**
24

7 (Pages 22 to 25)

John Scatchell, Jr.
August 5, 2020

26

1  BY THE WITNESS:
2      A.   I don't recognize it, but I
3  see it.  One thing stands out Nunzio
4  Maiello didn't receive this disk.
5  BY MR. FOWLER:
6      **Q.   Have you seen forms like this**
7  **before?**
8      A.   Probably.
9      **Q.   If you look on the officer's**
10 **signature line about two-thirds of the way**
11 **down, is that your signature?**
12     A.   Appears to be.
13     **Q.   There is a date beside your signature**
14 **of 3/31/17.**
15             **Did you sign it on or about**
16 **3/31/17?**
17     A.   I'd be inclined to believe so.
18     **Q.   Any reason to think you did not?**
19     A.   Nope.
20             (Document marked as Scatchell
21             Junior Exhibit No. 26 for
22             identification, 08/05/2020.)
23 BY MR. FOWLER:
24     **Q.   Taking a look at Exhibit 26,**

27

1  **please, is that your signature on the**
2  **officer's signature line?**
3             (Document tendered
4                 to the witness.)
5  BY THE WITNESS:
6      A.   I really can't tell.  It's just two
7  vague lines.
8  BY MR. FOWLER:
9      **Q.   Okay.  Is the date on that -- do**
10 **you recognize that writing?**
11     A.   Looks vaguely familiar.
12     **Q.   Was it yours?**
13     A.   Could be.
14     **Q.   Did you -- you were aware that one**
15 **of the rules at the village is that you need**
16 **to get permission for secondary employment?**
17             MR. COOPER:  One second.
18             MR. CASPER:  Objection, form.
19             MR. COOPER:  All right.  You
20         can answer that.
21 BY THE WITNESS:
22     A.   Yes, I am.
23 BY MR. FOWLER:
24     **Q.   And just to be clear, the secondary**

28

1  **employment is any employment with anybody**
2  **other than the village itself, while you were**
3  **a police officer, you had to get permission,**
4  **right?**
5             MR. COOPER:  Objection to
6         the form, specifically anybody.
7         You can answer if you understand.
8             MR. CASPER:  Join.
9  BY THE WITNESS:
10     A.   Rephrase it, please.
11 BY MR. FOWLER:
12     **Q.   Did you work for anybody else**
13 **while you were employed by the village?**
14             MR. COOPER:  Fifth.
15 BY THE WITNESS:
16     A.   Fifth Amendment.
17 BY MR. FOWLER:
18     **Q.   Just to be clear, I'm -- I hear**
19 **what you're saying.  My recollection is**
20 **and I don't have the detail right at my**
21 **head, but that you did some security work**
22 **for somebody while you were a police officer,**
23 **is that true?**
24             MR. COOPER:  I'd like for you

29

1         to come back to a question or to
2         withdraw the question and ask it
3         in another way.  Otherwise, I
4         will instruct him to assert his
5         Fifth Amendment right to remain
6         silent.
7             MR. FOWLER:  I'll stand on
8         the question.
9             MR. COOPER:  Then I would
10        suggest that you assert your
11        Fifth Amendment right.
12 BY THE WITNESS:
13     A.   Fifth Amendment.
14 BY MR. FOWLER:
15     **Q.   Did you ever submit a request to**
16 **your supervisors for permission to work**
17 **another job?**
18             MR. COOPER:  Fifth.
19 BY THE WITNESS:
20     A.   Fifth Amendment.
21 BY MR. FOWLER:
22     **Q.   Are you aware of any other police**
23 **officers employed by the Village of Melrose**
24 **Park who were involved in a business with**

8 (Pages 26 to 29)

John Scatchell, Jr.
August 5, 2020

---

30

1  a convicted felon?
2      A.   What I'm aware of --
3          MR. CASPER:  Hang on.
4      Object to form and foundation.
5  BY THE WITNESS:
6      A.   What I am aware is after you guys
7  served me with charges, Deputy Chief Rogowski
8  went to all of his buddies that were at the
9  station and made sure they put extra secondary
10  employment forms in.  That's what I'm aware
11  of.
12  BY MR. FOWLER:
13      Q.   So that wasn't the question that
14  I asked you.  The question I asked you is
15  while -- are you aware of any police officer
16  employed by the Village of Melrose Park who
17  was also working for a convicted felon?
18          MR. CASPER:  Renew my
19      objection.
20          MR. COOPER:  I think you need
21      to assert the Fifth on this one
22      because the way it was asked.
23  BY THE WITNESS:
24      A.   Fifth.

---

31

1  BY MR. FOWLER:
2      Q.   Are you aware of any police officers
3  employed by the Village of Melrose Park who
4  went hunting with a convicted felon?
5      A.   Fifth.
6      Q.   Let's talk about November 20th of
7  2017.
8          You recall that day, right?
9          MR. COOPER:  Well, object to
10      form.  If you understand the question,
11      you can answer the question.
12          MR. BERSANI:  Can I ask the
13      question to be repeated, please?
14          MR. FOWLER:  Want to read it
15      back, please, Lori?
16          (Whereupon, the requested
17          portion of the record was
18          read accordingly.)
19  BY THE WITNESS:
20      A.   I recall it was a day in November.
21  BY MR. FOWLER:
22      Q.   You recall an occasion in November
23  of 2017 when you and others were out hunting
24  and were approached by a conservation officer?

---

32

1          MR. CASPER:  Object to
2      form, foundation.
3  BY THE WITNESS:
4      A.   Fifth Amendment.  Fifth Amendment,
5  I repeat.
6  BY MR. FOWLER:
7      Q.   So if I ask you any questions
8  relating to the incident where you were
9  approached by a conservation officer in
10  November 2017, you're going to assert your
11  Fifth Amendment rights?
12      A.   Fifth Amendment.
13          MR. CASPER:  Objection, assumes
14      facts not established.
15          MS. SCATCHELL:  Can we take a
16      quick break?
17          MR. COOPER:  I don't want to
18      do that.  Just give me a second.
19          (Brief pause.)
20          MR. COOPER:  Okay.  So
21      objection, assumes facts not in
22      evidence and if the record isn't
23      clear, my client did assert his
24      Fifth Amendment right during this

---

33

1      time.
2          And now this -- if a
3      break is okay for a moment, I'm
4      okay with it.  I just wanted to
5      clear up any ambiguity around that
6      last question.
7          MR. FOWLER:  Sure.  If you want
8      to take a break, take a break.
9          MR. CASPER:  We don't need a
10      break.
11          MS. SCATCHELL:  We're fine.
12          MR. COOPER:  You don't?
13          MR. CASPER:  We just talked about
14      it.
15          MR. COOPER:  Okay.  Please.
16  BY MR. FOWLER:
17      Q.   And just to be clear, you recall
18  sitting for an interrogation with me on or
19  about January 9, 2018?
20          MR. COOPER:  That's okay.
21  BY THE WITNESS:
22      A.   Yes, I do.
23  BY MR. FOWLER:
24      Q.   And during that interrogation,

---

9 (Pages 30 to 33)

John Scatchell, Jr.
August 5, 2020

34

1  you were given an order to answer the
2  questions that I asked you truthfully?
3      A.   Yes.
4      Q.   During that interrogation, I
5  asked you a number of questions, right?
6      A.   Yes, you did.
7      Q.   And you answered to the best of
8  your ability?
9          MR. COOPER:  Objection,
10     Fifth.
11 BY THE WITNESS:
12     A.   Fifth Amendment.
13         MR. COOPER:  No objection.
14     Fifth Amendment.
15 BY MR. FOWLER:
16     Q.   And do you recall during that
17 interrogation that you were asked questions
18 about what happened on November 20, 2017?
19         MR. COOPER:  You go ahead
20         and take the Fifth.
21 BY THE WITNESS:
22     A.   Fifth Amendment.
23 BY MR. FOWLER:
24     Q.   So do I understand correctly that

35

1  even though you answered the questions during
2  the interrogation, any question I ask you
3  today based on that incident, you're going
4  to assert your Fifth Amendment?
5          MR. COOPER:  Objection to
6          reference -- or to the words
7          that incident, assumes facts
8          not in evidence, misrepresentation
9          of what the deponent has already
10         testified to.  I would take the
11         Fifth.
12         MR. CASPER:  I'm going to make
13         an objection to -- excuse me for
14         this, but to inquire of the witness
15         in a way in this deposition to get
16         him to adopt statements he made
17         while he was under a Garrity warning
18         would appear to be a Garrity violation.
19             I object to this line of
20         questioning on that basis.
21             MR. FOWLER:  That certainly
22         wasn't the intent and I don't think
23         that that's what I have been doing.
24             What I need to do is just

36

1          establish the parameters of what
2          you're going to take the Fifth on
3          or do I have to go through
4          question-by-question everything
5          that happened on November 20th?
6          That's my point here.
7  BY MR. FOWLER:
8      Q.   So to the extent that your
9  attorney objected based on facts not in
10 evidence, you're aware that a transcript
11 was done of the interrogation?
12         MR. COOPER:  You can answer
13         that.
14 BY THE WITNESS:
15     A.   I'm not aware of one, but I'm
16 sure there was one because there was a
17 court reporter.
18 BY MR. FOWLER:
19     Q.   You never read it?
20     A.   I've read it ages ago, so I don't...
21         (Document marked as Scatchell
22         Junior Exhibit No. 41 for
23         identification, 08/05/2020.)
24

37

1  BY MR. FOWLER:
2      Q.   So if you would take a look at
3  Exhibit 41.  You will see that the transcript
4  has page numbers on each page.  What I'm
5  referring to is what starts on Page 142 of
6  Exhibit No. 41.
7      A.   (Witness complied.)
8          MR. BERSANI:  You said 42?
9          MR. FOWLER:  142.
10         MR. BERSANI:  Thank you.
11         MR. COOPER:  Okay.  Is there
12         a question pending?  I'm sorry.
13         MR. FOWLER:  Not yet.
14         MR. COOPER:  Okay.
15 BY MR. FOWLER:
16     Q.   So for the purpose of my question
17 to the extent that your attorney objected
18 to facts not in evidence, what I'm referring
19 to is the incident that starts on Page 142.
20         Do you see that?
21     A.   I do.
22     Q.   So is it your position that you're
23 not going to answer any questions that
24 I ask you relating to the incident that was

10  (Pages 34 to 37)

John Scatchell, Jr.
August 5, 2020

---

38

1    discussed starting on Page 142 based upon
2    Fifth Amendment?
3         MR. COOPER:  All right.  Object
4    to the use of the word incident as
5    not representative of the witness's
6    testimony here today.
7         Jeff, I'm going to instruct
8    him that -- or suggest to him it's
9    best that he assert the Fifth unless,
10   of course, you can reword the sentence.
11        MR. FOWLER:  I'll stand on it as
12   I asked it.
13   BY THE WITNESS:
14   A.   Fifth Amendment.
15   BY MR. FOWLER:
16   Q.   Okay.  So after November 20th of
17   2017, did you have any communications with
18   any of your supervisors at the police
19   department about having contact with a
20   conservation officer?
21   A.   Fifth Amendment.
22   Q.   You were present during hearings
23   before the board that consists of Mr. Rauzi
24   and Mr. Caputo and Mr. Esposito, right?

---

39

1    A.   I was.
2    Q.   And those hearings related to the
3    charges against you relating for misconduct,
4    right?
5         MR. CASPER:  Object to
6    form, foundation.
7    BY THE WITNESS:
8    A.   Have there been any other officers
9    that have gone before the board recently?
10   BY MR. FOWLER:
11   Q.   You can answer that question.
12   A.   Repeat it again.
13        MR. FOWLER:  Would you read
14   it back, please?
15        (Whereupon, the requested
16        portion of the record was
17        read accordingly.)
18   BY THE WITNESS:
19   A.   I believe so.
20   BY MR. FOWLER:
21   Q.   During that hearing, you -- your
22   attorneys presented the testimony from
23   Mr. Paoletti, correct?
24        MR. CASPER:  Object to

---

40

1    foundation.
2         MR. COOPER:  Objection,
3    competency which goes to the
4    decision -- a decision that I
5    would have made as to who would
6    testify as a witness.
7         However, my client
8    may answer the question.  He's
9    welcome to.
10        THE WITNESS:  Can you repeat
11   it one more time?  I'm sorry.
12        (Whereupon, the requested
13        portion of the record was
14        read accordingly.)
15   BY THE WITNESS:
16   A.   Yes.
17   BY MR. FOWLER:
18   Q.   And you spoke to Mr. Paoletti a
19   couple of times before he testified, right?
20   A.   Fifth Amendment.
21   Q.   You spoke to Mr. Paoletti the evening
22   before he testified?
23   A.   Fifth Amendment.
24   Q.   Isn't it true that Mr. Paoletti

---

41

1    told you that he believed you're likely
2    to get disciplined for misconduct?
3    A.   Fifth Amendment.
4    Q.   You were present when he testified
5    though, right?
6    A.   I was.
7    Q.   You heard him testify that he
8    told you the night before that you were
9    subject to discipline for misconduct, right?
10        MR. CASPER:  Objection to
11   form, foundation.
12        MR. COOPER:  Just -- go ahead.
13   BY THE WITNESS:
14   A.   Fifth Amendment.
15   BY MR. FOWLER:
16   Q.   You're familiar with an Officer
17   Phillip Negron?
18   A.   I am.
19   Q.   Did I pronounce that right?
20   A.   I believe you did.
21   Q.   You're aware that -- well, strike
22   that.
23        Are you aware that at one
24   point your father recommended discipline

---

11 (Pages 38 to 41)

John Scatchell, Jr.
August 5, 2020

---

42

1  against Officer Negron for abusing sick
2  leave?
3        MR. CASPER:  Object to
4    foundation.
5        MR. COOPER:  Objection,
6    competency.  He can't speak for
7    his dad.  He's able to answer
8    the question if he can.
9  BY THE WITNESS:
10    A.  I'm aware there was something
11  with Phil, but that was before I even got
12  on the department, so that's way above my
13  purview.
14  BY MR. FOWLER:
15    Q.  So my question to you is were
16  you aware that your father had recommended
17  discipline against him for abuse of sick
18  leave?
19        MR. CASPER:  Same objection.
20  BY THE WITNESS:
21    A.  I have no direct knowledge of that,
22  no.
23  BY MR. FOWLER:
24    Q.  Have you ever spoken to your father

---

43

1  about Officer Negron?
2    A.  Just in passing of he's a cool guy
3  since I got on the department.  I have nothing
4  but good things to say about Phil despite what
5  the administration might have to say, but --
6    Q.  Did you ever --
7    A.  -- that's about it.
8    Q.  I'm sorry?  I didn't mean to --
9    A.  I said that's about it that I can
10  recall at this time.
11    Q.  Have you ever spoken with your
12  father about Officer Negron abusing sick
13  leave?
14    A.  No, I can't -- I don't believe I
15  did.
16    Q.  And just to be clear, your father
17  is John J. Scatchell?
18    A.  He is.
19    Q.  He is the plaintiff in this lawsuit?
20    A.  Yes.
21    Q.  Have you ever had any conversations
22  with your father concerning Kyll Lavalais?
23    A.  Yes.
24    Q.  How many conversations have you

---

44

1  spoken with your father about Kyll Lavalais?
2    A.  I wouldn't put a number on it.
3    Q.  Have you ever had any conversations
4  with your dad about Kyll Lavalais's
5  grievances?
6    A.  I've had conversations with my
7  father about everybody who showed up to vote
8  against Kyll that day getting a promotion
9  and everybody that went against my father
10  in the subsequent vote got a promotion and
11  then everybody else that didn't vote for
12  the powers that be, they got to pay the
13  Scatchell tax.  You know, that goes around
14  the department, the Scatchell tax.
15        Yeah.  That basically
16  means that anybody that was friends with
17  me, friends with my father, they're either
18  bottom of the sergeant list or told not to
19  hang out with me so they don't go to tact
20  or five other things.  It's -- I think you
21  know where I'm going with this, Jeff.
22    Q.  Anything else you'd like to say?
23    A.  Eh, not right now.
24        MR. FOWLER:  Would you read

---

45

1    the question back, please?
2        (Whereupon, the requested
3        portion of the record was
4        read accordingly.)
5        MR. COOPER:  Objection, asked
6    and answered.
7        You still can answer.
8  BY THE WITNESS:
9    A.  Yes.
10  BY MR. FOWLER:
11    Q.  When did you talk to your dad
12  about Kyll Lavalais's grievances?
13        MR. COOPER:  Objection,
14    asked and answered.
15  BY THE WITNESS:
16    A.  Well, it's still an ongoing
17  discussion because that's the basis of the
18  entire lawsuit is that they retaliated
19  against my father because he took a stand
20  for the only black officer in the department.
21  BY MR. FOWLER:
22    Q.  When is the last time you talked
23  to your dad about Kyll Lavalais's grievances?
24    A.  I don't know.

---

12 (Pages 42 to 45)

John Scatchell, Jr.
August 5, 2020

---

46

1    **Q.    Where did the conversation take**
2  **place?**
3        A.    Couldn't recall.
4    **Q.    Who was present?**
5        A.    Me and my dad.
6    **Q.    During that conversation, what**
7  **did you say and what did he say?**
8        A.    You're talking about hypothetical
9  conversations that spans the course of three
10  or four years since Kyll's grievances.
11  So...
12    **Q.    As you sit here today, do you**
13  **recall any of the conversations between**
14  **you and your dad concerning Kyll Lavalais's**
15  **grievances?**
16        A.    Yeah.  I recall Director Pitassi
17  being completely upset about it calling
18  him a nigger and calling him a bunch of
19  other things.  I remember that conversation --
20    **Q.    Okay.**
21        A.    -- very well because I was appalled
22  by it.
23    **Q.    Who was that conversation with?**
24        A.    It was with my father.

---

47

1    **Q.    You were present?**
2        A.    No, he told me about it.
3    **Q.    What --**
4        A.    And he couldn't wait to tell me
5  about it the minute he left there because
6  it's absolutely reprehensible that a police
7  chief in this day and age uses that fucking
8  language.  Okay.
9    **Q.    So the conversation that we're --**
10        A.    I'm sorry, a police director.  He's
11  not a chief anymore.  He's a civilian.
12    **Q.    Are you finished?**
13        A.    I'm finished.
14    **Q.    The conversation that you were**
15  **referring to with you and your dad, where**
16  **did that conversation take place?**
17            MR. CASPER:  Object to
18            form.
19  BY THE WITNESS:
20        A.    I couldn't recall at this time.
21  BY MR. FOWLER:
22    **Q.    When did it take place?**
23        A.    Right after it occurred.
24            MR. COOPER:  Just an objection

---

48

1    as to witness's past testimony.
2  My recollection is that there was
3  more than one conversation.
4            I think, Jeff, your
5  question refers to a single
6  conversation.
7  BY MR. FOWLER:
8    **Q.    I'm certainly referring to the**
9  **one you just told me about, so we're**
10  **talking about that one for right now.**
11  **That's the one that you said you recall,**
12  **right?**
13        A.    I just recall what was just said.
14    **Q.    All right.  So what I need to**
15  **do is what's called establish a foundation**
16  **for that conversation.  You don't recall**
17  **when it took place?**
18        A.    Whenever Kyll's first grievance
19  was submitted and he wanted to sue, that's
20  when he made the statement, Pitassi did.
21    **Q.    And do you know when that was**
22  **as you sit here today?**
23        A.    No.  Again, we're talking about
24  four years.  We're milling through 9 million

---

49

1  documents.  I couldn't tell you exactly when
2  that occurred.
3    **Q.    Anybody present during that**
4  **conversation?**
5        A.    Me and my father.
6    **Q.    During that conversation, what**
7  **did he say and what did you say?**
8        A.    I pretty much already said what
9  he said.  He said that Pitassi was irate
10  because Kyll was suing, referred to him
11  as a nigger and just completely degraded
12  him as a human being because he had the
13  right to sue because he was discriminated
14  against.  Let's call it what it is.  It's
15  discrimination.
16            This department discriminates
17  against black people all the time.  It's no
18  secret.  They fired Angela Williams so they
19  could hire Gary Montino's kid.  Are you kidding
20  me?  Convicted felon Gary Montino.
21    **Q.    Anything else?**
22        A.    No.
23    **Q.    Do you recall any other conversations**
24  **between you and your dad about Kyll Lavalais's**

---

13 (Pages 46 to 49)

John Scatchell, Jr.
August 5, 2020

50

1    grievances as you sit here today?
2           MR. COOPER:  Objection,
3    asked and answered.  He said yes.
4           MR. CASPER:  Join.
5    BY MR. FOWLER:
6       Q.   You told me about one.
7            Is there any others that
8    you recall?
9       A.   Not off the top of my head right
10   now.
11      Q.   Angela Williams, do you know why
12   she was let go?
13      A.   Residency.  So --
14           MR. CASPER:  Sorry.  I know
15   you answered.  Object to foundation.
16   BY THE WITNESS:
17      A.   The rumor was residency and the
18   funny thing about rumors is you happen to
19   know a lot about the department when you
20   work in patrol and you know who lives in
21   town and you know who doesn't and certain
22   people just get promoted up the ladder
23   while still living out of town.
24           Sergeant Steve Pesch,

51

1    because he's Castellan's friend, was allowed
2    to live in Carol Stream and Homer Glen before
3    he ever moved here but then they promoted
4    him to sergeant.
5            Jerry Manzel, they promoted
6    him to detective and he still doesn't live
7    in town, told his neighbor you'll never see
8    my family here ever because I don't live
9    here.  How is that allowed?  Why?  Because
10   they bought a house from Rosa or Donna
11   Serpico or Pitassi.  How is that allowed?
12   BY MR. FOWLER:
13      Q.   Anything else?
14      A.   No.  Your floor.  I yield back.
15      Q.   Do you have any personal knowledge
16   as to why Angela Williams was let go?
17           MR. COOPER:  Objection,
18   asked and answered.
19   BY THE WITNESS:
20      A.   The rumor was that they wanted to
21   take care of Harpo for being a good little
22   soldier so they gave his kid a job and then
23   they -- after that, they put him on the
24   fire department.

52

1    BY MR. FOWLER:
2       Q.   Anything else?
3       A.   No.  It's just a tangled web of
4    nepotism and deceit.
5       Q.   Who did you hear the rumor from?
6       A.   All over the station.
7       Q.   Anybody in particular?
8       A.   No, not that I recall at this
9    time.
10           MR. CASPER:  I'm sorry to
11   interrupt.
12           Could we just have the
13   witness state who Harpo is referring
14   to on this part of the transcript?
15           THE WITNESS:  Harpo is a nickname
16   for Gary Montino, which was Vito
17   Scavo's deputy chief and Deputy
18   Chief Castellan is very good friends
19   still.
20           MR. CASPER:  Thank you.
21   BY MR. FOWLER:
22      Q.   Did you ever have any conversations
23   with your father concerning the residency
24   requirement?

53

1       A.   Plenty.
2       Q.   As you sit here today, do you recall
3    any?
4       A.   Not in particular, but we've discussed
5    them.
6       Q.   Did you ever have any conversations
7    with your father about his -- about being
8    promoted to deputy chief?
9       A.   Yes.
10      Q.   When was that?
11      A.   Around the time that it would have
12   occurred.
13      Q.   How many conversations did you have?
14      A.   Impossible to measure.
15      Q.   How many do you recall as you sit
16   here today?
17      A.   Particular conversations, I don't
18   recall any.  I know we discussed it.
19      Q.   Do you recall what you and he said
20   to each other about it?
21      A.   Just that Ronnie promised him
22   the deputy chief position as in Mayor
23   Serpico and I do recall that Director
24   Pitassi was irate because the rumor got

14  (Pages 50 to 53)

John Scatchell, Jr.
August 5, 2020

---

54

1  back to him from Dino Dimaio that my dad
2  wanted his spot which was never the case.
3          Deputy chief was promised,
4  it was put on the agenda and then it was
5  revoked and given to Deputy Chief Rogowski --
6  well, at the time Lieutenant Rogowski for
7  no apparent reason.
8      Q.   How do you know that Director
9  Pitassi was irate?
10     A.   That was what was told to me.
11     Q.   Who told you?
12     A.   I can't recall.
13     Q.   You didn't see Director Pitassi
14  being irate?
15     A.   I did not, no, but I -- I was
16  told also that he ran through the hallways
17  one day saying they want a war after the
18  article about his kid shooting his gun off
19  and then that spawn -- I mean, this is a
20  couple months between timeframe because I
21  was off work, you know, I had come back
22  and guys were actually making songs about
23  it.  I don't know if you remember that
24  song, war, huh, and they were doing

---

55

1  impressions of the director, war, huh.
2  God no.
3      Q.   Anything else?
4      A.   That's it.
5      Q.   Any other conversations you recall
6  as you sit here today with your father about
7  his promotion?
8      A.   Just the fact that he got stabbed
9  in the back.
10     Q.   When did that conversation take
11  place?
12     A.   Just an overall consensus of what
13  the conversations would have consisted of.
14  I don't recall any particular conversations.
15     Q.   All right.  Ever have any
16  conversations with your father about an
17  incident involving Mr. Morales?
18     A.   Yes.
19     Q.   When did those conversations take
20  place -- strike that.
21          How many conversations
22  did you have with your dad about Morales?
23     A.   Again, I don't recall specific
24  conversations and I don't recall the amount

---

56

1  of times.  I just know we discussed it.
2      Q.   Ever have any conversations with
3  your father about an incident with fireworks
4  or some kind of explosive on your driveway?
5      A.   Yes.
6      Q.   When -- how many conversations?
7      A.   Numerous.  I don't recall the
8  context of every one of them, but I know
9  there was numerous including that the
10  administration did not do their job at
11  all.
12     Q.   Do you recall any of those
13  conversations as you sit here today?
14     A.   Particulars, no.
15     Q.   Were you present that night when
16  there was -- something happened on the
17  driveway, the fireworks or explosion or
18  whatever?
19     A.   You're going to have to be a
20  little more descriptive of something
21  happened.
22     Q.   Do you recall an occasion where
23  there was a loud bang on your driveway at
24  night?

---

57

1      A.   I recall an occasion where there
2  was dynamite blown up on my driveway, at
3  least an M-80 or a half stick.  I would have
4  to guess based on the audibility of it and
5  the way my house shook.
6      Q.   You were present?
7      A.   I was present.  I was inside my
8  parent's bedroom watching a movie with
9  them.
10     Q.   And you heard a loud noise?
11     A.   I heard an explosion, not a loud
12  noise, an explosion.
13     Q.   And you went out -- did you go
14  outside?
15     A.   I did.
16     Q.   What did you see?
17     A.   I saw fragments of what looked
18  like M-80 or half sticks because it's all
19  red wrapping and frayed firework display
20  of M-80 caliber.
21          I mean, it was -- you could
22  see there was a circular tube there the
23  size of an M-80 but naturally the evidence
24  technicians didn't take anything so -- and

---

L.A. Court Reporters, L.L.C.
312-419-9292

John Scatchell, Jr.
August 5, 2020

58

1  then this guy didn't do any follow-up work,
2  Rogowski.
3      Q.   How do you know that?
4      A.   He didn't ask me any questions.
5  I was a witness.  Leonard next door was a
6  witness.  He didn't ask him any questions.
7  Why?  Because he is black.
8      Q.   Anything else?
9      A.   That's it.
10     Q.   Any damage to the driveway?
11     A.   There is still a stain on the
12  driveway, yeah.
13     Q.   Other than the stain, any other
14  damage?
15     A.   It came within three feet of my
16  truck, so you could exasperate if the
17  offender had a better arm, he would have
18  blown up my truck.
19     Q.   Was your truck damaged?
20     A.   To my recollection, no.
21     Q.   And the stain you referred to, was
22  it within three feet of your truck?
23     A.   Yes.
24     Q.   Any conversations with your dad

59

1  about being assigned a station supervisor?
2      A.   Yes.
3      Q.   As you sit here today, do you
4  recall any of those?
5      A.   Specific conversations, no.  What
6  we discussed, perhaps.
7      Q.   What did you discuss with your dad
8  about being assigned a station supervisor?
9      A.   That Pitassi did the same thing
10  he did to his former best friend, Johnny
11  Simpson, stuffed him in the fucking hole.
12     Q.   Anything else?
13     A.   The fact that it was an absolute
14  travesty because he took away his entire
15  supervision when my dad's shift, in
16  everybody's opinion, was the best shift
17  on the department.
18     Q.   Anything else?
19     A.   Not that I recall, no.
20     Q.   Any conversations --
21     A.   Oh, wait.  I do recall something.
22  Can I have the floor back, Jeff?
23     Q.   Sure.
24     A.   Okay.  I do recall that

60

1  Director Pitassi told him the eyes of Texas
2  are upon you, which by the way is a racist
3  statement, has racist connotations but anyhow,
4  the eyes of Texas were upon my father -- we
5  had an agreement.  I'm going to finish and
6  then you can talk.  The eyes of Texas --
7      Q.   I --
8      A.   Well, you were getting ready.
9           The eyes of Texas were
10  upon my father meantime this other station
11  supervisor, his opposite Dino Dimaio, was
12  allowed to just go run amok, still, still
13  runs amok.  He's a station supervisor.
14          He gets a personal car
15  to run around in, throw the people's elbow
16  to anybody who's locked up.  Oh, we didn't
17  know that?
18     Q.   Anything else?
19     A.   Go ahead.
20     Q.   What's the basis of your statement
21  that the words the eyes of Texas are on you
22  has racial connotations?
23          MR. CASPER:  Object -- go
24     ahead.

61

1  BY THE WITNESS:
2      A.   I would have to take a break to
3  get you the exact verbiage, but it was just
4  in the news, Jeffrey.
5  BY MR. FOWLER:
6      Q.   Anything else?
7      A.   That's it.
8      Q.   Ever have any conversations with
9  your dad about him participating in shift
10  meetings as the station supervisor?
11     A.   Shift meetings?  Could you expound
12  on what that is?
13     Q.   I don't know.  Did you or he ever
14  talk about him being involved or not involved
15  in shift meetings?
16     A.   Shift meetings, he didn't have
17  anybody under him.  Who is he going to have
18  a meeting with, himself?
19     Q.   Does that mean no?
20     A.   They took away his entire -- all
21  his -- all his supported officers.  Who
22  the hell is he going to have a meeting
23  with?  Let me just type on the computer
24  and talk to myself.

16 (Pages 58 to 61)

John Scatchell, Jr.
August 5, 2020

62

1    Q.   Does that mean, no, you didn't --
2    A.   It means no.
3    Q.   Did you ever have any conversations
4  with your dad about him having computer access
5  once he became station supervisor?
6    A.   Yes.  He didn't have a computer
7  in his office.
8    Q.   And when did those -- as you sit
9  here today, do you recall any of those
10 conversations?
11   A.   Particular conversations, no.
12   Q.   Ever have any conversations with
13 your dad about his retirement plans?
14   A.   Sure.
15   Q.   As you sit here today, do you
16 recall any of those?
17   A.   Well, he's retired right now
18 loving every second of it.
19   Q.   Anything else?
20        MR. CASPER:  Objection.  I
21 move to strike that answer.
22 BY THE WITNESS:
23   A.   As far as retirement goes, he's
24 enjoying his retirement.

63

1        MR. CASPER:  Object.  Move
2        to strike that answer.
3  BY MR. FOWLER:
4    Q.   The question that I asked you is
5  did you have any discussions with your dad
6  about his retirement plans?
7    A.   I said sure, yes.
8    Q.   As you sit here today, do you
9  recall any of those?
10   A.   Be descriptive as what do you mean
11 by plans, after retirement, retiring when?
12 What do you --
13   Q.   That's fair.  That's fair.
14        And as I said at the beginning,
15 if you don't understand a question I ask you,
16 please let me know.
17        So prior to his retirement,
18 did you have any discussions with your dad
19 about when he would plan to retire?
20   A.   We discussed that he planned to be
21 deputy chief for a little bit and he wanted
22 to right the ship of this department that's
23 obviously going in a wrong direction and
24 once the powers that be found out that he

64

1  might get a promotion, they couldn't have
2  that because that gets in the way of all
3  of their traditions and old ways, the ways
4  they learned from Vito Scavo.
5    Q.   When did you have the discussion
6  with your dad about him planning to be
7  deputy chief for a little bit?
8    A.   It would have been around the
9  time that he was told by Mayor Serpico
10 that he was going to be promoted.
11   Q.   Where did the conversation take
12 place?
13   A.   Jeff, again, specific conversations,
14 I can't tell you three or four years ago
15 where they took place.
16   Q.   Anybody else present?
17   A.   I doubt it.
18   Q.   And when you said it was around
19 the time, was it after the promotion to
20 deputy chief had been posted or before
21 then?
22   A.   I wouldn't be able to recall that.
23   Q.   Okay.  During that conversation,
24 do you know who was present?

65

1    A.   Me and my father.
2    Q.   Anybody else?
3    A.   I don't recall specific conversations
4  so obviously I couldn't recall who was there
5  besides me and my father.
6    Q.   During that conversation that you
7  do recall, what did he say and what did you
8  say?
9    A.   Just that he really wanted to
10 right the ship of this department and guys
11 were behind him, guys really wanted him
12 to be deputy chief and for whatever reason
13 the three men sitting across from me didn't
14 like that or at least two of them.
15   Q.   How do you know that?
16   A.   Because they can't keep their mouth
17 shut and they tell everybody in town and then
18 it comes back to you.
19   Q.   So let me go that direction then.
20        Have you ever heard Deputy
21 Chief Castellan say anything about your
22 father's retirement?
23   A.   About my father's retirement
24 specifically?

17 (Pages 62 to 65)

John Scatchell, Jr.
August 5, 2020

66

1    Q.   Yes.
2    A.   Just that he's got to be out by 62.
3    Q.   Anything else?
4    A.   Not that I recall at this time.
5    Q.   And the out by 62 refers to all
6    police officers, doesn't it?
7         MR. CASPER:  Objection,
8    foundation.
9    BY THE WITNESS:
10   A.   That refers to yet another ordinance
11   that was enacted against my father just like
12   the two gun ordinances were enacted against my
13   father yet Nunzio Maiello violated it every
14   day by having a gun right here.
15        Is it because he's obese?
16   Maybe we should have physical activity where
17   you have to get a stipend based on if you
18   could complete physical activities because
19   there is a lot of ways to shipshape this
20   department.  They don't want to do any of
21   it.
22        MR. CASPER:  For the record,
23   when the witness said right here,
24   he put his hand up to his chest.

67

1    BY MR. FOWLER:
2    Q.   Anything else?
3    A.   That's it.
4         MR. FOWLER:  Could you read my
5    question back, please?
6         (Whereupon, the requested
7         portion of the record was
8         read accordingly.)
9    BY THE WITNESS:
10   A.   Just references that he can't wait
11   to get rid of him, can't wait to get the
12   thorn out of his side and that was again
13   police station rumor, but when Deputy Chief
14   Castellan wants you to know something, he
15   is very vocal about it.
16        He'll have a whole group in
17   his office and he'll purposely say it out
18   loud at roll call just so everybody hears
19   it, so he spreads his own rumors.  He's his
20   own hype man.
21   BY MR. FOWLER:
22   Q.   Did you personally hear Deputy
23   Chief Castellan say that he can't wait to
24   get rid of your father?

68

1    A.   I personally heard him run his
2    snowplow business from his office during
3    work hours.
4    Q.   Did you hear the question that
5    I asked you?
6    A.   And I'm just telling you what I
7    personally heard.
8    Q.   Is there a reason why you don't
9    want to answer the question that I asked
10   you?
11   A.   I'm telling you what I personally
12   heard.
13   Q.   So my question was did you personally
14   hear Deputy Chief Castellan say --
15   A.   No, I just know.
16   Q.   Let me finish my question.  Okay?
17        Did you hear Deputy
18   Chief Castellan say that he couldn't wait
19   to get rid of your father?
20   A.   No.  I just know because that's
21   what I was told from everybody that was
22   around or in his office at the time and,
23   no, I don't recall particular people,
24   but even if I did, which I don't and I'm

69

1    not saying I do, but even if I did, you
2    guys would call them here, ask them a
3    bunch of questions with these three guys
4    staring at them, and for the record,
5    Deputy Chief Rogowski, Director Pitassi
6    and Deputy Chief Castellan staring at
7    them, intimidating them.
8         They ain't going to say
9    nothing.  They'll look at me and say I
10   don't want to end up like John Scatchell
11   or John Scatchell, Sr.  Okay.
12        For three years, you
13   guys have used me as your punching bag
14   to get at my father, so I apologize for
15   the record if I have sworn a few times,
16   but it's something I'm pretty passionate
17   about because you guys have had no
18   consideration for me from beginning to
19   end in this, including you, Mr. Fowler,
20   with your ex parte conversations with my
21   doctors.
22   Q.   Anything else?
23   A.   No.
24   Q.   Have you ever heard personally

18 (Pages 66 to 69)

John Scatchell, Jr.
August 5, 2020

---

70

1　**Deputy Chief Castellan say anything about**
2　**your father?**
3　　A.　Yes.
4　　　　MR. CASPER:　Object.　Object
5　　to asked and answered.
6　BY MR. FOWLER:
7　　**Q.　What did you personally hear**
8　**Deputy Chief Castellan say about your**
9　**father?**
10　　A.　At a Cubs game him and I sat next
11　to each other --
12　　**Q.　Okay.　What did he say about your**
13　**father?**
14　　A.　-- at a law enforcement game.
15　　　　Well, he said something
16　to the effect of, well, Johnny babes, me
17　and your father, that's another story for
18　another day, but you can rest assured that
19　anything I do in my office is for the
20　safety of these officers.　Really?　Really?
21　　　　Because anytime something
22　is turned over to him or turned over to
23　Director Pitassi unless it involves me or
24　somebody that's close to me or my father,

---

71

1　it just gets, shhhh, shhhh, shhhh, shuffled
2　off.
3　　**Q.　Anything else?**
4　　A.　No.
5　　**Q.　When did that Cubs game take place?**
6　　A.　That would have been right before
7　everything took place with me.　So that would
8　have been, I think, May of 2017.　It was the
9　law enforcement game.　The whole -- the whole
10　department went.
11　　　　And to lay you a little
12　foundation there, okay, I went to be cordial.
13　I didn't like Deputy Chief Castellan as a
14　person.　I didn't like a lot of people as
15　persons, but guess what, I was cordial.
16　　　　I was a good officer.　I
17　was nice to everybody.　And you know what?
18　After -- that was right after the FOP thing
19　happened.　I tried to mend fences.　I tried
20　to be nice.　I grabbed people one-on-one.
21　Raul, Pesch, Gepetta, Natale.　What's your
22　problem with my father?　Why can't we all
23　get along here?　Why can't things be normal?
24　　　　I go to that Cubs game, I

---

72

1　have a cavalier conversation with the deputy
2　chief.　When does that ever happen?　But
3　then a few months later and right as that's
4　happening, you guys are putting in SOPs
5　about convicted felons, that and the
6　other and not telling anybody.
7　　　　You guys are doing all
8　your little work behind the scenes already
9　when -- when all I was doing was doing my
10　job.
11　　　　MR. CASPER:　Hang on.　I
12　　would object.　Now, we're moving
13　　way beyond the question that was
14　　asked as a narrative.
15　　　　I'm going to move to
16　　strike all of this.　This is way
17　　nonresponsive to the question.
18　BY MR. FOWLER:
19　　**Q.　Anything else you want to say?**
20　　A.　Your floor.
21　　　　MR. CASS:　Jeff, I would
22　　like to request a quick break.
23　　　　MR. FOWLER:　Sure.
24　　　　MR. CASS:　It's 2:00 o'clock.

---

73

1　　　　Thanks.
2　　　　(Whereupon, after a short
3　　　　break was had, the following
4　　　　proceedings were held
5　　　　accordingly.)
6　BY MR. FOWLER:
7　　**Q.　You were just referring to a Cubs**
8　**game that you attended along with a number**
9　**of other officers and you had a conversation**
10　**with Deputy Chief Castellan.**
11　　　　**Do you recall that**
12　**discussion?**
13　　A.　Yes.
14　　**Q.　That game was on May 17th of 2017,**
15　**isn't that right?**
16　　A.　If you're telling me, that means
17　you must have researched it, so I'm inclined
18　to believe you, but I'm not going to say for
19　certain that's the date.
20　　**Q.　Any reason to think that was not**
21　**the date?**
22　　A.　No reason to think not.　I'm just
23　not certain.　It makes sense.　It's around
24　the time period.

---

19 (Pages 70 to 73)

John Scatchell, Jr.
August 5, 2020

---

74

```
1        Q.   In the fall of 2017, you went
2    hunting with Vito Scavo, didn't you?
3        A.   Fifth Amendment.
4        Q.   In the fall of 2017, you went
5    hunting with groups of people that included
6    Vito Scavo, right?
7        A.   Fifth Amendment.
8        Q.   In the fall of 2017, you went
9    hunting from your duck boat or your jon
10   boat with Vito Scavo --
11       A.   Fifth Amendment.
12       Q.   -- right?
13       A.   Fifth Amendment.
14       Q.   There were occasions when you
15   were on one end of the boat and Mr. Scavo
16   was on the other end of the boat in 2017,
17   isn't that right?
18       A.   Fifth Amendment.
19       Q.   The occasions that you went hunting
20   in 2017, you sometimes brought a second shotgun,
21   true?
22       A.   Fifth Amendment.
23
24
```

---

75

```
1              (Document marked as Scatchell
2               Junior Exhibit No. 47 for
3               identification, 08/05/2020.)
4    BY MR. FOWLER:
5        Q.   I'm handing you what's been marked
6    as Deposition Exhibit 47. Here's another
7    one.
8              (Document tendered
9               to the witness.)
10   BY THE WITNESS:
11       A.   Same -- same thing, Jeff?
12   BY MR. FOWLER:
13       Q.   Yeah, a copy.
14             So right now I want to look
15   at the first page of Exhibit 47.
16             Do you recognize that as a
17   photo of you?
18             MR. CASPER:  Object to
19        foundation.
20   BY THE WITNESS:
21       A.   Fifth Amendment.
22   BY MR. FOWLER:
23       Q.   Who is the other individual in
24   the first page of Exhibit 47?
```

---

76

```
1        A.   Fifth Amendment.
2             MR. CASPER:  Same objection.
3             Continuing objection
4        as to foundation as to all of
5        these questions.
6    BY MR. FOWLER:
7        Q.   If you take a look at the second
8    page of Exhibit 47.
9             MR. COOPER:  If it helps,
10       we'll stipulate, so you don't have
11       to go through each one, he's going
12       to take the Fifth as to each one.
13   BY MR. FOWLER:
14       Q.   And just to be clear, the second
15   page of Exhibit 47 that shows you carrying
16   two long gun cases, is that true?
17       A.   Fifth Amendment.
18             MR. COOPER:  Jeff, when I
19        use the word stipulate, we'll --
20        maybe it's a bad choice of words.
21             He will take the Fifth
22        Amendment as to each image.  I
23        have looked at them and that's
24        my suggestion.
```

---

77

```
1    BY MR. FOWLER:
2        Q.   All right.  And just to be clear,
3    take a look at the third page of Exhibit 47,
4    the one that's marked 466 on the lower right
5    corner.
6        A.   Is there a question?
7             MR. CASPER:  Hang on.  466?
8             MR. FOWLER:  466.  It's actually
9        DSC00466, I think.
10             MR. CASPER:  Got it.
11   BY MR. FOWLER:
12       Q.   Do you see that photo?
13       A.   (Witness nodded.)
14       Q.   Yes?
15       A.   Fifth Amendment.
16       Q.   And that's an image of you carrying
17   a box, isn't that true?
18       A.   Fifth Amendment.
19       Q.   If you take a look at the page
20   that's marked DSC00281, do you recognize
21   that as an image of the field where you
22   have a pit blind that you hunted in 2017?
23       A.   Fifth Amendment.
24       Q.   In 2017 you saw Mr. Scavo shooting
```

20 (Pages 74 to 77)

John Scatchell, Jr.
August 5, 2020

---

78

1    from the pit blind, didn't you?
2        A.   Fifth Amendment.
3        Q.   **In 2017, you saw Mr. Scavo shooting**
4    **from your boat?**
5        A.   Fifth Amendment.
6        Q.   **Okay.  So we were talking about**
7    **conversations involving Deputy Chief**
8    **Castellan and what I'm really focusing on**
9    **is conversations that you heard Deputy**
10   **Chief Castellan say something.  Understand?**
11           **That if there is a question**
12   **about whether you heard something from**
13   **somebody else, that's going to be a separate**
14   **question.**
15           **Do you understand?**
16       A.   Okay.
17       Q.   **All right.  Did you ever hear**
18   **Deputy Chief Castellan say anything about**
19   **your father having computer access?**
20       A.   No.
21       Q.   **Did you ever hear Deputy**
22   **Chief Castellan say anything about your**
23   **father's participation in meetings as a**
24   **station supervisor?**

---

79

1        A.   Not direct personal knowledge,
2    but I was told what he said and all of the
3    supervisors except for my father were privy
4    to those meetings.  He was not invited.
5        Q.   **Who told --**
6        A.   Who?  That was word amongst all
7    of the supervisors.
8        Q.   **You said that you were told.  I'm**
9    **asking who told you?**
10       A.   One of the supervisors.  I don't
11   remember who, one of my lieutenants at the
12   time or sergeants.
13       Q.   **It wasn't Deputy Chief Rogowski or**
14   **Director Pitassi?**
15       A.   To me?
16       Q.   **Yes.**
17       A.   Not that I can recall at this time.
18       Q.   **Did you ever hear Deputy**
19   **Chief Castellan say anything about your**
20   **father's assignment as station supervisor?**
21       A.   Just word of what he would say at
22   breakfast at Cafe 23 with all his group.
23       Q.   **So what I'm asking you is did**
24   **you hear him say something at those breakfast**

---

80

1    meetings?
2        A.   No, I was told.
3        Q.   **Who told you?**
4        A.   Word around the station.
5        Q.   **You don't know?**
6        A.   I can't recall at this time.
7        Q.   **Did you ever hear Deputy**
8    **Chief Castellan say anything about the office**
9    **that your father was assigned to as station**
10   **supervisor?**
11       A.   Just that it was referred to as the
12   hole by him and Pitassi.
13       Q.   **Did you hear Deputy Chief Castellan**
14   **say that?**
15       A.   It's been referred to as the hole
16   for many years.
17       Q.   **Have you heard Deputy Chief Castellan**
18   **refer to it as the hole?**
19       A.   Over the years, I probably did, yes.
20       Q.   **Do you recall any of those occasions**
21   **specifically?**
22       A.   Specifically, no, but it was a
23   well-known fact that that office was
24   referred to as the hole since Johnny

---

81

1    Simpson.
2        Q.   **Anything else?**
3        A.   No.
4        Q.   **Have you ever heard Deputy**
5    **Chief Castellan make any statements relating**
6    **to the incident that you referred to as the**
7    **M-80 or some other kind of explosion?**
8            MR. CASPER:  Objection,
9        misstates the testimony.
10   BY THE WITNESS:
11       A.   To my recollection, that
12   investigation was given to Deputy Chief
13   Rogowski and he was derelict in his duties
14   there.
15   BY MR. FOWLER:
16       Q.   **My question to you was have you**
17   **ever heard Deputy Chief Castellan make any**
18   **statements about that incident?**
19       A.   Not that I can recall.
20       Q.   **Have you ever heard Deputy**
21   **Chief Castellan make any statements about**
22   **the Morales incident involving your father?**
23       A.   To be clear, Deputy Chief Castellan
24   and I, I would have to put it as the last

---

21 (Pages 78 to 81)

John Scatchell, Jr.
August 5, 2020

82

1    conversation we ever had face-to-face was
2    probably at that Cubs game, so that might
3    preempt a lot of your questions.
4        Q.   I still have to ask the questions.
5        A.   Go ahead.
6        Q.   Does that mean, no, you don't
7    recall any conversations or any statements
8    from Deputy Chief Castellan?
9        A.   Specifically with Deputy
10   Chief Castellan, I don't recall at this
11   time.
12       Q.   Have you ever heard Deputy
13   Chief Castellan make any statements about
14   your father's promotion to deputy chief?
15   Sorry.
16       A.   Just what I was told around the
17   station again that he was livid about it,
18   he was beside himself, this guy is going
19   to be deputy chief, he is going to come
20   after the patrol division and he wants
21   what I got, nobody is getting what I got.
22           Those were the rumors
23   that were going around and they come right
24   from the breakfast table that he sits at.

83

1    So...
2        Q.   But you never heard Deputy
3    Chief Castellan say any of those things?
4        A.   I don't recall if I did or not.
5        Q.   Have you ever heard Deputy
6    Chief Castellan make any statements about
7    the residency requirement?
8        A.   I mean, a lot of -- or at least
9    one of his good friends doesn't live in
10   town or that didn't live in town for at
11   least ten years.  So, I mean, what he
12   has to say about the residency requirements
13   is obviously subjective and biased.
14       Q.   Is there a reason why you don't
15   want to answer the question I asked you?
16       A.   That's the best answer I could
17   give you for that.
18           MR. FOWLER:  Read the question
19       back, please.
20           (Whereupon, the requested
21            portion of the record was
22            read accordingly.)
23   BY THE WITNESS:
24       A.   I do remember overhearing him

84

1    saying something about Kyll living out of
2    town, how this wasn't going to stand --
3    again, that was one of his situations where
4    he purposely talks loud in roll call so
5    everybody hears it and when we were rotating
6    all three shifts, everybody had their turn
7    to be on dayshift.  So everybody heard
8    whatever he wanted us to hear at the time.
9    BY MR. FOWLER:
10       Q.   Okay.  The comment that you're
11   just referring to, when did that take
12   place?
13       A.   I couldn't give you a time range.
14   I just know it was around -- around that
15   time period.
16       Q.   Around what time period?
17       A.   When all the -- all the -- when
18   the start of this whole case occurred, all
19   the stuff with Kyll around that time.  I
20   don't know exactly when it occurred.
21       Q.   And where did the statement take
22   place?
23       A.   Well, it would have been in roll
24   call because you can hear him from his

85

1    office when he wants to be loud.
2        Q.   So you're saying he was in his
3    office?
4        A.   Who, Castellan?
5        Q.   Yes.
6        A.   At the time I would have to say
7    yeah.
8        Q.   Who else was present in the roll
9    call room --
10       A.   Whoever was working --
11       Q.   -- when you heard that statement?
12       A.   Whoever was working on that given
13   day --
14       Q.   Do you recall?
15       A.   -- and God help me, I should have
16   wrote it down.
17       Q.   Do you recall who it was?
18       A.   No.  Whoever was on my shift at
19   the time.
20       Q.   What exactly did you hear Deputy
21   Chief Castellan say about residency?
22       A.   Just that he was upset about Kyll
23   violating residency even though he had a
24   federal decree that says he doesn't have

22 (Pages 82 to 85)

John Scatchell, Jr.
August 5, 2020

86

1  to live here. In the meantime, he overlooks
2  everybody else that lives out of town and
3  has lived out of town.
4      Q.   How do you know that there's a
5  federal decree that says Kyll can live out
6  of town?
7      A.   That was what was told around the
8  station. That's what everybody knew. I was
9  told that he got hired along with a fireman
10 at the time under the -- I forget -- you
11 have to forgive me. I forget what the exact
12 legal thing was called, but it was a ruling
13 in his favor and the female firefighter and
14 he stayed on and she, I don't really know
15 what happened to her.
16     Q.   So other than a rumor around the
17 station, any other basis for your belief
18 that he was allowed to live outside of town
19 pursuant to a federal decree?
20     A.   Just what I was told.
21     Q.   By whom?
22     A.   From rumors around the station and
23 such.
24     Q.   And other than that statement

87

1  that relates to Kyll Lavalais's residency,
2  have you ever heard Deputy Chief Castellan
3  make any other statements relating to Kyll
4  Lavalais?
5      A.   Directly to Kyll at this time I
6  don't recall any, but I -- I have to think
7  on that.
8      Q.   Have you ever heard Deputy
9  Chief Castellan say anything about Kyll
10 Lavalais to someone else?
11     A.   No, mostly because he wouldn't
12 talk in my presence. The only thing he
13 would ever ask me, hey, Johnny babes,
14 how's the chief and he wasn't referring
15 to Pitassi. He was referring to Vito
16 Scavo.
17     Q.   Anything else?
18     A.   That's all.
19     Q.   So your belief was that Deputy
20 Chief Castellan knew about your relationship
21 with Vito Scavo long before --
22     A.   Fifth Amendment.
23     Q.   -- 2017?
24     A.   Fifth Amendment.

88

1      Q.   When is the first time you recall
2  Deputy Chief Castellan asking about Vito
3  Scavo?
4          MR. COOPER: You can answer
5      that.
6  BY THE WITNESS:
7      A.   From the day I got on the job.
8  I walked in the building, hey, how's the
9  chief doing.
10 BY MR. FOWLER:
11     Q.   Asking that specifically of you?
12     A.   Right. And he could have asked
13 Mayor Serpico, he could have asked Deputy
14 Chief Campanili, he could have asked Trustee
15 Prignano. They all visited Vito in prison.
16     Q.   But your understanding was that
17 he asked you because he knew that you had
18 a relationship with Mr. Scavo?
19     A.   He had a relationship with
20 Mr. Scavo.
21     Q.   So my question to you is --
22     A.   He dug some of the pits that
23 Vito hunted out of while he was working.
24     Q.   My question to you is your

89

1  understanding of him -- why he asked
2  you about Mr. Scavo was because Deputy
3  Chief Castellan knew you had a
4  relationship with Mr. Scavo, correct?
5      A.   Yes. And I would ask him how
6  Harpo was because I knew he had a
7  relationship with Harpo.
8      Q.   Now, you referred to a residency
9  issue involving Deputy Chief Castellan's
10 friend?
11     A.   I perceive him to be a friend, yes.
12     Q.   Who is that?
13     A.   Steve Pesch. He brings him gifts
14 while he's on duty.
15     Q.   Where does Steve Pesch live?
16     A.   He claims he lives on 22nd, 1500
17 block, but we all know that's a lie. He
18 lives off Lies Avenue in Carol Stream. I
19 think it's Rose Street, something like
20 that.
21     Q.   How do you know that?
22     A.   It's public knowledge. Look it
23 up on Google.
24     Q.   How do you know that?

23 (Pages 86 to 89)

John Scatchell, Jr.
August 5, 2020

90

1    A.   I looked it up on Google.
2    Q.   What did you look up on Google?
3    A.   Steve Pesch and residency popped
4  up.
5    Q.   Anything else?
6    A.   Everybody knew he lived in Homer
7  Glen or Homewood-Flossmoor, one of the two
8  for ten years before he moved to Carol
9  Stream, then he bought the house in 2014.
10  Go look that up on Google.  It's right
11  there.
12    Q.   What house?
13    A.   Black and white.  You guys fired
14  Devon Moss while he was in Afghanistan, a
15  good policeman.  I was a good policeman
16  in my opinion.  You guys haven't brought
17  anybody here to say otherwise.  You guys
18  fired Devon Moss while he was overseas
19  for residency, but you'll promote Pesch
20  and you'll put Jerry Manzel in detectives,
21  the same Jerry Manzel that when Vito Scavo
22  was indicted fled to Italy so he wouldn't
23  have to testify, that Jerry Manzel, or
24  Nello Barone who claimed he was insane

91

1  or some type of disability when Vito
2  Scavo got indicted.  I'm not exactly
3  sure what he did, but he wasn't even
4  state certified until, what, 2003.  He
5  worked five years on the street without
6  state certification and you guys are
7  worried about pittance of me doing whatever
8  you accuse me of doing.  This is a mockery,
9  nothing more.
10    Q.   Anything else?
11    A.   I said nothing more.
12    Q.   Okay.  You said that Mr. Pesch
13  or Pesch bought a house?
14    A.   You can call him Sergeant Pesch
15  because he got promoted so go ahead and
16  refer to him as that.
17    Q.   Sergeant Pesch you said he bought
18  a house?
19    A.   In Carol Stream.
20    Q.   And when was?
21    A.   2014.
22    Q.   And how do you know that?
23    A.   Google.
24    Q.   Anything else?

92

1    A.   (Witness nodded.)
2    Q.   How do you know he lived in
3  Homewood-Flossmoor for ten years?
4    A.   It was either Homer Glen or
5  Homewood-Flossmoor, I'm not sure which
6  of the two.  I know it starts with an
7  H, but that was where he was born I
8  believe or where he grew up.
9    Q.   How do you know that he lived
10  there for ten years while he was employed
11  by the village?
12    A.   Because guys from shift would
13  go to parties at his house.  He invited
14  me specifically to his house.  He invited
15  many people to his house.
16         It wasn't a secret until
17  they just decided to start firing people
18  for residency and pick and choose and
19  cherry pick what they want to do.  It's
20  called disparate treatment.
21    Q.   How do you know that Deputy
22  Chief Castellan knew that Steve Pesch was
23  not a resident of the village?
24    A.   Because he was told so by Pitassi.

93

1  They were all told.  They knew.  Come
2  on.  There are many a people that he knew
3  lived out of town.  He tried to throw Dave
4  Hilgenberg under the bus for living out of
5  town when he actually lived in town because
6  he didn't like Davie.
7    Q.   How do you know?
8    A.   Because Davie told me.
9    Q.   Anything else?
10    A.   That's it.
11    Q.   How do you know that Deputy
12  Chief Castellan that Steve Pesch
13  lived out of town?
14    A.   Because the entire department
15  knew and he was told to his face by people
16  that didn't like Pesch.
17    Q.   How do you know that Deputy
18  Chief Castellan --
19    A.   Because I said it to him once too.
20    Q.   When did you say it to --
21    A.   I don't recall when it was, but
22  I said why is this allowed?  This guy
23  hasn't lived in town ever, ever at that
24  point.

L.A. Court Reporters, L.L.C.
312-419-9292

John Scatchell, Jr.
August 5, 2020

94

1    Q.    Where did that conversation take
2  place?
3    A.    Probably in his office because the
4  first few years I was on the job, he tried
5  to play cordial with me.  I knew his game.
6  He didn't like me.  I really don't care one
7  way or the other about him, but he would
8  try to get little tidbits of information
9  from me about anything he could.
10          Oh, Johnny babes, come
11 in my office.  Oh, hey, look, you got an
12 overtime slip.  Oh, you want to work the
13 taste, Johnny babes, how's Vito doing,
14 how's this, hey, oh.  I don't do small
15 talk with him because I don't trust him,
16 never did.
17   Q.    When you said that you told
18 him that Pesch lived out of town, was
19 anybody else present?
20   A.    Not that I recall.
21   Q.    During that conversation as best
22 you can recall, what did you say to him
23 and what did he say to you?
24   A.    I said how is this allowed.  This

95

1  guy hasn't lived in town for all this time,
2  but I didn't say this, I should've, is it
3  because he brought you a gift before
4  you put him in tact in the power car.
5    Q.    Anything else?
6    A.    Just months -- not even -- it
7  wasn't even a month before it, you got a
8  picture of Steve walking into his backyard
9  with a gift in uniform and then he gets
10 promoted and to be clear Steve Pesch might
11 be a likable guy, I believe there is a
12 lot better candidates to be a sergeant
13 than him.
14   Q.    Was there anything else said in
15 that conversation?
16   A.    There might have been.  I don't
17 recall at this time.
18   Q.    How do you know that Jerry Manzel
19 was not a resident of Melrose Park?
20   A.    Because of Google and because
21 somebody spoke to his neighbor who gave
22 me the information of what he told his
23 neighbor.
24          You'll never see me here

96

1  except for spending the night.  You'll
2  never see my family here, the reason
3  because I don't live here.
4    Q.    Who told you that?
5    A.    I don't recall at this time.
6    Q.    How do you know that Deputy
7  Chief Castellan knew that Jerry Manzel was
8  not a resident of Melrose Park?
9    A.    The entire department knew.
10 Every -- to be clear, everybody here knows
11 the score.  Everybody knows that Devon got
12 secured over and Pesch was allowed to stay.
13 Jeff Juan got screwed over or forced out and
14 Manzel was allowed to stay.
15          Lenny Bartemio lived out
16 of town for a long time and that was okay,
17 which, hey, I like Lenny, but let's call
18 a spade a spade.  He lived out of town.
19 Okay?
20          Davie did live out of
21 town at one point.  He moved back and
22 Castellan still tried to throw it in his
23 face, but ignored all the blatant evidence
24 right in front of him because those are his

97

1  friends --
2    Q.    Anything else?
3    A.    -- or as they're referred to at
4  the station, the dirty dozen.
5    Q.    Did you ever tell Deputy
6  Chief Castellan that Manzel lived out of
7  town?
8    A.    Me personally, I don't think I
9  did, but my opinion --
10   Q.    Were you ever --
11   A.    -- is Jerry Manzel shouldn't have
12 been a police officer still because he fled
13 to avoid having to testify in an indictment.
14   Q.    Were you ever present when somebody
15 else told Deputy Chief Castellan that Manzel
16 was not a resident?
17   A.    I don't recall at this time.
18   Q.    Did you ever tell Director Pitassi
19 or --
20   A.    I told Director Pitassi hundreds of
21 things.
22   Q.    Let me finish my question.  Okay?
23   A.    Go ahead.  Sorry.
24   Q.    I mean if you want to not only be

25 (Pages 94 to 97)

John Scatchell, Jr.
August 5, 2020

98

1    here all day today but come back another
2    day --
3        A.   Jeff --
4        Q.   -- to finish, certainly, I can do
5    that.
6        A.   Jeff, to be clear, I'm a civilian
7    now.  My schedule is wide open.  Whatever
8    you want to do.
9        Q.   Did you ever tell Director Pitassi
10   that Jerry Manzel was not a resident of Melrose
11   Park?
12       A.   I believe I did.
13       Q.   When did you do that?
14       A.   I don't know.  It would have been
15   a couple years ago when all this -- actually,
16   I do know when I told him.
17       Q.   When was that?
18       A.   I can recall exactly when I told
19   him when we were walking out of the senior
20   center after one of my hearings and I told
21   him to his face you're allowing this guy
22   to live out of town, that guy to live out
23   of town.  You know what his answer to me was?
24            Well, you know that's

99

1    politics, you know, the big guy, calls
2    him the big guy and that's in reference
3    to Mayor Serpico.
4        Q.   Anybody else present?
5        A.   My mom.
6        Q.   Anybody else?
7        A.   Not that I recall.
8        Q.   At that point in time, was Jerry
9    Manzel a resident?
10       A.   No.  He still isn't.
11       Q.   Okay.  Have you ever had any
12   conversations with Deputy Chief Rogowski
13   about Jerry Manzel not being a resident?
14       A.   Deputy Chief Rogowski after I
15   left his shift wouldn't even look at me
16   or so much as talk to me, so no.
17       Q.   Ever have any conversations with
18   Director Pitassi about Steve Pesch not
19   being a resident?
20       A.   I said it the same day I said
21   about Jerry.  And I said a lot of other
22   things which I can't recall, but he knows,
23   but he doesn't want to do anything about
24   it.

100

1            Just like when I presented
2    charges against Castellan and nobody wanted
3    to do anything about it.  Oh, we can't hear
4    this, we can't do this.  Well, you knew about
5    it.
6            To be clear Rogowski knew
7    about it, Pitassi knew about it and you know
8    what I was told, well, write a complaint
9    form and maybe we'll look at it.  You just
10   were told about it.  What do you need a
11   complaint form?  Look into it.  You
12   looked into stuff based on a lot less and
13   we know that.
14       Q.   Anything else?
15       A.   That's it.
16       Q.   Did you ever have any conversations
17   with Deputy Chief Rogowski about Pesch not
18   being a resident?
19       A.   Again, I told you, after I left
20   his shift, he had nothing to do with me --
21       Q.   You referred to --
22       A.   -- because I wasn't one of his
23   boys.
24       Q.   You referred to Davie.

101

1            Who is Davie?
2        A.   Hilgenberg.
3        Q.   Hilgenberg?
4        A.   Uh-huh.
5        Q.   H-I-L-G-E-N --
6        A.   Something like that.
7        Q.   -- B-E-R-G?
8        A.   And Deputy Chief Castellan for
9    years has tried to pin an argument on my
10   dad between him and Hilgenberg and still
11   continues to do it to this day when he sees
12   Hilgenberg.
13       Q.   And I -- again, this is something
14   that -- please listen to the questions I ask
15   you.
16       A.   I hear the question.  Go ahead.
17       Q.   And answer the questions.
18       A.   I'm answering to the best of my
19   ability, Jeff.
20       Q.   Dave Hilgenberg is a police officer
21   with the Village of Melrose Park?
22       A.   I believe so, yes.
23       Q.   And how long has he been in that
24   position?

26 (Pages 98 to 101)

John Scatchell, Jr.
August 5, 2020

102

1     A.   Probably 20 years.
2     Q.   And is it your position that he's
3  not a resident?
4     A.   He is resident.  My point is
5  Deputy Chief Castellan because he didn't
6  like Hilgenberg tried to threaten him by
7  saying I'm putting you on the list of
8  people that live out of town when he knew
9  damn well that Davie lived on 18th, and
10 excuse my language.
11    Q.   Okay.  Anybody else who you
12 believe was not a resident and was not
13 investigated regarding residency?
14    A.   I really don't have to go further
15 beyond the two people that were promoted
16 in the last year, Steve Pesch, Jerry Manzel,
17 that's it.
18    Q.   Anybody else?
19    A.   That I can recall right now, no,
20 but I'm not ruling it out.  And firemen,
21 who knows.
22    Q.   Have you ever had any conversations
23 with Director Pitassi about Kyll Lavalais?
24    A.   No.

103

1     Q.   Okay.  And have you ever heard
2  Director Pitassi make any statements about
3  Kyll Lavalais?
4     A.   Just the statements that I was
5  told that I referred to earlier with the
6  conversation with my father.
7     Q.   And to be clear what I'm asking
8  is have you ever personally heard Director
9  Pitassi make any comment about Kyll
10 Lavalais?
11    A.   If you walk in the station at
12 like 11:00 o'clock to get the mail run,
13 he's screaming about something usually
14 and I'm sure a couple of those times it
15 was about Kyll because when he's mad, he
16 leaves his door open and what the fuck,
17 this, that, swears, everything comes out
18 of that office.  It doesn't matter.  He
19 doesn't care.
20    Q.   On any of those occasions,
21 though, you don't know what it was about?
22    A.   Again, we're talking about three
23 years at least in the past, I don't recall
24 at this time.

104

1     Q.   Have you ever had any conversations
2  with Director Pitassi about the residency
3  requirement?
4     A.   I just told you I did at that --
5  coming from the senior center when I told
6  him about Pesch and Jerry.
7     Q.   Any others?
8     A.   That I can recall, no, because
9  he would never open his door to me.  He's
10 supposed to have this open door policy.
11 He has known me since I've about this high
12 and I'm indicating about 12 inches off
13 the ground or 18 inches off the ground.
14         I grew up with his son,
15 went to school with his son.  He claims
16 he has this open door policy, but that's
17 not the case because he never brought me
18 in his office.  I wasn't even welcome in
19 his office.  During my grievances, I
20 tried to have a confer and meet with him.
21 He refused.
22    Q.   Anything else?
23    A.   That's it.
24         MR. CASPER:  Counsel, may I

105

1  take a two-minute break?  I've
2  got something I have to give to
3  someone outside.
4         MR. FOWLER:  Sure.
5         (Whereupon, after a short
6          break was had, the following
7          proceedings were held
8          accordingly.)
9  BY MR. FOWLER:
10    Q.   Have you ever heard Director
11 Pitassi say anything about your father's
12 promotion to deputy chief?
13    A.   Well, to circle back to the
14 comment I made earlier about the eyes of
15 Texas are upon him, that comment was made
16 to my father relayed to me.
17         I heard it from my father,
18 but that being said to let you understand
19 what the racist connotation was, I guess
20 apparently the University of Texas used
21 to have some type of performances and that's
22 their fight song and when it was performed
23 early on, it was performed in blackface
24 and it's so offensive to the current Texas

27 (Pages 102 to 105)

John Scatchell, Jr.
August 5, 2020

106

1  football players that they refuse to take
2  the field until that song is removed.
3        So it's kind of ironic
4  that he uses a statement like that when
5  we're talking about the only person that
6  backup the last remaining black police
7  officer in the Melrose Park police force.
8  Makes kind of perfect sense actually.
9      **Q.  Do you have any reason to believe**
10 **that Deputy Chief -- or I'm sorry -- that**
11 **Director Pitassi had anything to do with**
12 **the University of Texas?**
13     A.   No, but I believe he knows or
14 should reasonably know what is okay and
15 not okay to say in this day and age and
16 saying nigger, saying the eyes of Texas
17 are upon you and any other of the euphemisms
18 that he uses regularly in his office are not
19 tolerable in today's police force and that's
20 why you see the situation that's going on
21 in this country.  There's a distrust with
22 our police force and it stems with the
23 chief.
24     MR. BERSANI:  Can we get the

107

1      question answered, please?  You
2      just went off on a narrative.
3          If you just answer --
4      THE WITNESS:  Excuse me.  I
5  don't --
6      MR. BERSANI:  I'm not talking
7  to you.
8      THE WITNESS:  Okay.  Well, I
9  don't interrupt you when I'm talking.
10     MR. BERSANI:  Can we -- can
11 we have the witness directed to
12 just answer the questions?
13 Otherwise, we are going to be
14 here forever.
15     MR. CASPER:  It's not my --
16 it's not my client.
17     MR. BERSANI:  I'm talking to --
18 he's not your client?
19     MR. CASPER:  Not for this.
20 Not for purposes of this.
21     MR. BERSANI:  Then, Chris, I
22 mean, I think he should be answering
23 the question that's asked and not
24 go off on narratives.  Otherwise,

108

1      we're going to be here all day,
2  which could be very expensive.
3      MR. FOWLER:  Chris, I'm
4  going to expand on that.
5      THE WITNESS:  You guys have
6  never had any care about cost
7  during this entire proceeding.
8  Now, you do?
9      MR. FOWLER:  Chris, as you're
10 well aware, transcripts have costs.
11 Attorney time has costs.  If this
12 continues, we're going to have to
13 address it with the judge.
14     MR. COOPER:  One second.
15     MR. CASPER:  Well, you know,
16 my co-counsel does make a good
17 point that Mr. Kyra, on Monday,
18 was repeating my question back
19 to me ad nauseam infinite number
20 of times all day and I did put up
21 with it I thought in a very
22 gentlemanly fashion.
23         So I would myself prefer
24 Mr. Scatchell listen to the question

109

1      and answer the question, but if
2  we're going to talk about going
3  to the judge, Monday with him was
4  very difficult for me too.  So...
5      MR. FOWLER:  I don't think
6  you're suggesting that I have been
7  ungentlemanly toward the witness.
8      MR. CASPER:  No, you have not
9  been, but for purposes of our
10 colloquy here --
11     MR. FOWLER:  I think that there
12 was a difference between Officer
13 Kyra's and this, but we'll address
14 that depending on the result of
15 Mr. Cooper's conversations with
16 his client.
17     MR. COOPER:  Well, I certainly
18 don't see it that way.  I can tell
19 you that my client is prepared to
20 continue to answer questions.
21 BY MR. FOWLER:
22     **Q.   So the question that I asked you**
23 **was have you ever heard Director Pitassi say**
24 **anything about your father's promotion?**

28 (Pages 106 to 109)

John Scatchell, Jr.
August 5, 2020

110

1    A.   And I told you that that was what
2  I heard through my father but never do I
3  recall hearing anything specific that I
4  recall at this time --
5    Q.   Okay.  So let me phrase the question
6  differently --
7    A.   -- out of Director Pitassi's mouth.
8    Q.   So let me phrase the question
9  differently.  Have you ever personally
10  heard Director Pitassi say anything about
11  your father being promoted to deputy
12  chief?
13    A.   Personally, no, just what was
14  said.
15    Q.   Have you ever personally heard
16  Director Pitassi say anything about the
17  Morales incident?
18    A.   Not that I can recall at this
19  time.
20    Q.   Have you ever personally heard
21  Director Pitassi say anything about the
22  M-80 incident?
23    A.   I can't recall.  My mother might
24  have said something to him that day when

111

1  we were walking from the senior center.
2  I'm sure she did, but I don't recall it.
3    Q.   Have you ever personally heard
4  Director Pitassi say anything about your
5  father's assignment as station supervisor?
6    A.   I overheard a conversation one
7  day where he referred to the jag-off in
8  the hole, so I assumed that he was referring
9  to my father because Dino has breakfast with
10  him every day, so there is only one person
11  he could be referring to.
12    Q.   When did that conversation take
13  place?
14    A.   Whenever my dad was in the hole.
15  So, 2018, I would have to say.
16    Q.   Where did the conversation take
17  place at?
18    A.   I overheard it out of his office.
19    Q.   Who was present?
20    A.   Maybe Jojette was there, maybe she
21  wasn't.  I'm not sure if she was on lunch or
22  not.  She could hear a lot of stuff that he
23  says and probably testify to a lot of it.
24    Q.   Was anybody present with you?

112

1    A.   There may have been.  There might
2  have been the CSO might have heard it.  I'm
3  not sure.
4    Q.   Do you know who else was in the
5  office?
6    A.   I don't recall.
7    Q.   What exactly did you hear
8  Director Pitassi say at that time?
9    A.   Something referring to the jag-off
10  in the hole.
11    Q.   That's all you heard?
12    A.   Yes.  I'm sorry, I don't linger
13  outside of doors and listen, but when I
14  hear something, I'm not going to ignore
15  it.
16    Q.   Have you ever personally heard
17  Director Pitassi say anything about your
18  father participating in meetings as station
19  supervisor?
20    A.   No, not Director Pitassi that I
21  can recall.
22    Q.   Have you ever personally heard
23  Director Pitassi say anything about your
24  father's access to a computer while he was

113

1  station supervisor?
2    A.   I don't recall ever hearing him
3  say it, but if the word was around the
4  station that my father was shut out of
5  the computers where everybody was saying
6  it, I'm sure he knew.
7    Q.   Have you ever personally heard
8  Director Pitassi say anything relating to
9  your father's retirement?
10    A.   Personally, no, but word-of-mouth,
11  yes.
12    Q.   The word of mouth, was it from
13  any of the deputy chiefs or -- of the police
14  department?
15    A.   I mean it could have been through
16  who they told.
17    Q.   Did you hear it from any of the
18  deputy chiefs?
19    A.   Personally, no.  Again, they
20  don't talk to me.  How would I hear it?
21    Q.   Have you ever personally heard
22  Director Pitassi say anything about your
23  father's age?
24    A.   Just -- again, nothing personal,

29 (Pages 110 to 113)

John Scatchell, Jr.
August 5, 2020

---

**114**

1  but the word of mouth is I can't wait to
2  get him out of here at 62, but the caveat
3  to that was they had to get rid of Castellan
4  too.
5      Q.   So you're saying -- you're aware
6  that Deputy Chief Castellan had to retire
7  at 62?
8      A.   I'm -- I'm hypothesizing.  I'm
9  not sure, but he did get another village
10  job that wasn't posted anywhere.
11      Q.   Have you ever heard Deputy
12  Chief Castellan say anything about your
13  father's age?
14      A.   Well, given that the last
15  discussion I had with him that I told
16  you earlier was you pinpointed the date
17  to May 17th, I would say no because that
18  would be before that period of time.
19      Q.   Have you ever heard Deputy
20  Chief Castellan say anything about your
21  father filing any EEOC charge?
22      A.   Not that I can recall because
23  I believe when my dad filed the EEOC, I
24  was on vacation, but I did hear rumblings

**115**

1  that he was not happy, none of them were
2  happy.
3      Q.   Have you ever heard Director
4  Pitassi say anything about your father filing
5  any EEOC charge?
6      A.   Yeah, actually -- well, not
7  personally but to my grandfather by proxy.
8      Q.   What did -- what is your knowledge
9  about Director Pitassi saying something to
10  your grandfather about your dad's EEOC?
11      A.   Director Pitassi used that as the
12  rationale to explain to my grandfather why
13  he wanted to fire me.
14      Q.   When did that conversation take
15  place?
16      A.   I would have to assume after I was
17  given the statement of charges, sometime
18  therein.  I know he broke bread with him at
19  Tom's Steak House, and my uncle.
20      Q.   You were not present, right?
21      A.   I was not present, no, but they
22  were discussing me.
23      Q.   Whatever you know is something
24  that either your grandfather or your uncle

**116**

1  told you?
2      A.   Or people that were sitting at
3  the nearby table told me.
4      Q.   Who were they?
5      A.   I don't recall at this time.
6      Q.   Anything else?
7            Have you ever heard
8  Director Pitassi -- strike that.
9            Have you ever personally
10  heard Director Pitassi say anything about
11  your dad's EEOC charge?
12      A.   Personally, no, because, again,
13  he filed the EEOC while I was on vacation.
14  I came back and whatever else happened,
15  then I came back to work probably four
16  or five months after that.  So anything
17  I would have heard would be four or five
18  months delayed, but I did hear rumors.
19      Q.   Have you ever heard Deputy
20  Chief Rogowski say anything about your dad's
21  EEOC charge?
22      A.   Not that I can recall.
23      Q.   Have you ever heard Deputy
24  Chief Rogowski ever say anything about your

**117**

1  dad's age?
2      A.   Not that I can recall.
3      Q.   Have --
4      A.   Again, to be clear, I haven't
5  worked with Deputy Chief Rogowski since
6  probably 2016 at some point and I would
7  ballpark that as the last time I actually
8  had a conversation with him because he
9  blocked me from his phone, so did Pitassi.
10            I mean, I don't talk to
11  any of them, so I could -- I know you got
12  to ask the questions, but I can help you
13  out a little bit there.
14      Q.   So is it fair to say that you
15  have not heard Deputy Chief Rogowski make
16  any statements whatsoever to you since,
17  say, January 1, 2017?
18      A.   Aside from minor, like, hi/bye,
19  whatever, yeah, I would say him and I haven't
20  had any kind of conversation.
21      Q.   So have you ever heard Deputy
22  Chief Rogowski make any statements to anybody
23  else about your dad's age?
24      A.   No, but I -- I was told again rumors

John Scatchell, Jr.
August 5, 2020

118

1   about things he says and where he wants
2   to go with that but, again, I don't talk
3   to them so no.
4       Q.   Have you ever heard Deputy
5   Chief Rogowski make any statements to
6   anybody else about your dad's retirement?
7       A.   Not that I can recall at this
8   time.
9       Q.   Have you ever heard Deputy
10  Chief Rogowski make any statement to
11  anybody about your dad having computer
12  access?
13      A.   Well, Deputy Chief Rogowski
14  had no supervision over my father at that
15  time, did he?  I thought he was in charge
16  of the specialty division, so why would
17  he be concerned with the computer?
18      Q.   So is the answer no?
19      A.   The answer is I don't know.  I
20  don't recall.
21      Q.   Have you ever heard Deputy
22  Chief Rogowski make any statements about
23  your dad participating in meetings as
24  station supervisor?

119

1           MR. CASPER:  Object to
2       form.
3   BY THE WITNESS:
4       A.   No, but I just know that those
5   meetings, again, dad was never invited and
6   even dad was a lieutenant in charge
7   of an entire shift, they purposely scheduled
8   those meetings when they thought he would
9   be out of town.
10  BY MR. FOWLER:
11      Q.   Have you ever heard Deputy
12  Chief Rogowski make any statements about
13  your dad being assigned as station
14  supervisor?
15      A.   Just in passing again referred
16  to as the hole.  Everybody refers to it
17  as the hole because it's like you're doing
18  time there.
19           You're -- you're sitting
20  in a little cubicle with no job capacity
21  whatsoever.  That's -- that's like --
22  that's -- that's torture bordering on.
23      Q.   Your testimony is that you've
24  heard Deputy Chief Rogowski talk about

120

1   your dad being in the hole?
2       A.   In the hallways, yeah, I heard
3   him refer to the office as the hole.
4       Q.   When did that happen?
5       A.   Around the time when my dad
6   would have been in the hole.
7       Q.   Where did it take place?
8       A.   Would have been in the hallways
9   upstairs when he was talking to one of
10  those guys coming out of the tact office.
11      Q.   Who was he talking to?
12      A.   One of those guys.  Again, I don't
13  know.  It could have been Pesch.  It could
14  have been Raul.  It could have been Dennis.
15  It could have been Natale.  It could have
16  been any one of the guys that got promoted
17  for going against my father --
18      Q.   Do you recall --
19      A.   -- and for voting against Kyll.
20      Q.   Do you recall anybody else who was
21  present?
22      A.   Not at this time I don't know, no.
23      Q.   As best you can recall, what exactly
24  did Deputy Chief Rogowski say?

121

1       A.   Just referred to the office as the
2   hole.
3       Q.   Anything else?
4       A.   Shows that he knows that that office
5   is a punishment.  Everybody knows it's a
6   punishment.
7       Q.   You've seen the office after your
8   dad moved into it, haven't you?
9       A.   Yes.
10      Q.   And how large is the office?
11      A.   Not very.  There's room for --
12  if you had to put two desks back-to-back,
13  you'd probably not leave enough room to
14  get around them.
15      Q.   There's room for a comfortable
16  leather-ish chair, right?
17           MR. CASPER:  Objection to
18      foundation.
19  BY MR. FOWLER:
20      Q.   You saw a leather chair in there,
21  right?
22      A.   I might have.
23      Q.   Television in there?
24      A.   There's a television in every

31 (Pages 118 to 121)

John Scatchell, Jr.
August 5, 2020

---

122

1   office.
2       Q.   And there was a television in
3   there?
4       A.   I believe there was.  I can't
5   recall at this time.  It wasn't my office
6   and God knows if you leave it around the
7   station, they watch the cameras so you
8   can't go visit anybody.  People got whistled
9   in for going to visit my dad.  Why you
10  visiting him?  Why you doing this?  Just
11  like people got whistled in for liking my
12  Facebook posts.
13      Q.   How do you know that people got
14  whistled in for meeting with your dad?
15      A.   They told us.
16      Q.   Who?
17      A.   I don't recall particular people,
18  but, again, even if I did, and I'm not
19  covering for anybody, you put them here
20  and they'd deny it because they got to
21  look at these three standing there, and
22  they're going to say I don't want to end
23  up like these guys, I'm just going to
24  dummy up.

---

123

1       Q.   Have you ever heard Deputy
2   Chief Rogowski make any statements relating
3   to the M-80 incident?
4       A.   No, because he wouldn't interview
5   me about it.
6       Q.   Have you ever heard Deputy
7   Chief Rogowski make any statements or --
8   regarding the Morales incident?
9       A.   I know he was at seat ticket
10  court one time when I was there and he
11  was representing or speaking on the
12  behalf of Anastacio Morales, which I've
13  never seen that occur.
14      Q.   Anything else?
15      A.   Nope.
16      Q.   What did you hear Deputy
17  Chief Rogowski --
18      A.   I didn't pay attention --
19      Q.   -- say at that time?
20      A.   I didn't pay attention.  It wasn't
21  my case and I didn't really care about what
22  he had to say about Anastacio Morales.
23      Q.   Have you ever heard Deputy
24  Chief Rogowski make any statements about

---

124

1   your father's promotion to deputy chief?
2       A.   Personally, no.
3       Q.   Have you ever heard Deputy
4   Chief Rogowski make any statements about
5   residency?
6       A.   Personally not at this time
7   that I can recall, but he was in charge of
8   both Pesch and Manzel under his division.
9       Q.   Have you ever heard Deputy
10  Chief Rogowski make any statements about
11  Kyll Lavalais?
12      A.   That I've got to think about.
13  Because I know Steve is -- he's shown his
14  temper quite a few times in the office
15  when the cameras aren't on him.
16           And I thought he got into
17  a heated exchange one day with Dino about
18  Kyll.  I can't remember what it was about,
19  but, again, just to lay a foundation, I
20  remember one time he spiked his phone across
21  a desk in his office, spiked his own cell
22  phone.
23      Q.   When did the conversation between
24  Dino and Deputy Chief Rogowski take place?

---

125

1       A.   I couldn't recall.  It would
2   have -- it would have been around that
3   timeframe 2016/'17, right in there
4   before anything came towards me.
5       Q.   Who was present?
6       A.   Whoever would be in the office
7   early, maybe Mark Lockton.  I don't know.
8       Q.   What did Deputy Chief Rogowski
9   say about Kyll Lavalais at that time?
10      A.   Again, I -- I don't remember the
11  exact conversation.  I know Dino hated Kyll
12  and I know that they probably had some
13  argument about whether his residency was
14  legal or something about the federal decree
15  and who knows because in the department,
16  it's well-known that Steve may be a smart
17  guy but he's also --
18           MR. BERSANI:  Look, he was
19      just asking --
20           THE WITNESS:  I'm answering
21      the question.
22           MR. BERSANI:  No, you're not.
23           THE WITNESS:  Okay.  You're
24      not talking.  Mr. Fowler is.  I

---

32 (Pages 122 to 125)

John Scatchell, Jr.
August 5, 2020

126

```
 1    don't interrupt you.  You haven't
 2    talked yet, but I'll interrupt
 3    you if you want.
 4         MR. BERSANI:  No.  Just answer
 5    the question.
 6         THE WITNESS:  I am answering the
 7    question.  Let me answer it.
 8         MR. BERSANI:  No, you're not.
 9         THE WITNESS:  Let me talk to
10    Fowler, please.
11         MR. CASPER:  He was.
12         THE COURT REPORTER:  I can only
13    do one at a time.
14         MR. BERSANI:  You're answering
15    in a narrative.  I just want him to
16    answer the question.
17         MR. CASPER:  Counsel -- counsel,
18    he was answering.
19         MR. BERSANI:  Do you represent
20    him?
21         MR. CASPER:  No, but I'm --
22         MR. BERSANI:  Okay.  Mr. Cooper?
23         MR. CASPER:  Excuse me,
24    Mr. Bersani.
```

127

```
 1         MR. BERSANI:  Yes.
 2         MR. CASPER:  I'm an attorney
 3    at this deposition.  I want to hear
 4    him finish that answer for the sake
 5    of --
 6         MR. BERSANI:  No, I want him
 7    to answer the question that's asked.
 8         MR. CASPER:  Would you let me
 9    finish?
10         MR. BERSANI:  He's wasting --
11         MR. CASPER:  Would you let me
12    finish?
13         MR. BERSANI:  He's wasting
14    everybody's time.
15         THE WITNESS:  How do you deem
16    that as a waste?
17         MR. CASPER:  Stop.
18         That was responsive as
19    I was understanding it.  I agree with
20    you --
21         MR. BERSANI:  You understood
22    it's wrong.
23         THE WITNESS:  Really, you know
24    how my mind works?
```

128

```
 1         MR. COOPER:  He's talking to
 2    Mr. Casper.
 3         MR. CASPER:  What is your basis
 4    for saying that I understood it wrong?
 5         MR. BERSANI:  Because he's not --
 6         MR. CASPER:  Are you in my head?
 7         MR. BERSANI:  Because he's
 8    not -- God, no.  He's not answering
 9    the question.
10         THE WITNESS:  God, no.  What
11    is that implying?  What is that
12    implying?
13         MR. CASPER:  Excuse me.  Yeah.
14    Are you implying that there is some
15    kind of --
16         MR. BERSANI:  It's a joke.  It's
17    a joke, Cass.
18         THE WITNESS:  Oh, yeah.  That
19    was a joke, just like Ronnie was
20    going to jump across the table at
21    him.
22         MR. CASPER:  John -- John --
23    Mr. Scatchell.
24         MR. BERSANI:  My objection is
```

129

```
 1    the witness is not answering the
 2    question directly and he's wasting
 3    everybody's time here.  That's my
 4    objection.  I can't keep him from
 5    answering, but that's my objection,
 6    for the record.
 7         THE WITNESS:  Your objection
 8    is noted.
 9         MR. COOPER:  John, John, John.
10         THE WITNESS:  Can I please
11    have what I said repeated because
12    I don't even -- it got so muddled
13    in Mr. Bersani's nonsense, I don't
14    even know what I said anymore.
15         MR. COOPER:  John, John.
16         Jeff, if you're going
17    to continue with the questioning
18    and -- are you okay with the
19    court reporter reading back his
20    response?
21         MR. FOWLER:  I think it's --
22         MR. COOPER:  Are you going to
23    move on or are you going to stick
24    with the question?
```

33 (Pages 126 to 129)

John Scatchell, Jr.
August 5, 2020

130

1    MR. FOWLER: I'm going to
2 continue questioning, whether it's
3 that particular one.
4    MR. COOPER: All right. Well,
5 then let's -- John, I would suggest --
6 all right. Go ahead, please.
7 BY MR. FOWLER:
8    Q. Is there anything else you recall
9 specifically hearing Deputy Chief Castellan
10 say in his conversation with Dino?
11    MR. BERSANI: Rogowski.
12    MR. FOWLER: I'm sorry.
13 You're right.
14 BY MR. FOWLER:
15    Q. So you were telling us about a
16 conversation that you overheard between
17 Deputy Chief Rogowski and Dino, right?
18    A. It was fairly heated I remember.
19    Q. Is there anything else you recall
20 as you sit here today that Deputy Chief
21 Rogowski said about Kyll Lavalais?
22    A. I don't recall specifics of it.
23 I know the conversation had something to
24 do with Kyll.

131

1    Q. Have you ever heard Deputy
2 Chief Rogowski make any statements about
3 Kyll Lavalais's grievances?
4    A. Not that I can recall at this
5 time.
6    Q. Have you ever heard Deputy
7 Chief Castellan make any statements about
8 Kyll Lavalais's grievance?
9    A. Not that I can recall at this
10 time.
11    Q. Have you ever heard Director Pitassi
12 make any statements about Kyll Lavalais's
13 grievance?
14    MR. COOPER: Objection,
15 asked and answered.
16    You can still answer.
17 BY THE WITNESS:
18    A. Personally, no, not that I can
19 recall at this time.
20 BY MR. FOWLER:
21    Q. You're familiar with Mayor Serpico,
22 right?
23    A. I am.
24    Q. Have you ever heard Mayor Serpico

132

1 make any statements about Kyll Lavalais's
2 grievance?
3    A. To be clear, I probably haven't
4 been in the presence of Mayor Serpico in
5 the last five years that I can recall
6 right now. So --
7    Q. Okay. So if I were to --
8    A. -- my answer would be, no, I
9 don't recall any -- anything hearing
10 from him because I haven't seen him.
11    Q. So if I were to go through that
12 whole series of questions relating to
13 Mayor Serpico, you would say no because
14 you haven't heard him saying anything
15 at all in five years?
16    A. Correct. That's what I tried
17 to do with Rogowski after 2017.
18    Q. Okay. All right. Other than --
19 I just want us all to be on the same page.
20 You consider your direct supervisors to
21 be sergeants, lieutenants then deputy
22 chief and then director, right?
23    A. If you're going to go by the
24 chain of command, yeah.

133

1    Q. Is there something other than
2 the chain of command?
3    A. Well, there's senior officers.
4 I mean, especially now there is not a
5 lieutenant or sergeant working every day
6 so --
7    Q. Okay. So --
8    A. -- you -- you -- as a subordinate
9 officer, if there is no supervisor, you
10 report to the superior officer --
11    Q. Correct.
12    A. -- whoever the most senior is.
13    Q. And the superior officers that
14 you're referring to are members of the
15 same FOP that you were?
16    A. I believe so. If they opted in
17 or out, I don't know.
18    Q. And sergeants and lieutenants
19 are the same -- are also members of the
20 same FOP that you were?
21    A. Correct. And that's where it
22 stops.
23    Q. And deputy chiefs are not,
24 right?

L.A. Court Reporters, L.L.C.
312-419-9292

John Scatchell, Jr.
August 5, 2020

134

1    A.   Correct.  They're not supposed
2    to have anything to do with it at all.
3       Q.   And so is it your understanding
4    that deputy chiefs and above are managers
5    of the department whereas lieutenants
6    below are supervisors to some extent of
7    daily activities?
8       A.   You could say that.
9       Q.   All right.  Other than the
10   deputy -- Deputy Chief Castellan, Deputy
11   Chief Rogowski and Director Pitassi, is
12   there anyone else at the police department
13   who you considered to be a manager?
14       MR. CASPER:  Object to form.
15       MR. COOPER:  My objection
16   is -- and I think I know where
17   this is going.
18          Objection, calls for
19   a legal conclusion.
20          Therefore, this is an
21   objection as to his competency.
22   He is not an attorney.
23   BY MR. FOWLER:
24       Q.   You can answer it.

135

1    A.   I'm not clear as to what exactly
2    you're asking here.
3       Q.   All right.  And that's fair.  And
4    that's doing what I asked you to earlier
5    is if you don't understand the question,
6    then give me a chance to rephrase it.
7          Do lieutenants have the
8    authority to discipline officers?
9       MR. COOPER:  Objection, calls
10   for a legal conclusion.
11          Again, competency is the
12   issue here.
13   BY MR. FOWLER:
14       Q.   Do you know?
15       A.   So, I mean, they can make
16   recommendations.  When I was on Lieutenant
17   Dimaio's shift, there was two separate
18   schedules and the one was the one that got
19   sent to him or Castellan or whoever and
20   the other one was the double secret schedule
21   where you either got punished or reimbursed
22   based on how they felt a ruling went by the
23   administration.
24       Q.   Your understanding is that

136

1    although sergeants and lieutenants could
2    make recommendations about discipline, they
3    couldn't do the discipline itself, is that
4    right?
5       MR. COOPER:  Are -- so --
6    hold on a second.
7          Once again, objection,
8    calls for a legal conclusion.  Not
9    to throw around cases, but Vance
10   versus Ball State is in issue as
11   to who's defined as a supervisor.
12          My client just doesn't
13   possess the competency to answer
14   that question.  He can tell you
15   what he knows having been a
16   patrolman.
17   BY MR. FOWLER:
18       Q.   And that's what I'm asking is
19   based on what you know as a patrolman, do --
20   lieutenants and sergeants have the authority
21   to recommend discipline, right?
22       A.   Well, my direct observation was
23   that my lieutenants at the time issued
24   discipline --

137

1       Q.   What dis- --
2       A.   -- Dimaio and Nunzio.
3       Q.   What discipline did your
4    lieutenants issue?
5       A.   If somebody showed up late for
6    work, they'd make you buy food for the
7    entire shift or if you showed up an hour
8    late, they would take the day away in
9    the book that was presented as pristine
10   and being the actual book and in the
11   other book, they'd reimburse it to you --
12       Q.   Anything else?
13       A.   -- or vice versa.
14       Q.   Anything else?
15       A.   No, but my direct --
16       MR. COOPER:  No, no.
17       THE WITNESS:  Go ahead.
18       MR. COOPER:  This is really
19   a legal issue.
20       THE WITNESS:  Yeah.
21   BY MR. FOWLER:
22       Q.   Did lieutenants and sergeants
23   have the authority to suspend somebody?
24       MR. COOPER:  Again, objection,

35 (Pages 134 to 137)

John Scatchell, Jr.
August 5, 2020

138

1    calls for a legal conclusion. This
2    witness is not competent to answer
3    that question. You can answer what
4    you know or what you believe.
5    BY THE WITNESS:
6        A.    To my knowledge. I mean, they
7    make recommendations and -- and I've
8    physically seen -- or not physically, but
9    I've seen the discipline occur. So I can't
10   assume what goes on on the other shifts,
11   but I could assume it's probably uniform.
12   There's some unwritten rule for every
13   shift.
14   BY MR. FOWLER:
15       Q.    Have you ever seen a sergeant
16   or lieutenant suspend an officer?
17       A.    I've -- again, off -- off of an
18   official document, sure, with the second
19   schedule.
20       Q.    All right. Anything else?
21       A.    That's it.
22       Q.    Have you ever heard any manager
23   or supervisor at the village make any
24   derogatory statements about your father's

139

1    age?
2        A.    Who -- I'm sorry. Who am I
3    asking -- who's make the statements?
4        Q.    In your mind anybody who you
5    considered to be a manager or supervisor.
6        A.    Just what rumors are being thrown
7    around that --
8        Q.    So let me ask the question
9    differently.
10       A.    Okay.
11       Q.    Have you ever personally heard
12   any manager or supervisor at the village
13   make any derogatory statements about your
14   father's age?
15       A.    There has been again three or
16   four years of stuff. There has been
17   comments made. I can't recall them at
18   this time.
19       Q.    Have you ever personally heard
20   any manager or supervisor at the village
21   make any derogatory statements about your
22   father filing an EEOC charge?
23       A.    Not that I can recall at this
24   time.

140

1        Q.    Have you ever personally heard
2    any manager or supervisor make any
3    derogatory statements about your father's
4    support of Kyll Lavalais?
5            MR. COOPER: Just so the
6        record --
7            MR. CASPER: Objection, asked
8        and answered.
9            MR. COOPER: Just so the record
10       is clear, Jeff, these are all --
11       Director Pitassi, by example, is a
12       supervisor. So these are other
13       people, right?
14           MR. FOWLER: Yeah. So -- and
15       that's fair.
16   BY MR. FOWLER:
17       Q.    We've already talked about those
18   three and -- actually four. We were talking
19   about the mayor, so let me ask the question
20   differently.
21       A.    Okay.
22       Q.    Other than those individuals that
23   we've already talked about --
24       A.    Okay.

141

1        Q.    -- have you ever personally heard
2    any manager or supervisor at the village
3    make any derogatory statements about your
4    father's support of Kyll Lavalais?
5        A.    Absolutely.
6        Q.    Who?
7        A.    I can't recall at this time who
8    would have said it, but it was definitely
9    word amongst the supervisors. Dino was
10   not pleased at all. He even said so in the
11   meeting.
12       Q.    What I'm asking is what you heard?
13       A.    I heard Dino argue in the meeting
14   with Kyll about his arbitration, something
15   that has nothing to do with Dino.
16       Q.    Was that -- so what I'm asking is --
17       A.    That was at an FOP meeting.
18       Q.    -- what did Dino say about your
19   father in that meeting?
20       A.    He didn't say anything in the
21   meeting about my father. After the meeting,
22   he might have.
23       Q.    So have you ever personally -- and
24   when we say Dino --

36 (Pages 138 to 141)

John Scatchell, Jr.
August 5, 2020

142

1    A.   Dimaio.
2    Q.   Have you ever heard Dino Dimaio
3  make any derogatory statements about your
4  father's support of Kyll Lavalais?
5    A.   Yes.
6    Q.   When was that?
7    A.   Just in passing in the parking
8  lot, on the street, he would make a
9  comment whenever he could because that's
10 Dino.
11   Q.   How many times have you heard
12 Dino Dimaio make negative comments about
13 your father's support of Kyll Lavalais?
14   A.   I don't think I've heard something
15 positive come out of Dino's mouth about my
16 father.
17   Q.   So the question is how many times
18 have you heard --
19   A.   I couldn't put a ballpark on it.
20   Q.   The times that you've heard it,
21 you said it was in passing.
22           Anybody else present?
23   A.   I'm sure there was.  Anybody that
24 would have been in the back lot where there

143

1  is back lot meetings every day.
2    Q.   Okay.  Do you recall any of
3  those specifically as you sit here today?
4    A.   Specifics, no, I do not recall
5  at this time.
6    Q.   As you sit here today, what
7  specifically do you recall Dino Dimaio
8  saying that was negative towards your
9  father's support of Kyll Lavalais?
10   A.   Who does he think he is, this
11 is why you guys can't promote him to
12 deputy chief, he's not going to do anything
13 you guys want him to do, that's why you
14 guys need to put me deputy chief.
15   Q.   Who was he talking to?
16   A.   He was talking to one of his
17 underlings and they're talking in the
18 context of he's having a conversation
19 with I would assume one of Rogowski --
20 or not Rogowski, Castellan and Pitassi.
21   Q.   During those conversations,
22 did you ever hear Dino Dimaio make those
23 kind of statements to Director Pitassi?
24   A.   No, they would never talk in my

144

1  presence.
2    Q.   Did you ever hear Dino Dimaio
3  make one of those kind of comments to
4  Deputy Chief Castellan?
5    A.   No, but he was explaining the
6  conversation as if he was having that
7  conversation with one of the two of them
8  and you can extrapolate it either occurred
9  in one of the two offices or at breakfast
10 at Cafe 23 where they go every day.
11   Q.   And did you ever hear Dino Dimaio
12 make one of those statements that was negative
13 toward your father's support of Kyll Lavalais
14 to Deputy Chief Rogowski?
15        MR. CASPER:  Object as to
16      form.
17 BY THE WITNESS:
18   A.   Not that I could recall at this
19 time.  I don't think Dino and Rogowski
20 really like each other.
21 BY MR. FOWLER:
22   Q.   You're aware that the police
23 department had SOPs concerning the use
24 or abuse of sick time?

145

1        MR. COOPER:  You're okay.
2  BY THE WITNESS:
3    A.   I am.
4  BY MR. FOWLER:
5    Q.   And you were aware that the
6  department had an SOP requiring contact
7  with law enforcement?
8    A.   Fifth Amendment.
9    Q.   You're aware that -- so when
10 you say Fifth --
11   A.   Fifth Amendment.
12   Q.   -- you're saying --
13   A.   I'm invoking my Fifth Amendment
14 right.
15   Q.   You're aware that the department
16 had a rule requiring officers to be truthful
17 during investigations?
18   A.   Fifth Amendment.
19   Q.   We talked about the interrogation
20 earlier and you recall that you received a
21 Garrity warning during that interrogation?
22   A.   Fifth Amendment.
23        MR. CASPER:  Object to
24      asked and answered to that

37 (Pages 142 to 145)

John Scatchell, Jr.
August 5, 2020

146

```
1      question.
2   BY MR. FOWLER:
3       Q.   And then we talked earlier about
4   you being present for the hearing before
5   the board on charges against you, right?
6           MR. CASPER:  Object to
7       asked and answered.
8   BY MR. FOWLER:
9       Q.   You recall that?
10      A.   Yes.
11      Q.   And including on October 22,
12  2018, when you were called as a witness,
13  do you recall that?
14      A.   Fifth Amendment.
15      Q.   During the October 22, 2018,
16  hearing, you were reminded that you had
17  been given the Garrity notice, correct?
18      A.   Fifth Amendment.
19          (Document marked as Scatchell
20          Junior Exhibit No. 40 for
21          identification, 08/05/2020.)
22  BY MR. FOWLER:
23      Q.   Taking a look at Scatchell Junior
24  Deposition Exhibit 40 --
```

147

```
1           MR. CASPER:  Counsel, is this
2       Bates 2368?
3           MR. FOWLER:  Yes, sir.
4           (Document tendered
5           to the witness.)
6   BY MR. FOWLER:
7       Q.   Do you see Exhibit 40?
8       A.   Fifth Amendment.
9       Q.   Is the signature on the line that
10  says John Scatchell, Jr. yours?
11      A.   Fifth Amendment.
12      Q.   During the hearing on October
13  22nd, you recall that Deputy Chief Castellan
14  was present?
15      A.   Fifth Amendment.
16      Q.   And during that hearing, you heard
17  Deputy Chief Castellan say to you I order
18  you to take the stand and answer all questions
19  truthfully and honestly?
20      A.   Fifth Amendment.
21      Q.   And when he said that, you
22  responded "at this time I assert my Fifth
23  Amendment right"?
24      A.   Fifth Amendment.  I'm asserting
```

148

```
1   that now to be clear.
2       Q.   When Deputy Chief Castellan
3   ordered you to take the stand, at that
4   point in time you had been sitting at
5   a table, you know, 15 feet or so back
6   away from where the "stand" was, is that
7   true?
8       A.   Fifth Amendment.
9       Q.   When Deputy Chief Castellan
10  ordered you to take the stand, you did
11  not rise up out of your seat, did you?
12      A.   Fifth Amendment.
13      Q.   When Deputy Chief Castellan
14  ordered you to take the stand, you did
15  not walk toward the front of the room
16  where the commissioners were, did you?
17      A.   Fifth Amendment.
18      Q.   When Deputy Chief Castellan
19  ordered you to take the stand, you did
20  not take the stand, did you?
21      A.   Fifth Amendment.
22      Q.   You were aware when you were
23  employed by the village that the police
24  department had very generous sick leave
```

149

```
1   benefits, isn't that true?
2           MR. CASPER:  Object to
3       form.
4           MR. COOPER:  Object to
5       form, the adjective generous.
6           Can you rephrase the
7       question?
8   BY MR. FOWLER:
9       Q.   Do you understand the question?
10      A.   I don't agree with the use of the
11  word generous.
12      Q.   Okay.  You were aware that the
13  police department provided six months of
14  full pay for an off-duty injury?
15      A.   I don't believe that to be true.
16  I thought it was three months and then
17  approved at the discretion of the director
18  is what I thought it was, but I'm not
19  positive on that.
20          (Document marked as Scatchell
21          Junior Exhibit No. 36 for
22          identification, 08/05/2020.)
23  BY MR. FOWLER:
24      Q.   And -- all right.  So let's -- in
```

38 (Pages 146 to 149)

John Scatchell, Jr.
August 5, 2020

150

1  the book in front of you, look at Scatchell
2  Junior Exhibit 36.
3              And just to be clear,
4  Exhibit 36 is the agreement between the
5  FOP Lodge 19 and the village, right?
6              (Document tendered
7              to the witness.)
8  BY THE WITNESS:
9     A.   You'd have to be more specific
10 as to which agreement you're referring to.
11 BY MR. FOWLER:
12    Q.   This agreement was the one that
13 went into effect in 2018, right?
14    A.   There is no dates on the last page.
15 I'm looking at Page 11 to be clear, but I
16 believe this could be the contract.  I'm not
17 positive.
18    Q.   Okay.
19         MR. CASPER:  We'll agree that
20         that is the contract if that helps
21         you at all.
22 BY MR. FOWLER:
23    Q.   And you were aware that the contract
24 that replaced the one from 2014 to 2017 reduced

151

1  sick leave benefits?
2     A.   Fifth Amendment.
3     Q.   You had an injury in February of
4  2015, is that right?
5     A.   Fifth Amendment.
6     Q.   That injury was to your upper back
7  and lower neck?
8     A.   Fifth Amendment.
9              (Document marked as Scatchell
10             Junior Exhibit No. 1 for
11             identification, 08/05/2020.)
12 BY MR. FOWLER:
13    Q.   And the book in front of you, if
14 you would, take a look at Exhibit 1, Scatchell
15 Junior Exhibit 1.
16             (Document tendered
17             to the witness.)
18 BY THE WITNESS:
19    A.   (Witness complied.)
20 BY MR. FOWLER:
21    Q.   Do you see Exhibit 1?
22    A.   Fifth Amendment.
23    Q.   The signature that's on the
24 line respectfully submitted, is that your

152

1  signature?
2     A.   Fifth Amendment.
3              (Document marked as Scatchell
4              Junior Exhibit No. 3 for
5              identification, 08/05/2020.)
6  BY MR. FOWLER:
7     Q.   Taking a look at Exhibit 3, is
8  that a note from your doctors that you
9  submitted to the police department?
10             (Document tendered
11             to the witness.)
12 BY THE WITNESS:
13    A.   Fifth Amendment.
14 BY MR. FOWLER:
15    Q.   You were released to work with
16 no restrictions in April 2015, is that
17 right?
18    A.   Fifth Amendment.
19         MR. CASPER:  Wait -- wait.
20         I'm sorry.  I do want to address
21         something with the witness right
22         now.
23             For the record,
24         Ms. Scatchell and myself do not

153

1  represent John Scatchell, Jr. at
2  this deposition.  I have not talked
3  to him at this deposition.  I never
4  prepared him for the deposition.
5              Counsel for Mr. Scatchell,
6  can you instruct your witness why
7  he's taking the Fifth Amendment
8  as to some of these like the medical
9  documentation?
10             I just want to avoid a
11 further issue and I don't understand
12 this myself, like Exhibit 3.
13         MR. COOPER:  He doesn't have
14         Garrity protection.
15         THE COURT REPORTER:  I'm sorry?
16         MR. COOPER:  Garrity, G-A-R-R-I-T-Y.
17         THE COURT REPORTER:  I just
18         couldn't hear you.  I'm sorry.
19         MR. COOPER:  He doesn't have
20         Garrity protection.
21         MR. CASPER:  As to exhibit --
22 what was the last question that was
23 asked?
24         MR. COOPER:  He doesn't -- all

39 (Pages 150 to 153)

John Scatchell, Jr.
August 5, 2020

154

1     right. So the starting point is
2     there were questions asked of him
3     in an interrogation a couple years
4     ago maybe. I don't recall the
5     exact date.
6             At that time he had
7     Garrity protection. He no longer
8     has Garrity protection. So it
9     seems prudent that he exercise his
10    Fifth Amendment right to remain
11    silent when necessary.
12        MR. CASPER: Mr. Fowler, may
13    I make a suggestion?
14            The questions about,
15    for example, Exhibit 3 in your
16    binder, is this a question about
17    that exhibit as it pertains to
18    Mr. Scatchell's response in the
19    interrogation or is this separate
20    from that entirely?
21            I'm trying to understand
22    this Fifth Amendment invocation on
23    these exhibits because I don't know
24    myself.

155

1         MR. COOPER: I'm not trying
2     to cut you off, Jeff, if you want
3     to answer, but for me, it doesn't
4     matter, you know, and if there were
5     not a Fifth Amendment objection, I
6     would make a relevance objection,
7     but we all know that a relevance
8     objection in a deposition doesn't
9     get us very far.
10            My client has a legitimate
11    basis to exercise his right to remain
12    silent.
13    BY MR. FOWLER:
14        **Q.   Dr. Sandoval was your personal**
15    **doctor?**
16        A.   Fifth Amendment.
17        **Q.   Nurse Practitioner Paulette**
18    **Feiereisel -- I'm having trouble with**
19    **that, I apologize -- do you know how to**
20    **pronounce it?**
21        A.   Fifth Amendment.
22        **Q.   Just so we're clear, it's**
23    **F-E-I-E-R-E-I-S-E-L, you're familiar with**
24    **her?**

156

1     A.   Fifth Amendment.
2         MR. COOPER: If I may, just --
3     just to -- just so that the record
4     is clear to Mr. Casper, to Mr. Casper,
5     if -- if, in fact, there was not a
6     Fifth Amendment basis.
7             What I would do is seek
8     court intervention for a limiting
9     instruction as to the questions
10    that could be asked because this --
11    this deposition -- or I should say
12    this case concerns John Scatchell,
13    Sr. and asking questions about
14    John Scatchell, Jr.'s medical or
15    alleged medical issues just seems
16    as a roundabout way to prevail in
17    the pending administrative matter
18    before Judge Meyerson in which
19    John Scatchell, Jr. is challenging
20    the board's decision to terminate.
21        MR. CASPER: Okay. I don't --
22    I don't see any of that as relevant
23    and, frankly, from my perspective,
24    this is why we have separate counsel.

157

1         Mr. Scatchell, Sr. would
2     like the testimony about, for
3     example, these medical records
4     that -- like, Scatchell Exhibit 3,
5     we -- we would like this too.
6             I don't understand the
7     Fifth Amendment invocation at this
8     point as to that either. I don't
9     understand that -- I do understand
10    it as to any questions about some
11    of the other stuff, but not as to
12    this.
13        MR. COOPER: All right. Let me
14    talk to my client.
15            (Whereupon, after a short
16            break was had, the following
17            proceedings were held
18            accordingly.)
19        MR. FOWLER: All right. We
20    are back on.
21    BY MR. FOWLER:
22        **Q.   Since April 24th, 2015, you never**
23    **reported any work-related injury to your**
24    **supervisors, did you?**

40 (Pages 154 to 157)

John Scatchell, Jr.
August 5, 2020

158

```
 1        A.   Fifth Amendment.
 2        Q.   The next time you reported anything
 3   was in October -- late October/early November
 4   2017, right?
 5        A.   Fifth Amendment.
 6        Q.   Now, as of November 9th, 2017,
 7   up to that point, have you ever been
 8   disciplined by anyone at the department?
 9             MR. COOPER:  You could answer
10        that.
11             MR. BERSANI:  Could you read
12        back the question, please?
13             (Whereupon, the requested
14             portion of the record was
15             read accordingly.)
16   BY THE WITNESS:
17        A.   No.
18   BY MR. FOWLER:
19        Q.   Have you ever been reprimanded by
20   anyone at the department up until November
21   9th of 2017?
22             MR. COOPER:  Objection as to
23        form.  The word reprimand seems
24        very broad.
```

159

```
 1             MR. CASPER:  Join.
 2   BY MR. FOWLER:
 3        Q.   You can answer.
 4        A.   Is there a -- somewhere I don't
 5   know about where reprimands are documented
 6   because I don't recall any.
 7        Q.   So you don't recall any reprimands?
 8        A.   Not off the top of my head at this
 9   time.
10        Q.   Up until November 9th of 2017, had
11   you suffered any kind of adverse action of
12   any kind from a supervisor or manager at the
13   village?
14             MR. CASPER:  Objection to
15        form.
16             MR. COOPER:  Objection to
17        calls for a legal conclusion,
18        the phrase adverse action.
19             This witness is not
20        competent to answer the question
21        as posed.
22             Answer if you can
23        understand it.
24
```

160

```
 1   BY MR. FOWLER:
 2        Q.   Do you understand what I'm asking?
 3        A.   Rephrase it, please.
 4        Q.   All right.  Up until November 9th
 5   of 2017, did any manager or supervisor do
 6   anything to you that you didn't like?
 7        A.   Pitassi when he promised me to
 8   my face I don't know how many times that I
 9   was going to traffic because I was a good
10   productive police officer and nobody could
11   say otherwise.
12        Q.   Anything else?
13        A.   Not that I could recall at this
14   time.
15        Q.   When did Director Pitassi first
16   say to you that you could go to traffic?
17        A.   That's probably been ongoing since
18   the second year I was on the job.
19        Q.   So around 2013?
20        A.   Empty promises -- well, I wouldn't
21   qualify '13 because up until whatever point
22   I was on probation, let's just call it '14
23   because no -- in my opinion no officer with
24   that little experience would deserve a
```

161

```
 1   promotion, but once you get past your
 2   probationary period and you know what
 3   you're doing, then I think it's appropriate,
 4   so that's where I'd ballpark it.
 5        Q.   On that issue, is there any
 6   difference in 2016?
 7        A.   Meaning?
 8        Q.   I don't know.  You're saying
 9   that you didn't get it -- you didn't get
10   put -- you wanted to be put in traffic,
11   right?
12        A.   At one point I did, yeah.
13        Q.   Did you still want it in 2015?
14        A.   I believe I did.  I had put in
15   for it all the way until the time that I
16   ended up on Lieutenant Dimaio's shift I
17   believe.
18        Q.   When was that?
19        A.   That would have been after I
20   left Rogowski's shift so going '16 into
21   '17 I believe is when that occurred.
22        Q.   And that's when you stopped
23   putting in for being assigned to traffic?
24        A.   Well, I -- I didn't think that
```

41 (Pages 158 to 161)

John Scatchell, Jr.
August 5, 2020

162

1  if I put in for it anybody would listen
2  anymore after you guys did whatever you
3  did. So I just stopped putting in for
4  it because nobody -- nobody ever listened
5  to begin with so...
6  **Q.   Now --**
7  A.   Although Sam promised me numerous
8  occasions.
9  **Q.   -- going back to the interrogation**
10 **on January 9th of 2018 or thereabouts, you**
11 **answered questions about your activities**
12 **while you were on sick leave, right?**
13    MR. COOPER:  You can answer
14  that.
15    MR. CASPER:  Objection, asked
16  and answered.
17 BY THE WITNESS:
18  A.   I believe I did.
19 BY MR. FOWLER:
20  **Q.   And you said that you were so**
21 **inactive as a result of the injury that**
22 **you gained 50 pounds, is that true?**
23  A.   Fifth Amendment.
24

163

1    (Document marked as Scatchell
2      Junior Exhibit No. 4 for
3      identification, 08/05/2020.)
4  BY MR. FOWLER:
5  **Q.   As of -- I'll tell you what, let's**
6  **make it easy.**
7      **Go to Scatchell Junior**
8  **Exhibit 4 in the book.**
9    **(Document tendered**
10     **to the witness.)**
11 BY THE WITNESS:
12  A.   (Witness complied.)
13 BY MR. FOWLER:
14  **Q.   Are you there?**
15  A.   I'm here.
16  **Q.   Did you see your doctor on or about**
17 **August 25th, 2016?**
18  A.   Fifth Amendment.
19
20
21
22
23
24

164

1
2
3
4
5
6
7
8
9    (Confidential testimony
10    bound under separate
11    cover.)
12
13
14
15
16
17
18
19
20
21
22
23
24

165

1
2
3
4
5
6
7
8
9    (Confidential testimony
10    bound under separate
11    cover.)
12
13
14
15
16
17
18
19
20
21
22
23
24

42 (Pages 162 to 165)

John Scatchell, Jr.
August 5, 2020

|  | 166 |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | (Confidential testimony |
| 10 | bound under separate |
| 11 | cover.) |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | 168 |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | (Confidential testimony |
| 10 | bound under separate |
| 11 | cover.) |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | 167 |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | (Confidential testimony |
| 10 | bound under separate |
| 11 | cover.) |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | 169 |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | (Confidential testimony |
| 10 | bound under separate |
| 11 | cover.) |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

43 (Pages 166 to 169)

John Scatchell, Jr.
August 5, 2020

|  | 170 |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | (Confidential testimony |
| 10 | bound under separate |
| 11 | cover.) |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | 172 |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | (Confidential testimony |
| 10 | bound under separate |
| 11 | cover.) |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | 171 |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | (Confidential testimony |
| 9 | bound under separate |
| 10 | cover.) |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | 173 |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | (Confidential testimony |
| 10 | bound under separate |
| 11 | cover.) |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

44 (Pages 170 to 173)

John Scatchell, Jr.
August 5, 2020

|  | 174 |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | (Confidential testimony |
| 10 | bound under separate |
| 11 | cover.) |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | 176 |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | (Confidential testimony |
| 10 | bound under separate |
| 11 | cover.) |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | 175 |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | (Confidential testimony |
| 10 | bound under separate |
| 11 | cover.) |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | 177 |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | (Confidential testimony |
| 10 | bound under separate |
| 11 | cover.) |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

45 (Pages 174 to 177)

John Scatchell, Jr.
August 5, 2020

178

```
1
2
3
4
5
6
7
8
9          (Confidential testimony
10          bound under separate
11          cover.)
12
13
14
15
16
17
18
19
20
21
22
23
24
```

180

```
1
2
3
4
5
6
7
8          (Confidential testimony
9           bound under separate
10           cover.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

179

```
1
2
3
4
5
6
7
8          (Confidential testimony
9           bound under separate
10           cover.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

181

```
1          (Confidential testimony
2           bound under separate
3           cover.)
4
5
6
7
8
9              MR. FOWLER:  Thank you.  I'm
10         glad you caught that, Cass.  I
11         forgot.
12     BY MR. FOWLER:
13         Q.   Taking a look at the page that's
14     second from the end on the lower right,
15     it's marked DSC00312.
16             Do you see that page?
17         A.   Fifth Amendment.
18         Q.   That's a photograph of you, isn't
19     it?
20         A.   Fifth Amendment.
21         Q.   You're carrying several different
22     geese in that photo, correct?
23         A.   Fifth Amendment.
24         Q.   A goose generally weighs on average
```

46 (Pages 178 to 181)

L.A. Court Reporters, L.L.C.
312-419-9292

John Scatchell, Jr.
August 5, 2020

182

```
 1   about ten pounds?
 2           MR. CASPER:  Objection.
 3   BY MR. FOWLER:
 4       Q.   So what does a goose weigh?
 5           MR. COOPER:  Fifth Amendment.
 6   BY THE WITNESS:
 7       A.   Fifth Amendment.
 8   BY MR. FOWLER:
 9       Q.   During the period of time in
10   November of -- between November 9th and
11   December 2nd of 2017 -- well, strike that.
12   Let me start over.
13           Prior to November 9,
14   2017, were you familiar with Tony Scavo?
15       A.   Who?
16       Q.   Sorry.  That -- all right.  Let
17   me try that one again.
18           Prior to November 9, 2017,
19   were you familiar -- and if you guys tell
20   Tony I said that, I'm going to growl at you.
21           Prior to November 9, 2017,
22   were you familiar with Tony Kyra?
23       A.   Yes.
24       Q.   You knew him?
```

183

```
 1       A.   Knew of him.
 2       Q.   Had you met him?
 3       A.   At the station.  He worked at the
 4   same station I did.
 5       Q.   You knew what he looked like?
 6       A.   Vaguely.
 7       Q.   During the period in late November
 8   of 2017, were you aware that he was doing
 9   surveillance on you?
10       A.   Fifth Amendment.
11           MR. CASPER:  I'm sorry.
12       Mr. Scatchell, do you need to
13       take a break because I'm just
14       sitting here and it seems like
15       you and I need to take a break
16       right now?
17           THE WITNESS:  I'm good.
18   BY MR. FOWLER:
19       Q.   During the period in the fall of
20   2017, did you see Tony Kyra outside of the
21   police department?
22       A.   Fifth Amendment.
23       Q.   In December of 2017, did you do
24   a trip to Portland with your grandfather?
```

184

```
 1       A.   Fifth Amendment.
 2       Q.   And while you were in Portland
 3   in December of 2017, did you go hunting
 4   with your grandfather?
 5       A.   Fifth Amendment.
 6       Q.   Taking a look in the binder at
 7   Exhibit 29, so starting with the first page,
 8   the portion -- you recognize this as text
 9   messages that you sent or received in May
10   and June of 2017?
11       A.   Fifth Amendment.
12       Q.   Taking a look at the second page,
13   do you recognize that as a check that was
14   written as a deposit for a hunting trip for
15   you and Mr. Scavo?
16       A.   Fifth Amendment.
17           (Document marked as Scatchell
18           Junior Exhibit No. 30 for
19           identification, 08/05/2020.)
20   BY MR. FOWLER:
21       Q.   Taking a look at Exhibit 30, do
22   you recognize that as a check that was
23   written for the hunting trip for you and
24   Mr. Scavo in 2017?
```

185

```
 1       A.   Fifth Amendment.
 2       Q.   During the interrogation on
 3   January 9th, 2018, you were asked questions
 4   about recoil of shotguns, isn't that true?
 5       A.   Fifth Amendment.
 6       Q.   And after that interrogation, you
 7   created videos of yourself shooting shotguns,
 8   didn't you?
 9       A.   Fifth Amendment.
10       Q.   Were those videos produced to
11   your dad's attorneys here -- strike
12   that.
13           Now, one of the attorneys
14   in the -- let me state that differently.
15           One of attorneys in the
16   board proceedings was Gianna Scatchell,
17   true?
18           MR. COOPER:  Jeff, if he
19       knows the answer, I don't recall.
20       She's not here.  She can't say
21       whether or not she filed an
22       appearance.
23           Do you know the answer?
24           THE WITNESS:  I don't know.
```

47 (Pages 182 to 185)

John Scatchell, Jr.
August 5, 2020

186

1          MR. FOWLER:  She -- she stepped
2   up and answered on dates that you
3   weren't there identifying herself
4   as counsel for him.
5          Specifically, I think
6   that was April 22nd.
7          MR. COOPER:  If you know the
8   answer.
9   BY THE WITNESS:
10     A.    I'm not aware of the answer.
11  BY MR. FOWLER:
12     Q.    **Gianna Scatchell was aware that**
13  **you did videos of shooting shotguns, wasn't**
14  **she?**
15     A.    Fifth Amendment.
16         MR. CASPER:  I'm going to
17  object to the form and foundation.
18  Gianna Scatchell was aware?
19  BY MR. FOWLER:
20     Q.    **You knew that Gianna Scatchell was**
21  **aware you did the videos?**
22         MR. CASPER:  Same objection.
23  BY THE WITNESS:
24     A.    Fifth Amendment.

187

1          MR. COOPER:  So you're asking
2   if...
3          MR. FOWLER:  Chris -- Chris --
4   hang on.  The short of it is that
5   those videos have never been
6   produced in this case.
7          And my point is counsel
8   had it, so I'm -- I'm not going
9   anywhere else with it.
10         MR. COOPER:  All right.
11         MR. FOWLER:  Don't sweat it.
12         MR. COOPER:  All right.
13         MR. CASPER:  I will -- I will
14  say for the record, I am not aware
15  of those videos personally.  I can
16  look into that if you want to make
17  an issue of it.  You've also never
18  brought it to my attention.  So...
19         MR. FOWLER:  Certainly you should
20  have a conversation if it's -- if he is
21  relevant to this case, the videos are
22  relevant to this case and so they
23  should be produced.
24         MR. CASPER:  Are you requesting

188

1   that any such videos, if they do
2   exist, be produced right now?  I
3   will talk to co-counsel about it.
4          MR. FOWLER:  I mean, whether
5   it's right now, not during the
6   course of the deposition.
7          MR. COOPER:  I will have that
8   conversation.
9          MR. FOWLER:  Thank you.
10         THE WITNESS:  If you want, we
11  can take a break.  It's up to you
12  guys.
13         MR. FOWLER:  If you want to --
14         THE WITNESS:  I've got to go
15  to the bathroom.  So...
16         MR. FOWLER:  That's fine.  That's
17  fine.
18         MR. CASPER:  All right.  It's
19  4:01.
20         (Whereupon, after a short
21         break was had, the following
22         proceedings were held
23         accordingly.)
24         MR. CASPER:  Back on the record.

189

1   I just talked to my co-counsel, Jeff,
2   about the videotapes that you were
3   asking about and my understanding
4   is those tapes were produced to
5   you in the context of the police
6   board case.
7          MR. FOWLER:  They were produced
8   in the police board case, I agree
9   with that.  They haven't been produced
10  in this case and they certainly haven't
11  been produced to the other parties.
12         MR. CASPER:  All right.  I was
13  not aware of these tapes and that
14  they had not been produced.
15         I will produce them in
16  this case, but I want to emphasize
17  this was an inadvertency on our
18  part --
19         MR. FOWLER:  I'm not suggesting
20  anything else.
21         MR. CASPER:  -- and we'll produce
22  them in this case.
23         MR. FOWLER:  I'm not suggesting
24  anything else.

L.A. Court Reporters, L.L.C.
312-419-9292

John Scatchell, Jr.
August 5, 2020

190

1          MR. BERSANI:  For the record,
2    that's the first time I ever heard
3    that these tapes even exist.  I
4    never heard of that previously.
5          MR. CASPER:  That candidly
6    is the first time I ever heard
7    of the existence.  So...
8          MR. FOWLER:  And just so
9    we're -- there was a question
10   about whether Ms. Scatchell was
11   counsel in the police board case
12   and taking a look at Exhibit 35,
13   in fact, let me do it with the
14   witness.
15         (Document marked as Scatchell
16          Junior Exhibit No. 35 for
17          identification, 08/05/2020.)
18   BY MR. FOWLER:
19   **Q.   Take a look at Exhibit 35, please.**
20         **(Document tendered**
21          **to the witness.)**
22   BY THE WITNESS:
23   A.   (Witness complied.)
24

191

1    BY MR. FOWLER:
2    **Q.   Do you recognize this as the answer**
3    **to the charges that was filed on your behalf**
4    **in the police board case?**
5          MR. COOPER:  If you know
6    the answer.
7    BY THE WITNESS:
8    A.   It -- I mean, it might have
9    been.  There has been so much paperwork.
10   So...
11   BY MR. FOWLER:
12   **Q.   And taking a look at the very last**
13   **page.**
14         MS. SCATCHELL:  Jeff, is that
15   the amended answer, too, or just
16   the answer?
17         MR. FOWLER:  This is the original.
18   I didn't bring the amended answer.
19   I'm not using it as an exhibit with
20   him.
21         MS. SCATCHELL:  Okay.
22   BY MR. FOWLER:
23   **Q.   So just looking at -- you see the**
24   **reference to the Law Offices of Gianna**

192

1    Scatchell in the middle of the page?
2    A.   I do.
3    **Q.   She was one of the attorneys who**
4    **submitted this answer, right?**
5          MR. COOPER:  Well, yeah, I --
6          if he knows, he can answer the
7          question.
8    BY THE WITNESS:
9    A.   I mean, it's on a piece of paper.
10   So I'm not sure what that implies, but...
11   BY MR. FOWLER:
12   **Q.   Okay.  And that's the same Gianna**
13   **Scatchell that's representing your dad here**
14   **today, right?**
15         MR. COOPER:  Well -- so the
16         question is is Gianna Scatchell,
17         mentioned on the page, the same
18         Gianna Scatchell here today?
19         MR. FOWLER:  Yes.
20         MR. COOPER:  He can answer that.
21   BY THE WITNESS:
22   A.   I believe so, yes.
23   BY MR. FOWLER:
24   **Q.   Okay.  That's all I'm doing with**

193

1    that.
2          **(Document marked as Scatchell**
3          **Junior Exhibit No. 33 for**
4          **identification, 08/05/2020.)**
5    BY MR. FOWLER:
6    **Q.   Take a look at Exhibit 33, please.**
7          **(Document tendered**
8          **to the witness.)**
9    BY THE WITNESS:
10   A.   (Witness complied.)
11   BY MR. FOWLER:
12   **Q.   What is Exhibit 33?**
13   A.   Fifth Amendment.
14         (Document marked as Scatchell
15          Junior Exhibit No. 34 for
16          identification, 08/05/2020.)
17   BY MR. FOWLER:
18   **Q.   Take a look at Exhibit 34, please.**
19         **(Document tendered**
20          **to the witness.)**
21   BY THE WITNESS:
22   A.   (Witness complied.)
23   BY MR. FOWLER:
24   **Q.   What is Exhibit 34?**

L.A. Court Reporters, L.L.C.
312-419-9292

John Scatchell, Jr.
August 5, 2020

194

1    A.   Fifth Amendment.
2    Q.   Now, we were talking earlier
3  about the police board hearing and you
4  recall that there were half a dozen
5  different dates were -- that was up and
6  you were present between April and
7  November of 2018, right?
8    A.   Fifth Amendment.
9    Q.   During the police board hearings,
10 you were aware that there were side
11 conferences between your attorney and the
12 attorney for the village?
13   A.   Fifth Amendment.
14   Q.   During that period of time, you
15 were aware that you had the opportunity
16 to resign from your employment with the
17 village, isn't that true?
18   A.   Fifth Amendment.
19   Q.   During the period of time from
20 November of 2017 through December of 2018,
21 did you apply for work as a police officer
22 with any other agency or city or organization?
23       MR. CASPER:  I object to
24       that.

195

1        Go ahead.  Sorry.  No
2        objection.
3  BY THE WITNESS:
4    A.   Can you repeat the date range once?
5  BY MR. FOWLER:
6    Q.   Between November of 2017 and December
7  of 2018.
8    A.   I have never put in a formal job
9  application anywhere.
10   Q.   Were you considering or considered
11 for an opportunity in Maywood?
12       MR. CASPER:  I'm having a
13       hard time understanding how this
14       question and these questions are
15       relevant to this proceeding.
16       MR. FOWLER:  You put in this
17       complaint that one of the things
18       that plaintiff is complaining about
19       is that John Jr. did not have the
20       opportunity to resign.  That's in
21       your complaint, in the new one.
22       MR. CASPER:  Okay.  But how
23       does whether or not he -- and you
24       asked that question and he answered

196

1  it.  How does whether or not he
2  applied anywhere else have any
3  bearing on this complaint?
4        MR. FOWLER:  Same subject
5        designed to lead to the discovery
6        of relevant.  So I'm entitled --
7        MR. CASPER:  How does that
8        answer lead to --
9        THE COURT REPORTER:  Wait one
10 second.  I can't hear you, Counsel.
11       MR. CASPER:  Sorry.
12       THE COURT REPORTER:  That's okay.
13       MR. CASPER:  How does whether
14 or not John Scatchell, Jr. applied
15 or considered employment at other
16 police entities between I think you
17 said November 2017 to November 2018
18 have any bearing on this complaint?
19       MR. FOWLER:  Obviously, we
20 disagree.  I think it does.  So
21 unless you're instructing him not
22 to answer, I'm going to ask him
23 to answer.
24       MR. CASPER:  I will allow this

197

1  to go forward a little bit, but at
2  some point, we're just getting
3  too far afield, but I will not --
4        MR. FOWLER:  Do you need the
5        question read back?
6        MR. CASPER:  No.  I'm allowing
7  him to answer the question.  I mean,
8  I'm not --
9        MR. COOPER:  Okay.
10 BY MR. FOWLER:
11   Q.   So let me rephrase the question.
12       During the period from
13 November 9th, 2017, to December of 2018,
14 did -- were you considering an opportunity
15 to accept a position with Elmwood Park?
16       MR. COOPER:  You can answer
17       that.
18 BY THE WITNESS:
19   A.   I entertained it until I found out
20 that Deputy Chief Castellan was close friends
21 with Deputy Chief Hock over there and I just
22 thought it's the same exact scenario especially
23 if I'm not going to be going over there and
24 bringing my dirty laundry there.  Melrose Park

50 (Pages 194 to 197)

John Scatchell, Jr.
August 5, 2020

198

1   can stay in Melrose Park.
2   BY MR. FOWLER:
3       Q.   So you were the one who decided
4   not to pursue the opportunity, right?
5       A.   Absolutely.
6               (Document marked as Scatchell
7               Junior Exhibit No. 42 for
8               identification, 08/05/2020.)
9   BY MR. FOWLER:
10      Q.   Referring to Exhibit 42, at a
11  glance, it looked to me like Exhibit 42
12  was included in the documents that you
13  gave --
14          MR. FOWLER:  And, Cass, I
15      need those documents that he
16      brought with him today.
17          THE WITNESS:  I think you
18      still have them.
19          MR. FOWLER:  No.  They went
20      from him to Cass and I haven't
21      seen them since.
22          MS. SCATCHELL:  The grievances
23      from yesterday?
24          MR. CASPER:  No, no, the stack

199

1       of documents.
2           MR. FOWLER:  I haven't seen
3       them yet.
4           MS. SCATCHELL:  It might not
5       be relevant.
6           MR. CASPER:  Well, hang on.
7       Hang on.  I thought -- I thought
8       you did review those.
9           MR. FOWLER:  No.  They went
10      from Mike to you.
11          MR. BERSANI:  I reviewed them.
12      You reviewed them.
13          MR. CASPER:  What did you do
14      with those?  Are they right there?
15      That's it.  That's it right there.
16      We will gather them.
17          MR. FOWLER:  I need them before
18      I finish.
19          MR. CASPER:  Okay.  We'll gather
20      them.
21          MS. SCATCHELL:  Uh-huh.
22  BY MR. FOWLER:
23      Q.   So my question what led to that
24  is I believe that Exhibit 42 when I glanced

200

1   at the torn papers was a portion of the stack
2   that you had.
3           So what I'm asking you is
4   do you recognize Exhibit 42?
5           MR. COOPER:  You can answer
6       that.
7   BY THE WITNESS:
8       A.   Yes, I do.
9   BY MR. FOWLER:
10      Q.   And these are the grievances that
11  you submitted and the responses to the
12  grievances?
13      A.   I don't know if they're all in
14  here.  I would have to look through them.
15      Q.   Take your time and look through.
16      A.   Even if I did take my time and
17  look through, I submitted several grievances
18  and none of them were ever truly entertained,
19  but I'd say the documents in here I submitted
20  these.
21      Q.   Were there any grievances that you
22  submitted that are not included in Exhibit
23  42?
24      A.   That I can recall off the top of my

201

1   head, no.
2       Q.   Are there any responses that you
3   received that are not included in Exhibit
4   42?
5       A.   Verbal responses.
6       Q.   Okay.  Anything else?
7       A.   Not that I can recall off the top
8   of my head at this time.
9       Q.   Who did you receive verbal responses
10  from?
11      A.   Mark Reiger.
12      Q.   And he was your direct supervisor?
13      A.   When he was at work.
14      Q.   How many times did he directly
15  respond verbally to you about your grievances?
16      A.   Took me in the car, rode me around,
17  explained to me the politics of Melrose Park
18  and how I should just play the game and just
19  do what they say and it will probably go away,
20  stuff like that.
21      Q.   And when did that conversation take
22  place?
23      A.   Right in the middle of the proceedings,
24  2018 at some point.

51 (Pages 198 to 201)

John Scatchell, Jr.
August 5, 2020

202

```
 1      Q.   You're saying middle of 2018?
 2      A.   Some -- at some point in 2018.
 3           MR. FOWLER:  That's way more
 4   than he gave and the only reason
 5   I'm saying that is I don't want
 6   you to --
 7           MS. SCATCHELL:  These are all
 8   the copies.  So what happened was
 9   what you saw was one copy from each
10   of these.  So I already put them
11   back in -- you know, we passed out
12   copies for you, for us, for him,
13   for the court reporter.  So that's
14   why you see more copies.
15           So when you just look at
16   it, each one of these top documents,
17   that's what was reviewed.
18           MR. FOWLER:  So here's what
19   I'm going to do, since Mike saw
20   these, I'm going to ask Mike to
21   go through -- sorry, Mike.
22           MR. BERSANI:  Are you paying me
23   to do this?  I'll be happy to do that.
24           MR. FOWLER:  Thank you, Mike.
```

203

```
 1   BY MR. FOWLER:
 2      Q.   During that conversation with
 3   Reiger, was anybody else present?
 4      A.   No.
 5      Q.   In that conversation, what exactly
 6   did he say and what did you say?
 7      A.   Obviously it's a three-year-old --
 8   two-year-old conversation approaching.  So
 9   I'm paraphrasing, but like I said, he said
10   just play ball, you should stop writing
11   these letters, this ain't helping you,
12   blah, blah, blah.
13           And my response to that was
14   I'm just supposed to take a backseat when
15   my career is on the line, I'm just supposed
16   to sit here and do nothing.
17      Q.   Anything else?
18      A.   I mean there were injustices and
19   I addressed them in these grievances.
20   Director Pitassi disagreed and it never
21   really went any further.
22           I heard a little bit about
23   one going to arbitration and that was it
24   and I never heard nothing since that point.
```

204

```
 1      Q.   Anything else?
 2      A.   No.
 3      Q.   None of your grievances -- strike
 4   that.
 5           You're aware that the
 6   process is that to go to arbitration, it
 7   has to be decided by the FOP, isn't that
 8   right?
 9      A.   I was never given any decision.
10      Q.   You knew that the FOP was the
11   one that pushes it to arbitration?
12      A.   I would say yeah.
13      Q.   Okay.  And none of your grievances
14   went to arbitration, right?
15      A.   To my knowledge, no.
16      Q.   Do you know why?
17      A.   I was never given an answer.
18   President Gepetta and Vice-President Natale
19   don't like me or at that time those two
20   didn't like me.  That's the problem.
21      Q.   One of the issues in your grievances
22   is that you didn't receive a day of pay for a
23   birthday or birthday off, something like that,
24   do you recall that?
```

205

```
 1      A.   I believe I recall that.
 2      Q.   And you did receive that in 2018,
 3   didn't you, after the grievances?
 4      A.   I don't recall that.
 5      Q.   You don't recall one way or the
 6   other?
 7      A.   At this time, no.
 8      Q.   Did you ever file a claim with
 9   the Illinois Department of Labor about
10   not receiving compensation that was owed
11   to you?
12      A.   I don't recall at this time.
13      Q.   Do you have any personal knowledge
14   of a policy at the Village of Melrose Park
15   of retaliating against people for exercising
16   First Amendment rights?
17           MR. CASPER:  I object to --
18   well, no objection.
19   BY THE WITNESS:
20      A.   I'm not aware of the exact policy,
21   but I know one exits.
22   BY MR. FOWLER:
23      Q.   How do you know one exists?
24      A.   That's common sense.  First
```

52 (Pages 202 to 205)

John Scatchell, Jr.
August 5, 2020

206

1    Amendment right is protected speech.
2    That's anywhere.  This is the United
3    States of America.  So Melrose Park
4    applies to that.  I would assume they
5    have that in the SOPs.  That's a pretty
6    safe assumption.
7        **Q.   Okay.  So just so I'm clear,**
8    **what you're saying your testimony is**
9    **that you're aware that there is a policy**
10   **of allowing First Amendment speech, is**
11   **that true?**
12           **Is that what you're saying?**
13           MR. COOPER:  Objection, calls
14       for a legal conclusion, the phrase
15       First Amendment.
16   BY THE WITNESS:
17       A.   My understanding of your question
18   is you're asking me is there an SOP that
19   protects First Amendment -- free speech.
20   I believe there is.  I'm not positive on
21   it.
22   BY MR. FOWLER:
23       **Q.   Okay.  That wasn't actually what**
24   **I was asking you.**

207

1        A.   Okay.
2        **Q.   So thank you for --**
3        A.   Please be clear about it then for
4    me.
5        **Q.   I will certainly try.**
6            **Are you aware of any**
7    **express policy to retaliate against people**
8    **who have exercised their First Amendment**
9    **rights?**
10       A.   Is there a policy?  Okay.  Now,
11   I understand your question.  No, but there
12   is unwritten rules, sure.
13       **Q.   How do you know that there are**
14   **unwritten notes?**
15       A.   Look at my father.  He is a prime
16   example.
17       **Q.   Anything else?**
18       A.   Look at anybody they forced out
19   of this town versus the people that were
20   allowed to stay that did far greater things
21   or far worse things I should say than
22   whatever was accused of anybody in this
23   case.
24       **Q.   Who do you believe was forced out?**

208

1        A.   Let's see.  Well --
2            MR. COOPER:  Objection,
3        asked and answered.
4            Go ahead and answer
5        again.  Same names you gave earlier.
6    BY THE WITNESS:
7        A.   Yeah.  I mean, Jeff Juan, you guys
8    forced him out.  Devon Moss, he was in
9    Afghanistan, you guys fired him for residency.
10   His residency at the time was Afghanistan.
11   So, I mean, let's see.  You guys forced out,
12   Mark Lockton.  Who else?  Gil Espinosa.
13           Fired Angela Williams, but
14   again Steve Pesch arguably still doesn't
15   live in town.  He mows the lawn occasionally,
16   puts on a nice show.  Jerry Manzel definitely
17   doesn't live in town right now and claims
18   the consensus -- not a -- what do you call
19   it decree, a homeowner's exemption on the
20   house that he had as out west versus the
21   house that he has here.  He claimed one on
22   both.  How do you do that?
23   BY MR. FOWLER:
24       **Q.   Anybody else?**

209

1        A.   No.
2        **Q.   What did Jeff Juan say or do that**
3    **you believe was protected by the First**
4    **Amendment?**
5        A.   I believe he told somebody he
6    lived out of town and they told somebody
7    else and that's how he got in trouble or
8    invited somebody.
9        **Q.   Now, do you have any firsthand**
10   **knowledge of that or is that just what**
11   **you're guessing?**
12       A.   And that's my belief based on
13   conversations I had with people around
14   the time.
15       **Q.   What firsthand knowledge do you**
16   **have that Devon Moss engaged in First**
17   **Amendment protected activity of speech?**
18       A.   He was serving our country at
19   the time that you guys fired him.  He told
20   everybody he lived in town before that and
21   still you guys fired him.  So -- and I know
22   he lived in town because I actually saw
23   him at his house and he used to come and
24   visit me and my neighbor walking.

53 (Pages 206 to 209)

John Scatchell, Jr.
August 5, 2020

210

1    Q.   Anything else?
2    A.   That's all.
3    Q.   What First Amendment protected
4    activity did Mark Lockton engage in?
5    A.   Free speech.
6    Q.   What speech?
7    A.   He was talking about something
8    in Harlo about the mayor never promoting
9    him and then it turned into a whole thing
10   where Pitassi wanted to fire him over it.
11   Q.   Where did -- how do you know
12   that Mark Lockton --
13   A.   Because I was sitting with Mark
14   when he said it.
15   Q.   Remember you got to let me finish
16   my question. Okay?
17   A.   Okay.
18   Q.   When did that conversation take
19   place?
20   A.   Shortly after Mark retired, took
21   his forced retirement.
22   Q.   Anybody else present?
23   A.   I forget who the village official
24   was, but somebody was sitting two seats down

211

1    and it doesn't take a brain surgeon to
2    extrapolate what occurred from there.
3    Q.   So this was after Mark Lockton
4    had retired?
5    A.   I'm sorry. I misspoke. This
6    was before he had officially retired.
7    He was still on the books because from
8    when he retired, his time carried him
9    to I believe August of that year if my --
10   Q.   So if I'm hearing what you're
11   saying right that he had already put in
12   the papers for retirement but he was just --
13   this was the interim period that he was
14   burning up his used time, is that fair?
15   A.   Correct. I don't know -- I don't
16   have direct knowledge that any papers were
17   submitted at that point. I just know that
18   that was -- he was to be off the books
19   around August of that year.
20   Q.   During -- and you said that there
21   was some village official two seats down.
22           Was that in a different
23   table or booth or was that part of this
24   same conversation?

212

1    A.   The old Harlo, the way that the
2    old Harlo was laid out, there was just one
3    consecutive line of seats, so one next to
4    the other next to the other.
5           And I don't think there
6    was anybody sitting between Mark and whoever
7    that -- I believe he was a fireman. I don't
8    think he is there anymore.
9    Q.   That person wasn't part of your
10   conversation, but you think they could have
11   overheard it, is that what you're saying?
12   A.   Oh, they definitely overheard it
13   because they actually made remarks about it.
14   Q.   Who -- and you don't know who that
15   person was?
16   A.   He's a fireman. I would remember
17   his face if I saw him. I don't remember.
18   Q.   A fireman meaning a firefighter
19   or --
20   A.   A firefighter in the Village of
21   Melrose Park, yes.
22   Q.   During that conversation with
23   Mr. Lockton, what did he say to you and
24   what did you say to him?

213

1    A.   He just talked about how it was
2    BS that this guy gets promoted, this guy
3    gets promoted, this guy gets promoted and
4    the mayor has done nothing for me.
5    Q.   Anything else?
6    A.   That I can recall, no.
7    Q.   What did Gil Espinosa do that
8    you believe was protected by the First
9    Amendment?
10   A.   Again, told people where he
11   lived.
12   Q.   Anything else?
13   A.   Made the mistake of trusting
14   people that he shouldn't have.
15   Q.   Anything else?
16   A.   That I can recall at this time,
17   no.
18   Q.   What did Angela Williams do that
19   you believe was protected by the First
20   Amendment?
21   A.   She was occupying a job somebody
22   else wanted.
23   Q.   Anything else?
24   A.   And again invited people to her

John Scatchell, Jr.
August 5, 2020

214

1    house, told people where she lived.  None
2    of these instances of residency were
3    secrets.  The only secret that remains
4    is that Steve Pesch and Jerry Manzel
5    don't live in town.
6        Q.   So a minute ago I was asking you
7    the questions about a policy, right?
8             You understood that?
9        A.   (Witness nodded.)
10       Q.   And do you believe that there
11   is a difference between a policy and a
12   custom?
13            Do you know what the term
14   "custom" means?
15            MR. CASPER:  Object to
16       foundation.
17   BY THE WITNESS:
18       A.   Something that's passed down,
19   traditional or something like that would
20   be how I would --
21   BY MR. FOWLER:
22       Q.   So if I were to ask you the
23   similar kind of question, do you have
24   any personal knowledge of a custom within

215

1    the village of retaliating against people
2    for First Amendment rights, would that be
3    the same five people that you just gave
4    me?
5        A.   I would probably add -- was it
6    Mario Trombetta to the list.
7        Q.   Anybody else?
8        A.   And he was the one that had a
9    lawsuit with the mayor I believe 20 years
10   ago.
11       Q.   Anybody else?
12       A.   At this time -- well, Jennifer
13   McMillan.  She spoke out against somebody
14   sending her from this building, this very
15   building, sending her a picture of his
16   genitalia and then shortly thereafter was
17   fired.
18            MR. BERSANI:  Could you
19       read back that answer, please?
20            (Whereupon, the requested
21            portion of the record was
22            read accordingly.)
23   BY MR. FOWLER:
24       Q.   Anybody else?

216

1        A.   I know there's names that I'm
2    forgetting, but, I mean, there's so many
3    names and so much stuff to go over at
4    this time, I don't recall anybody else.
5        Q.   What did Mario Trombetta do or
6    say that you believe was covered by the
7    First Amendment?
8        A.   What did he do or say?  He was
9    vocal against the mayor and the mayor
10   went after him.
11       Q.   When was that?
12       A.   Twenty years ago, whenever that
13   lawsuit was.  I do believe the mayor lost
14   or the village lost, one of the two.
15       Q.   And do you -- do you have any
16   personal knowledge of what happened either
17   with what Mr. Trombetta said or did or the
18   mayor's response to it?
19       A.   That would have been -- if the
20   lawsuit was around the year 2000, I would
21   have been 11 or 12 years old.  My focus
22   wasn't on this stuff.
23       Q.   So is the answer you do not have
24   personal knowledge?

217

1        A.   I don't recall at this time.
2        Q.   Jennifer McMillan, who is she?
3        A.   She worked for the village.
4        Q.   What was her job?
5        A.   I know she worked at the desk.
6    I don't know exactly what she did here.
7    She was here quite sometime and her father
8    had just passed away right before all of
9    this stuff happened and a custom -- if
10   you want to ask what customs are, in this
11   town, everybody is perceived to have clout
12   or most people are perceived to have what
13   is called clout in this town and the new
14   custom apparently is once you're perceived
15   clout or what people call clout around
16   town dies, then so does your career.
17            And that -- I'm not saying
18   that applies to me in any way whatsoever.
19   I'm speaking specifically to Jennifer
20   McMillan.
21       Q.   When did she leave village's
22   employment?
23       A.   She didn't leave.  She was fired.
24       Q.   When was she fired?

John Scatchell, Jr.
August 5, 2020

218

1    A.   I think it was this year.  And
2 another -- and another person that I
3 actually do recall now and I don't have
4 firsthand knowledge of it, but it's rumors
5 around town would be Jimmy Principe.
6         And the rumor around town
7 is he was fired for the mayor's speech
8 because the mayor was the one referring
9 to him as derogatory terms.
10    **Q.   So Jennifer --**
11    A.   They used his -- they used it as
12 saying he had used his free speech, that's
13 why we fired him.
14    **Q.   Do you have any personal knowledge**
15 **of Jennifer McMillan complaining about**
16 **somebody sending her a picture?**
17    A.   I heard from many people throughout
18 this town, people that work in this building
19 or visit this building often.  It was a very
20 well-known fact in this town.
21    **Q.   Who did you hear it from?**
22    A.   I can't recall at this time, many
23 people.
24    **Q.   Do you have any firsthand knowledge**

219

1 **as to the reasons why she was fired?**
2    A.   No.  But I know it was in
3 retaliation for what she did.
4    **Q.   How do you know that?**
5    A.   Because that was the word around
6 town.  You don't go against this town and
7 expect to work here.  That's -- that's what
8 they've made abundantly clear.
9    **Q.   Anything else?**
10    A.   Just like when they sent
11 Attorney Scatchell a letter saying something
12 to the effect of she took an adverse action
13 because of Kyll's thing.  It's black and
14 white that if you oppose the village, guess
15 what, your time is running out as to your
16 employment.  You can't have an opinion that
17 differs from the village and still work
18 here.
19    **Q.   Who made the decision to discharge**
20 **Jennifer McMillan?**
21    A.   I would have to assume that came
22 from either Christine Piemonte or Mayor
23 Serpico.
24    **Q.   You don't know?**

220

1    A.   No, but, I mean, her direct
2 supervisors would have been -- well,
3 Christine is head of HR and the mayor
4 is the mayor.  So...
5    **Q.   Who was her direct supervisor?**
6    A.   I wouldn't know.  Christine
7 Piemonte being head of HR, but aside from
8 that, I don't know any of the structure
9 in this particular building.  I can't speak
10 to that.
11    **Q.   Do you have -- so we've talked**
12 **about several individuals and other than**
13 **those individuals.**
14        **Do you have any knowledge**
15 **of a practice within the Village of Melrose**
16 **Park of retaliating against people for**
17 **exercising First Amendment rights?**
18    A.   It seems to be a practice, yeah,
19 or a common theme --
20    **Q.   Okay.**
21    A.   -- that if you speak out against
22 the village, your days are numbered.
23    **Q.   Other than with respect to the**
24 **individuals that you just mentioned, Jeff**

221

1 **Juan, Devon Moss, Mark Lockton, Gil Espinosa,**
2 **Angela Williams, Mark (sic) Trombetta,**
3 **Jennifer McMillan and Jimmy Principe --**
4    A.   I think it was Mario, Mario
5 Trombetta.
6    **Q.   Mario.  Sorry.**
7    A.   No worries.
8    **Q.   Do you have personal knowledge**
9 **of anyone else who you believe was subjected**
10 **to a practice of retaliation?**
11    A.   Johnny Simpson, Sr.
12    **Q.   Anybody else?**
13    A.   Sam stuffed him in the hole,
14 made his shift 8:00 p.m. to 4:00 a.m.
15    **Q.   Anybody else?**
16    A.   Not that I can recall at this time.
17    **Q.   When was -- when you're saying**
18 **Johnny Simpson, Sr. he was made station**
19 **supervisor?**
20    A.   I believe that was the title given
21 to him.  Nobody ever called it that.
22    **Q.   And your position is that he was**
23 **then assigned to the same office that your**
24 **father was assigned to?**

56 (Pages 218 to 221)

John Scatchell, Jr.
August 5, 2020

222

1    A.   Correct.  This is --
2    Q.   When was that?
3    A.   In the mid-2000s before Simpson
4  retired.
5    Q.   And how do you know that Johnny
6  Simpson engaged in First Amendment protected
7  activity?
8    A.   Because he did something that
9  upset Director Pitassi and that was his
10  response and that was a well-known fact
11  around town and it's something that still
12  bothers people as far as how they can
13  trust Pitassi based on how he treated his
14  best friend.
15    Q.   So my question was how do you
16  know that?
17    A.   Word-of-mouth.
18    Q.   Anything else?
19    A.   That's it.
20    Q.   You filed charges against Deputy
21  Chief Castellan with the Board of Fire and
22  Police Commissioners, right?
23    A.   I did.
24    Q.   One of -- one of the allegations

223

1  in those charges was that Deputy Chief
2  Castellan had changed an odometer reading
3  on the car that he sold.
4        Do you recall that?
5    A.   I recall something about that.
6    Q.   What firsthand knowledge do you
7  have about Deputy Chief Castellan doing
8  anything with an odometer of a vehicle
9  that he sold?
10    A.   I believe -- and I'm not clear
11  exactly how the chain of events worked,
12  but -- and I would -- if I had that document
13  in front of me, I could read what I wrote,
14  but I don't have that in front of me, I
15  believe he had the -- he being Deputy Chief
16  Castellan had sold the car or the Jeep in
17  question to Robert Anzaldi who used to work
18  in the evidence room at the station and now
19  I believe is working again for the village
20  under Castellan and then it was sold to
21  Lieutenant Nowicki at the time and I believe
22  the problem occurred when Lieutenant Nowicki
23  attempted to sell the car and whoever he
24  sold it or tried to sell it to looked up the

224

1  Carfax and noticed the odometer was way off
2  and that was perfectly evident when you put
3  the VIN into Carfax, it confirmed that.
4    Q.   My question to you is what firsthand
5  knowledge do you have of that incident?
6    A.   I was told by somebody who spoke
7  directly to Bobby Anzaldi, Sr.
8    Q.   And who told you?
9    A.   I don't remember who that was at
10  this time.
11    Q.   You don't have any other firsthand
12  knowledge?
13    A.   Just Nowicki running around the
14  station saying do you believe this guy sold
15  me a lemon.
16    Q.   You never had any conversation with
17  Anzaldi about it?
18    A.   Senior?
19    Q.   Whoever the Anzaldi who --
20    A.   It's Anzaldi, Sr.  No, because
21  something happened with Greg Salvi with the
22  evidence room and then shortly thereafter
23  Robert Anzaldi banished from the face of
24  the earth.

225

1    Q.   Have you ever heard Deputy
2  Chief Castellan make any statements
3  regarding that odometer incident?
4    A.   I know I heard them talk about
5  the Jeep.  I don't recall anything about
6  the odometer.
7    Q.   Anything else?
8    A.   No.
9    Q.   You also made allegations against
10  Deputy Chief Castellan regarding some
11  ammunition issues.
12        Do you recall that?
13    A.   Oh, I do.
14    Q.   What personal knowledge do you
15  have regarding the ammunition issues?
16    A.   The on-duty CSO at the time told
17  me exactly when Castellan and his nephew,
18  Robert Anzaldi, Jr., took the ammunition
19  out of the CSO office on July 4th when
20  they knew nobody else would be there besides
21  the CSO and they told the CSO you didn't
22  see nothing and then they had the CSO prior
23  to that put a note on there do not touch
24  ammunition per Deputy Chief Castellan.

57 (Pages 222 to 225)

John Scatchell, Jr.
August 5, 2020

226

1    Q.   Who was that CSO?
2    A.   I don't recall at this time.
3    Q.   Any other firsthand knowledge about
4  that incident?
5    A.   Just that it's never, never been
6  addressed.  Nobody has ever said where this
7  ammunition went.  All the range guys said
8  it was missing.  It never -- it never showed
9  up and then all of a sudden ammunition showed
10  up one day out of nowhere and everybody found
11  that to be quite odd and then they changed
12  the keys.  There was all kind of things that
13  went on with the range.
14    Q.   And how do you know it was never
15  addressed?
16    A.   Well, if it was, there was obviously
17  no transparency which is the exact issue as
18  to why we're here, disparate treatment, zero
19  transparency.  You do something wrong, you
20  should expect to be disciplined.
21    Q.   So you believe --
22    A.   Certain people don't get disciplined.
23    Q.   Okay.  So you believe any time any
24  officer is disciplined no matter what that

227

1  that should be communicated to everybody in
2  the department?
3    A.   Any time that somebody is made
4  an example of, they purposely put that
5  information out there, be it, the to/from
6  will be left on desks in roll call or
7  whatever.  It's all mind games, so, yes,
8  I believe that information would have
9  been outed.
10    Q.   That wasn't what I asked you.
11    A.   Okay.  Repeat what you asked me.
12    Q.   What I asked is should it be?
13    A.   Should it be?  I think so, yes,
14  absolutely.  I think that other officers
15  should know if I screw up in this regard,
16  I have this to look at.  Not, oh, this
17  guy did this, but then I do the same thing
18  perhaps and I'll get 15 days, he gets nothing
19  or I'll get fired and he gets nothing, I'll
20  get suspended and he gets nothing or vice
21  versa.  It just depends who you're friends
22  with.
23
24

228

1      (Document marked as Scatchell
2       Junior Exhibit No. 43 for
3       identification, 08/05/2020.)
4  BY MR. FOWLER:
5    Q.   Take a look at Exhibit No. 43,
6  please.
7      (Document tendered
8       to the witness.)
9  BY THE WITNESS:
10    A.   (Witness complied.)
11  BY MR. FOWLER:
12    Q.   Did you receive this on or about
13  December 8th, 2017?
14      MR. COOPER:  Hold on one
15    second.  I would take the Fifth.
16  BY THE WITNESS:
17    A.   Fifth Amendment.
18      (Document marked as Scatchell
19       Junior Exhibit No. 44 for
20       identification, 08/05/2020.)
21  BY MR. FOWLER:
22    Q.   Take a look at Exhibit 44, please.
23      (Document tendered
24       to the witness.)

229

1  BY THE WITNESS:
2    A.   (Witness complied.)
3  BY MR. FOWLER:
4    Q.   Did you receive Exhibit 44 on
5  or about December 21st or 22nd of 2017?
6    A.   Fifth Amendment.
7      MR. FOWLER:  Let's take five
8    minutes.
9      (Whereupon, after a short
10       break was had, the following
11       proceedings were held
12       accordingly.)
13  BY MR. FOWLER:
14    Q.   Mr. Scatchell, is there anything
15  that you can think of that's relevant to
16  your father's lawsuit that we haven't talked
17  about today?
18    A.   That I could add at this particular
19  time, not that I can recall.
20    Q.   And that goes right to my next
21  question.  Is there anything that you'd
22  like to add to what we talked about today
23  that you feel like you didn't have an
24  opportunity?

58 (Pages 226 to 229)

John Scatchell, Jr.
August 5, 2020

230

1         MR. CASPER:  Objection to
2    the extent it calls for a narrative.
3   BY MR. FOWLER:
4       **Q.   You can answer.**
5       A.   At this time nothing that comes
6   to mind.
7       **Q.   There were a few times where I**
8   **asked you a question and you said you didn't**
9   **understand or you asked me to rephrase,**
10  **right?**
11          **Do you recall that?**
12      A.   Yes.
13      **Q.   In all of the other times when**
14  **you answered it, it was -- you understood**
15  **the questions and you were doing your best**
16  **to answer them?**
17      A.   I believe I was, yes.
18      **Q.   And have I been courteous and**
19  **professional to you throughout this**
20  **deposition?**
21      A.   You have.
22          MR. FOWLER:  In that case, as
23      they say in Texas, since somebody
24      talked about Texas, pass the witness.

231

1         MR. BERSANI:  I have no
2    questions.
3         MR. WOERNER:  I have nothing
4    either.
5         MR. CASPER:  I didn't know you
6    were done, Jeff.
7         Let me just talk to my
8    co-counsel for a second.
9         MR. FOWLER:  Okay.
10        (Whereupon, after a short
11        break was had, the following
12        proceedings were held
13        accordingly.)
14  C R O S S - E X A M I N A T I O N
15        by Mr. Casper
16      **Q.   Good afternoon, Mr. Scatchell.**
17  **I know it's been a long**
18  **day.  I don't want to keep you much longer**
19  **than you need to be.**
20          **You took the Fifth on**
21  **some issues that I was planning on asking**
22  **you about.  So I'm not going to go into**
23  **those topics.**
24          **There are a couple of**

232

1   **things I do want to follow-up on.  Number**
2   **one, you mentioned early on in your**
3   **testimony that there was something -- and**
4   **I didn't quite understand how this came**
5   **up, so forgive me.**
6       A.   Okay.
7       **Q.   There was something called the**
8   **Scatchell tax, your words.**
9       A.   Yes.
10      **Q.   Did you say those words?**
11      A.   I did.
12      **Q.   What does that refer to as you were**
13  **using it here today?**
14      A.   That refers to and arguably I was
15  the founding member of the Scatchell tax
16  because they came after me because of my
17  father, but that's what it's referred to
18  at the station.
19          When they either look
20   over, treat poorly or do something to
21  anybody that was either close to me or my
22  father, it's referred to as the Scatchell
23  tax.
24      **Q.   Who have -- who have you heard**

233

1   use that phrase Scatchell tax around Melrose
2   **Park police station --**
3       A.   My entire --
4       **Q.   -- let me finish --**
5       A.   I'm sorry.
6       **Q.   -- when you were working there?**
7       A.   My entire shift at the time in 2018
8   used it.  It was actually -- everybody kind
9   of would even bust balls about it, they'd
10  say, hey, the Scatchell tax, you guys are
11  paying the Scatchell tax, right?  Yeah, me
12  too.
13      **Q.   Did you ever hear Deputy Chief**
14  **Michael Castellan use the phrase Scatchell**
15  **tax?**
16      A.   Not personally, no.
17      **Q.   Did you ever hear Mr. Rogowski**
18  **use that phrase?**
19      A.   No, I did not.
20      **Q.   Did you ever hear Mr. Pitassi**
21  **use that phrase?**
22      A.   Not that I can recall.
23      **Q.   How many different dates would**
24  **you say, if you could estimate, did you**

John Scatchell, Jr.
August 5, 2020

234

1  hear other officers using the phrase
2  Scatchell tax around the police station?
3      A.   I would probably say the entire
4  last year I worked on the street.
5      Q.   And what year would that have
6  been?
7      A.   2018.
8      Q.   Is that a term -- who came up
9  with that term, if you know?
10     A.   The guys in -- just random guys
11  in the station.  I don't know who came up
12  with it.
13     Q.   Did you come up with it?
14     A.   No.
15     Q.   And was it being used in a joking
16  fashion or some other fashion, you tell me?
17     A.   Both.  People that really weren't
18  in our party would use it in a joking fashion
19  like, hey, did you pay the Scatchell tax?
20  Yeah, I didn't get promoted.  How about
21  you?  Nope, not me either.  But those were
22  guys that never were involved in any of
23  this.  More so, it's meant to talk about
24  friends of mine, close friends of mine

235

1  that have been clearly overlooked for
2  promotions that they deserve or people
3  who were loyal to my father and voted a
4  certain way against Kyll or a certain way
5  for the election, they were treated poorly.
6  Either way were -- I mean --
7      Q.   Does that mean Scatchell tax
8  that those individuals were being treated
9  poorly by Mr. Scatchell and yourself?
10     A.   No.
11     Q.   Is that -- well --
12     A.   It means that --
13     Q.   Let me finish the question.
14          Who does it refer to as
15  treating them poorly?
16     A.   The administration/the village.
17          MR. BERSANI:  Hold on.
18      Objection to the vagueness of
19      the question.
20  BY MR. CASPER:
21     Q.   You can answer if you understand.
22     A.   The administration/village.
23     Q.   All right.  So the Scatchell
24  tax as it's being thrown around by officers,

236

1  as you're describing it, that refers to the
2  administration treating officers badly as
3  a result of their positions being aligned
4  with the Scatchells, is that kind of the
5  gist of it?
6      A.   Right.  If you're friends with the
7  Scatchells --
8          MR. BERSANI:  Hang on.
9      Objection --
10  BY THE WITNESS:
11     A.   If you're friends with --
12          MR. BERSANI:  Hang on.
13          THE WITNESS:  I didn't know
14      if you were done or not.
15          THE COURT REPORTER:  Can
16      you repeat that for me, please,
17      Mike?
18          MR. BERSANI:  I'm going to
19      object to the lack of foundation
20      of the question.
21  BY MR. CASPER:
22     Q.   You can answer.
23     A.   Could you repeat it one more
24  time?

237

1          MR. CASPER:  Could you read
2      the question back, please?
3          (Whereupon, the requested
4          portion of the record was
5          read accordingly.)
6  BY MR. CASPER:
7      Q.   Let me rephrase that question.  It
8  was awkwardly worded.
9          So is the phrase Scatchell
10  tax, is that referring to officers complaining
11  about being treated badly by the administration
12  as a result of being perceived as aligned with
13  the Scatchells?
14     A.   Yes.
15          MR. BERSANI:  Same objection.
16  BY MR. CASPER:
17     Q.   In your own words, can you describe
18  what the Scatchell tax is?
19     A.   It's basically you showed support
20  or friendship for the Scatchells, you're not
21  going to get anything.  You put your feet
22  up in the air, we're going to fire you
23  just like them.
24     Q.   And who is going to be engaging

60 (Pages 234 to 237)

John Scatchell, Jr.
August 5, 2020

238

1  in the punishing acts as officers are using
2  that phrase?
3      A.   The administration.
4          MR. BERSANI:  Same objection,
5      lack of foundation, vague --
6  BY THE WITNESS:
7      A.   The administration --
8          MR. BERSANI:  -- assumes facts
9      not in evidence.
10 BY THE WITNESS:
11     A.   -- particularly Deputy Chief
12 Castellan at the time and Director Pitassi
13 at the time.
14 BY MR. CASPER:
15     Q.   And how many other of your fellow
16 officers when you were working here did you
17 use -- did you hear use the phrase Scatchell
18 tax?
19     A.   Dozens.
20     Q.   And was this something you hear on a
21 daily basis, weekly basis --
22     A.   Daily.
23     Q.   Let me finish the question.
24          Was this something you'd

239

1  hear on a daily basis, weekly basis, monthly
2  basis or something else?
3      A.   Daily.
4      Q.   And did you ever hear officers
5  use the term Scatchell tax in the presence
6  of Mr. Rogowski?
7      A.   Like I said earlier with Mr. Fowler,
8  once I left Rogowski's shift, he had nothing
9  to do with me, so him and I were never really
10 in the vicinity of each other much.  So my
11 answer to that would be, no, I don't recall
12 that.
13     Q.   Do you recall any officers using
14 the phrase Scatchell tax in front of
15 Mr. Castellan?
16     A.   Not that I recall, but I'm sure
17 he's well-aware of the phrase.
18     Q.   Did you ever hear any officers
19 use the phrase Scatchell tax in front of
20 Mr. Pitassi?
21     A.   Not that I can directly recall
22 at this time.
23     Q.   Did you ever hear any officers
24 complaining to sergeants or lieutenants

240

1  about the fact that the phrase Scatchell
2  tax was being bandied about?
3      A.   They never complained about the
4  phrase.  They complained about their
5  treatment.
6      Q.   Okay.  And who was subject to
7  this Scatchell tax according to what you
8  heard?
9      A.   I remember one of the big people
10 that I first heard it from was Brian Jarecki.
11     Q.   Who?
12     A.   Brian Jarecki.
13     Q.   Could you spell that last name?
14     A.   J-A-R-E-C-K-I.
15     Q.   And did you hear Brian Jarecki
16 use the phrase Scatchell tax yourself?
17     A.   Yes.
18     Q.   And where were you when you heard
19 that?
20     A.   Roll call.
21     Q.   Where was that roll call held?
22     A.   Melrose Park police department.
23     Q.   Do you remember what month and
24 year this was approximately?

241

1      A.   No, I don't.
2      Q.   Do you remember what shift this
3  was on?
4      A.   It was when my shift would have
5  been starting, I was sitting in roll call
6  and Jarecki was walking into the supervisor's
7  office talking about the Scatchell tax and
8  how he'll never get promoted because he
9  voted for my dad.
10     Q.   All right.  Now, what time -- I
11 don't know when that roll call would have
12 been held here.  You tell me --
13     A.   I --
14     Q.   Let me finish the question.
15          What time of day was that
16 roll call held where you heard Mr. Jarecki
17 make that statement?
18     A.   It would have been -- can you
19 repeat that one more time?  I'm sorry.
20          MR. CASPER:  Can you read
21     the question back, please?
22          (Whereupon, the requested
23          portion of the record was
24          read accordingly.)

61 (Pages 238 to 241)

John Scatchell, Jr.
August 5, 2020

242

1  BY THE WITNESS:
2      A.   I would have to guess it was
3  afternoon shift when I was coming into
4  work.
5  BY MR. CASPER:
6      Q.   What range of hours would that
7  have been where you would have been coming
8  to work?
9      A.   4:00 to midnight.
10     Q.   And this was close to the beginning
11 of the shift when you heard this?
12     A.   This was in my roll call.  So he
13 was getting done with his shift as we were
14 starting ours.
15     Q.   And how far away from Mr. Jarecki
16 were you when you heard him begin this
17 conversation?
18     A.   Inches.  Inches.
19     Q.   And who else was present at the
20 time in the immediate vicinity?
21     A.   Whoever was in the supervisor's
22 office and whoever was in roll call because
23 where I used to sit in roll call a lot of
24 times was the very first chair outside the

243

1  supervisor's office.
2      Q.   Now, that supervisor's office is
3  it appended directly to the roll call room?
4      A.   Yes.
5      Q.   And was there, in fact, a supervisor
6  in that office at that time?
7      A.   Several.
8      Q.   Do you know by what rank those
9  individuals in there were at that time?
10     A.   Sergeants and lieutenants.  I don't
11 remember specifics as to who was in the room.
12     Q.   But you're certain there were
13 sergeants and lieutenants in that room at
14 that time?
15     A.   He was complaining to his lieutenant.
16     Q.   Brian Jarecki was complaining to
17 the lieutenant.
18          And what did you hear Brian
19 Jarecki say at that time?
20     A.   I heard him say I'm going to be
21 paying the Scatchell tax for life because
22 I voted for John in the presidency.  I mean,
23 he wasn't -- it wasn't saying it like he
24 was upset, he was upset that he voted for

244

1  dad.
2          He was upset at what they
3  did to him because of his right to vote.
4  I mean, just like we're told in roll call
5  to go early vote because the mayor likes
6  it.
7      Q.   Did you hear any responses to
8  that statement by Mr. Jarecki?
9      A.   Once -- I mean, because like I
10 said when he made the statement, he was
11 walking into the office, he was mere
12 inches from me.  Once he gets in the
13 office, then the sound becomes a little
14 more distorted especially as your supervisors
15 are discussing whatever's going on for
16 that day.
17     Q.   So your answer is, no, you didn't
18 hear any other statement made in response
19 to Mr. Jarecki's?
20     A.   That I can recall at this time,
21 no.
22     Q.   Did you say anything in response
23 to that?
24     A.   No.

245

1      Q.   Were there any other officers
2  in the roll call room at that time?
3      A.   Everybody was working a shift
4  that night.
5      Q.   And did you hear any other
6  officers in the roll call room make any
7  statements in response to what Mr. Jarecki
8  said?
9      A.   I remember guys just kind of
10 snickering or -- yeah, the Scatchell tax
11 or wolf pack or stuff like that.
12     Q.   Wolf pack?
13     A.   Uh-huh.
14     Q.   What's that?
15     A.   That was what the administration
16 referred to my dad and his friends as, the
17 wolf pack.
18     Q.   Who from the administration
19 referred to your dad and his friends as
20 the wolf pack?
21     A.   I believe Castellan and Pitassi
22 both.
23     Q.   Did you ever personally hear them
24 use that phrase?

L.A. Court Reporters, L.L.C.
312-419-9292

John Scatchell, Jr.
August 5, 2020

246

1    A.   Yes.
2    Q.   What does that mean, the wolf
3 pack, as far as you understand it?
4    A.   I couldn't even really put a
5 guess. I just assumed that they wanted
6 to put some type of moniker into their --
7 what they perceived to be there enemies.
8    Q.   All right. All right. All
9 right. How many times did you hear the
10 phrase wolf pack used by Mr. Castellan
11 in reference to your dad, you personally?
12   A.   I know I heard him say MAC pack
13 versus wolf pack several times.
14   Q.   MAC pack?
15   A.   Uh-huh. That was his crew.
16   Q.   What's that?
17   A.   That was his crew. Anybody --
18   Q.   Whose crew?
19   A.   Deputy Chief Castellan. Anybody
20 that was in his crew -- to be clear his
21 initials are Michael A. Castellan. MAC
22 pack stands for M-A-C pack.
23   Q.   All right. Going back to the
24 original question, how many times did you

247

1 hear Mr. Castellan refer to your father
2 and his friends as the wolf pack?
3    A.   Several.
4    Q.   Can you give me any specifics
5 about any of those times that you heard
6 that?
7    A.   I remember, yeah, wolf pack
8 versus MAC pack, we're ready whenever
9 they're ready and just the rah-rah nonsense
10 from his office.
11   Q.   Okay. Did you actually hear
12 Mr. Castellan make statements along the
13 lines of what you just said?
14   A.   For roll call, yeah.
15   Q.   How many times did you hear
16 Mr. Castellan make those kinds of
17 statements that you just articulated?
18   A.   Several.
19   Q.   Over what time period?
20   A.   That same exact time period that
21 I just described, right around when the
22 Scatchell tax discussion was going around
23 that was -- all these different monikers
24 and nicknames were going around because

248

1 you have to understand one thing, guys,
2 especially policemen, love to talk.
3    Q.   Okay. I just want to get the
4 facts here. Okay.
5    A.   Go ahead.
6    Q.   So just answer my question.
7    A.   Uh-huh.
8    Q.   What time period did you start
9 hearing the Scatchell tax phrase being
10 used?
11   A.   I would say right around the time
12 period of why my dad showed his support for
13 Kyll.
14   Q.   Okay. Can you put a month and
15 year on that when you started to hear this?
16   A.   I would say in the 2017 timeframe.
17   Q.   And how long after that did you
18 continue to hear the phrase Scatchell tax
19 being used around the department?
20        MR. BERSANI: Object to the
21        lack of foundation.
22 BY MR. CASPER:
23   Q.   How long after that?
24   A.   Until the last day I worked the

249

1 street.
2    Q.   And that was when?
3    A.   They pulled me off the street
4 sometime in November.
5    Q.   Now, this wolf pack thing, can
6 you put a month and year when you first
7 started hearing that phrase being used
8 around the police station?
9    A.   Probably shortly after I got
10 hired.
11   Q.   When would that have been?
12   A.   I would say that I first heard
13 it in the year 2013.
14   Q.   And MAC pack, can you put a
15 month and year when you first heard that?
16   A.   Same timeframe.
17   Q.   All right. Now, wolf pack, was
18 that ever used, as you took it, in a
19 derogatory fashion towards your father?
20   A.   Absolutely.
21   Q.   Okay. In your own words, I
22 mean, I don't quite get this, how is wolf
23 pack derogatory? Can you explain that
24 to me?

John Scatchell, Jr.
August 5, 2020

250

```
1        A.   Because he was --
2        MR. BERSANI:  Hang on.
3        THE WITNESS:  Go ahead.  I'm
4    sorry.  Go ahead.  Go ahead.
5        MR. BERSANI:  I want to speak
6    before you answer.
7        Object to lack of
8    foundation.
9    BY MR. CASPER:
10       Q.   You can answer.
11       THE WITNESS:  Can you repeat
12   the question one more time?  I'm
13   sorry.
14       (Whereupon, the requested
15        portion of the record was
16        read accordingly.)
17   BY THE WITNESS:
18       A.   Yeah, it's derogatory because he's
19   pigeonholing anybody that he perceives to be
20   a friend of my father into this group which
21   he now has shown that he perceives them
22   to be the enemies, the MAC pack versus
23   the wolf pack.
24       What is that supposed to
```

251

```
1    mean?  Are we having a backyard fight?
2    BY MR. CASPER:
3        Q.   And who is the he you're referring
4    to?
5        A.   Deputy Chief Castellan.
6        Q.   Did you ever hear of Mr. Pitassi
7    refer to your father as wolf man or wolf
8    pack?
9        MR. BERSANI:  Object, wolf
10       man was never used.
11       Mischaracterizes his
12       testimony.
13   BY MR. CASPER:
14       Q.   Okay.  Well --
15       A.   Yeah, I've heard him say wolf
16   pack and stuff like that.
17       Q.   And can you recall any specific --
18       MR. BERSANI:  Object to
19       vagueness.
20   BY MR. CASPER:
21       Q.   Now, can you recall any specific
22   incidents where you heard Mr. Pitassi refer
23   to your father as wolf pack?
24       A.   In the sense of any time he had
```

252

```
1    a conversation with my dad, he would mock
2    him like, ah, the wolf pack wants this,
3    the wolf wants that, the wolf pack wants
4    this.
5        Q.   That would be Mr. Pitassi?
6        A.   That would be Mr. Pitassi.
7        Q.   And were you ever present to hear
8    that personally?
9        A.   Yes.
10       Q.   How many times?
11       A.   Any time I was inside the station,
12   you could pretty much guarantee you're going
13   to get some kind of gold nugget from Sam's
14   mouth.  He -- he literally screams at the
15   top of his lungs from his office or rants
16   and raves and walks down the hallway past
17   the CSO office, past the mail room, past
18   the traffic office, so there's lots of
19   people that hear that stuff he says.
20       Q.   And as long as we're on the
21   subject, you stated early on in your
22   examination by Mr. Fowler that you heard
23   Mr. Pitassi use the N word.
24       Did I hear you say that?
```

253

```
1        A.   I personally have heard him say
2    a lot of swears.  The N word, I was told
3    that he said that from my father in a meeting
4    with him about Kyll.
5        Q.   Okay.  Have you ever personally
6    heard Mr. Pitassi use the N word?
7        A.   When I was at his house as a child,
8    all the time.
9        Q.   Okay.  How many times did you
10   hear Mr. Pitassi use the N word in that
11   capacity?
12       A.   Almost every other word at times.
13       Q.   All right.  How long has it been
14   since you heard Mr. Pitassi use the N word?
15       MR. BERSANI:  Object to
16       the form, lack of foundation,
17       vague.
18   BY THE WITNESS:
19       A.   I stopped hanging around with his
20   kid around 8th grade, so I would say that
21   the last time I physically was present to
22   hear him say the N word would have been
23   around that time, so I don't know, I was
24   14 maybe.
```

64 (Pages 250 to 253)

John Scatchell, Jr.
August 5, 2020

254

1    BY MR. CASPER:
2        Q.    All right.  And I just want to
3    get this clear, when did you hear that
4    Mr. Pitassi used the N word in reference
5    to Kyll?
6        A.    As soon as my dad left his office.
7        Q.    Month and year?
8            MR. BERSANI:  Wait, wait.
9        Can we get some foundation for
10        this?
11            MR. CASPER:  I'm doing that.
12    BY MR. CASPER:
13        Q.    Month and year, please?
14        A.    Shortly after he filed his grievance
15    so that would have been like late 2016.
16        Q.    Who filed what grievance?
17        A.    Kyll filed his grievance.
18        Q.    Okay.  So where are you when you
19    hear this from Mr. Scatchell?
20        A.    From my father?
21        Q.    Yes.
22        A.    In the house that we shared together.
23        Q.    All right.  And do you recall --
24    I know Mr. Fowler asked you some of this.

255

1    What did you say to your father and what
2    did he say to you in this conversation about
3    the N word?
4        A.    Again, it was a long time ago.
5    I just remember what he told me that Pitassi
6    referred to Kyll as a nigger and a bunch of
7    other whatever the hell he said, but that
8    was what stuck out to me the most.  I
9    mean --
10        Q.    Do you remember?
11        A.    -- he's the same person he was
12    when I grew up with his son --
13        Q.    Do you remember anything --
14        A.    -- didn't change.
15        Q.    Go ahead.  I'm sorry.
16            In this conversation between
17    you and your father, this occurs in your house,
18    do you remember any other words that your
19    father used or that you used to your father
20    in this conversation?
21        A.    Not at this time I don't recall.
22        Q.    And did this conversation occur
23    before or after you learned that Kyll
24    Lavalais filed a grievance over the residency

256

1    issue?
2        A.    It occurred after.
3        Q.    How did this conversation between
4    you and your father come up?
5        A.    Just that do you believe what this
6    guy is trying to pull.
7            MR. BERSANI:  Let me object
8        to the lack of foundation as to
9        that question, the previous one
10        you just asked.  Go ahead.
11    BY MR. CASPER:
12        Q.    How does this conversation
13    between you and your father where your
14    father says Pitassi used the N word,
15    how does this conversation start?
16        A.    He goes he is trying to fire
17    Kyll when Kyll has every right to not
18    live in town according to that decree.
19        Q.    Now, that statement, is that
20    something your father said or something --
21        A.    That's something that I'm
22    paraphrasing because I don't really
23    remember much of the particulars of the
24    conversation.

257

1            I remember the crux of
2    it was Sam called Kyll a nigger and that's --
3    I don't know how you remain in police and
4    law enforcement and use that kind of
5    language.
6        Q.    Okay.  And did you ever hear
7    around the station Mr. Lavalais being
8    referred to as the N word by any other
9    officers?
10        A.    Not that I can recall at this
11    time.
12        Q.    And when you were working at the
13    police station, how many of your fellow
14    officers were African-American, if you know?
15        A.    Strike my last answer.  I'd like
16    to reanswer.
17        Q.    Okay.
18        A.    Dino Dimaio.
19        Q.    What did Dino Dimaio with respect
20    to --
21        A.    Uses the N word constantly.
22        Q.    How frequently have you heard
23    Mr. Dimaio --
24        A.    Any time he encounters a black

65 (Pages 254 to 257)

John Scatchell, Jr.
August 5, 2020

258

1    subject on a call which are calls he
2    shouldn't be on because he's a station
3    supervisor for the last four years by
4    the by.
5        Q.   My question is how often have
6    you heard Mr. Dimaio use the N word in
7    reference to African-Americans?
8        A.   Very often.
9        Q.   Did that include --
10       A.   It wasn't -- it wasn't restricted
11   to just the N word either.
12       Q.   Is that -- did you ever hear
13   Mr. Dimaio us the N word in reference to
14   Kyll Lavalais?
15       A.   Yes.
16       Q.   How many times?
17       A.   At least once.
18       Q.   And was that in your presence?
19       A.   No.  I was told what he said.
20       Q.   By whom?
21       A.   People who were sitting with him
22   and Lieutenant Maiello.
23       Q.   Okay.  Lieutenant Nunzio Maiello?
24       A.   It is.

259

1        Q.   All right.  What did you hear
2    about Mr. Dimaio saying with respect to
3    Kyll?
4        A.   Just after -- it was shortly after
5    that meeting where him and Kyll had words
6    over Kyll's arbitration and just talk of if
7    anybody on our shift supports that nigger,
8    they're going to have to really fucking pay
9    for it --
10       Q.   Okay.
11       A.   -- and that was what I was told.
12       Q.   Someone told you that there was a
13   conversation where that was stated?
14       A.   Yes.
15       Q.   Who told you that?
16       A.   Somebody from my shift.  I don't
17   recall.
18       Q.   Who?
19       A.   I don't recall at this time.
20       Q.   Was it an officer?
21       A.   Definitely.
22       Q.   Okay.  A young officer, old officer?
23       A.   I don't recall at this time.
24       Q.   Male or female?

260

1        A.   There's not many female officers.
2        Q.   And where were you when this officer
3    relays to you this conversation?
4        A.   It probably would have been at
5    Bakers Square or something like that where
6    we would have -- a lot of time at night on
7    the 4:00 to 12:00 shift, we would all get
8    together, we would march down, we would have
9    a cup of coffee or something to keep us at
10   our peak performance through the twilight
11   hours of the evening.
12       Q.   And how many officers present for
13   this conversation?
14       A.   It could have been any more --
15   or it could have been up to six to ten
16   officers.
17       Q.   And do you remember a month and
18   year where this conversation occurs?
19       A.   I'd have to say it was shortly
20   right after the arbitration hearing.  So
21   probably right around the time I went to
22   Dino's shift and that's when I heard it.
23   So it would be early '17.
24       Q.   Early '17, is that?

261

1        A.   2017.
2        Q.   Is that before or after Kyll's
3    arbitration hearing?
4        A.   I believe that's after.
5        Q.   All right.  Well, you testified
6    a minute ago about there was some meeting
7    where Dimaio and Lavalais had words?
8        A.   That was at the arbitration
9    hearing --
10       Q.   Okay.
11       A.   -- or when we were discussing a
12   vote to arbitrate for Kyll.
13       Q.   Okay.  So was your meeting with
14   this individual where you heard about --
15   you heard about Dimaio using the N word,
16   was that before or after the FOP meeting
17   discussing voting on Kyll's arbitration?
18       A.   After.  I believe the timeline
19   of events was we had a meeting about
20   arbitrating and then another meeting to
21   vote it.  I'm not positive on that.
22       Q.   So my question is where you
23   hear this -- it said that Dimaio called
24   Lavalais -- refer to Lavalais as the

66 (Pages 258 to 261)

John Scatchell, Jr.
August 5, 2020

262

1  **N word --**
2      A.  Uh-huh.
3      **Q.  -- does that happen before the**
4  **first meeting where the -- Kyll's arbitration**
5  **is discussed or after that meeting?**
6      A.  I believe --
7          MR. BERSANI:  Object to lack
8      of foundation.
9  BY THE WITNESS:
10     A.  I believe it directly followed
11 when him and Kyll argued with each other
12 at that meeting.
13 BY MR. CASPER:
14     **Q.  What meeting did they argue with**
15 **each other?**
16     A.  It was either the arbitration
17 meeting or the meeting before that.  I'm
18 not sure.  Both -- the crux is both meetings
19 were about Kyll arbitrating.
20     **Q.  All right.  Do you understand**
21 **there is a difference between an arbitration**
22 **hearing and a union meeting?**
23     A.  Absolutely.
24     **Q.  Okay.  Is this a union meeting you**

263

1  **were referring to?**
2      A.  Yes, this is an FOP union meeting.
3      **Q.  All right.  And you're not referring**
4  **to the arbitration hearing when you're talking**
5  **about --**
6      A.  No.
7      **Q.  -- when you heard about Dimaio**
8  **refer -- okay.**
9          **What do you hear about**
10 **Dimaio saying about Lavalais?**
11     A.  I was told that if anybody shows
12 support for this nigger that they're really
13 going to pay for it and that's his exact
14 words to whoever told me and it went around
15 through our shift.
16     **Q.  All right.  Other than that, have**
17 **you ever heard anyone else refer -- heard**
18 **or heard of anyone else referring to Kyll**
19 **Lavalais with a racially derogatory term?**
20     A.  Other than Dino Dimaio, not
21 that I can recall off the top of my head
22 right now.
23     **Q.  Now, you mentioned Nunzio Maiello**
24 **a moment ago?**

264

1      A.  Yes.
2      **Q.  All right.  And is that person a**
3  lieutenant or some other officer here at the
4  department?
5      A.  He was lieutenant.
6      **Q.  Is he still here?**
7      A.  I believe so.
8      **Q.  All right.  Now, did you ever**
9  **hear an allegation that Mr. Maiello was**
10 **accused of hunting while on sick leave?**
11     A.  I may have.  I don't recall
12 that at this time.
13     **Q.  At any point in time, did anyone**
14 **at the department ever approach you and**
15 **state something to the effect that if your**
16 **dad, John Scatchell, Sr. retires, it will**
17 **save your job?**
18     A.  Yes.
19     **Q.  Okay.  So who -- I'm going to lay**
20 **some foundation now.**
21          **Where does this conversation**
22 **occur?**
23     A.  A lot of conversation at the
24 department occurs in the back lot behind

265

1  the back door.
2      **Q.  I don't care --**
3      A.  I would say that that conversation
4  there took place at the back lot.
5      **Q.  All right.  And who is present**
6  **for this conversation?**
7      A.  I believe I originally heard it
8  I want to say Chane and Vaughn.
9      **Q.  All right.  That's Officer Chane?**
10     A.  Fogg.
11     **Q.  I'm sorry?**
12     A.  Chane Fogg.
13     **Q.  Can you spell that?**
14     A.  C-H-A-N-E, F-O-G-G.
15     **Q.  Is that an officer?**
16     A.  Yes.
17     **Q.  And who is the other party's**
18 **participant?**
19     A.  Vaughn, V-A-U-G-H-N.
20     **Q.  Is that an officer?**
21     A.  Yes.
22     **Q.  Was anybody else present for this**
23 **conversation?**
24     A.  Whoever else was working the shift

L.A. Court Reporters, L.L.C.
312-419-9292

John Scatchell, Jr.
August 5, 2020

266

1  that night.
2      Q.   All right.  And are you physically
3  present to hear this conversation?
4      A.   Yes.
5      Q.   Where are you standing when you
6  hear this conversation?
7      A.   Next to them.
8      Q.   And so it's you --
9      A.   It's in a circle.
10     Q.   Okay.  So you guys are in a circle.
11  Where is the circle?
12     A.   Back door of the station waiting
13  to leave.
14     Q.   What time of day was this?
15     A.   This would have been whatever
16  time we were getting off shift.
17     Q.   And what date was this?
18     A.    It was sometime after the point
19  where I was served with a statement of
20  charges, so sometime in 2018 because I
21  didn't -- I didn't go back to work until
22  the middle of January I believe of 2018.
23     Q.   Can you give me a month on this
24  in 2018?

267

1      A.   I would say it's January --
2  well, I heard -- to be clear that was the
3  first --
4      Q.   Just answer my question.
5      A.   I would say that particular one was
6  January of '18 or February of '18, one of the
7  two.
8      Q.   Okay.  January or February 2018,
9  you're standing in the circle by the station
10  with Chane Fogg and Officer Vaughn, do I
11  have this right?
12     A.   And several other officers that
13  I can't remember.
14     Q.   And what do you hear with respect
15  to your job being saved?
16     A.   That the word around from everybody
17  is if your dad retires, it will save your job
18  and that's what they want, they want your dad
19  out of the picture.
20     Q.   And who stated that?
21     A.   Either Fogg or Vaughn, I'm not
22  sure.
23     Q.   And did anybody else state that?
24     A.   Over the course of time or that

268

1  day?
2      Q.   That day.
3      A.   People nodded in agreement that
4  that's what they had heard but nobody else
5  vocalized it.
6      Q.   Subsequent to that conversation,
7  did you ever hear words to this effect
8  stated again?
9      A.   Many people have come to me and
10  said that.
11     Q.   Such as who?
12     A.   People that don't even work in
13  this town have come to me and said that,
14  you know, Johnny, maybe your father --
15     Q.   Like who?
16     A.   Again, so many people have said
17  it because that was perceived to be the
18  truth.
19     Q.   Such as who?
20     A.   I know my -- my -- a couple
21  neighbors had said it, something like they
22  heard that if your dad retires, it will
23  save your job and then maybe you can go
24  on and still have a career.

269

1          I mean, what kind of
2  answer is that -- or what kind of question
3  is that?
4      Q.   What neighbor said that to
5  you?
6      A.   I don't know, down the block.
7  I can't recall at this time maybe -- maybe
8  Joey Amabile.
9      Q.   Did they say where they heard that
10  from?
11     A.   The powers that be.
12     Q.   Who would that be?
13     A.   The administration, the village
14  or whoever they talk to by proxy and by
15  proxy I mean a lot of times a message will
16  be sent through one person to another so
17  as to not implicate the other person.
18     Q.   All right.  One other thing I want
19  to follow up on and we'll call it quits here
20  is the chief.  You testified that Vito Scavo
21  was being referred to as the chief?
22     A.   Yes.
23     Q.   Okay.  And you heard Michael
24  Castellan refer to him as the chief, is

68 (Pages 266 to 269)

John Scatchell, Jr.
August 5, 2020

270

1  that correct?
2      A.   The chief, chiefy babes, Vito the
3  chief.
4      Q.   All right.  Were you ever in
5  the police station when Michael Castellan
6  referred to Vito Scavo as the chief?
7      A.   Yes.
8      Q.   How many times?
9      A.   Many.
10      Q.   And would he address you?
11      A.   We'd be like -- for example, the
12  one that stands out to me is me and him were
13  walking in the back door -- well, he was
14  walking in from his garage --
15      Q.   You, you and who?
16      A.   Me and Deputy Chief Castellan.
17  I was walking in from where we park the
18  squads which is the same back door.  His
19  parking garage, you could pretty much meet --
20  if you're all going up the stairs, if you
21  walk in the same time, you're going to
22  walk up the same time.
23              So one day, him and I had
24  a conversation in the hallway in the

271

1  stairwell, hey, how's chiefy babes, how's
2  he doing, things like that and when he wants
3  to friendly up, he refers to everybody
4  as babes, Johnny babes, chiefy babes, this
5  babes, that babes.  I don't trust him.
6      Q.   Is Vito Scavo known as chief by
7  anyone else?
8      A.   Only to people that still show
9  him the respect of the position he once
10  held.
11      Q.   Okay.  So is that a nickname for
12  him, chief?
13      A.   I would say.
14      Q.   Do other people call him the chief?
15      A.   Some.
16      Q.   Are you certain that when Michael
17  Castellan had, for example, that conversation
18  with you that you just mentioned, are you
19  certain that he was referring to Vito Scavo?
20      A.   Absolutely.
21      Q.   How are you certain of that?
22      A.   Because I don't have a personal
23  relationship with Chief Pitassi.
24      Q.   And at any other times did Michael

272

1  Castellan mention the chief around you in
2  reference to Vito Scavo?
3      A.   Many of -- no other ones that I
4  can cite in particular besides that one.
5      Q.   That particular one do you
6  remember like a month and year of that?
7      A.   Probably because he was still
8  talking to me at the time so 2014-'15ish.
9      Q.   And did you ever hear Deputy
10  Chief Castellan use the phrase the chief
11  in reference to Vito Scavo after that?
12      A.   Maybe at the Cubs game and that
13  would probably be the last time I heard it.
14      Q.   And so as far as you were aware,
15  based on that conversation, Deputy Chief
16  Castellan, Deputy Chief Castellan knew --
17  strike that question.
18              MR. CASPER:  All right.
19  That's all the questions I have.
20  R E D I R E C T   E X A M I N A T I O N
21          by Mr. Fowler
22      Q.   What is Brian Jarecki's position?
23      A.   Patrol officer.
24      Q.   What's the process for being

273

1  promoted from patrol officer?
2      A.   I believe -- I don't think you
3  have to put in for it.  I believe that
4  they've promoted people without putting
5  in for it, but if it's something that you
6  really want, you should put in a to/from
7  for it.
8      Q.   Isn't there a testing process
9  with the Board of Fire and Police
10  Commissioners?
11              MR. CASPER:  Object to
12  foundation.
13  BY THE WITNESS:
14      A.   For which kind of promotion?
15  BY MR. CASPER:
16      Q.   For promotion from patrolman to
17  sergeant?
18      A.   Patrolman to sergeant, sure.  I
19  wasn't saying that's what Jarecki wanted.
20      Q.   What promotion did he want?
21      A.   He wanted to be put in the tact
22  division again.
23              MR. BERSANI:  Did you say --
24  what was the last word?

69 (Pages 270 to 273)

John Scatchell, Jr.
August 5, 2020

274

1          (Whereupon, the requested
2          portion of the record was
3          read accordingly.)
4    BY MR. FOWLER:
5      Q.   So Jarecki had been in the tact
6    division at one point?
7      A.   Yes.
8      Q.   Do you know what -- why he was
9    moved out of the tact division?
10     A.   Because he testified during Vito's
11   hearing.
12     Q.   What personal knowledge do you
13   have of why he was moved out of tact?
14         MR. CASPER:  Objection, asked
15     and answered.
16   BY THE WITNESS:
17     A.   Just what I was told as to why
18   he was removed and that was what I was told.
19   BY MR. FOWLER:
20     Q.   Who told you that?
21     A.   Many people.
22     Q.   Any of the deputy chiefs tell you
23   that?
24     A.   No.

275

1      Q.   Pitassi tell you that?
2      A.   Not that I recall.
3      Q.   How do you know who voted for and
4    against your father?
5          Well, let me ask you first,
6    do you know who voted for and against your
7    father?
8      A.   Based on --
9          MR. BERSANI:  What are we
10     talking about, Jeff?
11   BY MR. FOWLER:
12     Q.   Let me back up.  You referred to
13   earlier that the Scatchell tax was paid by
14   people who voted against your dad, right?
15     A.   Voted for my dad.
16     Q.   Voted for your dad?
17     A.   Showed support for my dad, yes.
18     Q.   And you're referring to the vote
19   whereby he was running for president of
20   the FOP and he was replaced, is that it?
21     A.   Correct.
22     Q.   All right.  And that was in the
23   fall of 2017, December 2017?
24     A.   I believe it was fall.

276

1      Q.   So --
2          MR. BERSANI:  '17?
3          THE WITNESS:  '16.
4    BY MR. FOWLER:
5      Q.   '16?
6      A.   Yeah, '16.  Sorry.
7      Q.   So referring to that vote, do
8    you know who voted for and against him?
9      A.   Based on what people have told
10   me how they voted, yes.
11     Q.   And it's only based on what people
12   said they voted?
13     A.   No.
14     Q.   So how did that vote take place?
15     A.   In the roll call room in the station.
16     Q.   Okay.  So in the roll call room.
17         Was it hands, was it secret
18   ballot, what was it?
19     A.   I think it was secret ballot.  I
20   don't exactly recall right now.
21     Q.   So the only way you know who voted
22   for and against was based on what people
23   said afterwards about how they voted?
24     A.   No, read the room.

277

1      Q.   Okay.  Anything else?
2      A.   There's FOP meetings every month.
3    All of a sudden every person from the
4    specialty division, every person that was
5    deemed to be a friend of either Castellan,
6    Pitassi or Rogowski showed up.  It seemed
7    like the deck was stacked from the minute
8    he walked in that room, him being my father.
9      Q.   Now, during that vote, none of
10   the deputy chiefs were there, were they?
11     A.   They shouldn't have been.  If
12   they were, they hid pretty well.
13     Q.   You were there, you didn't see
14   them?
15     A.   Just because I didn't see them
16   doesn't mean their presence was there.
17   There was cameras all in that room.
18     Q.   Did you see Pitassi in that room?
19     A.   I didn't.
20     Q.   Any other way you know how people
21   voted during that meeting?
22     A.   Yes, they told me.
23     Q.   Okay.  Anything else?
24     A.   Would you like to know who told me?

L.A. Court Reporters, L.L.C.
312-419-9292

John Scatchell, Jr.
August 5, 2020

278

1    Q.   Not really.
2    A.   Well, Gene Cacciatore told me he
3    did, he voted against my dad and he got
4    promoted.  Luis Flores told me he voted
5    against my dad and he got put in tact and
6    then removed.  Johnny Amabile told me he
7    voted against my dad and he got promoted
8    to tact.
9    Q.   Who voted for your dad -- well,
10   strike that.
11        Who told you that they voted
12   for your dad?
13   A.   That's a slippery slope, Jeff,
14   because then they're going to have to sit
15   here.
16   Q.   So let me ask it this way, who
17   told you that they voted for your dad and
18   then suffered an adverse consequence because
19   of it?
20   A.   Brian Jarecki.
21   Q.   Anybody else?
22   A.   Chane Fogg.
23   Q.   Anybody else?
24   A.   John Menolascino.

279

1        MR. COOPER:  How do you
2        spell that for the court reporter?
3    BY THE WITNESS:
4    A.   M-E-N-O-L-A-S-C-I-N-O.
5        And to be clear, he told
6    me he voted for my father.  I extrapolated
7    the rest.
8    BY MR. FOWLER:
9    Q.   Okay.  Anybody else?
10   A.   Joe Urso and I said Brian Jarecki.
11   I'd have to sit and think about this for
12   a second.  At this time I can't recall any
13   other names, but there are other names
14   obviously.  He had --
15   Q.   What negative thing happened to --
16   A.   -- seventeen votes.
17   Q.   What negative thing happened to Joe
18   Urso?
19   A.   Joe Urso is never going to be
20   promoted anything higher than lieutenant.
21   Q.   He was promoted to lieutenant
22   after that meeting, wasn't he?
23   A.   No, he was not.  He was promoted
24   by Scavo.

280

1    Q.   How do you know he's never going
2    to be promoted above lieutenant?
3    A.   Well, let's revisit the question
4    in five years and we'll answer it.
5    Q.   Okay.  What negative thing happened
6    to John Menolascino?
7    A.   I know he adamantly wanted the
8    tactical division because he's one of my
9    best friends and we had that discussion
10   many times.
11        And I felt there is no
12   better officer in that building still
13   qualified to be in that tact division
14   than John Menolascino and the only reason
15   I figure he wasn't given it was because
16   he was my friend.  And the rumor was his
17   father was told that.
18   Q.   Anything else?
19   A.   That's it.
20   Q.   What negative thing happened to
21   Chane Fogg as a result of voting for your
22   father?
23   A.   Last place on the sergeant's
24   list or within the last three spots and

281

1    he's another guy with a ton of seniority,
2    ton of knowledge, has no business being
3    at the bottom of the sergeant list.
4    Q.   Okay.  So walk me through the
5    process of what it takes, what happens
6    when somebody gets put on the sergeant
7    list.
8        Is that a written test?
9    What is it?
10   A.   Yeah, you go in for a written test
11   first.
12   Q.   Who does the written test?
13   A.   The police commissioners, the
14   board, I believe.
15   Q.   Other than a written test, is
16   there anything else part of the process?
17   A.   Well, the process changes from
18   year-to-year or -- well, it's every three
19   years but that changes every couple of
20   years.  The first time it came about I
21   was able to take the test.  They told me
22   I could take the test, I took the test, I
23   passed, took the oral interview and then
24   I was told I didn't have enough chief

John Scatchell, Jr.
August 5, 2020

282

1   points to qualify.
2           Whatever, I had a couple
3   years on, I didn't care.  A couple of years
4   later when the last one came out, I was
5   told I wasn't allowed to take the test
6   because I didn't have enough time on the
7   job, but then Robert Anzaldi was allowed
8   to take the test because he was Castellan's
9   nephew.
10      Q.   Anything else?
11      A.   And he didn't have five years on
12  him.  He transferred from Berkley after I
13  came here, so he had less than five clearly.
14      Q.   So other than a written test, what
15  is it in the process that results in how
16  they place on the list?
17          MR. COOPER:  Asked and
18          answered.  He said oral in addition.
19  BY MR. FOWLER:
20      Q.   Who is the oral with?
21      A.   Probably the commissioners.  When
22  I went, it was -- I remember Esposito and
23  Caputo being there.  I can't recall if Rauzi
24  was there or not.

283

1       Q.   What facts do you have that lead
2   you to believe that Mayor Serpico decides
3   how somebody places on the sergeant's list?
4       A.   Look at the list and look at the
5   candidates and look at the candidates that
6   were passed up or told that they failed.
7   They told Mark Lockton he failed his last
8   police test, which he might have, but I
9   find that hard to believe a 20-year guy
10  would fail a sergeant test especially when
11  they put him as a senior officer I don't
12  know how many times.
13      Q.   Anything else?
14      A.   Not that I can recall at this time.
15      Q.   What facts do you have that Deputy
16  Chief Castellan had a say as to where somebody
17  placed on the sergeant's list?
18      A.   All of his friends are promoted.
19      Q.   Anything else?
20      A.   Pesch, Natale, Gepetta, anybody
21  that was ever shown to be close to Castellan
22  now has a good position.
23      Q.   Anything else?
24      A.   No.

284

1       Q.   What facts do you have that Deputy
2   Chief Rogowski had any say in how somebody
3   places on the sergeant's list?
4       A.   I don't know that he did.
5       Q.   All right.  What facts do you
6   have that Director Pitassi has any say in
7   how somebody places on the sergeant's list?
8       A.   I don't know that too many of
9   his guys have been promoted.  I mean,
10  some of them have, but I know that he has
11  a direct oversee of who gets promoted in
12  the specialty divisions.  His son was
13  promoted in the tact division which after
14  what, two years, not even.  I don't think
15  that was warranted.  Still don't.
16      Q.   Did I hear you say that John
17  Menolascino had been on the tact unit?
18      A.   No, he never was.  Brian Jarecki
19  was.
20      Q.   And you mentioned that the last
21  time you heard Director Pitassi use the
22  N word was when you were about 14.
23           How old are you now?
24      A.   Thirty-one.

285

1       Q.   So that was about 17 years ago?
2       A.   Yes.  Doesn't change the fact
3   that it occurred over many years and I
4   heard it many times.  A tiger doesn't
5   change its stripes.
6           MR. FOWLER:  All right.  That's
7   all I have.
8           MR. BERSANI:  I have nothing.
9           MR. WOERNER:  Nothing further.
10     R E C R O S S - E X A M I N A T I O N
11           by Mr. Casper
12      Q.   Based on that, when you used the
13  phrase promotion, are you using that to
14  refer to transfers from officers to the
15  tact division?
16      A.   Promotion can mean promotion
17  from anything from patrol, so patrol to
18  traffic, patrol to tact, patrol to detectives
19  or patrol to rank and file position like
20  sergeant or lieutenant.
21      Q.   Okay.  But when you refer to a
22  promotion as a transfer from patrol to
23  tact or those other divisions, that doesn't
24  have to go through a list process --

72 (Pages 282 to 285)

John Scatchell, Jr.
August 5, 2020

286

1    A.   No.
2    Q.   -- such the sergeant's list does,
3  does it?
4    A.   No, it doesn't.
5    Q.   Who's in charge of those
6  "promotions" from, for example, patrol
7  to tact?
8    A.   I was always told that that was
9  the deputy chief's role and then when
10 Rogowski came in as deputy chief, they
11 subdivided the roles.
12   Q.   So, in other words, the police
13 board, the personnel board, the Board of
14 Fire and Police Commissioners doesn't have
15 any control over the "promotion" from
16 patrol to tactical?
17   A.   Correct.
18   Q.   Okay.  That's the deputy chief
19 or the chief or the director?
20   A.   Correct.
21   Q.   And there is an oral interview
22 that is required in this municipality for
23 an officer to be placed on the sergeant's
24 list, is that true?

287

1    A.   Yes.
2    Q.   So it's not just a test,
3  it's a test plus an interview, is that
4  true?
5    A.   Yes.
6    Q.   And that interview is conducted
7  by whom, if you know?
8    A.   I believe that same board, whatever
9  name they go by, but those three individuals.
10   Q.   And those individuals, do you know
11 who they are now?
12   A.   As they are now, I believe it's
13 Rauzi, Caputo and Esposito.
14   Q.   And how long have those three
15 gentlemen been on that board?
16   A.   At least until some point after
17 I got hired or they might have been there
18 when I got hired.  All I can tell you is my
19 commission card showed George Leoni and
20 that was in 2012.
21   Q.   Okay.  But Caputo, Rauzi and
22 Esposito have been there since after you
23 were hired?
24   A.   Yes.

288

1    Q.   And they were appointed by who?
2    A.   To my belief, the mayor.
3    Q.   Does the mayor have to reappoint
4  those three individuals every so often?
5    A.   He's supposed to do it staggered
6  every three years.
7    Q.   Has he ever appointed any other
8  individuals to that spot other than those --
9  Rauzi, Esposito and Caputo?
10        MR. BERSANI:  Object to lack
11   of foundation.
12 BY MR. CASPER:
13   Q.   If you know?
14   A.   Since that point, no.
15   Q.   So is it always those same three
16 individuals who are conducting the role
17 interview for an officer to be on the
18 sergeant's list?
19   A.   Yes.
20   Q.   Do you know anything about are
21 those oral interviews open to the public?
22   A.   No.
23   Q.   Do you know that?
24   A.   Well, when I was at my interview,

289

1  there was no public there.
2    Q.   Well, when did you undergo yours?
3    A.   It would have either been 2013 or
4  '14 I believe.
5    Q.   Who was your oral interview with?
6    A.   Caputo and Esposito.
7    Q.   What kinds of questions did they
8  ask you?
9    A.   Why do you believe that you would
10 be a good supervisor, what traits, like basic
11 background questions as to they want to know
12 what kind of supervisor you're going to be
13 like if you witness another supervisor doing
14 this, are you going to keep it to yourself
15 or are you going to tell -- it's like all
16 those kind of questions and there is a panel
17 of five people and everybody answers in
18 turn.
19   Q.   Oh, there is a five person panel
20 to conduct the oral interview?
21   A.   There's five other officers.  So
22 I would be there and then four others and
23 then the same question is posed to all five
24 officers in order.

John Scatchell, Jr.
August 5, 2020

290

1    **Q.   Are the questions preprinted like**
2  **on a form?**
3    A.   I would guess, yes.
4    **Q.   Okay.  And then Mr. Caputo and**
5  **Mr. Rauzi and Mr. Esposito, did they make**
6  **the determination of who goes on that list**
7  **next?**
8    A.   I believe they do.
9    **Q.   Is there -- is that decision made**
10  **there and then or sometime later?**
11    A.   Sometime very later.
12    **Q.   If you know, do they have to get**
13  **approval from Mayor Serpico to pick who**
14  **passes the oral interview process?**
15    A.   I believe they do.
16    **Q.   What's your basis for that belief?**
17    A.   That's what's been told around
18  town.  I mean --
19    **Q.   Who told that around town?**
20    A.   It goes around the station and
21  then rumor mill in town picks it up pretty
22  quickly, but my point would be that -- go
23  ahead, next question.
24        MR. CASPER:  No, that's all

291

1    I have.
2        MR. BERSANI:  I have a quick
3  question.
4    C R O S S - E X A M I N A T I O N
5        by Mr. Bersani
6    **Q.   Have you ever heard your father**
7  **use the term wolf pack?**
8        MR. CASPER:  Object to --
9    go -- go ahead.
10  BY THE WITNESS:
11    A.   Yeah, exciting that's what we're
12  referred to as the wolf pack by them so
13  instead of just whatever, okay, we're the
14  wolf pack, big deal, call us what you want
15  to call us, it doesn't matter.
16  BY MR. BERSANI:
17    **Q.   And how many times have you heard**
18  **your father use the term wolf pack to refer**
19  **to his guys?**
20    A.   Not to refer to his guys, to
21  refer to what Castellan would say.
22    **Q.   In referring to his guys?**
23    A.   Yeah.
24    **Q.   How many times have you heard**

292

1  your father use the term wolf pack?
2    A.   I don't know, a few.
3    **Q.   More than ten?**
4    A.   I wouldn't say that.  I -- I
5  couldn't give you a firm answer as far
6  as numbers because again the term I don't
7  believe originated from us and it was
8  perpetuated by the other side.
9    **Q.   That's not what I asked you,**
10  **though.  I asked you how many times did**
11  **your father use --**
12    A.   And my answer was --
13        MR. CASPER:  Objection,
14    asked and answer.
15  BY MR. BERSANI:
16    **Q.   Hang on.  Hang on.  He objected.**
17  **You've got to wait until he finishes.  So**
18  **he's done.**
19        **How many times did your**
20  **father use the term wolf pack?**
21    A.   My recollection would be I don't
22  recall how many times because we had many
23  conversations about what Castellan referred
24  to us as.

293

1    **Q.   Has he ever used the term wolf**
2  **pack outside of referencing Mike Castellan?**
3    A.   Not that I can recall at this
4  time.
5    **Q.   And have you ever heard -- has**
6  **anyone ever told you that your father used**
7  **the term wolf pack?**
8    A.   Not that I can recall at this time.
9        MR. BERSANI:  That's it.  Thanks.
10        MR. CASPER:  That's all.
11        MR. FOWLER:  That's it.
12        MR. COOPER:  We'll reserve.
13        (Witness excused.)
14  AND FURTHER THE DEPONENT SAITH NAUGHT...
15        -ooOoo-
16
17
18
19
20
21
22
23
24

74 (Pages 290 to 293)

John Scatchell, Jr.
August 5, 2020

294

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF ILLINOIS
                       EASTERN DIVISION
 3
     JOHN SCATCHELL, SR.,    )
 4                           )
            Plaintiff,       )
 5                           )
        vs         ) No. 2018cv03989
 6                           )
     VILLAGE OF MELROSE PARK, )
 7   an Illinois Municipal   )
     Corporation; RONALD D.  )
 8   SERPICO; SAM C. PITASSI; )
     MICHAEL CASTELLAN; and  )
 9   STEVEN ROGOWSKI,        )
                             )
10          Defendants.      )
11              I hereby certify that I have
     read the foregoing transcript of my deposition
12   given on August 5, 2020, at the time and place
     aforesaid, consisting of Pages 1 through 293,
13   inclusive, and I do again subscribe and make
     an oath that the same is a true, correct and
14   complete transcript of my deposition so given
     as aforesaid.
15
          Please check one:
16
          _____ I have submitted errata sheet(s)
17        _____ No corrections were noted
18
     _____
19          JOHN SCATCHELL
20
     SUBSCRIBED AND SWORN TO
21   before me this ____ day
     of _____, A.D., 2020.
22
     _____
23   Notary Public
24
```

295

```
 1         WITNESS ERRATA SHEET   Page #1
 2   JOHN SCATCHELL, SR.,    )
                             )
 3          Plaintiff,       )
                             )
 4        vs        ) No. 2018cv03989
                             )
 5   VILLAGE OF MELROSE PARK, )
     an Illinois Municipal   )
 6   Corporation; RONALD D.  )
     SERPICO; SAM C. PITASSI; )
 7   MICHAEL CASTELLAN; and  )
     STEVEN ROGOWSKI,        )
 8                           )
          Defendants.        )
 9     I wish to make the following changes for the
10   following reasons:
11   Page   Line
     _____
12   Change:_____
     Reason:_____
13   Page   Line
     _____
14   Change:_____
     Reason:_____
15   Page   Line
     _____
16   Change:_____
     Reason:_____
17   Page   Line
     _____
18   Change:_____
     Reason:_____
19   Page   Line
     _____
20   Change:_____
     Reason:_____
21   Page   Line
     _____
22   Change:_____
     Reason:_____
23
     (Signed) _____
24
```

296

```
 1         WITNESS ERRATA SHEET   Page #2
 2   JOHN SCATCHELL, SR.,    )
                             )
 3          Plaintiff,       )
                             )
 4        vs        ) No. 2018cv03989
                             )
 5   VILLAGE OF MELROSE PARK, )
     an Illinois Municipal   )
 6   Corporation; RONALD D.  )
     SERPICO; SAM C. PITASSI; )
 7   MICHAEL CASTELLAN; and  )
     STEVEN ROGOWSKI,        )
 8                           )
          Defendants.        )
 9     I wish to make the following changes for the
10   following reasons:
11   Page   Line
     _____
12   Change:_____
     Reason:_____
13   Page   Line
     _____
14   Change:_____
     Reason:_____
15   Page   Line
     _____
16   Change:_____
     Reason:_____
17   Page   Line
     _____
18   Change:_____
     Reason:_____
19   Page   Line
     _____
20   Change:_____
     Reason:_____
21   Page   Line
     _____
22   Change:_____
     Reason:_____
23
     (Signed) _____
24
```

297

```
 1         WITNESS ERRATA SHEET   Page #3
 2   JOHN SCATCHELL, SR.,    )
                             )
 3          Plaintiff,       )
                             )
 4        vs        ) No. 2018cv03989
                             )
 5   VILLAGE OF MELROSE PARK, )
     an Illinois Municipal   )
 6   Corporation; RONALD D.  )
     SERPICO; SAM C. PITASSI; )
 7   MICHAEL CASTELLAN; and  )
     STEVEN ROGOWSKI,        )
 8                           )
          Defendants.        )
 9     I wish to make the following changes for the
10   following reasons:
11   Page   Line
     _____
12   Change:_____
     Reason:_____
13   Page   Line
     _____
14   Change:_____
     Reason:_____
15   Page   Line
     _____
16   Change:_____
     Reason:_____
17   Page   Line
     _____
18   Change:_____
     Reason:_____
19   Page   Line
     _____
20   Change:_____
     Reason:_____
21   Page   Line
     _____
22   Change:_____
     Reason:_____
23
     (Signed) _____
24
```

75 (Pages 294 to 297)

John Scatchell, Jr.
August 5, 2020

298

1   STATE OF ILLINOIS  )
                        ) SS.
2   COUNTY OF C O O K  )

3

4        I, LORI ANN ASAUSKAS, a notary public
5   within and for the County of Cook and State of
6   Illinois, do hereby certify that heretofore,
7   to-wit, on the 5th day of August, A.D., 2020,
8   personally appeared before me at the Village
9   of Melrose Park, 1000 N. 25th Street, Melrose
10  Park, Illinois, County of Cook and State of
11  Illinois, JOHN SCATCHELL, JR., a witness,
12  called by the Defendants in a certain cause
13  now pending and undetermined in the United
14  States District Court, Northern District of
15  Illinois, Eastern Division wherein JOHN
16  SCATCHELL, SR., is the plaintiff and VILLAGE
17  OF MELROSE PARK, an Illinois Municipal
18  Corporation; RONALD D. SERPICO; SAM C. PITASSI;
19  MICHAEL CASTELLAN; and STEVEN ROGOWSKI are the
20  defendants.
21       I further certify that the said witness,
22  JOHN SCATCHELL, was by me first duly sworn to
23  testify the truth, the whole truth and nothing
24  but the truth in the cause aforesaid; that the

299

1   testimony then given by him was by me
2   reduced to writing by means of shorthand
3   in the presence of said witness and
4   afterwards transcribed upon a computer,
5   and the foregoing is a true and correct
6   transcript of the testimony so given by
7   him as aforesaid.
8        I further certify that the
9   reading and signing of said deposition was
10  reserved by the witness.
11       I further certify that the taking
12  of the deposition was pursuant to notice,
13  and that there were present at the taking
14  of the deposition the aforementioned parties.
15       I further certify that I am not
16  counsel for nor in any way related to any
17  of the parties to this suit, nor am I in
18  any way interested in the outcome thereof.
19       In testimony whereof I have
20  hereunto set my hand and affixed my notarial
21  seal this 24th day of August, A.D., 2020.
22  _____
        LORI ANN ASAUSKAS, CSR, RPR.
23      Notary Public, Cook County, IL
        Illinois License No. 084-002890
24

76 (Pages 298 to 299)

John Scatchell, Jr.
August 5, 2020

Page 300

**A**

**A.D** 294:21 298:7
299:21
**a.m** 3:5 221:14
**ability** 9:20 10:2
34:8 101:19
**able** 10:7 42:7
64:22 281:21
**absolute** 59:13
**absolutely** 47:6
141:5 198:5
227:14 249:20
262:23 271:20
**abundantly** 219:8
**abuse** 42:17
144:24
**abusing** 42:1
43:12
**accept** 197:15
**access** 62:4 78:19
112:24 118:12
**accommodate** 8:5
**accurately** 7:23
**accuse** 91:8
**accused** 207:22
264:10
**action** 159:11,18
219:12
**activities** 66:18
134:7 162:11
**activity** 66:16
209:17 210:4
222:7
**acts** 238:1
**actual** 137:10
**ad** 108:19
**adamantly** 280:7
**add** 215:5 229:18
229:22
**addition** 282:18
**address** 108:13
109:13 152:20
270:10
**addressed** 203:19

226:6,15
**adjective** 149:5
**administration**
43:5 56:10
135:23 236:2
237:11 238:3,7
245:15,18
269:13
**administration/...**
235:16
**administration/...**
235:22
**administrative**
156:17
**adopt** 35:16
**adverse** 159:11,18
219:12 278:18
**affect** 9:20 10:1
**affixed** 299:20
**Afghanistan**
90:14 208:9,10
**afield** 197:3
**aforementioned**
299:1
**aforesaid** 294:12
294:14 298:24
299:7
**African-Americ...**
257:14
**African-Americ...**
258:7
**afternoon** 231:16
242:3
**age** 47:7 106:15
113:23 114:13
117:1,23 139:1
139:14
**agency** 194:22
**agenda** 54:4
**ages** 36:20
**ago** 12:7 36:20
64:14 98:15
154:4 214:6
215:10 216:12

255:4 261:6
263:24 285:1
**agree** 25:18
127:19 149:10
150:19 189:8
**agreement** 60:5
150:4,10,12
268:3
**ah** 252:2
**ahead** 18:21 34:19
41:12 60:19,24
82:5 91:15
97:23 101:16
130:6 137:17
195:1 208:4
248:5 250:3,4,4
255:15 256:10
290:23 291:9
**ain't** 69:8 203:11
**air** 237:22
**aligned** 236:3
237:12
**allegation** 264:9
**allegations** 222:24
225:9
**alleged** 156:15
**allow** 196:24
**allowed** 51:1,9,11
60:12 86:18
93:22 94:24
96:12,14 207:20
282:5,7
**allowing** 98:21
197:6 206:10
**Amabile** 269:8
278:6
**ambiguity** 33:5
**amended** 191:15
191:18
**Amendment** 15:1
15:3,14,21,24
16:9,18,22 17:3
17:6,10 18:11
28:16 29:5,11,13

29:20 32:4,4,11
32:12,24 34:12
34:14,22 35:4
38:2,14,21 40:20
40:23 41:3,14
74:3,7,11,13,18
74:22 75:21
76:1,17,22 77:15
77:18,23 78:2,5
87:22,24 145:8
145:11,13,18,22
146:14,18 147:8
147:11,15,20,23
147:24 148:8,12
148:17,21 151:2
151:5,8,22 152:2
152:13,18 153:7
154:10,22 155:5
155:16,21 156:1
156:6 157:7
158:1,5 162:23
163:18 181:17
181:20,23 182:5
182:7 183:10,22
184:1,5,11,16
185:1,5,9 186:15
186:24 193:13
194:1,8,13,18
205:16 206:1,10
206:15,19 207:8
209:4,17 210:3
213:9,20 215:2
216:7 220:17
222:6 228:17
229:6
**America** 206:3
**ammunition**
225:11,15,18,24
226:7,9
**amok** 60:12,13
**amount** 55:24
**Anastacio** 123:12
123:22
**and-** 2:6,21

**Angela** 49:18
50:11 51:16
208:13 213:18
221:2
**ANN** 1:15 298:4
299:22
**answer** 7:12,17,19
7:22 8:7 9:5,10
15:11,17,20 16:8
17:12 18:13,15
18:22 19:6
27:20 28:7
31:11 34:1
36:12 37:23
39:11 40:8 42:7
45:7 62:21 63:2
68:9 83:15,16
88:4 98:23
101:17 107:3,12
109:1,20 118:18
118:19 126:4,7
126:16 127:4,7
131:16 132:8
134:24 136:13
138:2,3 147:18
155:3 158:9
159:3,20,22
162:13 185:19
185:23 186:8,10
191:2,6,15,16,18
192:4,6,20 196:8
196:22,23 197:7
197:16 200:5
204:17 208:4
215:19 216:23
230:4,16 235:21
236:22 239:11
244:17 248:6
250:6,10 257:15
267:4 269:2
280:4 292:5,12
292:14
**answered** 16:5
34:7 35:1 45:6

John Scatchell, Jr.
August 5, 2020

Page 301

45:14 50:3,15
51:18 70:5
107:1 131:15
140:8 145:24
146:7 162:11,16
186:2 195:24
208:3 230:14
274:15 282:18
**answering** 9:6
18:19 101:18
107:22 125:20
126:6,14,18
128:8 129:1,5
**answers** 9:21 10:3
10:8 289:17
**anybody** 28:1,6
28:12 44:16
49:3 52:7 60:16
61:17 64:16
65:2 72:6 90:17
94:19 99:4,6
102:11,18
111:24 117:22
118:6,11 120:20
122:8,19 139:4
142:22,23 162:1
203:3 207:18,22
208:24 210:22
212:6 215:7,11
215:24 216:4
221:12,15
232:21 246:17
246:19 250:19
259:7 263:11
265:22 267:23
278:21,23 279:9
283:20
**anymore** 47:11
129:14 162:2
212:8
**anytime** 70:21
**Anzaldi** 223:17
224:7,17,19,20
224:23 225:18

282:7
**apologize** 69:14
155:19
**appalled** 46:21
**apparent** 54:7
**apparently**
105:20 217:14
**appear** 35:18
**appearance**
185:22
**appeared** 2:11 3:6
3:12 298:8
**Appears** 21:14
23:14 26:12
**appended** 243:3
**application** 195:9
**applied** 196:2,14
**applies** 206:4
217:18
**apply** 194:21
**appointed** 288:1,7
**appreciate** 13:9
**approach** 264:14
**approached** 31:24
32:9
**approaching**
203:8
**appropriate** 161:3
**approval** 290:13
**approved** 149:17
**approximately**
240:24
**April** 152:16
157:22 186:6
194:6
**arbitrate** 261:12
**arbitrating**
261:20 262:19
**arbitration**
141:14 203:23
204:6,11,14
259:6 260:20
261:3,8,17 262:4
262:16,21 263:4

**arguably** 208:14
232:14
**argue** 141:13
262:14
**argued** 262:11
**argument** 101:9
125:13
**arm** 58:17
**article** 54:18
**articulated**
247:17
**ASAUSKAS** 1:15
298:4 299:22
**aside** 117:18
220:7
**asked** 30:14,14,22
34:2,5,17 38:12
45:5,14 50:3
51:18 63:4 68:5
68:9 70:5 72:14
83:15 88:12,13
88:14,17 89:1
107:23 109:22
127:7 131:15
135:4 140:7
145:24 146:7
153:23 154:2
156:10 162:15
185:3 195:24
208:3 227:10,11
227:12 230:8,9
254:24 256:10
274:14 282:17
292:9,10,14
**asking** 9:3 79:9,23
88:2,11 103:7
125:19 135:2
136:18 139:3
141:12,16
156:13 160:2
187:1 189:3
200:3 206:18,24
214:6 231:21
**asks** 10:11

**assert** 16:9 29:4
29:10 30:21
32:10,23 35:4
38:9 147:22
**asserting** 15:13
18:10 147:24
**assertion** 15:16
**assigned** 59:1,8
80:9 119:13
161:23 221:23
221:24
**assignment** 79:20
111:5
**associates** 20:2
**assume** 115:16
138:10,11
143:19 206:4
219:21
**assumed** 111:8
246:5
**assumes** 32:13,21
35:7 238:8
**assumption** 206:6
**assured** 70:18
**attempted** 223:23
**attended** 73:8
**attention** 123:18
123:20 187:18
**attorney** 20:12
36:9 37:17
108:11 127:2
134:22 194:11
194:12 219:11
**attorneys** 39:22
185:11,13,15
192:3
**audibility** 57:4
**audio** 12:14,17
**August** 1:19 21:15
21:19 24:12
163:17 211:9,19
294:12 298:7
299:21
**authority** 135:8

136:20 137:23
**Avenue** 3:3 89:18
**average** 181:24
**avoid** 97:13
153:10
**aware** 17:7,17,18
19:1,11 27:14
29:22 30:2,6,10
30:15 31:2
36:10,15 41:21
41:23 42:10,16
108:10 114:5
144:22 145:5,9
145:15 148:22
149:12 150:23
183:8 186:10,12
186:18,21
187:14 189:13
194:10,15 204:5
205:20 206:9
207:6 272:14
**awkwardly** 237:8

**B**

**B** 4:8 5:1
**B-E-R-G** 101:7
**babes** 70:16 87:13
94:10,13 270:2
271:1,4,4,4,5,5
**back** 29:1 31:15
39:14 45:1
51:14 54:1,21
55:9 59:22
65:18 67:5
83:19 96:21
98:1 105:13
108:18 116:14
116:15 129:19
142:24 143:1
148:5 151:6
157:20 158:12
162:9 188:24
197:5 202:11
215:19 237:2

John Scatchell, Jr.
August 5, 2020

241:21 246:23
264:24 265:1,4
266:12,21
270:13,18
275:12
**back-to-back**
121:12
**background**
289:11
**backseat** 203:14
**backup** 106:6
**backyard** 95:8
251:1
**bad** 12:2 76:20
**badge** 24:9
**badly** 236:2
237:11
**bag** 69:13
**Bakers** 260:5
**ball** 136:10 203:10
**ballot** 276:18,19
**ballpark** 117:7
142:19 161:4
**balls** 233:9
**bandied** 240:2
**bang** 56:23
**banished** 224:23
**Barone** 90:24
**Bartemio** 96:15
**based** 15:10,16
18:22 35:3 36:9
38:1 57:4 66:17
100:12 135:22
136:19 209:12
222:13 272:15
275:8 276:9,11
276:22 285:12
**basic** 289:10
**basically** 44:15
237:19
**basis** 35:20 45:17
60:20 86:17
128:3 155:11
156:6 238:21,21

239:1,1,2 290:16
**Bates** 147:2
**bathroom** 188:15
**bearing** 196:3,18
**bedroom** 57:8
**beginning** 63:14
69:18 242:10
**behalf** 2:11 3:6,12
123:12 191:3
**belief** 86:17 87:19
209:12 288:2
290:16
**believe** 11:24
26:17 39:19
41:20 43:14
73:18 92:8
95:11 98:12
101:22 102:12
106:9,13 114:23
122:4 133:16
138:4 149:15
150:16 161:14
161:17,21
162:18 192:22
199:24 205:1
206:20 207:24
209:3,5 211:9
212:7 213:8,19
214:10 215:9
216:6,13 221:9
221:20 223:10
223:15,19,21
224:14 226:21
226:23 227:8
230:17 245:21
256:5 261:4,18
262:6,10 264:7
265:7 266:22
273:2,3 275:24
281:14 283:2,9
287:8,12 289:4,9
290:8,15 292:7
**believed** 41:1
**benefits** 149:1

151:1
**Berkley** 282:12
**Bersani** 2:17,20
4:7 21:2 31:12
37:8,10 106:24
107:6,10,17,21
125:18,22 126:4
126:8,14,19,22
126:24 127:1,6
127:10,13,21
128:5,7,16,24
130:11 158:11
190:1 199:11
202:22 215:18
231:1 235:17
236:8,12,18
237:15 238:4,8
248:20 250:2,5
251:9,18 253:15
254:8 256:7
262:7 273:23
275:9 276:2
285:8 288:10
291:2,5,16
292:15 293:9
**Bersani's** 129:13
**Berwyn** 3:3
**best** 7:22 34:7
38:9 59:10,16
83:16 94:21
101:18 120:23
222:14 230:15
280:9
**better** 58:17 95:12
280:12
**beyond** 72:13
102:15
**biased** 83:13
**big** 99:1,2 240:9
291:14
**binder** 20:12
154:16 184:6
**birthday** 204:23
204:23

**bit** 63:21 64:7
117:13 197:1
203:22
**black** 45:20 49:17
58:7 90:13
106:6 219:13
257:24
**blackface** 105:23
**blah** 203:12,12,12
**blatant** 96:23
**blind** 77:22 78:1
**block** 89:17 269:6
**blocked** 117:9
**blown** 57:2 58:18
**board** 11:6,9 12:5
38:23 39:9
146:5 185:16
189:6,8 190:11
191:4 194:3,9
222:21 273:9
281:14 286:13
286:13,13 287:8
287:15
**board's** 156:20
**boat** 74:9,10,15
74:16 78:4
**Bobby** 224:7
**book** 17:1 137:9
137:10,11 150:1
151:13 163:8
**books** 211:7,18
**booth** 211:23
**bordering** 119:22
**born** 92:7
**bothers** 222:12
**bottom** 44:18
281:3
**bought** 51:10 90:9
91:13,17
**bound** 164:10
165:10 166:10
167:10 168:10
169:10 170:10
171:9 172:10

173:10 174:10
175:10 176:10
177:10 178:10
179:9 180:9
181:2
**box** 77:17
**boys** 100:23
**brain** 211:1
**bread** 115:18
**break** 8:2,4,8
32:16 33:3,8,8
33:10 61:2
72:22 73:3
105:1,6 157:16
183:13,15
188:11,21
229:10 231:11
**breakfast** 79:22
79:24 82:24
111:9 144:9
**Brian** 240:10,12
240:15 243:16
243:18 272:22
278:20 279:10
284:18
**Brief** 32:19
**bring** 191:18
**bringing** 197:24
**brings** 89:13
**broad** 158:24
**broke** 115:18
**brought** 74:20
90:16 95:3
104:17 187:18
198:16
**BS** 213:2
**buddies** 30:8
**building** 88:8
215:14,15
218:18,19 220:9
280:12
**bunch** 46:18 69:3
255:6
**burning** 211:14

John Scatchell, Jr.
August 5, 2020

**bus** 93:4
**business** 29:24
  68:2 281:2
**bust** 233:9
**buy** 137:6

**C**

**C** 1:7 2:1 3:1 6:17
  6:17,20 231:14
  272:20 285:10
  291:4 294:8
  295:6 296:6
  297:6 298:2,18
**C-H-A-N-E**
  265:14
**Cacciatore** 278:2
**Cafe** 79:22 144:10
**caliber** 57:20
**call** 19:17 20:22
  21:2 49:14
  67:18 69:2 84:4
  84:24 85:9
  91:14 96:17
  160:22 208:18
  217:15 227:6
  240:20,21 241:5
  241:11,16
  242:12,22,23
  243:3 244:4
  245:2,6 247:14
  258:1 269:19
  271:14 276:15
  276:16 291:14
  291:15
**called** 1:13 6:18
  14:23 19:12
  48:15 86:12
  92:20 146:12
  217:13 221:21
  232:7 257:2
  261:23 298:12
**calling** 46:17,18
**calls** 99:1 134:18
  135:9 136:8

138:1 159:17
  206:13 230:2
  258:1
**cameras** 122:7
  124:15 277:17
**Campanili** 88:14
**candidates** 95:12
  283:5,5
**candidly** 190:5
**capacity** 119:20
  253:11
**Caputo** 12:9
  38:24 282:23
  287:13,21 288:9
  289:6 290:4
**car** 60:14 95:4
  201:16 223:3,16
  223:23
**card** 11:16,22
  12:1,3 287:19
**care** 51:21 94:6
  103:19 108:6
  123:21 265:2
  282:3
**career** 203:15
  217:16 268:24
**Carfax** 224:1,3
**Carol** 51:2 89:18
  90:8 91:19
**carried** 211:8
**carrying** 76:15
  77:16 181:21
**case** 7:4,6 54:2
  84:18 104:17
  123:21 156:12
  187:6,21,22
  189:6,8,10,16,22
  190:11 191:4
  207:23 230:22
**cases** 76:16 136:9
**Casper** 2:10 4:4,6
  10:11 19:4
  20:17,24 21:6
  25:17 27:18

28:8 30:3,18
  32:1,13 33:9,13
  35:12 39:5,24
  41:10 42:3,19
  47:17 50:4,14
  52:10,20 60:23
  62:20 63:1 66:7
  66:22 70:4
  72:11 75:18
  76:2 77:7,10
  81:8 104:24
  107:15,19
  108:15 109:8
  119:1 121:17
  126:11,17,21,23
  127:2,8,11,17
  128:2,3,6,13,22
  134:14 140:7
  144:15 145:23
  146:6 147:1
  149:2 150:19
  152:19 153:21
  154:12 156:4,4
  156:21 159:1,14
  162:15 182:2
  183:11 186:16
  186:22 187:13
  187:24 188:18
  188:24 189:12
  189:21 190:5
  194:23 195:12
  195:22 196:7,11
  196:13,24 197:6
  198:24 199:6,13
  199:19 205:17
  214:15 230:1
  231:5,15 235:20
  236:21 237:1,6
  237:16 238:14
  241:20 242:5
  248:22 250:9
  251:2,13,20
  254:1,11,12
  256:11 262:13

272:18 273:11
  273:15 274:14
  285:11 288:12
  290:24 291:8
  292:13 293:10
**Cass** 2:10 72:21
  72:24 128:17
  181:10 198:14
  198:20
**Castellan** 1:8 3:16
  17:19 20:4
  52:18 65:21
  67:14,23 68:14
  68:18 69:6 70:1
  70:8 71:13
  73:10 78:8,10,18
  78:22 79:19
  80:8,13,17 81:5
  81:17,21,23 82:8
  82:10,13 83:3,6
  85:4,21 87:2,9
  87:20 88:2 89:3
  92:22 93:12,18
  96:7,22 97:6,15
  100:2 101:8
  102:5 114:3,6,12
  114:20 130:9
  131:7 134:10
  135:19 143:20
  144:4 147:13,17
  148:2,9,13,18
  197:20 222:21
  223:2,7,16,20
  225:2,10,17,24
  233:14 238:12
  239:15 245:21
  246:10,19,21
  247:1,12,16
  251:5 269:24
  270:5,16 271:17
  272:1,10,16,16
  277:5 283:16,21
  291:21 292:23
  293:2 294:8

295:7 296:7
  297:7 298:19
**Castellan's** 51:1
  89:9 282:8
**caught** 181:10
**cause** 298:12,24
**cavalier** 72:1
**caveat** 114:2
**cell** 124:21
**center** 98:20
  104:5 111:1
**certain** 50:21
  73:19,23 226:22
  235:4,4 243:12
  271:16,19,21
  298:12
**certainly** 35:21
  48:8 98:4
  109:17 187:19
  189:10 207:5
**certification** 91:6
**certified** 91:4
**certify** 294:11
  298:6,21 299:8
  299:11,15
**chain** 132:24
  133:2 223:11
**chair** 121:16,20
  242:24
**challenging**
  156:19
**chance** 19:20
  21:10 135:6
**Chane** 265:8,9,12
  267:10 278:22
  280:21
**change** 255:14
  285:2,5 295:12
  295:14,16,18,20
  295:22 296:12
  296:14,16,18,20
  296:22 297:12
  297:14,16,18,20
  297:22

John Scatchell, Jr.
August 5, 2020

Page 304

**changed** 19:23 223:2 226:11
**changes** 281:17 281:19 295:9 296:9 297:9
**charge** 114:21 115:5 116:11,21 118:15 119:6 124:7 139:22 286:5
**charges** 30:7 39:3 100:2 115:17 146:5 191:3 222:20 223:1 266:20
**chastised** 9:11
**check** 184:13,22 294:15
**cherry** 92:19
**chest** 66:24
**Chicago** 2:3,8,15 3:10
**chief** 17:19,20,20 18:9,16,18 30:7 47:7,11 52:17,18 53:8,22 54:3,5 63:21 64:7,20 65:12,21 67:13 67:23 68:14,18 69:5,6 70:1,8 71:13 72:2 73:10 78:7,10,18 78:22 79:13,19 80:8,13,17 81:5 81:12,17,21,23 82:8,10,13,14,19 83:3,6 85:21 87:2,9,14,20 88:2,9,14 89:3,9 92:22 93:12,18 96:7 97:6,15 99:12,14 100:17 101:8 102:5 105:12 106:10
**chief's** 286:9
**chiefs** 113:13,18 133:23 134:4 274:22 277:10
**chiefy** 270:2 271:1 271:4
**child** 253:7
**choice** 76:20
**choose** 92:18
**Chris** 22:10 107:21 108:3,9 187:3,3
**Christine** 219:22 220:3,6
**CHRISTOPHER**

106:23 110:12 114:6,12,20 116:20,24 117:5 117:15,22 118:5 118:10,13,22 119:12,24 120:24 123:2,7 123:17,24 124:1 124:4,10,24 125:8 130:9,17 130:20 131:2,7 132:22 134:10 134:11 143:12 143:14 144:4,14 147:13,17 148:2 148:9,13,18 197:20,21 222:21 223:1,7 223:15 225:2,10 225:24 233:13 238:11 246:19 251:5 269:20,21 269:24 270:2,3,6 270:16 271:6,12 271:14,23 272:1 272:10,10,15,16 281:24 283:16 284:2 286:10,18 286:19

3:8,11
**circle** 105:13 266:9,10,11 267:9
**circular** 57:22
**cite** 272:4
**city** 194:22
**Civil** 6:3
**civilian** 47:11 98:6
**claim** 205:8
**claimed** 90:24 208:21
**claims** 89:16 104:15 208:17
**clarification** 20:18
**clear** 27:24 28:18 32:23 33:5,17 43:16 76:14 77:2 81:23 95:10 96:10 98:6 100:6 103:7 117:4 132:3 135:1 140:10 148:1 150:3,15 155:22 156:4 206:7 207:3 219:8 223:10 246:20 254:3 267:2 279:5
**clearly** 235:1 282:13
**client** 32:23 40:7 107:16,18 109:16,19 136:12 155:10 157:14
**close** 70:24 197:20 232:21 234:24 242:10 283:21
**clout** 217:11,13,15 217:15
**co-counsel** 108:16

188:3 189:1 231:8
**coffee** 260:9
**colleague** 10:11
**colloquy** 109:10
**come** 19:24 29:1 54:21 82:19,23 93:1 94:10 98:1 142:15 209:23 234:13 256:4 268:9,13
**comes** 65:18 103:17 230:5
**comfortable** 121:15
**coming** 104:5 120:10 242:3,7
**command** 132:24 133:2
**commence** 1:20
**comment** 84:10 103:9 105:14,15 142:9
**comments** 139:17 142:12 144:3
**commission** 11:16 11:22 12:1,3,6 287:19
**Commissioner** 12:8,9
**commissioners** 11:7 148:16 222:22 273:10 281:13 282:21 286:14
**common** 205:24 220:19
**communicate** 8:21
**communicated** 227:1
**communications** 38:17
**compensation**

205:10
**competency** 40:3 42:6 134:21 135:11 136:13
**competent** 138:2 159:20
**competition** 13:24
**complained** 240:3 240:4
**complaining** 195:18 218:15 237:10 239:24 243:15,16
**complaint** 100:8 100:11 195:17 195:21 196:3,18
**complete** 9:21 10:2,8 66:18 294:14
**completely** 46:17 49:11
**complied** 6:9 37:7 151:19 163:12 190:23 193:10 193:22 228:10 229:2
**computer** 61:23 62:4,6 78:19 112:24 118:11 118:17 299:4
**computers** 113:5
**concerned** 118:17
**concerning** 7:6 17:8 19:2 43:22 46:14 52:23 144:23
**concerns** 156:12
**conclusion** 134:19 135:10 136:8 138:1 159:17 206:14
**condition** 10:1
**CONDON** 2:17
**conduct** 17:8 19:2

John Scatchell, Jr.
August 5, 2020

289:20
conducted 287:6
conducting
288:16
confer 104:20
conferences
194:11
Confidential
164:9 165:9
166:9 167:9
168:9 169:9
170:9 171:8
172:9 173:9
174:9 175:9
176:9 177:9
178:9 179:8
180:8 181:1
confirmed 224:3
confused 18:6
connotation
105:19
connotations 60:3
60:22
consecutive 212:3
consensus 55:12
208:18
consequence
278:18
conservation
31:24 32:9
38:20
consider 14:17
132:20
consideration
69:18
considered 134:13
139:5 195:10
196:15
considering
195:10 197:14
consisted 55:13
consisting 294:12
consists 38:23
constantly 257:21

contact 38:19
145:6
context 56:8
143:18 189:5
continue 109:20
129:17 130:2
248:18
continues 101:11
108:12
Continuing 76:3
contract 150:16
150:20,23
control 286:15
conversation 8:19
46:1,6,19,23
47:9,14,16 48:3
48:6,16 49:4,6
55:10 64:11,23
65:6 72:1 73:9
82:1 94:1,21
95:15 103:6
111:6,12,16
115:14 117:8,20
124:23 125:11
130:10,16,23
143:18 144:6,7
187:20 188:8
201:21 203:2,5,8
210:18 211:24
212:10,22
224:16 242:17
252:1 255:2,16
255:20,22 256:3
256:12,15,24
259:13 260:3,13
260:18 264:21
264:23 265:3,6
265:23 266:3,6
268:6 270:24
271:17 272:15
conversations
43:21,24 44:3,6
46:9,13 49:23
52:22 53:6,13,17

55:5,13,14,16,19
55:21,24 56:2,6
56:13 58:24
59:5,20 61:8
62:3,10,11,12
64:13 65:3
69:20 78:7,9
82:7 99:12,17
100:16 102:22
104:1 109:15
143:21 209:13
292:23
convicted 10:16
15:23 16:17
20:1,2 30:1,17
31:4 49:20 72:5
Cook 1:16 298:5
298:10 299:23
cool 43:2
Cooper 3:8,11
12:12,18 13:1,5
13:9 14:6 15:8
17:11 19:6 22:4
22:17,21 23:1
25:18 27:17,19
28:5,14,24 29:9
29:18 30:20
31:9 32:17,20
33:12,15,20 34:9
34:13,19 35:5
36:12 37:11,14
38:3 40:2 41:12
42:5 45:5,13
47:24 50:2
51:17 76:9,18
88:4 108:14
109:17 126:22
128:1 129:9,15
129:22 130:4
131:14 134:15
135:9 136:5
137:16,18,24
140:5,9 145:1
149:4 153:13,16

153:19,24 155:1
156:2 157:13
158:9,22 159:16
162:13 182:5
185:18 186:7
187:1,10,12
188:7 191:5
192:5,15,20
197:9,16 200:5
206:13 208:2
228:14 279:1
282:17 293:12
Cooper's 109:15
cooperlaw3234...
3:11
copies 19:14,18
202:8,12,14
copy 19:19 22:5
75:13 202:9
cordial 71:12,15
94:5
corner 77:5
Corporation 1:7
294:7 295:6
296:6 297:6
298:18
correct 15:19
39:23 89:4
132:16 133:11
133:21 134:1
146:17 181:22
211:15 222:1
270:1 275:21
286:17,20
294:13 299:5
corrections
294:17
correctly 34:24
cost 108:6
costs 108:10,11
counsel 15:6
25:16 104:24
126:17,17 147:1
153:5 156:24

186:4 187:7
190:11 196:10
299:16
country 106:21
209:18
County 1:16
298:2,5,10
299:23
couple 8:14 40:19
54:20 98:15
103:14 154:3
231:24 268:20
281:19 282:2,3
course 18:4 38:10
46:9 188:6
267:24
court 1:1 6:7,10
8:17 12:16
36:17 123:10
126:12 129:19
153:15,17 156:8
196:9,12 202:13
236:15 279:2
294:1 298:14
courteous 230:18
cover 164:11
165:11 166:11
167:11 168:11
169:11 170:11
171:10 172:11
173:11 174:11
175:11 176:11
177:11 178:11
179:10 180:10
181:3
covered 216:6
covering 122:19
CPD 17:22
created 185:7
crew 246:15,17,18
246:20
Cristina 3:15
Cross-Examina...
4:4,6,7

John Scatchell, Jr.
August 5, 2020

crux 257:1 262:18
CSO 112:2 225:16
  225:19,21,21,22
  226:1 252:17
CSR 1:15 299:22
ctc@talonlaw.c...
  2:9
cubicle 119:20
Cubs 70:10 71:5
  71:24 73:7 82:2
  272:12
cup 260:9
current 105:24
custom 214:12,14
  214:24 217:9,14
customs 217:10
cut 155:2

        D

D 1:7 4:1 6:20
  272:20 294:7
  295:6 296:6
  297:6 298:18
dad 42:7 44:4
  45:11,23 46:5,14
  47:15 49:24
  54:1 55:22
  58:24 59:7 61:9
  62:4,13 63:5,18
  64:6 101:10
  111:14 114:23
  118:11,23 119:5
  119:6,13 120:1,5
  121:8 122:9,14
  192:13 241:9
  244:1 245:16,19
  246:11 248:12
  252:1 254:6
  264:16 267:17
  267:18 268:22
  275:14,15,16,17
  278:3,5,7,9,12
  278:17
dad's 59:15

115:10 116:11
116:20 117:1,23
118:6 185:11
daily 134:7
  238:21,22 239:1
  239:3
damage 58:10,14
damaged 58:19
damn 102:9
date 21:15 26:13
  27:9 73:19,21
  114:16 154:5
  195:4 266:17
dates 150:14
  186:2 194:5
  233:23
Dave 93:3 101:20
Davie 93:6,8
  96:20 100:24
  101:1 102:9
day 18:4 31:8,20
  44:8 47:7 54:17
  66:14 70:18
  85:13 88:7 98:1
  98:2 99:20
  101:11 106:15
  108:1,20 110:24
  111:7,10 124:17
  133:5 137:8
  143:1 144:10
  204:22 226:10
  231:18 241:15
  244:16 248:24
  266:14 268:1,2
  270:23 294:21
  298:7 299:21
days 220:22
  227:18
dayshift 84:7
deal 291:14
deceit 52:4
December 10:18
  11:11,19 16:23
  17:5 182:11

183:23 184:3
194:20 195:6
197:13 228:13
229:5 275:23
decent 10:15
decided 92:17
  198:3 204:7
decides 283:2
decision 40:4,4
  156:20 204:9
  219:19 290:9
deck 277:7
decree 85:24 86:5
  86:19 125:14
  208:19 256:18
deem 127:15
deemed 277:5
defendants 1:9,13
  3:6 294:10
  295:8 296:8
  297:8 298:12,20
defined 136:11
definitely 141:8
  208:16 212:12
  259:21
degraded 49:11
DEL 3:2
delayed 116:18
Dennis 120:14
deny 122:20
department 17:8
  19:1,16 38:19
  42:12 43:3
  44:14 45:20
  49:16 50:19
  51:24 59:17
  63:22 65:10
  66:20 71:10
  93:14 96:9
  113:14 125:15
  134:5,12 144:23
  145:6,15 148:24
  149:13 152:9
  158:8,20 183:21

205:9 227:2
240:22 248:19
264:4,14,24
depending 109:14
depends 16:11
  227:21
deponent 3:12
  35:9 293:14
deposeth 6:19
deposit 184:14
deposition 1:12
  4:11,12,13,14,15
  4:16,17,18,19,20
  4:21,22,23,24
  5:3,4,5,6,7,8,9
  5:10,11,12,13,14
  5:15,16,17,18,19
  5:20,21,22,23
  6:1,24 7:3 8:3
  20:14 35:15
  75:6 127:3
  146:24 153:2,3,4
  155:8 156:11
  188:6 230:20
  294:11,14 299:9
  299:12,14
depositions 12:24
deputy 17:19,20
  17:20 30:7
  52:17,17 53:8,22
  54:3,5 63:21
  64:7,20 65:12,20
  67:13,22 68:14
  68:17 69:5,6
  70:1,8 71:13
  72:1 73:10 78:7
  78:9,18,21 79:13
  79:18 80:7,13,17
  81:4,12,17,20,23
  82:8,9,12,14,19
  83:2,5 85:20
  87:2,8,19 88:2
  88:13 89:2,9
  92:21 93:11,17

96:6 97:5,15
99:12,14 100:17
101:8 102:5
105:12 106:10
110:11 113:13
113:18 114:6,11
114:19 116:19
116:23 117:5,15
117:21 118:4,9
118:13,21
119:11,24
120:24 123:1,6
123:16,23 124:1
124:3,9,24 125:8
130:9,17,20
131:1,6 132:21
133:23 134:4,10
134:10,10
143:12,14 144:4
144:14 147:13
147:17 148:2,9
148:13,18
197:20,21
222:20 223:1,7
223:15 225:1,10
225:24 233:15
238:11 246:19
251:5 270:16
272:9,15,16
274:22 277:10
283:15 284:1
286:9,10,18
derelict 81:13
derogatory
  138:24 139:13
  139:21 140:3
  141:3 142:3
  218:9 249:19,23
  250:18 263:19
describe 237:17
described 247:21
describing 236:1
descriptive 56:20
  63:10

John Scatchell, Jr.
August 5, 2020

Page 307

deserve 160:24
   235:2
designed 196:5
desk 124:21 217:5
desks 121:12
   227:6
despite 43:4
detail 28:20
detective 51:6
detectives 90:20
   285:18
determination
   290:6
Devon 90:14,18
   96:11 208:8
   209:16 221:1
dies 217:16
difference 11:17
   109:12 161:6
   214:11 262:21
different 8:19
   11:15 181:21
   194:5 211:22
   233:23 247:23
differently 15:15
   16:3 110:6,9
   139:9 140:20
   185:14
differs 219:17
difficult 109:4
Dimaio 54:1
   60:11 137:2
   142:1,2,12 143:7
   143:22 144:2,11
   257:18,19,23
   258:6,13 259:2
   261:7,15,23
   263:7,10,20
Dimaio's 135:17
   161:16
Dino 54:1 60:11
   111:9 124:17,24
   125:11 130:10
   130:17 141:9,13

141:15,18,24
142:2,10,12
143:7,22 144:2
144:11,19
257:18,19
263:20
Dino's 142:15
   260:22
direct 4:3 42:21
   79:1 132:20
   136:22 137:15
   201:12 211:16
   220:1,5 284:11
directed 107:11
direction 63:23
   65:19
directly 87:5
   129:2 201:14
   224:7 239:21
   243:3 262:10
director 17:19
   46:16 47:10
   53:23 54:8,13
   55:1 60:1 69:5
   70:23 79:14
   97:18,20 98:9
   99:18 102:23
   103:2,8 104:2
   105:10 106:11
   109:23 110:7,10
   110:16,21 111:4
   112:8,17,20,23
   113:8,22 115:3,9
   115:11 116:8,10
   131:11 132:22
   134:11 140:11
   143:23 149:17
   160:15 203:20
   222:9 238:12
   284:6,21 286:19
dirty 97:4 197:24
dis- 137:1
disability 91:1
disagree 196:20

disagreed 203:20
discharge 219:19
discipline 41:9,24
   42:17 135:8
   136:2,3,21,24
   137:3 138:9
disciplined 41:2
   158:8 226:20,22
   226:24
discovery 1:12
   196:5
discretion 149:17
discriminated
   49:13
discriminates
   49:16
discrimination
   49:15
discuss 59:7
discussed 38:1
   53:4,18 56:1
   59:6 63:20
   262:5
discussing 115:22
   244:15 261:11
   261:17
discussion 45:17
   64:5 73:12
   114:15 247:22
   280:9
discussions 63:5
   63:18
disk 26:4
disparate 92:20
   226:18
display 57:19
distorted 244:14
District 1:1,1
   294:1,2 298:14
   298:14
distrust 106:21
division 1:2 82:20
   118:16 124:8
   273:22 274:6,9

277:4 280:8,13
284:13 285:15
294:2 298:15
divisions 284:12
285:23
doctor 155:15
163:16
doctors 69:21
152:8
document 20:7,15
21:22 23:5,13,18
24:1,13,15,22
25:7,22 26:20
27:3 36:21 75:1
75:8 138:18
146:19 147:4
149:20 150:6
151:9,16 152:3
152:10 163:1,9
184:17 190:15
190:20 193:2,7
193:14,19 198:6
223:12 228:1,7
228:18,23
documentation
153:9
documented
159:5
documents 49:1
198:12,15 199:1
200:19 202:16
doing 7:22 14:3
35:23 54:24
72:7,9,9 88:9
91:7,8 94:13
119:17 122:10
135:4 161:3
183:8 192:24
223:7 230:15
254:11 271:2
289:13
Donna 51:10
door 58:5 103:16
104:9,10,16

265:1 266:12
270:13,18
doors 112:13
double 135:20
doubt 64:17
dozen 97:4 194:4
Dozens 238:19
Dr 155:14
drawing 18:17,20
driveway 56:4,17
   56:23 57:2
   58:10,12
DSC00281 77:20
DSC00312 181:15
DSC00466 77:9
duck 74:9
dug 88:22
duly 6:19 298:22
dummy 122:24
duties 81:13
duty 89:14
dynamite 57:2

_____
         E
E 2:1,1 3:1,1 4:1,8
   5:1 6:17,20,20
   231:14 272:20
   272:20,20
   285:10,10 291:4
earlier 12:10
   103:5 105:14
   114:16 135:4
   145:20 146:3
   194:2 208:5
   239:7 275:13
early 105:23
   125:7 232:2
   244:5 252:21
   260:23,24
earth 224:24
Eastern 1:2 294:2
   298:15
easy 163:6
EEOC 114:21,23

John Scatchell, Jr.
August 5, 2020

Page 308

115:5,10 116:11
116:13,21
139:22
**effect** 70:16
150:13 219:12
264:15 268:7
**Eh** 18:4 44:23
**either** 44:17 92:4
115:24 135:21
144:8 157:8
216:16 219:22
231:4 232:19,21
234:21 235:6
258:11 262:16
267:21 277:5
289:3
**elbow** 60:15
**election** 235:5
**Elmwood** 197:15
**emphasize** 189:16
**employed** 10:18
13:13 19:15
28:13 29:23
30:16 31:3
92:10 148:23
**employment**
27:16 28:1,1
30:10 194:16
196:15 217:22
219:16
**Empty** 160:20
**enacted** 66:11,12
**encounters**
257:24
**ended** 161:16
**enemies** 246:7
250:22
**enforcement**
70:14 71:9
145:7 257:4
**engage** 210:4
**engaged** 209:16
222:6
**engaging** 237:24

**enjoying** 62:24
**entertained**
197:19 200:18
**entire** 45:18 59:14
61:20 93:14
96:9 108:7
119:7 137:7
233:3,7 234:3
**entirely** 154:20
**entities** 196:16
**entitled** 196:6
**errata** 294:16
295:1 296:1
297:1
**especially** 20:4
133:4 197:22
244:14 248:2
283:10
**Espinosa** 208:12
213:7 221:1
**Esposito** 12:8
38:24 282:22
287:13,22 288:9
289:6 290:5
**establish** 36:1
48:15
**established** 32:14
**estimate** 233:24
**euphemisms**
106:17
**evening** 40:21
260:11
**events** 223:11
261:19
**everybody** 9:9,17
44:7,9,11 65:17
67:18 68:21
71:17 84:5,6,7
86:2,8 90:6
96:10,11 113:5
119:16 121:5
209:20 217:11
226:10 227:1
233:8 245:3

267:16 271:3
289:17
**everybody's** 59:16
127:14 129:3
**evidence** 32:22
35:8 36:10
37:18 57:23
96:23 223:18
224:22 238:9
**evident** 224:2
**ex** 69:20
**exact** 61:3 86:11
125:11 154:5
197:22 205:20
226:17 247:20
263:13
**exactly** 49:1 84:20
85:20 91:2
98:18 112:7
120:23 135:11
203:5 217:6
223:11 225:17
276:20
**examination** 1:14
4:3,5 252:22
**example** 140:11
154:15 157:3
207:16 227:4
270:11 271:17
286:6
**exasperate** 58:16
**exchange** 124:17
**exciting** 291:11
**excuse** 35:13
102:10 107:4
126:23 128:13
**excused** 293:13
**exemption** 208:19
**exercise** 154:9
155:11
**exercised** 207:8
**exercising** 205:15
220:17
**exhibit** 4:11,12,13

4:14,15,16,17,18
4:19,20,21,22,23
4:24 5:3,4,5,6,7
5:8,9,10,11,12
5:13,14,15,16,17
5:18,19,20,21,22
5:23 20:8,14
21:11,23 22:3
23:4,19,23 24:16
24:19 25:8,11,12
25:14,20 26:21
26:24 36:22
37:3,6 75:2,6,15
75:24 76:8,15
77:3 146:20,24
147:7 149:21
150:2,4 151:10
151:14,15,21
152:4,7 153:12
153:21 154:15
154:17 157:4
163:2,8 184:7,18
184:21 190:12
190:16,19
191:19 193:3,6
193:12,15,18,24
198:7,10,11
199:24 200:4,22
201:3 228:2,5,19
228:22 229:4
**exhibits** 20:19
21:7 154:23
**exist** 188:2 190:3
**existence** 190:7
**exists** 205:23
**exits** 205:21
**expand** 108:4
**expect** 219:7
226:20
**expensive** 108:2
**experience** 11:3
160:24
**explain** 115:12
249:23

**explained** 201:17
**explaining** 144:5
**explosion** 56:17
57:11,12 81:7
**explosive** 56:4
**expound** 61:11
**express** 207:7
**extent** 36:8 37:17
134:6 230:2
**extra** 30:9
**extrapolate** 144:8
211:2
**extrapolated**
279:6
**eyes** 60:1,4,6,9,21
105:14 106:16

---

**F**

**F-E-I-E-R-E-I-...**
155:23
**F-O-G-G** 265:14
**face** 93:15 96:23
98:21 160:8
212:17 224:23
**face-to-face** 82:1
**Facebook** 122:12
**fact** 14:17 55:8
59:13 80:23
156:5 190:13
218:20 222:10
240:1 243:5
285:2
**facts** 32:14,21
35:7 36:9 37:18
238:8 248:4
283:1,15 284:1,5
**fail** 283:10
**failed** 283:6,7
**fair** 7:23,24 25:14
63:13,13 117:14
135:3 140:15
211:14
**fairly** 10:15
130:18

John Scatchell, Jr.
August 5, 2020

**fall** 16:1,20 74:1,4
74:8 183:19
275:23,24
**familiar** 14:5,13
14:14,15,22
15:22 27:11
41:16 131:21
155:23 182:14
182:19,22
**family** 14:16 51:8
96:2
**far** 62:23 155:9
197:3 207:20,21
222:12 242:15
246:3 272:14
292:5
**fashion** 108:22
234:16,16,18
249:19
**faster** 22:6
**father** 14:18 41:24
42:16,24 43:12
43:16,22 44:1,7
44:9,17 45:19
46:24 49:5
52:23 53:7 55:6
55:16 56:3 60:4
60:10 65:1,5
66:11,13 67:24
68:19 69:14
70:2,9,13,17,24
71:22 78:19
79:3 80:9 81:22
103:6 105:16,17
110:2,11 111:9
112:18 113:4
114:21 115:4
118:14 120:17
139:22 141:19
141:21 142:16
207:15 217:7
221:24 232:17
232:22 235:3
247:1 249:19

250:20 251:7,23
253:3 254:20
255:1,17,19,19
256:4,13,14,20
268:14 275:4,7
277:8 279:6
280:17,22 291:6
291:18 292:1,11
292:20 293:6
**father's** 65:22,23
78:23 79:20
82:14 105:11
109:24 111:5
112:24 113:9,23
114:13 124:1
138:24 139:14
140:3 141:4
142:4,13 143:9
144:13 229:16
**favor** 86:13
**February** 151:3
267:6,8
**federal** 6:2 85:24
86:5,19 125:14
**feel** 9:11 229:23
**feet** 58:15,22
148:5 237:21
**Feiereisel** 155:18
**fellow** 238:15
257:13
**felon** 15:23 30:1
30:17 31:4
49:20
**felons** 20:1,3 72:5
**felony** 10:16 16:17
**felt** 135:22 280:11
**female** 86:13
259:24 260:1
**fences** 71:19
**field** 77:21 106:2
**Fifth** 14:8,24 15:2
15:14,21,24 16:9
16:18,22 17:3,6
17:10 18:11

28:14,16 29:5,11
29:13,18,20
30:21,24 31:5
32:4,4,11,12,24
34:10,12,14,20
34:22 35:4,11
36:2 38:2,9,14
38:21 40:20,23
41:3,14 74:3,7
74:11,13,18,22
75:21 76:1,12,17
76:21 77:15,18
77:23 78:2,5
87:22,24 145:8
145:10,11,13,18
145:22 146:14
146:18 147:8,11
147:15,20,22,24
148:8,12,17,21
151:2,5,8,22
152:2,13,18
153:7 154:10,22
155:5,16,21
156:1,6 157:7
158:1,5 162:23
163:18 181:17
181:20,23 182:5
182:7 183:10,22
184:1,5,11,16
185:1,5,9 186:15
186:24 193:13
194:1,8,13,18
228:15,17 229:6
231:20
**fight** 105:22 251:1
**figure** 280:15
**file** 205:8 285:19
**filed** 114:23
116:13 185:21
191:3 222:20
254:14,16,17
255:24
**filing** 114:21
115:4 139:22

**find** 283:9
**fine** 33:11 188:16
188:17
**finish** 9:4,6 60:5
68:16 97:22
98:4 127:4,9,12
199:18 210:15
233:4 235:13
238:23 241:14
**finished** 47:12,13
**finishes** 292:17
**fire** 11:6 12:5
51:24 115:13
210:10 222:21
237:22 256:16
273:9 286:14
**fired** 49:18 90:13
90:18 208:9,13
209:19,21
215:17 217:23
217:24 218:7,13
219:1 227:19
**firefighter** 86:13
212:18,20
**fireman** 86:9
212:7,16,18
**firemen** 102:20
**firework** 57:19
**fireworks** 56:3,17
**firing** 13:20 92:17
**firm** 10:21 292:5
**first** 6:18 48:18
75:15,24 88:1
94:4 160:15
184:7 190:2,6
205:16,24
206:10,15,19
207:8 209:3,16
210:3 213:8,19
215:2 216:7
220:17 222:6
240:10 242:24
249:6,12,15
262:4 267:3

275:5 281:11,20
298:22
**firsthand** 209:9
209:15 218:4,24
223:6 224:4,11
226:3
**five** 44:20 91:5
116:16,17 132:5
132:15 215:3
229:7 280:4
282:11,13
289:17,19,21,23
**fled** 90:22 97:12
**floor** 51:14 59:22
72:20
**Flores** 278:4
**focus** 216:21
**focusing** 78:8
**Fogg** 265:10,12
267:10,21
278:22 280:21
**follow** 7:9 17:14
269:19
**follow-up** 58:1
232:1
**followed** 19:8
262:10
**following** 73:3
105:6 157:16
188:21 229:10
231:11 295:9,10
296:9,10 297:9
297:10
**follows** 6:19
**food** 137:6
**football** 106:1
**FOP** 71:18 133:15
133:20 141:17
150:5 204:7,10
261:16 263:2
275:20 277:2
**force** 106:7,19,22
**forced** 17:21,21
96:13 207:18,24

John Scatchell, Jr.
August 5, 2020

208:8,11 210:21
**foregoing** 294:11
299:5
**forever** 107:14
**forget** 86:10,11
210:23
**forgetting** 216:2
**forgive** 86:11
232:5
**forgot** 181:11
**form** 25:21 27:18
28:6 30:4 31:10
32:2 39:6 41:11
47:18 100:9,11
119:2 134:14
144:16 149:3,5
158:23 159:15
186:17 253:16
290:2
**formal** 195:8
**former** 59:10
**forms** 26:6 30:10
**forward** 197:1
**found** 63:24
197:19 226:10
**foundation** 17:23
19:5 30:4 32:2
39:6 40:1 41:11
42:4 48:15
50:15 66:8
71:12 75:19
76:4 121:18
124:19 186:17
214:16 236:19
238:5 248:21
250:8 253:16
254:9 256:8
262:8 264:20
273:12 288:11
**founding** 232:15
**four** 46:10 48:24
64:14 116:15,17
139:16 140:18
258:3 289:22

**Fowler** 2:16 4:3,5
6:1,21 12:20
13:3,7,10,11
14:12 15:6,9
18:1 19:10
20:10,22 21:4,8
21:9 22:1,9,19
22:23 23:2,9,21
24:5,18 25:3,10
25:16,19 26:5,23
27:8,23 28:11,17
29:7,14,21 30:12
31:1,14,21 32:6
33:7,16,23 34:15
34:23 35:21
36:7,18 37:1,9
37:13,15 38:11
38:15 39:10,13
39:20 40:17
41:15 42:14,23
44:24 45:10,21
47:21 48:7 50:5
51:12 52:1,21
61:5 63:3 67:1,4
67:21 69:19
70:6 72:18,23
73:6 75:4,12,22
76:6,13 77:1,8
77:11 81:15
83:18 84:9
88:10 105:4,9
108:3,9 109:5,11
109:21 119:10
121:19 125:24
126:10 129:21
130:1,7,12,14
131:20 134:23
135:13 136:17
137:21 138:14
140:14,16
144:21 145:4
146:2,8,22 147:3
147:6 149:8,23
150:11,22

151:12,20 152:6
152:14 154:12
155:13 157:19
157:21 158:18
159:2 160:1
162:19 163:4,13
181:9,12 182:3,8
183:18 184:20
186:1,11,19
187:3,11,19
188:4,9,13,16
189:7,19,23
190:8,18 191:1
191:11,17,22
192:11,19,23
193:5,11,17,23
195:5,16 196:4
196:19 197:4,10
198:2,9,14,19
199:2,9,17,22
200:9 202:3,18
202:24 203:1
205:22 206:22
208:23 214:21
215:23 228:4,11
228:21 229:3,7
229:13 230:3,22
231:9 239:7
252:22 254:24
272:21 274:4,19
275:11 276:4
279:8 282:19
285:6 293:11
**fragments** 57:17
**frankly** 156:23
**frayed** 57:19
**free** 206:19 210:5
218:12
**frequently** 257:22
**friend** 14:16 51:1
59:10 89:10,11
222:14 250:20
277:5 280:16
**friendly** 271:3

**friends** 44:16,17
52:18 83:9 97:1
197:20 227:21
234:24,24 236:6
236:11 245:16
245:19 247:2
280:9 283:18
**friendship** 237:20
**front** 96:24
148:15 150:1
151:13 223:13
223:14 239:14
239:19
**fuck** 103:16
**fucking** 47:7
59:11 259:8
**full** 149:14
**fun** 14:1
**funny** 50:18
**further** 102:14
153:11 203:21
285:9 293:14
298:21 299:8,11
299:15

---

## G

G-A-R-R-I-T-Y
153:16
**GADO** 3:2
**gained** 162:22
**game** 70:10,14
71:5,9,24 73:8
73:14 82:2 94:5
201:18 272:12
**games** 227:7
**garage** 270:14,19
**Garrity** 35:17,18
145:21 146:17
153:14,16,20
154:7,8
**Gary** 49:19,20
52:16
**gather** 199:16,19
**geese** 181:22

**Gene** 278:2
**general** 8:6
**generally** 13:23
14:4 181:24
**generous** 148:24
149:5,11
**genitalia** 215:16
**gentlemanly**
108:22
**gentlemen** 287:15
**George** 11:16
287:19
**Gepetta** 71:21
204:18 283:20
**getting** 44:8 60:8
82:21 197:2
242:13 266:16
**gia@lawfirm.gs**
2:4
**Gianna** 2:2,5
185:16 186:12
186:18,20
191:24 192:12
192:16,18
**gift** 95:3,9
**gifts** 89:13
**Gil** 208:12 213:7
221:1
**gist** 236:5
**give** 6:11 7:4,16
9:21 10:2,7 12:2
17:22 18:22
19:21 22:23
32:18 83:17
84:13 105:2
135:6 247:4
266:23 292:5
**given** 8:12 24:13
34:1 54:5 81:12
85:12 114:14
115:17 146:17
204:9,17 221:20
280:15 294:12
294:14 299:1,6

John Scatchell, Jr.
August 5, 2020

**glad** 181:10
**glance** 198:11
**glanced** 199:24
**Glen** 51:2 90:7
92:4
**go** 8:3 12:4 16:13
16:20 17:4
18:21 19:19,21
22:6 23:1 34:19
36:3 41:12
44:19 50:12
51:16 57:13
60:12,19,23
65:19 71:24
76:11 82:5
90:10 91:15
92:13 97:23
101:16 102:14
107:24 118:2
122:8 130:6
132:11,23
137:17 144:10
160:16 163:7
184:3 188:14
195:1 197:1
201:19 202:21
204:6 208:4
216:3 219:6
231:22 244:5
248:5 250:3,4,4
255:15 256:10
266:21 268:23
281:10 285:24
287:9 290:22
291:9,9
**God** 6:13 55:2
85:15 122:6
128:8,10
**goes** 40:3 44:13
62:23 138:10
229:20 256:16
290:6,20
**going** 8:3 9:8 13:2
14:8,9 15:2,10

15:17 16:4,9
17:13 18:13
20:20 22:7
32:10 35:3,12
36:2 37:23 38:7
44:21 56:19
60:5 61:17,22
63:23 64:10
69:8 72:15
73:18 76:11
78:13 82:18,19
82:23 84:2
106:20 107:13
108:1,4,12 109:2
109:2 112:14
120:17 122:9,22
122:23 128:20
129:16,22,23
130:1 132:23
134:17 143:12
160:9 161:20
162:9 182:20
186:16 187:8
196:22 197:23
197:23 202:19
202:20 203:23
231:22 236:18
237:21,22,24
243:20 244:15
246:23 247:22
247:24 252:12
259:8 263:13
264:19 270:20
270:21 278:14
279:19 280:1
289:12,14,15
**gold** 252:13
**good** 9:13 10:12
10:13 43:4
51:21 52:18
71:16 83:9
90:15,15 108:16
160:9 183:17
231:16 283:22

289:10
**Google** 89:23 90:1
90:2,10 91:23
95:20
**goose** 181:24
182:4
**grabbed** 71:20
**grade** 253:20
**grandfather** 115:7
115:10,12,24
183:24 184:4
**greater** 207:20
**Greg** 224:21
**grew** 92:8 104:14
255:12
**grievance** 48:18
131:8,13 132:2
254:14,16,17
255:24
**grievances** 44:5
45:12,23 46:10
46:15 50:1
104:19 131:3
198:22 200:10
200:12,17,21
201:15 203:19
204:3,13,21
205:3
**ground** 7:9
104:13,13
**group** 3:2 67:16
79:22 250:20
**groups** 74:5
**growl** 182:20
**guarantee** 252:12
**guess** 57:4 71:15
105:19 219:14
242:2 246:5
290:3
**guessing** 209:11
**Guide** 14:23 15:4
15:12,18
**gun** 54:18 66:12
66:14 76:16

**guy** 43:2 58:1
82:18 93:22
95:1,11 98:21,22
99:1,2 125:17
213:2,2,3 224:14
227:17 256:6
281:1 283:9
**guys** 19:17 30:6
54:22 65:10,11
69:2,3,13,17
72:4,7 90:13,16
90:17 91:6
92:12 108:5
120:10,12,16
122:23 143:11
143:13,14 162:2
182:19 188:12
208:7,9,11
209:19,21 226:7
233:10 234:10
234:10,22 245:9
248:1 266:10
284:9 291:19,20
291:22

**H**

**H** 4:8 5:1 6:17,17
92:7
**H-I-L-G-E-N**
101:5
**half** 57:3,18 194:4
**hallway** 252:16
270:24
**hallways** 54:16
120:2,8
**hand** 6:8 13:18
66:24 299:20
**handed** 20:11
**handing** 75:5
**hands** 276:17
**handwriting**
23:12
**hang** 30:3 44:19
72:11 77:7

187:4 199:6,7
236:8,12 250:2
292:16,16
**hanging** 253:19
**happen** 50:18
72:2 120:4
262:3
**happened** 34:18
36:5 56:16,21
71:19 86:15
116:14 202:8
216:16 217:9
224:21 279:15
279:17 280:5,20
**happening** 72:4
**happens** 9:9 281:5
**happy** 115:1,2
202:23
**hard** 195:13 283:9
**Harlem** 3:3
**Harlo** 210:8 212:1
212:2
**Harpo** 51:21
52:13,15 89:6,7
**hated** 125:11
**he'll** 67:16,17
241:8
**head** 8:21,22
28:21 50:9
128:6 159:8
201:1,8 220:3,7
263:21
**hear** 7:11 28:18
52:5 67:22 68:4
68:14,17 70:7
78:17,21 79:18
79:24 80:7,13
84:8,24 85:20
100:3 101:16
111:22 112:7,14
113:17,20
114:24 116:18
123:16 127:3
143:22 144:2,11

John Scatchell, Jr.
August 5, 2020

Page 312

153:18 196:10
218:21 233:13
233:17,20 234:1
238:17,20 239:1
239:4,18,23
240:15 243:18
244:7,18 245:5
245:23 246:9
247:1,11,15
248:15,18 251:6
252:7,19,24
253:10,22 254:3
254:19 257:6
258:12 259:1
261:23 263:9
264:9 266:3,6
267:14 268:7
272:9 284:16
**heard** 7:20 41:7
57:10,11 65:20
68:1,7,12 69:24
78:9,12 80:17
81:4,17,20 82:12
83:2,5 84:7
85:11 87:2,8
103:1,8 105:10
105:17 109:23
110:2,10,15,20
111:3 112:2,11
112:16,22 113:7
113:21 114:11
114:19 115:3
116:7,10,17,19
116:23 117:15
117:21 118:4,9
118:21 119:11
119:24 120:2
123:1,6,23 124:3
124:9 131:1,6,11
131:24 132:14
138:22 139:11
139:19 140:1
141:1,12,13
142:2,11,14,18

142:20 147:16
190:2,4,6 203:22
203:24 218:17
225:1,4 232:24
240:8,10,18
241:16 242:11
242:16 243:20
246:12 247:5
249:12,15
251:15,22
252:22 253:1,6
253:14 257:22
258:6 260:22
261:14,15 263:7
263:17,17,18
265:7 267:2
268:4,22 269:9
269:23 272:13
284:21 285:4
291:6,17,24
293:5
**hearing** 39:21
110:3 113:2
130:9 132:9
146:4,16 147:12
147:16 194:3
211:10 248:9
249:7 260:20
261:3,9 262:22
263:4 274:11
**hearings** 38:22
39:2 98:20
194:9
**hears** 67:18 84:5
**heated** 124:17
130:18
**held** 73:4 105:7
157:17 188:22
229:11 231:12
240:21 241:12
241:16 271:10
**hell** 61:22 255:7
**help** 6:13 85:15
117:12

**helpful** 21:1
**helping** 203:11
**helps** 76:9 150:20
**heretofore** 298:6
**hereunto** 299:20
**HERVAS** 2:17
**hey** 12:12 87:13
88:8 94:11,14
96:17 233:10
234:19 271:1
**hi/bye** 117:18
**hid** 277:12
**high** 104:11
**higher** 279:20
**Hilgenberg** 93:4
101:2,3,10,12,20
102:6
**hire** 49:19
**hired** 11:6,10,20
17:20 86:9
249:10 287:17
287:18,23
**Hock** 197:21
**hold** 136:6 228:14
235:17
**hole** 59:11 80:12
80:15,18,24
111:8,14 112:10
119:16,17 120:1
120:3,6 121:2
221:13
**homeowner's**
208:19
**Homer** 51:2 90:6
92:4
**Homewood-Flo...**
90:7 92:3,5
**honestly** 147:19
**hour** 137:7
**hours** 68:3 242:6
260:11
**house** 51:10 57:5
90:9,12 91:13,18
92:13,14,15

115:19 208:20
208:21 209:23
214:1 253:7
254:22 255:17
**how's** 87:14 88:8
94:13,14 271:1,1
**HR** 220:3,7
**Hubbard** 2:2
**huh** 54:24 55:1
**huh-huh** 8:22
**human** 49:12
**hundreds** 97:20
**hunted** 77:22
88:23
**hunting** 14:2
16:20 17:5 31:4
31:23 74:2,5,9
74:19 184:3,14
184:23 264:10
**hype** 67:20
**hypothesizing**
114:8
**hypothetical** 46:8

_____

**I**
**IDecoyem** 14:23
15:4,12,18
**identification** 4:9
5:2 20:9 21:24
23:20 24:17
25:9 26:22
36:23 75:3
146:21 149:22
151:11 152:5
163:3 184:19
190:17 193:4,16
198:8 228:3,20
**identifying** 186:3
**ignore** 112:14
**ignored** 96:23
**IL** 299:23
**Illinois** 1:1,7,17
1:18 2:3,8,15,19
3:3,10 205:9

294:2,7 295:5
296:5 297:5
298:1,6,10,11,15
298:17 299:23
**image** 76:22 77:16
77:21
**immediate** 242:20
**implicate** 269:17
**implies** 192:10
**implying** 128:11
128:12,14
**important** 7:8 9:2
**Impossible** 53:14
**impressions** 55:1
**inactive** 162:21
**inadvertency**
189:17
**inches** 104:12,13
242:18,18
244:12
**incident** 32:8 35:3
35:7 37:19,24
38:4 55:17 56:3
81:6,18,22
110:17,22 123:3
123:8 224:5
225:3 226:4
**incidents** 251:22
**inclined** 26:17
73:17
**include** 258:9
**included** 74:5
198:12 200:22
201:3
**including** 56:9
69:19 146:11
**inclusive** 294:13
**indicated** 14:7
**indicating** 104:12
**indicted** 90:22
91:2
**indictment** 97:13
**individual** 75:23
261:14

John Scatchell, Jr.
August 5, 2020

individuals
140:22 220:12
220:13,24 235:8
243:9 287:9,10
288:4,8,16
infinite 108:19
information 94:8
95:22 227:5,8
initials 246:21
injury 149:14
151:3,6 157:23
162:21
injustices 203:18
inquire 35:14
insane 90:24
inside 57:7 252:11
instances 214:2
instruct 29:4 38:7
153:6
instructing
196:21
instruction 156:9
instructions 8:11
12:21 13:7
intent 35:22
interested 299:18
interim 211:13
interrogation
33:18,24 34:4,17
35:2 36:11
145:19,21 154:3
154:19 162:9
185:2,6
interrupt 12:13
52:11 107:9
126:1,2
intervention
156:8
interview 12:4,10
123:4 281:23
286:21 287:3,6
288:17,24 289:5
289:20 290:14
interviews 288:21

intimidating 69:7
investigated
102:13
investigation
81:12
investigations
145:17
invited 79:4 92:13
92:14 119:5
209:8 213:24
invocation 154:22
157:7
invoke 14:24 15:2
invoking 145:13
involved 29:24
61:14,14 234:22
involves 70:23
involving 55:17
78:7 81:22 89:9
irate 49:9 53:24
54:9,14
ironic 106:3
issue 89:9 135:12
136:10 137:4,19
153:11 161:5
187:17 226:17
256:1
issued 136:23
issues 156:15
204:21 225:11
225:15 231:21
Italy 90:22
Itasca 2:19

_____

**J**

J 6:17 43:17
J-A-R-E-C-K-I
240:14
jag-off 111:7
112:9
January 33:19
117:17 162:10
185:3 266:22
267:1,6,8

Jarecki 240:10,12
240:15 241:6,16
242:15 243:16
243:19 244:8
245:7 273:19
274:5 278:20
279:10 284:18
Jarecki's 244:19
272:22
Jeep 223:16 225:5
Jeff 12:12 14:7
18:23 20:18
22:4 38:7 44:21
48:4 59:22
64:13 72:21
75:11 76:18
96:13 98:3,6
101:19 129:16
140:10 155:2
185:18 189:1
191:14 208:7
209:2 220:24
231:6 275:10
278:13
Jeffrey 2:16 61:4
jeffrey.fowler@...
2:16
Jennifer 215:12
217:2,19 218:10
218:15 219:20
221:3
Jerry 51:5 90:20
90:21,23 95:18
96:7 97:11
98:10 99:8,13,21
102:16 104:6
208:16 214:4
Jimmy 218:5
221:3
job 10:22 29:17
51:22 56:10
72:10 88:7 94:4
114:10 119:20
160:18 195:8

213:21 217:4
264:17 267:15
267:17 268:23
282:7
Joe 279:10,17,19
Joey 269:8
John 1:3,13 3:15
4:2 6:23 14:10
43:17 69:10,11
128:22,22 129:9
129:9,9,15,15
130:5 147:10
153:1 156:12,14
156:19 195:19
196:14 243:22
264:16 278:24
280:6,14 284:16
294:3,19 295:2
296:2 297:2
298:11,15,22
Johnny 59:10
70:16 80:24
87:13 94:10,13
221:11,18 222:5
268:14 271:4
278:6
Join 28:8 50:4
159:1
Jojette 111:20
joke 128:16,17,19
joking 234:15,18
jon 74:9
Jr 4:2 147:10
153:1 156:19
195:19 196:14
225:18 298:11
Jr.'s 156:14
Juan 96:13 208:7
209:2 221:1
judge 108:13
109:3 156:18
July 225:19
jump 128:20
June 25:5 184:10

Junior 20:8 21:3,7
21:11,23 22:2
23:19,22 24:16
25:8,14 26:21
36:22 75:2
146:20,23
149:21 150:2
151:10,15 152:4
163:2,7 184:18
190:16 193:3,15
198:7 228:2,19

_____

**K**

K 298:2
keep 65:16 129:4
231:18 260:9
289:14
keys 226:12
kid 49:19 51:22
54:18 253:20
kidding 49:19
kind 8:16,22 9:1
56:4 81:7 106:3
106:8 117:20
128:15 143:23
144:3 159:11,12
214:23 226:12
233:8 236:4
245:9 252:13
257:4 269:1,2
273:14 289:12
289:16
kinds 247:16
289:7
knew 86:8 87:20
88:17 89:3,6
90:6 92:22 93:1
93:2,12,15 94:5
96:7,9 100:4,6,7
102:8 113:6
182:24 183:1,5
186:20 204:10
225:20 272:16
know 7:5,12,16

John Scatchell, Jr.
August 5, 2020

Page 314

| | | | | |
|---|---|---|---|---|
| 8:2,4 12:19 | 231:5,17 234:9 | 130:24 131:3,8 | 261:24 263:10 | **Leonard** 58:5 |
| 44:13,21 45:24 | 234:11 236:13 | 131:12 132:1 | 263:19 | **Leoni** 11:16 |
| 48:21 50:11,14 | 241:11 243:8 | 140:4 141:4,14 | **Lavalais's** 44:4 | 287:19 |
| 50:19,20,21 | 246:12 253:23 | 142:4,13 143:9 | 45:12,23 46:14 | **let's** 31:6 49:14 |
| 53:18 54:8,21,23 | 254:24 257:3,14 | 144:13 235:4 | 49:24 87:1 | 96:17 130:5 |
| 56:1,8 58:3 | 268:14,20 269:6 | 248:13 253:4 | 131:3,8,12 132:1 | 149:24 160:22 |
| 60:17 61:13 | 274:8 275:3,6 | 254:5,17 255:6 | **law** 2:2,7 3:2,8 | 163:5 208:1,11 |
| 63:16 64:24 | 276:8,21 277:20 | 255:23 256:17 | 10:21 70:14 | 229:7 280:3 |
| 65:15 67:14 | 277:24 280:1,7 | 256:17 257:2 | 71:9 145:7 | **letter** 219:11 |
| 68:15,20 71:17 | 283:12 284:4,8 | 258:14 259:3,5 | 191:24 257:4 | **letters** 203:11 |
| 80:5 84:14,20 | 284:10 287:7,10 | 261:12 262:11 | **lawn** 208:15 | **License** 299:23 |
| 86:4,14 89:17,21 | 288:13,20,23 | 262:19 263:18 | **lawsuit** 43:19 | **lie** 89:17 |
| 89:24 91:22 | 289:11 290:12 | **Kyll's** 46:10 48:18 | 45:18 215:9 | **Lies** 89:18 |
| 92:2,6,9,21 93:7 | 292:2 | 219:13 259:6 | 216:13,20 | **lieutenant** 54:6 |
| 93:11,17 95:18 | **knowledge** 42:21 | 261:2,17 262:4 | 229:16 | 119:6 133:5 |
| 96:6 98:14,16,23 | 51:15 79:1 | **Kyra** 108:17 | **lawyers** 7:4 | 135:16 138:16 |
| 98:24 99:1 | 89:22 115:8 | 182:22 183:20 | **lay** 71:11 124:19 | 161:16 223:21 |
| 100:7,13 103:21 | 138:6 204:15 | **Kyra's** 109:13 | 264:19 | 223:22 243:15 |
| 106:14 108:15 | 205:13 209:10 | | **lead** 196:5,8 283:1 | 243:17 258:22 |
| 112:4 115:18,23 | 209:15 211:16 | **L** | **learned** 64:4 | 258:23 264:3,5 |
| 117:11 118:19 | 214:24 216:16 | **L** 6:17,17 | 255:23 | 279:20,21 280:2 |
| 119:4 120:13,22 | 216:24 218:4,14 | **Labor** 205:9 | **leather** 121:20 | 285:20 |
| 122:13 123:9 | 218:24 220:14 | **lack** 236:19 238:5 | **leather-ish** 121:16 | **lieutenants** 79:11 |
| 124:13 125:7,11 | 221:8 223:6 | 248:21 250:7 | **leave** 42:2,18 | 132:21 133:18 |
| 125:12 127:23 | 224:5,12 225:14 | 253:16 256:8 | 43:13 121:13 | 134:5 135:7 |
| 129:14 130:23 | 226:3 274:12 | 262:7 288:10 | 122:6 148:24 | 136:1,20,23 |
| 133:17 134:16 | 281:2 | **ladder** 50:22 | 151:1 162:12 | 137:4,22 239:24 |
| 135:14 136:19 | **known** 104:11 | **laid** 212:2 | 217:21,23 | 243:10,13 |
| 138:4 148:5 | 271:6 | **LANER** 2:13 | 264:10 266:13 | **life** 243:21 |
| 154:23 155:4,7 | **knows** 96:10,11 | **language** 47:8 | **leaves** 103:16 | **Life-long** 14:16 |
| 155:19 159:5 | 99:22 102:21 | 102:10 257:5 | **led** 199:23 | **likable** 95:11 |
| 160:8 161:2,8 | 106:13 121:4,5 | **large** 121:10 | **left** 23:13 47:5 | **likes** 244:5 |
| 185:23,24 186:7 | 122:6 125:15 | **late** 137:5,8 158:3 | 99:15 100:19 | **likewise** 9:5 |
| 191:5 200:13 | 136:15 185:19 | 183:7 254:15 | 161:20 227:6 | **liking** 122:11 |
| 202:11 204:16 | 192:6 | **laundry** 197:24 | 239:8 254:6 | **limiting** 156:8 |
| 205:21,23 | **Kyll** 43:22 44:1,4 | **Lavalais** 43:22 | **left-handed** 14:1 | **line** 18:17,21 24:7 |
| 207:13 209:21 | 44:8 45:12,23 | 44:1 87:4,10 | **legal** 86:12 125:14 | 24:21 26:10 |
| 210:11 211:15 | 46:14 49:10,24 | 102:23 103:3,10 | 134:19 135:10 | 27:2 35:19 |
| 211:17 212:14 | 84:1,19 85:22 | 124:11 125:9 | 136:8 137:19 | 147:9 151:24 |
| 214:13 216:1 | 86:5 87:1,3,5,9 | 130:21 140:4 | 138:1 159:17 | 203:15 212:3 |
| 217:5,6 219:2,4 | 102:23 103:3,9 | 141:4 142:4,13 | 206:14 | 295:11,13,15,17 |
| 219:24 220:6,8 | 103:15 120:19 | 143:9 144:13 | **legitimate** 155:10 | 295:19,21 |
| 222:5,16 225:4 | 124:11,18 125:9 | 255:24 257:7 | **lemon** 224:15 | 296:11,13,15,17 |
| 226:14 227:15 | 125:11 130:21 | 258:14 261:7,24 | **Lenny** 96:15,17 | 296:19,21 |

John Scatchell, Jr.
August 5, 2020

297:11,13,15,17
297:19,21
**lines** 27:7 247:13
**linger** 112:12
**list** 44:18 102:7
215:6 280:24
281:3,7 282:16
283:3,4,17 284:3
284:7 285:24
286:2,24 288:18
290:6
**listen** 101:14
108:24 112:13
162:1
**listened** 162:4
**literally** 252:14
**little** 17:22 18:6
51:21 56:20
63:21 64:7
71:11 72:8 94:8
117:13 119:20
160:24 197:1
203:22 244:13
**live** 51:2,6,8 83:9
83:10 86:1,5,18
89:15 96:3,20
98:22,22 102:8
208:15,17 214:5
256:18
**lived** 86:3 90:6
92:2,9 93:3,5,13
93:23 94:18
95:1 96:15,18
97:6 102:9
209:6,20,22
213:11 214:1
**lives** 50:20 86:2
89:16,18
**livid** 82:17
**living** 50:23 84:1
93:4
**LLC** 2:7 3:2
**locked** 60:16
**Lockton** 125:7

208:12 210:4,12
211:3 212:23
221:1 283:7
**Lodge** 150:5
**long** 8:2 12:7
76:16 87:21
96:16 101:23
231:17 248:17
248:23 252:20
253:13 255:4
287:14
**longer** 154:7
231:18
**look** 20:13 22:2
23:22 24:19
25:11,20 26:9,24
37:2 69:9 75:14
76:7 77:3,19
89:22 90:2,10
94:11 99:15
100:9,11 122:21
125:18 146:23
150:1 151:14
152:7 181:13
184:6,12,21
187:16 190:12
190:19 191:12
193:6,18 200:14
200:15,17
202:15 207:15
207:18 227:16
228:5,22 232:19
283:4,4,5
**looked** 57:17
76:23 90:1
100:12 183:5
198:11 223:24
**looking** 23:3
150:15 191:23
**Looks** 27:11
**Lori** 1:15 31:15
298:4 299:22
**lost** 216:13,14
**lot** 50:19 66:19

71:14 82:3 83:8
95:12 99:21
100:12 111:22
111:23 142:8,24
143:1 242:23
253:2 260:6
264:23,24 265:4
269:15
**lots** 252:18
**loud** 56:23 57:10
57:11 67:18
84:4 85:1
**love** 248:2
**loving** 62:18
**lower** 23:13 77:4
151:7 181:14
**loyal** 235:3
**Luis** 278:4
**lunch** 111:21
**lungs** 252:15

---

**M**

**M** 6:20 231:14
272:20 285:10
291:4
**M-80** 57:3,18,20
57:23 81:7
110:22 123:3
**M-A-C** 246:22
**M-E-N-O-L-A-...**
279:4
**MAC** 246:12,14
246:21 247:8
249:14 250:22
**mad** 103:15
**Madison** 2:7
**Maiello** 26:4
66:13 258:22,23
263:23 264:9
**mail** 103:12
252:17
**making** 54:22
**Male** 259:24
**man** 67:20 251:7

251:10
**manager** 134:13
138:22 139:5,12
139:20 140:2
141:2 159:12
160:5
**managers** 134:4
**Manzel** 51:5
90:20,21,23
95:18 96:7,14
97:6,11,15 98:10
99:9,13 102:16
124:8 208:16
214:4
**Mario** 215:6
216:5 221:4,4,6
**mark** 125:7
201:11 208:12
210:4,12,13,20
211:3 212:6
221:1,2 260:8
283:7
**marked** 4:9 5:1
20:7 21:22
23:18 24:15
25:7 26:20
36:21 75:1,5
77:4,20 146:19
149:20 151:9
152:3 163:1
181:15 184:17
190:15 193:2,14
198:6 228:1,18
**marks** 22:15
**matter** 103:18
155:4 156:17
226:24 291:15
**matters** 22:10
**mayor** 53:22 64:9
88:13 99:3
131:21,24 132:4
132:13 140:19
210:8 213:4
215:9 216:9,9,13

218:8 219:22
220:3,4 244:5
283:2 288:2,3
290:13
**mayor's** 216:18
218:7
**Maywood** 195:11
**mbersani@hcb...**
2:20
**McMillan** 215:13
217:2,20 218:15
219:20 221:3
**mean** 43:8 54:19
57:21 61:19
62:1 63:10 82:6
83:8,11 97:24
107:22 113:15
117:10 133:4
135:15 138:6
188:4 191:8
192:9 197:7
203:18 208:7,11
216:2 220:1
235:6,7 243:22
244:4,9 246:2
249:22 251:1
255:9 269:1,15
277:16 284:9
285:16 290:18
**meaning** 161:7
212:18
**means** 44:16 62:2
73:16 214:14
235:12 299:2
**meant** 234:23
**measure** 53:14
**medical** 9:24
153:8 156:14,15
157:3
**medication** 9:19
**meet** 104:20
270:19
**meeting** 61:18,22
122:14 141:11

John Scatchell, Jr.
August 5, 2020

Page 316

141:13,17,19,21
141:21 253:3
259:5 261:6,13
261:16,19,20
262:4,5,12,14,17
262:17,22,24
263:2 277:21
279:22
**meetings** 61:10,11
61:15,16 78:23
79:4 80:1
112:18 118:23
119:5,8 143:1
262:18 277:2
**Melrose** 1:6,17,18
11:1 13:13
29:23 30:16
31:3 95:19 96:8
98:10 101:21
106:7 197:24
198:1 201:17
205:14 206:3
212:21 220:15
233:1 240:22
294:6 295:5
296:5 297:5
298:9,9,17
**member** 232:15
**members** 11:9,10
12:5 133:14,19
**men** 65:13
**mend** 71:19
**Menolascino**
278:24 280:6,14
284:17
**mention** 272:1
**mentioned** 192:17
220:24 232:2
263:23 271:18
284:20
**mere** 244:11
**mess** 8:15 9:8
**message** 269:15
**messages** 184:9

**met** 183:2
**Mexico** 17:2,5
**Meyerson** 156:18
**Michael** 1:8 2:20
3:16 233:14
246:21 269:23
270:5 271:16,24
294:8 295:7
296:7 297:7
298:19
**mid-2000s** 222:3
**middle** 192:1
201:23 202:1
266:22
**midnight** 242:9
**Mike** 199:10
202:19,20,21,24
236:17 293:2
**mill** 290:21
**milling** 48:24
**million** 48:24
**mind** 127:24
139:4 227:7
230:6
**mine** 23:14
234:24,24
**minor** 117:18
**minute** 47:5 214:6
261:6 277:7
**minutes** 229:8
**Mischaracterizes**
251:11
**misconduct** 39:3
41:2,9
**misrepresentati-**
35:8
**missing** 226:8
**misspoke** 211:5
**misstates** 81:9
**mistake** 213:13
**mock** 252:1
**mockery** 91:8
**mom** 99:5
**moment** 33:3

263:24
**Monday** 108:17
109:3
**moniker** 246:6
**monikers** 247:23
**Monroe** 3:9
**month** 95:7
240:23 248:14
249:6,15 254:7
254:13 260:17
266:23 272:6
277:2
**monthly** 239:1
**months** 19:24
54:20 72:3 95:6
116:16,18
149:13,16
**Montino** 49:20
52:16
**Montino's** 49:19
**Morales** 55:17,22
81:22 110:17
123:8,12,22
**Moss** 90:14,18
208:8 209:16
221:1
**mother** 110:23
**mouth** 65:16
110:7 113:12
114:1 142:15
252:14
**move** 62:21 63:1
72:15 129:23
**moved** 51:3 90:8
96:21 121:8
274:9,13
**movie** 57:8
**moving** 72:12
**mows** 208:15
**MUCHIN** 2:13
**muddled** 129:12
**Municipal** 1:7
294:7 295:5
296:5 297:5

298:17
**municipality**
286:22

___

**N**

**N** 1:18 2:1 3:1 4:1
6:17,20,20
231:14,14
252:23 253:2,6
253:10,14,22
254:4 255:3
256:14 257:8,21
258:6,11,13
261:15 262:1
272:20,20
284:22 285:10
285:10 291:4,4
298:9
**name** 6:22 240:13
287:9
**names** 208:5
216:1,3 279:13
279:13
**narrative** 72:14
107:2 126:15
230:2
**narratives** 107:24
**Natale** 71:21
120:15 204:18
283:20
**naturally** 57:23
**NAUGHT** 293:14
**nauseam** 108:19
**nearby** 116:3
**necessary** 154:11
**neck** 151:7
**need** 8:1,4 27:15
30:20 33:9
35:24 48:14
100:10 143:14
183:12,15 197:4
198:15 199:17
231:19
**negative** 142:12

298:17
**municipality**
286:22

143:8 144:12
279:15,17 280:5
280:20
**Negron** 41:17
42:1 43:1,12
**neighbor** 51:7
95:21,23 209:24
269:4
**neighbors** 268:21
**Nello** 90:24
**nephew** 225:17
282:9
**nepotism** 52:4
**never** 36:19 51:7
54:2 83:2 94:16
95:24 96:2
104:9,17 108:6
110:2 119:5
123:13 143:24
153:3 157:22
187:5,17 190:4
195:8 203:20,24
204:9,17 210:8
224:16 226:5,5,8
226:8,14 234:22
239:9 240:3
241:8 251:10
279:19 280:1
284:18
**new** 195:21
217:13
**news** 61:4
**nice** 71:17,20
208:16
**nickname** 52:15
271:11
**nicknames** 247:24
**nigger** 46:18
49:11 106:16
255:6 257:2
259:7 263:12
**night** 10:12 41:8
56:15,24 96:1
245:4 260:6

John Scatchell, Jr.
August 5, 2020

Page 317

266:1
nodded 77:13
92:1 214:9
268:3
nodding 8:22
noise 57:10,12
nonresponsive
72:17
nonsense 129:13
247:9
Nope 11:21 26:19
123:15 234:21
normal 8:19 71:23
North 2:14
Northern 1:1
294:2 298:14
notarial 299:20
notary 1:15
294:23 298:4
299:23
note 152:8 225:23
noted 129:8
294:17
notes 207:14
notice 1:14 6:3
146:17 299:12
noticed 224:1
November 31:6
31:20,22 32:10
34:18 36:5
38:16 158:3,6,20
159:10 160:4
182:10,10,13,18
182:21 183:7
194:7,20 195:6
196:17,17
197:13 249:4
Nowicki 223:21
223:22 224:13
nugget 252:13
number 8:20 24:9
34:5 44:2 73:8
108:19 232:1
numbered 220:22

numbers 37:4
292:6
numerous 56:7,9
162:7
Nunzio 26:3 66:13
137:2 258:23
263:23
Nurse 155:17

O

O 6:17,20 231:14
231:14 272:20
285:10,10 291:4
291:4 298:2,2
o'clock 1:20 72:24
103:12
oath 294:13
obese 66:15
object 30:4 31:9
32:1 35:19 38:3
39:5,24 42:3
47:17 50:15
60:23 63:1 70:4
70:4 72:12
75:18 119:1
134:14 144:15
145:23 146:6
149:2,4 186:17
194:23 205:17
214:15 236:19
248:20 250:7
251:9,18 253:15
256:7 262:7
273:11 288:10
291:8
objected 36:9
37:17 292:16
objection 19:4
27:18 28:5
30:19 32:13,21
34:9,13 35:5,13
40:2 41:10 42:5
42:19 45:5,13
47:24 50:2

51:17 62:20
66:7 76:2,3 81:8
121:17 128:24
129:4,5,7 131:14
134:15,18,21
135:9 136:7
137:24 140:7
155:5,6,8 158:22
159:14,16
162:15 182:2
186:22 195:2
205:18 206:13
208:2 230:1
235:18 236:9
237:15 238:4
274:14 292:13
observation
136:22
obviously 63:23
65:4 83:13
196:19 203:7
226:16 279:14
occasion 31:22
56:22 57:1
occasionally
208:15
occasions 74:14
74:19 80:20
103:20 162:8
occupying 213:21
occur 123:13
138:9 255:22
264:22
occurred 47:23
49:2 53:12
84:18,20 144:8
161:21 211:2
223:22 256:2
285:3
occurs 255:17
260:18 264:24
October 146:11
146:15 147:12
158:3

October/early
158:3
odd 226:11
odometer 223:2,8
224:1 225:3,6
off-duty 149:14
offender 58:17
offense 9:18
offensive 105:24
office 3:8 62:7
67:17 68:2,22
70:19 80:8,23
85:1,3 94:3,11
103:18 104:18
104:19 106:18
111:18 112:5
120:3,10 121:1,4
121:7,10 122:1,5
124:14,21 125:6
221:23 225:19
241:7 242:22
243:1,2,6 244:11
244:13 247:10
252:15,17,18
254:6
officer 10:24
13:14 24:7 28:3
28:22 30:15
31:24 32:9
38:20 41:16
42:1 43:1,12
45:20 71:16
97:12 101:20
106:7 109:12
133:9,10 138:16
160:10,23
194:21 226:24
259:20,22,22
260:2 264:3
265:9,15,20
267:10 272:23
273:1 280:12
283:11 286:23
288:17

officer's 24:21
26:9 27:2
officers 17:9 19:2
29:23 31:2 39:8
61:21 66:6
70:20 73:9
133:3,13 135:8
145:16 227:14
234:1 235:24
236:2 237:10
238:1,16 239:4
239:13,18,23
245:1,6 257:9,14
260:1,12,16
267:12 285:14
289:21,24
offices 2:2 144:9
191:24
official 138:18
210:23 211:21
officially 211:6
oh 13:5 59:21
60:16 94:10,11
94:12,14 100:3
128:18 212:12
225:13 227:16
289:19
okay 7:13 8:10,24
12:11 13:6,10
14:11,20 16:13
17:15 24:4,19
25:15 27:9
32:20 33:3,4,15
33:20 37:11,14
38:16 46:20
47:8 59:24
64:23 68:16
69:11 70:12
71:12 78:6,16
84:10 91:12
96:16,19 97:22
99:11 102:11
103:1 106:14,15
107:8 110:5

John Scatchell, Jr.
August 5, 2020

125:23 126:22
129:18 132:7,18
133:7 139:10
140:21,24 143:2
145:1 149:12
150:18 156:21
191:21 192:12
192:24 195:22
196:12 197:9
199:19 201:6
204:13 206:7,23
207:1,10 210:16
210:17 220:20
226:23 227:11
231:9 232:6
240:6 247:11
248:3,4,14
249:21 251:14
253:5,9 254:18
257:6,17 258:23
259:10,22
261:10,13
262:24 263:8
264:19 266:10
267:8 269:23
271:11 276:16
277:1,23 279:9
280:5 281:4
285:21 286:18
287:21 290:4
291:13
**old** 64:3 212:1,2
216:21 259:22
284:23
**on-duty** 225:16
**once** 62:5 63:24
93:19 136:7
161:1 195:4
217:14 239:8
244:9,12 258:17
271:9
**one-on-one** 71:20
**ones** 272:3
**ongoing** 45:16

160:17
**ooOoo-** 293:15
**open** 98:7 103:16
104:9,10,16
288:21
**opinion** 59:16
90:16 97:9
160:23 219:16
**opportunity** 7:4
7:16 194:15
195:11,20
197:14 198:4
229:24
**oppose** 219:14
**opposite** 60:11
**opted** 133:16
**oral** 281:23
282:18,20
286:21 288:21
289:5,20 290:14
**order** 7:7 34:1
147:17 289:24
**ordered** 148:3,10
148:14,19
**ordinance** 66:10
**ordinances** 66:12
**organization**
194:22
**original** 191:17
246:24
**originally** 265:7
**originated** 292:7
**outcome** 299:18
**outed** 227:9
**outside** 57:14
86:18 105:3
112:13 183:20
242:24 293:2
**overall** 55:12
**overheard** 111:6
111:18 130:16
212:11,12
**overhearing** 83:24
**overlooked** 235:1

**overlooks** 86:1
**overseas** 90:18
**oversee** 284:11
**overtime** 94:12
**owed** 205:10

---

**P**

**P** 2:1,1 3:1,1
**P.C** 2:17
**p.m** 1:20 221:14
**pack** 245:11,12,17
245:20 246:3,10
246:12,13,14,22
246:22 247:2,7,8
249:5,14,17,23
250:22,23 251:8
251:16,23 252:2
252:3 291:7,12
291:14,18 292:1
292:20 293:2,7
**page** 21:13 22:13
37:4,4,5,19 38:1
75:15,24 76:8,15
77:3,19 132:19
150:14,15
181:13,16 184:7
184:12 191:13
192:1,17 295:1
295:11,13,15,17
295:19,21 296:1
296:11,13,15,17
296:19,21 297:1
297:11,13,15,17
297:19,21
**pages** 4:2 19:22
294:12
**paid** 275:13
**panel** 289:16,19
**Paoletti** 39:23
40:18,21,24
**paper** 192:9
**papers** 200:1
211:12,16
**paperwork** 191:9

**parameters** 36:1
**paraphrasing**
203:9 256:22
**parent's** 57:8
**park** 1:6,17,18
11:1 29:24
30:16 31:3
95:19 96:8
98:11 101:21
106:7 197:15,24
198:1 201:17
205:14 206:3
212:21 220:16
233:2 240:22
270:17 294:6
295:5 296:5
297:5 298:9,10
298:17
**parking** 142:7
270:19
**part** 52:14 189:18
211:23 212:9
281:16
**parte** 69:20
**participant**
265:18
**participating** 61:9
112:18 118:23
**participation**
78:23
**particular** 16:11
52:7 53:4,17
55:14 62:11
68:23 122:17
130:3 220:9
229:18 267:5
272:4,5
**particularly**
238:11
**particulars** 56:14
256:23
**parties** 6:3 92:13
189:11 299:14
299:17

**party** 234:18
**party's** 265:17
**pass** 230:24
**passed** 202:11
214:18 217:8
281:23 283:6
**passes** 290:14
**passing** 43:2
119:15 142:7,21
**passionate** 69:16
**patrol** 13:14 50:20
82:20 272:23
273:1 285:17,17
285:18,18,19,22
286:6,16
**patrolman** 136:16
136:19 273:16
273:18
**Paulette** 155:17
**pause** 32:19
**pay** 44:12 123:18
123:20 149:14
204:22 234:19
259:8 263:13
**paying** 202:22
233:11 243:21
**peak** 260:10
**pending** 8:8 37:12
156:17 298:13
**people** 49:17
50:22 68:23
71:14,20 74:5
92:15,17 93:2,15
102:8,15 116:2
122:8,11,13,17
140:13 205:15
207:7,19 209:13
213:10,14,24
214:1 215:1,3
217:12,15
218:17,18,23
220:16 222:12
226:22 234:17
235:2 240:9

John Scatchell, Jr.
August 5, 2020

252:19 258:21
268:3,9,12,16
271:8,14 273:4
274:21 275:14
276:9,11,22
277:20 289:17
**people's** 60:15
**perceive** 89:11
**perceived** 217:11
217:12,14
237:12 246:7
268:17
**perceives** 250:19
250:21
**percent** 19:9
**perfect** 106:8
**perfectly** 224:2
**performance**
260:10
**performances**
105:21
**performed** 105:22
105:23
**period** 16:1,14,19
73:24 84:15,16
114:18 161:2
182:9 183:7,19
194:14,19
197:12 211:13
247:19,20 248:8
248:12
**periodically** 19:15
**periods** 12:23
**permission** 27:16
28:3 29:16
**perpetuated**
292:8
**person** 71:14
106:5 111:10
212:9,15 218:2
255:11 264:2
269:16,17 277:3
277:4 289:19
**personal** 51:15

60:14 79:1
113:24 155:14
205:13 214:24
216:16,24
218:14 221:8
225:14 271:22
274:12
**personally** 67:22
68:1,7,11,13
69:24 70:7 97:8
103:8 110:9,13
110:15,20 111:3
112:16,22 113:7
113:10,19,21
115:7 116:9,12
124:2,6 131:18
139:11,19 140:1
141:1,23 187:15
233:16 245:23
246:11 252:8
253:1,5 298:8
**personnel** 286:13
**persons** 71:15
**perspective**
156:23
**pertains** 154:17
**Pesch** 50:24 71:21
89:13,15 90:3,19
91:12,13,14,17
92:22 93:12,16
94:18 95:10
96:12 99:18
100:17 102:16
104:6 120:13
124:8 208:14
214:4 283:20
**Phil** 42:11 43:4
**Phillip** 41:17
**phone** 117:9
124:20,22
**photo** 75:17 77:12
181:22
**photograph**
181:18

**phrase** 110:5,8
159:18 206:14
233:1,14,18,21
234:1 237:9
238:2,17 239:14
239:17,19 240:1
240:4,16 245:24
246:10 248:9,18
249:7 272:10
285:13
**physical** 66:16,18
**physically** 138:8,8
253:21 266:2
**pick** 92:18,19
290:13
**picks** 290:21
**picture** 95:8
215:15 218:16
267:19
**piece** 192:9
**Piemonte** 219:22
220:7
**Pierce** 2:18
**pigeonholing**
250:19
**pin** 101:9
**pinpointed**
114:16
**pit** 77:22 78:1
**Pitassi** 1:8 3:16
17:19 20:3
46:16 48:20
49:9 51:11
53:24 54:9,13
59:9 60:1 69:5
70:23 79:14
80:12 87:15
92:24 97:18,20
98:9 99:18
100:7 102:23
103:2,9 104:2
105:11 106:11
109:23 110:10
110:16,21 111:4

112:8,17,20,23
113:8,22 115:4,9
115:11 116:8,10
117:9 131:11
134:11 140:11
143:20,23 160:7
160:15 203:20
210:10 222:9,13
233:20 238:12
239:20 245:21
251:6,22 252:5,6
252:23 253:6,10
253:14 254:4
255:5 256:14
271:23 275:1
277:6,18 284:6
284:21 294:8
295:6 296:6
297:6 298:18
**Pitassi's** 110:7
**pits** 88:22
**pittance** 91:7
**place** 46:2 47:16
47:22 48:17
55:11,20 64:12
64:15 71:5,7
84:12,22 94:2
111:13,17
115:15 120:7
124:24 201:22
210:19 265:4
276:14 280:23
282:16 294:12
**placed** 283:17
286:23
**places** 283:3 284:3
284:7
**plaintiff** 1:4 2:11
43:19 195:18
294:4 295:3
296:3 297:3
298:16
**plan** 63:19
**planned** 63:20

**planning** 64:6
231:21
**plans** 62:13 63:6
63:11
**play** 94:5 201:18
203:10
**players** 106:1
**please** 6:6,7,22
9:17 27:1 28:10
31:13,15 33:15
39:14 45:1
63:16 67:5
83:19 101:14
107:1 126:10
129:10 130:6
158:12 160:3
190:19 193:6,18
207:3 215:19
228:6,22 236:16
237:2 241:21
254:13 294:15
**pleased** 141:10
**Plenty** 53:1
**plus** 287:3
**point** 9:9 14:20
20:17 36:6
41:24 93:24
96:21 99:8
102:4 108:17
117:6 148:4
154:1 157:8
158:7 160:21
161:12 187:7
197:2 201:24
202:2 203:24
211:17 264:13
266:18 274:6
287:16 288:14
290:22
**points** 282:1
**police** 10:24 11:7
12:5 17:7,9 18:9
18:18 19:1,2
28:3,22 29:22

John Scatchell, Jr.
August 5, 2020

Page 320

30:15 31:2
38:18 47:6,10
66:6 67:13
97:12 101:20
106:6,7,19,22
113:13 134:12
144:22 148:23
149:13 152:9
160:10 183:21
189:5,8 190:11
191:4 194:3,9,21
196:16 222:22
233:2 234:2
240:22 249:8
257:3,13 270:5
273:9 281:13
283:8 286:12,14
policeman 11:4
90:15,15
policemen 248:2
policy 104:10,16
205:14,20 206:9
207:7,10 214:7
214:11
politics 99:1
201:17
poorly 232:20
235:5,9,15
popped 90:3
portion 31:17
39:16 40:13
45:3 67:7 83:21
158:14 184:8
200:1 215:21
237:4 241:23
250:15 274:2
Portland 183:24
184:2
posed 159:21
289:23
position 37:22
53:22 101:24
102:2 197:15
221:22 271:9

272:22 283:22
285:19
positions 236:3
positive 142:15
149:19 150:17
206:20 261:21
possess 136:13
posted 64:20
114:10
posts 122:12
pounds 162:22
182:1
power 95:4
powers 44:12
63:24 269:11
practice 220:15
220:18 221:10
Practitioner
155:17
preempt 82:3
prefer 108:23
prepared 109:19
153:4
preprinted 290:1
presence 87:12
132:4 144:1
239:5 258:18
277:16 299:3
present 3:14
38:22 41:4 46:4
47:1 49:3 56:15
57:6,7 64:16,24
85:8 94:19
97:14 99:4
111:19,24
115:20,21
120:21 125:5
142:22 146:4
147:14 194:6
203:3 210:22
242:19 252:7
253:21 260:12
265:5,22 266:3
299:13

presented 39:22
100:1 137:9
presidency 243:22
president 204:18
275:19
pretty 49:8 69:16
206:5 252:12
270:19 277:12
290:21
prevail 156:16
previous 256:9
previously 190:4
Prignano 88:15
prime 207:15
Principe 218:5
221:3
prior 11:3 63:17
182:13,18,21
225:22
prison 88:15
pristine 137:9
privy 79:3
probably 21:4
22:6 26:8 80:19
82:2 94:3 102:1
111:23 116:15
117:6 121:13
125:12 132:3
138:11 160:17
201:19 215:5
234:3 249:9
260:4,21 272:7
272:13 282:21
probation 160:22
probationary
161:2
problem 71:22
204:20 223:22
Procedure 6:3
proceeding 108:7
195:15
proceedings 73:4
105:7 157:17
185:16 188:22

201:23 229:11
231:12
process 7:7 8:16
12:4 204:6
272:24 273:8
281:5,16,17
282:15 285:24
290:14
produce 189:15
189:21
produced 185:10
187:6,23 188:2
189:4,7,9,11,14
productive 160:10
professional
230:19
promised 53:21
54:3 160:7
162:7
promises 160:20
promote 90:19
143:11
promoted 17:18
50:22 51:3,5
53:8 64:10
91:15 95:10
102:15 110:11
120:16 213:2,3,3
234:20 241:8
273:1,4 278:4,7
279:20,21,23
280:2 283:18
284:9,11,13
promoting 210:8
promotion 44:8
44:10 55:7 64:1
64:19 82:14
105:12 109:24
124:1 161:1
273:14,16,20
285:13,16,16,22
286:15
promotions 235:2
286:6

pronounce 41:19
155:20
protected 206:1
209:3,17 210:3
213:8,19 222:6
protection 153:14
153:20 154:7,8
protects 206:19
provided 149:13
proxy 115:7
269:14,15
prudent 154:9
psychological
10:1
public 1:15 89:22
288:21 289:1
294:23 298:4
299:23
pull 256:6
pulled 249:3
punching 69:13
punished 135:21
punishing 238:1
punishment 121:5
121:6
purpose 7:3 37:16
purposely 67:17
84:4 119:7
227:4
purposes 107:20
109:9
pursuant 1:14 6:2
86:19 299:12
pursue 198:4
purview 42:13
pushes 204:11
put 19:24 30:9
44:2 51:23 54:4
66:24 81:24
90:20 95:4
108:20 121:12
122:19 142:19
143:14 161:10
161:10,14 162:1

John Scatchell, Jr.
August 5, 2020

195:8,16 202:10
211:11 224:2
225:23 227:4
237:21 246:4,6
248:14 249:6,14
273:3,6,21 278:5
281:6 283:11
**puts** 208:16
**putting** 72:4
102:7 161:23
162:3 273:4

**Q**

**qualified** 280:13
**qualify** 160:21
282:1
**question** 7:11,15
7:19,21 8:7 9:4
9:7 16:2 17:12
18:24 29:1,2,8
30:13,14 31:10
31:11,13 33:6
35:2 37:12,16
39:11 40:8 42:8
42:15 45:1 48:5
63:4,15 67:5
68:4,9,13,16
72:13,17 77:6
78:11,14 81:16
83:15,18 88:21
88:24 97:22
101:16 107:1,23
108:18,24 109:1
109:22 110:5,8
125:21 126:5,7
126:16 127:7
128:9 129:2,24
135:5 136:14
138:3 139:8
140:19 142:17
146:1 149:7,9
153:22 154:16
158:12 159:20
190:9 192:7,16

195:14,24 197:5
197:7,11 199:23
206:17 207:11
210:16 214:23
222:15 223:17
224:4 229:21
230:8 235:13,19
236:20 237:2,7
238:23 241:14
241:21 246:24
248:6 250:12
256:9 258:5
261:22 267:4
269:2 272:17
280:3 289:23
290:23 291:3
**question-by-qu...**
36:4
**questioning** 35:20
129:17 130:2
**questions** 7:5 9:4
9:16,22 10:3,8
15:3,11,17 16:3
16:7,11 18:8,13
18:15,19,21 32:7
34:2,5,17 35:1
37:23 58:4,6
69:3 76:5 82:3,4
101:14,17
107:12 109:20
117:12 132:12
147:18 154:2,14
156:9,13 157:10
162:11 185:3
195:14 214:7
230:15 231:2
272:19 289:7,11
289:16 290:1
**quick** 8:14 32:16
72:22 291:2
**quickly** 290:22
**quite** 124:14
217:7 226:11
232:4 249:22

**quits** 269:19

**R**

**R** 2:1 3:1 6:20
231:14 272:20
272:20 285:10
285:10 291:4
**racial** 60:22
**racially** 263:19
**racist** 60:2,3
105:19
**rah-rah** 247:9
**raise** 6:7
**ran** 54:16
**random** 234:10
**range** 84:13 195:4
226:7,13 242:6
**rank** 243:8 285:19
**ranks** 19:9
**rants** 252:15
**rationale** 115:12
**Raul** 71:21 120:14
**Rauzi** 11:24 38:23
282:23 287:13
287:21 288:9
290:5
**raves** 252:16
**read** 19:19,21
31:14,18 36:19
36:20 39:13,17
40:14 44:24
45:4 67:4,8
83:18,22 158:11
158:15 197:5
215:19,22
223:13 237:1,5
241:20,24
250:16 274:3
276:24 294:11
**reading** 129:19
223:2 299:9
**ready** 60:8 247:8
247:9
**really** 7:8 8:23 9:1

27:6 65:9,11
70:20,20 78:8
86:14 94:6
102:14 123:21
127:23 137:18
144:20 203:21
234:17 239:9
246:4 256:22
259:8 263:12
273:6 278:1
**reanswer** 257:16
**reappoint** 288:3
**reason** 10:6 26:18
54:7 65:12 68:8
73:20,22 83:14
96:2 106:9
202:4 280:14
295:12,14,16,18
295:20,22
296:12,14,16,18
296:20,22
297:12,14,16,18
297:20,22
**reasonably** 106:14
**reasons** 219:1
295:10 296:10
297:10
**recall** 7:2 31:8,20
31:22 33:17
34:16 43:10
46:3,13,16 47:20
48:11,13,16
49:23 50:8 52:8
53:2,15,18,19,23
54:12 55:5,14,23
55:24 56:7,12,22
57:1 59:4,19,21
59:24 62:9,16
63:9 64:22 65:3
65:4,7 66:4
68:23 73:11
79:17 80:6,20
81:19 82:7,10
83:4 85:14,17

87:6 88:1 93:21
94:20,22 95:17
96:5 97:17
98:18 99:7,22
102:19 103:23
104:8 110:3,4,18
110:23 111:2
112:6,21 113:2
114:22 116:5,22
117:2 118:7,20
120:18,20,23
122:5,17 124:7
125:1 130:8,19
130:22 131:4,9
131:19 132:5,9
139:17,23 141:7
143:2,4,7 144:18
145:20 146:9,13
147:13 154:4
159:6,7 160:13
185:19 194:4
200:24 201:7
204:24 205:1,4,5
205:12 213:6,16
216:4 217:1
218:3,22 221:16
223:4,5 225:5,12
226:2 229:19
230:11 233:22
239:11,13,16,21
244:20 251:17
251:21 254:23
255:21 257:10
259:17,19,23
263:21 264:11
269:7 275:2
276:20 279:12
282:23 283:14
292:22 293:3,8
**receive** 23:15 26:4
201:9 204:22
205:2 228:12
229:4
**received** 19:14,18

John Scatchell, Jr.
August 5, 2020

145:20 184:9
201:3
**receiving** 205:10
**recognize** 23:10
25:21 26:2
27:10 75:16
77:20 184:8,13
184:22 191:2
200:4
**recoil** 185:4
**recollection** 28:19
48:2 58:20
81:11 292:21
**recommend**
136:21
**recommendations**
135:16 136:2
138:7
**recommended**
41:24 42:16
**record** 9:13 20:3
31:17 32:22
39:16 40:13
45:3 66:22 67:7
69:4,15 83:21
129:6 140:6,9
152:23 156:3
158:14 187:14
188:24 190:1
215:21 237:4
241:23 250:15
274:2
**records** 157:3
**red** 57:19
**Redirect** 4:5
**reduced** 150:24
299:2
**refer** 25:12 80:18
91:16 120:3
232:12 235:14
247:1 251:7,22
261:24 263:8,17
269:24 285:14
285:21 291:18

291:20,21
**reference** 35:6
99:2 191:24
246:11 254:4
258:7,13 272:2
272:11
**references** 67:10
**referencing** 293:2
**referred** 49:10
58:21 80:11,15
80:24 81:6 89:8
97:3 100:21,24
103:5 111:7
119:15 121:1
232:17,22
245:16,19 255:6
257:8 269:21
270:6 275:12
291:12 292:23
**referring** 37:5,18
47:15 48:8
52:13 73:7
84:11 87:14,15
111:8,11 112:9
133:14 150:10
198:10 218:8
237:10 251:3
263:1,3,18
271:19 275:18
276:7 291:22
**refers** 48:5 66:5
66:10 119:16
232:14 236:1
271:3
**refuse** 15:11 106:1
**refused** 104:21
**refusing** 15:13
**regard** 227:15
**regarding** 102:13
123:8 225:3,10
225:15
**regularly** 106:18
**Reiger** 201:11
203:3

**reimburse** 137:11
**reimbursed**
135:21
**related** 39:2
299:16
**relates** 87:1
**relating** 32:8
37:24 39:3 81:5
87:3 113:8
123:2 132:12
**relationship** 16:6
87:20 88:18,19
89:4,7 271:23
**relayed** 105:16
**relays** 260:3
**released** 152:15
**relevance** 155:6,7
**relevant** 156:22
187:21,22
195:15 196:6
199:5 229:15
**remain** 29:5
154:10 155:11
257:3
**remaining** 106:6
**remains** 214:3
**remarks** 212:13
**remember** 12:7
46:19 54:23
79:11 83:24
124:18,20
125:10 130:18
210:15 212:16
212:17 224:9
240:9,23 241:2
243:11 245:9
247:7 255:5,10
255:13,18
256:23 257:1
260:17 267:13
272:6 282:22
**reminded** 146:16
**removed** 106:2
274:18 278:6

**Renew** 30:18
**repeat** 9:10 32:5
39:12 40:10
195:4 227:11
236:16,23
241:19 250:11
**repeated** 31:13
129:11
**repeating** 108:18
**rephrase** 7:17
28:10 135:6
149:6 160:3
197:11 230:9
237:7
**replaced** 150:24
275:20
**report** 133:10
**reported** 157:23
158:2
**reporter** 6:7,10
8:17 12:16
36:17 126:12
129:19 153:15
153:17 196:9,12
202:13 236:15
279:2
**reprehensible**
47:6
**represent** 126:19
153:1
**representative**
38:5
**representing**
123:11 192:13
**reprimand** 158:23
**reprimanded**
158:19
**reprimands** 159:5
159:7
**request** 29:15
72:22
**requested** 31:16
39:15 40:12
45:2 67:6 83:20

158:13 215:20
237:3 241:22
250:14 274:1
**requesting** 187:24
**required** 286:22
**requirement**
52:24 83:7
104:3
**requirements**
83:12
**requiring** 145:6
145:16
**researched** 73:17
**reserve** 293:12
**reserved** 299:10
**residency** 50:13
50:17 52:23
83:7,12 85:21,23
87:1 89:8 90:3
90:19 92:18
102:13 104:2
124:5 125:13
208:9,10 214:2
255:24
**resident** 92:23
95:19 96:8
97:16 98:10
99:9,13,19
100:18 102:3,4
102:12
**resign** 194:16
195:20
**resignation** 17:22
**respect** 15:3
220:23 257:19
259:2 267:14
271:9
**respectfully**
151:24
**respond** 201:15
**responded** 147:22
**response** 129:20
154:18 203:13
216:18 222:10

John Scatchell, Jr.
August 5, 2020

Page 323

244:18,22 245:7
**responses** 200:11
201:2,5,9 244:7
**responsive** 127:18
**rest** 70:18 279:7
**restricted** 258:10
**restrictions**
152:16
**result** 109:14
162:21 236:3
237:12 280:21
**results** 282:15
**retaliate** 207:7
**retaliated** 45:18
**retaliating** 205:15
215:1 220:16
**retaliation** 219:3
221:10
**retire** 63:19 114:6
**retired** 62:17
210:20 211:4,6,8
222:4
**retirement** 62:13
62:23,24 63:6,11
63:17 65:22,23
113:9 118:6
210:21 211:12
**retires** 264:16
267:17 268:22
**retiring** 63:11
**review** 21:11
199:8
**reviewed** 199:11
199:12 202:17
**revisit** 280:3
**revoked** 54:5
**reword** 38:10
**rid** 67:11,24 68:19
114:3
**rifle** 13:21
**right** 6:8 7:14
8:14 11:1 13:6
13:18,21 14:3,18
15:1,3,14 16:10

17:9 19:3,16
21:10 23:3
27:19 28:4,20
29:5,11 31:8
32:24 34:5 38:3
38:24 39:4
40:19 41:5,9,19
44:23 47:23
48:10,12,14
49:13 50:9
55:15 62:17
63:22 65:10
66:14,23 71:6,18
72:3 73:15 74:6
74:12,17 75:14
77:2,4 78:17
82:23 88:12
90:10 95:3
96:24 102:19
115:20 121:16
121:21 125:3
130:4,6,13,17
131:22 132:6,18
132:22 133:24
134:9 135:3
136:4,21 138:20
140:13 145:14
146:5 147:23
149:24 150:5,13
151:4 152:17,21
154:1,10 155:11
157:13,19 158:4
160:4 161:11
162:12 181:14
182:16 183:16
187:10,12 188:2
188:5,18 189:12
192:4,14 194:7
198:4 199:14,15
201:23 204:8,14
206:1 208:17
211:11 214:7
217:8 222:22
229:20 230:10

233:11 235:23
236:6 241:10
244:3 246:8,8,9
246:23 247:21
248:11 249:17
253:13 254:2,23
256:17 259:1
260:20,21 261:5
262:20 263:3,16
263:22 264:2,8
265:5,9 266:2
267:11 269:18
270:4 272:18
275:14,22
276:20 284:5
285:6
**right-handed**
13:16
**rights** 32:11
205:16 207:9
215:2 220:17
**rise** 148:11
**Road** 2:18
**Robert** 223:17
224:23 225:18
282:7
**rode** 201:16
**Rogowski** 1:8
3:17 17:20,21
30:7 54:5,6 58:2
69:5 79:13
81:13 99:12,14
100:6,17 116:20
116:24 117:5,15
117:22 118:5,10
118:13,22
119:12,24
120:24 123:2,7
123:17,24 124:4
124:10,24 125:8
130:11,17,21
131:2 132:17
134:11 143:19
143:20 144:14

144:19 233:17
239:6 277:6
284:2 286:10
294:9 295:7
296:7 297:7
298:19
**Rogowski's**
161:20 239:8
**role** 286:9 288:16
**roles** 286:11
**roll** 67:18 84:4,23
85:8 227:6
240:20,21 241:5
241:11,16
242:12,22,23
243:3 244:4
245:2,6 247:14
276:15,16
**RONALD** 1:7
294:7 295:6
296:7 297:6
298:18
**Ronnie** 53:21
128:19
**room** 12:15 85:9
121:11,13,15
148:15 223:18
224:22 243:3,11
243:13 245:2,6
252:17 276:15
276:16,24 277:8
277:17,18
**Rosa** 51:10
**Rose** 89:19
**rotating** 19:20
84:5
**roundabout**
156:16
**RPR** 1:15 299:22
**rude** 22:8
**rule** 8:6 138:12
145:16
**rules** 6:2 7:9 17:8
17:17 19:1,11

27:15 207:12
**ruling** 86:12
102:20 135:22
**rumblings** 114:24
**rumor** 50:17
51:20 52:5
53:24 67:13
86:16 218:6
280:16 290:21
**rumors** 50:18
67:19 82:22
86:22 116:18
117:24 139:6
218:4
**run** 60:12,15 68:1
103:12
**running** 219:15
224:13 275:19
**runs** 60:13

---

**S**

**S** 2:1,16 3:1 4:8
5:1 6:17 231:14
231:14 285:10
285:10 291:4,4
**Sabater** 3:15
**safe** 206:6
**safety** 70:20
**saith** 6:19 293:14
**sake** 127:4
**Salvi** 224:21
**Sam** 1:7 162:7
221:13 257:2
294:8 295:6
296:6 297:6
298:18
**Sam's** 252:13
**Samuel** 3:16
**Sandoval** 155:14
**sat** 70:10
**save** 264:17
267:17 268:23
**saved** 267:15
**saw** 57:17 77:24

John Scatchell, Jr.
August 5, 2020

78:3 121:20
202:9,19 209:22
212:17
**saying** 28:19
54:17 69:1 84:1
85:2 102:7
106:16,16 113:5
114:5 115:9
128:4 132:14
143:8 145:12
161:8 202:1,5
206:8,12 211:11
212:11 217:17
218:12 219:11
221:17 224:14
243:23 259:2
263:10 273:19
**says** 85:24 86:5
111:23 118:1
147:10 252:19
256:14
**Scatchell** 1:3,13
2:2,5 3:15 4:2
6:23 20:7,21,23
21:3,7,11,22
22:2 23:3,18,22
24:15 25:7,14
26:20 32:15
33:11 36:21
43:17 44:13,14
69:10,11 75:1
108:24 128:23
146:19,23
147:10 149:20
150:1 151:9,14
152:3,24 153:1,5
156:12,14,19
157:1,4 163:1,7
183:12 184:17
185:16 186:12
186:18,20
190:10,15
191:14,21 192:1
192:13,16,18

193:2,14 196:14
198:6,22 199:4
199:21 202:7
219:11 228:1,18
229:14 231:16
232:8,15,22
233:1,10,11,14
234:2,19 235:7,9
235:23 237:9,18
238:17 239:5,14
239:19 240:1,7
240:16 241:7
243:21 245:10
247:22 248:9,18
254:19 264:16
275:13 294:3,19
295:2 296:2
297:2 298:11,16
298:22
**Scatchell's** 154:18
**Scatchells** 236:4,7
237:13,20
**Scavo** 14:5,13
15:22 16:4,8,16
16:21 17:2,4,18
18:7,10,14 64:4
74:2,6,10,15
77:24 78:3
87:16,21 88:3,18
88:20 89:2,4
90:21 91:2
182:14 184:15
184:24 269:20
270:6 271:6,19
272:2,11 279:24
**Scavo's** 52:17
scenario 197:22
**scenes** 72:8
**schedule** 98:7
135:20 138:19
**scheduled** 1:19
119:7
**schedules** 135:18
**school** 104:15

**score** 96:11
**screaming** 103:13
**screams** 252:14
**screw** 227:15
**screwed** 96:13
**seal** 299:21
**seat** 123:9 148:11
**seats** 210:24
211:21 212:3
**second** 9:1 12:13
14:18 27:17
32:18 62:18
74:20 76:7,14
108:14 136:6
138:18 160:18
181:14 184:12
196:10 228:15
231:8 279:12
**secondary** 27:16
27:24 30:9
**secret** 49:18 92:16
135:20 214:3
276:17,19
**secrets** 214:3
**secured** 96:12
**security** 28:21
**see** 7:5 21:17 22:3
23:4 26:3 37:3
37:20 51:7
54:13 57:16,22
77:12 95:24
96:2 106:20
109:18 147:7
151:21 156:22
163:16 181:16
183:20 191:23
202:14 208:1,11
225:22 277:13
277:15,18
**seek** 156:7
**seen** 26:6 121:7
123:13 132:10
138:8,9,15
198:21 199:2

**sees** 101:11
**segregating** 20:19
**sell** 223:23,24
**sending** 215:14,15
218:16
**senior** 98:19 104:5
111:1 133:3,12
224:18 283:11
**seniority** 281:1
**sense** 21:5 73:23
106:8 205:24
251:24
**sent** 135:19 184:9
219:10 269:16
**sentence** 38:10
**separate** 78:13
135:17 154:19
156:24 164:10
165:10 166:10
167:10 168:10
169:10 170:10
171:9 172:10
173:10 174:10
175:10 176:10
177:10 178:10
179:9 180:9
181:2
**September** 23:16
**sergeant** 44:18
50:24 51:4
91:14,17 95:12
133:5 138:15
273:17,18 281:3
281:6 283:10
285:20
**sergeant's** 280:23
283:3,17 284:3,7
286:2,23 288:18
**sergeants** 79:12
132:21 133:18
136:1,20 137:22
239:24 243:10
243:13
**series** 16:3 132:12

**Serpico** 1:7 51:11
53:23 64:9
88:13 99:3
131:21,24 132:4
132:13 219:23
283:2 290:13
294:8 295:6
296:6 297:6
298:18
**served** 30:7
266:19
**Service** 14:23 15:4
15:12,18
**serving** 209:18
**set** 299:20
**seventeen** 279:16
**Shaking** 8:21
**shared** 254:22
**SHEET** 295:1
296:1 297:1
**sheet(s)** 294:16
**shhhh** 71:1,1,1
**shift** 59:15,16
61:9,11,15,16
85:18 92:12
99:15 100:20
119:7 135:17
137:7 138:13
161:16,20
221:14 233:7
239:8 241:2,4
242:3,11,13
245:3 259:7,16
260:7,22 263:15
265:24 266:16
**shifts** 19:20 84:6
138:10
**ship** 63:22 65:10
**shipshape** 66:19
**shit** 19:21
**shook** 57:5
**shoot** 13:18,24
**shooting** 54:18
77:24 78:3

John Scatchell, Jr.
August 5, 2020

185:7 186:13
**shoots** 13:24
**short** 73:2 105:5
  157:15 187:4
  188:20 229:9
  231:10
**shorthand** 299:2
**shortly** 210:20
  215:16 224:22
  249:9 254:14
  259:4 260:19
**shotgun** 13:20
  74:20
**shotguns** 185:4,7
  186:13
**should've** 95:2
**shoulder** 13:22
  14:3
**show** 208:16
  271:8
**showed** 44:7
  137:5,7 226:8,9
  237:19 248:12
  275:17 277:6
  287:19
**shown** 124:13
  250:21 283:21
**shows** 11:16 76:15
  121:4 263:11
**shuffled** 71:1
**shut** 65:17 113:4
**sic** 221:2
**sick** 42:1,17 43:12
  144:24 148:24
  151:1 162:12
  264:10
**side** 67:12 194:10
  292:8
**sign** 21:19 24:11
  25:4 26:15
**signature** 21:13
  23:10 24:6,7,20
  24:21 26:10,11
  26:13 27:1,2

147:9 151:23
  152:1
**Signed** 295:23
  296:23 297:23
**signing** 299:9
**silent** 29:6 154:11
  155:12
**similar** 214:23
**Simpson** 59:11
  81:1 221:11,18
  222:3,6
**single** 48:5
**sir** 147:3
**sister's** 10:20
**sit** 46:12 48:22
  50:1 53:2,15
  55:6 56:13 59:3
  62:8,15 63:8
  130:20 143:3,6
  203:16 242:23
  278:14 279:11
**sits** 82:24
**sitting** 33:18
  65:13 116:2
  119:19 148:4
  183:14 210:13
  210:24 212:6
  241:5 258:21
**situation** 106:20
**situations** 84:3
**six** 19:23 149:13
  260:15
**size** 57:23
**sleep** 10:12,13
**slip** 94:12
**slippery** 278:13
**slope** 278:13
**small** 94:14
**smart** 125:16
**snickering** 245:10
**snowplow** 68:2
**sold** 223:3,9,16,20
  223:24 224:14
**soldier** 51:22

**solemnly** 6:10
**somebody** 28:22
  70:24 78:13
  95:21 97:14
  137:5,23 209:5,6
  209:8 210:24
  213:21 215:13
  218:16 224:6
  227:3 230:23
  259:16 281:6
  283:3,16 284:2,7
**son** 104:14,15
  255:12 284:12
**song** 54:24 105:22
  106:2
**songs** 54:22
**soon** 18:18 254:6
**SOP** 145:6 206:18
**SOPs** 19:12,14
  72:4 144:23
  206:5
**sorry** 22:20 37:12
  40:11 43:8
  47:10 50:14
  52:10 82:15
  97:23 106:10
  112:12 130:12
  139:2 152:20
  153:15,18
  182:16 183:11
  195:1 196:11
  202:21 211:5
  221:6 233:5
  241:19 250:4,13
  255:15 265:11
  276:6
**sound** 244:13
**Sounds** 7:24
**South** 3:3
**spade** 96:18,18
**spans** 46:9
**spawn** 54:19
**speak** 9:2 42:6
  220:9,21 250:5

**speaking** 123:11
  217:19
**specialty** 118:16
  277:4 284:12
**specific** 55:23
  59:5 64:13 65:3
  110:3 150:9
  251:17,21
**specifically** 28:6
  65:24 80:21,22
  82:9 88:11
  92:14 130:9
  143:3,7 186:5
  217:19
**specifics** 130:22
  143:4 243:11
  247:4
**speech** 206:1,10
  206:19 209:17
  210:5,6 218:7,12
**spell** 240:13
  265:13 279:2
**spending** 96:1
**spiked** 124:20,21
**spoke** 40:18,21
  95:21 215:13
  224:6
**spoken** 42:24
  43:11 44:1
**spot** 54:2 288:8
**spots** 280:24
**spreads** 67:19
**squads** 270:18
**Square** 260:5
**Sr** 1:3 3:15 69:11
  156:13 157:1
  221:11,18 224:7
  224:20 264:16
  294:3 295:2
  296:2 297:2
  298:16
**SS** 298:1
**stabbed** 55:8
**stack** 198:24

200:1
**stacked** 277:7
**staggered** 288:5
**stain** 58:11,13,21
**stairs** 270:20
**stairwell** 271:1
**stand** 29:7 38:11
  45:19 84:2
  147:18 148:3,6
  148:10,14,19,20
**standing** 122:21
  266:5 267:9
**stands** 26:3
  246:22 270:12
**staring** 69:4,6
**start** 84:18 92:17
  182:12 248:8
  256:15
**started** 248:15
  249:7
**starting** 38:1
  154:1 184:7
  241:5 242:14
**starts** 37:5,19
  92:6
**state** 1:16 2:14
  52:13 91:4,6
  136:10 185:14
  264:15 267:23
  298:1,5,10
**stated** 252:21
  259:13 267:20
  268:8
**statement** 48:20
  60:3,20 84:21
  85:11 86:24
  106:4 115:17
  118:10 241:17
  244:8,10,18
  256:19 266:19
**statements** 35:16
  81:5,18,21 82:7
  82:13 83:6 87:3
  103:2,4 117:16

John Scatchell, Jr.
August 5, 2020

117:22 118:5,22
119:12 123:2,7
123:24 124:4,10
131:2,7,12 132:1
138:24 139:3,13
139:21 140:3
141:3 142:3
143:23 144:12
225:2 245:7
247:12,17
**States** 1:1 206:3
294:1 298:14
**station** 30:9 52:6
59:1,8 60:10,13
61:10 62:5
67:13 78:24
79:20 80:4,9
82:17 86:8,17,22
97:4 103:11
111:5 112:18
113:1,4 118:24
119:13 122:7
183:3,4 221:18
223:18 224:14
232:18 233:2
234:2,11 249:8
252:11 257:7,13
258:2 266:12
267:9 270:5
276:15 290:20
**stay** 96:12,14
198:1 207:20
**stayed** 86:14
**Steak** 115:19
**stems** 106:22
**stepped** 186:1
**Steve** 50:24 89:13
89:15 90:3
92:22 93:12
95:8,10 99:18
102:16 124:13
125:16 208:14
214:4
**Steven** 1:8 3:17

294:9 295:7
296:7 297:7
298:19
**stick** 57:3 129:23
**stickers** 22:11,14
22:16,17,22
**sticks** 57:18
**stipend** 66:17
**stipulate** 76:10,19
**stop** 127:17
203:10
**stopped** 161:22
162:3 253:19
**stops** 133:22
**story** 70:17
**Stream** 51:2 89:18
90:9 91:19
**street** 1:18 2:2,7
2:14 3:9 89:19
91:5 142:8
234:4 249:1,3
298:9
**strike** 14:21 16:15
16:23 23:11
41:21 55:20
62:21 63:2
72:16 116:8
182:11 185:11
204:3 257:15
272:17 278:10
**stripes** 285:5
**structure** 220:8
**stuck** 255:8
**stuff** 8:23 84:19
100:12 111:22
139:16 157:11
201:20 216:3,22
217:9 245:11
251:16 252:19
**stuffed** 59:11
221:13
**subdivided**
286:11
**subject** 41:9 196:4

240:6 252:21
258:1
**subjected** 221:9
**subjective** 83:13
**submit** 29:15
**submitted** 48:19
151:24 152:9
192:4 200:11,17
200:19,22
211:17 294:16
**subordinate** 133:8
**subpoena** 6:4
**subscribe** 294:13
**SUBSCRIBED**
294:20
**subsequent** 44:10
268:6
**substance** 9:20
**sudden** 226:9
277:3
**sue** 48:19 49:13
**suffered** 159:11
278:18
**suggest** 29:10
38:8 130:5
**suggesting** 109:6
189:19,23
**suggestion** 76:24
154:13
**suing** 49:10
**suit** 299:17
**Suite** 2:3,8,14,18
3:9
**superior** 133:10
133:13
**supervision** 59:15
118:14
**supervisor** 59:1,8
60:11,13 61:10
62:5 78:24
79:20 80:10
111:5 112:19
113:1 118:24
119:14 133:9

136:11 138:23
139:5,12,20
140:2,12 141:2
159:12 160:5
201:12 220:5
221:19 243:5
258:3 289:10,12
289:13
**supervisor's** 241:6
242:21 243:1,2
**supervisors** 29:16
38:18 79:3,7,10
132:20 134:6
141:9 157:24
220:2 244:14
**support** 140:4
141:4 142:4,13
143:9 144:13
237:19 248:12
263:12 275:17
**supported** 61:21
**supports** 259:7
**supposed** 104:10
134:1 203:14,15
250:24 288:5
**sure** 9:2,13 17:13
18:16 30:9 33:7
36:16 59:23
62:14 63:7
72:23 91:3 92:5
103:14 105:4
111:2,21 112:3
113:6 114:9
138:18 142:23
192:10 207:12
239:16 262:18
267:22 273:18
**surgeon** 211:1
**surveillance** 183:9
**suspend** 137:23
138:16
**suspended** 227:20
**swear** 6:5,11
**swears** 103:17

253:2
**sweat** 187:11
**switch** 22:18
**sworn** 6:15,19
69:15 294:20
298:22
**systems** 12:22

**T**

**T** 2:10 4:8 5:1
6:17,20,20
231:14 272:20
272:20 285:10
291:4
**tab** 20:14 22:15
**table** 82:24 116:3
128:20 148:5
211:23
**tact** 44:19 95:4
120:10 273:21
274:5,9,13 278:5
278:8 280:13
284:13,17
285:15,18,23
286:7
**tactical** 280:8
286:16
**take** 8:1,4,8 9:17
14:8 17:21
20:13 23:22
24:19 32:15
33:8,8 34:20
35:10 36:2 37:2
46:1 47:16,22
51:21 55:10,19
57:24 61:2
64:11 71:5 76:7
76:12,21 77:3,19
84:11,21 94:1
105:1 106:1
111:12,16
115:14 120:7
124:24 137:8
147:18 148:3,10

L.A. Court Reporters, L.L.C.
312-419-9292

John Scatchell, Jr.
August 5, 2020

148:14,19,20
151:14 183:13
183:15 188:11
190:19 193:6,18
200:15,16
201:21 203:14
210:18 211:1
228:5,15,22
229:7 276:14
281:21,22 282:5
282:8
**taken** 1:14 6:2
8:17 9:19
**takes** 281:5
**talk** 18:7 31:6
45:11 60:6
61:14,24 87:12
94:15 99:16
109:2 113:20
117:10 118:2
119:24 126:9
143:24 157:14
188:3 225:4
231:7 234:23
248:2 259:6
269:14
**talked** 33:13
45:22 126:2
140:17,23
145:19 146:3
153:2 189:1
213:1 220:11
229:16,22
230:24
**talking** 17:23 46:8
48:10,23 78:6
103:22 106:5
107:6,9,17 120:9
120:11 125:24
128:1 140:18
143:15,16,17
194:2 210:7
272:8 275:10

**talks** 84:4
**TALON** 2:7
**tangled** 52:3
**tapes** 189:4,13
190:3
**taste** 94:13
**tax** 44:13,14 232:8
232:15,23 233:1
233:10,11,15
234:2,19 235:7
235:24 237:10
237:18 238:18
239:5,14,19
240:2,7,16 241:7
243:21 245:10
247:22 248:9,18
275:13
**technicians** 57:24
**television** 121:23
121:24 122:2
**tell** 6:22 27:6 47:4
49:1 64:14
65:17 97:5,18
98:9 109:18
136:14 163:5
182:19 234:16
241:12 274:22
275:1 287:18
289:15
**telling** 68:6,11
72:6 73:16
130:15
**temper** 124:14
**ten** 83:11 90:8
92:3,10 182:1
260:15 292:3
**tendered** 20:15
23:5 24:1,22
25:22 27:3 75:8
147:4 150:6
151:16 152:10
163:9 190:20
193:7,19 228:7
228:23

**term** 214:13 234:8
234:9 239:5
263:19 291:7,18
292:1,6,20 293:1
293:7
**terminate** 156:20
**terms** 218:9
**test** 281:8,10,12
281:15,21,22,22
282:5,8,14 283:8
283:10 287:2,3
**testified** 35:10
40:19,22 41:4
261:5 269:20
274:10
**testify** 40:6 41:7
90:23 97:13
111:23 298:23
**testimony** 6:11
38:6 39:22 48:1
81:9 119:23
157:2 164:9
165:9 166:9
167:9 168:9
169:9 170:9
171:8 172:9
173:9 174:9
175:9 176:9
177:9 178:9
179:8 180:8
181:1 206:8
232:3 251:12
299:1,6,19
**testing** 273:8
**Texas** 60:1,4,6,9
60:21 105:15,20
105:24 106:12
106:16 230:23
230:24
**text** 184:8
**thank** 37:10 52:20
181:9 188:9
202:24 207:2
**Thanks** 13:6 73:1

293:9
**theme** 220:19
**thereabouts**
162:10
**thereof** 299:18
**they'd** 122:20
137:6,11 233:9
**thing** 20:1 26:3
50:18 59:9
71:18 75:11
86:12 87:12
210:9 219:13
227:17 248:1
249:5 269:18
279:15,17 280:5
280:20
**things** 8:15,18
43:4 44:20
46:19 71:23
83:3 97:21
99:22 118:1
195:17 207:20
207:21 226:12
232:1 271:2
**think** 11:18 17:11
22:9 26:18
30:20 35:22
44:20 48:4 71:8
73:20,22 77:9
87:6 89:19 97:8
107:22 109:5,11
124:12 129:21
134:16 142:14
143:10 144:19
161:3,24 186:5
196:16,20
198:17 212:5,8
212:10 218:1
221:4 227:13,14
229:15 273:2
276:19 279:11
284:14
**third** 77:3
**Thirty-one** 284:24

**thorn** 67:12
**thought** 108:21
118:15 119:8
124:16 149:16
149:18 197:22
199:7,7
**threaten** 102:6
**three** 11:19 46:9
58:15,22 64:14
65:13 69:3,12
84:6 103:22
122:21 139:15
140:18 149:16
280:24 281:18
287:9,14 288:4,6
288:15
**three-year-old**
203:7
**throw** 60:15 93:3
96:22 136:9
**thrown** 139:6
235:24
**ticket** 123:9
**tidbits** 94:8
**tiger** 285:4
**time** 8:1 9:3 13:12
14:21,24 16:19
33:1 40:11
43:10 45:22
47:20 49:17
52:9 53:11 54:6
64:9,19 66:4
68:22 73:24
79:12,17 80:6
82:11 84:8,13,15
84:16,19 85:6,19
86:10 87:5 88:1
95:1,17 96:5,16
97:17 99:8
103:24 108:11
110:4,19 112:8
114:18 116:5
117:7 118:8,15
119:18 120:5,22

John Scatchell, Jr.
August 5, 2020

122:5 123:10,19
124:6,20 125:9
126:13 127:14
129:3 131:5,10
131:19 136:23
139:18,24 141:7
143:5 144:19,24
147:22 148:4
154:6 158:2
159:9 160:14
161:15 182:9
190:2,6 194:14
194:19 195:13
200:15,16 201:8
204:19 205:7,12
208:10 209:14
209:19 211:8,14
213:16 215:12
216:4 217:1
218:22 219:15
221:16 223:21
224:10 225:16
226:2,23 227:3
229:19 230:5
233:7 236:24
238:12,13
239:22 241:10
241:15,19
242:20 243:6,9
243:14,19
244:20 245:2
247:19,20 248:8
248:11 250:12
251:24 252:11
253:8,21,23
255:4,21 257:11
257:24 259:19
259:23 260:6,21
264:12,13
266:14,16
267:24 269:7
270:21,22 272:8
272:13 279:12
281:20 282:6

283:14 284:21
293:4,8 294:12
**timeframe** 54:20
125:3 248:16
249:16
**timeline** 261:18
**times** 40:19 56:1
69:15 103:14
108:20 124:14
142:11,17,20
160:8 201:14
230:7,13 242:24
246:9,13,24
247:5,15 252:10
253:9,12 258:16
269:15 270:8
271:24 280:10
283:12 285:4
291:17,24
292:10,19,22
**TIMOTHY** 3:5
**title** 221:20
**to-wit** 298:7
**to/from** 227:5
273:6
**today** 8:3 9:22
10:4,9 35:3 38:6
46:12 48:22
50:1 53:2,16
55:6 56:13 59:3
62:9,15 63:8
98:1 130:20
143:3,6 192:14
192:18 198:16
229:17,22
232:13
**today's** 106:19
**told** 41:1,8 44:18
47:2 48:9 50:6
51:7 54:10,11,16
60:1 64:9 68:21
79:2,5,8,9 80:2
80:3 82:16 86:7
86:9,20 92:24

93:1,8,15 94:17
95:22 96:4
97:15,20 98:16
98:18,20 100:8
100:10,19 103:5
104:4,5 110:1
113:16 114:15
116:1,3 117:24
122:15 209:5,6
209:19 213:10
214:1 224:6,8
225:16,21 244:4
253:2 255:5
258:19 259:11
259:12,15
263:11,14
274:17,18,20
276:9 277:22,24
278:2,4,6,11,17
279:5 280:17
281:21,24 282:5
283:6,7 286:8
290:17,19 293:6
**tolerable** 106:19
**Tom's** 115:19
**ton** 281:1,2
**Tony** 182:14,20
182:22 183:20
**top** 50:9 159:8
200:24 201:7
202:16 252:15
263:21
**topics** 231:23
**torn** 200:1
**torture** 119:22
**touch** 225:23
**town** 50:21,23
51:7 65:17
83:10,10 84:2
86:2,3,6,18 93:3
93:5,5,13,23
94:18 95:1
96:16,18,21 97:7
98:22,23 102:8

119:9 207:19
208:15,17 209:6
209:20,22 214:5
217:11,13,16
218:5,6,18,20
219:6,6 222:11
256:18 268:13
290:18,19,21
**traditional** 214:19
**traditions** 64:3
**traffic** 160:9,16
161:10,23
252:18 285:18
**traits** 289:10
**transcribed** 299:4
**transcript** 36:10
37:3 52:14
294:11,14 299:6
**transcripts** 108:10
**transfer** 285:22
**transferred**
282:12
**transfers** 285:14
**translate** 8:23
**transparency**
226:17,19
**travesty** 59:14
**treat** 232:20
**treated** 222:13
235:5,8 237:11
**treating** 235:15
236:2
**treatment** 92:20
226:18 240:5
**tried** 71:19,19
93:3 94:4 96:22
101:9 102:6
104:20 132:16
223:24
**trip** 17:2,4 183:24
184:14,23
**Trombetta** 215:6
216:5,17 221:2,5
**trouble** 155:18

209:7
**truck** 58:16,18,19
58:22
**true** 11:13 28:23
40:24 74:21
76:16 77:17
148:7 149:1,15
162:22 185:4,17
194:17 206:11
286:24 287:4
294:13 299:5
**truly** 200:18
**trust** 94:15 222:13
271:5
**Trustee** 88:14
**trusting** 213:13
**truth** 6:12,12,13
268:18 298:23
298:23,24
**truthful** 9:21 10:2
10:7 145:16
**truthfully** 7:22
34:2 147:19
**try** 8:5 9:5 94:8
182:17 207:5
**trying** 9:12
154:21 155:1
256:6,16
**tube** 57:22
**turn** 22:7 84:6
289:18
**turned** 12:23
70:22,22 210:9
**Twenty** 216:12
**twilight** 260:10
**two** 27:6 65:14
66:12 76:16
90:7 92:6
102:15 121:12
135:17 144:7,9
204:19 210:24
211:21 216:14
267:7 284:14
**two-minute** 105:1

John Scatchell, Jr.
August 5, 2020

two-thirds 26:10
two-year-old
 203:8
type 61:23 91:1
 105:21 246:6

**U**

uh-huh 8:22
 101:4 199:21
 245:13 246:15
 248:7 262:2
uncle 115:19,24
undergo 289:2
underline 19:23
underlings 143:17
understand 7:14
 7:20 8:9,11 9:14
 12:20 25:13
 28:7 31:10
 34:24 63:15
 78:10,15 105:18
 135:5 149:9
 153:11 154:21
 157:6,9,9 159:23
 160:2 207:11
 230:9 232:4
 235:21 246:3
 248:1 262:20
understanding
 13:8 15:7 88:16
 89:1 127:19
 134:3 135:24
 189:3 195:13
 206:17
understood 7:21
 127:21 128:4
 214:8 230:14
undetermined
 298:13
ungentlemanly
 109:7
uniform 95:9
 138:11
union 262:22,24

263:2
unit 284:17
United 1:1 206:2
 294:1 298:13
University 105:20
 106:12
unusual 8:16
unwritten 138:12
 207:12,14
upper 151:6
upset 46:17 85:22
 222:9 243:24,24
 244:2
upstairs 120:9
Urso 279:10,18,19
use 38:4 76:19
 144:23 149:10
 233:1,14,18,21
 234:18 238:17
 238:17 239:5,19
 240:16 245:24
 252:23 253:6,10
 253:14 257:4
 258:6 272:10
 284:21 291:7,18
 292:1,11,20
useful 7:8
uses 47:7 106:4,18
 257:21
usually 103:13

**V**

V-A-U-G-H-N
 265:19
vacation 114:24
 116:13
vague 27:7 238:5
 253:17
vaguely 27:11
 183:6
vagueness 235:18
 251:19
Vance 136:9
Vaughn 265:8,19

267:10,21
vehicle 223:8
verbal 201:5,9
verbally 201:15
verbiage 61:3
versa 137:13
 227:21
versus 136:10
 207:19 208:20
 246:13 247:8
 250:22
vice 137:13
 227:20
Vice-President
 204:18
vicinity 239:10
 242:20
video 13:1,2,3,5
videos 185:7,10
 186:13,21 187:5
 187:15,21 188:1
videotapes 189:2
village 1:6,17 11:1
 13:13 27:15
 28:2,13 29:23
 30:16 31:3
 92:11,23 101:21
 114:9 138:23
 139:12,20 141:2
 148:23 150:5
 159:13 194:12
 194:17 205:14
 210:23 211:21
 212:20 215:1
 216:14 217:3
 219:14,17
 220:15,22
 223:19 235:16
 269:13 294:6
 295:5 296:5
 297:5 298:8,16
village's 217:21
VIN 224:3
violated 66:13

violating 85:23
violation 35:18
visit 122:8,9
 209:24 218:19
visited 88:15
visiting 122:10
Vito 14:5,13
 15:22 16:4,8
 17:18 18:7,10,14
 52:16 64:4 74:2
 74:6,10 87:15,21
 88:2,15,23 90:21
 91:1 94:13
 269:20 270:2,6
 271:6,19 272:2
 272:11
Vito's 274:10
vocal 67:15 216:9
vocalized 268:5
vote 44:7,10,11
 244:3,5 261:12
 261:21 275:18
 276:7,14 277:9
voted 235:3 241:9
 243:22,24 275:3
 275:6,14,15,16
 276:8,10,12,21
 276:23 277:21
 278:3,4,7,9,11
 278:17 279:6
votes 279:16
voting 120:19
 261:17 280:21
vs 1:5 294:5 295:4
 296:4 297:4

**W**

wait 47:4 59:21
 67:10,11,23
 68:18 114:1
 152:19,19 196:9
 254:8,8 292:17
waiting 266:12
walk 103:11

148:15 270:21
 270:22 281:4
walked 88:8 277:8
walking 95:8
 98:19 111:1
 209:24 241:6
 244:11 270:13
 270:14,17
walks 252:16
want 12:12 19:17
 22:8,18 31:14
 32:17 33:7
 54:17 66:20
 68:9 69:10
 72:19 75:14
 83:15 92:19
 94:12 97:24
 98:8 99:23
 122:22 126:3,15
 127:3,6 132:19
 143:13 152:20
 153:10 155:2
 161:13 187:16
 188:10,13
 189:16 202:5
 217:10 231:18
 232:1 248:3
 250:5 254:2
 265:8 267:18,18
 269:18 273:6,20
 289:11 291:14
wanted 33:4
 48:19 51:20
 54:2 63:21 65:9
 65:11 84:8
 100:2 115:13
 161:10 210:10
 213:22 246:5
 273:19,21 280:7
wants 22:21 67:14
 82:20 85:1
 118:1 252:2,3,3
 271:2
war 54:17,24 55:1

John Scatchell, Jr.
August 5, 2020

**warning** 35:17 145:21
**warranted** 284:15
**wasn't** 30:13 35:22 79:13 84:2 87:14 91:3 92:16 95:7 100:22 104:18 111:21 114:10 122:5 123:20 186:13 206:23 212:9 216:22 227:10 243:23 243:23 258:10 258:10 273:19 279:22 280:15 282:5
**waste** 127:16
**wasting** 127:10,13 129:2
**watch** 122:7
**watching** 57:8
**waterfowl** 14:2
**way** 25:12 26:10 29:3 30:22 35:15 42:12 57:5 60:2 64:2 72:13,16 94:7 109:18 156:16 161:15 202:3 205:5 212:1 217:18 224:1 235:4,4 276:21 277:20 278:16 299:16,18
**ways** 64:3,3 66:19
**we'll** 7:20 8:5 76:10,19 100:9 109:13 150:19 189:21 199:19 269:19 280:4 293:12
**we're** 9:12 17:23 22:12 33:11

47:9 48:9,23,24 72:12 103:22 106:5 108:1,12 109:2 155:22 190:9 197:2 226:18 237:22 244:4 247:8 252:20 291:11 291:13
**we've** 53:4 140:17 140:23 220:11
**web** 52:3
**Wednesday** 1:19
**weekly** 238:21 239:1
**weigh** 182:4
**weighs** 181:24
**welcome** 40:9 104:18
**well-aware** 239:17
**well-known** 80:23 125:16 218:20 222:10
**went** 30:8 31:4 44:9 57:13 71:10,12 74:1,4 74:8,19 104:15 107:2 135:22 150:13 198:19 199:9 203:21 204:14 216:10 226:7,13 260:21 263:14 282:22
**weren't** 186:3 234:17
**west** 2:2,7 3:9 208:20
**whatever's** 244:15
**whatsoever** 117:16 119:21 217:18
**whereof** 299:19
**whistled** 122:8,11 122:14

**white** 90:13 219:14
**wide** 98:7
**Williams** 49:18 50:11 51:16 208:13 213:18 221:2
**willing** 18:7
**wish** 295:9 296:9 297:9
**withdraw** 29:2
**witness** 4:2 6:4,9 6:9,14,15,18 14:11 17:15,16 19:7 20:16,20 22:13,24 23:6,7 24:2,3,23 25:1 25:23 26:1 27:4 27:5,21 28:9,15 29:12,19 30:5,23 31:19 32:3 33:21 34:11,21 35:14 36:14 37:7 38:13 39:7 39:18 40:6,10,15 41:13 42:9,20 45:8,15 47:19 50:16 51:19 52:13,15 58:5,6 61:1 62:22 66:9 66:23 67:9 75:9 75:10,20 77:13 81:10 83:23 88:6 92:1 107:4 107:8,11 108:5 109:7 119:3 125:20,23 126:6 126:9 127:15,23 128:10,18 129:1 129:7,10 131:17 137:17,20 138:2 138:5 144:17 145:2 146:12 147:5 150:7,8

151:17,18,19 152:11,12,21 153:6 158:16 159:19 162:17 163:10,11,12 182:6 183:17 185:24 186:9,23 188:10,14 190:14,21,22,23 191:7 192:8,21 193:8,9,10,20,21 193:22 195:3 197:18 198:17 200:7 205:19 206:16 208:6 214:9,17 228:8,9 228:10,16,24 229:1,2 230:24 236:10,13 238:6 238:10 242:1 250:3,11,17 253:18 262:9 273:13 274:16 276:3 279:3 289:13 291:10 293:13 295:1 296:1 297:1 298:11,21 299:3 299:10
**witness's** 38:5 48:1
**WOERNER** 3:5 231:3 285:9
**woerner@dgla...** 3:4
**wolf** 245:11,12,17 245:20 246:2,10 246:13 247:2,7 249:5,17,22 250:23 251:7,7,9 251:15,23 252:2 252:3,3 291:7,12 291:14,18 292:1 292:20 293:1,7

**word** 38:4 76:19 79:6,21 80:4 113:3,12 114:1 141:9 149:11 158:23 219:5 252:23 253:2,6 253:10,12,14,22 254:4 255:3 256:14 257:8,21 258:6,11,13 261:15 262:1 267:16 273:24 284:22
**word-of-mouth** 113:10 222:17
**worded** 237:8
**words** 8:21 35:6 60:21 76:20 232:8,10 237:17 249:21 255:18 259:5 261:7 263:14 268:7 286:12
**work** 10:20 28:12 28:21 29:16 50:20 54:21 58:1 68:3 72:8 94:12 116:15 137:6 152:15 194:21 201:13 218:18 219:7,17 223:17 242:4,8 266:21 268:12
**work-related** 157:23
**worked** 91:5 117:5 183:3 217:3,5 223:11 234:4 248:24
**working** 30:17 85:10,12 88:23 133:5 223:19 233:6 238:16 245:3 257:12

John Scatchell, Jr.
August 5, 2020

265:24
**works** 127:24
**worried** 91:7
**worries** 221:7
**worse** 207:21
**wouldn't** 44:2
64:22 87:11
90:22 99:15
123:4 160:20
220:6 292:4
**wrapping** 57:19
**write** 100:8
**writing** 27:10
203:10 299:2
**written** 184:14,23
281:8,10,12,15
282:14
**wrong** 63:23
127:22 128:4
226:19
**wrote** 85:16
223:13

---

**X**

**X** 4:1,8 5:1 6:20
231:14 272:20
285:10 291:4

---

**Y**

**yeah** 8:13 10:14
15:8,8 22:7,19
44:15 46:16
58:12 75:13
85:7 115:6
117:19 120:2
128:13,18
132:24 137:20
140:14 161:12
192:5 204:12
208:7 220:18
233:11 234:20
245:10 247:7,14
250:18 251:15
276:6 281:10
291:11,23

**year** 102:16
160:18 211:9,19
216:20 218:1
234:4,5 240:24
248:15 249:6,13
249:15 254:7,13
260:18 272:6
**year-to-year**
281:18
**years** 46:10 48:24
64:14 69:12
80:16,19 83:11
90:8 91:5 92:3
92:10 94:4
98:15 101:9
102:1 103:23
132:5,15 139:16
154:3 215:9
216:12,21 258:3
280:4 281:19,20
282:3,3,11
284:14 285:1,3
288:6
**yesterday** 198:23
**yield** 51:14
**young** 259:22

---

**Z**

**zero** 226:18

---

**0**

**08/05/2020** 20:9
21:24 23:20
24:17 25:9
26:22 36:23
75:3 146:21
149:22 151:11
152:5 163:3
184:19 190:17
193:4,16 198:8
228:3,20
**084-002890**
299:23

---

**1**

**1** 4:11 117:17
151:10,14,15,21
294:12 295:1
**1:00** 1:20
**10** 4:19
**1000** 1:18 298:9
**105** 2:7
**11** 4:20 150:15
216:21
**11:00** 103:12
**12** 4:21 104:12
216:21
**12:00** 260:7
**1213** 3:9
**13** 4:22 160:21
**1350** 2:8
**14** 4:23 160:22
253:24 284:22
289:4
**1404** 2:3
**142** 37:5,9,19 38:1
**1441** 3:3
**146** 5:19
**149** 5:17,18
**15** 4:24 148:5
227:18
**1500** 89:16
**151** 4:11
**152** 4:12
**16** 161:20 276:3,5
276:6
**163** 4:13
**165** 4:14,16
**166** 4:15
**17** 5:3 161:21
260:23,24 276:2
285:1
**170** 4:17
**171** 4:18
**172** 4:19
**173** 4:20
**174** 4:21,22
**175** 4:23,24
**176** 5:3,4

**178** 5:5,6
**17th** 73:14 114:17
**18** 5:4 11:11,20
104:13 267:6,6
**184** 5:13
**18th** 102:9
**19** 5:5 150:5
**190** 5:16
**193** 5:14,15
**195** 2:18

---

**2**

**2** 296:1
**2:00** 72:24
**20** 5:6,7 34:18
102:1 215:9
**20-year** 283:9
**2000** 14:20 216:20
**2003** 91:4
**2012** 11:1 21:16
21:20 23:16
287:20
**2013** 160:19
249:13 289:3
**2014** 90:9 91:21
150:24
**2014-'15ish** 272:8
**2015** 24:12 151:4
152:16 157:22
161:13
**2016** 25:5 117:6
161:6 163:17
254:15
**2016/'17** 125:3
**2017** 16:20 17:1,5
31:7,23 32:10
34:18 38:17
71:8 73:14 74:1
74:4,8,16,20
77:22,24 78:3
87:23 117:17
132:17 150:24
158:4,6,21
159:10 160:5

**182**:11,14,18,21
183:8,20,23
184:3,10,24
194:20 195:6
196:17 197:13
228:13 229:5
248:16 261:1
275:23,23
**2018** 10:19 33:19
111:15 146:12
146:15 150:13
162:10 185:3
194:7,20 195:7
196:17 197:13
201:24 202:1,2
205:2 233:7
234:7 266:20,22
266:24 267:8
**2018cv03989** 1:6
294:5 295:4
296:4 297:4
**2020** 1:19 294:12
294:21 298:7
299:21
**20th** 31:6 36:5
38:16
**21** 5:7,8 20:8,14
20:14,21,21,23
21:3,11 24:12
**21st** 229:5
**22** 5:8 21:23 22:3
23:4 146:11,15
**222-7000** 3:4
**228** 5:21,22
**22nd** 89:16
147:13 186:6
229:5
**23** 5:9,9 23:19,23
24:9 79:22
144:10
**231** 4:3,4
**2368** 147:2
**24** 5:10,10 24:16
24:19

L.A. Court Reporters, L.L.C.
312-419-9292

John Scatchell, Jr.
August 5, 2020

Page 332

**248-3303** 2:4
**24th** 157:22
 299:21
**25** 5:11,11 25:8,11
 25:20
**25th** 1:18 163:17
 298:9
**26** 5:12,12 23:16
 26:21,24
**272** 4:4
**273** 4:5
**2800** 2:14
**285** 4:5,6
**29** 184:7
**291** 4:6,7
**293** 4:7 294:12
**2nd** 182:11

**3**
**3** 4:12 152:4,7
 153:12 154:15
 157:4 297:1
**3/31/17** 26:14,16
**30** 5:13 184:18,21
**31** 21:15,19
**312** 2:4,9,15 3:10
**33** 5:14 193:3,6,12
**333** 2:18
**34** 5:15 193:15,18
 193:24
**35** 5:16 190:12,16
 190:19
**36** 5:17,18,20
 149:21 150:2,4
**360** 2:2

**4**
**4** 4:13 163:2,8
**4:00** 221:14 242:9
 260:7
**4:01** 188:19
**40** 5:19 146:20,24
 147:7
**41** 5:20 36:22 37:3
 37:6

**42** 37:8 198:7,10
 198:11 199:24
 200:4,23 201:4
**43** 5:21 228:2,5
**44** 5:22 228:19,22
 229:4
**466** 77:4,7,8
**467-9800** 2:15
**47** 5:23 75:2,6,15
 75:24 76:8,15
 77:3
**473-2968** 3:10
**4th** 225:19

**5**
**5** 1:19 4:14 294:12
**50** 162:22
**500** 19:22
**515** 2:14
**5th** 298:7

**6**
**6** 4:3,15
**60143** 2:19
**60402** 3:3
**60602** 2:8
**60603** 3:10
**60654** 2:3,15
**62** 66:2,5 114:2,7
**630** 2:19

**7**
**7** 4:16
**702-0627** 2:9
**708** 3:4
**75** 5:23
**773-4774** 2:19
**79** 3:9

**8**
**8** 4:17 25:5
**8:00** 221:14
**8th** 228:13 253:20

**9**

**9** 4:18 33:19 48:24
 182:13,18,21
**90** 19:9
**9th** 158:6,21
 159:10 160:4
 162:10 182:10
 185:3 197:13

*John J. Scatchell v. Village of Melrose Park, et al.*
Case No. 2018 C 3989

# John A. Scatchell (aka "Jr.)

# Deposition Exhibits



# EXHIBIT 1



# MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi ◆ Chief of Police

**To:** Chief Sam Pitassi

**From:** OFC. John A. Scatchell #23

**Date:** 16 FEB 15

**Ref:** Injury


In summary, on 03 FEB 15 at 20:29, I responded to an unwanted subject call outside Gottlieb's emergency room. Upon arrival, I encountered a subject who was highly combative, making violent threats, and refusing to listen to verbal commands. OFC Loochtan #91 and I had to physically restrain the subject as he attempted re-entry into the emergency room lobby, where he was not wanted. Upon placing our hands on the subjects' arms, the subject tensed up and attempted to break free of our grasp. At that time the subject then fell forward in an attempt to break free, causing himself, myself, and OFC Loochtan to fall to the ground. The subject was then detained and taken into the hospital for a psychiatric evaluation.

I did not immediately realize any injury was sustained during the interaction, but felt discomfort in the upper back and neck region later that evening from the fall. On the following day I woke up with severe neck and back pain, with a loss of range of motion in the neck. On 05 FEB 15, I made an appointment with Dr. Paulette N. Feiereisel and notified Lt. Rogowski of the injury via text message. Dr. Feiereisel diagnosed me with a cervical strain, and provided me with a note to remain off work. I provided Lt. Rogowski with the initial note and any notes that followed, until being cleared to return to duty on 16 FEB 15.


Respectfully submitted,

OFC. John A. Scatchell #23


**1 North Broadway ◆ Melrose Park, Illinois 60160 ◆ (708) 344-8409**

**www.mppd.com**

VMP/SCATCHELL JR 110

CHIEF'S EXHIBIT ___

# EXHIBIT 2

# ILLINOIS FORM 45: EMPLOYER'S FIRST REPORT OF INJURY

*Please type or print.*

| Employer's FEIN | Date of report | Case or File # | Is this a lost workday case? |
|---|---|---|---|
| 36-60005996 | 02/6/15 | | Yes |

| Employer's name | | Doing business as |
|---|---|---|
| Village of Melrose Park | | |

| Employer's mailing address | Employer's email address |
|---|---|
| 1000 N. 25th AV Melrose Park IL 60160 | |

| Nature of business or service | SIC code |
|---|---|
| Municipality | |

| Name of workers' compensation carrier/admin. | Policy/Contract # | Self-insured? |
|---|---|---|
| | | Yes |

| Employee's full name | Birthdate |
|---|---|
| John Scatchell | 12/09/88 |

| Employee's mailing address | Employee's e-mail address |
|---|---|
| 912 Norwood AV Melrose Park IL 60160 | |

| Gender | Marital status | # Dependents | Employee's average weekly wage |
|---|---|---|---|
| Male | Single | 0 | |

| Job title or occupation | Date hired |
|---|---|
| Police Patrol Officer | 09/26/12 |

| Time employee began work | Date and time of accident | Last day employee worked |
|---|---|---|
| 400 P.M. | 02/03/15    829PM | 02/03/15 |

| If the employee died as a result of the accident, give the date of death. | Did the accident occur on the employer's premises? |
|---|---|
| No | No |

**Address of accident**

701 W. North AV Melrose Park IL 60160

**What was the employee doing when the accident occurred?**

Employee was at a disturbanc call at Gottlieb Hospital

**How did the accident occur?**

Employee struggled with a disorderly subject.

**What was the injury or illness? List the part of body affected and explain how it was affected.**

Pain in the back and neck described as a cervical strain.

**What object or substance, if any, directly harmed the employee?**

Unknown at time of report

**Name and address of physician/health care professional**

Paulette N Feierseisel NP

**If treatment was given away from the worksite, list the name and address of the place it was given.**

Westside Medical Associates 675 W. North Av Suite 330 Melrose Park IL 60160 708-450-5060

| Was the employee treated in an emergency room? | Was the employee hospitalized overnight as an inpatient? |
|---|---|
| Yes | Yes |

| Report prepared by | Signature | Title and telephone # | Email address |
|---|---|---|---|
| Steven Rogowski | | Lieutenant 708-345-9029 | srogowski@m rkpd.com |

Please send this form to: ILLINOIS WORKERS' COMPENSATION COMMISSION 4500 S. SIXTH ST. FRONTAGE ROAD SPRINGFIELD, IL 62703-5118
By law, employers must keep accurate records of all work-related injuries and illness (except for certain minor injuries). Employers shall report to
the Commission all injuries resulting in the loss of more than three scheduled workdays. Filing this form does not affect liability under the
Workers' Compensation Act and is not incriminatory in any sense. This information is confidential.    IC45  8/12

Dep Ex No. 6

for ID, as of  1 9 1 6

VMP/SCATCHELL JR 105

CHIEF'S EXHIBIT __

# EXHIBIT 3

## DuPage Medical Group
WE CARE FOR YOU

**WESTSIDE MEDICAL ASSOCIATES MELROSE
PARK INTERNAL MEDICINE; MEMBER OF
DUPAGE MEDICAL GROUP
675 West North Avenue
Suite 303
Melrose Park IL 60160
708-450-6060**

April 2, 2015

To whom it may concern:

This is to certify that John A Scatchell, date of birth: 12/9/1988:

Starting Saturday April 4th, John can return to work light duty for 4 hours a day for one week, then 6 hours a day for one week, then 8 hours a day for one week. He may return to full unrestricted duty April 24, 2015

The patient was seen on at our office today for an evaluation

Please call if you have further questions,

PAULETTE N FEIEREISEL, NP

This letter (including any attachments) contains confidential information intended only for the addressee. Any use or disclosure by any other person is unlawful. If you are not the intended recipient, please notify our office immediately (630-469-9200) and we will make arrangements for the return of the information to DuPage Medical Group. You are hereby notified that any disclosure, copying, or distribution of this letter, or the taking of any action based on it, is strictly prohibited by law.

John A Scatchell, GE11793006, 12/9/1988

**VMP/SCATCHELL JR 118**

**CHIEF'S EXHIBIT ___**

# EXHIBIT 4

LYME DISEASE, TOTAL AB W RFLX (Resulted 12/9/2016, Abnormal)
B. BURGDORFERI AB, IGM BY WESTERN BLOT REFLEX (Resulted 12/12/2016)
CBC W/ DIFFERENTIAL (Resulted 12/9/2016)
CBC WITH DIFFERENTIAL WITH PLATELET (Resulted 12/9/2016)
LYME DISEASE ANTIBODY
LYME DISEASE ANTIBODY
LYME DISEASE ANTIBODY
OFFICE/OUTPT VISIT,EST,LEVL III

## Medication Changes
As of 12/9/2016 3:04 PM

| | Refills | Start Date | End Date |
|---|---|---|---|
| **Added: Doxycycline Hyclate 100 MG Oral Tab** | 0 | 12/9/2016 | 12/19/2016 |
| Take 1 tablet (100 mg total) by mouth 2 (two) times daily. - Oral | | | |

## Visit Diagnoses

Rash R21

# John A Scatchell

8/25/2016 12:30 PM   Office Visit
MRN: GE11793006

Description: **27 year old male** Provider: Sandoval, Maryam, MD Department: Brush Hill Im

## Scanning Cover Sheet

Click to print Barcode Encounter Cover Sheet for scanning

# Scatchell, John A

MRN: GE11793006
Description: 27 year old male

**Office Visit** 8/25/2016
DMG INTERNAL MEDICINE -
ELMHURST, BRUSH HILL

Provider: Sandoval, Maryam, MD (Internal Medicine)
Primary diagnosis: Reactive cervical lymphadenopathy
Reason for Visit: **Therapeutic Management**

## ⚡ Reason for Visit

**Therapeutic Management**

## Progress Notes

Sandoval, Maryam, MD (Physician) • Internal Medicine

John A Scatchell is a 27 year old male.
CC:
Patient presents with:
Therapeutic Management

**HPI:**
27 yo male. Asked to be seen acutely . Reports noticing a uncomfortable lump on his left anterior neck
(below jawline) for 3 days. No sore throat or cough. No recent fevers. Has chronic allergies and using
flonase and singulair daily. Also, had felt a bump on his lower back of neck a few days ago that has now
disappeared. Became alarmed after looking up causes on Web MD and decided to seek care.
No weight loss. No diaphoresis or night sweats. Appetite is good. No sick exposures

MPD/SCATCHELL 392

**CHIEF'S EXHIBIT \_\_\_**

Current Outpatient Prescriptions:

| | | |
|---|---|---|
| Fluticasone Propionate (FLONASE) 50 MCG/ACT Nasal Suspension | PLACE 1 SPRAY IN EACH NOSTRIL TWICE DAILY | Disp: 1 Bottle  Rfl: prn |
| Montelukast Sodium (SINGULAIR) 10 MG Oral Tab | TAKE 1 TABLET BY MOUTH EVERY EVENING | Disp: 90 tablet Rfl: 3 |

**Past Medical History**
Diagnosis                                                              Date
· Allergic rhinitis

Social History:
  Smoking Status: Never Smoker
  Smokeless Status: Never Used
  Alcohol Use: No

**REVIEW OF SYSTEMS:**
**GENERAL HEALTH:** No fever.  No chills.  No diaphoresis
**ENT:**  No sore throat or congestion
**RESPIRATORY:** No shortness of breath. No cough. No wheezing
**GI:** No abdominal pain. No diarrhea. No constipation. No N/V.  Appetite good
**SKIN:** no rash or itching

**EXAM:**
BP 98/65 mmHg | Pulse 75 | Temp(Src) 98.2 °F (36.8 °C) | Wt 224 lb (101.606 kg)
**GENERAL:** young, pleasant white male in no distress
**HEENT:**  Normocephalic, no visual deficits, no pharyngeal exudates, +posterior pharynx cobblestoning
**NECK:** very minimal small mobile left anterior chain cervical LN tenderness
**LUNGS:** Clear to auscultation bilaterally.  No wheezes.  No crackles.
**SKIN:** No rash.  No suspicious lesions.

**ASSESSMENT AND PLAN:**

Diagnoses and all orders for this visit:

**Reactive cervical lymphadenopathy in a patient with Allergic rhinitis**
Reassured pt in great length.
No evidence of abnormal lymphadenopathy.
Asked pt to stop massaging and palpating the LN to prevent enlargement/reactive reaction.
No signs of infection and no need for oral abx at this time.
-motrin prn pain
-hydration
-will call with any acute changes.

**Orders Placed This Encounter**
EST Levl II [99212]

**Meds & Refills for this Visit:**
No prescriptions requested or ordered in this encounter

**Imaging & Consults:**

None

Maryam Sandoval, MD

## Instructions
DMG AFTER VISIT SUMM (Automatic SnapShot taken 8/25/2016)

## Additional Documentation
Vitals:            BP 98/65 Pulse 75 Temp 98.2 °F (36.8 °C) Wt 224 lb BMI 34.06 kg/m² BSA 2.14 m²
                   More Vitals
Flowsheets:        Custom Formula Data, DMG TEMP FOR BP BPA COMPARE
Encounter Info:    Billing Info, History, Allergies, Detailed Report

## Encounter Status
Electronically signed by Sandoval, Maryam, MD on 8/25/16 at 2:00 PM

## Additional Encounter Details
Scanning Cover Sheet
All Scans
Questionnaire Details
Referral Information
Elm Time Out
Administrative Information
Coding Query

## SmartForms
No SmartForms are associated with this patient.

## Infusion Orders
No relevant orders to display.

## Medication Waste Documentation
No orders found for this encounter

## Orders Placed
OFFICE/OUTPT VISIT,EST,LEVL II

## Medication Changes
As of 8/25/2016 12:16 PM
None

## Visit Diagnoses
Reactive cervical lymphadenopathy R59.0
Allergic rhinitis due to other allergic trigger J30.89

MPD/SCATCHELL 394

# EXHIBIT 5

## Orders Placed

**CBC WITH DIFFERENTIAL WITH PLATELET** (Resulted 10/31/2017, Abnormal)
COMP METABOLIC PANEL (14) (Resulted 10/31/2017)
SED RATE, WESTERGREN (AUTOMATED) (Resulted 10/31/2017)
OFFICE/OUTPT VISIT,EST,LEVL III

## Medication Changes

As of 10/31/2017 3:59 PM

|  | Refills | Start Date | End Date |
|---|---|---|---|
| **Added: predniSONE 20 MG Oral Tab** | 0 | 10/31/2017 | 11/7/2017 |

Take 1 tablet (20 mg total) by mouth 2 (two) times daily. - Oral

**Calcipotriene**

Discontinued: Calcipotriene 0.005 % External Solution (Patient discontinued)

Discontinued: CALCIPOTRIENE 0.005 % External Cream (Patient discontinued)

Discontinued: Clindamycin Phosphate 1 % External Lotion (Patient discontinued)

**Clobetasol Propionate**

Discontinued: Clobetasol Propionate 0.05 % External Cream (Duplicate therapy)

Discontinued: Clobetasol Propionate 0.05 % External Solution (Patient discontinued)

## Visit Diagnoses

Neck fullness R22.1
Cervical radiculopathy M54.12

## Immunizations Given

Not given: Influenza Vaccine Refused Deferred (Patient Refused)

# John A Scatchell

1/12/2017 1:00 PM   Office Visit
MRN: GE11793006

Description: **28 year old male** Provider: **Sandoval, Maryam, MD** Department: **Brush Hill Im**

## Scanning Cover Sheet

Click to print Barcode Encounter Cover Sheet for scanning

# Scatchell, John A

MRN: GE11793006
Description: 28 year old male

**Office Visit** 1/12/2017          Provider: **Sandoval, Maryam, MD** (Internal Medicine)
DMG INTERNAL MEDICINE -      Primary diagnosis: **Guttate psoriasis**
ELMHURST, BRUSH HILL        Reason for Visit: **Rash**

## ᚛° Reason for Visit

**Rash**

## Progress Notes                    Sandoval, Maryam, MD (Physician) • Internal Medicine

John A Scatchell is a 28 year old male.
**CC:**

MPD/SCATCHELL 386

CHIEF'S EXHIBIT ___

Patient presents with:
**Rash**

## HPI:

28 yo male.

No significant improvement in rash that developed one month ago. Diagnosed with "guttate psoriasis" at NWMH. Unable to return due to insurance restrictions.

Finished course of doxycycline and remains on topical steroidal creams bid. Lesions are not itchy. Slight reduction in anterior torso but worsened on arm and legs.

Tried tanning but did not notice a great change. Frustrated with lack of change. Has not touched base with derm at NW.

| Current Outpatient Prescriptions: | | |
|---|---|---|
| Fluticasone Propionate 50 MCG/ACT Nasal Suspension | 1 spray by Nasal route 2 (two) times daily as needed for Rhinitis. | Disp: 1 Bottle Rfl: prn |
| Montelukast Sodium 10 MG Oral Tab | Take 1 tablet (10 mg total) by mouth daily. | Disp: 90 tablet Rfl: 3 |
| Fexofenadine HCl (ALLEGRA ALLERGY) 180 MG Oral Tab | Take 180 mg by mouth daily. | Disp: Rfl: |

| Past Medical History | |
|---|---|
| Diagnosis | Date |
| • Allergic rhinitis | |

Social History:
Smoking Status: Never Smoker
Smokeless Status: Never Used
Alcohol Use: No

## REVIEW OF SYSTEMS:

**GENERAL HEALTH:** No fever. No chills.
**ENT:** No sore throat or congestion
**RESPIRATORY:** No shortness of breath. No cough. No wheezing
**CARDIOVASCULAR:** No chest pain. No palpitations.
**GI:** No abdominal pain. No diarrhea. No constipation. No N/V. Appetite good
**MS:** No joint swelling, no warmth, no tenderness
**SKIN:** Non itchy rash.

## EXAM:

Temp(Src) 98.2 °F (36.8 °C) (Oral) | Wt 220 lb (99.791 kg)
**GENERAL:** pleasant young male
**HEENT:** Normocephalic, no visual deficits, no pharyngeal exudates
**NECK:** No lymphadenopathy or masses palpable
**LUNGS:** Clear to auscultation bilaterally. No wheezes. No crackles.
**SKIN:** multiple, wide spread lesions on arms, legs, frontal scalp and torso (slightly raised erythrematous lesions that are scaly and annular appearing)

## ASSESSMENT AND PLAN:

Diagnoses and all orders for this visit:

**Guttate psoriasis**
- EVALUATE & TREAT, DERM (DMG)
Will refer to derm.

Will call in names of topical creams prescribed at NWMH.

**Meds & Refills for this Visit:**
No prescriptions requested or ordered in this encounter

**Imaging & Consults:**
EVALUATE & TREAT, DERM (DMG)

Maryam Sandoval, MD

## Instructions

DMG AFTER VISIT SUMM (Automatic SnapShot taken 1/12/2017)

## Additional Documentation

| | |
|---|---|
| Vitals: | Temp 98.2 °F (36.8 °C) (Oral) Wt 220 lb BMI 33.45 kg/m² BSA 2.13 m² |
| Flowsheets: | Custom Formula Data, CAGE Flowsheet, PHQ2 Depression Screen |
| Encounter Info: | Billing Info, History, Allergies, Detailed Report |

## Encounter Status

Electronically signed by Sandoval, Maryam, MD on 1/12/17 at 2:09 PM

## Additional Encounter Details

Scanning Cover Sheet
All Scans
Questionnaire Details
Referral Information
Elm Time Out
Administrative Information
Coding Query

## SmartForms

No SmartForms are associated with this patient.

## Infusion Orders

No relevant orders to display.

## Medication Waste Documentation

No orders found for this encounter

## Orders Placed

EVALUATE & TREAT, DERM (DMG) Authorized
OFFICE/OUTPT VISIT,EST,LEVL II

## Medication Changes

As of 1/12/2017 1:05 PM

None

MPD/SCATCHELL 388

# EXHIBIT 6



CONFIDENTIAL

# John A Scatchell

10/31/2017 3:00 PM  Office Visit
MRN: GE11793006

Description: 28 year old male  Provider: Sandoval, Maryam, MD  Department: Brush Hill Im

## Scanning Cover Sheet

Click to print Barcode Encounter Cover Sheet for scanning

# Scatchell, John A

MRN: GE11793006
Description: 28 year old male

**Office Visit** 10/31/2017
DMG INTERNAL MEDICINE -
ELMHURST, BRUSH HILL

Provider: Sandoval, Maryam, MD (Internal Medicine)
Primary diagnosis: Neck fullness
Reason for Visit: Neck Pain

## ♪○ Reason for Visit

Neck Pain

## Progress Notes

Sandoval, Maryam, MD (Physician) • Internal Medicine

John A Scatchell is a 28 year old male.
CC:
Patient presents with:
Neck Pain

**HPI:**
28 yo male who was asked to be seen for acute visit.  Accompanied by his parents.
Pt reports waking up with severe right sided neck pain 3 days ago with radiation to shoulder, down arms to
finger tips. Associated with numbness and tingling. Unable to recall any kind of trauma, heavy lifting,
pushing or pulling. Has been very relaxed and on vacation. Has a very firm, comfortable mattress and
pillow.
Additionally, has noticed bulging of muscles in his neck as compared to the left side. Pain free while flat in
bed.  Worse with movement.
No fevers or chills.  No sore throat, cough, ear pressure or rash.
Was being treated with Stelara injections but with resolution of his skin changes, injections were stopped
over 2 months ago.

| Current Outpatient Prescriptions: | | |
|---|---|---|
| predniSONE 20 MG Oral Tab | Take 1 tablet (20 mg total) by mouth 2 (two) times daily. | Disp: 14 tablet Rfl: 0 |
| FLUTICASONE PROPIONATE 50 MCG/ACT Nasal Suspension | USE 1 SPRAY NASALLY TWICE DAILY AS NEEDED FOR RHINITIS | Disp: 1 Bottle Rfl: 5 |
| Montelukast Sodium 10 MG Oral Tab | Take 1 tablet (10 mg total) by mouth daily. | Disp: 30 tablet Rfl: 1 |
| Fexofenadine HCl (ALLEGRA ALLERGY) 180 MG Oral Tab | Take 180 mg by mouth daily. Disp: | Rfl: |

**Past Medical History:**

| Diagnosis | Date |
|---|---|
| • Allergic rhinitis | |

**Social History:**

EXHIBIT #CHEP's /
WIT: SANDOVAL
DATE: 10-2-18

MPD/SCATCHELL 383

# CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2138

Smoking status: Never Smoker

Smokeless tobacco: Never Used
Alcohol use: No

# CONFIDENTIAL

## REVIEW OF SYSTEMS:
**GENERAL HEALTH:** No fever. No chills. No diaphoresis
**ENT:** No sore throat or congestion
**RESPIRATORY:** No shortness of breath. No cough. No wheezing
**CARDIOVASCULAR:** No chest pain. No palpitations.
**GI:** No abdominal pain. No diarrhea. No constipation. No N/V. Appetite good
**MS:** Right sided neck pain with radiation down right arm to finger tips
**PSYCH:** No anxiety. No depression.
**SKIN:** No lesions. No rash.

## EXAM:
BP 107/65 | Pulse 99 | Temp 98 °F (36.7 °C) | Wt 228 lb (103.4 kg) | BMI 34.67 kg/m²
**GENERAL:** Young male, pain with head movement. No distress otherwise
**HEENT:** Normocephalic, no visual deficits, no pharyngeal exudates
**NECK:** No lymphadenopathy or masses palpable
**LUNGS:** Clear to auscultation bilaterally. No wheezes. No crackles.
**CARDIO:** S1 S2, regular, no S3, no murmurs
**MS:** No vertebral tenderness, right paracervical tenderness and right neck fullness without
lymphadenopathy or reproducible pain
**NEURO:** Normal triceps and biceps reflexes in bilateral upper ext
No tremors or weakness noted.
**SKIN:** No rash. No suspicious lesions.

## ASSESSMENT AND PLAN:

Diagnoses and all orders for this visit:

**Cervical radiculopathy with**
**Neck fullness**
No reproducible tenderness or lymphadenopathy.
Positional pain which is radiating most consistent with cervical nerve impingement.
No superimposed infectious sx's or findings noted.
In light of hx of stelara use (but cessation 2 months ago), will check labs including ESR and CBC.
Hold off on imaging.
One week course of prednisone.
If not better, may need to pursue imaging.
Asked pt to call with any change in sx's and with update.
No heavy lifting, pushing or pulling. Will be on vacation until 11/9.

**Other orders**
- INFLUENZA REFUSED DMG
- predniSONE 20 MG Oral Tab; Take 1 tablet (20 mg total) by mouth 2 (two) times daily.

Annual Physical due on 12/09/1990
Influenza Vaccine(1) due on 09/01/2017
Annual Depression Screen due on 01/12/2018

**Orders Placed This Encounter**
  CBC With Differential With Platelet

MPD/SCATCHELL 384

Comp Metabolic Panel (14)
Sed Rate, Westergren (Automated)
INFLUENZA REFUSED DMG

**CONFIDENTIAL**

**Meds & Refills for this Visit:**
Signed Prescriptions

| | Disp | Refills |
|---|---|---|
| predniSONE 20 MG Oral Tab | 14 tablet | 0 |

Sig: Take 1 tablet (20 mg total) by mouth 2 (two) times daily.

**Imaging & Consults:**
INFLUENZA REFUSED DMG

Maryam Sandoval, MD

## Instructions

After Visit Summary (Printed 10/31/2017)

## Additional Documentation

Vitals: BP 107/65 Pulse 99 Temp 98 °F (36.7 °C) Wt 228 lb BMI 34.67 kg/m² BSA 2.16 m²
More Vitals

Flowsheets: Custom Formula Data, DMG TEMP FOR BP BPA COMPARE

Encounter Info: Billing Info, History, Allergies, Detailed Report

## Encounter Status

Electronically signed by Sandoval, Maryam, MD on 10/31/17 at 9:20 PM

## Additional Encounter Details

Scanning Cover Sheet
All Scans
Questionnaire Details
Referral Information
Elm Time Out
Administrative Information
Coding Query

## SmartForms

No SmartForms are associated with this patient.

## Infusion Orders

No relevant orders to display.

## Medication Waste Documentation

MPD/SCATCHELL 385

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2140

## Orders Placed

CBC WITH DIFFERENTIAL WITH PLATELET (Resulted 10/31/2017, Abnormal)
COMP METABOLIC PANEL (14) (Resulted 10/31/2017)
SED RATE, WESTERGREN (AUTOMATED) (Resulted 10/31/2017)
OFFICE/OUTPT VISIT,EST,LEVL III



## Medication Changes
As of 10/31/2017 3:59 PM

|  | Refills | Start Date | End Date |
|---|---|---|---|
| Added: predniSONE 20 MG Oral Tab | 0 | 10/31/2017 | 11/7/2017 |

Take 1 tablet (20 mg total) by mouth 2 (two) times daily. - Oral

Calcipotriene
  Discontinued: Calcipotriene 0.005 % External Solution (Patient discontinued)
  Discontinued: CALCIPOTRIENE 0.005 % External Cream (Patient discontinued)

Discontinued: Clindamycin Phosphate 1 % External Lotion (Patient discontinued)

Clobetasol Propionate
  Discontinued: Clobetasol Propionate 0.05 % External Cream (Duplicate therapy)
  Discontinued: Clobetasol Propionate 0.05 % External Solution (Patient discontinued)

## Visit Diagnoses

Neck fullness R22.1
Cervical radiculopathy M54.12

## Immunizations Given

Not given: Influenza Vaccine Refused Deferred (Patient Refused)

# John A Scatchell

1/12/2017 1:00 PM   Office Visit
MRN: GE11793006

Description: 28 year old male  Provider: Sandoval, Maryam, MD  Department: Brush Hill Im

## Scanning Cover Sheet

Click to print Barcode Encounter Cover Sheet for scanning

# Scatchell, John A

MRN: GE11793006
Description: 28 year old male

**Office Visit 1/12/2017**
DMG INTERNAL MEDICINE -
ELMHURST, BRUSH HILL

Provider: Sandoval, Maryam, MD (Internal Medicine)
Primary diagnosis: Guttate psoriasis
Reason for Visit: Rash

## ℘ Reason for Visit

Rash

## Progress Notes

Sandoval, Maryam, MD (Physician) • Internal Medicine

John A Scatchell is a 28 year old male.
CC:

MPD/SCATCHELL 386

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMP/JJS 2141

# EXHIBIT 7

Scatchell, John A (MR # GE11793006)                    Encounter Date: 03/10/2015

I sent you the note via MyChart. Let me know if you need a note to return to      3:53 PM    
work too.
Hope you continue to feel better with rest and the new medications.
These neck problems can drag on for weeks but should definitely improve over the next
week.
Keep me posted.

Dr. S



Last read by John A Scatchell at 5:02 PM on 11/9/2017.

---

Cozzi, Karen, CMA routed this conversation to Sandoval, Maryam, MD      3:31 PM    

**John A Scatchell to Maryam Sandoval, MD**

   I'm not sure, I still haven't improved much. Last night I felt better and today      11:35 AM
not so much. Maybe until Friday and see how I feel as the week progresses?

**Sandoval, Maryam, MD to John A Scatchell**

I would be happy to give you a note.                                              11:28 AM    
Do you want to shoot for a return next week?
Mon? Tuesday? Later?
Just write me back ASAP and I will draft the letter and send it to you via MyChart.

Best,
Dr. Sandoval



Last read by John A Scatchell at 11:29 AM on 11/9/2017.

November 8, 2017

---

Gibson, Regina routed this conversation to Sandoval, Maryam, MD      9:39 AM    

**Gibson, Regina**

Note                                                                              9:38 AM    

From: John A Scatchell
To: Sandoval, Maryam, MD
Sent: 11/7/2017 9:24 PM CST
Subject: Visit Follow-up Question

Hi Dr, sorry we've been playing phone tag the last day or so. I picked up both
prescriptions and started those this evening. Would it be possible to have a note for      MS 021

Scatchell, John A (MR # GE11793006) Printed by Biggs, Fay K. [7313] at 5/22/18 2:4...   Page 20 of 66

Scatchell, John A (MR # GE11793006)                    Encounter Date: 03/10/2015

work? I am supposed to return to work on Thursday the 9th. As of now I'm still in a lot
of pain and have been using the heating pad often. The swelling has gone down a
little, but it is still visible and the numbness/tingling sensation has been more
prevalent in recent days down my right shoulder and arm.



November 7, 2017



John A Scatchell  to Maryam Sandoval, MD

Hi Dr, sorry we've been playing phone tag the last day or so. I picked up both  9:24 PM
prescriptions and started those this evening. Would it be possible to have a note for
work? I am supposed to return to work on Thursday the 9th. As of now I'm still in a lot
of pain and have been using the heating pad often. The swelling has gone down a little,
but it is still visible and the numbness/tingling sensation has been more prevalent in
recent days down my right shoulder and arm.

## Additional Documentation

Encounter Info:   Billing Info, History, Allergies, Detailed Report

## Communications

Letter sent to John A Scatchell
Sent 11/9/2017

## Encounter Status

Closed by Sandoval, Maryam, MD on 11/9/17 at 3:53 PM

## Additional Encounter Details

Scanning Cover Sheet
All Scans
Questionnaire Details
Administrative

## Orders Placed

None

## Medication Renewals and Changes
As of 11/9/2017 3:53 PM

None

## Visit Diagnoses

None

# John A Scatchell                          11/6/2017  Telephone
                                           MRN: GE11793006

Description: 28 year old male  Provider: Sandoval, Maryam, MD  Department: Highland Internal Mail 022

Scatchell, John A (MR # GE11793006) Printed by Biggs, Fay K. [7313] at 5/22/18 2:4...  Page 21 of 66

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2143

# EXHIBIT 8

Name: John A. Scatchell | DOB: 12/9/1988 | MRN: GE11793006 | PCP: MARYAM SANDOVAL, MD

## Letter Details

**DuPage Medical Group**
WE CARE FOR YOU

DMG INTERNAL MEDICINE - ELMHURST,
BRUSH HILL
133 Brush Hill Road
Suite 401
Elmhurst IL, 60126
630-832-2030

**CONFIDENTIAL**

November 9, 2017

To whom it may concern:

I am the primary care physician for your employee, Mr. John Scatchell. He was seen and evaluated by myself in the office for an acute musculoskeletal condition that has not yet resolved. He remains on active treatment and has been advised to continue to rest at home. Please excuse the patient from work until further notice.

Thank you for you understanding and cooperation. Please call with any remaining questions.

Sincerely,

Maryam N. Sandoval, MD

*This letter was initially viewed by John A Scatchell at 11/9/2017 4:30 PM.*

MyChart® licensed from Epic Systems Corporation © 1999 - 2016

Dep Ex No. 8
for ID, as of 11/9/18

EXHIBIT CHERS 3
WIT: SANDOVAL
DATE: 10-2-18

VMP/SCATCHELL JR 120

# EXHIBIT 9

Scatchell, John A (MR # GE11793006)                                  Encounter Date: 03/10/2015

Cozzi, Karen, CMA routed this conversation to Sandoval, Maryam,    11/21/17 3:24 PM
MD

**Cozzi, Karen, CMA**

📝 Note                                                             11/21/17 3:24 PM



From: John A Scatchell
To: Sandoval, Maryam, MD
Sent: 11/21/2017 2:07 PM CST
Subject: Visit Follow-up Question

**CONFIDENTIAL**

Hi Dr Sandoval,

I just wanted to touch base with you. I still have a considerable amount of pain,
particularly if I don't take any pills for a prolonged period of time. The numbness in
my right arm comes and goes all day. Also if I move my neck too fast or too far, I get
a quick shooting sensations down my whole arm. I haven't been engaged in really any
activity at all except stretches and have been applying heat/cold around the clock.

John A Scatchell  to Maryam Sandoval, MD



Hi Dr Sandoval,                                                    11/21/17 2:07 PM

I just wanted to touch base with you. I still have a considerable amount of pain,
particularly if I don't take any pills for a prolonged period of time. The numbness in my
right arm comes and goes all day. Also if I move my neck too fast or too far, I get a
quick shooting sensations down my whole arm. I haven't been engaged in really any
activity at all except stretches and have been applying heat/cold around the clock.

## Additional Documentation

Encounter Info:   Billing Info, History, Allergies, Detailed Report

## Encounter Status

Closed by Sandoval, Maryam, MD on 11/21/17 at 3:56 PM

## Additional Encounter Details

Scanning Cover Sheet
All Scans
Questionnaire Details
Administrative

EXHIBIT *Chee 4*
WIT: *Sandoval*
DATE: *10-2-18*

## Orders Placed

EMG/NCV TEST(S), PHYSIATRY (DMG) Authorized                        **MS 018**

Scatchell, John A (MR # GE11793006) Printed by Biggs, Fay K. [7313] at 5/22/18 2:4... Page 17 of 66

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMP/JJS 2145

# **EXHIBIT 10**

Scatchell, John A (MR # GE11793006)                          Encounter Date: 03/10/2015

Best,
Dr. Sandoval

Last read by John A Scatchell at 12:47 PM on 11/27/2017.

---

Cozzi, Karen, CMA routed this conversation to Sandoval, Maryam, MD          7:12 AM          

---

Cozzi, Karen, CMA                                                          7:12 AM

📄 Note

From: John A Scatchell
To: Sandoval, Maryam, MD
Sent: 11/26/2017 9:52 PM CST
Subject: Visit Follow-up Question

Hi Dr Sandoval,

I scheduled my appointment the day you messaged me. The earliest that they could
get me in at any of their locations is December 4th, so that's the date I took. Would it
be possible to get an updated Dr's note for work that allows me to do light exercise? I
feel the best after I stretch and then ally heat/cold. The last few days has been better
on the pain, but the numbness still persists.

Thanks

CONFIDENTIAL

EXHIBIT Sither's 5
WIT: Sandoval
DATE: 10-2-18

November 26, 2017

John A Scatchell  to Maryam Sandoval, MD
                                                      9:52 PM
Hi Dr Sandoval,

I scheduled my appointment the day you messaged me. The earliest that they could get
me in at any of their locations is December 4th, so that's the date I took. Would it be
possible to get an updated Dr's note for work that allows me to do light exercise? I feel
the best after I stretch and then ally heat/cold. The last few days has been better on the
pain, but the numbness still persists.

Thanks

## Additional Documentation

Encounter Info:   Billing Info, History, Allergies, Detailed Report

## Communications

MS 016

Scatchell, John A (MR # GE11793006) Printed by Biggs, Fay K. [7313] at 5/22/18 2:4...   Page 15 of 66

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2146

# EXHIBIT 11

Scatchell, John A (MR # GE11793006)                    Encounter Date: 03/10/2015

# John A Scatchell

11/27/2017  Patient Email
MRN: GE11793006

Description: 28 year old male  Provider: Sandoval, Maryam, MD  Department: Brush Hill Im

# Scatchell, John A

MRN: GE11793006
Description: 28 year old male

**Patient Email** 11/27/2017    Provider: Sandoval, Maryam, MD (Internal Medicine)
DMG INTERNAL MEDICINE -
ELMHURST, BRUSH HILL

## Conversation: Visit Follow-up Question                    (Newest Message First)

Sandoval, Maryam, MD

✎ Note                                    11/27/17 6:28 PM    

Already called pt and sent new letter.

Cozzi, Karen, CMA routed this conversation to Sandoval, Maryam,    11/27/17 1:17 PM
MD

Cozzi, Karen, CMA

✎ Note                                    11/27/17 1:17 PM    

From: John A Scatchell
To: Sandoval, Maryam, MD
Sent: 11/27/2017 12:43 PM CST
Subject: Visit Follow-up Question



Hi Dr Sandoval,

Sorry to be a bother. I was hoping to remain off work and be able to exercise lightly
(walking/stretching/light cardio) until the results of the test on the 4th. Light duty at
work would entail me sitting around all day and doing almost nothing. I did light duty
the last time I was hurt a few years ago and sitting around all day in a chair made me
feel worse.

EXHIBIT _CHIEF'S_
WIT SANDOVAL
DATE: 10-2-19

John A Scatchell  to Maryam Sandoval, MD

 Hi Dr Sandoval,                            11/27/17 12:43 PM

Sorry to be a bother. I was hoping to remain off work and be able to exercise lightly
(walking/stretching/light cardio) until the results of the test on the 4th. Light duty at
work would entail me sitting around all day and doing almost nothing. I did light duty

MS 014

Scatchell, John A (MR # GE11793006) Printed by Biggs, Fay K. [7313] at 5/22/18 2:4...  Page 13 of 66

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMP/JJS 2147

# EXHIBIT 12

Name: John A. Scatchell | DOB: 12/9/1988 | MRN: GE11793D06 | PCP: MARYAM SANDOVAL, MD

## Letter Details

DuPage Medical Group
WE CARE FOR YOU

DMG INTERNAL MEDICINE - LOMBARD,
HIGHLAND AVENUE
2340 Highland Avenue, Suite 210
Lombard IL 60148
630-932-2620

November 27, 2017

To whom it may concern:

I am the primary care physician for your employee, Mr. John Scatchell.

The patient remains under my care for an ongoing medical problem which has improved but not resolved. He has been advised to resume light exercises and may walk outside of his home. However, he is not able to return to his full time work pending completion and review of ordered tests.

Thank you for your understanding and cooperation. Please call with any remaining questions.

Sincerely,

Maryam N. Sandoval, MD

CONFIDENTIAL

*This letter was initially viewed by John A Scatchell at 11/27/2017 6:19 PM.*

MyChart® licensed from Epic Systems Corporation © 1999 - 2016

EXHIBIT CHEF'S 7
WIT: SANDOVAL
DATE: 10-2-19

Dep Ex No. 10
for ID, as of 11 9 18

**VMP/SCATCHELL JR 121**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMP/JJS 2148

# EXHIBIT 13

Scatchell, John A (MR # GE11793006)

Concentric needle EMG reveals evidence of increased insertional activity, membrane irritability, in the right deltoid where recruitment is slightly diminished

Conclusion

No root pattern is identified, EMG testing findings of this electrodiagnostic study are limited to the right deltoid and suggestive of possible partial right C5 and/or C6 root irritability

Plan F/u Dr Sandoval

------------------
Ellen Voronov, M.D.



## Instructions

After Visit Summary (Automatic SnapShot taken 12/4/2017)

## Additional Documentation

Vitals: Wt 228 lb (103.4 kg) BMI 34.67 kg/m² BSA 2.16 m² More Vitals

Flowsheets: Custom Formula Data

Encounter Info: Billing Info, History, Allergies, Detailed Report

## Communications

⊞ ⚞ Chart Routed to Sandoval, Maryam, MD

## Encounter Status

Electronically signed by Voronov, Ellen I, MD on 12/4/17 at 10:46 PM

## Encounter Reviewed By

Sandoval, Maryam, MD on 12/5/2017 12:26 PM

## Additional Encounter Details

Scanning Cover Sheet
All Scans
Questionnaire Details
Referral Information
Elm Time Out
Administrative Information
Coding Query



EXHIBIT CHEE 8
WIT SANDOVAL
DATE: 10-2-18

## SmartForms

No SmartForms are associated with this patient.

## Infusion Orders

No relevant orders to display.

MS 095

Scatchell, John A (MR # GE11793006) DOB: 12/09/1988 Printed by [11996] at 7/25/18 8:51 AM

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMP/JJS 2149

# EXHIBIT 14

I sent the letter to you via MyChart. 12/15/17 3:59 PM
Hope it works.

Best,
Dr. S

Last read by John A Scatchell at 4:25 PM on 12/15/2017.

Lieb, Elizabeth J, RN routed this conversation to Sandoval, Maryam, MD 12/15/17 3:30 PM

Lieb, Elizabeth J, RN

Note 12/15/17 3:29 PM

From: John A Scatchell
To: Sandoval, Maryam, MD
Sent: 12/15/2017 3:14 PM CST
Subject: Visit Follow-up Question

CONFIDENTIAL

Hi Dr,

I just received a little clarification. If you could just let them know that I'm still under care right now and cannot return to full police duties yet. I would like to return to work in a light duty capacity at this time though. Also as far as the travel, anything along the lines of traveling/flying should not adversely affect my medical condition. Thank you so much, talk to you soon.

EXHIBIT Rivera's 9
WIT: Sandoval
DATE: 10-2-18

John A Scatchell to Maryam Sandoval, MD

Hi Dr, 12/15/17 3:14 PM

I just received a little clarification. If you could just let them know that I'm still under care right now and cannot return to full police duties yet. I would like to return to work in a light duty capacity at this time though. Also as far as the travel, anything along the lines of traveling/flying should not adversely affect my medical condition. Thank you so much, talk to you soon.

## Additional Documentation

Encounter Info: Billing Info, History, Allergies, Detailed Report

## Communications

Letter sent to John A Scatchell

MS 008

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 15

**11:57**



**Urso**



Tue, Nov 7, 8:26 PM

> Hey LT. Not sure if Dad told you, but my neck is really fucked up. I'm gonna be on injury in a couple days, so I gave both of my days (14th and 22nd) to Jimmy. I'm not sure if I'll be back or not for December. They've had me on steroids for the last week, now they put me on anti inflammatory and muscle relaxers. Gotta go for an X-ray tomorrow or Thursday.

OK didn't know, im Florida for the week, just take care, no problem

> Thanks LT, have fun 

Tue, Nov 14, 3:54 PM

> You going to this Jagoff meeting

Yeah

> Alone or with your pal?

  iMessage 

CHIEF'S EXHIBIT ___

# EXHIBIT 16



# MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi • Chief of Police

TO:        Officer John Scatchell # 23

FROM:     Michael Castellan
              Deputy Chief of Police

Date:       December 4, 2017

Subject:   Days off Request

I received a memorandum from Sergeant Schillinger advising you
requested to take time off for vacation. Your current status was examined.
Since your situation involves medical leave, I consulted with legal counsel
for the village of Melrose Park.

Due to the fact you are on medical leave and unable to report to duty for
your scheduled shift, your request must be denied.

Sincerely,

*Deputy Chief Michael A. Castellan*

Michael Castellan
Deputy Chief of Police

CC:    Director Sam Pitassi
       Lt. Nunzio Maiello
       Sgt. John Schillinger

**1 North Broadway • Melrose Park, Illinois 60160 • (708) 344-8409**

**www.mppd.com**

Dep Ex No. 11
for ID, as of 1/9/18

VMP/SCATCHELL JR 123

# EXHIBIT 17

  

**MPPD**    **Johnny**

Tue, Dec 5, 2:18 PM

So the procedure yesterday showed that my numbness is coming from my c5-c6 in my neck. Going for an MRI today. Just wanted to keep you both informed.

chat114503678749724831

 **Ok**

CHIEF'S EXHIBIT ___

# EXHIBIT 18

Name: John A. Scatchell | DOB: 12/9/1988 | MRN: GE11793006 | PCP: MARYAM SANDOVAL, MD

## Letter Details

**DuPage Medical Group**

WE CARE FOR YOU

DMG INTERNAL MEDICINE - ELMHURST,
BRUSH HILL
133 Brush Hill Road
Suite 401
Elmhurst IL 60126
630-832-2020

December 15, 2017

**CONFIDENTIAL**

To whom it may concern:

I am the primary care physician for your employee, Mr. John Scatchell.

The patient remains under my care for an ongoing medical problem which has improved but not resolved. Based on recent test results, the patient has been referred to a specialist and his appointment is still pending. In the meantime, he may return to light duty employment pending the consultant input. His prior arranged travel plans are deemed safe and should not affect his ongoing medical problems.

Thank you for your understanding and cooperation. Please call with any remaining questions.

Sincerely,

Maryam N. Sandoval, MD

*This letter was initially viewed by John A Scatchell at 12/15/2017 3:59 PM.*

MyChart® licensed from Epic Systems Corporation © 1999 - 2016

Dep Ex No. 12
for ID, as of 19 18

EXHIBIT SHEES 10
WIT: SANDOVAL
DATE: 10-2-18

**VMP/SCATCHELL JR 124**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMP/JJS 2150

# EXHIBIT 19



# MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi ✦ Chief of Police

TO:        Officer John Scatchell Jr.

FROM:      Sam C. Pitassi
           Director of Police

Date:      February 13, 2018

Subject:   Authority Release of Medical Records

In light of your agreement to sign an authorization for us to receive your medical records, and also recognizing that your attorneys have apparently agreed upon the language, you are hereby ordered to complete and sign the attached Authorization for Release of Medical Records and return the original of the completed and signed document to Deputy Chief Michael Castellan on or before 1:00 p.m. on Friday, February 16, 2018. You are further ordered not to hinder or interfere, in any way, with the medical providers regarding their submission of such records.

Of course, please feel free to call if you would like discuss it further.

Sincerely,

Sam C. Pitassi
Director of Police

CC:    Michael Castellan
       Deputy Chief of Police

**1 North Broadway ✦ Melrose Park, Illinois 60160 ✦ (708) 344-8409**

**www.mppd.com**

CHIEF'S EXHIBIT ___



# MELROSE PARK POLICE DEPARTMENT

## Sam C. Pitassi ✦ Chief of Police

### AUTHORIZATION FOR RELEASE OF MEDICAL RECORDS

#### Patient Identification

Printed Name: _____

Date of Birth: _____

Address: _____

Last four digits of Social Security #: _____

#### Authority for Limited Release of Protected Health Information by the Health Care Providers Listed Below:

I, John Scatchell, Jr., hereby authorize the Custodian of Medical Records ("Medical Provider"), _____, to release the information identified in this authorization form for the partial and limited release of my medical records since September 1, 2012, and to provide such information to the following people only: Jeffrey S. Fowler or Joseph Gagliardo of Laner Muchin, Ltd., 515 N. State St., Suite 2800, Chicago, Illinois 60654, or any representative thereof.

#### The following information is to be released

A **Certified** Copy of the limited health and medical records file, which shall be limited to:

Office notes, correspondence, existing narrative reports, x-ray films and reports, CT Scan films and reports, diagnostic films and reports, etc., health history records, treatment records, hospital records, lab results, patient intake forms, initial application and information sheets, consultation reports, correspondence or reports from other health care providers, physical therapist records and reports, appointment records, progress notes, handwritten notes, nurses' notes, records of prescriptions, patient orders, pathology slides, billing records, insurance claim forms, functional capacity tests, and any and all other records compiled by you or in your possession relating to my physical condition since September 1, 2012, that relates to or may relate to my ability to perform the functions of a police officer.

This release authorizes the release of tangible medical information only and does not authorize verbal communication by the health care provider to the requesting party. This information must be kept strictly confidential in files that are separate from the general personnel files. A photocopy of this medical authorization may be used for the release of these records. The Medical Professional will provide a copy of the medical records sent to the Melrose Park Police Department.

## Purpose of the Requested Disclosure of Protected Health Information

I am authorizing the limited release of my Protected Health Information for the following purposes for all purposes related to my employment with the Village of Melrose Park, Illinois.

## Right to Revoke Authorization

Except to the extent that action has already been taken in reliance on this authorization, the authorization may be revoked at any time by submitting a written or electronic notice to the Medical Provider, who may be contacted using the following contact information:

Unless revoked, this authorization will expire on April 1, 2018.

## Re-disclosure

I understand the information disclosed by this authorization may be subject to re-disclosure by the recipient and no longer be protected by the Health Insurance Portability and Accountability Act of 1996.

Signature: _____

Date: _____

2

# EXHIBIT 20



# MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi ✦ Chief of Police

## AUTHORIZATION FOR RELEASE OF MEDICAL RECORDS

### Patient Identification

Printed Name: __John A. Scatchell__

Date of Birth: __12/09/1988__

Address: __912 Norwood Drive Melrose Park, IL 60160__

Last four digits of Social Security #: __6484__

### Authority for Limited Release of Protected Health Information by the Health Care Providers Listed Below:

I, John Scatchell, Jr., hereby authorize the Custodian of Medical Records ("Medical Provider"), __Dr. Sandoval__ , to release the information identified in this authorization form for the partial and limited release of my medical records since January 1, 2014, and to provide such information to the following people only: Jeffrey S. Fowler or Joseph Gagliardo of Laner Muchin, Ltd., 515 N. State St., Suite 2800, Chicago, Illinois 60654, or any representative thereof.

### The following information is to be released

**A Certified Copy** of the limited health and medical records file, which shall be limited to:

> Office notes, existing narrative reports, x-ray films and reports, CT Scan films and reports, diagnostic films and reports, etc., health history records, treatment records, hospital records, lab results, patient intake forms, initial application and information sheets, consultation reports, or reports from other health care providers, physical therapist records and reports, appointment records, progress notes, handwritten notes, nurses' notes, records of prescriptions, patient orders, pathology slides, billing records, insurance claim forms, functional capacity tests, and any and all other records compiled by you or in your possession relating to my physical condition since January 1, 2014, that relates to or may relate to my ability to perform the functions of a police officer.

**1 North Broadway ✦ Melrose Park, Illinois 60160 ✦ (708) 344-8409**

**www.mppd.com**

CHIEF'S EXHIBIT ___

This release authorizes the release of tangible medical information only and does not authorize verbal communication by the health care provider to the requesting party. This information must be kept strictly confidential in files that are separate from the general personnel files. A photocopy of this medical authorization may be used for the release of these records. The Medical Professional will provide a copy of the medical records sent to the Melrose Park Police Department.

## Purpose of the Requested Disclosure of Protected Health Information

I am authorizing the limited release of my Protected Health Information for the following purposes for all purposes related to my employment with the Village of Melrose Park, Illinois.

## Right to Revoke Authorization

Except to the extent that action has already been taken in reliance on this authorization, the authorization may be revoked at any time by submitting a written or electronic notice to the Medical Provider, who may be contacted using the following contact information:

Unless revoked, this authorization will expire on April 1, 2018.

## Re-disclosure

I understand the information disclosed by this authorization may be subject to re-disclosure by the recipient and no longer be protected by the Health Insurance Portability and Accountability Act of 1996.

Signature: _____

Date: 2/16/2018 _____

# EXHIBIT 21

# MELROSE PARK POLICE DEPARTMENT
# EMPLOYEE ACKNOWLEDGEMENT FORM

The employee procedures describe important information about your employment with the Village of Melrose Park. I further understand that I should consult with my supervisor regarding any questions I may have not answered in the procedures. I have entered into my employment relationship with the Village of Melrose Park voluntarily and acknowledge that there is no specified length of employment for cause brought about by my own actions.

Since the information, policies, and benefits described in this handbook are necessarily subject to change, I acknowledge that revisions to these procedures are neither a contract of employment nor a legal document. My signature acknowledges receipt of these procedures and I further understand this it is my responsibility to read and comply with the policies and procedures set forth and any future revisions which may occur.

Employee Name: _John Scatchell_

Employee Signature _____  Date _8/31/12_

Scatchell Dep Ex No. 5
for ID, as of _1/9/18_

VMP/SCATCHELL JR 8

# EXHIBIT 22



# MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi ✦ Chief of Police

# STANDARD OPERATING PROCEDURE

Please be advised, attached hereto is the M.P.P.D. S.O.P. V.09.2012 Disk

which contains the updated Standard Operating Procedure (S.O.P.) for the

Melrose Park police Department. The S.O.P. establishes methods to be

routinely followed by employees of the Melrose Park Police Department. The

attached S.O.P. supersedes all prior S.O.P.'S of the Melrose Park Police

Department as set forth in Policy 106.1 of the Policy Manual, attached hereto.

Please review the attached and sign below that you have received it.

John A. Scratchell
Name

Patrol Officer
Title

9/26/2012
Date

Dep Ex No. 4
for ID, as of 1 9 18

**1 North Broadway ✦ Melrose Park, Illinois 60160 ✦ (708) 344-8409**

**www.mppd.com**

VMP/SCATCHELL JR 4

CHIEF'S EXHIBIT ___

# EXHIBIT 23



# MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi ◆ Chief of Police

## Melrose Park Police Department Manual
## Standard Operating Procedures
## (SOP)

I  John Scatchell Jr., acknowledge that I have received one copy of the SOP V.08_2015 version, of Melrose Park Police Department manual and its contents which contain Standard Operating Procedures and Regulations of the Department.  I further acknowledge I am responsible to familiarize myself with the current contents and general conditions of this manual/cd at all time.

I acknowledge with my signature that I have read and understand these conditions.

_____     __23__    8 , 21 , 15
Officers Signature    Star Number    Date

_____    __10__    8 , 21 , 15
Supervisors Signature    Star number    Date

**1 North Broadway ◆ Melrose Park, Illinois 60160 ◆ (708) 344-8409**
**www.mppd.com**

CHIEF'S EXHIBIT ___

# EXHIBIT 24



# MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi ✦ Chief of Police

# MELROSE PARK
# POLICE DEPARTMENT MANUAL
# STANDARD OPERATING PROCEDURES
# (SOP)

I, John Scatchell Jr. acknowledge that I have received One Copy of SOP V.06.2016 version, of the Melrose Park Police Department Manual and its contents which contain Standard Operation Procedures and Regulations of the Department. I further acknowledge I am responsible to familiarize myself with the current contents as well as any and all amendments that may be added or rescinded from time to time. I also know that it is my sole responsibility to maintain the contents and general condition of this manual/CD at all times.

I acknowledge with my signature that I have read and understand these conditions.

| | | |
|---|---|---|
| _____ | _23_ | _6-8-16_ |
| Officers Signature | Star Number | Date |
| _____ | _5_ | _06/08/16_ |
| Supervisor Signature | Star Number | Date |

**1 North Broadway ✦ Melrose Park, Illinois 60160 ✦ (708) 344-8409**

**www.mppd.com**

CHIEF'S EXHIBIT ___

# EXHIBIT 25

MELROSE PARK POLICE DEPARTMENT MANUAL

STANDARD OPERATING PROCEDURES (SOP)　　　　　　　　　　　As of 3-17-2017

| | Name / Person receiving SOP | Badge # | Name / Person Giving SOP | Badge # | Officer Signature | Date Received | SOP CD | SOP BOOK |
|---|---|---|---|---|---|---|---|---|
| 1 | LT. Dino Dimaio | 4 | Lt. Maiello | 9 | | 3-31-17 | | |
| 2 | Sgt. Nunzio Maillo | 9 | Lt. Maiello | 9 | | | | |
| 3 | Off. Scott Thull | 33 | Lt Maiello | 9 | Scott Thull | 03-30-17 | | |
| 4 | Phillip Negron | 78 | LT Maiello | 9 | | 3-30-17 | | |
| 5 | Devon Moss | 30 | Lt. Maiello | | | 4-13-17 | | |
| 6 | Adam Gibson | 35 | LT. Maiello | 9 | | 3/31/17 | | |
| 7 | Off. William Potamianos JR. | 86 | Lt. Maiello | 9 | | 3/30/17 | | |
| 8 | Off. Chane Fogg | 75 | Lt Maiello | 75 | | 03-30-17 | | |
| 9 | Off. Vaughn Damron | 74 | Lt Maiello | | | 4|1|17 | | |
| 10 | Off. Daniel Richter | 25 | LT Maiello | 9 | | 3-31-17 | | |
| 11 | Off. John Scatchell Jr | 23 | Lt. Maiello | 9 | | 3-31-17 | | |
| 12 | Off. John Menolascino Jr. | 29 | Lt. Maiello | | | 3-30-17 | | |
| 13 | Off. Robert Anzald Jr. | 43 | | | | 4-13-17 | | |
| 14 | Off. Jessica Ortiz | 49 | Lt. Maiello | 9 | | 3-30-17 | | |
| 15 | Off. Pedro Montoya | 60 | LT. Maiello | 9 | | 3-30-17 | | |
| 16 | Joseph G. Panzani | 44 | LT MAIELLO | 9 | | 3-30-17 | | |
| 17 | Giovanni Castellàn | 76 | LT MAIELLO | | | 4-1-17 | | |
| 18 | Joseph De Carlo | 87 | Lt. Maiello | 9 | | 3/30/17 | | |

CHIEF'S EXHIBIT ___

# EXHIBIT 26



# MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi ◆ Chief of Police

# MELROSE PARK
# POLICE DEPARTMENT MANUAL
# STANDARD OPERATING PROCEDURES
# (SOP)

I, John Scatchell Jr. acknowledge that I have received One Copy of SOP
V31717 version, of the Melrose Park Police Department Manual and its
contents which contain Standard Operation Procedures and Regulations
of the Department. I further acknowledge I am responsible to familiarize
myself with the current contents as well as any and all amendments that
may be added or rescinded from time to time. I also know that it is my
sole responsibility to maintain the contents and general condition of this
manual/CD at all times.

I acknowledge with my signature that I have read and understand these
conditions.

| | | |
|---|---|---|
| _____ | __23__ | 3/31/17 |
| Officers Signature | Star Number | Date |
| _____ | __7__ | 5/31/17 |
| Supervisor Signature | Star Number | Date |

**1 North Broadway ◆ Melrose Park, Illinois 60160 ◆ (708) 344-8409**

**www.mppd.com**

CHIEF'S EXHIBIT ___

# EXHIBIT 27

| Policy |
| 1040 |

**Melrose Park Police Department**
Policy Manual

# Outside Employment

## 1040.1 PURPOSE AND SCOPE
To avoid actual or perceived conflicts of interest for departmental employees engaging in outside employment, all employees shall obtain written approval from the Chief of Police/Police Administrator prior to engaging in any outside employment. Approval of outside employment shall be at the discretion of the Chief of Police/Police Administrator in accordance with the provisions of this policy.

### 1040.1.1 DEFINITIONS
**Outside Employment** - Where any member of this department who receives wages, compensation or other consideration of value from another employer, organization or individual not affiliated directly with this department for services, product(s) or benefits rendered. For purposes of this section, the definition of outside employment includes those employees who are self-employed and not affiliated directly with this department for services, product(s) or benefits rendered.

**Outside Overtime** - Any member of this department who performs duties or services on behalf of an outside organization, company, or individual. Such outside overtime shall be requested and scheduled directly through this department so that the Department may be reimbursed for the cost of wages and benefits.

## 1040.2 OBTAINING APPROVAL
No member of this department may engage in any outside employment without first obtaining prior written approval of the Chief of Police. Failure to obtain prior written approval for outside employment or engaging in outside employment prohibited by this policy may lead to disciplinary action.

To obtain approval for outside employment, the employee must complete an Outside Employment Application which shall be submitted to the employee's immediate supervisor. The application will then be forwarded through channels to the Chief of Police for consideration, along with any applicable comments or review of work history provided by the submitting supervisor or any other supervisor having information which should be legitimately considered as factors for approval or rejection.

Applications must be accompanied by a Village indemnification/hold harmless agreement executed by the outside employer.

### 1040.2.1 REVOCATION/SUSPENSION OF OUTSIDE EMPLOYMENT PERMITS
Any outside employment permission may be revoked or suspended under the following circumstances:

(a) When an employee's performance at this department is evaluated by a supervisor as needing improvement to reach an overall level of competency, the Chief of Police may, at his/her discretion, revoke any outside employment permission(s). That revocation will stand

Copyright Lexipol, LLC 2017/03/15, All Rights Reserved.
Published with permission by Melrose Park Police Department

Outside Employment - 488

## Melrose Park Police Department
Policy Manual

*Outside Employment*

until the employee's performance has been reestablished at a satisfactory level and his/her supervisor recommends reinstatement of the outside employment permission.

(b) When included as a term or condition of sustained discipline.

(c) When an employee is suspended from the department for 5 days or less the employee's outside employment permission will be suspended for the same amount of time.

(d) When an employee is suspended from the department for more than 5 days the member's outside employment permission will be considered revoked.

(e) When an employee's conduct or outside employment conflicts with the provisions of department policy, the permission may be suspended or revoked.

(f) When an employee is unable to perform at a full duty capacity due to an injury or other condition, any previously approved outside employment permission may be subjected to similar restrictions as those applicable to the employee's full time duties until the employee has returned to a full duty status.

### 1040.3  PROHIBITED OUTSIDE EMPLOYMENT
The Department expressly reserves the right to deny any Outside Employment Application submitted by an employee seeking to engage in any activity which:

(a) Involves the employee's use of departmental time, facilities, equipment or supplies, the use of or reliance upon the Department badge, uniform, prestige or influence for private gain or advantage.

(b) Involves the employee's receipt or acceptance of any money or other consideration from anyone other than this department for the performance of an act which the employee, if not performing such act, would be required or expected to render in the regular course or hours of employment or as a part of the employee's duties as a member of this department.

(c) Involves the performance of an act in other than the employee's capacity as a member of this department that may later be subject directly or indirectly to the control, inspection, review, audit or enforcement of any other employee of this department.

(d) Involves time demands that would render performance of the employee's duties for this department less efficient.

### 1040.3.1  OUTSIDE OVERTIME ARREST AND REPORTING PROCEDURE
Any employee making an arrest or taking other official police action while working in an approved outside overtime assignment shall be required to complete all related reports in a timely manner pursuant to department policy. Time spent on the completion of such reports shall be considered incidental to the outside overtime assignment.

### 1040.3.2  SPECIAL RESTRICTIONS
Except for emergency situations or with prior authorization from the Investigations Deputy Chief, undercover officers or officers assigned to covert operations shall not be eligible to work overtime

## Melrose Park Police Department
Policy Manual

or other assignments in a uniformed or other capacity which might reasonably disclose the officer's law enforcement status.

### 1040.4  DEPARTMENT RESOURCES
Employees are prohibited from utilizing other departmental employees, and any department equipment or resources in the course of or for the benefit of any outside employment. This shall include the prohibition of access to official records or databases of this department or other agencies through the use of the employee's position with this department.

### 1040.4.1  REVIEW OF FINANCIAL RECORDS
Prior to providing written approval for an outside employment position, the Department may request that an officer provide his or her personal financial records for review/audit in order to determine whether a conflict of interest exists. Failure of the employee to provide the requested personal financial records could result in denial of the off-duty work permission. If, after approving a request for an outside employment position, the Department becomes concerned that a conflict of interest exists based on a financial reason, the Department may request that the employee provide his or her personal financial records for review/audit. If the employee elects not to provide the requested records, his or her off-duty work permission may be revoked pursuant to Policy Manual § 1040.2.2(c).

### 1040.5  OUTSIDE EMPLOYMENT WHILE ON DISABILITY
Department members engaged in outside employment who are placed on disability leave or modified/light-duty shall inform their immediate supervisor in writing within five days whether or not they intend to continue to engage in such outside employment while on such leave or light-duty status. The immediate supervisor shall review the duties of the outside employment along with any related doctor's orders, and make a recommendation to the Chief of Police/Police Administrator whether such outside employment should continue.

In the event the Chief of Police/Police Administrator determines that the outside employment should be discontinued or if the employee fails to promptly notify his/her supervisor of his/her intentions regarding their work permission, a notice of revocation of the member's permission will be forwarded to the involved employee.

Criteria for revoking the outside employment permission include, but are not limited to, the following:

(a)  The outside employment is medically detrimental to the total recovery of the disabled member, as indicated by the Village's professional medical advisors.

(b)  The outside employment performed requires the same or similar physical ability, as would be required of an on-duty member.

(c)  The employee's failure to make timely notice of their intentions to their supervisor.

When the disabled member returns to full duty with the Melrose Park Police Department, a request (in writing) may be made to the Chief of Police/Police Administrator to restore the permission.

Copyright Lexipol, LLC 2017/03/15, All Rights Reserved.
Published with permission by Melrose Park Police Department

# Melrose Park Police Department
Policy Manual

## Outside Employment

### 1040.6 SEE APENDIX FOR SPECIAL ORDER ISSUED BY THE CHIEF
The chief has issued a "Special Order" regarding secondary employment. You will find this order at the back of the manual.

Copyright Lexipol, LLC 2017/03/15, All Rights Reserved.
Published with permission by Melrose Park Police Department

VMP/JJS 491

# EXHIBIT 28

# THESE DOCUMENTS WERE PRODUCED AT:

## VMP-JJS 2480-2496

# THE BATES NUMBERED COPIES ARE BAD SCANS AND ARE TOO SMALL TO BE LEGIBLE

# Illinois Conservation Police

NATURAL RESOURCES

## FIELD REPORT LAW ENFORCEMENT

SPRINGFIELD, ILLINOIS

Page 1 of 6

'17 NOV 30 PM 2:05

| | | | |
|---|---|---|---|
| **FIELD REPORT NUMBER** | 2017-2-365-017 | | |

| **Reporting Officer and ID** |
|---|
| Bergland, W.J. #365 |

| Date | Reg | Dist | Review the Supervisor and Date | Case Status | Evidence Status | ☒ Springfield ☐ Region |
|---|---|---|---|---|---|---|
| 11/20/17 | 2 | 3 | 565 JW/h VZH #401 11/27/17 | Open | Open | ☐ States Attorney |

| **COMPLAINT** | **DATE OCCURRED** | **TIME** |
|---|---|---|
| Unlawful Possession of a Firearm By a Felon | 11/20/2017 | 7:30am |

| **LOCATION** | **COUNTY OF OCCURRENCE** | **DATE REPORTED** | **TIME** |
|---|---|---|---|
| Fox Ridge Stone Quarry, Rt. 71 and Minkler Rd. | Kendall | 11/20/2017 | 7:30 |

| Evidence | Location Where Evidence is Stored | Photos | Location of Photographs | Attachments | Agency Contacted / Name | Dates |
|---|---|---|---|---|---|---|
| No | | Yes | Attached | | | |

## SUBJECT 1: Code ☒ Arrested ☐ Person Discovering Crime ☐ Offender ☐ Victim ☐ Witness ☐ Other ☐ Passenger ☐ Complainant

| Code | Last | First | M.I | Street | City | State | Zip |
|---|---|---|---|---|---|---|---|
| O | Scavo | Vito | R | 280 Braddock | Melrose Park | IL | 60160 |

| Race | Sex | Date of Birth | Height | Weight | Hair | Eyes | Build | Complexion | SSN / DLN | Telephone |
|---|---|---|---|---|---|---|---|---|---|---|
| W | M | 4/30/1948 | 5' 0.9" | 190 | GRY | BRO | MED | LGT | S10-8764-8123 | (708) 906-3644 |

| Charge / Citation / WW | 0 | Chapter / Act / Section | Description | Court Date None |
|---|---|---|---|---|

## SUBJECT 2: Code ☒ Arrested ☐ Person Discovering Crime ☐ Offender ☐ Victim ☐ Witness ☐ Other ☐ Passenger ☐ Complainant

| Code | Last | First | M.I | Street | City | State | Zip |
|---|---|---|---|---|---|---|---|
| W | Scatchell | John | A | 912 Norwood Dr. | Melrose Park | IL | 60160 |

| Race | Sex | Date of Birth | Height | Weight | Hair | Eyes | Build | Complexion | SSN / DLN | Telephone |
|---|---|---|---|---|---|---|---|---|---|---|
| W | M | 12-09-1988 | 5' 0.9" | 195 | BRO | BRO | MED | MED | S324-461-8350 | (708) 906-1188 |

| Charge / Citation / WW | 0 | Chapter / Act / Section | Description | Court Date None |
|---|---|---|---|---|

## SUBJECT 3: Code ☒ Arrested ☐ Person Discovering Crime ☐ Offender ☐ Victim ☐ Witness ☐ Other ☐ Passenger ☐ Complainant

| Code | Last | First | M.I | Street | City | State | Zip |
|---|---|---|---|---|---|---|---|
| W | Grivetti | Rodger | J | 261 Northwood | Riverside | IL | 60546 |

| Race | Sex | Date of Birth | Height | Weight | Hair | Eyes | Build | Complexion | SSN / DLN | Telephone |
|---|---|---|---|---|---|---|---|---|---|---|
| W | M | 07/31/1964 | 6' 0.0" | 190 | BRO | BRO | MED | LGT | G613-7306-4217 | (708) 774-9013 |

| Charge / Citation / WW | 0 | Chapter / Act / Section | Description | Court Date None |
|---|---|---|---|---|

## SUBJECT 4: Code ☒ Arrested ☐ Person Discovering Crime ☐ Offender ☐ Victim ☐ Witness ☐ Other ☐ Passenger ☐ Complainant

| Code | Last | First | M.I | Street | City | State | Zip |
|---|---|---|---|---|---|---|---|
| W | Bono | Richard | L | 1518 William St. | River Forest | IL | 60305 |

| Race | Sex | Date of Birth | Height | Weight | Hair | Eyes | Build | Complexion | SSN / DLN | Telephone |
|---|---|---|---|---|---|---|---|---|---|---|
| W | M | 06/18/1963 | 5' 1.1" | 190 | BRO | BRO | MED | MED | B500-7526-3173 | (708) 280-9996 |

| Charge / Citation / WW | 0 | Chapter / Act / Section | Description | Court Date None |
|---|---|---|---|---|

## VEHICLE / BOAT INFORMATION

| Vehicle Year | Vehicle Make | Vehicle Color | VIN/HIN or Serial Number | License Number | License Year | State |
|---|---|---|---|---|---|---|
| 2006 | Express | Green | JBC62068C606 | | 2020 | WI |

| Boat Registration Number | Boat Length | Vehicle Towed | Vehicle Removed By | Vehicle Removed To | Telephone |
|---|---|---|---|---|---|
| WS 9833 HU | 17' | ☐ | | | |

## SYNOPSIS

I observed a group of waterfowl hunters in a boat blind hunting waterfowl. One of the hunters was known to me to be a convicted felon and to have a revoked FOID card. I did see that person in possession of a shotgun and saw him shoot the gun.

**CHIEF'S EXHIBIT __**

*OA IDNR / ICP 01*



This document contains neither recommendations nor conclusions of the agency listed above. It and its contents are not to be disseminated.



Illinois
Department of
Natural
Resources

# Illinois Conservation Police

## FIELD REPORT

Page 2 of 6

| | |
|---|---|
| FIELD REPORT NUMBER | 2017-2-365-017 |
| Reporting Officer and ID | Bergland, W.J. #365 |

**NARRATIVE**

On 11-16-17 I received information from Sgt. Wollgast about group of waterfowl hunters that hunt at the Fox Stone Quarry located off the southeast corner of the intersection of Rt. 71 and Minkler Rd. Sgt. Wollgast told me that one of the subjects was suspected to be Vito R. Scavo and he was a felon and not able to possess a firearm. I told Sgt. Wollgast that I was aware of this group and had checked them before as they had come off of the water in their boat blind. They hunt on a body of water on the far southeast corner of the property. I had never before found any violations and had never seen Scavo in possession of a firearm. As Sgt. Wollgast had asked, I worked the area the next day but no hunters came to hunt.

Today, 11/20/17 I arrived at the quarry a little before 7:00am and parked away from where the hunting area is located. Shortly after I got out of my truck, I heard shots coming from the body of water on the southeast corner of the property. I walked/crawled to a location on the north side of the body of water where I could see their spread of decoys and the boat from which they were hunting. (See attached Google earth view) I later used the Google Earth measuring tool to determine that I was approximately 230 yards from the boat blind. I was sitting on the ground facing south. There were reeds in front of me, but using binoculars, I could clearly see the boat and the occupants when the top of the boat blind was pulled back. The boat was camouflaged with reed like material on a metal frame that goes up a few feet from the gunwales of the boat and then covers the boat on top. The roof has a section that can be slid back so the hunters can stand up and take shots when birds come within range. (see below picture of boat) As I was looking at them, the stern of the boat was to my left and the bow to my right. On the far left at the stern of the boat was a man with a beard and sunglasses, later identified as John A. Scatchell. Next to him was a taller man wearing a hood, later identified as Rodger J. Grivetti. Next to Grivetti was his small grade school aged son. Next to, but always slightly behind Grivetti's son, was a taller man with a black hooded sweatshirt and camo bib overalls, later identified as Richard L. Bono. Next to Bono, at the far right and at the bow of the boat, was a shorter older man wearing sunglasses. He was later identified as Vito R. Scavo. All subjects were dressed in camouflage clothing.

As stated earlier, I could clearly see all the subjects in the boat through binoculars, however I could not hear their conversations. I could hear people speaking, but I could not make out what they were saying. I could hear when they were using their call to attract the waterfowl to their location. When ever they started calling, I would observe them with the binoculars. I observed the group shoot at least five or six times, and every time I could see Scavo holding a shotgun. On at least two occasions I could see the recoil of the shotgun that Scavo was holding. One time in particular I can remember when a flock of geese flew over the top of the hunters and Scavo was holding the gun almost straight up and took a shot.

I observed the hunters from approximately 7:00am to approximately 9:00am. I then went back to my truck and pulled closer to the boat launch to wait for the hunters to come back to the launch. I rolled my window down and heard a few more groups of shots. I then heard the boat start up and could tell from the sounds I was hearing that they were picking up their decoys. I got out of my truck and walked down the boat ramp and stood off to the side in the reeds until the boat landed at the ramp. I was in full uniform and identified myself as Scavo, who was still at the bow of the boat, got off the boat. I saw that they had all of their kill on separate stringers or in separate piles as required. All the guns were cased. The boat was owned by Scatchell and I did an equipment inspection on the boat with him. fire extinguisher was not charged and there was no type IV throwable PFD in the boat. Scatchell was given a

This document contains neither recommendations nor conclusions of the agency listed above. It and its contents are not to be disseminated.





Illinois
Department of
Natural
Resources



# Illinois Conservation Police

## FIELD REPORT

Page 3 of 6

FIELD REPORT NUMBER
2017-2-365-017

REPORTING OFFICER and ID
Bergland, W.J. #365

verbal warning for these violations. I then checked the paperwork and weapons of Grivetti and his son, Bono, and Scatchell and found no violations.

There were only four guns on the boat so there was no gun to check for Scavo, but I saw that he had a hunting license in his hand. I then asked Scavo to step away from the group so I could talk to him in private. He offered me his hunting license and I took it. We walked several steps away from the others. I was standing facing east with my truck to my right. Scavo was facing me, facing west, with the boat launch behind him and his vehicle behind him and to his right. I told Scavo I was going to ask him some questions and asked him to be honest with me. I asked him if he had taken any shots this morning. He stated that he had shot at one that was on the water. I then advised him that he should know that I had been watching the group for over an hour and a half. I asked him if that was all he shot at and he said that it was. I again advised him how long I had been watching him and told him that I had observed him shoot at several groups of birds that came in. He then admitted that he had taken more than just that one shot. I then asked him if this was the only time this year that he had taken shots at waterfowl and he said that it was not. I then told him that I knew his situation and knew that he could not legally be in possession of a firearm. I asked him why he would do this knowing that he couldn't legally do it. He said that hunting is in his blood and he just can't seem to get away from it. He then spent the next fifteen minutes or so trying to convince me not to do anything with the information that I had gathered this morning. I told him several times that I was not going to risk my career and my family's well being because he had made bad choices. I also told him that I was not going to arrest him today. I told him I would be writing a report on what I observed and what I was told here today and present it to the Kendall unty State's Attorney's office. It should be noted that except for his initial withholding about how many times he had shot this morning, Scavo was very cooperative and forthcoming. He was also very polite and respectful towards me.

I then spoke to Scatchell. I asked for his ID and he gave it to me and I took down his information. He identified himself as a Melrose Park police officer, showing me his badge. I asked him if he saw Scavo shoot this morning. He told me could not say if he saw Scavo shoot or not. Scatchell explained that he was fifteen feet away from Scavo, further explaining that it was a seventeen foot boat and they were at opposite ends of the boat. Scavo was not standing on the bow so the distance between them was probably more like eleven to twelve feet. I advised Scatchell that I had observed them hunt for over an hour and a half and asked again if he was still going to tell me that he did not know if Scavo shot or been in possession of firearm. Scatchell then said something similar to "We are all in law enforcement here, we all know what's going on." I told him that doesn't answer my question. He then again told me that his answer is that he could not say if Scavo had shot or been in possession of a firearm.

I then spoke to Bono. I took down his information from his ID and asked him if Scavo had taken any shots this morning. He stated that he saw Scavo shoot at one cripple on the water. I also adivsed Bono of how long and from where I had been observing them and asked the question again and Bono again said that he had only seen him shoot the one time. I asked Bono if he knew of Scavo's situation and that he could not be in possession of a firearm. Bono said that he knew that Scavo had been in trouble before and assumed that he could not because he had never brought a firearm when they went hunting.



This document contains neither recommendations nor conclusions of the agency listed above. It and its contents are not to be disseminated.

OA-10NR/14 01



Illinois Department of Natural Resources



# Illinois Conservation Police

## FIELD REPORT

Page 4 of 6

FIELD REPORT NUMBER
2017-2-365-017

REPORTING OFFICER (ID)
Bergland, W.J. #365

I then spoke to Gravetti. I took down his information too and asked him if he had seen or knew if Scavo had taken any shots or been in possession of a firearm this morning. He stated that he did not see if Scavo had or had not taken shots or been in possession of a firearm. He stated that his focus was on his son and his son's firearm safety.

I spoke to Bono once more and asked if it was his gun that Scavo had used and he said that it was.

I then again told Scavo that I was going to be writing a report and sending it to the S. A. office. He asked that I speak with his lawyer whom he was on the phone with at the time and I did so. All the lawyer really wanted to know was what county would be getting the report and I advised him that it would be Kendall County.

I then left the scene.

This space intentionally left blank

This document contains neither recommendations nor conclusions of the agency listed above. It and its contents are not to be disseminated.







# Illinois Conservation Police

## PHOTOGRAPHIC EVIDENCE

Page 5 of 6

FIELD REPORT NUMBER

2017-2-365-017

Reporting Officer and ID

Bergland, W.J. #365



Google earth image of Fox Ridge Stone Quarry

Description



Google Earth Image of pond on SE corner of Fox Ridge Stone Quarry showing CPO Bergland's approximate observation point and the approximate location of the boat blind. The approximate distance between the two locations using the google earth measuring tool is 230 yards.



Description





This document contains neither recommendations nor conclusions of the agency listed above. It and its contents are not to be disseminated.

# Illinois Conservation Police

## PHOTOGRAPHIC EVIDENCE



2017-2-365-017

Bergland, W.J. #365



Photo of the boat blind taken later that evening while parked at the boat launch.

Description





This document contains neither recommendations nor conclusions of the agency listed above. It and its contents are not to be disseminated.

Illinois Department of Natural Resources

ATT 1, P61

CIC MESSAGE NUMBER 3185138        11/20/17

FROM IL
WDZ  17.35.27 11/20/17 . IL08486
    )4700W1
***  ILLINOIS CONCEALED CARRY LICENSE RECORD    ***
NO RECORD FOUND FOR NAM/SCAVO,VITO R DOB/1948-04-30
/END
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


CIC MESSAGE NUMBER 3185140        11/20/17

FROM IL
WDZ  17.36.13 11/20/17 . IL08486
IL04700W1
    FOID RESPONSE
FID 67280118      ISSUED/2001-11-01      EXP/2011-11-01
STATUS REVOKED FOID CARD
NAME SCAVO, VITO R        SEX MALE  DOB 1948-04-30
STREET ADDRESS 280 BRADDOCK
CITY MELROSE PARK              COUNTY COOK   ZIP 60160
HEIGHT 509  WEIGHT 190  HAIR GRY  EYES BRO
NO SPONSOR
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

OA 10NR/149 01

ATT 1, P62

```
CIC MESSAGE NUMBER 3185181        11/20/17

201711201746
IL0470000  OPR/93  PUR/C  REQ/OFC BURGLAND/F16
I  /SCAVO,VITO R                SEX/M RAC/U DOB/19480430
SID/IL2396580  NAM/SCAVO,VITO ROCCO             SEX/M
RAC/W  DOB/19480430  HGT/509  WGT/190  HAI/BRO  EYE/BRO
SKN/FAR  SMT/
FPC/                    FBI/255339AA7
SOC/321405589  CIR/        MNU/
TOTAL ARRESTS    1
CHARGES CONV OFFENSE      CHARGES CONV OFFENSE
    2    0 LARCENY           2    0 FRADULENT ACTIV
LAST ARREST 19820929 BY IL0169M00          CASE # 81E4732
FOR THEFT                  ,INSURANCE FRAUD
-------------------------------------------------------------



CIC MESSAGE NUMBER 3185184        11/20/17

        REQ/OFC BURGLAND/F16
7L01WDZ1I2735KC
IL0470000
THIS NCIC INTERSTATE IDENTIFICATION INDEX RESPONSE IS THE RESULT OF YOUR
INQUIRY ON NAM/SCAVO,VITO R SEX/M RAC/U DOB/19480430 PUR/C
NAME                    FBI NO.        INQUIRY DATE
S  JO,VITO ROCCO             255339AA7   2017/11/20
SEX RACE BIRTH DATE  HEIGHT WEIGHT EYES HAIR PHOTO
M  W   1948/04/30  509    180    BRO  BRO  Y
BIRTH PLACE
ILLINOIS
FINGERPRINT CLASS      PATTERN CLASS
25 PM PO PM PO
18 PI 22 PI 22
ALIAS NAMES
SCAVO,VITO                  SCAVO,VITO R
SCAVO,VITO ROCCO
OTHER
BIRTH DATES SOCIAL SECURITY
1948/04/03  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
IDENTIFICATION DATA UPDATED 2016/01/05
THE CRIMINAL HISTORY RECORD IS MAINTAINED AND AVAILABLE FROM THE
FOLLOWING:
 FBI        - FBI/255339AA7
THE RECORD(S) CAN BE OBTAINED THROUGH THE INTERSTATE IDENTIFICATION
-------------------------------------------------------------



CIC MESSAGE NUMBER 3185185        11/20/17

        REQ/OFC BURGLAND/F16
NCIC.
```

OA1DNR/14P01

CIC MESSAGE NUMBER 3185187      11/20/17                    ATT 1, PG 3

17.324 17.47.48
IL0470000  OPR/93  PUR/C  REQ/OFC BURGLAND/F16
   D/IL23986580
ATN/OFC BURGLAND/F16
THIS RECORD IS BASED ONLY ON THE SID NUMBER IN YOUR REQUEST-
IL23986580 BECAUSE ADDITIONS OR DELETIONS MAY BE MADE AT ANY TIME,
A NEW COPY SHOULD BE REQUESTED WHEN NEEDED FOR SUBSEQUENT USE.
                    ILLINOIS STATE POLICE
              CRIMINAL HISTORY RECORD INFORMATION
STATE ID NO.  FBI NO.    CHICAGO IR NO.  DATE REQUESTED
********************* ILLINOIS STATE POLICE ********************
************************* STATE USE ONLY *************************
------------------------------------------------------------------
DATE: 11/20/2017 * ORI: IL0470000
------------------------------------------------------------------
ILLINOIS STATE POLICE
BUREAU OF IDENTIFICATION
260 NORTH CHICAGO STREET
JOLIET, IL 60432-4075
==================================================================
CRIMINAL HISTORY OF SCAVO,?VITO?ROCCO? (LAST KNOWN NAME)
==================================================================
STATE IDENTIFICATION NUMBER: IL23986580
CONVICTION STATUS: NO CONVICTION STATUS
CUSTODIAL STATUS: NO STATUS FOUND
JUVENILE DATA
------------------------------------------------------------------
  ORMAL ADJUSTMENT: 0 * FORMAL ADJUSTMENT: 0 * PROBATION ADJUSTMENT: 0
ALIAS NAME(S)
------------------------------------------------------------------
SCAVO,?VITO?ROCCO?
DATE OF BIRTH
------------------------------------------------------------------
04/30/1948
==================================================================
                    SUBJECT IDENTIFICATION DATA
END OF PAGE 001 -- MORE DATA WILL FOLLOW
------------------------------------------------------------------


CIC MESSAGE NUMBER 3185188      11/20/17

17.324 17.47.48
IL0470000  OPR/93  PUR/C  REQ/OFC BURGLAND/F16
SID/IL23986580
(CONTINUED FROM PREVIOUS RESPONSE)
==================================================================
FPT#: 255339AA7 * CHICAGO IR#:
    : MALE
RACE: WHITE
HEIGHT: 509 * DATE REPORTED:
WEIGHT: 190 * DATE REPORTED:
EYES: BROWN

ATT 1, P64

```
HAIR: BROWN
SKIN: FAIR
SCARS/MARKS/TATTOOS:
PLACE OF BIRTH: ILLINOIS
D  VERS LICENSE NUMBERS * DL STATE:
SOCIAL SECURITY NUMBERS:
??321405589
MISCELLANEOUS NUMBERS  NUMBER CODE -- ID NUMBER :
PALM PRINT AVAILABLE ORGANIZATIONS:
PHOTO AVAILABLE ORGANIZATIONS:
IDOC#:
FOID#:
INS#:
OCCUPATION * DATE REPORTED:
EMPLOYER * DATE REPORTED:
BASIS FOR CAUTION * DATE REPORTED:
??   *
=================================================================
                      CRIMINAL HISTORY DATA
=================================================================
**************************** ARREST ****************************
DCN: D03541241 * DATE OF ARREST: 09/29/1982
NAME: SCAVO, VITOROCCO * DATE OF BIRTH: 04/30/1948
RESIDENCE:
??
ARRESTING AGENCY: ISP INVESTIGATION DISTRICT CHICAGO * NCIC: IL0169M00
AGENCY CASE NUMBER: 81E4732 * OFFICER BADGE NUMBER:
PHOTO AVAILABLE: NO
ARREST CHARGES
-----------------------------------------------------------------
C   T: 1
    STATUTE CITATION: 38-16-1-B
    LITERAL DESCRIPTION: THEFT
    INCHOATE CODE: O
    CLASS: Z
    ARREST TYPE:  * DATE OF OFFENSE: 09/29/1982
    COURT CASE NUMBER: 83CR7889 * COUNTY ISSUING WARANT:
COUNT: 2
    STATUTE CITATION: 73-1101
    LITERAL DESCRIPTION: INSURANCE FRAUD
    INCHOATE CODE: O
    CLASS: 4
    ARREST TYPE:  * DATE OF OFFENSE: 09/29/1982
END OF PAGE 002 -- MORE DATA WILL FOLLOW
-----------------------------------------------------------------


CIC MESSAGE NUMBER 3185190      11/20/17

17.324 17.47.48
IL0470000  OPR/93  PUR/C  REQ/OFC BURGLAND/F16
S. IL23986580
(CONTINUED FROM PREVIOUS RESPONSE)
COUNT: 3
    STATUTE CITATION: 38-16-1
    LITERAL DESCRIPTION: CONSPIRACYTHEFT
```

ATT I, P65

```
    INCHOATE CODE: C
    CLASS: Z
    ARREST TYPE: * DATE OF OFFENSE: 09/29/1982
COUNT: 4
    STATUTE CITATION: 73-1101
    LITERAL DESCRIPTION: CONSPIRACYINSURANCE FRAUD
    INCHOATE CODE: C
    CLASS: 4
    ARREST TYPE: * DATE OF OFFENSE: 09/29/1982
STATES ATTORNEY SECTION
------------------------------------------------------------------
FILING DECISION: FILED * DECISION DATE: 09/29/1982
COUNT: 1
    STATUTE CITATION: 38-16-1-B
    LITERAL DSCRIPTION: THEFT
    INCHOATE CODE: O
    CLASS: Z
    AGENCY NAME: COOK COUNTY STATE'S ATTORNEY * NCIC: IL016013A
    COURT CASE NUMBER: 83CR7889
FILING DECISION: FILED * DECISION DATE: 09/29/1982
COUNT: 2
    STATUTE CITATION: 73-1101
    LITERAL DSCRIPTION: INSURANCE FRAUD
    INCHOATE CODE: O
    CLASS: Z
    AGENCY NAME: COOK COUNTY STATE'S ATTORNEY * NCIC: IL016013A
FILING DECISION: FILED * DECISION DATE: 09/29/1982
COUNT: 3
    STATUTE CITATION: 38-16-1
    LITERAL DSCRIPTION: THEFT
    INCHOATE CODE: O
    CLASS: Z
    AGENCY NAME: COOK COUNTY STATE'S ATTORNEY * NCIC: IL016013A
FILING DECISION: FILED * DECISION DATE: 09/29/1982
COUNT: 4
    STATUTE CITATION: 73-1101
    LITERAL DSCRIPTION: INSURANCE FRAUD
    INCHOATE CODE: O
    CLASS! Z
    AGENCY NAME: COOK COUNTY STATE'S ATTORNEY * NCIC: IL016013A
COURT CHARGES DISPOSITION
------------------------------------------------------------------
COUNT: 1
    STATUTE CITATION: 38-16-1-B
    LITERAL DESCRIPTION: THEFT
    INCHOATE CODE: O
    CLASS: Z
END OF PAGE 003 -- MORE DATA WILL FOLLOW
------------------------------------------------------------------
```

```
    C MESSAGE NUMBER 3185191      11/20/17

17.324 17.47.48
IL0470000  OPR/93  PUR/C  REQ/OFC BURGLAND/F16
SID/IL23986580
```

ATT1, P66

(CONTINUED FROM PREVIOUS RESPONSE)
    DISP DATE: 07/02/1984   DISP: NOT GUILTY
    CASE NUMBER: 83CR7889
    AGENCY NAME: COOK COUNTY CIRCUIT COURT * NCIC: IL016025J
    NT: 2
    STATUTE CITATION: 73-1101
    LITERAL DESCRIPTION: INSURANCE FRAUD
    INCHOATE CODE: O
    CLASS: Z
    DISP DATE: 07/02/1984   DISP: NOT GUILTY
    CASE NUMBER:
    AGENCY NAME: COOK COUNTY CIRCUIT COURT * NCIC: IL016025J
COUNT: 3
    STATUTE CITATION: 38-16-1
    LITERAL DESCRIPTION: THEFT
    INCHOATE CODE: O
    CLASS: Z
    DISP DATE: 07/02/1984   DISP: NOT GUILTY
    CASE NUMBER:
    AGENCY NAME: COOK COUNTY CIRCUIT COURT * NCIC: IL016025J
COUNT: 4
    STATUTE CITATION: 73-1101
    LITERAL DESCRIPTION: INSURANCE FRAUD
    INCHOATE CODE: O
    CLASS: Z
    DISP DATE: 07/02/1984   DISP: NOT GUILTY
    CASE NUMBER:
    AGENCY NAME: COOK COUNTY CIRCUIT COURT * NCIC: IL016025J
========================== END OF RECORD ==========================
========================== STATE USE ONLY ==========================
------------------------------------------------------------------
END OF PAGE 004 -- END OF RECORD
------------------------------------------------------------------

ATT 1, P67

CIC MESSAGE NUMBER 3185197     11/20/17

        REQ/OFC BURGLAND/F16
F⁻ ⁻1WDZFM2738KC
⁻ ⁻470000
THIS INTERSTATE IDENTIFICATION INDEX RESPONSE IS THE RESULT OF YOUR
RECORD REQUEST FOR FBI/255339AA7. THE FOLLOWING WILL RESPOND TO YOUR
AGENCY:
 FBI          - FBI/255339AA7
 END
----------------------------------------------------------------------


CIC MESSAGE NUMBER 3185198     11/20/17

BEA  17.48.39 11/20/17 WVFBINF00
IL0470000
HDR/2L01WDZFM2738KC
ATN/OFC BURGLAND/F16
********************** CRIMINAL HISTORY RECORD **********************
************************** Introduction **************************
This rap sheet was produced in response to the following request:
FBI Number              255339AA7
Request Id              2738K17147
Purpose Code            C
A⁺⁻ention               OFC BURGLAND/F16
1 . information in this rap sheet is subject to the following caveats:
This record is based only on the FBI number in your request-UCN:
255339AA7 Because additions or deletions may be made at any time, a new
copy should be requested when needed for subsequent use.(US;
2017-11-20)
All arrest entries contained in this FBI record are based on
fingerprint comparisons and pertain to the same individual.(US;
2017-11-20)
The use of this record is regulated by law. It is provided for official
use only and may be used only for the purpose requested.(US;
2017-11-20)
************************** IDENTIFICATION **************************
Subject Name(s)
SCAUO, VITO ROCCO
SCAVO, VITO  (AKA)
SCAVO, VITO R  (AKA)
SCAVO, VITO ROCCO  (AKA)
Subject Description
FBI Number
255339AA7
Social Security Number
321405589

| Sex | Race | |
|-----|------|---|
| Male | White | |
| F ʰght | Weight | Date of Birth |
| ⁻ ⁻9" | 180 | 1948-04-30 |
| | | 1948-04-03 |
| Hair Color | Eye Color | Fingerprint Pattern |
| Brown | Brown | 25PMPOPMPO18PI22PI22 (FPC) |
| Place of Birth | Citizenship | |

ATT I, Pg 8

```
Illinois                    United States
Fingerprint Images
Photo Images
Photo Image Available
C    ture Date              1982-09-20
(No Photo Image Transmitted  )
Photo Image Available
Capture Date                2007-07-25
(No Photo Image Transmitted  )
Photo Image Available
Capture Date                2007-07-25
(No Photo Image Transmitted  )
Photo Image Available
Capture Date                2007-07-25
(No Photo Image Transmitted  )
Photo Image Available
Capture Date                2010-08-03
(No Photo Image Transmitted  )
Photo Image Available
Capture Date                2010-08-03
(No Photo Image Transmitted  )
************************* CRIMINAL HISTORY  *************************
============================ Cycle 001 ============================
Earliest Event Date    1982-09-20
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Arrest Date            1982-09-20
Arrest Case Number     81E4732
Arresting Agency       IL0169M00 SPOL-CI-ZONE 4 CHICAGO
Charge                 1
        Charge Literal  THEFT
              Severity  Unknown
Charge                 2
        Charge Literal  INS FRAUD
              Severity  Unknown
Charge                 3
        Charge Literal  CONS TO COMMIT THEFT
              Severity  Unknown
Charge                 4
        Charge Literal  CONS TO COMMIT INS FRAUD
              Severity  Unknown
============================ Cycle 002 ============================
Earliest Event Date    2007-07-25
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Arrest Date            2007-07-25
Arrest Case Number
Arresting Agency       ILFBICG00 FBI CHICAGO
Subject's Name         SCAVO,VITO R
Charge                 1
        Charge Literal  2699 - FRAUD
              Severity  Unknown
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Court Disposition      (Cycle 002)
Court Case Number
Court Agency
Charge                 1
        Charge Literal  1 COUNT OF RACKETEERING CONSPIRACY (TITLE 18
                        USC SEC 1962(D))
            Disposition ( 06/01/09 CONVICTED)
Charge                 2
        Charge Literal  8 COUNTS OF MAIL FRAUD (TITLE 18 USC SEC 1941)
```

*ATT 1, p69*

```
                 Disposition     ( 06/01/09 CONVICTED)
Charge                           3
                 Charge Literal  2 COUNTS OF WIRE FRAUD (TITLE 18 USC SEC 1943)
                 Disposition     ( 06/01/09 CONVICTED)
C   ge                           4
                 Charge Literal  1 COUNT OF EXTORTION (TITLE 18 USC SEC 1951)
                 Disposition     ( 06/01/09 CONVICTED)
Charge                           5
                 Charge Literal  1 COUNT OF OBSTRUCTION OF JUSTICE (TITLE 18 USC
                                 SEC 1503)
                 Disposition     ( 06/01/09 CONVICTED)
Charge                           6
                 Charge Literal  9 COUNTS OF FILING FALSE FEDERAL INCOME TAX
                                 RETURNS (TITLE 26 SEC 7206(1))
                 Disposition     ( 06/01/09 CONVICTED; SENTENCED TO 6 YRS
                                 CONFINEMENT, 2 YRS SUPERVISED RELASE, $5000
                                 FINE, $12,600 RESTITUTION, $100 SPECIAL
                                 ASSESSMENT)
----------------------------------------------------------------
Corrections                      (Cycle 002)
Supervision Date                 2014-10-24
Corrections Agency               IL016017G US PROBATION CHICAGO
      Correction Action          STATUS--SUPERVISED RELEASE/EARLY TERMINATION -
                                 GOALS ACHIEVED
Release Date
============================== Cycle 003 ==============================
Earliest Event Date             2010-08-03
----------------------------------------------------------------
Arrest Date                      2010-08-03
Arrest Case Number
Arresting Agency                 MN069037C FED PRISON CAMP DULUTH
Subject's Name                   SCAVO,VITO R
Charge                           1
                 Charge Literal  CONSPIRACY TO COMMIT RACKETEERING &amp; CORRUPT
                                 ORGANIZATION - 18 USC 1962(O); MAIL FRAUD
                                 (COUNTS 2-9) 18 USC 1341; WIRE FRAUD (COUNTS
                                 10-11) 18 USC 1343; EXTORTION (COUNT 16) 18 USC
                                 1951; OBSTRUCTION OF JUSTICE (COUNT 18) 18 USC
                                 1503
                 Severity        Unknown
Charge                           2
                 Charge Literal  FILING A FALSE TAX RETURN (COUNTS 20-28) 18 USC
                                 7206
                 Severity        Unknown
----------------------------------------------------------------
Court Disposition                (Cycle 003)
Court Case Number
Court Agency
Charge                           1
                 Charge Literal  CONSPIRACY TO COMMIT RACKETEERING &amp; CORRUPT
                                 ORGANIZATION - 18 USC 1962(O); MAIL FRAUD
                                 (COUNTS 2-9) 18 USC 1341; WIRE FRAUD (COUNTS
                                 10-11) 18 USC 1343; EXTORTION (COUNT 16) 18 USC
                                 1951; OBSTRUCTION OF JUSTICE (COUNT 18) 18 USC
                                 1503
                 Disposition     ( 72 MONTHS CBOP, 2 YRS SRT, SENT IMPOSED
                                 05-05-2010)
Charge                           2
                 Charge Literal  FILING A FALSE TAX RETURN (COUNTS 20-28) 18 USC
                                 7206
```

ATT1, PG 10

```
        Disposition  ( 36 MONTHS CBOP(CC), 1 YRS SRT(CC), SENT
                     IMPOSED 05-05-2010)
************************  INDEX OF AGENCIES  ************************
Agency                   SPOL-CI-ZONE 4; IL0169M00;
Agency Email Address
Address
                         8330 S KING DR
                         CHICAGO, IL 604632341
-------------------------------------------------------------------
Agency                   FBI; ILFBICG00;
Agency Email Address
Address
                         2111 W ROOSEVELT RD
                         CHICAGO, IL 60608
-------------------------------------------------------------------
Agency                   US PROBATION; .IL016017G;
Agency Email Address
Address
                         230 S DEARBORN ST
                         CHICAGO, IL 60604
-------------------------------------------------------------------
Agency                   FED PRISON CAMP; MN069037C;
Agency Email Address
Address
                         PO BOX 1400
                         DULUTH, MN 558141400
* * * END OF RECORD * * *
-------------------------------------------------------------------
```



# DL/ID Image Retrieval

DL-ID Image

**Driver License/ID #:** S10087648123

**Name:** VITO R SCAVO

**Street:** 280 BRADDOCK

**City:** MELROSE PARK

**Zip:** 60160

**Date Of Birth:** 04/30/1948

**Gender:** MALE



 

Only for use as authorized by 625 ILCS 5/6-110.1 and 92 Ill. Adm. Code 1030.140. This information and image cannot be certified to be anything other than the information and image of the individual who presented himself or herself to the Secretary of State's Office with the required forms of identification.

# EXHIBIT 29

 Mexico deposit paid in May 2017



### DB
**Dan**

May 31, 2017, 1:28 PM



Check is in the mail!

Jun 5, 2017, 5:58 PM

Hey Dan, I just wanted to see if you got the check for mine and Vitos deposit. It was made out from Starr Plumbing.

Got it.

Awesome

CHIEF'S EXHIBIT ___

STARR PLUMBING INC.
P.O. BOX 1162
MELROSE PARK, IL 60161

1089

DATE 5-31-17

PAY TO THE ORDER OF _Midwest Hunting Consultants LLC._ | $ 3000.00

_Three Thousand Dollars_ ___ 00/100 ___ DOLLARS

PAN AMERICAN BANK
Here The Dream

FOR _Dep-Sut-Trovo_

⑆OO1089⑆ ⑆O71OO6868⑆ O16OO56300⑆

**Check 1089 Amount $3,000.00 Date 6/7/2017**

CHIEF'S EXHIBIT ___

# EXHIBIT 30

6/18/2018                                       Check Details - chase.com



**Printed from Chase Personal Online**

## Check

Front

```
JOHN A SCATCHELL                                        2882
912 NORWOOD ST
MELROSE PARK, IL 60160-2244              DATE 11/11/17    2-1/710

PAY TO THE
ORDER OF   M.d west Hunting  Consultants   | $ 3000.00

    Three thousand  and  0/100              DOLLARS

CHASE
JPMorgan Chase Bank, N.A.
www.Chase.com
MEMO  Inc. lit. Eng.                                      MP

⑆071000013⑆      167030380⑈ 2882
```

Back

```
20171130 7913503695 E967084 3
FTCH023 04722 12377681 1400
5/3 Bank >042000314<

                              ENDORSE HERE
                              Midwest Hunting Consultants
                              828041 6053
```

| Post date | Check # | Check amount |
|---|---|---|
| Nov 30, 2017 | 2882 | $3,000.00 |

CHIEF'S EXHIBIT ___

6/18/2018                                  Check Details - chase.com



**CHASE**
Printed from Chase Personal Online

**Check**          2nd Deposit

Front

---

JOHN A SCATCHELL                                            2882
912 NORWOOD ST
MELROSE PARK, IL 60160-2244                                 2-1/710
                                          DATE 11/11/17

PAY TO THE
ORDER OF   Mid West Hunting Consultants      | $ 3000.00

Three thousand and 0/100                           DOLLARS

**CHASE**
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO  Jacklit, Fee

⑆071000013⑆      ⑈670303380⑈ 2882

Back

20171130 7913503695 E967084 3
FTCH023 04722 12377681 1400
5/3 Bank >042000314<

                                          Midwest Hunting Consultants
                                          828041 6053
                                          ENDORSE HERE

| Post date | Check # | Check amount |
|-----------|---------|--------------|
| Nov 30, 2017 | 2882 | $3,000.00 |

# EXHIBIT 31

## Fowler, Jeff

| | |
|---|---|
| **From:** | Christopher Cooper <cooperlaw3234@gmail.com> |
| **Sent:** | Thursday, December 14, 2017 6:12 PM |
| **To:** | Fowler, Jeff |
| **Subject:** | Fwd: J. SCATCHELL 12/21/17 Itinerary |

---------- Forwarded message ----------
From: **John Scatchell** <jscatch88@gmail.com>
Date: Thu, Dec 14, 2017 at 6:11 PM
Subject: Fwd: J. SCATCHELL 12/21/17 Itinerary
To: cooperlaw3234@gmail.com



**AA Record Locator:  USLFTI**

**Status:  ON HOLD - Purchase By: Nov 22, 2017 11:59 PM PST**

### Your Itinerary

| Carrier | Flight Number | Departing | | Arriving | | Booking Code | Meals |
|---|---|---|---|---|---|---|---|
| | | City | Date & Time | City | Time | | |
| AMERICAN AIRLINES | 2737 | PDX Portland | Dec 21, 2017 07:45 PM | PHX Phoenix | Dec 21, 2017 11:20 PM | Y | Food for purchase |
| AMERICAN AIRLINES | 2691 | PHX Phoenix | Dec 22, 2017 12:55 AM | ORD Chicago | Dec 22, 2017 05:14 AM | Y | Food for purchase |

### Traveler Information

| Passenger | Class | Seat Assignment |
|---|---|---|
| JOHN SCATCHELL | Economy | |
| ANTHONY MAGGIO | Economy | |
| JOHN SCATCHELL | Economy | |
| ANTHONY MAGGIO | Economy | |

Traveling passengers may check in and obtain boarding passes for U.S. domestic electronic tickets within 24 hours of the flight time online at AA.com by using www.aa.com/checkin or at a Self-Service Check-In machine at the airport. Check-in options may be found at www.aa.com/options. For information regarding American Airlines checked baggage policies, please visit www.aa.com/baggageinfo.

1

Scatchell Dep Ex No. 16
for ID, as of 1/9/18

**CHIEF'S EXHIBIT ___**

Travelers must present a government-issue photo ID with either a boarding pass or a priority verification card at the security screening checkpoint

Please remember flight details are subject to change. In order to check a flight's status, gate, or departure and arrival time, go to www.aa.com and enter the flight information in the Gates and Times search area. In order to receive automatic notifications of flight changes, click on the Flight Status Notifications section on the www.aa.com homepage and enter the required flight and contact information.

Privacy Policy

--
Christopher Cooper, JD, ESQ, PhD, Practice in Indiana and Illinois

Fraternal Order of Police Legal Defense Plan Attorney

EMPLOYMENT LAW PRACTICE (Before Police Boards & in Federal Court)

Law Office of Christopher Cooper, INC.
79 West Monroe Street, Suite 1213, Chicago, IL 60603
TEL: 312 473 2968; Fax: 866 334 7458
cooperlaw3234@gmail.com
          WEBSITE: civilrightsemploymentlaw.com

INDIANA
LAW OFFICE OF CHRISTOPHER COOPER, INC.
426 N. Broad Street, Griffith, Indiana 46319
TEL: 219 228 4396  Fax: 866 334 7458
cooperlaw3234@gmail.com

CONFIDENTIAL AND PRIVILEGED: This e-mail message (including any attachments hereto) contains information which is confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone this message or any information contained in the message. If you have received this message in error, please advise the sender by reply email and delete this message.

2

# EXHIBIT 32

**Fowler, Jeff**

| | |
|---|---|
| **From:** | Christopher Cooper <cooperlaw3234@gmail.com> |
| **Sent:** | Thursday, December 14, 2017 6:12 PM |
| **To:** | Fowler, Jeff |
| **Subject:** | Fwd: MileagePlus eTicket Itinerary and Receipt for Confirmation MDWZHK |

---------- Forwarded message ----------
From: **John Scatchell** <jscatch88@gmail.com>
Date: Thu, Dec 14, 2017 at 6:11 PM
Subject: Fwd: MileagePlus eTicket Itinerary and Receipt for Confirmation MDWZHK
To: cooperlaw3234@gmail.com

Confirmation:

MDWZHK

Issue Date: November 18, 2017

# TRAVELER INFORMATION

| Traveler | eTicket Number | Frequent FlyerNumber | Seats |
|---|---|---|---|
| SCATCHELLJR/JOHN | 0162374215620 | UA-XXXXX787 | 36C |

# FLIGHT INFORMATION

| Day, Date | Flight | Class | Departure City and Time | Arrival City and Time | Aircraft | Meal |
|---|---|---|---|---|---|---|
| Sun, 17DEC17 | UA1836 | YN | CHICAGO, IL (ORD - O'HARE) **4:35 PM** | PORTLAND, OR (PDX) **7:06 PM** | A-320 | Purchase |

# FARE INFORMATION

## Fare Breakdown

- Airfare:

    USD

- September 11th Security Fee:

0.00

5.60

MileagePlus Account Debited: DLV27787

Form of Payment:
VISA
Last Four Digits 7868

MileagePlus Miles Debited/ Award Used:

25000/E25K

1

CHIEF'S EXHIBIT ___

17

- Per Person Total:

5.60

USD

- eTicket Total:

5.60

USD

The airfare you paid on this itinerary totals: 0.00 USD

The taxes, fees, and surcharges paid total: 5.60 USD

Award Rules:  Additional charges may apply for changes in addition to any fare rules listed.
RWD/NONEND/-TRAN;VALID UA;NOT VALID AFTER 11/17/2018
All changes must be made prior to the departure date, or the ticket has no value.

## Baggage allowance and charges for this itinerary.

### Baggage fees are per traveler

| Origin and destination for checked baggage | 1st bag | 2nd bag | Maximum weight and dimensions per piece of baggage Max wt / dim per piece |
| --- | --- | --- | --- |
| 12/17/2017 Chicago, IL (ORD - O'Hare) to Portland, OR (PDX) | 25.00 USD | 35.00 USD | 50.0lbs (23.0kg) - 62.0in (157.0cm) |

## Important Information about MileagePlus Earning

Accruals vary based on the terms and conditions of the traveler's frequent flyer program, the traveler's frequent flyer status and the itinerary selected. United MileagePlus® mileage accrual is subject to the rules of the MileagePlus program

Once travel has started, accruals will no longer display. You can view your MileagePlus account for posted accrual

You can earn up to 75,000 award miles per ticket. The 75,000 award miles cap may be applied to your posted flight activity in an order different than shown

PQD are a Premier status requirement for members in the U.S. only.

Accrual is only displayed for MileagePlus members who choose to accrue to their MileagePlus account.

## MileagePlus eTicket Reminders

Check-in Requirement - Bags must be checked and boarding passes obtained at least 30 minutes prior to scheduled departure. Baggage will not be accepted and advance seat assignments may be cancelled if this condition is not met.

2

**EXCEPTION:** When departing from Anchorage, Atlanta, Austin, Baltimore, Chicago, Cincinnati, Cleveland, Dallas/Ft. Worth, Denver, Detroit, Fort Lauderdale, Greenville-Spartanburg, Guam, Honolulu, Houston, Indianapolis, Jacksonville Kona, Las Vegas, Los Angeles, Maui, Miami, New York (LGA), Newark, Orange County (SNA), Orlando, Philadelphia, Phoenix, Pittsburgh, Raleigh/Durham, Reno, San Diego, San Francisco, San Juan, PR (60 minutes), Savannah, Seattle, St. Louis, St. Thomas, U.S. Virgin Islands (60 minutes), Tampa, Washington, DC (both IAD and DCA), the check in requirement time for Passengers and Bags is 45 minutes except where noted.

**Boarding Requirement** - Passengers must be prepared to board at the departure gate with their boarding pass at least 15 minutes prior to scheduled departure.

Failure to meet the **Boarding Requirements** may result in cancellation of reservations, denied boarding, removal of checked baggage from the aircraft and loss of eligibility for denied boarding compensation.

Bring your boarding pass or this eTicket Receipt along with photo identification to the airport.

The FAA now restricts carry-on baggage to one bag plus one personal item (purse, briefcase, laptop computer, etc.) per passenger. The fare rules for your ticket may restrict your carry-on baggage allowance even further.

For up to the minute flight information, sign-up for our Flight Status Updates or call 1-800-824-6200; in Spanish 1-800-426-5561.

If flight segments are not flown in order, your reservation will be cancelled. Rebooking will be subject to the fare rules governing your ticket.

For the most current status of your reservation, go to our Flight Status page.

Your eTicket is non transferable and valid for 1 year from the issue date unless otherwise noted in the fare rules.

Award travel is subject to the terms and conditions of the MileagePlus program.

Redeposit or change fees apply for award travel based on Premier level. Please go to united.com or call 800-UNITED-1 for details.

# Customer Care Contact Information

We welcome your compliments, comments or complaints regarding United or a United travel experience. You may contact us using our Customer Care form

# Refunds Within 24 Hours

When you book and ticket a reservation through united.com, the United mobile app, the United Customer Contact Center, at our ticket counters or city ticket offices, or if you use MileagePlus® miles to book an award ticket, we will allow you to cancel the ticketed reservation without penalty and receive a 100 percent refund of the ticket price to the original form of payment if you cancel the reservation within 24 hours of purchase and if the reservation is made one week or more prior to scheduled flight departure.

# Hazardous materials

Federal law forbids the carriage of hazardous materials on board aircraft in your luggage or on your person. A violation can result in five years imprisonment and penalties of $250,000 or more (49 U.S.C. 5124).

Hazardous materials include explosives, compressed gases, flammable liquids and solids, oxidizers, poisons, corrosives and radioactive materials. Common examples of hazardous materials/dangerous goods include spare or loose lithium batteries, fireworks, strike-anywhere matches, aerosols, pesticides, bleach and corrosive materials.

Additional information can be found on:

- 
  - united.com restricted items page
  - FAA website Pack Safe page
  - TSA website Prohibited Items page

# Proud Member of Star Alliance

We are making connections so you make yours. You can earn and redeem miles on 28 member airlines offering over 18,000 daily flights to more than 1,300 destinations worldwide.

Go to www.staralliance.com to find out more. You've earned it.

## IMPORTANT CONSUMER NOTICES

**Notice of Baggage Liability Limitations** - For domestic travel between points within the United States (except for domestic portions of international journeys), United's liability for loss of, damage to, or delay in delivery of a customer's checked baggage is limited to $3,500 per ticketed customer unless a higher value is declared in advance and additional charges are paid (not applicable to wheelchairs or other assistive devices). For such travel, United assumes no liability for high value, fragile, perishable, or otherwise excluded items; excess valuation may not be declared on certain types of valuable articles. Further information may be obtained from the carrier. For international travel governed by the Warsaw Convention (including the domestic portions of the trip), maximum liability is approximately 640 USD per bag for checked baggage, and 400 USD per passenger for unchecked baggage. For international travel governed by the Montreal Convention (including the domestic portions of the trip), maximum liability is 1,131 SDRs per passenger for baggage, whether checked or unchecked. For baggage lost, delayed, or damaged in connection with domestic travel, United requires that customers provide preliminary notice within 24 hours after arrival of the flight on which the baggage was or was to be transported and submit a written claim within 45 days of the flight. For baggage damaged or delayed in connection with most international travel (including domestic portions of international journeys), the Montreal Convention and United require customers to provide carriers written notice as follows: (a) for damaged baggage, within seven days from the date of receipt of the damaged baggage; (b) for delayed baggage, within 21 days from the date the baggage should have been returned to the customer. Please refer to Rule 28 of United's Contract of Carriage for important information relating to baggage and other limitations of liability.

**Notice of Incorporated Terms** - Transportation is subject to the terms and conditions of United's Contract of Carriage, which are incorporated herein by reference. Incorporated terms may include, but are not limited to: 1. Limits on liability for personal injury or death of the customer, and for loss, damage, or delay of goods and baggage, including high value, fragile, perishable, or otherwise excluded items. 2. Claims restrictions, including time periods within which customers must file a claim or bring an action against the carrier. 3. Rights of the carrier to change terms of the contract. 4. Rules about reconfirmation of reservations, check-in times, and refusal to carry. 5. Rights of the carrier and limits on liability for delay or failure to perform service, including schedule changes, substitution of an alternate air carrier or aircraft, and rerouting. The full text of United's Contract of Carriage is available at united.com or you may request a copy at any United ticket counter. Passengers have the

4

right, upon request at any location where United's tickets are sold within the United States, to receive free of charge by mail or other delivery service the full text of United's Contract of Carriage.

**Notice of Certain Terms** - If you have purchased a restricted ticket, depending on the rules applicable to the fare paid, one or more restrictions including, but not limited to, the following may apply to your travel: (1) the ticket may not be refundable but can be exchanged for a fee for another restricted fare ticket meeting all the rules/restrictions of the original ticket (including the payment of any difference in fares); (2) a fee may apply for changing/canceling reservations; or (3) select tickets may not be eligible for refunds or changes even for a fee; (4) select tickets have no residual value and cannot be applied towards the purchase of future travel; or (5) travel may be restricted to specific flights and/ or times and a minimum and/or maximum stay may be required. United reserves the right to refuse carriage to any person who has acquired a ticket in violation of any United tariffs, rules, or regulations, or in violation of any applicable national, federal, state, or local law, order, regulation, or ordinance. Notwithstanding the foregoing, you are entitled to a full refund if you cancel a ticket purchased at least a week prior to departure within 24 hours of purchase.

**Notice of Boarding Times** - For Domestic flights, customers must be at the boarding gate at least 15 minutes prior to scheduled departure. For International flights, customers must be at the boarding gate at least 30 minutes prior to scheduled departure. The time limits provided by United in this Notice are minimum time requirements. Customer and baggage processing times may differ from airport to airport. Please visit united.com for information regarding airport-specific boarding times. It is the customer's responsibility to arrive at the airport with enough time to complete check-in, baggage, and security screening processes within these minimum time limits. Please be sure to check flight information monitors for the correct boarding gate and the departure time of your flight. Failure to be at the boarding gate by the required time could result in the loss of your seat without compensation, regardless of whether you are already checked in or have a confirmed seat and boarding pass.

**Advice to International Passengers on Carrier Liability** - Passengers on a journey involving an ultimate destination or a stop in a country other than the country of departure are advised that international treaties known as the Montreal Convention, or its predecessor, the Warsaw Convention, including its amendments, may apply to the entire journey, including any portion thereof within a country. For such passengers, the treaty, including contracts of carriage embodied in applicable tariffs, governs, and may limit the liability of the Carrier in respect of death or injury to passengers, and for destruction or loss of, or damage to, baggage, and for delay of passengers and baggage.

**Notice - Overbooking of Flights** - Airline flights may be overbooked, and there is a slight chance that a seat will not be available on a flight for which a person has a confirmed reservation. If the flight is overbooked, no one will be denied a seat until airline personnel first ask for volunteers willing to give up their reservation in exchange for compensation of the airline's choosing. If there are not enough volunteers, the airline will deny boarding to other persons in accordance with its particular boarding priority. With few exceptions, including failure to comply with the carrier's check-in deadlines, which are available upon request from the air carrier, persons, denied boarding involuntarily are entitled to compensation. The complete rules for the payment of compensation and each airline's boarding priorities are available at all airport ticket counters and boarding locations. *Some airlines do not apply these consumer protections to travel from some foreign countries, although other consumer protections may be available. Check with your airline or your travel agent.*

**Thank you for choosing United Airlines**
united.com

Legal Notices. Privacy Policy
Copyright © 2017 United Airlines, Inc. All rights reserved.
For assistance, please contact United Airlines via telephone or via e-mail.

5

--

Christopher Cooper, JD, ESQ, PhD, Practice in Indiana and Illinois

Fraternal Order of Police Legal Defense Plan Attorney

EMPLOYMENT LAW PRACTICE (Before Police Boards & in Federal Court)

Law Office of Christopher Cooper, INC.
79 West Monroe Street, Suite 1213, Chicago, IL 60603
TEL: 312 473 2968; Fax: 866 334 7458
cooperlaw3234@gmail.com
                    WEBSITE: civilrightsemploymentlaw.com

INDIANA
LAW OFFICE OF CHRISTOPHER COOPER, INC.
426 N. Broad Street, Griffith, Indiana 46319
TEL: 219 228 4396   Fax: 866 334 7458
cooperlaw3234@gmail.com

CONFIDENTIAL AND PRIVILEGED: This e-mail message (including any attachments hereto) contains information which is confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone this message or any information contained in the message. If you have received this message in error, please advise the sender by reply email and delete this message.

# EXHIBIT 33

2017/18

# Outfitter Permit Application



Check all that apply: New____ Renewal ✗ Class A Permit Deer/Turkey ____ Class B Permit Waterfowl ✗

Name of Applicant (if individual) or Contact Person: \_\_\_Vito R. Scavo\_\_\_
Physical Address (No P.O. Box): ____
City: [redacted]  State: [redacted]  Zip: [redacted]  County: Cook
Date of Birth: [redacted]  Phone Number: [redacted]

*Business Name: I Decoy M Guide Service
Street:
City: [redacted]  State: [redacted]  Zip: [redacted]  County: Cook
FEIN Number (if applicable): N/A  Phone Number: (708) 634-6673
Web Site: www.idecoym.com
Applicant is: ☒ Individual          [ ] Partnership
             [ ] Corporation       [ ] Limited Liability Company
             [ ] Other (Specify): ____

*If applicant is a business entity, attach a copy of the organization papers filed with the Illinois Secretary of State and/or the certificate of compliance with the Assumed Business Name Act from the County Clerk.

I hereby certify that the above named applicant is a (check one) ✗ Resident ____ Non-Resident of Illinois. (Note: An Illinois resident individual is a person who has resided in Illinois for at least 30 consecutive days prior to submitting any application. In order to qualify as a resident corporation or limited liability company, the business must have been in existence at least 30 days prior to submitting application for an Outfitter Permit, and more than 50% of the stock or ownership is owned by Illinois resident individuals.)

## LIST ALL GUIDES TO BE EMPLOYED (INCLUDING SELF)

| Name: Vito R Scavo | Name: John A. Scatchell | Name: ____ |
|---|---|---|
| Address: [redacted] | Address: [redacted] | Address: ____ |
| Date of Birth: [redacted] | Date of Birth: [redacted] | Date of Birth: ____ |
| SSN: [redacted] | SSN: [redacted] | SSN: ____ |

| Name: ____ | Name: ____ | Name: ____ |
|---|---|---|
| Address: ____ | Address: ____ | Address: ____ |
| Date of Birth: ____ | Date of Birth: ____ | Date of Birth: ____ |
| SSN: ____ | SSN: ____ | SSN: ____ |

Have all guides successfully completed an approved hunter safety course?(check one) Yes ✗ No___ If No, certification must be obtained before providing guide services.
ADDITIONAL NAMES MAY BE LISTED ON A SEPARATE SHEET OF PAPER.

*application continued on reverse*

OA1DNR/ICP 01

MPD/SCATCHELL 172

CHIEF'S EXHIBIT ___

Applicant must also attach the following:

X  1. A listing of the county, township, range, section, acres and landowner name of the property where the outfitting services will be provided.

X  2. For Class A outfitters - completed proposed management plan, consisting of a description of hunting activities for the hunting season, including the approximate number of hunters, whether deer or turkey hunting and the type of weapons to be used. For Class B outfitter a description of the primary hunting activities proposed i.e.:duck or geese. (A management plan is not required for outfitters who only solicit or secure waterfowl, deer and/or turkey hunting clients for a landowner or tenant or another outfitter)

X  3. Proof of current commercial liability insurance for property damage, personal injury and death with a minimum benefit of $1,000,000..

___ 4. *For Class A renewals only.* Completed report of harvest form.

___ 5. Class A Outfitters - Check or money order in the amount of $500 for a resident applicant, $2,500 for a non-resident applicant.

X  6. Class B Outfitters - Check or money order in the amount of $250 for a resident applicant, $1,500 for a non-resident applicant.

Certification:
IDNR requires license applicants to certify as follows: "I hereby certify, under penalty of perjury," that: (check all that apply)

    I am not subject to a child support order.
    I am not more than 30 days delinquent in complying with a child support order.
    I am more than 30 days delinquent in complying with a child support order.
    Prior to making application I have not been found guilty, by a court of law, of outfitting without a license.
    Applicant's Social Security Number:

Disclosure of applicant's Social Security Number is mandatory pursuant to 42 U.S.C. 666(a)(13) and 5 ILCS 100/10-65 for use under the State's child support enforcement program.

Failure to certify may result in denial of the application/renewal and making a false statement may subject the licensee to contempt of court [5 ILCS 100/10-65(c)].

I hereby certify that the information contained herein is true and accurate to the best of my knowledge.

Signature _____   Date: 7/1/17

Please return completed application to:
Illinois Department of Natural Resources
One Natural Resources Way
Springfield, IL 62702-1271
Attn: Outfitters

Equal opportunity to participate in programs of the Illinois Department of Natural Resources (IDNR) and those funded by the U.S. Fish and Wildlife Service and other agencies is available to all individuals regardless of race, sex, national origin, disability, age, religion or other non-merit factors. If you believe you have been discriminated against, contact the funding source's civil rights office and/or the Equal Employment Opportunity Officer, IDNR, One Natural Resources Way, Springfield, IL, 62702-1271; 217/785-0067; TTY 217/782-9175.

This information may be provided in an alternative format if required. Contact the IDNR Clearinghouse at 217/782-7498 for assistance.

OA-10NR/ICP 01
Revised 1/26/2016

Printed by the authority of the State of Illinois

MPD/SCATCHELL 173

# EXHIBIT 34



# 2017 - 2018

# Illinois Licensed Waterfowl Outfitters

*December 07, 2017*



CHIEF'S EXHIBIT ___

**Scavo, Vito**

**I Decoy M Guide Service**

**280 Braddoch Dr**

**Melrose Park, Il 60160**

**License #: WF1700619     County: Cook**

**Phone: (708) 906-3644**

**Date Issued: 07/24/2017     Expires: 06/30/2018**

*Guides*

John A Scatchell

Vito R Scavo

# EXHIBIT 35

BOARD OF FIRE & POLICE COMM'R VILLAGE OF MELROSE PARK, IL

DEPUTY CHIEF MICHAEL CASTELLAN,
PETITIONER,                                    No. 18-1

            v.

JOHN SCATCHELL JR.,
RESPONDENT.

---

### Respondent's Answer to Petitioners' Statement of Charges

     NOW COMES Respondent, John A. Scatchell ("Ofc. Scatchell" or "Scatchell"), by and through his attorneys, Christopher C. Cooper and Gianna Scatchell of the Fraternal Order of Police Legal Defense Plan. **Respondent hereby files his involuntary—and coerced—** Answer to Petitioners' Statement of Charges against him. Respondent states that he has been compelled to "Answer", by Board of Fire & Police Comm'r Village of Melrose Park, Illinois ("Board" or "BOFPC") rules. Respondent will be filing his forthcoming Motion to Dismiss. Respondent further states that by compelling him to file an Answer, the Board has violated his 5th Amendment right not to incriminate himself. Accordingly, without admitting the legal sufficiency or waiving any objections and responding only to factual allegations therein, Respondent, through his attorneys, states as follows:

1. Director Pitassi at all times relevant to bringing these charges was and is the duly appointed Director of Police of the Village of Melrose Park.

    **ANSWER: Respondent objects to the undefined term "director" as vague and ambiguous because Pitassi uses Chief and Director interchangeably.[1] For the remaining allegations in this Paragraph, Scatchell has insufficient information to admit or deny the allegations contained in this Paragraph and, therefore, neither admits nor denies the same but demands strict proof thereof.**

---

[1] True and correct copies of Pitassi using both Chief and Director are attached hereto as Exhibit 1

1

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMP/JJS 2176

2. Deputy Chief Castellan at all times relevant to bringing these charges was and is a duly appointed Deputy Chief of Police of the Village of Melrose Park, and is authorized to act on behalf of the Director of Police in this matter.

   **ANSWER: Respondent admits that Deputy Chief Castellan is one of the deputy chiefs. For the remaining allegations in this Paragraph, Respondent has insufficient information to admit or deny the allegations and, therefore, neither admits nor denies the same but demands strict proof thereof.**

3. Officer John A. Scatchell ("Ofc. Scatchell") is a duly appointed member of the Melrose Park Police Department and is an Officer as that term is defined in the Board's Rules and Regulations.

   **ANSWER: Admit**

4. The Melrose Park Police Department has a very generous sick leave provision - full pay for six months for conditions that originated off duty and "An officer who is placed on sick leave as a result of an injury or illness contracted in the in [sic] line of duty shall be entitled to full pay for one (1) year."

   **ANSWER: Deny the allegations in the first sentence of this Paragraph because the phrase "generous sick leave policy" is vague, ambiguous, and argumentative. To the extent the allegations of Paragraph 4 seek to paraphrase or characterize the Sick Leave Policy, the document speaks for itself, and Scatchell denies the allegations to the extent that they are inconsistent with that document.[2]**

5. Ofc. Scatchell was hired as a police officer for the Village of Melrose Park on September 26, 2012 and he received MPPD's Standard Operating Procedures and rules when he was hired.

   **ANSWER: Paragraph Five is admitted, except that Scatchell did not receive a printed version of the MPPD Standard Operating Procedures ("SOP's"), he received a CD-ROM. At the time Scatchell received the CD-Rom, he did not have an opportunity to review the 500 + page SOP's before directed to sign an acknowledgement form. Further, the SOP acknowledgement form was never signed by Scatchell.[3] Scatchell further states that the SOP Acknowledgement forms for 2013, 2014, 2015, 2016, and 2017 SOP's are not in his personnel file. Scatchell denies all remaining allegations in this Paragraph.**

6. In February 2015 Ofc. Scatchell reported that he was injured in an altercation and he reportedly suffered from a cervical strain to his upper back and lower neck. Ofc. Scatchell was off work from February 5, 2015 until he was released to work frill duty effective April 24, 2015.

---

[2] Copies of the MPPD Sick Leave Policy, SOP's, and CBA are attached hereto as Exhibit 2.

[3] A copy of the unsigned Acknowledgement Form is attached hereto and incorporated by reference as Ex. 3.

2

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**ANSWER: Admit and Denies to the extent that the averment announces and medical diagnosis. Officer Scatchell is not competent to diagnose the then condition. Scatchell denies all remaining allegations in this Paragraph.**

7. After February 2015, Ofc. Scatchell was not injured further while at work.

**ANSWER: This Paragraph does not contain an allegation of fact to which no answer is required. Scatchell further objects to this allegation because the word "injured" is vague and broad. Scatchell denies all remaining allegations in this paragraph.**

8. On or about July 24, 2017, Vito Scavo obtained a Waterfowl Outfitter's License on behalf of an entity named "I Decoy M Guide Service" for 2017-2018, listing Ofc. Scatchell as an employee and "Guide" for the Company. Ofc. Scatchell never sought or received permission to accept secondary employment with I Decoy M Guide Service.

**ANSWER: Scatchell denies that he was employed with Scavo's company. Scatchell admits that he never sought or received permission to accept secondary employment because he was never an employee. For the remaining allegations in this Paragraph, Respondent has insufficient information to admit or deny the allegations contained in this Paragraph and, therefore, neither admits nor denies the same but demands strict proof thereof.**

9. Mr. Scavo is a convicted felon. Ofc. Scatchell is aware that Mr. Scavo is a felon and is prohibited from possessing a firearm. In fact, possession of a firearm by a felon in Illinois is a Class 3 felony with a mandatory minimum 2-year prison sentence in Illinois, and is therefore a serious crime.

**ANSWER: Scatchell objects to Paragraph 9 as seeking irrelevant, and highly prejudicial information about the former MPPD Police Chief who is not a party to this matter. The statement of fact is not reasonably calculated to produce discoverable evidence. The third sentence of paragraph 9 is a statement of law to which no response is required; therefore, Scatchell neither admits nor denies the same but demands strict proof thereof. To the extent that a response is required, Scatchell denies all remaining allegations and inferences in paragraph 9 of Petitioners' Statement of Charges.**

10. Ofc. Scatchell is an avid hunter. He scheduled vacation for October 2017 to correspond with the beginning of waterfowl hunting season, and during that period he frequently went waterfowl hunting with Mr. Scavo.

**ANSWER: The first sentence of this Paragraph contains Petitioner's characterization of Respondent, which requires no response. Scatchell objects to the undefined term "avid hunter" as vague, ambiguous, and prejudicial. Scatchell admits that one of his scheduled vacations occurred in October 2017. Scatchell denies the remaining allegations in this Paragraph because the information sought is irrelevant and not reasonably calculated to produce discoverable evidence.**

3

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2178

11.   Waterfowl hunting is typically done with a shotgun and shotguns have significant recoil affecting the shooter's shoulder, upper back and neck area.

**ANSWER: The first sentence of this Paragraph contains Petitioner's characterization of "waterfowl hunting", which requires no response. To the extent that this Paragraph could be interpreted as containing any allegations of fact, Scatchell objects to the undefined term "shotgun" as vague and ambiguous. Several types of shotguns exist. Each type of shotgun has different recoil, size, and purpose. Scatchell also objects to the undefined term "significant recoil" as vague and ambiguous. Scatchell further objects to this Paragraph because the information sought is irrelevant and not reasonably calculated to produce discoverable evidence. To the extent that a response is deemed required, Scatchell denies all allegations and inferences contained in this paragraph.**

12.   Ofc. Scatchell was on approved vacation and/or "time due" from October 13, 2017 to November 8, 2017.

**ANSWER:  Based on recent claims by the MPPD through its attorneys as to what constitutes "approved" or "disapproved" vacation time, Respondent has insufficient information to admit or deny the allegations contained in this Paragraph and, therefore, neither admits nor denies the same but demands strict proof thereof.**

13.   According to Ofc. Scatchell, in late October or early November 2017, after he had been on vacation for at least ten days, and while he was on vacation, he felt pain in his back which he claims related to his February 2015 work-related injury.

**ANSWER:  Based on recent claims by the MPPD through its attorneys as to what constitutes "approved" or "disapproved" vacation time, Respondent has insufficient information to admit or deny the allegations contained in this Paragraph and, therefore, neither admits nor denies the same but demands strict proof thereof. To the extent that an answer is required, Respondent invokes his Fifth Amendment right to remain silent as to the matter of pain.**

14.   On November 9, 2017, Ofc. Scatchell presented a note from Dr. Maryam Sandoval reporting that Ofc. Scatchell "was seen and evaluated ... for an acute musculoskeletal condition that has not yet resolved. He remains on active treatment and has been advised to continue to rest at home. Please excuse the patient from work until further notice."

**ANSWER: To the extent the allegations of Paragraph 14 seek to paraphrase or characterize Dr. Sandoval's doctor's note, the document speaks for itself. A true and correct copy of the Dr.'s Note is attached hereto and incorporated by reference as Exhibit 3. Scatchell denies the allegations to the extent that they are inconsistent with that document.[4]**

---

[4] A true and correct copy of the Dr.'s Note is attached hereto and incorporated by reference as Exhibit 4.

4

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

15. Ofc. Scatchell did not tell his physicians that he was hunting during his medical leave or ask about whether hunting with a shotgun was consistent with the medical restrictions.

**ANSWER: Petitioner's allegation is vague and ambiguous and, therefore, is denied in its entirety. Officer Scatchell further denies these allegations as premature and based on speculation. Scatchell objects to the undefined term "hunting" as vague and ambiguous and, therefore, is denied in its entirety. To the extent that a response is deemed required, Scatchell denies all remaining allegations and inferences contained in paragraph 15.**

16. In contravention to his doctor's orders, Ofc. Scatchell frequently went hunting for waterfowl during the period of his medical leave, usually carrying heavy equipment and shotguns.

**ANSWER: Deny. Petitioner's allegation is inconsistent and contradictory to the allegation in Paragraph 15. Either Officer Scatchell did not tell his doctors he was hunting (Paragraph 15) or he violated his doctor's orders not to hunt (Paragraph 16). Scatchell objects to the undefined term "hunting" as vague and ambiguous and, therefore, is denied in its entirety. To the extent that an answer is deemed required, Scatchell denies all remaining allegations contained in Paragraph 16.**

17. On November 19, 2017, Ofc. Scatchell asked his supervisor for time off on December 21, 22, 26, 27, 28, 29, 30 and 31st to travel to Mexico. On December 4, 2017, the request was denied because Ofc. Scatchell was on medical leave.

**ANSWER: Scatchell has insufficient information to admit or deny the allegations because of the word "time off." To the extent that an answer is required, Respondent invokes his Fifth Amendment right to remain silent.**

On October 6, 2017, Ofc. Scatchell obtained air travel arrangements for he and Mr. Scavo to travel to and from Harlingen, Texas, between December 26-30, 2018.

**ANSWER: Scatchell has insufficient information to admit or deny the allegations because of the phrase "obtained." To the extent that a response is required, Scatchell objects to these allegations as irrelevant and not likely to produce discoverable evidence.**

18. On or about November 18, 2017, Ofc. Scatchell obtained air travel arrangements to travel to and from Washington from December 17 to December 22, 2017. [sic].

**ANSWER: Scatchell has insufficient information to admit or deny the allegations because of the phrase "obtained."**

19. Ofc. Scatchell went on the trip to Washington as he had scheduled and his activities there included waterfowl hunting. Director Pitassi and Deputy Chief Castellan believe that Ofc. Scatchell also took his planned trip to Mexico in late December 2017.

**ANSWER: Scatchell objects to this allegation to the extent it requires him to speculate as to what Pitassi and Castellan believe. Scatchell further objects to the reliance on the**

5

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2180

undefined term "waterfowl hunting" as vague and ambiguous. **Respondent admits he was in Washington. Scatchell denies all remaining allegations in this paragraph.**

20.  On November 20, 2017, Ofc. Scatchell, Mr. Scavo and others were hunting from a small boat and they were observed by Illinois Conservation Police with Mr. Scavo possessing a firearm and actively shooting over a prolonged period. When the boat returned to the shore, the Conservation Police Officer met and interviewed the group, including Ofc. Scatchell, who showed his Melrose Park Police Department badge and identified himself as a Melrose Park police officer and said that "he could not say if he saw Scavo shoot or not" and "[w]e are all in law enforcement here, we all know what's going on." Ofc. Scatchell knew that the Conservation Police Officer stated that he saw Mr. Scavo possessing and firing a shotgun, knew that the Conservation Police Officer did not believe Ofc. Scatchell's denials and knew that the conduct would constitute a felony, but Ofc. Scatchell did not report the contact with the Conservation Police Officer to his supervisors.

**ANSWER: Scatchell objects to the undefined terms "hunting" and "prolonged period" as vague and ambiguous. Scatchell further denies this allegation on the grounds that this excerpt does not fully encapsulate Scatchell's response during his Interrogation.[5] Scatchell additionally objects to the allegation that would require him to speculate as to what the DNR officer saw. Scatchell further denies that the allegations or inferences in Paragraph 20 contain a complete understanding of the conversation with the DNR. Scatchell only participated in an informal conversation. Scatchell denies all remaining allegations of fact contained in this paragraph.**

21.  On November 27, 2017, Ofc. Scatchell presented a note from Dr. Sandoval stating that "has been advised to resume light exercises and may walk outside of his home. However, he is not able to return to his full-time [sic] work pending completion and review of ordered tests." During the ensuing period, Ofc. Scatchell did not merely engage in "light exercises" or "walk outside of his home," but instead continued hunting activities on virtually a daily basis.

**ANSWER: Scatchell objects to the undefined terms "hunting" as vague and ambiguous. Scatchell admits that on November 27, 2017, he presented a doctor's note from Dr. Sandoval.[6] To the extent the allegations of this Paragraph seek to paraphrase or characterize the contents of that written document, the document speaks for itself, and Respondent denies the allegations to the extent that they are inconsistent with that document. Respondent denies all remaining allegations and inferences contained in this Paragraph.**

22.  On December 8, 2017, Director Pitassi and Deputy Chief Castellan issued a notice to Ofc. Scatchell, informing him of the investigation into his conduct and scheduling an "interrogation" of Ofc. Scatchell. Ofc. Scatchell did not appear as ordered, and a new Notice was issued on December 20, 2017.

---

[5] A true and correct copy of the Interrogation transcript is attached hereto and incorporated by reference as Ex. 5.

[6] A true and correct copy of the 11/27/2017 Doctor's Note is attached hereto and incorporated by reference as Ex. 6.

6

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**ANSWER: Scatchell admits that he received correspondence from Pitassi and Castellan. Scatchell denies that he did not appear as ordered for two reasons. First, the original hearing date was on 12/19/2017, Scatchell's day off. Pursuant to the Uniform Peace Officer Disciplinary Act, any interrogations should be scheduled when the officer is on duty. [7] Second, someone changed Scatchell's status on the MPPD's department scheduling software so that he did not have a day off, but was instead on sick leave. [8] Scatchell denies all remaining allegations of fact contained in this paragraph.**

23. On December 15, 2017, Ofc. Scatchell presented a note from Dr. Sandoval stating that Ofc. Scatchell's "ongoing medical problem ... has improved but not resolved. Based on recent test results, the patient has been referred to a specialist and his appointment is still pending. In the meantime, he may return to light duty employment pending the consultant input. His prior arranged travel plans are deemed safe and should not affect his ongoing medical problems." However, Ofc. Scatchell had not told Dr. Sandoval about the details of his travel plans, including his plan to go hunting.

**ANSWER: Scatchell admits that on 12/15/2017, he presented a doctor's note from Dr. Sandoval. [9] To the extent the allegations of this Paragraph seek to paraphrase or characterize the contents of that written document, the document speaks for itself, and Respondent denies the allegations to the extent that they are inconsistent with that document. Respondent denies all remaining allegations and inferences contained in this Paragraph.**

24. On January 8, 2018, Dr. Sandoval issued a work restriction limiting Ofc. Scatchell to "Desk duty such as typing and paperwork" "but he should not carry or wear heavy equipment (ex. body armor) until seen by a specialist."

**ANSWER: Scatchell admits that on January 8, 2018, he presented a doctor's note from Dr. Sandoval. [10] To the extent the allegations of this Paragraph seek to paraphrase or characterize the contents of that written document, the document speaks for itself, and Respondent denies the allegations to the extent that they are inconsistent with that document. Respondent denies all remaining allegations and inferences contained in this Paragraph.**

25. On January 9, 2018, Ofc. Scatchell participated in an interrogation regarding the investigation being conducted into his conduct. During the interrogation, Ofc. Scatchell was dishonest in some of his responses. For example, Ofc. Scatchell claimed that after feeling pain

---

[7] 50 ILCS 725/3.3 ("All interrogations shall be conducted at a reasonable time of day. Whenever the nature of the alleged incident and operational requirements permit, interrogations shall be conducted during the time when the officer is on duty.")

[8] A true and correct copy of the Schedule change is attached hereto and incorporated by reference as Ex. 7.

[9] A true and correct copy of the 12/15/2017 Doctor's Note is attached hereto and incorporated by reference as Ex. 8.

[10] A true and correct copy of the 01/08/2018 Doctor's Note is attached hereto and incorporated by reference as Ex. 9.

7

VMP/JJS 2182

in his neck and back in early November 2017 he took extensive time off of hunting, he denied carrying two shotguns during his hunting trips in November 2017, he denied seeing Mr. Scavo possessing or firing a shotgun on November 20, 2018, -he denied that his shotguns had a recoil that could have affected his alleged neck or back injury, he falsely reported the findings of the Conservation Officer on November 20, 2017, and he falsely reported the dates he was working a side-job (when he claims that he noticed a re-injury). Each of these statements was false.

**ANSWER: Scatchell objects to the undefined terms "hunting" as vague and ambiguous. Scatchell further objects to the undefined term "extensive" as overly broad without any constraining parameters. Scatchell admits that on January 9, 2018, he participated in an interrogation. To the extent that this Paragraph contains allegations of fact, Scatchell denies the remaining allegations.**

26.   During the interrogation, Ofc. Scatchell's attorney agreed that Ofc. Scatchell would sign a release for the Village to obtain his medical records.

**ANSWER: Scatchell admits that his attorney discussed the option of signing a medical release, but the attorneys had not yet limited the scope of the authorization. See Scatchell Interrogation pp. 157 – 160. To the extent the allegations of Paragraph 26 seek to paraphrase or characterize the conversation during the Interrogation, the transcript speaks for itself, and Scatchell denies the allegations to the extent that they are inconsistent with that document.**

27.   On January 10, 2018, Ofc. Scatchell was given a work restriction from Dr. Dalip Pelinkovic, limiting him to sedentary work and no lifting more than ten pounds for six weeks.

**ANSWER: Scatchell admits that on January 10, 2018, he presented a doctor's note from Dr. Dalip Pelinkovic.[11] To the extent the allegations of this Paragraph seek to paraphrase or characterize the contents of that written document, the document speaks for itself, and Respondent denies the allegations to the extent that they are inconsistent with that document. Respondent denies all remaining allegations and inferences contained in this Paragraph.**

28.   After multiple communications between the Village's attorney and Scatchell's attorney about the medical release, on February 13, 2018, Director Pitassi issued a written order to Ofc. Scatchell to sign a medical release attached to the Order, and he was "further ordered not to hinder or interfere, in any way, with the medical providers regarding their submission of such records." Rather than sign the release as instructed by Director Pitassi, Ofc. Scatchell instead (through his attorney/sister) signed a limited release applicable only to Dr. Sandoval and excluding any medical records from any other provider, including the specialist identified by Dr. Sandoval, and excluding any correspondence relating to Ofc. Scatchell.

---

[11] A true and correct copy of the 11/27/2017 Doctor's Note is attached hereto and incorporated by reference as Ex. 10.

8

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ANSWER: Respondent objects to this Paragraph because the information requested is protected from disclosure by the Fifth Amendment of the US Constitution in that Respondent has a right to not incriminate himself, and therefore incorporates his First Affirmative Defense (*infra*). Respondent further avers that he is under no obligation to incriminate himself.

Respondent admits that he signed a limited release at the advice of his attorney because Petitioner was not clear on which other medical providers it sought to subpoena. Respondent also has a right to privileged communications with his physician. Respondent has both a fundamental privacy and HIPAA (Health Insurance Portability and Accountability Act of 1996) right not to disclose his medical records to MPPD.

Respondent also admits that on or about February 13, 2018, Director Pitassi issued a written order compelling him to sign the medical release, but denies that he "hindered or interfered, in any way, with the medical providers regarding their submission of such records." Scatchell admits that his attorney removed the "request for correspondence relating to Scatchell" from the medical authorization because it is privileged communication between a doctor and her patient.

Scatchell objects to the undefined term "multiple communications." Scatchell admits that the Village's attorney and his attorney communicated about the medical authorizations, but denies that his attorneys agreed on the language of the medical authorization form. Scatchell denies the remaining allegations of this paragraph.

29.     Despite Ofc. Scatchell's failure to comply with Director Pitassi's order, MPPD submitted the signed release to the medical providers and as of March 23, 2018, no documents have been provided. Director Pitassi and Deputy Chief Castellan therefore believe that Ofc. Scatchell has interfered with the production of his medical records, also in violation of the direct order he was given on February 13, 2018.

ANSWER: Respondent incorporates his affirmative defense (number 1), infra. Respondent is under no obligation to incriminate himself. Respondent has a right to privileged communications with his physician. Respondent has both fundamental and HIPAA (Health Insurance Portability and Accountability Act of 1996) rights not to disclose his medical records to MPPD.

Scatchell objects to the allegations relating to "Director Pitassi and Deputy Chief Castellan's belie[f]" as inadmissible hearsay. Scatchell has insufficient information to admit or deny the allegations that MPPD submitted the signed release to the medical providers or what Director Pitassi or DC Castellan "believe", therefore, he neither admits nor denies the same but demands strict proof thereof.

Scatchell denies that he failed to comply with 02/13/2018 Order because his attorney Emailed Petitioner's attorney a signed medical authorization form on 02/16/2018, which was the date of compliance. Scatchell further denies that he interfered with the production of medical records in violation of the 02/13/2018 Order. Scatchell admits that no

9

documents have been provided because Petitioner failed to follow the subpoena procedure as articulated by DuPage Medical Group.[12] Scatchell denies all remaining allegations of this paragraph.

### COUNT I - Abuse of Sick Leave

30.   Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-30 above as though fully set forth herein.

**ANSWER: Respondent re-alleges and incorporates his answers to the allegations of paragraphs 1-29 as his answer to Paragraph 30 as though fully set forth herein.**

31.   MPPD's Policy Manual Rule 340.5.5(c) prohibits excessive absenteeism or abuse of leave privileges. Further, Section 1014.2 provides, "Sick leave is not considered vacation, and abuse of sick leave may result in discipline and/or denial of sick-leave benefits. Employees on sick leave shall not engage in other employment or self-employment, or participate in any sport, hobby, recreational or other activity which may impede recovery from the injury or illness."

**ANSWER: Scatchell admits that Petitioner accurately quoted MPPD SOP's: §§ 340.5.5(c) or 1014.2. Code of Ethics in the MPPD Policy. To the extent the allegations of this Paragraph seek to paraphrase or characterize the MPPD Policy Manual, the document speaks for itself, and Scatchell denies any allegations to the extent that they are inconsistent with that document.**

32.   Ofc. Scatchell's actions constituted an abuse of sick leave.

**ANSWER: Officer Scatchell denies the conclusory allegations contained in Paragraph 32.**

### COUNT II - FAILURE TO REPORT CONTACT WITH ANOTHER LAW ENFORCEMENT AGENCY

33.   Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-33 above as though fully set forth herein.

**ANSWER: Respondent re-alleges and incorporates his answers to the allegations of paragraphs 1-32 as his answer to Paragraph 33 as though fully set forth herein.**

34.   MPPD's Policy Manual contains a Law Enforcement Code of Ethics, which includes, in part, the statement that "I will cooperate with all legally authorized agencies and their representatives in the pursuit of justice."

**ANSWER: Scatchell admits that Petitioner accurately quoted the Law Enforcement Code of Ethics in the MPPD Policy. To the extent the allegations of this Paragraph seek to**

---

[12] A true and correct copy of the Denial Letter from DuPage Medical Group is attached hereto and incorporated by reference as Exhibit 11.

10

VMP/JJS 2185

paraphrase or characterize the MPPD Policy Manual, the document speaks for itself, and Scatchell denies the allegations to the extent that they are inconsistent with that document.

35. MPPD's Policy Manual Rule 340.5.9(a) requires offices to promptly and fully report activities on his/her part or the part of any other member where such activities resulted in contact with any other law enforcement agency or that may result in criminal prosecution.

   **ANSWER: Scatchell admits that Petitioner accurately paraphrases MPPD's Policy Manual Rule 340.5.9(a). To the extent the allegations of this Paragraph seek to paraphrase or characterize the MPPD Policy Manual, the document speaks for itself, and Scatchell denies the allegations to the extent that they are inconsistent with that document.**

36. Ofc. Scatchell violated MPPD's rule by failing to report his contact with the Illinois Conservation Police on November 20, 2017.

   **ANSWER: Officer Scatchell denies the conclusory allegations contained in this Paragraph.**

## COUNT III - False Report to MPPD

37. Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-37 above as though fully set forth herein.

   **ANSWER: Respondent re-alleges and incorporates his answers to the allegations of paragraphs 1-36 as his answer to Paragraph 37 as though fully set forth herein.**

38. MPPD's Policy Manual Rules 340.5.8(a), (c) and (D) prohibit officers from failing to disclose or misrepresenting material facts during the course of any work-related investigation.

   **ANSWER: To the extent the allegations of Paragraph 38 seek to paraphrase or characterize the MPPD Policy Manual, the document speaks for itself, and Scatchell denies the allegations to the extent that they are inconsistent with that document.**

39. Ofc. Scatchell violated MPPD's rules through his false statements to MPPD during its investigation of his conduct, including the following: a) he took an extensive period of time off of hunting after noticing pain in his back in late October or early November 2017; b) he never carried two shotguns during the period of October to December 2017; c) his statement that he did not see Mr. Scavo possessing a firearm or shooting on November 20, 2017; d) that his shotguns did not have a recoil that could have affected his alleged neck or back injury; he falsely reported the findings of the Conservation Officer on November 20, 2017; and he falsely reported the dates he was working a side-job (when he claims that he noticed a re-injury).

   **ANSWER: Officer Scatchell denies the allegations contained in this Paragraph in their entirety.**

11

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2186

## COUNT IV - PROVIDING FALSE INFORMATION TO ANOTHER LAW ENFORCEMENT AGENCY

**40.** Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-40 above as though fully set forth herein.

**ANSWER: Respondent re-alleges and incorporates his answers to the allegations of paragraphs 1-39 as his answer to Paragraph 40 as though fully set forth herein.**

**41.** MPPD's Policy Manual Rule 340.5.8(i) prohibits officers from engaging in any act, on- or off-duty, that brings discredit to MPPD.

**ANSWER: To the extent the allegations of this Paragraph seek to paraphrase or characterize the MPPD Policy Manual, the document speaks for itself, and Scatchell denies the allegations to the extent that they are inconsistent with that document.**

**42.** Pursuant to MPPD's Policy Manual Section 340.2 and 340.4, officers must follow MPPD guidelines both on and off duty.

**ANSWER: To the extent the allegations of this Paragraph seek to paraphrase or characterize the MPPD SOPS §§ 340.2 and 340.4, the documents speak for themselves, and Scatchell denies the allegations to the extent that they are inconsistent with that document.**

**43.** Rule 200.3.3 of MPPD's Policy Manual requires officers to "respond to and make a good faith and reasonable effort to comply with the lawful order of superior officers and other proper authority" and Section 340.3 provides that officers "shall comply with lawful directives and orders from any department supervisor or person in a position of authority, absent a reasonable and bona fide justification."

**ANSWER: To the extent the allegations of this Paragraph seek to paraphrase or characterize the MPPD SOPS §§ 200.3.3 and 340.3, the documents speak for themselves, and Scatchell denies the allegations to the extent that they are inconsistent with that document.**

**44.** Ofc. Scatchell violated MPPD rules by not cooperating with and providing knowingly false information to a Conservation Police Officer on November 20, 2017.

**ANSWER: Officer Scatchell denies the allegations contained in this Paragraph in their entirety.**

### COUNT V - Violating MPPD Rules in Communications with Conservation Police

**45.** Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-45 above as though fully set forth herein.

12

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2187

ANSWER: Respondent re-alleges and incorporates his answers to the allegations of paragraphs 1-44 as his answer to Paragraph 45 as though fully set forth herein.

46. MPPD's Policy Manual prohibits officers from "using or disclosing one's status as a member of the Melrose Park Police Department in any way that could reasonably be perceived as an attempt to gain influence or authority for non-department business or activity."

ANSWER: To the extent the allegations of this Paragraph seek to paraphrase or characterize the MPPD Policy Manual, the document speaks for itself, and Scatchell denies the allegations to the extent that they are inconsistent with that document.

47. Ofc. Scatchell violated MPPD rules by showing his badge and identifying himself as a Melrose Park Police Officer to the Conservation Police Officer on November 20, 2017, and stating, "We are all in law enforcement here, we all know what's going on."

ANSWER: Deny in part as the recitation is incomplete. This does not correctly set out the general tenor of Scatchell's conversation regarding the DNR.[13] To the extent the allegations of this Paragraph seek to paraphrase or characterize the Interrogation transcript, the document speaks for itself and Scatchell denies the allegations to the extent that they are inconsistent with that document.

### COUNT VI - Disobeying Lawful Order Regarding Medical Records

48. Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-48 above as though fully set forth herein.

ANSWER: Respondent repeats and re-alleges the allegations contained in paragraphs 1-47 as his answer to Paragraph 48 as though fully set forth herein.

49. Ofc. Scatchell disobeyed a lawful order from his supervisors by refusing to sign the medical release as instructed, and instead signing a modified version that did not adequately address all of the records that are relevant to his medical condition.

ANSWER: Respondent incorporates his affirmative defense (number 1), infra. Respondent is under no obligation to incriminate himself. Respondent has a right to privileged communications with his physician. Respondent has both fundamental privacy and HIPAA (Health Insurance Portability and Accountability Act of 1996) rights not to disclose his medical records to MPPD. Scatchell denies all remaining allegations of this paragraph.

50. Upon information and belief, Ofc. Scatchell has also disobeyed a lawful order by interfering with the production of his medical records.

---

[13] See prior Exhibit

13

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**ANSWER: Respondent denies that disobeyed a lawful order that he interfered with the production of his medical records. Respondent further denies that the order was lawful.**

## COUNT VII - DISOBEYING LAWFUL ORDER RE: TIME OFF TO TRAVEL DURING MEDICAL LEAVE

51. Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1 -51 above as though fully set forth herein.

**ANSWER: Respondent re-alleges and incorporates his answers to the allegations of paragraphs 1-50 as his answer to Paragraph 51 as though fully set forth herein.**

52. Ofc. Scatchell disobeyed a lawful order by traveling to Washington from December 17-22, 2017.

**ANSWER: Respondent denies the conclusory allegations contained in this Paragraph.**

53. Upon information and belief, Ofc. Scatchell disobeyed a lawful order by traveling to Harlingen, Texas from December 26-30, 2017.

**ANSWER: Respondent denies the conclusory allegations contained in this Paragraph.**

### COUNT VIII - Conduct Unbecoming

54. Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-54 above as though fully set forth herein.

**ANSWER: Respondent repeats and re-alleges the allegations contained in paragraphs 1-53 as his answer to Paragraph 54 as though fully set forth herein.**

55. MPPD's Policy Manual Rule
prohibits conduct unbecoming an officer, on- or off-duty when the conduct is "contrary to good order, efficiency or morale, or tends to reflect unfavorably upon this department or its members."

**ANSWER: To the extent the allegations of this Paragraph seek to paraphrase or characterize the MPPD Policy Manual, the document speaks for itself, and Scatchell denies the allegations to the extent that they are inconsistent with that document.**

56. Ofc. Scatchell's activities constitute conduct unbecoming an officer, in violation of MPPD's rules.

**ANSWER: Deny.**

### COUNT IX - Violating State Law

14

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2189

57. Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-57 above as though fully set forth herein.

**ANSWER: Respondent re-alleges and incorporates his answers to the allegations of paragraphs 1-56 as his answer to Paragraph 57 as though fully set forth herein.**

58. MPPD's Policy Manual Section 340.5.1 requires officers to comply with federal, state, local or administrative laws, rules or regulations.

**ANSWER: To the extent the allegations of this Paragraph seek to paraphrase or characterize the MPPD Policy Manual, the document speaks for itself, and Scatchell denies the allegations to the extent that they are inconsistent with that document.**

59. In assisting Mr. Scavo in possessing and firing a shotgun, Ofc. Scatchell violated state law, rules or regulations, and in violating state law, Ofc. Scatchell violated MPPD rules.

**ANSWER: Scatchell denies these allegations in their entirety.**

### COUNT X - Association with a Known Felon

60. Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-60 above as though fully set forth herein.

**ANSWER: Respondent re-alleges and incorporates his answers to the allegations of paragraphs 1-59 as his answer to Paragraph 60 as though fully set forth herein.**

61. MPPD's Policy Manual Rule 340.5.4 prohibits officers from "Associating on a personal, rather than official basis with persons who demonstrate recurring involvement in serious violations of state or federal laws after the member knows, or reasonably should know of such criminal activities, except as specifically directed and authorized by this department" and section 1050.2(e) provides "Except as required in the performance of official duties or, in the case of immediate relatives, employees shall not develop or maintain personal or financial relationships with any individual they know or reasonably should know ... is a convicted felon ... or who engages in serious violations of state or federal laws."

**ANSWER: To the extent the allegations of this Paragraph seek to paraphrase or characterize the MPPD Policy Manual, the document speaks for itself, and Scatchell denies the allegations to the extent that they are inconsistent with that document.**

62. Ofc. Scatchell's association with Mr. Scavo constitutes a violation of MPPD's rules.

**ANSWER: The allegation in this Paragraph consists of a legal conclusion to which no response is required. To the extent that a response is deemed required, Respondent has insufficient information to admit or deny the allegations contained in this Paragraph and, therefore, neither admits nor denies the same but demands strict proof thereof.**

15

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## COUNT XI - Secondary Employment Without Authorization

63.   Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-63 above as though fully set forth herein.

**ANSWER: Respondent re-alleges and incorporates his answers to the allegations of paragraphs 1-62 as his answer to Paragraph 63 as though fully set forth herein.**

64.   MPPD's Policy Manual Section 1040.2 requires officers to obtain "prior written approval of the Chief of Police" before engaging in outside employment and Section 1040.5 requires further that officers on disability leave or modified/light duty must seek permission for outside employment.

**ANSWER: To the extent the allegations of this Paragraph seek to paraphrase or characterize the MPPD Policy Manual, the document speaks for itself, and Scatchell denies the allegations to the extent that they are inconsistent with that document.**

65.   By failing to seek authorization to accept employment as a Guide with I Decoy M Guide Service, Ofc. Scatchell violated MPPD rules.

**ANSWER: Scatchell denies this allegation in its entirety. This allegation misstates that Scatchell was an employee, which he was not. Therefore, Scatchell denies he would have to seek any authorization. Scatchell further denies that Petitioner is entitled to relief on this purported secondary employment SOP violation or on any other claim in the Statement of Charges.**

## COUNT XII - Conduct Unbecoming and Violation of Law

66.   Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-66 above as though fully set forth herein.

**ANSWER: Respondent re-alleges and incorporates his answers to the allegations of paragraphs 1-65 as his answer to Paragraph 66 as though fully set forth herein.**

67.   On or about November 13, 2017, Deputy Chief Castellan received an anonymous report that Ofc. Scatchell "is calling in sick when, in fact, he is not" and that instead, "He is out HUNTING every morning." As a result, MPPD initiated surveillance of Ofc. Scatchell to attempt to determine if there was any validity to the anonymous report. The surveillance was conducted by an experienced police officer and was conducted frequently over the course of the next month.

**ANSWER: Deny. Anyone filing a complaint against a State Police Officer must have the complaint supported by a sworn affidavit." In accordance with the aforementioned law,**

16

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2191

all complaints must contain a complainant signature and notary signature before the MPPD could lawfully investigate the alleged misconduct.[14] To the extent that a response is required, Scatchell has insufficient information to admit or deny the allegations contained in this Paragraph and, therefore, neither admits nor denies the same but demands strict proof thereof.

**Insufficient Knowledge:** As to a complaint\report. As to initiation of surveillance on Respondent, the experience of a person who conducted surveillance; and the frequency of surveillance.

68. During the course of the surveillance, Ofc. Scatchell's vehicle was frequently observed travelling at incredibly high rates of speed, sometimes exceeding 100 mph and frequently ignoring stop signs, including within Melrose Park Village limits.

**ANSWER: Deny. This allegation is overly broad in that it does not specify where and when and how fast Respondent was driving. This allegation is further denied on the basis that the allegation does not even allege Respondent was the driver of his vehicle at the time in question. Without more information as to dates, times, locations, rates of speed, and other relevant evidence, Scatchell has insufficient information to admit or deny the allegations contained in this Paragraph and, therefore, neither admits nor denies the same but demands strict proof thereof. Respondent further invokes his Fifth Amendment right to remain silent and not incriminate himself.**

69. By either driving in the foregoing manner, or allowing another to drive in that manner while he was a passenger, and by identifying himself as an MPPD officer to avoid State Police action, Ofc. Scatchell has violated MPPD Rules.

**ANSWER: Deny.**

**PRAYER FOR RELIEF BY PETITIONER:** Director Pitassi and Deputy Chief Castellan respectfully request that a hearing be held before the Board of Fire and Police Commissioners of the Village of Melrose Park and that the Board terminate the employment of Officer John Scatchell as a police officer of the Village of Melrose Park. This request is made pursuant to the Board's Rules and Regulations requires further that officers on disability leave or modified/light duty must seek permission for outside employment.

**ANSWER: Scatchell denies each and every allegation set forth in the prayer for relief. Scatchell denies any allegations as to damage and the amount thereof.**

---

[14] Illinois State Police Act, 20 ILCS 2610/14

17

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

66. By failing to seek authorization to accept employment as a Guide with I Decoy M Guide Service, Ofc. Scatchell violated MPPD rules.[15]

ANSWER: Deny.

<div align="center">

**COUNT XII - Conduct Unbecoming and Violation of Law[16]**

</div>

67. Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1 - 66 above as though fully set forth herein.

ANSWER: **Respondent re-alleges and incorporates his answers to the allegations of paragraphs 1-66 as his answer to Paragraph 67 as though fully set forth herein.**

68. On or about November 13, 2017, Deputy Chief Castellan received an anonymous report that Ofc. Scatchell "is calling in sick when, in fact, he is not" and that instead, "He is out HUNTING every morning." As a result, MPPD initiated surveillance of Ofc. Scatchell to attempt to determine if there was any validity to the anonymous report. The surveillance was conducted by an experienced police officer and was conducted frequently over the course of the next month.

ANSWER: Deny.

69. During the course of the surveillance, Ofc. Scatchell's vehicle was frequently observed travelling at excessively high rates of speed and frequently ignoring traffic signs and signals, including within Melrose Park Village limits.

ANSWER: Deny.

70. By either driving in the foregoing manner, or allowing another to drive in that manner while he was a passenger, Ofc. Scatchell has violated MPPD Rules.

ANSWER: Deny.

Respondent generally denies the allegations of Petitioner's complaint and demands strict proof thereof.

Respectfully submitted,

---

[15] Petitioner incorrectly numbered the final Count of Petitioner's Complaint, entitled "Conduct Unbecoming and Violation of Law," as COUNT XII. The subject Count should have been sequentially numbered as Count XIII and therefore Respondent has referred to it as XII for the purposes of his Answer to Complaint.

[16] Petitioner incorrectly numbered ¶¶ 66-70. The subject Paragraphs should have been sequentially numbered as 67-71 and therefore Respondent has referred to these Paragraphs as ¶¶ 66-70 for the purposes of his Answer to Complaint.

18

<div align="center">

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

</div>

VMP/JJS 2193

Respondent, Officer John Scatchell
By his attorneys Christopher Cooper and Gianna Scatchell
/s Gianna Scatchell

**JURY DEMAND**

Respondent, Officer Scatchell hereby demands a jury trial for all issues so triable.

## AFFIRMATIVE DEFENSES

71. Respondent, John Scatchell, refers to and incorporates by reference the preceding paragraphs of their Petition as if fully rewritten herein.

72. Respondent asserts the following affirmative and other defenses without assuming any burden of production or proof that, pursuant to law, belong to Petitioner. Respondent reserves the right to amend his answer and to assert any additional defenses and affirmative defenses as may become available or apparent during the course of this proceeding.

### 1st Affirmative Defense—Violation of Officer Scatchell's 5th Amendment Right to be Free from Incriminating Himself.

73. Respondent, John Scatchell, refers to and incorporates by reference the preceding paragraphs of their Petition as if fully rewritten herein.

74. Respondent makes no admission of a refusal to sign a medical release. He denies the allegation. Respondent asserts that even in the above captioned proceedings (quasi-judicial in nature), he has a right to invoke his 5th Amendment right to remain silent. Client's medical records are in part or in whole, testimonial. In order to be "testimonial," an accused's oral or written communication, or act, must itself, explicitly or implicitly, relate a factual assertion or disclose information. (Cf. *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39; *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552).

75. Based on Petitioner's erroneous allegations of fraud, Respondent "reasonably believes" the disclosure of medical records "could be used in a criminal prosecution or could lead to other evidence that might be so used." Respondent has both a fundamental and HIPAA (Health Insurance Portability and Accountability Act of 1996) right not to disclose his medical records to MPPD.

WHEREFORE, Respondent, John Scatchell requests that Complaint\Statement of Charges\Notice of Discipline be dismissed with prejudice.

### 2nd Affirmative Defense: MPPD Deviated from the CBA & Violated Scatchell's Rights

19

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2194

76. Respondent, John Scatchell, refers to and incorporates by reference the preceding paragraphs of their Petition as if fully rewritten herein.

77. That § 3.5 of the 2014 – 2017 Collective Bargaining Agreement for Lodge 19 outlines the process for reviewing sick claims and states in relevant part:

> A Review Board composed of the (1) representation from the Police Department, who shall be designated by the Lodge, one (1) representation of the Village who shall be designated by the Village, and one (1) citizen representation, who shall be chosen jointly by the other two members of the Review Board shall oversee the application of the sick leave policy specified in the foregoing subsection, provided that the Review Board shall not inquire into any particular case until the officer has been on sick leave for at least one (1) month (emphasis added).

78. Officer Scatchell first went on sick leave on or about November 9, 2017.

79. That on or about November 14, 2017, and on information and belief, MPPD begin surveilling Respondent.

80. That on or about November 14, 2017, Respondent had only been on sick leave for four (4) days.

81. That on or about November 14, 2017, Respondent had a regular day off.

82. That on or about December 7, 2017, Officer Scatchell was on his earned vacation.

83. That on December 8, 2017, Officer Scatchell received MPPD's Notice of an Investigation pending against him.

84. That on December 8, 2017, Respondent was on sick leave for approximately 29 days.

85. That MPPD began investigating Officer Scatchell before he had been on sick leave "for at least one (1) month" in violating od the CBA by actively investigating Officer Scatchell.

WHEREFORE, Respondent, John Scatchell requests that Complaint\Statement of Charges\Notice of Discipline be dismissed with prejudice.

### 3rd Affirmative Defense: The Board is Illegally Constituted

86. Respondent, John Scatchell, refers to and incorporates by reference the preceding paragraphs of their Petition as if fully rewritten herein.

87. The Board is illegal and illegally constituted. "Where an administrative body acts outside of its specific statutory authority, it acts without jurisdiction, and its actions are void and a nullity from their inception." *Siddens v. Indust Comm'n*, 711 N.E.2d 18, 22 (1999); *Daniels v. Indus.*

20

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMP/JJS 2195

*Comm,* 711 N.E.2d 936, 940 (2002); and, *Taylor v. Dart,* 64 N.E.3d 123, 126-27 (2016). The Board lacks jurisdiction of Officer Scatchell and the above captioned matter.

WHEREFORE, Respondent, John Scatchell requests that Complaint\Statement of Charges\Notice of Discipline be dismissed with prejudice.

### 4th Affirmative Defense: Petitioner's Statement of Charges Fails to State a Claim upon which Relief may be Granted.

88. Respondent, John Scatchell, refers to and incorporates by reference the preceding paragraphs of their Petition as if fully rewritten herein.

89. Petitioner's Statement of Charges fails to state a claim upon which relief may be granted because it does not contain enough facts to state a claim to relief that is plausible on its face. Instead, Petitioner's make numerous allegations based on speculation, what the Director or Deputy Chief "believe" which falls below the threshold of stating a claim.

WHEREFORE, Respondent, John Scatchell requests that Complaint\Statement of Charges\Notice of Discipline be dismissed with prejudice.

### 5th Affirmative Defense—Unclean Hands

90. Respondent, John Scatchell, refers to and incorporates by reference the preceding paragraphs of their Petition as if fully rewritten herein.

91. The Petitioner's complaint is barred in whole or in part by Petitioner's inequitable conduct which constitutes unclean hands. *Zahl v. Krupa,* 365 Ill. App. 3d 653, 658 (2006)

92. The circumstantial evidence presented fell short of proving wrongdoing on Officer Scatchell's part. In particular, the evidence did not establish that Scatchell acted illegally, immorally, or contrary to the established procedure of the MPPD. The whole area of how to properly deal with sick leave is problematic and the past practices show that the MPPD gave its officers considerable leeway in that area.

93. Further, Petitioner has not given evidence that Scatchell's testimony was unrebutted, and it is clear that superiors of Scatchell were aware of his conduct and did nothing about it from March 24, 1987 until November 12, 1987.

94. We further note that Scatchell had an unblemished record serving as a police officer for over 5 years without any incidents of discipline.

WHEREFORE, Respondent, John Scatchell requests that Complaint\Statement of Charges\Notice of Discipline be dismissed with prejudice.

### 6th Affirmative Defense: MPPD Violated Scatchell's Rights under the Family Medical Leave Act

21

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2196

95. Respondent, John Scatchell, refers to and incorporates by reference the preceding paragraphs of their Petition as if fully rewritten herein.

96. Eligible employees seeking to use FMLA leave may be required to provide: (a) 30-day advance notice of the need to take FMLA leave when the need is foreseeable; (b) notice "as soon as practicable" when the need to take FMLA leave is not foreseeable; (c) sufficient information for the employer to understand that the employee needs leave for FMLA-qualifying reasons; and (d) where the employer was not made aware that an employee was absent for FMLA reasons and the employee wants the leave counted as FMLA leave, timely notice (usually within 2 business days of returning to work) that leave was taken for a FMLA-qualifying reason.

97. Petitioner failed to provide proper notice as required by the FMLA. See 29 C.F.R. § 825.304.

98. Petitioner failed to provide paperwork as required by the FMLA when Officer Scatchell returned to work.

99. If Petitioner doubted the veracity of Scatchell's injury, it could have requested a medical certification under the FMLA provide proper notice as required by the FMLA.

100.    Petitioner never requested Scatchell to fill out an FMLA medical certification.

WHEREFORE, Respondent, John Scatchell requests that Complaint\Statement of Charges\Notice of Discipline be dismissed with prejudice.

### 7th Affirmative Defense: Statement of Charges is Barred

101.    Respondent, John Scatchell, refers to and incorporates by reference the preceding paragraphs of their Petition as if fully rewritten herein.

102.    The Petitioner's complaint is barred whole because the Petitioner engaged in acts and courses of conduct which rendered it in pari delicto.

WHEREFORE, Respondent, John Scatchell requests that Complaint\Statement of Charges\Notice of Discipline be dismissed with prejudice.

### 8th Affirmative Defense: Waiver and Laches

103.    Respondent, John Scatchell, refers to and incorporates by reference the preceding paragraphs of their Petition as if fully rewritten herein.

104.    The Petitioner's complaint is barred in whole or in part by laches.

105.    A defense of waiver is defined as "an intentional relinquishment of a known right."

22

## CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**106.** Scatchell never was disciplined in the five years he has been a police officer.

**107.** Petitioner's disapproval of Scatchell's alleged misconduct did not occur until nearly five (5) years after he began working for the police department. There is no indication in the record that Scatchell was ever informed by his superiors that his conduct was inappropriate— where superiors knew about the conduct for over five years prior to filing a statement of charges; it seems that they acquiesced in and approved of his activities at that time.

**108.** Those responsible for Scatchell's police work acquiesced in and approved of his relationship with Scavo.

WHEREFORE, Respondent, John Scatchell requests that Complaint\Statement of Charges\Notice of Discipline be dismissed with prejudice.

s\Gianna Scatchell
FRATERNAL ORDER OF POLICE LEGAL DEFENSE PLAN COUNSEL
Law Offices of Gianna Scatchell
360 West Hubbard Street, 1404 Chicago, Illinois 60654
T 312-248-3303 | F 312-801-4438   gia@lawfirm.gs

s\Christopher Cooper, ESQ., Counsel for Respondent
FRATERNAL ORDER OF POLICE LEGAL DEFENSE PLAN COUNSEL
Law Office of Christopher Cooper, Inc.
79 W. Monroe Street, Suite 1213, Chicago, IL 60603 [or]
426 N. Broad St., Griffith, IN 46319
Tel: 312 473 2968 [or] 219 228 4396 | cooperlaw3234@gmail.com

**CERTIFICATE OF SERVICE:** The undersigned certifies that she caused the foregoing to be filed with the Board, through its hearing officer, on May 10, 2018, and that a copy was served by email, on opposing counsel. s\Gianna Scatchell

23

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMP/JJS 2198

# EXHIBIT 36

## AGREEMENT BETWEEN THE VILLAGE OF MELROSE PARK
## AND

## THE MICKINZIE-VERTUNO MEMORIAL FRATERNAL ORDER OF POLICE LODGE #19

## PREAMBLE

This agreement is entered into the Village of Melrose Park, an Illinois Municipal Corporation ("Employer"), and the Mickinzie –Vertuno Memorial Fraternal Order of Police Lodge No. 19 ("Lodge").

## ARTICLE 1 - RECOGNITION AND LODGE SECURITY

### Section 1.1 – Recognition & Bargaining Unit

The Employer recognizes the Lodge as the sole and exclusive collective bargaining representative for all sworn police officers, except the Chief and the Deputy Chief, employed by the Employer in its Department of Police.

### Section 1.2 – Maintenance of Membership

Each officer who is a member of the Lodge on the effective date of this Agreement and each officer who becomes a member after that date shall, as a condition of employment, maintain his/her membership in good standing in the Lodge during the term of this Agreement. The regular and timely payment of dues (dues shall be for contract maintenance not for good standing) and other financial obligations uniformly required of Lodge members shall be sufficient to maintain membership in good standing under this section.

### Section 1.3 – Fair Share Deduction

With respect to any officer who is not a member of the Lodge on the effective date of this Agreement or on the Thirtieth (30th) day of the officer's employment, whichever is later, the Employer shall deduct from the wages of the officer and forward to the Lodge a fair share of the cost of negotiating and administering this Agreement and its successors. The Lodge shall inform the Employer of the amount of the fair share deduction, which shall be uniform for all officers who are not Lodge members, and shall not exceed the amount of dues uniformly required of Lodge members.

## ARTICLE 2 – EMPLOYEE SECURITY

### Section 2.1 – Just Cause Standard

No officer covered by this Agreement shall be discharged, suspended, relieved from duty, or disciplined in any manner without just cause.

### Section 2.2 – Performance Evaluations

Before any supervisor shall submit any individual performance review, he or she shall meet with the officer reviewed and afford an opportunity to inspect the review. The reviewed

1

officer shall have the further opportunity of indicating his or her written review and placing his or her signature near such box.

### Section 2.3 – Probationary Officers

Each officer employed with the Melrose Park Police Department will be on probation for a period of twelve (12) months.

Each officer must establish and thereafter at all times maintain residency three (3) months after completion of their probationary period totaling 15 months.

If an officer terminates he/her employment with the Melrose Park Police Department in order to obtain employment with another police department before that officer reached twenty-four (24) months of employment with the Melrose Park the full cost of the Police Academy incurred by the Village of Melrose Park.

## ARTICLE 3 – SENIORITY

### Section 3.1 – Definition

Each officer's seniority shall be defined as his or her continuous length of active service as a full time police officer in the Village. "Active service" refers to time actually worked by the officer. Time that is not considered to be "active service" for purposes of seniority calculation includes, but is not limited to, time off work pursuant to Sections 5.2.1(c), (d) and (e) in this Agreement. In the event that more than one officer has an identical cumulative length of service, their seniority shall be determined by their respective lengths of continuous active service as a police officer in the Village or by the hiring eligibility list, whichever is greater (the Lodge and Employer will compile and update the list).

### Section 3.2 – Application

Seniority shall determine priority in choosing days off, bidding for voluntary overtime, holiday assignments, personal and vacation days off, and recall from layoff (Officers shall have the right to choose pay or time due especially on call backs or changing their RDO). In the event that non-disciplinary demotions or layoffs, becomes strictly necessary for economic reasons, officers with the least seniority shall be subject to such demotions or layoffs before officers with greater seniority.

## ARTICLE 4 – GRIEVANCE AND ARBITRATION

### Section 4.1 – Grievable Issues

Any dispute over meaning or application of the terms of this Agreement shall be grievable and shall be subject to binding arbitration as specified in this Article. There shall be no strikes while this Agreement is in effect. Grievable issues are only those issues relevant to the interpretation of this Collective Bargaining Agreement. General Village Employment Policies, Management Rights and S.O.P. are not grievable issues.

### Section 4.2 – Initiation and Processing of Grievances

Should any grievable issue arise which has not been resolved by informal means to the satisfaction of all affected parties such as one or more officers, the Lodge, or the Employer, the Lodge or any aggrieved may initiate a grievance by reducing the issue or complaint to writing and specifying the requested relief. At this request of an aggrieved officer who has initiated a

2

grievance, the Lodge shall provide grievance representation to be adjusted in a manner, which is inconsistent with this Agreement.

## Section 4.3 – First Step

The party initiating a grievance shall first attempt to resolve the issue or dispute with the aggrieved officer's immediate supervisor. If the aggrieved officer's immediate supervisor does not provide a response which is acceptable to the party initiating the grievance within five (5) days of the submission of the grievance to the Employer, the Grievance shall proceed to the second step. In the event that a grievance concerns more than one officer, the party initiating the grievance shall first attempt to resolve the issue or dispute with the lowest ranking officer in the Department with authority over all of the aggrieved officers.

## Section 4.4 – Second Step

In the event that a grievance is not resolved at the first step, it shall be presented to the Chief. If the Chief does not provide a response which is acceptable to the party initiating the grievance within ten (10) days of the presentation of the grievance to the Chief, the Lodge may request that the grievance proceed to binding arbitration.

## Section 4.5 – Arbitration

If the Lodge requests that a grievance be submitted to binding arbitration, the Lodge and the Employer shall attempt to agree upon an arbitrator of their choosing. If the Lodge and the Employer are unable to agree upon the selection of an arbitrator within seven (7) days of the request for binding arbitration, the parties shall request a list of five (5) qualified neutrals from the American Arbitration Association. The parties shall alternatively strike names from said list until only one person remains thereon. The party filing the grievance shall strike the first name. The person so remaining shall arbitrate the dispute according to procedures agreed upon by the Association and the Employer, and where none of the foregoing procedures apply according to the rules of the American Arbitration Association. The Arbitrator shall decide the dispute presented according to this or her interpretation of the meaning or application of the terms of this Agreement to the facts of the grievance presented; and he or she shall issue a written decision and award within forty-five (45) days of the close of the hearing unless the Lodge and the Employer agree to a difference date. The party who does not prevail shall pay the cost of the arbitration.

## Section 4.6 – Time Limits

The time limits set forth in this Article may be extended for reasonable periods only if an aggrieved Officer is unavailable to participate in the grievance process and such participation would materially assist in settlement. Unless mutually agreed upon, no time limit be extended to more than twice that designated by this Agreement.

## Section 4.7 – Interpretation of Agreement

In interpreting and applying this Agreement, the Association, the Employer, and the Arbitrator shall consider the terms of this Agreement in light of past practice of the parties over the duration of their collective bargaining relationship.

3

## Section 5.1 – Holidays and Vacations

Each officer shall receive an annual number of vacation days according to the following schedule:

| Length of Service completed: | Number of Vacation Days: |
| --- | --- |
| 2 years | 25 days |
| 5 years | 30 days |
| 10 years | 35 days |
| 15 years | 40 days |
| 20 years | 45 days |
| 25 years | 48 days |

It is agreed that nine (9) of the days specified in each line of the foregoing schedules(s) represent paid legal holidays. It is understood that probationary officers shall receive nine (9) paid holidays, one (1) day for each month of service and five (5) personal days in the prior fiscal year during the probationary period. (Example; Office A is hired on July 1, 1998 and his probationary year will end in 1999, that officer will be entitled to receive as a vacation pick in 1999, nine (9) holidays plus six (6) days, one for each month of service in the year 1998. It is agreed that each officer will receive these vacation days in the year the anniversary is reached, and will be allowed to pick such vacation, at the time the vacation schedule for that year is posted.)

Vacation days that are not used by the last day of the fiscal year in which they were earned will be forfeited and the officer will not be paid for the unused days.

In the event that the foregoing vacation schedule causes the Village to incur overtime pay due to a shift manpower shortage, the post1993 employees' vacation schedule section of this Agreement shall be renegotiated. Pre-1993 employees will remain on the above vacation schedule.

## Section 5.2 – Personal Days

In addition to the holiday and vacation days specified in the foregoing sections of this Article, each officer shall receive an annual number of personal days off per annum to be taken when the officer chooses provided that the officer submits a prior written request for each personal taken according to the following schedule:

| Length of completed service: | Personal Days: |
| --- | --- |
| Probationary year | 5 days |
| 1 year | 6 days |
| 2 years | 7 days |
| 3 years | 8 days |
| 4 years | 9 days |
| Thereafter | 10 days |

In addition to all of the foregoing days off, each officer shall receive his/her birthday off as an additional day off.

4

### Section 5.3 – Sick Leave

(a)     Sick Leave Accumulation - On January 1st of each year of this Agreement, each officer shall be credited six (6) sick days. Sick days can be taken only to the extent that they are accrued. Sick days will not accrue while an employee is on leave pursuant to the Family and Medical Leave Act ("FMLA"), the Public Employee Disability Act ("PEDA"), Military Leave, Extended Leave, or Long-Term Leave, but will resume upon the officer's return to work on a regular basis. Accrued sick days may be carried over into subsequent year. No more than thirty (30) sick days may be accumulated at any time. Unused sick days will be forfeited, and the bargaining member shall not receive any compensation in any form for forfeited sick days. If at retirement an officer has accumulated thirty (30) sick days, the officer shall be awarded fifteen (15) additional days for a total of forty-five days.

(b)     Public Employee Disability Act –A Officer who is placed on sick leave as a result of an injury or illness contracted in the line of duty shall be entitled to full pay for one (1) year pursuant to the terms of the Public Employee Disability Act ("PEDA"), 5 ILCS 345/1 et seq.

(c)     Extended Leave – An officer who is placed on sick leave as a result of a injury or illness **not** contracted in the line of duty, except that resulting from an injury or illness incurred in the course of employment outside of the Officer's employment with the Village, may be entitled to leave with full pay for a maximum of **ninety (90) days (three calendar months)** ("Extended Leave"), subject to approval by the Chief of Police, but only after the officer has exhausted all accumulated sick leave, subject to approval by the Chief of Police, but only after the officer has exhausted all accumulated sick leave. After an officer has been on Extended Leave for **ninety (90) days (three calendar months)**, the Village may offer him a light duty work assignment, if available.

(d)     Long-Term Leave  – In the event that a Officer exhausts his **three-month** leave pursuant to Subsection 5.3(c) above, the Officer may apply for long-term leave, not to exceed six (6) calendar months ("Long-Term Leave"). A Review Board composed of (1) representative from the Police Department, who shall be designated by the Lodge, one (1) representative of the Village who shall be designated by the Village, and one (1) representative of the Fire Department, who shall be designate by the Fire Department ('Review Board"), shall have jurisdiction over applications for Long-Term Leave and shall render a decision whether to grant or deny the application pursuant to any policies and/or procedures adopted by the Review Board with respect to Long-Term Leave applications, provided that the Review Board shall not inquire into any particular case until the officer has been on sick leave for at least **three (3) calendar months.**

(e)     Sick Leave Department Order - The use and accumulation of sick days shall be exclusively determined by the Chief of Police in the form of a written Order applicable to all officers governed by this Contract. The Order shall remain in effect until revoked, modified or amended by a subsequent written order of the Chief of Police. Sick days are accumulated at six (6) days per year. Thirty (30) days is the maximum sick days an officer may accumulate

5

Personal days that are not used by the last day of the fiscal year in which they were earned will be forfeited and the officer will not be paid for the unused days

## ARTICLE 6 – HOURS AND OVERTIME

### Section 6.1 – Work Day and Work Period

The normal workday shall consist of eight (8) hours, or if assigned to a 5/2-5/3 work schedule, eight and one half (8.5) hours. The work period shall consist of twenty-eight (28) days. All time worked in excess of the hours worked in the normal workday or the normal work period shall be considered overtime.

All time, outside of an officer's regularly assigned schedule, during which an officer is required to appear in court in connection with his or her duties as a police officer shall be considered court time.

Any officer entitled to overtime or court time shall have the choice, at the officer's discretion, to receive pay or compensatory time.

### Section 6.2 – Special Compensation

All court time and overtime shall be compensated at the rate of one and one half (11/2) times the rate of pay specified in Article 7 of this Agreement. A minimum of two hours shall be credited as court time for each occasion on which an officer is required to appear in court outside of his or her regularly assigned schedule.

### Section 6.3 – Compensatory Time

Court time and overtime may, at each officer's discretion, be taken as compensatory time off at the rate of one and one-half (1 ½) hours for each hour of court time or overtime worked. At no time shall an officer accumulate more than 480 hours of compensatory time. Beginning January 1988, an officer's shift commander shall assign the officer up to one day of compensatory time within a twenty-eight (28) work period in which the officer would otherwise be schedule to work for more than 171 hours. Effective January 1, 1988, the Employer shall return to the prior scheduling practice under which officers change their shifts on Thursdays.

### Section 6.4 – Patrol Division Hours Work Schedule

(a)     Effective January 7, 2018, the normal workday for officers assigned to the Patrol Division will consist of an eight and one-half (8.5) consecutive shift.

(b)     While the eight and one-half (8.5) hour day is in effect the work schedule rotation for each officer assigned to the Patrol Division will be five (5) working days on, followed by two (2) days off, then five (5) working days on, followed by three (3) days off.

(c)     Normal shift hours – The normal shift hours will be as follows:

    Midnight shift: 12:00 a.m. until 8:30 a.m.
    Day shift: 8:00 a.m. until 4:30 p.m.
    Afternoon shift: 4:00 p.m. until 12:30 a.m.

6

(d)    Hourly rate – The parties recognize that with the 8.5 hour, 5/2-5/3 work schedule, employees on average will work less than 2080 hours per year. The parties agree that while the schedule is in effect, employees will not be required to payback hours to reach 2080 annual hours.

## Section 6.5 – Shift Scheduling

Patrol Officers shall be assigned their shifts through bidding by seniority on a yearly basis by November 30th of each calendar year. Officers shall be required to submit to the chief of police or his designee their list of shift preferences by listing a First Choice, Second Choice, and Third Choice.    If an officer fails to submit such preference list by the deadline, the officer's shift preferences shall be designated by the Chief of Police or his designee. The top nine selections of patrol officers on each shift and the supervisors (Lieutenant/Sergeant) shall be determined by seniority as defined in article 3 of this Agreement.  The assignment of the remaining officers to each shift shall be made by the Chief of Police or his designee, without regard to seniority. For such other shift assignments, the Chief of Police or his designee shall consider those officers' preferences and seniority, but such preferences and seniority shall not be controlling.  However, no officer shall be assigned to the same shift for more than two (2) consecutive years, if such shift was the officer's "Third Choice" in each of the two (2) prior consecutive years.

Patrol Officers shall be assigned their shifts through bidding by seniority on a yearly basis.  The seniority list used to determine the shifts will be compiled by the Lodge and employer as seniority is defined in Article 3 of this Agreement.

## ARTICLE 7 – WAGES, COMPENSATION AND BENEFITS

### Section 7.1 – Patrolmen

(a)    Effective January 1, 2018, the basic salary schedule for officers covered by this Agreement shall be reflected in Appendix A, a copy of which is appended hereto and made apart hereof.   The basic salary schedule shall be increased and officers covered by this Agreement whose salaries increased as follows: effective January 1, 2018, three (3%) percent; January 1, 2019, two (2%) percent; January 1, 2020, two (2%) percent and January 1, 2021, three (3%).

(b)    New Hires – During the term of this Agreement, the starting pay of new hires shall be forty-four thousand dollars ($44,000.00) in 2018, forty-five thousand dollars ($45,000.00) in 2019, forty-six thousand dollars ($46,000.00) in 2020 and forty-seven thousand dollars ($47,000.00) in 2021.

### Section 7.2 – Senior Ranks

It is agreed that the per annum schedule for officers above the rank of patrolman (Sergeant and Lieutenant) shall be as reflected in Appendix A attached hereto and made a part hereof, which shall also reflect a salary increase as follows: effective January 1, 2018, three (3%) percent; January 1, 2019, two (2%) percent; January 1, 2020, two (2%) percent and January 1, 2021, three (3%) percent.

**Section 7.3 – Detectives/Tactical Unit**

During the stated term of this Agreement, any officer assigned or working as a detective/tactical unit shall receive a stipend of two thousand dollars ($2,000.00) per annum in addition to the salary due according to the rank and length of service as set forth elsewhere in this Article. The stipend shall be paid separately and not added to the officer's base wages.

**Section 7.4 – Insurance**

(a) Coverage for active officers hired prior to 2003 – The Employer shall provide and, as except as stated herein, pay the full cost of full major medical, hospitalization dental and optical insurance. The Employer shall negotiate with the Lodge over any changes in the insurance plans covering the police officers or in the insurance carriers providing such coverage. No changes in the existing insurance plans shall diminish the coverage provided on the effective date of this agreement, unless upon expiration of no less than two (2) years of this Agreement, the Employer demonstrates that it is financially unable to maintain insurance benefits at their current levels, or the cost of insurance exceeds by 10% or more over the prior year provided, however, that any decrease of insurance costs in prior years shall be credited by 10% of the decrease to offset the following year's increase.

  i. All emergency room visits, which do not result in admission, shall require a co-pay of $100.00 for each visit, said co-pay to be charged against the deductible.

  ii. The applicable deductibles shall not exceed $250.00 per person or $500.00 per family.

  iii. Prescription/drug costs shall be provided per the insurance.

(b) Coverage for active officers hired after 2003: Officers including probationary officers hired after the effective date of this Agreement shall receive HMO insurance at the Employer's expense. A three percent (3%) of annual wages insurance contribution fee will be taken from all officers.

(c) Continuing Coverage – If an active officer dies from any cause, his or her spouse and dependents, if any, shall remain covered under the insurance plans specified in subsection (a) of this section pursuant to the terms of, and to the extent required by, the Illinois Public Safety Employee Benefits Act ("PSEBA"), 820 ILCS 320/1 *et seq.*, unless and until the spouse remarries or receives insurance benefits as a result of other employment. If the spouse's new insurance benefits do not cover the officer's dependents, the dependents shall remain covered by the insurance plans specified in the subsection (a) of this section to the extent required by PSEBA.

(d) Retiree Insurance: Officers who retire with twenty (20) years or more of service who are under the age of sixty-five (65) shall receive the same insurance benefits as active officers hired after 2003 as specified in Section 7.4(c) above, and shall, for each year enrolled in the Village's health insurance under this Section 7.4(d), contribute three percent (3%) of their annual wages as an insurance contribution

8

fee. The retired officer's "annual wages" for purposes of this Section 7.4(d) shall be calculated using their annual wage as of their date of retirement or the pension amount if the retiree is a pensioner. The retired officer must tender the three percent (3%) contribution to the Village on the date specified by the Village. If a timely payment(s) is not received by the Village, the retired officer may be dropped from the Village's insurance.

If a retired officer dies and his or her spouse is eligible, pursuant to the terms of the plan, to remain on the Village's insurance, then the spouse shall receive the same insurance benefits as active officers hired after 2003 as specified in Section 7.4(c) above. The spouse must tender to the Village, on the date specified above, the three percent (3%) retiree contribution calculated as set forth in this Section 7.4(d) (3% of the deceased retired officer's annual wages at the time of retirement). Failure by the spouse to make a timely payment(s) may result in the spouse being dropped from the Village's insurance.

During any period(s) when the retiree or spouse of a deceased retiree receives insurance benefits as a result of other employment, the retiree or spouse of a deceased retiree shall not be eligible to participate in the Village's insurance plan.

Once the retired officer, the retired officer's spouse, and/or the spouse of a decease retiree, becomes eligible for Medicare (currently age 65), he or she shall no longer be eligible to participate in the Village's insurance. In lieu of participating in the Village's insurance, he or she shall receive supplemental insurance selected by the Village and paid for by the Village.

The parties agree to reopen this Agreement this agreement upon thirty (30) days' written notice to the other party. Such reopener negotiations shall be limited to the subject of retiree health insurance for retirees age 65 or older, unless the parties agree in writing to add additional subjects. [Prior provisions regarding early retirees shall apply, but be subject to the remaining provisions of this Agreement.]

(e)   Life Insurance – All Police Officers shall receive life insurance in the face value of $10,000 without cost to the Police Officer, in accordance with the terms and provisions of the policy and the insurance provider. Retirees will receive life insurance with the amount being determined by the insurance carrier.

(d)   Physical Examination – Once each year, every Police Officer shall be entitled to a physical examination by Village's appointed physician at no cost to the Officer.

**Section 7.5 – Uniform Allowance**

Any officer who is assigned or working as a detective/tactical shall, on the first of June of each year during which this Agreement is in effect, receive $800.00 as a clothing and cleaning allowance. All uniform officers shall receive an $800.00 voucher as clothing and cleaning allowance. All uniform officers shall receive an $800.00 voucher as a clothing allowance at four (4) locations of the Village's choosing. There shall only be one (1) $800.00 allowance provided hereunder.

**Section 7.6 – Longevity Pay**

    (a)    After the completion of fifteen (15) years of employment (starting the 16th year), each officer covered by this Agreement shall receive longevity pay of an additional $1,000.00 per year added to the officer's salary.

    (b)    After completion of twenty (20) years of employment (starting the 21st year), each officer covered by this Agreement shall receive longevity pay of an additional $1,500.00 per year added to the officer's salary.

**Section 7.7 – Education Voucher Program**

Officers shall receive payment in the amount of five hundred dollars ($500.00) for each of the officer's children who reside within the Village of Melrose Park and attend a private (non-public) elementary (grades K-8) or secondary (grades 9-12) school for each year the child attends the private school and resides in the Village ("Education Voucher").

In order to receive the Education Voucher payment, the Officer must present the following documentation: (i) in the case of a biological child, a copy of the child's birth certificate listing the officer as a parent; or (ii) in the case of an adopted child, a copy of the child's amended birth certificate listing the officer as a parent; or (iii) in the case of legal guardianship, a certified copy of a court order appointing the officer as the child's legal guardian. The documentation must be submitted on or before September 1st of the school year for which the voucher is requested.

The Education Voucher shall be made as a separate payment and not added to the Officer's base wages.

**Section 7.8 – Fitness Program**

Employees on active payroll with the Village in a position covered by this Agreement shall receive a free membership I.D. card, so that the Employee may use the health and fitness center as well as use of the racquet ball court to improve his or her personal health.

**Section 7.9 – Mandatory Retirement Age**

Subject to the provisions of any Village Ordinance regarding mandatory retirement age for officers, officers who attain the age of sixty-two (62) shall be retired, on their 62nd birthday, from the Police Department, except that an officer who has not achieved thirty (30) pension creditable years of service may remain a member of the Police Department until the date the officer's thirty (30) pension creditable years of service has been obtained.

## <u>ARTICLE 8 – CREDIT UNION</u>

Employees on active payroll with the Village in a position covered by this Agreement shall be part of the instrumentation of participation into a credit union that will be chosen by full agreement between the Lodge and the Village.

## ARTICLE 9 – IMPASSE RESOLUTION

If an impasse should arise between the Association and the Employer during negotiations over the terms of a successor to this Agreement, the impasse resolution procedures specified in Section 14 of the Illinois Public Labor Relations Act shall apply.

## ARTICLE 10 - DURATION

### Section 10.1 – Term of Agreement

This Agreement shall be effective from January 1, 2018, and it shall remain in full force and effect until December 31, 2021. Thereafter, this Agreement shall continue in full force and effect from year to year unless either party serves, within (60) days to ninety (90) days prior to the expiration of this Agreement, written notice upon the other party that it desires modification of the terms of this Agreement.

### Section 10.2 – Savings Clause

This Agreement shall, where possible, be interpreted by the courts and administrative agencies so as to avoid a finding that any provision hereof is invalid, unenforceable, or unlawful. If any provision or provisions of this Agreement should be declared invalid, unenforceable, or unlawful by any court or administrative agency, the remaining provisions of this Agreement shall remain in full force and effect. In such event, the parties shall, at the request of the other party, promptly meet and bargaining with respect to such modifications of the terms of this Agreement as are necessitated by the invalidity, unenforceability, or unlawfulness of any provision or provisions so declared.

Each person executing this Agreement certifies that he or she is an agent authorized to enter into this Agreement by the Party that each represents. It shall be no defense that a person executing this Agreement was not a duly authorized agent of the Party on whose behalf they have signed this Agreement.

IN WITNESS WHEREOF, the duly authorized representative of the parties has hereunto affixed their signatures this_____ day of _____, 2017.

FOR THE EMPLOYER:                    FOR THE LODGE:

RONALD M. SERPICO                    SAM CHIAPPETTA
                                     as Designee

11

# **APPENDIX A**

## MELROSE PARK POLICE DEPARTMENT
## SALARY INCREASE 2014-2017

| Increases | 3% | 2% | 2% | 3% |
|---|---|---|---|---|
| Rank | January 1, 2018 | January 1, 2019 | January 1, 2020 | January 1, 2021 |
| Starting Pay | $44,000.00 | $45,000.00 | $46,000.00 | $47,000.00 |
| 1 Yr Complete | $49,992.40 | $50,992.20 | $52,012.00 | $53,572.40 |
| 2 Yr Complete | $59,670.90 | $60,864.30 | $62,081.60 | $63,944.00 |
| 3 Yr Complete | $72,463.10 | $73,912.40 | $75,390.60 | $77,652.30 |
| 4 Yr Complete | $80,221.90 | $81,826.30 | $83,462.80 | $85,966.70 |
| 5 Yr Complete | $88,706.40 | $90,480.50 | $92,290.10 | $94,135.90 |
| PM – 15 Yrs | $90,630.90 | $92,443.50 | $94,292.40 | $97,121.20 |
| PM – 20 Yrs | $93,633.70 | $95,506.40 | $97,416.50 | $100,339.00 |
| SGT | $97,618.80 | $99,571.20 | $101,562.60 | $104,609.50 |
| SGT – 15 Yrs | $99,589.80 | $101,581.60 | $103,613.20 | $106,721.60 |
| SGT – 20 Yrs | $102,546.10 | $104,597.00 | $106,688.90 | $109,889.60 |
| LT | $106,531.30 | $108,661.90 | $110,835.10 | $114,160.20 |
| LT – 15 Yrs | $108,502.20 | $110,672.20 | $112,885.60 | $116,272.20 |
| LT – 20 Yrs | $111,458.60 | $113,685.80 | $115,959.50 | $119,438.30 |

13

Memorandum of Understanding

Between

McKinzie-Vertuno Memorial Fraternal Order of Police Lodge #19

and

Village of Melrose Park, Illinois

January 18, 2018

On **Dec. 11th** , 2017, a collective bargaining agreement ("CBA") was entered into between the the McKinzie-Vertuno Memorial Fraternal Order of Police Lodge #19 ("Lodge" or "Union") and the Village of Melrose Park ("Village") for the period January 1, 2018 through December 31, 2021.

The Union and Village desire to correct a scrivener's error(s) and/or to clarify certain language in the CBA; therefore, the parties enter into this Memorandum of Understanding ("MOU"). The language set forth below shall replace and supercede the language in the enumerated sections or appendices of the CBA. A copy of this MOU shall be attached to the CBA and become a part thereof.

**Section 3.1 – Definition**

Each officer's seniority shall be defined as his or her continuous length of active service as a full time police office in the Village. "Active service" refers to time actually worked by the officer. Time that is not considered to be "active service" for purposes of seniority calculation includes, but is not limited to, time off work pursuant to Sections 5.3(c), (d) and (e) in this Agreement. In the event that more than one officer has an identical cumulative length of service, their seniority shall be determined by their respective lengths of continuous active service as a police officer in the Village or by the hiring eligibility list, whichever is greater (the Lodge and Employer will compile and update the list).

**Section 6.4 Patrol Division Hours Work Schedule**
(c)     Normal shift hours – The normal shift hours will be as follows:

    Midnight shift: 12:00 a.m. until 8:30 a.m.
    Day shift: 8:00 a.m. until 4:30 p.m.
    Afternoon shift: 4:00 p.m. until 12:30 a.m.

    The Chief of Police or the Chief's designee shall have sole discretion and authority to adjust the work shift start and end times within one hour of the above-listed times.

# APPENDIX A

## MELROSE PARK POLICE DEPARTMENT

### SALARY INCREASE 2018-2021

| Increases | 3% | 2% | 2% | 3% |
|---|---|---|---|---|
| Rank | January 1, 2018 | January 1, 2019 | January 1, 2020 | January 1, 2021 |
| Starting Pay | $44,000.00 | $45,000.00 | $46,000.00 | $47,000.00 |
| 1 Yr Complete | $49,992.40 | $50,992.20 | $52,012.00 | $53,572.40 |
| 2 Yr Complete | $59,670.90 | $60,864.30 | $62,081.60 | $63,944.00 |
| 3 Yr Complete | $72,463.10 | $73,912.40 | $75,390.60 | $77,652.30 |
| 4 Yr Complete | $80,221.90 | $81,826.30 | $83,462.80 | $85,966.70 |
| 5 Yr Complete | $88,706.40 | $90,480.50 | $92,290.10 | $95,058.80 |
| PM – 15 Yrs | $90,630.90 | $92,443.50 | $94,292.40 | $97,121.20 |
| PM – 20 Yrs | $93,633.70 | $95,506.40 | $97,416.50 | $100,339.00 |
| SGT | $97,618.80 | $99,571.20 | $101,562.60 | $104,609.50 |
| SGT – 15 Yrs | $99,589.80 | $101,581.60 | $103,613.20 | $106,721.60 |
| SGT – 20 Yrs | $102,546.10 | $104,597.00 | $106,688.90 | $109,889.60 |
| LT | $106,531.30 | $108,661.90 | $110,835.10 | $114,160.20 |
| LT – 15 Yrs | $108,502.20 | $110,672.20 | $112,885.60 | $116,272.20 |
| LT – 20 Yrs | $111,458.60 | $113,685.80 | $115,959.50 | $119,438.30 |

This Memorandum and Agreement is entered into this 18th day of January, 2018.

Mayor, Village of Melrose Park

President, Lodge #19

2 - 26 - 2018
Date

01-18-2018
Date

3

# EXHIBIT 37

# Melrose Park Police Department
## SPECIAL ORDER:
## OFF-DUTY SECONDARY EMPLOYMENT

Issuing Authority:   **Sam C. Pitassi**, Chief of Police
Annual Review Date:  October

## PURPOSE

The Purpose of this policy is to set forth guidelines to govern off-duty or Secondary Employment by members of the Melrose Park Police Department (the "Department").

## POLICY

The policy of the Department is to provide guidelines to police employees to inform them of the types of Secondary Employment which are appropriate and to establish procedures to maintain accountability for the welfare of the Department. These requirements are essential for the welfare of the Department and for the protection of the community.

## DEFINITIONS

A. "Collective Bargaining Agreement": The current collective bargaining agreement between the Village of Melrose Park and organized labor union representing the various officers and employees of the Village of Melrose Park Police Department.

B. "Conflict of Interest": Any Secondary Employment duty that is illegal, inconsistent, incompatible with, or in opposition to, the duties, functions, and/or responsibilities of employment with the Department.

C. "Employment": The provision of a service, whether or not in exchange for a fee or other service, including self-employment. This includes any employment in which another may financially benefit from the employee's work, e.g. a family member or other person receiving compensation for the work of the employee. Employment does not include volunteer charity work.

# Melrose Park Police Department
## SPECIAL ORDER:
## OFF-DUTY SECONDARY EMPLOYMENT

### DEFINITIONS (continued)

D. "Extra-Duty Employment": Any employment that is conditioned on the actual or potential use of law enforcement powers by the off-duty employee.

E. "Officer": Is synonymous with any employee or member of the Department and includes":

1) "Full-Time Officer": Any sworn full-time member of the Department

2) "Part-Time Officer": Any sworn member of the Department who is not considered full-time by the Department.

3) "Auxiliary Officer": Any uniformed member of the Department, who is not an officer or part-time officer, who volunteers their time to the Department except for paid select secondary Employment.

4) "Regular Off-Duty Employment": Any employment that will not require use or potential use of law enforcement powers by the off-duty employee.

5) "Secondary Employment": Secondary Employment is any employment other than the employee's regular employment with the Department, including both Regular Off-Duty Employment and Extra-Duty Employment.

### DISCUSSION

A. General Guidelines

The Department has a legitimate interest in regulating its Officer's Secondary Employment. While the Department will not unreasonably restrict off-duty employment, it will require responsibility and accountability to the Department of officers engaged in Secondary Employment.

B. Applicability of Policy

The Department recognizes that there are individuals working for the Department who have other primary jobs and only carry out part-time duties with the Department. Even though these individuals do not need to acquire approval for their primary employment, they may forfeit their positions with the Department, if their employment would not be approved under this policy. These individuals must inform the Chief of Police, in writing, of any employment, or change in employment responsibilities which could be contrary to any aspect of this policy.

Special Order 27, Evaluation                                                  Page 2

VMP/JJS 585

# Melrose Park Police Department
## SPECIAL ORDER:
## OFF-DUTY SECONDARY EMPLOYMENT

**DISCUSSION (continued)**

### C. Mandatory Approval

Prior to commencing any Secondary Employment, including self-employment, employees must submit a written request and receive written approval for such employment. All approved requests are subject to periodic review and reconsideration for approval by the Chief of Police.

The employee's request for Regular Off-Duty Employment shall be on the prescribed Secondary Employment Application (Appendix A) and shall include the following information:

1) the Secondary Employer's name, address, phone number and type of business;
2) A complete narrative of the type of work and duties to be performed;
3) Maximum number of days and hours to be worked in any given week;
4) Name / phone number of the person who will be their immediate supervisor;
5) A complete list of any law enforcement-type equipment the officer must use on the job (e.g., uniform, firearm, handcuffs, personal defense equipment, etc)
6) Secondary Employment Addendum form (Appendix B) will also be completed and accompany employee's Secondary Employment request form.
7) Secondary Employment Indemnity Agreement form (Appendix C) must be completed and accompany the employee's Secondary Employment request form.

Employees shall communicate, in writing, within Seven (7) days, of any such change in Secondary Employment status. Such change in status may include, but not limited to, any change in the following: job responsibilities, time or hours of work, days of work, location, employer name or majority interest in employer, any change of information on the Secondary Employment Application. Notwithstanding Any other provision of this agreement, the Chief, in his sole and absolute discretion may revoke or deny secondary employment privileges. Reference Policy 1042 attachment.

**PROCEDURES**

There are two types of Secondary Employment in which an Officer may engage:

A) Regular Off-Duty Employment: Officers may engage in Regular Off-Duty Employment that meets the following criteria:

1) Employment of a non-police nature in which the Officer's vested police powers, (e.g. arrest, detention, interrogation), are not a condition of the Regular Off-Duty Employment; the work provides no real or implied law enforcement service to the secondary employer; and is not performed during the Officer's assigned police duty hours. Officers may be employed as a security guard at locations outside the corporate limits of the Village of Melrose Park.

Special Order 27. Evaluation                                    Page 3

VMP/JJS 586

# Melrose Park Police Department
# SPECIAL ORDER:
# OFF-DUTY SECONDARY EMPLOYMENT

**PROCEDURES (continued)**

Employment as a security guard at locations within the corporate limits of the Village of Melrose Park shall not be permitted unless pursuant to paragraph B., section entitled "Extra-Duty Employment", located here-in-below.

2) Employment that presents no potential Conflict of Interest between their duties as a Department Officer and their duties for the secondary employer. Examples of employment representing a Conflict of Interest include, but are Not limited to, the following:

    a. As a process server, repossessor or bill collector, towing of vehicles within the corporate limits of the Village, or in any other employment in which police authority might tend to be used to collect money or merchandise for private purposes, or imply an official law enforcement or government interest.

    b. Dressed in an official uniform in the performance of tasks other than that of a police employee, except as otherwise authorized in writing by the Chief of Police or his designee.

    c. Personnel or private investigations within the corporate limits of the Village or involving any Village employee including an Officer, or any employment which might require the Officer to have access to police information, files, records or services of the Village of Melrose Park Police Department as a condition of employment.

    d. Assisting in the case preparation for the defense in any criminal court proceeding, provided, however, this shall not prevent an Officer who has his law license from the case preparation for the defense in any criminal court proceeding not involving the Department or within the corporate limits of the Village.

    e. Providing security for any business or labor group involved in any strike, work stoppage or other job action.

3) Employment that does not constitute a threat to the status or dignity of the Village or Police Department. Examples of such employment that do constitute an actual threat to the status or dignity of the municipality or the Department include the following:

    a) An establishment, which as its principal business sells, distributes, rents, Displays or purchases pornographic books, magazines, sexual devices, or Videos or that otherwise provides entertainment / services of sexual nature;

    b) Employment involving manufacture/sale/serving of alcoholic beverage.

B. **Extra-Duty Employment:** Officers may engage in Extra-Duty Employment as follows:

**Special Order 27. Evaluation**                                         Page 4

# Melrose Park Police Department
# SPECIAL ORDER:
# OFF-DUTY SECONDARY EMPLOYMENT

## PROCEDURES (continued)

1) Where a government, profit making or not-for-profit entity has a contract agreement with the Department for Officers in uniform who are expected to exercise their official police duties.

2) The Chief of Police or his designee is responsible for planning, staffing and coordinating all special duty events requiring Extra Duty Employment, provided such planning, staffing or coordinating does not conflict with the Collective Bargaining Agreement. All requests for these types of police services will be forwarded to the Chief of Police or his designee.

3) Types of extra-duty services which may be considered for contracting include the following:

   a. Traffic control and pedestrian safety.
   b. Crowd control
   c. Security and protection of life and property
   d. Routine law enforcement for public authorities; and

C. Limitations on Regular Off-Duty and Extra-Duty Employment

1. In order to be eligible for Regular Off-Duty and Extra-Duty Employment, an Officer must be in good standing with the Department. Continued Department approval of a police officer's Regular Off-Duty Employment and Extra-Duty Employment is contingent on an employee continuing to be in good standing with the Department. Disputes concerning the reasonableness of the determination of an officer's good standing shall be subject to the grievance and arbitration procedure of the Collective Bargaining Agreement and Off-Duty Employment and Extra-Duty Employment shall not be restricted until a final determination on the employee's good standing is received.

2. Officers who are on on-duty injury leave shall not be eligible to engage in any Secondary Employment.

3. Officers who are on medical or other leave due to sickness, temporary disability or currently assigned to light-duty assignment shall not be eligible to engage in any Secondary Employment unless approved by the office of the Chief of Police. Such approval shall not be unreasonably denied.

4. An Officer may work a maximum of twenty-four (24) hours of regular off-duty or Extra-Duty Employment per week. Employee's may exceed the twenty-four (24) hours per week only in direct relation to the amount of time in a regularly scheduled forty (40) hour week that an employee is off on authorized leave.

5. Work hours for all Secondary Employment must be scheduled in a manner that does not conflict or interfere with the police employee's performance of regular duty.

Special Order 27. Evaluation                                    Page 5

VMP/JJS 588

# Melrose Park Police Department
## SPECIAL ORDER:
## OFF-DUTY SECONDARY EMPLOYMENT

**PROCEDURES (continued)**

   C. Limitations on Regular Off-Duty and Extra-Duty Employment (continued)
   6. An officer engaged in any Secondary Employment is subject to call out in cases of emergency and shall be expected to leave their off-duty or Extra-Duty Employment in such situations when required by the Department.
   7. Permission for an Officer to engage in outside employment may be revoked in any case where an employee fails to perform adequately while on duty as a direct result of such outside employment.
   8. No Officer shall solicit any person, business, or other entity for Secondary Employment while on duty or while acting in official capacity.
   9. Prior to obtaining regular off-duty or Extra-Duty Employment, an employee shall comply with all Departmental procedures for granting approval for such employment.
   10. Uniforms, Department-issued equipment, or Village equipment of any kind shall not be used while the employee is in the actual performance of Regular Off-Duty Employment.

**LIABILITY**

In working Regular Off-Duty Employment, the Officer fully understands and agrees to the terms and conditions contained herein. The officer understands that is their sole responsibility to arrange with the Regular Off-Duty Employer for the protection of liability and workers' compensation.
   1) The Department shall not be responsible for workers' compensation expenses, losses, and/or costs incurred from injuries sustained by the officer in the course of working any Regular Off-Duty Employment.
   2) The Department shall not be responsible for medical expenses, losses, and/or costs incurred from injuries sustained by the officer in the course of working any Regular Off-Duty Employment except as otherwise required by the parties Collective Bargaining Agreement and by State and Federal law.
   3) The Department shall not be responsible for any retirement, pension, or other types of expenses, losses, and/or costs incurred from injuries sustained by the officer in the course of working any Regular Off-Duty Employment except as otherwise required by the parties Collective Bargaining Agreement and by State and Federal law.
   4) The Department shall not be responsible for any third party liability incurred or created by an officer in the course of working any Regular Off-Duty Employment.

VMP/JJS 589

# Melrose Park Police Department
## SPECIAL ORDER:
## OFF-DUTY SECONDARY EMPLOYMENT

**LIABILITY (continued)**

5) The Department shall not be responsible for any expenses, losses, and/or costs incurred for the defense of any criminal prosecution against the officer as a result of any Regular Off-Duty Employment.

6) PRIOR TO COMMENCING EMPLOYMENT, THE OFFICER SHALL PROVIDE TO THE CHIEF OF POLICE A COPY OF THE OFF-DUTY EMPLOYERS CERTIFICATE(S) OF GENERAL COMMERCIAL LIABILITY INSURANCE. SAID POLICY SHALL BE IN A MINIMUM AMOUNT OF ONE MILLION AND NO/100 U.S. DOLLARS ($1,000,000.00). SAID POLICY SHALL: (A) NAME THE VILLAGE, ITS ELECTED OR APPOINTED OFFICIALS, ALL OFFICERS INCLUDING, BUT NOT LIMITED TO, THE PRESIDENT AND BOARD OF TRUSTEES, DIRECTORS, AGENTS, ATTORNEYS AND EMPLOYEES, ITS PRESENT AND FUTURE INDEPENDENT CONTRACTORS, AGENTS, AND AS ADDITIONAL INSUREDS; (B) SHALL PROVIDE THAT THE INSURANCE IS PRIMARY TO, AND NOT CONTRIBUTING WITH, ANY POLICY CARRIED BY THE VILLAGE; (C) SHALL PROVIDE BY ENDORSEMENT THAT NO COVERAGE MAY BE CANCELED, TERMINATED OR REDUCED BY THE INSURING COMPANY WITHOUT THE INSURING COMPANY HAVING FIRST GIVEN AT LEAST THIRTY (30) DAYS PRIOR WRITTEN NOTICE VIA CERTIFIED MAIL(S) TO THE CHIEF OF POLICE.

7) BY EXECUTING, THE OFFICER ACKNOWLEDGES THAT THE VILLAGE WILL PROVIDE NO PROTECTION OR INDEMNIFICATION FOR INJURIES (TO PERSON OR PROPERTY) OR WRONGFUL DEATH FOR OCCURRENCES OR OMISSIONS RELATED TO THE SECONDARY EMPLOYMENT.

VMP/JJS 590

# EXHIBIT 38



**Melrose Park Police Department**
Policy Manual

Policy
**340**

# Conduct

### 340.1 PURPOSE AND SCOPE
This policy establishes standards of conduct that are consistent with the values and mission of the Melrose Park Police Department and are expected of all department members. The standards contained in this policy are not intended to be an exhaustive list of requirements and prohibitions but they do identify many of the important matters concerning conduct. In addition to the provisions of this policy, members are subject to all other provisions contained in this manual, as well as any additional guidance on conduct that may be disseminated by this department or a member's supervisors.

### 340.2 POLICY
The continued employment or appointment of every member of the Melrose Park Police Department shall be based on conduct that reasonably conforms to the guidelines set forth herein. Failure to meet the guidelines set forth in this policy, whether on- or off-duty, may be cause for disciplinary action.

### 340.3 DIRECTIVES AND ORDERS
Members shall comply with lawful directives and orders from any department supervisor or person in a position of authority, absent a reasonable and bona fide justification.

### 340.3.1 UNLAWFUL OR CONFLICTING ORDERS
Supervisors shall not knowingly issue orders or directives that, if carried out, would result in a violation of any law or department policy. Supervisors should not issue orders that conflict with any previous order without making reasonable clarification that the new order is intended to countermand the earlier order.

No member is required to obey any order that appears to be in direct conflict with any federal law, state law or local ordinance. Following a known unlawful order is not a defense and does not relieve the member from criminal or civil prosecution or administrative discipline. If the legality of an order is in doubt, the affected member shall ask the issuing supervisor to clarify the order or shall confer with a higher authority. The responsibility for refusal to obey rests with the member, who shall subsequently be required to justify the refusal.

Unless it would jeopardize the safety of any individual, members who are presented with a lawful order that is in conflict with a previous lawful order, department policy or other directive shall respectfully inform the issuing supervisor of the conflict. The issuing supervisor is responsible for either resolving the conflict or clarifying that the lawful order is intended to countermand the previous lawful order or directive, in which case the member is obliged to comply. Members who are compelled to follow a conflicting lawful order after having given the issuing supervisor the opportunity to correct the conflict, will not be held accountable for disobedience of the lawful order or directive that was initially issued.

Copyright Lexipol, LLC 2017/03/15. All Rights Reserved.
Published with permission by Melrose Park Police Department

## Melrose Park Police Department
Policy Manual

*Conduct*

The person countermanding the original order shall notify, in writing, the person issuing the original order, indicating the action taken and the reason.

### 340.3.2 SUPERVISOR RESPONSIBILITIES
Supervisors and managers are required to follow all policies and procedures and may be subject to discipline for:

(a) Failure to be reasonably aware of the performance of their subordinates or to provide appropriate guidance and control.

(b) Failure to promptly and fully report any known misconduct of a member to his/her immediate supervisor or to document such misconduct appropriately or as required by policy.

(c) Directing a subordinate to violate a policy or directive, acquiesce to such a violation, or are indifferent to any such violation by a subordinate.

(d) The unequal or disparate exercise of authority on the part of a supervisor toward any member for malicious or other improper purpose.

### 340.4 GENERAL STANDARDS
Members shall conduct themselves, whether on- or off-duty, in accordance with the United States and Illinois Constitutions and all applicable laws, ordinances and rules enacted or established pursuant to legal authority.

Members shall familiarize themselves with policies and procedures and are responsible for compliance with each. Members should seek clarification and guidance from supervisors in the event of any perceived ambiguity or uncertainty.

Discipline may be initiated for any good cause. It is not mandatory that a specific policy or rule violation be cited to sustain discipline. This policy is not intended to cover every possible type of misconduct.

### 340.5 CAUSES FOR DISCIPLINE
The following are illustrative of causes for disciplinary action. This list is not intended to cover every possible type of misconduct and does not preclude the recommendation of disciplinary action for violation of other rules, standards, ethics and specific action or inaction that is detrimental to efficient department service.

### 340.5.1 LAWS, RULES AND ORDERS

(a) Violation of, or ordering or instructing a subordinate to violate any policy, procedure, rule, order, directive, requirement or failure to follow instructions contained in department or Village manuals.

(b) Disobedience of any legal directive or order issued by any department member of a higher rank.

(c) Violation of federal, state, local or administrative laws, rules or regulations.

Copyright Lexipol, LLC 2017/03/15, All Rights Reserved.
Published with permission by Melrose Park Police Department

Conduct - 156

## Melrose Park Police Department
Policy Manual

*Conduct*

### 340.5.2 ETHICS

(a) Using or disclosing one's status as a member of the Melrose Park Police Department in any way that could reasonably be perceived as an attempt to gain influence or authority for non-department business or activity.

(b) The wrongful or unlawful exercise of authority on the part of any member for malicious purpose, personal gain, willful deceit or any other improper purpose.

(c) The receipt or acceptance of a reward, fee or gift from any person for service incident to the performance of the member's duties (lawful subpoena fees and authorized work permits excepted).

(d) Acceptance of fees, gifts or money contrary to the rules of this department and/or laws of the state.

(e) Offer or acceptance of a bribe or gratuity.

(f) Misappropriation or misuse of public funds, property, personnel or services.

(g) Any other failure to abide by the standards of ethical conduct.

### 340.5.3 DISCRIMINATION, OPPRESSION OR FAVORITISM

Discriminating against, oppressing or providing favoritism to any person because of age, race, color, creed, religion, sex, sexual orientation, gender identity or expression, national origin, ancestry, marital status, physical or mental disability, medical condition or other classification protected by law, or intentionally denying or impeding another in the exercise or enjoyment of any right, privilege, power or immunity, knowing the conduct is unlawful.

### 340.5.4 RELATIONSHIPS

(a) Unwelcome solicitation of a personal or sexual relationship while on-duty or through the use of one's official capacity.

(b) Engaging in on-duty sexual activity including, but not limited to, sexual intercourse, excessive displays of public affection or other sexual contact.

(c) Establishing or maintaining an inappropriate personal or financial relationship, as a result of an investigation, with a known victim, witness, suspect or defendant while a case is being investigated or prosecuted, or as a direct result of any official contact.

(d) Associating with or joining a criminal gang, organized crime and/or criminal syndicate when the member knows or reasonably should know of the criminal nature of the organization. This includes any organization involved in a definable criminal activity or enterprise, except as specifically directed and authorized by this department.

(e) Associating on a personal, rather than official basis with persons who demonstrate recurring involvement in serious violations of state or federal laws after the member knows, or reasonably should know of such criminal activities, except as specifically directed and authorized by this department.

Copyright Lexipol, LLC 2017/03/15, All Rights Reserved.
Published with permission by Melrose Park Police Department

## Melrose Park Police Department
Policy Manual

*Conduct*

### 340.5.5 ATTENDANCE

(a) Leaving the job to which the member is assigned during duty hours without a reasonable excuse and proper permission and approval.

(b) Unexcused or unauthorized absence or tardiness.

(c) Excessive absenteeism or abuse of leave privileges.

(d) Failure to report to work or to place of assignment at time specified and fully prepared to perform duties without a reasonable excuse.

### 340.5.6 UNAUTHORIZED ACCESS, DISCLOSURE OR USE

(a) Unauthorized and inappropriate intentional release of confidential or protected information, materials, data, forms or reports obtained as a result of the member's position with this department.

(b) Disclosing active or protected investigation information to any unauthorized person.

(c) The use of any information, photograph, video or other recording obtained or accessed as a result of employment or appointment to this department for personal or financial gain or without the express authorization of the Chief of Police/Police Administrator or the authorized designee.

(d) Loaning, selling, allowing unauthorized use, giving away or appropriating any Melrose Park Police Department badge, uniform, identification card or department property for personal use, personal gain or any other improper or unauthorized use or purpose.

(e) Using department resources in association with any portion of an independent civil action. These resources include, but are not limited to, personnel, vehicles, equipment and non-subpoenaed records.

### 340.5.7 EFFICIENCY

(a) Neglect of duty.

(b) Unsatisfactory work performance including, but not limited to, failure, incompetence, inefficiency or delay in performing and/or carrying out proper orders, work assignments or the instructions of supervisors without a reasonable and bona fide excuse.

(c) Concealing, attempting to conceal, removing or destroying defective or incompetent work.

(d) Unauthorized sleeping during on-duty time or assignments.

(e) Failing to provide a visual deterrent to crime by lack of patrol activity, such as standing or parking a patrol vehicle for an inordinate length of time.

(f) Concealing a marked patrol vehicle from public view without a reasonable and bonafide law enforcement purpose.

(g) Failure to notify the Department within 24 hours of any change in residence address, contact telephone numbers or marital status.

Copyright Lexipol, LLC 2017/03/15, All Rights Reserved.
Published with permission by Melrose Park Police Department

VMP/JJS 158

## Melrose Park Police Department
### Policy Manual

*Conduct*

### 340.5.8 PERFORMANCE

(a) Failure to disclose or misrepresenting material facts, or making any false or misleading statement on any application, examination form, or other official document, report or form, or during the course of any work-related investigation.

(b) The falsification of any work-related records, making misleading entries or statements with the intent to deceive, or the willful and unauthorized removal, alteration, destruction and/or mutilation of any department record, public record, book, paper or document.

(c) Failure to participate in, or giving false or misleading statements, or misrepresenting or omitting material information to a supervisor or other person in a position of authority, in connection with any investigation or in the reporting of any department-related business.

(d) Being untruthful or knowingly making false, misleading or malicious statements that are reasonably calculated to harm the reputation, authority or official standing of this department or its members.

(e) Disparaging remarks or conduct concerning duly constituted authority to the extent that such conduct disrupts the efficiency of this department or subverts the good order, efficiency and discipline of this department or that would tend to discredit any of its members.

(f) Unlawful gambling or unlawful betting at any time or any place. Legal gambling or betting under any of the following conditions:

    1. While on department premises.

    2. At any work site, while on-duty or while in uniform, or while using any department equipment or system.

    3. Gambling activity undertaken as part of an officer's official duties and with the express knowledge and permission of a direct supervisor is exempt from this prohibition.

(g) Improper political activity including:

    1. Unauthorized attendance while on-duty at official legislative or political sessions.

    2. Solicitations, speeches or distribution of campaign literature for or against any political candidate or position while on-duty or on department property except as expressly authorized by Village policy, the collective bargaining agreement, or the Chief of Police/Police Administrator.

(h) Engaging in political activities during assigned working hours except as expressly authorized by Village policy, the collective bargaining agreement, or the Chief of Police/Police Administrator.

(i) Any act on- or off-duty that brings discredit to this department.

### 340.5.9 CONDUCT

(a) Failure of any member to promptly and fully report activities on his/her part or the part of any other member where such activities resulted in contact with any other law enforcement agency or that may result in criminal prosecution or discipline under this policy.

(b) Unreasonable and unwarranted force to a person encountered or a person under arrest.

Copyright Lexipol, LLC 2017/03/15, All Rights Reserved.
Published with permission by Melrose Park Police Department

## Melrose Park Police Department
Policy Manual

*Conduct*

(c)   Exceeding lawful peace officer powers by unreasonable, unlawful or excessive conduct.

(d)   Unauthorized or unlawful fighting, threatening or attempting to inflict unlawful bodily harm on another.

(e)   Engaging in horseplay that reasonably could result in injury or property damage.

(f)   Discourteous, disrespectful or discriminatory treatment of any member of the public or any member of this department or the Village.

(g)   Use of obscene, indecent, profane or derogatory language while on-duty or in uniform.

(h)   Criminal, dishonest, or disgraceful conduct, whether on- or off-duty, that adversely affects the member's relationship with this department.

(i)   Unauthorized possession of, loss of, or damage to department property or the property of others, or endangering it through carelessness or maliciousness.

(j)   Attempted or actual theft of department property; misappropriation or misuse of public funds, property, personnel or the services or property of others; unauthorized removal or possession of department property or the property of another person.

(k)   Activity that is incompatible with a member's conditions of employment or appointment as established by law or that violates a provision of any collective bargaining agreement or contract to include fraud in securing the appointment or hire.

(l)   Initiating any civil action for recovery of any damages or injuries incurred in the course and scope of employment or appointment without first notifying the Chief of Police/Police Administrator of such action.

(m)   Any other on- or off-duty conduct which any member knows or reasonably should know is unbecoming a member of this department, is contrary to good order, efficiency or morale, or tends to reflect unfavorably upon this department or its members.

### 340.5.10  SAFETY

(a)   Failure to observe or violating department safety standards or safe working practices.

(b)   Failure to maintain current licenses or certifications required for the assignment or position (e.g., driver's license, first aid).

(c)   Failure to maintain good physical condition sufficient to adequately and safely perform law enforcement duties.

(d)   Unsafe firearm or other dangerous weapon handling to include loading or unloading firearms in an unsafe manner, either on- or off-duty.

(e)   Carrying, while on the premises of the work place, any firearm or other lethal weapon that is not authorized by the member's appointing authority.

(f)   Unsafe or improper driving habits or actions in the course of employment or appointment.

(g)   Any personal action contributing to a preventable traffic crash.

(h)   Concealing or knowingly failing to report any on-the-job or work-related accident or injury as soon as practicable.

Copyright Lexipol, LLC 2017/03/15, All Rights Reserved.
Published with permission by Melrose Park Police Department

## Melrose Park Police Department
Policy Manual

*Conduct*

### 340.5.11 INTOXICANTS

(a) Reporting for work or being at work while intoxicated or when the member's ability to perform assigned duties is impaired due to the use of alcohol, medication or drugs, whether legal, prescribed or illegal.

(b) Possession or use of alcohol at any work site or while on-duty, except as authorized in the performance of an official assignment. A member who is authorized to consume alcohol is not permitted to do so to such a degree that it may impair on-duty performance or driving.

(c) Unauthorized possession, use of, or attempting to bring a controlled substance, illegal drug or non-prescribed medication to any work site.

# EXHIBIT 39

| Policy 1014 | **Melrose Park Police Department**<br>Policy Manual |
|---|---|

# Sick Leave Reporting

## 1014.1 PURPOSE AND SCOPE

Employees of this department are provided with a sick leave benefit that gives them continued compensation during times of absence due to personal or family illness. The number of hours available is detailed in the employee's respective personnel manual or applicable collective bargaining agreement (*See Appendix*). Employees may also be entitled to additional paid or unpaid leave for certain family and medical reasons as provided for in the Family and Medical Leave Act (FMLA) (29CFR 825).

## 1014.2 EMPLOYEE RESPONSIBILITIES

Sick leave may be used for absences caused by illness, injury, temporary disability (including pregnancy/maternity), or for medical, dental or vision exams or medical treatment of the employee or the employee's immediate family when it is not possible to schedule such appointments during non-working hours.

Sick leave is not considered vacation, and abuse of sick leave may result in discipline and/or denial of sick-leave benefits. Employees on sick leave shall not engage in other employment or self-employment, or participate in any sport, hobby, recreational or other activity which may impede recovery from the injury or illness.

Upon return to work, employees shall complete and submit a leave request describing the type of leave used and the specific amount of time taken.

### 1014.2.1 NOTIFICATION

Employees are required to notify the C.S.O. Desk and thier Shift Commander or appropriate supervisor when he or she is on duty or as soon as they are aware that they will not be able to report to work. At a minimum, employees shall make such notification no less than two hours before the start of their scheduled shift. If an employee is unable to contact the supervisor in the case of an emergency, every effort should be made to have a representative contact the supervisor.

When the necessity for leave is foreseeable, such as an expected birth or planned medical treatment, the employee shall, whenever possible, provide the Department with no less than 30-days notice of the intent to take leave.

## 1014.3 EXTENDED ILLNESS

Employees on extended absences shall, if possible, contact their unit supervisor at three-day intervals to provide an update on their absence and expected date of return. Employees absent from duty due to personal illness in excess of three consecutive days may be required to furnish a statement from their health care provider supporting the use of sick leave and/or the ability to return to work.

Nothing in this section precludes a supervisor, with cause, from requiring a physician's statement if three or fewer sick days are taken.

Copyright Lexipol, LLC 2017/03/15, All Rights Reserved.
Published with permission by Melrose Park Police Department

VMP/JJS 452

# EXHIBIT 40

tag at top

## ADMINISTRATIVE NOTICE/WARNING TO OFFICER JOHN SCATCHELL, JR.

### RE: INVESTIGATION OF JANUARY 9, 2018

1.    We received information that you may have been involved in a situation where a felon was in possession of and used a firearm. We are conducting an investigation into the allegations that were reported to us.

2.    You are hereby advised that you are given immunity from criminal prosecution on the basis of your answers to the questions you are asked today. Stated another way, nothing you say in this investigation will be given to any Illinois or federal law enforcement agents or offices.

3.    Additionally, nothing that you say during the interrogation today can or will be used against you in any criminal proceeding.

4.    ~~This is not to say that the matter will or will not be referred to the appropriate law enforcement officials for investigation and/or prosecution in their discretion. Only that~~ your statements will not be disclosed to them at any time or in any investigation or criminal proceeding.

5.    Having been given immunity as set forth above, you are hereby warned that because of that immunity, you may not refuse to answer the questions on the ground that the answers may incriminate you. Accordingly, if you refuse to answer the questions, you will be subject to discipline up to and including your dismissal for insubordination for failing to comply with our directive that you answer our questions related to this investigation.

I acknowledge receiving the above notice and warning, and state that I fully understand what it says and means, and that I am not under any mental impairment or disability.

Dated: 1/9/18          _____
                        John Scatchell, Jr.



Dep Ex No. 1
for ID, as of 1 9 18

EXHIBIT Chief's A
WIT:
DATE: 10-22-18
Nick D. Bowen, CSR

**CHIEF'S EXHIBIT __**

## CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2368

# EXHIBIT 41

## Page 1

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

IN RE THE MATTER OF:

THE INTERROGATION OF JOHN SCATCHELL,

Officer of the Melrose Park

Police Department.

THE INTERROGATION OF OFFICER

JOHN SCATCHELL, taken before CORDELIA BUSSE WERT,

a licensed Certified Shorthand Reporter of the

State of Illinois, License No. 84-2985, taken at

the Melrose Park Village Hall, 1000 North 25th

Avenue, Multi-Purpose Room, Melrose Park,

Illinois, on the 9th day of January, 2018, at

1:46 p.m.

## Page 2

```
 1   PRESENT:
 2
 3   LANER MUCHIN, LTD., By:
     MR. JEFFREY S. FOWLER
 4   515 North State Street, Suite 2800
     Chicago, Illinois 60654
 5   (312) 467-9800
     jfowler@lanermuchin.com
 6
     Appeared on behalf of the Village of
 7   Melrose Park;
 8   FRATERNAL ORDER OF POLICE, By:
     MR. CHRISTOPHER COOPER
 9   Legal Defense Plan Attorney
     LAW OFFICE OF CHRISTOPHER COOPER, INC.
10   79 West Monroe Street, Suite 1213
     Chicago, Illinois 60603
11   (312) 473-2968
     cooperlaw3234@gmail.com
12
     Appeared on behalf of Officer Scatchell.
13
14
15
     ALSO PRESENT: Mr. Sam C. Pitassi, Director
16   Deputy Chief Steven Rogowski
     Deputy Chief Michael Castellan
17   Mr. Raul Rodriguez, FOP Lodge 19
18
19
20
21
22
23
24
```

## Page 3

```
 1              I N D E X
 2   JOHN SCATCHELL        EXAMINATION
 3   By Mr. Fowler         4
 4
 5            E X H I B I T S
 6   NUMBER              MARKED FOR ID
 7   Scatchell Exhibit
 8      No. 1         4
 9      No. 2         5
10      No. 3         11
11      No. 4         12
12      No. 5         13
13      No. 6         17
14      No. 7         19
15      No. 8         36
16      No. 9         49
17      No. 10        52
18      No. 11        63
19      No. 12        70
20      No. 13        78
21      No. 14        92
22      No. 15        94
23      No. 16        96
24      No. 17        114
```

## Page 4

```
          1          MR. FOWLER: This is the interview of
          2   John Scatchell being conducted pursuant to
          3   notice and pursuant to the Police Officer
          4   Disciplinary Act.
01:45:58  5          Mark this as Exhibit No. 1,
          6   please.
          7          (Scatchell Ex No. 1 was marked as of
          8   1/9/18.)
          9   BY MR. FOWLER:
01:46:22 10     Q.   Officer Scatchell, prior to starting, I
         11   had a conversation with your attorney. I had
         12   tendered to him a document. He asked for a couple
         13   of changes on it. I have just marked that
         14   document as Exhibit 1 and tendered it to you.
01:46:36 15          Is that your signature on the lower
         16   right side?
         17     A.   Yes, it is.
         18     Q.   Okay. You understand that you have
         19   been instructed -- that you are required to answer
01:46:46 20   the questions that we ask you today?
         21     A.   Yes.
         22     Q.   Okay. Largely I'm going to go through
         23   a chronology of what's happened, but I wanted to
         24   do a couple of things first.
```

L.A. Court Reporters, L.L.C.
312-419-9292

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

VMP/LIS 001637

## Page 5

|          |    |                                                      |
|----------|----|------------------------------------------------------|
|          | 1  | (Scatchell Ex No. 2 was marked as of                 |
|          | 2  | 1/9/18.)                                             |
|          | 3  | BY MR. FOWLER:                                        |
|          | 4  | Q. I show you what's been marked as                  |
| 01:47:22 | 5  | Exhibit 2.                                            |
|          | 6  | Do you recognize this as a memo that                 |
|          | 7  | you received on or about December 8, 2017?           |
|          | 8  | A. Yes, I do.                                         |
|          | 9  | Q. When did you receive this?                         |
| 01:47:34 | 10 | A. December 8th, I believe.                          |
|          | 11 | Q. How did you receive it?                            |
|          | 12 | A. Via Department email and then an                  |
|          | 13 | officer served me at the door, at my front door.     |
|          | 14 | Q. Who was the officer?                               |
| 01:47:46 | 15 | A. Officer Nocita, Investigator Nocita.              |
|          | 16 | Q. Now, when you received the letter, did            |
|          | 17 | you read it?                                          |
|          | 18 | A. Yes.                                               |
|          | 19 | Q. Okay.                                              |
| 01:47:52 | 20 | A. I had already read it prior to him.               |
|          | 21 | Q. You had read it by email --                       |
|          | 22 | A. Correct.                                           |
|          | 23 | Q. -- when you received it by email?                 |
|          | 24 | A. Correct.                                           |

## Page 6

|          |    |                                                      |
|----------|----|------------------------------------------------------|
|          | 1  | Q. Then you understood that -- and you               |
|          | 2  | understand by this memo that you also have been      |
|          | 3  | ordered to answer the questions that I ask you,      |
|          | 4  | right?                                               |
| 01:48:08 | 5  | A. Correct.                                           |
|          | 6  | Q. And you're required to answer them                |
|          | 7  | truthfully and as accurately as you can?             |
|          | 8  | A. Correct.                                           |
|          | 9  | Q. The letter asks you to bring documents            |
| 01:48:18 | 10 | with you responsive to these issues.                 |
|          | 11 | Did you bring any documents with you?                |
|          | 12 | A. Yes.                                               |
|          | 13 | Q. What documents did you bring?                      |
|          | 14 | A. Pertinent SOPs, copies of this that you           |
| 01:48:32 | 15 | guys sent me, and then various doctor notes          |
|          | 16 | (indicating).                                        |
|          | 17 | MR. FOWLER: Chris, do you mind if I                  |
|          | 18 | come around to see them instead of handing           |
|          | 19 | them to me?                                          |
| 01:48:42 | 20 | MR. COOPER: Well, if you understand                  |
|          | 21 | what these are, we can hand them to you.             |
|          | 22 | BY MR. FOWLER:                                        |
|          | 23 | Q. Let me see what they are.                          |
|          | 24 | A. (Tendering folder.)                               |

## Page 7

|          |    |                                                      |
|----------|----|------------------------------------------------------|
|          | 1  | Q. There's one document here that I'm not            |
|          | 2  | familiar with and I think it may be pertinent. So    |
|          | 3  | give me just a second.                                |
|          | 4  | What I would like to do is to take out              |
| 01:50:44 | 5  | these two pages of what you've brought and mark it   |
|          | 6  | so that we'll all have a copy of it (indicating).    |
|          | 7  | MR. COOPER: Let me see.                              |
|          | 8  | MR. FOWLER: (Tendering documents.)                   |
|          | 9  | MR. COOPER: Well, my intuition tells                 |
| 01:51:12 | 10 | me that that's not the best approach at this         |
|          | 11 | time.                                                 |
|          | 12 | If you want his medical records --                  |
|          | 13 | MR. FOWLER: Are you willing for him to               |
|          | 14 | sign a release so that we can get all of his         |
| 01:51:26 | 15 | medical records?                                      |
|          | 16 | MR. COOPER: At some point in time but               |
|          | 17 | not today. I mean, you took the words right          |
|          | 18 | out of my mouth.                                      |
|          | 19 | MR. FOWLER: But at some point in                     |
| 01:51:36 | 20 | time --                                               |
|          | 21 | MR. COOPER: You can't do it today.                   |
|          | 22 | But if you want to ask him questions as to           |
|          | 23 | this document, first of all, it's my position        |
|          | 24 | he can't answer the question because he's not        |

## Page 8

|          |    |                                                      |
|----------|----|------------------------------------------------------|
|          | 1  | a physician.                                          |
|          | 2  | MR. FOWLER: Well, he'll be able to                   |
|          | 3  | answer whatever he can. If he can't answer,          |
|          | 4  | then he'll tell me that.                              |
| 01:52:10 | 5  | MR. COOPER: I think it's proper for                  |
|          | 6  | you to ask questions based on the document, I        |
|          | 7  | don't see a problem, but I don't think it's          |
|          | 8  | proper for these documents to go into                |
|          | 9  | evidence. I would object to the document             |
| 01:52:30 | 10 | being entered into evidence.                          |
|          | 11 | MR. FOWLER: Well, it's not -- well,                  |
|          | 12 | recognize that this is an investigative              |
|          | 13 | proceeding. It's not going into evidence.            |
|          | 14 | Are you willing to give me the                       |
| 01:52:38 | 15 | document? That's really what I was looking           |
|          | 16 | for.                                                  |
|          | 17 | MR. COOPER: No. I'm willing to allow                 |
|          | 18 | you to ask questions from the document today.        |
|          | 19 | Now, whether we call it evidence or material         |
| 01:52:50 | 20 | for the purpose of an interrogation, no, I           |
|          | 21 | will not allow this document to become part          |
|          | 22 | of the record of today's proceedings.                |
|          | 23 | However, I will hand you the document and            |
|          | 24 | you're welcome to ask questions.                      |

2  (Pages 5 to 8)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMP/JJS 001638

## Page 9

1    MR. FOWLER: Okay.
2    BY MR. FOWLER:
3        Q.   So, Officer Scatchell, do you
4    understand that the letter that I've handed you
01:53:14  5    marked as Exhibit 2, the second page, the third
6    paragraph, says: You're ordered to bring and
7    present any relevant evidence, documents, photos,
8    materials or recordings with you to this meeting
9    so that such information, if appropriate and
01:53:28  10    relevant, can be considered as part of the
11    investigation, including, but not limited to, your
12    medical records relating to your medical leave
13    since November 9, 2017, and your recreational
14    activities during the period that you've been on
01:53:42  15    leave since November 9, 2017, and your
16    participation or involvement in potential illegal
17    activities by a known felon on or about November
18    20, 2017, and your contact with any other law
19    enforcement agencies that may lead to criminal
01:53:58  20    prosecution on or about November 20, 2017; you
21    understood that in the letter?
22        A.   Correct.
23        Q.   And in light of that instruction, the
24    only documents that you brought are those that

## Page 10

1    you've tendered to me today?
2        A.   Correct.
3        Q.   But you're not willing to provide me
4    with copies of or allow me to keep the documents
01:54:22  5    that you've tendered today?
6        MR. COOPER: I, as an attorney, advise
7    you that -- and he's listening to me,
8    that it's my recommendation as his attorney
9    that he disallow you from copying any of the
01:54:38  10    documents in that packet today. And if you
11    want those documents, it's necessary that the
12    Village follow the proper procedure which
13    would be, one, to obtain a release, and he
14    will sign a release.
01:54:54  15        MR. FOWLER: Okay.
16    BY MR. FOWLER:
17        Q.   So my question is: Since this is the
18    interview of you today --
19        A.   Right.
01:55:02  20        Q.   -- are you going to follow Mr. Cooper's
21    advice and not allow me to have these documents or
22    copies of these documents today?
23        A.   Yes, I am. I'm following my attorney's
24    advice.

## Page 11

1    MR. FOWLER: Mark this one, please.
2    (Scatchell Ex No. 3 was marked as of
3    1/9/18.)
4    BY MR. FOWLER:
01:55:26  5        Q.   Showing you what's been marked as
6    Exhibit 3, did you receive this letter?
7        A.   Yes, I did.
8        Q.   When did you receive it?
9        A.   On or about the 20th of December.
01:55:36  10        Q.   How did you receive it?
11        A.   Email and also served at the front
12    door.
13        Q.   By whom?
14        A.   Detective Gvist.
01:55:46  15        Q.   And when you received it, you read it?
16        A.   Yes.
17        Q.   And you understood by this letter,
18    you're also instructed to answer the questions
19    that I ask you today truthfully and accurately?
01:55:56  20        A.   Yes.
21        Q.   Do you have any medical or
22    psychological condition that makes you incapable
23    of participating in this interview today?
24        A.   Not to my knowledge.

## Page 12

1        Q.   Are there any physical limitations that
2    we need to accommodate for you today?
3        A.   I'm comfortable.
4        Q.   If at any time in the process you
01:56:18  5    determine that you are uncomfortable, will you let
6    me know that?
7        A.   I will.
8        Q.   When did you become employed by the
9    Village of Melrose Park Police Department?
01:56:32  10        A.   2012.
11        Q.   When you became employed by the
12    Village, you became aware that the Village had
13    standard operating procedures?
14        A.   Yes.
01:56:42  15        Q.   How did you become aware of that?
16        A.   They gave me a written copy of it which
17    I signed.
18    (Scatchell Ex No. 4 was marked as of
19    1/9/18.)
01:57:04  20    BY MR. FOWLER:
21        Q.   Showing you what's been marked as
22    Exhibit 4, do you recognize that?
23        A.   Yes, I do.
24        Q.   What is it?

3  (Pages 9 to 12)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 13

1    A.  It's a standard operating procedure
2  form which I signed off on.
3    Q.  And that's your signature on the
4  document?
01:57:16  5    A.  Yes, it is -- well, actually there's no
6  signature, just my name.
7    Q.  Okay.  You put your name there?
8    A.  Yes.
9    Q.  And you received this in or about
01:57:24  10  September of 2012?
11    A.  Yes.
12      (Scatchell Ex No. 5 was marked as of
13      1/9/18.)
14  BY MR. FOWLER:
01:57:42  15    Q.  Showing you what's been marked as
16  Exhibit No. 5, what is that?
17    A.  A Melrose Park employee acknowledgement
18  form.
19    Q.  Is that your name on the document?
01:57:52  20    A.  Yes, it is.
21    Q.  Is that your signature on the document?
22    A.  Yes, it is.
23    Q.  Did you sign this on or about August
24  31, 2012?

Page 14

1    A.  Yes.
2    Q.  And by signing this document, were you
3  acknowledging that you had received a copy of the
4  Melrose Park employee procedures?
01:58:10  5    A.  Yes.
6    Q.  You're aware that the Village of
7  Melrose Park has procedures relating to reporting
8  injuries when they occur?
9    A.  Yes.
01:58:18  10    Q.  And you're aware that Melrose Park has
11  procedures relating to obtaining permission for
12  secondary employment?
13    A.  Yes.
14    Q.  You're aware that there are procedures
01:58:30  15  regarding restrictions during the use of sick
16  time?
17    A.  Yes.
18    Q.  You're aware of procedures requiring
19  you to report contact with law enforcement?
01:58:40  20    A.  Yes.
21    Q.  You're aware that there's ethics rules?
22    A.  Yes.
23    Q.  You're aware that there's rules
24  restricting or prohibiting associating with

Page 15

1  felons?
2    A.  I'm not aware of that.
3    Q.  Okay.  You're aware that you're
4  required to be truthful during investigations?
01:58:56  5    A.  Yes.
6    Q.  Any reason to believe that any of the
7  rules that I just mentioned that you said you were
8  aware of do not apply to you?
9    A.  Well, you stated that it says felons,
01:59:10  10  and the verbiage in the SOP says persons who
11  exhibit a recurring pattern of violating state and
12  federal laws.  It does not say felons.
13    Q.  Okay.  The question that I asked you,
14  though, was:  With respect to the policies that
01:59:22  15  you said you were aware of --
16    A.  Uh-huh.
17    Q.  -- do you have any reason to believe
18  that those policies do not apply to you?
19    A.  No, I don't.
01:59:30  20    Q.  You started in 2012, and at some
21  point within a short time after that, you were
22  injured at work?
23    A.  Yes.
24    Q.  What was that injury?

Page 16

1    A.  Well, which -- I'm not sure which
2  injury you're --
3    Q.  The first injury you had.
4    A.  On the job?
02:00:00  5    Q.  Yes.
6    A.  That would have been, I believe,
7  February of 2014.
8    Q.  Tell us about that injury.
9    A.  I got in a physical altercation with a
02:00:12  10  subject who was mentally unstable at Gottlieb
11  Hospital.  He was told not to enter the building
12  and he proceeded to try to enter the building
13  after making physical and verbal threats to
14  nurses.  So myself and my partner performed a
02:00:28  15  take-down of him.
16      At that time I did not feel anything,
17  but several hours later, my back and neck area
18  were throbbing.  Then I notified at the time
19  Lieutenant Rogowski the follow day, I believe, and
02:00:42  20  I told him the following day I couldn't move.  I
21  had severe restriction of my neck and severe pain.
22  Then at that time I notified my superior officer
23  which would have been Lieutenant Rogowski, not
24  deputy chief.

4  (Pages 13 to 16)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMP/JJS 001640

## Page 17

1  Q.  I think you said that that was February
2  of 2014?
3  A.  Yes, I believe it was.
4  Q.  Could it have been 2015?
02:01:02  5  A.  It could have been, yes.
6  Q.  Okay.
7  (Scatchell Ex No. 6 was marked as of
8  1/9/18.)
9  BY MR. FOWLER:
02:02:38  10  Q.  I'm now handing you what's been marked
11  as Exhibit 6.
12  Do you recognize this form?
13  A.  I recognize it from recent.
14  Q.  Is this the employer's first report of
02:02:56  15  injury concerning the injury that you just talked
16  about?
17  A.  Yes.
18  Q.  This shows a date of report of 2/6 of
19  2015. Does your refresh your recollection as to
02:03:06  20  when that injury occurred?
21  A.  That seems correct, yes.
22  Q.  Okay. So rather than '14, it was '15?
23  A.  Correct.
24  Q.  Now, you were telling us that as a

## Page 18

1  result of that incident, you were injured. How
2  were you injured?
3  A.  I sustained injuries to my neck and
4  back region. I'm not entirely sure how I was
02:03:26  5  injured because I'm not a doctor, but I know that
6  at some point during the proceedings with the
7  subject that we encountered was when I sustained
8  an injury because I felt perfectly fine before and
9  then slightly thereafter is when I felt pain.
02:03:40  10  Then the following day, I had severe pain and loss
11  of motion.
12  Q.  As a result of that injury, you
13  reported it to the Department, your supervisor?
14  A.  Yes, I did.
02:03:48  15  Q.  Who did you report it to?
16  A.  Lieutenant Rogowski.
17  Q.  And you then sought medical treatment?
18  A.  Yes, I did.
19  Q.  And the doctor put you off work for a
02:03:58  20  while?
21  A.  Yes, she did.
22  Q.  You then went back and saw the doctor
23  several different times?
24  A.  Yes.

## Page 19

1  Q.  Do you remember which doctor it was?
2  A.  I saw Nurse Practitioner Paulette
3  Feiereisel. As per the HMO, you have to see a
4  nurse practitioner first. Then I saw Dr. Sandoval
02:04:14  5  who's my primary care physician.
6  (Scatchell Ex No. 7 was marked as of
7  1/9/18.)
8  BY MR. FOWLER:
9  Q.  Showing you what's been marked as
02:04:50  10  Exhibit 7, this is a group exhibit with a bunch of
11  different pages, and I want to go through them one
12  at a time.
13  A.  Okay.
14  Q.  The first pages, that's -- there's a
02:05:00  15  note dated February 15th from Paulette Feiereisel,
16  NP. That's the nurse practitioner you just
17  referred to?
18  A.  February 5th.
19  MR. COOPER:  February 5th.
02:05:10  20  BY MR. FOWLER:
21  Q.  Okay. That's the nurse practitioner
22  you just referred to?
23  A.  Yes.
24  Q.  You obtained this note and submitted it

## Page 20

1  to your supervisor?
2  A.  Yes, I did.
3  Q.  The next page that's marked 110 on the
4  bottom, can you tell me what that is, please?
02:05:28  5  A.  This is a To/From from myself to Chief
6  Pitassi in short explaining the incident, not with
7  all details but with pertinent details.
8  Q.  And is that your signature?
9  A.  It is.
02:05:42  10  Q.  The next page that's on the bottom
11  right marked 111, what is that?
12  A.  Another note from Nurse Practitioner
13  Feiereisel.
14  Q.  You obtained this on or about February
02:05:52  15  9, 2015?
16  A.  Yes.
17  Q.  You submitted it to your supervisor
18  around then?
19  A.  Yes.
02:05:58  20  Q.  The next page marked 112, can you tell
21  me what this one is?
22  A.  Another note from Nurse Practitioner
23  Feiereisel.
24  Q.  Dated February 12, 2015?

5  (Pages 17 to 20)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMP/LIS 001641

Page 21

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. And you obtained this on or about |
| 3 | February 12th? |
| 4 | A. Yes. |
| 02:06:14 5 | Q. Submitted it to your supervisor on or |
| 6 | about February 12th? |
| 7 | A. Yes. |
| 8 | Q. That was to Lieutenant Rogowski? |
| 9 | A. Yes. |
| 02:06:20 10 | Q. The next page, tell us what that is, |
| 11 | please. |
| 12 | A. Another note from Nurse Practitioner |
| 13 | Feiereisel dated February 17th. |
| 14 | Q. This is the page that's marked 113 on |
| 02:06:32 15 | the bottom, right? |
| 16 | A. Yes. |
| 17 | Q. Dated February 17, 2015? |
| 18 | A. Yes. |
| 19 | Q. You obtained this on or about February |
| 02:06:38 20 | 17, 2015? |
| 21 | A. Yes. |
| 22 | Q. And when you obtained it, did you |
| 23 | provide it to your supervisor? |
| 24 | A. Yes. |

Page 22

| | |
|---|---|
| 1 | Q. And that was to Lieutenant Rogowski? |
| 2 | A. Yes. |
| 3 | Q. The next page dated February 20, 2015, |
| 4 | marked 114 on the bottom, can you tell me what |
| 02:06:54 5 | this is? |
| 6 | A. Another note from Nurse Practitioner |
| 7 | Feiereisel. |
| 8 | Q. You obtained this on or about February |
| 9 | 20, 2015? |
| 02:07:02 10 | A. Yes. |
| 11 | Q. And when you obtained it, you provided |
| 12 | it to your supervisor on or about that date? |
| 13 | A. Yes. |
| 14 | Q. The next page marked 115 on the bottom, |
| 02:07:12 15 | can you tell us what this page is, please? |
| 16 | A. Another note from Nurse Practitioner |
| 17 | Feiereisel. |
| 18 | Q. This is dated March 2nd of 2015, |
| 19 | correct? |
| 02:07:20 20 | A. Yes. |
| 21 | Q. You obtained this on or about March 2, |
| 22 | 2015? |
| 23 | A. Yes. |
| 24 | Q. Did you provide it to your supervisor |

Page 23

| | |
|---|---|
| 1 | on or about that date? |
| 2 | A. Yes. |
| 3 | Q. And that was to Lieutenant Rogowski? |
| 4 | A. Yes. |
| 02:07:30 5 | Q. The next page is marked 116 on the |
| 6 | bottom. Can you tell me what that is? |
| 7 | A. Another note from Nurse Practitioner |
| 8 | Feiereisel. |
| 9 | Q. And that's dated March 9, 2015? |
| 02:07:42 10 | A. Yes. |
| 11 | Q. You obtained it on or about March 9, |
| 12 | 2015? |
| 13 | A. Yes. |
| 14 | Q. When you obtained it, did you provide |
| 02:07:48 15 | it to your supervisor? |
| 16 | A. Yes. |
| 17 | Q. That was to Lieutenant Rogowski? |
| 18 | A. Yes. |
| 19 | Q. The next page is marked 117 on the |
| 02:07:54 20 | bottom. |
| 21 | A. Okay. |
| 22 | Q. And it shows a date of March 23, 2015, |
| 23 | correct? |
| 24 | A. Yes. |

Page 24

| | |
|---|---|
| 1 | Q. Did you obtain this on or about March |
| 2 | 23, 2015? |
| 3 | A. Yes. |
| 4 | Q. When you obtained it, did you provide |
| 02:08:06 5 | it to your supervisor? |
| 6 | A. Yes. |
| 7 | Q. And that was to Lieutenant Rogowski? |
| 8 | A. Yes. |
| 9 | Q. The last page in this set is marked |
| 02:08:16 10 | 118. Do you see that? |
| 11 | A. Yes. |
| 12 | Q. It's dated April 2, 2015? |
| 13 | A. Yes. |
| 14 | Q. Can you tell us what this page is? |
| 02:08:22 15 | A. Another note from Nurse Practitioner |
| 16 | Feiereisel. |
| 17 | Q. And when you obtained this, you |
| 18 | provided it to you supervisor? |
| 19 | A. Yes. |
| 02:08:30 20 | Q. To Lieutenant Rogowski? |
| 21 | A. Yes. |
| 22 | Q. Okay. This note says: Starting April |
| 23 | 4th, John can return to work light duty for four |
| 24 | hours a day for one week. |

6 (Pages 21 to 24)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMPLLIS 001642

Page 25

The "John" refers to you, right?

A. Yes.

Q. Then six hours a day for one week and then eight hours a day for one week. He may

02:08:46 return to full unrestricted duty April 24, 2015, right?

A. Yes.

Q. I read that correctly?

A. Yes.

02:08:52 Q. Did you return to full unrestricted duty on or about April 24, 2015?

A. I believe I did.

Q. The injury itself, you said that it was to your neck and back?

02:09:02 A. Correct.

Q. What part of your neck and back?

A. I'm not a doctor, but it was to my upper back and lower neck.

Q. What was your understanding of the

02:09:10 nature of the injury?

A. Can you quantify that?

Q. What did the doctors tell you?

A. They told me that I had a partially bulging disc in one of my discs, I'm not sure

Page 26

which disc; I had spinal stenosis; and several other words that I don't know what they mean or what they are.

Q. And that's what they told you at the

02:09:32 time?

A. Yes.

Q. Did you see anyone other than the nurse practitioner in early 2015?

A. I believe I did.

02:09:38 Q. Who did you see?

A. An MRI doctor, x-ray doctor, specialist. I'm not sure of names or any of that. That would be in my medical record.

Q. After April 2, 2015, what was the next

02:10:22 communication you had with anyone with the Melrose Park Police Department management?

And let me be clear on this: You're a patrol officer, right?

A. Yes.

02:10:36 Q. You have a sergeant?

A. Sergeant, lieutenant.

Q. The sergeant is a member of the union, right?

A. Yes -- well, we don't have a union. We

Page 27

have an FOP, but yes.

Q. Okay. So sergeant, lieutenant, deputy chief, and the director of police; is that the chain?

02:10:50 A. Correct. At that time it would have been chief of police.

Q. Okay. So who have been your sergeants since April of 2015?

A. Let's see. I had Sergeant Rieger, he's

02:11:08 now a lieutenant; Sergeant Schillinger, he's the most recent one. As far as sergeants, that's the extent of who I can remember.

Q. Who have been your lieutenants since April of 2015?

02:11:26 A. Rieger, Rogowski, Maiello, DiMaio.

Q. How do you spell Maiello?

A. M-A-I-E-L-L-O.

Q. You said DiMaio?

A. Yes.

02:11:38 Q. How do spell that?

A. D-E-M-A-I-O, I believe.

Q. Okay. Anybody else?

A. That's all I can recall.

Q. Okay.

Page 28

A. I'm sorry. And Sergeant Lavalais for a brief period of time.

Q. And the deputy chiefs have been who?

A. Castellan and Rogowski.

02:12:00 Q. And either chief or director of police?

A. Pitassi.

Q. You said you returned to work full unrestricted duty on or about April 24, 2015, right?

02:12:20 A. Yes.

Q. Starting on April 25th of 2015, tell me every conversation or communication you've had with Sergeant Rieger relating to your neck or back.

02:12:36 A. I don't recall ever having any conversation with any supervisor after I furnished that note.

Q. Ever?

A. Maybe in unrelated talk, like not in a

02:12:48 capacity of officer to supervisor, maybe in a friendly basis. But as far as anything official, the last document that I furnished would be this and that was the last official conversation I had with anybody.

L.A. Court Reporters, L.L.C.
312-419-9292
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/LIS 001643

Page 29

```
           1      Q.  Okay.  And then includes up
           2   through 2017?
           3      A.  To my recollection right now, yes.
           4      Q.  So you're saying up through today, the
02:13:10   5   last conversation you had with any supervisor or
           6   manager at the Department in any kind of formal
           7   sense was April —
           8      A.  Regarding that injury?
           9      Q.  Regarding your neck or back.
02:13:22  10          MR. COOPER:  Which injury?
          11   BY THE WITNESS:
          12      A.  You're rolling all the injuries into
          13   one.
          14   BY MR. FOWLER:
02:13:26  15      Q.  Okay.  That's what I'm trying to figure
          16   out.
          17      A.  Okay.
          18      Q.  The neck or back injury that you had in
          19   February of 2015 —
02:13:34  20      A.  Uh-huh.
          21      Q.  — that's what we've been talking
          22   about, right?
          23      A.  Yes.
          24      Q.  So —
```

Page 30

```
           1      A.  Relating to that, the last official
           2   conversation I had was when I furnished this note
           3   to I believe then Lieutenant Rogowski.
           4      Q.  Okay.  So I want to focus a minute on
02:13:50   5   your use of the term "official conversation."
           6      A.  Okay.
           7      Q.  Other than official conversations, as
           8   you sit here today, do you recall any unofficial
           9   conversations with any manager or supervisor about
02:14:00  10   the injuries that's noted in Exhibit 6?
          11      A.  I don't recall ever discussing it with
          12   anybody, it could have occurred, but at this time,
          13   I don't recall.
          14      Q.  Fair enough.
02:14:14  15          After April 24, 2015, were you ever
          16   injured again on the job?
          17      A.  On the job?  Well, my belief is that
          18   the current injury stems from this injury.  But as
          19   far as something that was reported during my
02:14:36  20   eight-hour shift, no.
          21      Q.  Since April 24, 2015, you have not
          22   reported any injury that was work related to your
          23   managers or supervisors at the Police Department;
          24   is that fair?
```

Page 31

```
           1      A.  I wouldn't say that's fair.  I —
           2          MR. COOPER:  Wait.
           3   BY MR. FOWLER:
           4      Q.  What is the next occasion then that you
02:14:56   5   had any communications with a supervisor at the
           6   Department about your neck or back injury?
           7      A.  Around, I would say — well, let me
           8   see.  Can I take a look at this?
           9      Q.  Sure.
02:15:12  10          MR. COOPER:  Let the record reflect my
          11          client is looking at his notes that he
          12          brought with him, or documents.
          13   BY THE WITNESS:
          14      A.  I believe the last conversation I had
02:15:30  15   regarding any kind — or the first conversation I
          16   had, I should say, regarding any kind of new
          17   injury or recurring injury from the past would
          18   have been in the range of late October/early
          19   November while I was still on vacation, approved
02:15:46  20   vacation.
          21   BY MR. FOWLER:
          22      Q.  Of 2017?
          23      A.  Yes.
          24      Q.  How did that conversation take place?
```

Page 32

```
           1      A.  I spoke with Lieutenant Maiello on the
           2   phone and notified him that I was experiencing
           3   severe discomfort in my neck, severe pain, very
           4   similar to what I went through in 2015.
02:16:06   5      Q.  Anybody else on the line?
           6      A.  Nobody else was on the line.  There was
           7   someone else present, but I don't think that's
           8   relevant.
           9      Q.  You said the conversation took place on
02:16:16  10   the phone.  Who called who?
          11      A.  I called Lieutenant Maiello to notify
          12   him.
          13      Q.  Do you remember what date that was?
          14      A.  I do not.
02:16:24  15      Q.  During that conversation, you said that
          16   somebody else was present in the same location you
          17   were?
          18      A.  Yes.
          19      Q.  Who was that person?
02:16:30  20      A.  Officer Menolascino.
          21      Q.  How do you spell the name?
          22      A.  M-E-N-O-L-A-S-C-l-N-O.
          23      Q.  Where were you when the conversation
          24   took place?
```

8  (Pages 29 to 32)

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

VMP/JJS 001644

## Page 33

| | |
|---|---|
| 1 | A. Driver's seat of my car, my truck. |
| 2 | Q. So you were on your cell phone? |
| 3 | A. No. I was on Bluetooth, over the |
| 4 | speaker. |
| 02:16:48 5 | Q. Using your cell phone? |
| 6 | A. Yes, hands-free. |
| 7 | Q. So if you were Bluetooth on the |
| 8 | speaker, then Officer Menolascino heard not only |
| 9 | your part of the conversation, but he could also |
| 02:17:04 10 | hear what Lieutenant Maiello was saying as well, |
| 11 | right? |
| 12 | A. Yes. |
| 13 | Q. Okay. So you recall — you said that |
| 14 | that conversation took place late October/early |
| 02:17:12 15 | November? |
| 16 | A. Somewhere in there. I'm not sure of |
| 17 | the exact date. |
| 18 | Q. What was it that caused you to make |
| 19 | that phone call? |
| 02:17:18 20 | A. I wanted to notify Lieutenant Maiello |
| 21 | that I was experiencing an injury and I'm going to |
| 22 | followup with a doctor, and the capacity that |
| 23 | Officer Menolascino was involved was we were |
| 24 | together and he also wanted to speak to Lieutenant |

## Page 34

| | |
|---|---|
| 1 | Maiello about something unrelated. So he was |
| 2 | present for the conversation and I was fine with |
| 3 | him hearing our conversation. |
| 4 | Q. During that conversation, tell me — |
| 02:17:48 5 | and you're saying that whatever Officer |
| 6 | Menolascino was talking about is unrelated to you? |
| 7 | A. Correct. |
| 8 | Q. Okay. So I don't want to hear about |
| 9 | that part. What I want to hear about is you. |
| 02:17:56 10 | A. Uh-huh. |
| 11 | Q. With respect to you, tell me everything |
| 12 | that you said and everything that Lieutenant |
| 13 | Maiello said in that conversation. |
| 14 | A. Well, some time has elapsed. We can |
| 02:18:06 15 | agree on that. So I wouldn't be able to tell you |
| 16 | exactly what was said. |
| 17 | I can paraphrase which was basically: |
| 18 | Hey, Lou, how are you? I just wanted to let you |
| 19 | know that I'm experiencing — what I told him |
| 02:18:18 20 | which was I have severe discomfort in my neck, |
| 21 | severe pain, and I'm going to followup with a |
| 22 | doctor. |
| 23 | Q. Did you say anything else? |
| 24 | A. He said: Okay. And he says: Just |

## Page 35

| | |
|---|---|
| 1 | when you hear something — or something along |
| 2 | those lines — just followup with me, good luck |
| 3 | with the doctor, something along those lines. |
| 4 | Q. Anything else? |
| 02:18:38 5 | A. Not that I can recall at this time. |
| 6 | Q. As of the time of that conversation, |
| 7 | how long had you been on vacation? |
| 8 | A. Maybe a week and a half, two weeks. |
| 9 | I'm not entirely sure. |
| 02:18:52 10 | Q. During that week and a half or |
| 11 | immediately prior to you feeling that — let me |
| 12 | ask it differently. |
| 13 | When you felt the pain, how long was it |
| 14 | before you called Lieutenant Maiello? |
| 02:19:02 15 | A. Two, three days, maybe. |
| 16 | Q. In the period of time before when that |
| 17 | pain started, was there any physical activity that |
| 18 | you engaged in that you attribute as a basis to |
| 19 | the injury? |
| 02:19:16 20 | A. No. |
| 21 | Q. When was it that you first noticed |
| 22 | feeling the pain? |
| 23 | A. I was actually working a side job at |
| 24 | Cinemark with another lieutenant who was off-duty |

## Page 36

| | |
|---|---|
| 1 | at the time, Lieutenant Urso, and I had mentioned |
| 2 | to him that I feel some discomfort in my neck. I |
| 3 | don't know why. I mean, I haven't done anything. |
| 4 | I just mentioned that to him in casual |
| 02:19:44 5 | conversation, very similar to the injury in 2015: |
| 6 | Discomfort, sleep, wake up the next day, severe |
| 7 | pain, severe discomfort. |
| 8 | Q. Okay. Then how long was it before you |
| 9 | went to see a doctor? |
| 02:20:00 10 | A. Almost immediately after talking with |
| 11 | Lieutenant Maiello. I'm not sure of the exact |
| 12 | date that that was, but the earliest available |
| 13 | date I was able to get an appointment, I took. |
| 14 | I believe as soon as I hung up with Lieutenant |
| 02:20:14 15 | Maiello, I contacted my physician to make an |
| 16 | appointment. |
| 17 | (Scatchell Ex No. 8 was marked as of |
| 18 | 1/9/18.) |
| 19 | BY MR. FOWLER: |
| 02:20:50 20 | Q. All right. Showing you what's been |
| 21 | marked as Exhibit 8, this is — well, you tell me |
| 22 | what this is. |
| 23 | A. A doctor's note from my primary care |
| 24 | physician, Sandoval, she's a doctor. |

9 (Pages 33 to 36)

## Page 37

1    Q.  You received this -- well, you did

2  receive this letter, right?

3    A.  Yes.

4    Q.  You received it on or about November 9,

02:21:12  5  2017?

6    A.  Yes.

7    Q.  When you received it, what did you do

8  with it?

9    A.  I gave it to my immediate supervisor

02:21:18  10  which -- I believe Lieutenant Maiello was on

11  vacation, so I most likely gave it to Sergeant

12  Schillinger, but I'm not positive.

13    Q.  Do you believe as you sit here today

14  that this is the first note that you received

02:21:32  15  after feeling pain in your neck in or about

16  October/November of 2017?

17    A.  Yes.

18    Q.  So you think that the onset of the pain

19  came sometime/days before November 9, 2017?

02:21:46  20    A.  Yes.

21    Q.  Then does that suggest to you that your

22  conversation with Lieutenant Maiello that you

23  referred to a few minutes ago was early November

24  of 2017?

## Page 38

1    A.  Yes.

2    Q.  Okay.  So early November of 2017, you

3  have a conversation with Lieutenant Maiello by

4  phone?

02:22:08  5    A.  Yes.

6    Q.  You went to see a doctor?

7    A.  Yes.

8    Q.  You got the note that's marked

9  Exhibit 8?

02:22:12  10    A.  Yes.

11    Q.  What's the next thing that happened

12  relating to your medical condition or your back?

13    A.  Let me look at my note.

14    So I believe after this note, my doctor

02:22:26  15  wanted to play it cautious because I already had

16  undergone x-rays and MRI imaging in 2015.  So she

17  didn't want to expose me right away to radiation

18  if she thought that it was something that may be

19  able to be resolved through medication.

02:22:40  20    So she put me on an aggressive steroid

21  and I'm not sure what other pills and told me to

22  followup with her in a couple days and see how I

23  felt.  That kind of went on for maybe a week or so

24  or maybe more than that.  I'm not sure what the

## Page 39

1  timeframe is.

2    After that, the pain was still

3  persisting.  The numbness was still persisting.

4  So at that point, she made arrangements for me to

02:23:08  5  go do a -- I'm not sure of the name of the test.

6  Basically they test the nerves in your arms, your

7  spine, your neck.  So I did that.  And then after

8  that, I did an MRI.

9    Q.  When did you do the -- the test that

02:23:22  10  you're referring to is -- have you ever heard that

11  called as a nerve conduction test?

12    A.  No.

13    Q.  Okay.  The nerve test that you're

14  referring to, when was that?

02:23:34  15    A.  Maybe -- I'm not positive.  It might

16  have been early December or late November.  I'm

17  not -- I think -- I believe it was early

18  November -- I'm sorry, early December.

19    Q.  So November 9th, your doctor says

02:23:48  20  contact her in a couple of days and see how you're

21  feeling, correct?

22    A.  Correct.  And I was in constant contact

23  with her.

24    Q.  So a couple of days go by, you contact

## Page 40

1  her.  How did you contact her?

2    A.  Via phone or it might have been through

3  MyChart but most likely through phone.

4    Q.  Okay.  Whatever that contact method

02:24:06  5  was, you said you're still hurting?

6    A.  Correct.

7    Q.  What's the next thing that happened

8  after that?

9    A.  She said: Let's continue with the

02:24:14  10  pills and see if it resolves on its own, and she

11  told me to just try to rest and take the pills.

12    Q.  Okay.  Now, her note says: Has been

13  advised to continue to rest at home, on Exhibit 8.

14  Do you see that?

02:24:32  15    A.  Yes, I see that.

16    Q.  And that's what she told you?

17    A.  She told me to get rest.  She didn't

18  say to continue to rest at home.  She didn't say

19  those exact words.  She said just try to rest it.

02:24:40  20    Q.  When you received Exhibit 8, did you

21  read it?

22    A.  I did.

23    Q.  And then you gave it to your

24  supervisor, right?

10  (Pages 37 to 40)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 001646

## Page 41

1   A.  Yes.

2   Q.  And you gave it to your supervisor on

3  or about November 9th?

4   A.  Yes.

02:24:56  5   Q.  So we're moving forward a couple of

6  dates.  She said she wants you to continue that

7  treatment?

8   A.  Uh-huh.

9   Q.  What's the next thing that happened

02:25:06 10  related to your neck or back?

11   A.  I continued to relay information to her

12  that nothing was improving at all and that I

13  didn't like taking the pills because all that made

14  me do was sleep, all I did was get drowsy and go

02:25:20 15  to sleep, and it really did nothing to numb the

16  pain or nothing like that.  It just put me to

17  sleep.

18      So I told her I'd like to figure out

19  how we can move forward and resolve this injury in

02:25:32 20  the most time-efficient way possible.

21      And being that I'm on an HMO, she made

22  the recommendation then for me to go for this -- I

23  believe she referred to it as an EMG test.  She

24  made the recommendation, and it took some time for

## Page 42

1  the HMO to approve it.  Then once they did, I went

2  for that test.

3   Q.  After November 9th of 2017 when you

4  gave Exhibit 8 to your supervisor, what's the next

02:26:02  5  contact you had with any manager or supervisor at

6  the Police Department?

7   A.  Probably a week later, I checked in

8  with either Lieutenant Maiello or Sergeant

9  Schillinger weekly.

02:26:14 10  Q.  Why weekly?

11   A.  That was just something I felt was

12  honorable on my part and just to keep them in the

13  loop.

14   Q.  You're aware that the SOP requires you

02:26:24 15  to contact the Department every three days?

16   A.  I'm not aware of that.

17   Q.  Did you check?

18   A.  Did I check?

19   Q.  What the rules were about how often you

02:26:34 20  were supposed to report when you're on sick leave?

21   A.  No.

22   Q.  So the first conversation that you had

23  after November 9th with either Maiello or

24  Schillinger, as you sit here today, do you recall

## Page 43

1  that conversation?

2   A.  Which conversation are you --

3   Q.  The first one that you had with either

4  one of them.

02:26:52  5   A.  With Lieutenant Maiello, the one where

6  I explained I was with Menolascino at the time?

7   Q.  Okay.  Let's go back in the chronology.

8   A.  Okay.

9   Q.  You had the phone conversation with

02:27:02 10  Lieutenant Maiello before you went to see a

11  doctor, correct?

12   A.  Correct.

13   Q.  You went to see the doctor?

14   A.  Yes.

02:27:08 15  Q.  You got the November 9th note?

16   A.  Yes.

17   Q.  You gave that to your supervisor?

18   A.  Yes.

19   Q.  You said about a week later, you talked

02:27:14 20  to one of your supervisors?

21   A.  Yes.

22   Q.  Which one?

23   A.  I'm not positive.  I believe it might

24  have been Schillinger, but it could have been

## Page 44

1  either of them.  Like I said, I was in contact

2  with them weekly and I don't know that they

3  requested that kind of timeframe.  They just --

4  what was stated to me was when you hear something

02:27:30  5  or something changes, keep us in the know.  And

6  even though nothing was changing, I was still

7  keeping them in the know.

8   Q.  So that conversation would have been a

9  week after November 9th, right?

02:27:40 10  A.  Roughly.

11   Q.  So somewhere around November 16th?

12   A.  Roughly.

13   Q.  Okay.  During that conversation -- and

14  I understand you said you don't recall exactly who

02:27:50 15  you spoke to?

16   A.  Uh-huh.

17   Q.  But you said it was one of those two,

18  correct?

19   A.  Yes.

02:27:54 20  Q.  During that conversation, what did you

21  say to them and what did whoever it was say back

22  to you?

23   A.  I just said that the doctor put me on

24  steroids and they're trying to do this medicinally

11 (Pages 41 to 44)

## Page 45

1  rather than go through any kind of imaging, and
2  they said: Okay. If anything changes, let us
3  know.
4      Q.  What is the next communication you had
02:28:14  5  with any supervisor or manager at the Department
6  relating to your back or neck or your attendance?
7      A.  It would have been somewhere around the
8  20-something, the early 20s of November.
9      Q.  Okay. Do you remember who that
02:28:30  10  conversation was with?
11      A.  I do not.
12      Q.  How did that conversation take place?
13      A.  Same as the last one.
14      Q.  By phone?
02:28:36  15      A.  Yes.
16      Q.  You called them?
17      A.  Yes.
18      Q.  During that conversation, what did you
19  say and what did they say?
02:28:42  20      A.  I said that my injury is still the same
21  and we're continuing to evaluate it medicinally as
22  opposed to imaging.
23      Q.  During that conversation in the early
24  November 20s period that you referred to, was

## Page 46

1  anybody else on the line?
2      A.  No.
3      Q.  During the conversation on or about
4  November 16th, was anybody else on the line?
02:29:04  5      A.  No.
6      Q.  After this conversation that you had in
7  the early November 20s timeframe that you referred
8  to, what's the next conversation you had with any
9  manager or supervisor at the Department?
02:29:16  10      A.  Would have been late November/early
11  December, extrapolate a week from whatever
12  supposed date and there you are.
13      Q.  Did you have a conversation with
14  Sergeant Schillinger on or about November 27,
02:29:34  15  2017, about taking some vacation days?
16      A.  Not about vacation days.
17      Q.  Did you text Sergeant Schillinger on or
18  about November 19, 2017?
19      A.  Yes, I believe so.
02:29:52  20      Q.  Do you still have that text?
21      A.  I may. I may not. I'm not positive.
22      Q.  Okay. I'm going to instruct you do not
23  delete that if you do have it. Understood?
24      A.  Okay.

## Page 47

1      Q.  You texted him a message. What was the
2  point of texting him?
3          MR. COOPER: Jeff, it would be great if
4  we could see that document.
02:30:12  5          MR. FOWLER: He's already seen it.
6          MR. COOPER: Well, we can see it again.
7          MR. FOWLER: It was part of his
8  personnel file.
9          MR. COOPER: It's a big file.
02:30:24  10          Go ahead and read it (indicating).
11  BY THE WITNESS:
12      A.  Okay. I've seen this.
13  BY MR. FOWLER.
14      Q.  So you sent him a text message on or
02:30:42  15  about November 19th, right?
16      A.  I believe so, or around that date.
17      Q.  What did that text message say?
18      A.  I believe it says: Hey, can you give
19  me a call, or something like that.
02:30:50  20      Q.  He called you?
21      A.  Yes.
22      Q.  Anybody else on the line?
23      A.  No.
24      Q.  During that conversation, what did you

## Page 48

1  say and what did he say?
2      A.  I followed up with him based on a
3  conversation I've had with him repeated times over
4  the year and Lieutenant Maiello where I stated
02:31:06  5  that I would like to have time-due days for a
6  certain date range which I believe is outlined in
7  that letter and I had verbal consent from them
8  that that would be okay when the time came to put
9  in for those days which is seven to ten days
02:31:22  10  before that period starts.
11          So throughout the year, we had
12  conversations about that, and I believe November
13  19th would have been roughly or around that date
14  range when the next period schedule would come out
02:31:36  15  and I'm allowed to put in for my compensatory
16  time.
17      Q.  What I'm asking is: In that phone
18  conversation with Sergeant Schillinger on or about
19  November 19th, what did you say and what did he
02:31:44  20  say?
21      A.  I said: Hey, Sarge -- paraphrasing, of
22  course, because I don't remember exact words. I
23  said something to the effect of: Hey, Sarge, just
24  following up with you about those days I asked you

## Page 49

```
 1    for. Would that be okay to put in for those when
 2    the schedule comes out?
 3         And he says: Yes. When we hang up,
 4    text me exactly the days that you want and I'll
02:32:06  5  check the manpower. If it's good, then we'll --
 6    I'll write you the slip and we'll get it to Deputy
 7    Chief Castellan.
 8         Q.   Who approves time-due days?
 9         A.   Well, there's a process to shift
02:32:20 10  approval and then ultimately approved by Deputy
11    Chief Castellan. But as far as the shift goes,
12    you can't just put in for whatever days and then
13    that automatically gets forwarded to Deputy Chief
14    Castellan. That has to be vetted by either the
02:32:34 15  sergeant or lieutenant, whoever is around that day
16    or around that period, and they'll look at the
17    manpower and say: Well, we either can or can't
18    approve this day because we have this many guys or
19    because we don't or do.
02:32:46 20        Q.   The ultimate approval goes up to the
21    deputy chief?
22         A.   Correct.
23              (Scatchell Ex No. 9 was marked as of
24              1/9/18.)
```

## Page 50

```
 1    BY MR. FOWLER:
 2         Q.   Showing you what's been marked as
 3    Exhibit 9, this is the document we've just been
 4    talking about?
02:33:10  5  A.   Yes.
 6         Q.   And you received this document on or
 7    about -- or you received it before today?
 8         A.   Before today, yes.
 9         Q.   When you received it, you reviewed it?
02:33:20 10  A.   Briefly, yes.
11         Q.   Is there anything in this document that
12    strikes you as being untrue?
13         A.   To my conversation with Sergeant
14    Schillinger, nothing appears to be untrue.
02:33:44 15        Q.   All right. So after November 19th
16    then, what was the next communication that you had
17    with anyone from the Department concerning your
18    neck, back, or time off?
19         A.   After November 19th?
02:33:56 20        Q.   Yes.
21         A.   I believe I told you earlier it was
22    late November or early December.
23         Q.   So there was another conversation late
24    November/early December, right?
```

## Page 51

```
 1         A.   Correct. This more or less would be
 2    mid November, the 19th. So --
 3         Q.   The conversation that you're referring
 4    to late November/early December, who was that
02:34:10  5  with?
 6         A.   Again, either Sergeant Schillinger or
 7    Lieutenant Maiello.
 8         Q.   How did the conversation take place?
 9         A.   I believe at that time I would have
02:34:22 10  informed them that I was going for that EMG test
11    which I explained.
12         Q.   Okay. How did the conversation take
13    place; in person, over the phone?
14         A.   Over the phone.
02:34:30 15        Q.   Who called who?
16         A.   I would have called them.
17         Q.   Anybody else on the line?
18         A.   No.
19         Q.   During that conversation, what did you
02:34:36 20  say and what did they say?
21         A.   Again, I explained to them that I
22    believe at that time was when I was going for the
23    EMG test or I was scheduled to go for the EMG
24    test, and I explained to them the process from
```

## Page 52

```
 1    there. I believe the phrasing that he used was:
 2    We don't really need to know exactly what your
 3    medical condition is. I mean, if anything changes
 4    or your condition changes, let us know.
02:35:02  5  Q.   What's the next communication you had
 6    with anybody from the Police Department about your
 7    medical condition or time off?
 8         A.   After the MRI which would have been
 9    shortly -- maybe two or three days after the EMG
02:35:16 10  test because they didn't like the results of that
11    test, they sent me for an MRI and I contacted --
12    which would only have been a couple of days. So
13    it wouldn't have been a week.
14              I contacted one of my supervisors, not
02:35:28 15  sure which, via the phone to let them know I'm
16    going for an MRI.
17              (Scatchell Ex No. 10 was marked as
18              of 1/9/18.)
19    BY MR. FOWLER:
02:35:48 20        Q.   Showing you what's been marked as
21    Exhibit 10, do you recognize this as the letter
22    you received on or about November 27, 2017?
23         A.   Yes.
24         Q.   When you received this letter, did you
```

13   (Pages 49 to 52)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMP/LLS 001649

## Page 53

1  turn it over to your supervisor?
2     A.  Yes.
3     Q.  When you received it, you read it?
4     A.  Yes.
02:36:04  5     Q.  What happened to cause this letter to
6  be issued?
7     A.  Well, through the grapevine which
8  obviously is not official and I don't remember who
9  it came from, but I heard that my letter -- my
02:36:26  10  first letter which would have been the November
11  9th letter, Exhibit 8, was interpreted by Deputy
12  Chief Castellan to mean that I was not to leave my
13  house, ever, which I told my doctor that and she
14  goes: That is not my intention with that note.
02:36:42  15  And she outlined what's in this note so that I may
16  go about my everyday normal life (indicating).
17     Q.  When did you have that conversation
18  with your doctor?
19     A.  On or about the 27th, or maybe a day
02:36:56  20  before that.
21     Q.  When was it that you heard the rumor
22  from this person that you don't remember?
23     A.  It would have been shortly before that.
24     Q.  What exactly was it that you heard?

## Page 54

1     MR. COOPER:  Well, this isn't a
2  deposition. Because at this point you're
3  sort of going into some attorney-client
4  stuff, some of which could be --
02:37:22  5     MR. FOWLER:  So let me be clear. I
6  appreciate that.
7     MR. COOPER:  We can waive some stuff,
8  but I need to go in the hallway with him.
9     MR. FOWLER:  Okay. But let me ask the
02:37:30  10  question first.
11  BY MR. FOWLER:
12     Q.  You said you don't remember who you
13  heard it from?
14     A.  Correct.
02:37:34  15     Q.  Was it an attorney?
16     MR. COOPER:  Well, slow down. Stop,
17  stop, stop. Give us a minute.
18     (WHEREUPON, a recess was had.)
19     MR. COOPER:  It's a little bit of
02:45:00  20  attorney-client privileged information that
21  I'm willing to give you, but let's see where
22  this goes.
23  BY MR. FOWLER:
24     Q.  Okay. So let's do it this way: After

## Page 55

1  having had an opportunity to talk to your
2  attorney, is there something that you'd like to
3  tell us?
4     A.  No.
02:45:16  5     Q.  I'll get back to that in a second. I'm
6  going to backtrack a little bit.
7     Earlier you told us about the medical
8  treatment you received between February and April
9  of 2015. Do you remember that?
02:45:30  10     A.  Yes.
11     Q.  And that was as a result of a
12  work-related injury that you reported to your
13  supervisors, right?
14     A.  Yes.
02:45:34  15     Q.  Okay. And that medical care was taken
16  care of pursuant to Workmen's Comp, wasn't it?
17     A.  No.
18     Q.  That was part of your HMO?
19     A.  Correct. I did not choose to use
02:45:46  20  Workmen's Comp.
21     Q.  Why not?
22     A.  Didn't feel it was necessary. It was
23  suggested by other people to use Workmen's Comp
24  and sue or do whatever to get personal gains out

## Page 56

1  of it, and I says absolutely not. My only concern
2  is getting better, and that's what I did.
3     Q.  So then you continued to use your HMO
4  in November of 2017?
02:46:08  5     A.  Yes.
6     Q.  Did you communicate to your HMO that
7  you thought the injury was as a result of --
8  strike that.
9     Did you tell the doctor or the nurse
02:46:30  10  practitioner, whoever, in November of 2017 that
11  you thought that the nature of the injury stemmed
12  from February of 2015?
13     A.  Yes, I told her I believe it's related
14  to my last injury.
02:46:46  15     Q.  All right. So who did you tell that
16  to?
17     A.  My primary care physician, Sandoval.
18     Q.  Now, we were talking about this
19  grapevine that you referred to.
02:47:00  20     A.  Yes.
21     Q.  And you said that sometime before
22  November 27, 2017, you heard through the grapevine
23  that you had a different -- that Deputy Chief
24  Castellan had different perceptions of your

14 (Pages 53 to 56)

Page 57

```
                  1   restrictions than you did?
                  2       A.  Correct.
                  3       Q.  And that caused you to go back to your
                  4   doctor, right?
02:47:18          5       A.  Correct.  And I asked her could you
                  6   more -- or, I'm sorry, could you clarify in
                  7   more -- in a little bit more detail as to what my
                  8   restrictions are.
                  9       Q.  So I'm going to do this two ways:
02:47:30         10   First, I want to talk about the conversation with
                 11   the doctor.
                 12       A.  Okay.
                 13       Q.  That was Dr. Sandoval?
                 14       A.  Correct.
02:47:38         15       Q.  At her office?
                 16       A.  To my recollection, yes.
                 17       Q.  Anybody else present in the room?
                 18       A.  No.
                 19       Q.  That conversation took place on or
02:47:46         20   about November 27th?
                 21       A.  Roughly, yeah.
                 22       Q.  During that conversation, what did you
                 23   say and what did she say?
                 24       A.  I told her that there's some word going
```

Page 58

```
                  1   around that your note was interpreted -- the first
                  2   note, the November 9th note, was interpreted to
                  3   mean that I'm essentially bedridden or forbidden
                  4   to leave my house because it said:  Rest at home,
02:48:08          5   and that was, what I was told, interrupted as
                  6   stay home.
                  7       Q.  Did you tell her anything else?
                  8       A.  I may have.  I do not recall at this
                  9   time.
02:48:18         10       Q.  How did Dr. Sandoval respond?
                 11       A.  She said:  That is 110 percent not my
                 12   intention with that letter.
                 13       Q.  What else did she say?
                 14       A.  She said that she would write another
02:48:32         15   note and clarify what she meant, and then the rest
                 16   of our conversation was typical doctor-patient
                 17   stuff.
                 18       Q.  What do you mean by that?
                 19       A.  Well, she was talking to me about what
02:48:44         20   the next procedure is with my medical condition,
                 21   and from there on, nothing pertained to the Police
                 22   Department.
                 23       Q.  And then you said that she gave you the
                 24   note.  That's the one that we talked about,
```

Page 59

```
                  1   Exhibit 10?
                  2       A.  Yes.
                  3       Q.  During that conversation, did you tell
                  4   Dr. Sandoval that you were going hunting?
02:49:04          5       A.  It may have came up.  I'm not sure.
                  6           I asked her if I was allowed to do
                  7   light exercises, and she said:  Yes.  She said:
                  8   You can go about doing your everyday life.  They
                  9   can't restrict you from doing your everyday life
02:49:18         10   as long as you're not doing anything that I would
                 11   deem to cause you further injury or further
                 12   aggravation to the injury.
                 13       Q.  Did you give her any details about what
                 14   your everyday physical activities were?
02:49:30         15       A.  Yeah.  I told her that I walk around a
                 16   lot and that really was my only form of exercise
                 17   since this injury started which, for the record,
                 18   started -- the injury started somewhere in late
                 19   October, as I stated earlier.  At that time I
02:49:48         20   weighed 186 pounds.  Okay?  Today -- or at my most
                 21   recent medical examination, I think was
                 22   228 pounds, and my scale today says 236 pounds.
                 23           So I'm roughly 50 pounds heavier just
                 24   during the course of this injury because I haven't
```

Page 60

```
                  1   been able to do any kind of exercise like I would
                  2   normally do, like my usual repetitions and going
                  3   to the gym and stuff like that, and I would never
                  4   go to the gym at this point out of fear of action
02:50:26          5   by my administration.
                  6       Q.  Did you tell Dr. Sandoval anything else
                  7   about your daily physical activities were?
                  8       A.  I told her I like to walk around.  I
                  9   like to do light exercise.  She didn't ask me to
02:50:38         10   elaborate and I didn't.
                 11       Q.  Anything else?
                 12       A.  No.
                 13       Q.  What is the next communication that you
                 14   had with any supervisor or manager at the Police
02:50:50         15   Department relating to your neck, back, or
                 16   attendance at work?
                 17       A.  Following November 27th?
                 18       Q.  Yes.
                 19       A.  I believe I stated earlier which would
02:51:02         20   have been when I was going for the EMG test, early
                 21   December.
                 22       Q.  And who was that conversation with?
                 23       A.  Again, either Lieutenant Maiello or
                 24   Sergeant Schillinger.
```

15 (Pages 57 to 60)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/LIS 001651

Page 61

1    Q.  The grapevine that you referred to, who
2  told you about that grapevine comment?
3    A.  I don't recall.
4    Q.  How many people told you about the
02:51:20   5  grapevine comment?
6    A.  Multiple people.
7    Q.  "Multiple people" meaning people from
8  the Department?
9    A.  Yes.
02:51:28  10    Q.  Other officers?
11    A.  To my recollection, yes.
12    Q.  Any supervisor or manager?
13    A.  I don't recall if it was a supervisor
14  or manager.  Again, I don't recall exactly who it
02:51:36  15  was.  Because over the course of the last six
16  weeks, I've had multiple conversations with
17  multiple people about multiple different things.
18    Q.  So you've told us about a conversation
19  with either Lieutenant Maiello or Sergeant
02:51:48  20  Schillinger about the EMG test?
21    A.  Yes.
22    Q.  What is the next communication that you
23  had with anyone from the Department about your
24  physical condition or your attendance?

Page 62

1    A.  It would have been what I stated
2  earlier which was after the EMG test, I let them
3  know that I was going for an MRI which was a
4  couple of days later.
02:52:06   5    Q.  Who did you talk to?
6    A.  Sergeant Schillinger, Lieutenant
7  Maiello.
8    Q.  How did that conversation take place?
9    A.  By phone.
02:52:14  10    Q.  You called them?
11    A.  Yes.
12    Q.  Anybody else on the line?
13    A.  No.
14    Q.  During that conversation, what did you
02:52:20  15  say and what did they say?
16    A.  I let them know that my EMG test
17  results came back kind of iffy and I was going for
18  an MRI, and they stated to me:  We don't need to
19  know exactly -- I don't know which one stated this
02:52:30  20  to me -- we don't need to know exactly what's
21  going on with your medical condition.  Just let us
22  know if something changes or if you're returning
23  to work or light duty or anything like that.
24    Q.  Now, during around this timeframe, you

Page 63

1  received a memo from Deputy Chief Castellan,
2  didn't you?
3    A.  Which memo are you referring to?
4      (Scatchell Ex No. 11 was marked as
02:52:48   5     of 1/9/18.)
6  BY MR. FOWLER:
7    Q.  Showing you what's been marked as
8  Exhibit 11, do you recognize this as a memo you
9  received on or about December 4, 2017?
02:53:16  10    A.  I did not receive this on or about
11  December 4th.
12    Q.  Had you received it before today?
13    A.  Yes, I have.  It would have been more
14  like December 20th maybe, something to that
02:53:24  15  effect.  It was never presented to me by anybody
16  until Sergeant Schillinger came to my house as a
17  followup.
18      I told him:  Hey, come by and we'll
19  talk.
02:53:36  20      Then he said:  This was left, a sealed
21  envelope that was left in the supervisor's desk.
22  It was never furnished to me until that point.
23    Q.  Okay.  So let's go through the
24  chronology.

Page 64

1      You said that there was a conversation
2  about the MRI, and I'm guessing from what you're
3  saying that was around the second week or so of
4  December?
02:53:54   5    A.  Probably more like around the 7th, 8th,
6  9th, something like that.  I think I went the day
7  before or the day of my birthday which would have
8  been the 9th.  I'm not positive but roughly.
9    Q.  After that MRI conversation, what was
02:54:08  10  the next communication that you had with any
11  manager or supervisor at the Police Department?
12    A.  It would have been a couple days to a
13  week later, and I was letting them know that now
14  they want me to go see a neurosurgeon, my doctor.
02:54:22  15    Q.  You called?  The conversation took
16  place by phone?
17    A.  Yes.  And I called, yes.
18    Q.  Anybody else on the line?
19    A.  No.
02:54:30  20    Q.  And as you sit here today, do you know
21  who you were speaking to?
22    A.  One of the two, either the lieutenant
23  or sergeant.
24    Q.  Okay.  During that conversation, what

16  (Pages 61 to 64)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMP/LIS 001652

Page 65

1  did you say and what did they say?

2  A.  I said that the MRI results came back

3  with -- like I said in the last one, they didn't

4  want specifics.  So it didn't come back in a

02:54:48  5  favorable manner and they wanted to go to the next

6  step which would be a neurosurgeon because my

7  doctor felt that at this point the injury was

8  something that's not her expertise and she needs

9  to send it to somebody else.

02:55:04  10  Q.  After that conversation, what's the

11  next time you had any communication with any

12  manager or supervisor at the Police Department

13  concerning your physical condition or your

14  attendance?

02:55:14  15  A.  Like I said, I don't recall specifics,

16  but I would guess it would be around a week later,

17  another phone call just to let them know:  Hey,

18  I'm still waiting to go for this neurosurgeon

19  test, because the HMO took two weeks to respond to

02:55:30  20  my doctor's referral and then ultimately denied

21  it.

22  Q.  That conversation, do I have the

23  chronology right, it would be somewhere around

24  December 15th, something like that?

Page 66

1  A.  Something like that, yes.

2  Q.  And that conversation, you're not sure

3  which of the two it was?

4  A.  Correct.

02:55:48  5  Q.  And anybody else on the line?

6  A.  No.

7  Q.  That conversation also took place by

8  telephone?

9  A.  Yes.

02:55:52  10  Q.  Anything else in that conversation that

11  you recall?

12  A.  No, just letting them know that I was

13  waiting.  And I believe my doctor's note says the

14  same thing from somewhere around that time, that I

02:56:02  15  was -- that my appointment was pending.

16  Q.  Your communications with your

17  supervisors, you mentioned by them by phone.  Was

18  it always from your cell phone?

19  A.  I believe so.  I'm not positive.  Like

02:56:14  20  I said, there's times when I'm with Officer

21  Menolascino or whoever else and -- I mean, we

22  don't -- there's no reason that anything needs to

23  be secretive.  So if I'm with him and he's got to

24  call Nunz and I got to call Nunz, Lieutenant

Page 67

1  Maiello formerly, we'll both talk to him on the

2  phone.  So it could have been from his phone.  It

3  could be from anyone's phone.  So I'm not

4  positive.

02:56:36  5  Q.  So after this one that you talked

6  to your supervisor about the neuro test being

7  denied, what's the next communication that you had

8  with any manager?

9  A.  That wasn't about the neuro testing.

02:56:50  10  That was to  let them know I was waiting for

11  approval for the neuro.

12  Q.  Okay.  After the conversation where you

13  said you were waiting for approval, what's the

14  next communication you had with a manager or

02:56:58  15  supervisor about your medical condition or your

16  attendance?

17  A.  Same thing, my guess would be about a

18  week later to let them know --

19  Q.  So just before Christmas?

02:57:08  20  A.  Yeah, I would say that's reasonable,

21  somewhere like the 22nd, 23rd.

22  Q.  Okay.  Who did you talk to?

23  A.  I believe that one to be Sergeant

24  Schillinger because Lieutenant Maiello was on

Page 68

1  vacation.

2  Q.  Also by phone?

3  A.  Yes.

4  Q.  Now, you said that somewhere around

02:57:26  5  December 20th somebody brought a letter to you?

6  A.  Sergeant Schillinger, yes.

7  Q.  Was this in the conversation that

8  you're talking about December 22nd or was there

9  something in between?

02:57:36  10  A.  Well, there was that and I'm not sure

11  of the chronology of it, but shortly thereafter,

12  maybe a day or two later, we spoke on the phone

13  again after he was at my house.

14  Q.  Okay.  So he came to your house first?

02:57:48  15  A.  Correct.

16  Q.  Anybody else present?

17  A.  No.

18  Q.  He came to your house somewhere around

19  December 20th?

02:57:54  20  A.  Somewhere around there, yeah.

21  Q.  During that conversation, what did you

22  say and what did he say?

23  A.  Basically just let him know my status

24  which -- to be honest, now we're getting muddled

17 (Pages 65 to 68)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMP/ LIS 001652

## Page 69

1 in chronology, but he then gave me the note and
2 wished me luck with all this stuff because at that
3 point now the entire town apparently knew about
4 it.

02:58:16 5      Q.   The note you're referring to is the
6 note marked Exhibit 11?
7      A.   Yes, marked 123 on the bottom.
8      Q.   Then you said --
9      A.   That was the first time I saw that
02:58:28 10 note.
11      Q.   Okay.  Then you said a couple days
12 later, you had a telephone conversation with
13 Sergeant Schillinger?
14      A.   Yes.
02:58:34 15      Q.   You called him?
16      A.   Yes.
17      Q.   Anybody else on the line?
18      A.   No.
19      Q.   During that conversation, what did you
02:58:40 20 say and what did he say?
21      A.   Let him know that the neuro got denied
22 by my HMO, and the reason for their denial is we
23 don't have a neurosurgeon in the network that I
24 chose when I was hired.  So being that it's an

## Page 70

1 HMO, they wanted me to go see a spinal specialist
2 who is in our network and there's only two of
3 them.
4      So I told him that, and then I said:
02:59:02 5 Unfortunately being that there's only two, I
6 believe that the secretary said they're both out
7 of town, and the earliest date that I could get in
8 would be either January 9th which I did not take
9 because here we sit on January 10th which is
02:59:14 10 tomorrow, and that's the appointment that I took.
11      (Scatchell Ex No. 12 was marked as
12      of 1/9/18.)
13 BY MR. FOWLER:
14      Q.   Showing you what's been marked as
02:59:36 15 Exhibit 12, do you recognize this letter?
16      A.   Yes.
17      Q.   This letter is dated December 15, 2017?
18      A.   Yes.
19      Q.   You received it on or about December
02:59:46 20 15th?
21      A.   Thereabouts, yes.
22      Q.   What did you do with it when you got
23 it?
24      A.   Turned it over to my supervisor, I

## Page 71

1 believe.  Let me --
2      MR. COOPER:  This is probably a good
3 time for me to chime in.
4      This letter came about on my
03:00:02 5 recommendation to my client to get clarity
6 from his physician based on conversations
7 that you and I had; for the record,
8 Mr. Fowler, the conversations had between
9 myself and you, Mr. Fowler, as to my client's
03:00:20 10 fitness to travel.
11 BY MR. FOWLER:
12      Q.   You received this letter on or about
13 the 15th?
14      A.   Yes.
03:00:26 15      Q.   You gave it to your supervisor on or
16 about that day?
17      A.   I believe I did, yes.  I'm not
18 positive, but I believe I did.
19      Q.   I understand what your attorney said,
03:00:36 20 but we're here talking about what you know.
21      A.   Okay.
22      Q.   Did you have any communications with
23 any supervisor or manager at the Police Department
24 about this letter?

## Page 72

1      A.   Can you rephrase?
2      Q.   Did you talk to any of your supervisors
3 about this?
4      A.   I believe I said that.  Around the
03:00:54 5 15th, I contacted them to let them know that my
6 appointment was pending, somewhere or thereabouts.
7      Q.   Okay.  Anything else?
8      A.   Not to my recollection at this time.
9      Q.   And the appointment that was pending is
03:01:10 10 the one that led to getting this letter, is that
11 what you're saying?
12      MR. COOPER:  I think that misstates the
13 witness' testimony.
14      MR. FOWLER:  That's what I'm trying to
03:01:18 15 understand.
16      MR. COOPER:  Can you please reask the
17 question or reword it?
18 BY THE WITNESS:
19      A.   Yeah.  Can you reword that?
03:01:24 20 BY MR. FOWLER:
21      Q.   You went to see the doctor on or about
22 December 15th, right?
23      A.   I don't believe I went to my doctor.  I
24 think that was just her following up with her

18 (Pages 69 to 72)

## Page 73

```
           1    referral to the neuro at that time.
           2        Q.   Okay.
           3        A.   And she furnished another note.
           4        Q.   Now, this note is referring to your
03:01:46   5    prior arranged travel plans. Do you see that?
           6             Are you looking at the wrong document?
           7             MR. COOPER: We're looking a document
           8    dated December 15th, and we see the word
           9    "prior" in the second to the last sentence.
03:02:00  10    BY MR. FOWLER:
          11        Q.   Do you see that?
          12        A.   Right.
          13        Q.   So how did your doctor know about your
          14    prior arranged travel plans?
03:02:06  15        A.   I let her know.
          16        Q.   By phone, by person, how?
          17        A.   By phone.
          18        Q.   You called her up and asked her for
          19    another note?
03:02:16  20             MR. COOPER: Wait. My instructions to
          21    my client -- I understand you're asking what
          22    he said. My instructions to my client were
          23    to get clarity from his physician so that I
          24    can give you answers to questions that you
```

## Page 74

```
           1    asked me.
           2             MR. FOWLER: I understand.
           3    BY MR. FOWLER:
           4        Q.   And I'm focusing, Officer Scatchell, on
03:02:36   5    what you did and who you talked to and what you
           6    said. Do you understand that?
           7        A.   Yes.
           8        Q.   Okay. What I'm asking you is: What
           9    conversation or communication did you have with
03:02:46  10    Dr. Sandoval that resulted in Exhibit 12?
          11        A.   It would have been by phone after I
          12    spoke with my attorney, and I let her know that I
          13    had a trip planned which was planned for a long
          14    time.
03:02:58  15             I asked her would me being on a plane
          16    have any impact whatsoever on my injury?
          17             She said: No.
          18        Q.   Is there anything else in that
          19    conversation that you told her other than being on
03:03:10  20    a plane?
          21        A.   I just told her that I was going out of
          22    town and that I would be on a plane. No, there
          23    was nothing else.
          24        Q.   Did you tell her --
```

## Page 75

```
           1        A.   Nothing else pertinent.
           2        Q.   Did you tell her where you were going?
           3        A.   No. She didn't ask.
           4        Q.   Did you tell her what you would be
03:03:28   5    doing at the destination?
           6        A.   I told her recreation.
           7        Q.   Did she ask what recreation?
           8        A.   No.
           9        Q.   Then you said that you gave Exhibit 12
03:03:38  10    to one of your supervisors?
          11        A.   I believe so, but I'm not positive on
          12    that.
          13        Q.   Now, after December 15th, then you told
          14    us about the communications with Sergeant
03:03:50  15    Schillinger on or about the 20th and the 22nd,
          16    right?
          17        A.   Somewhere in there, yes.
          18        Q.   What's the next communication that you
          19    had with any manager or supervisor with the
03:04:00  20    Department regarding your attendance or your
          21    physical condition?
          22        A.   It would have been the very next
          23    doctor's note which was, I don't know, maybe ten
          24    days after this one.
```

## Page 76

```
           1        Q.   What doctor's note are you referring
           2    to?
           3        A.   I think there's -- or is this the last
           4    one (indicating)?
03:04:14   5        Q.   Well, I'll tell you, this is the last
           6    one I'm aware of.
           7        A.   Okay. Then this is the last one. I'm
           8    sorry. I misspoke.
           9        Q.   Okay. As you sit here today, you're
03:04:26  10    not aware of a doctor's note after December 15th?
          11        A.   The one that I attempted to give Deputy
          12    Chief Castellan yesterday.
          13        Q.   Okay.
          14        A.   That would be probably the only recent
03:04:36  15    one that I can recall.
          16        Q.   Do you have a copy of that one?
          17        A.   Not with me, no. Unfortunately my
          18    printer at home wasn't working and -- actually,
          19    you know what? There's two doctor's notes.
03:04:42  20    There's one -- wait.
          21             No, this is the most recent one as of
          22    yesterday which states light duty employment
          23    pending the consultant input, and I wrote a
          24    To/From to Director Pitassi a couple days ago
```

L.A. Court Reporters, L.L.C.
312-419-9292
**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
VMP/LIS 001655

## Page 77

1   stating that I would like to come back light duty.
2   He instructed me to get ahold of Deputy Chief
3   Castellan yesterday at 10:00 a.m. which I did.
4       I contacted him and he stated to me
03:05:14   5   that basically he believes this to be too vague
6   and he wanted me to have my doctor more so define
7   what I can do, and that's -- she wrote that note.
8   And within maybe ten minutes of her sending me
9   that note through MyChart, I contacted Deputy
03:05:34   10  Chief Castellan again and received no answer.
11      MR. FOWLER: Chris, have you seen the
12  doctor's note that he's referring to?
13      MR. COOPER: No.
14  BY MR. FOWLER:
03:05:40   15  Q.  I'll tell you, I haven't, either.
16  A.  Right. Again, this all came up
17  yesterday. I assumed that I would be speaking
18  with Deputy Chief Castellan about it, but I
19  contacted him, left a voicemail, and at that point
03:05:52   20  I never received any correspondence thereafter.
21      Q.  Here's what I want you to do: I want
22  you to give that note to your attorney as soon as
23  you can.
24      A.  Okay.

## Page 78

1       MR. FOWLER: And then, Chris, you're
2   going to send it to me.
3       MR. COOPER: Absolutely.
4       MR. FOWLER: Can I mark this one?
5       MR. COOPER: Is that the same one?
6       MR. FOWLER: No, it's not the doctor's
7   note.
8   BY THE WITNESS:
9   A.  Is that my To/From?
10      (Scatchell Ex No. 13 was marked as
11      of 1/9/18.)
12  BY MR. FOWLER:
13  Q.  Now showing you what's been marked as
14  Exhibit 13, can you tell us what that is, please?
03:06:36   15  A.  That's the aforementioned To/From that
16  I wrote the other day to Director Pitassi.
17  Q.  And this is the one that you talked
18  about asking for light duty, correct?
19  A.  Correct.
03:06:50   20  Q.  When you submitted Exhibit 13, had you
21  checked the SOPs first as to what information you
22  were supposed to provide?
23  A.  I spoke with Director Pitassi and --
24      MR. FOWLER: Chris, don't mark on that

## Page 79

1   one.
2       MR. COOPER: Don't mark it?
3       MR. FOWLER: No, because that's the
4   only one we have.
12:48:08   5   MR. COOPER: She's already marked it
6   (indicating).
7       MR. FOWLER: Oh, okay.
8   BY MR. FOWLER:
9   Q.  All right. So looking at Exhibit 13,
03:07:30   10  there's now some writing on the lower right,
11  inter-something, it looks like that's what Chris
12  just wrote?
13  A.  Inter.
14  Q.  Okay. So that's the document that you
03:07:40   15  referred to that you gave to Deputy Chief
16  Castellan, right?
17  A.  No. I gave that to Director Pitassi
18  and Deputy Chief Castellan was copied.
19  Q.  Got it. And as a result of this note,
03:07:50   20  you received communication back saying that you
21  need to provide more detail as to your medical
22  restrictions, right?
23  A.  Correct.
24  Q.  And that's the document that you think

## Page 80

1   you submitted yesterday?
2   A.  I did not submit it yesterday. I
3   attempted to submit it as per my conversation with
4   Deputy Chief Castellan. He asked me to contact my
03:08:08   5   doctor which I did, and I told her -- or explained
6   to her secretary that her last note which would be
7   Exhibit 11 was deemed too vague and it needed to
8   be clarified as to what I could do in a light-duty
9   capacity.
03:08:26   10  MR. COOPER: Exhibit 11 or 12?
11      THE WITNESS: I'm sorry. 12, it's 12,
12  dated December 15th.
13  BY MR. FOWLER:
14  Q.  You said you attempted to submit a
03:08:36   15  doctor's note yesterday?
16  A.  Yes.
17  Q.  What does that mean?
18  A.  That means I spoke with Deputy Chief
19  Castellan. We had a clear understanding of what I
03:08:44   20  was going to do that day which was contact my
21  doctor. I asked him: Are you going to be in the
22  office the rest of the day?
23      He stated to me: Yes, I will, because
24  of this new system we're running -- or whatever

L.A. Court Reporters, L.L.C.
312-419-9292
**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
VMP/LLS 001656

Page 81

1    his occupation on that day.
2          I contacted my doctor, explained to the
3    secretary that her note was too vague, and I asked
4    if she can put in there what she deems appropriate
03:09:08  5    for me in a light-duty capacity.
6          She wrote her note through MyChart and
7    that goes straight to my email. Within ten
8    minutes of getting that email, I contacted Deputy
9    Chief Castellan through the CSO desk and no
03:09:22  10   answer, left a voicemail.
11   Q.  Okay. So you tried to contact him?
12   A.  Correct.
13   Q.  Okay. I'm just trying to be clear as
14   to what happened.
03:09:28  15   A.  This is the second time. I did contact
16   him the first time.
17   Q.  So let's break it down a little bit.
18   A.  Okay.
19   Q.  The first conversation with Deputy
03:09:34  20   Chief Castellan yesterday --
21   A.  Yes.
22   Q.  -- by phone or in person?
23   A.  By phone.
24   Q.  Anybody else on the line?

Page 82

1    A.  It's a station line so it's recorded.
2    Q.  But nobody else was an active
3    participant?
4    A.  Not to my knowledge.
03:09:46  5    Q.  During that conversation, what did he
6    say and what did you say?
7    A.  He stated to me: Okay. You want to
8    come back light duty, that's great. I'm
9    paraphrasing, of course.
03:09:58  10         I said: Yeah, I'd like to come back.
11         And he said: Okay. What we need you
12   to do is contact your doctor and get a more clear
13   definition as to what you can and can't do.
14         He cited Officer Thull as an example,
03:10:14  15   stating that -- and whether it's accurate or not,
16   that his doctor's note stated that -- and this is
17   verbatim -- he is allowed to answer phones and sit
18   in a chair. This is verbatim from Deputy Chief
19   Castellan.
03:10:24  20   Q.  Okay. Anything else in that
21   conversation?
22   A.  I says: Okay. Thank you very much,
23   Chief. I'll contact you later. Are you going to
24   be in the office the rest of the day?

Page 83

1          And he stated: Yes, I'll be in the
2    office the rest of the day because of this new
3    system we're implementing.
4    Q.  Anything else in that conversation?
03:10:42  5    A.  Take care, Chief.
6          Take care, John. That was probably the
7    extent of it.
8    Q.  Anything else you recall as you sit
9    here today?
03:10:50  10   A.  Not at this time.
11   Q.  Then you had a conversation with your
12   doctor?
13   A.  Doctor's secretary.
14   Q.  And you understood as a result of the
03:11:02  15   conversation with the doctor's secretary they
16   would issue a revised note spelling out the
17   restrictions, right?
18   A.  Correct. And for the record, my doctor
19   was kind of perplexed as to why it was requested.
03:11:16  20   She wanted me to wait for the specialist's
21   appointment tomorrow, but acting in good faith as
22   I have been, I wanted to return to work. So I
23   asked her if there was anyway she could just
24   clarify what she meant in the last note.

Page 84

1    Q.  So let me backtrack a second.
2          You talked to the secretary?
3    A.  Yes.
4    Q.  You told her that you needed a note
03:11:38  5    clarifying the restrictions?
6    A.  Correct.
7    Q.  Anything else in that conversation with
8    the secretary?
9    A.  No.
03:11:42  10   Q.  And that was by phone?
11   A.  Yes.
12   Q.  Anybody else on the line?
13   A.  No.
14   Q.  The next conversation -- did you talk
03:11:48  15   to the doctor again?
16   A.  Never spoke to her verbally.
17   Q.  How do you know she was perplexed about
18   anything?
19   A.  Because that's what the secretary
03:11:56  20   stated to me.
21   Q.  Is there anything else that you and the
22   secretary talked about that we haven't talked
23   about here today?
24   A.  Not that I recall.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 85

```
          1    Q.   You finished with the secretary, and at
          2  some point after that, you saw a new letter in
          3  MyChart?
          4    A.   Yes.
03:12:08  5    Q.   So it was emailed to you?
          6    A.   Through MyChart, yes.
          7    Q.   Okay. And then you tried to reach
          8  Deputy Chief Castellan?
          9    A.   Yes, station line.
03:12:18 10    Q.   Did you email the document to him?
         11    A.   I do not have his email.
         12    Q.   You tried to reach him by phone but
         13  didn't speak to him; is that what I understood you
         14  to say?
03:12:28 15    A.   Correct.
         16    Q.   Have you spoken to him since then?
         17    A.   No. After I did not hear back from him
         18  last night, I assumed I would see him here which I
         19  was correct in assuming. At that point I was
03:12:36 20  planning on furnishing him the note, but my
         21  printer does not work at home. So I could furnish
         22  a copy on -- electronically, but I can't -- but I
         23  have no hardcopy.
         24    Q.   Okay. Have we now exhausted your
```

Page 86

```
          1  memory of every communication that you have had
          2  with every supervisor or manager at the Police
          3  Department concerning your medical condition or
          4  your attendance since October of 2017?
03:13:04  5    A.   To what I can recall at this time, yes.
          6    Q.   Okay. Now I want to go back and talk
          7  about the vacation schedule.
          8        What is the process for you to request
          9  vacation days -- well, let me break it down a
03:13:32 10  little bit more. You referred to vacation, time
         11  due, birthday.
         12        Time due is the same as comp time; you
         13  use that term, also?
         14    A.   I believe that would -- could you
03:13:44 15  define like what you're referring to as "comp
         16  time"?
         17    Q.   Well, I'm asking you. You used the
         18  term earlier, "comp time." What did you mean?
         19    A.   Compensatory time, is what I said
03:13:52 20  earlier.
         21    Q.   Right. What is "compensatory time"?
         22    A.   Well, that's basically I worked, the
         23  Department has already received the man hours for
         24  it, and I get a bank of what's called time due.
```

Page 87

```
          1        So if I go to court, I'm guaranteed,
          2  for example, three hours of time due and that
          3  would be my bank. So any time you use a time-due
          4  date, it takes eight hours off.
03:14:10  5    Q.   So we can agree that when you use the
          6  term "compensatory time," that's the same as "time
          7  due"?
          8    A.   Correct.
          9    Q.   Vacation time, compensatory time,
03:14:20 10  birthday, any other time off other than sick time
         11  or sick leave?
         12    A.   Sick time, sick days, and new days
         13  which I guess in layman's terms would be personal
         14  days.
03:14:34 15    Q.   Okay. What is the process for
         16  requesting vacation time in advance? If you want
         17  to take a vacation at some time in the future, how
         18  do you go about asking for it?
         19    A.   Could you be more clear as to if you're
03:14:48 20  asking for the use of vacation days or going on a
         21  vacation?
         22    Q.   I'm not sure what distinction you're
         23  making, but I think from my standpoint, if you're
         24  going on vacation, you're using vacation days,
```

Page 88

```
          1  right?
          2    A.   That wouldn't be accurate.
          3    Q.   Okay. Why not?
          4    A.   Well, who's to say that you can't use
03:15:14  5  new days to go on vacation?
          6    Q.   Okay.
          7    A.   Or use time due to go on vacation? You
          8  can use anything to go on vacation. That's just
          9  the vernacular.
03:15:22 10    Q.   Okay. So then I will be more precise.
         11  Thank you for the clarification.
         12        What is the process for asking for the
         13  use of vacation days?
         14    A.   The use of vacation days would start
03:15:32 15  roughly in November/December of the preceding
         16  year.
         17        So the document that you have in front
         18  of you is 2017 vacation picks, so that would have
         19  started somewhere around November/December of
03:15:46 20  2017. The only way that works is it goes by
         21  seniority based on the shift that you're on.
         22        So the senior officer has a clean sheet
         23  and he's able to make his pick. Then it goes down
         24  to the second, third, fourth, fifth, sixth,
```

22 (Pages 85 to 88)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMP/LIS 001658

Page 89

1 seventh, eighth officer until it gets to me. Then
2 I make my pick. Then it goes back through the
3 order. Once it hits the last person in seniority,
4 it comes back to the top. Then it continues that
03:16:08 5 process all the way until each officer has
6 exhausted their vacation days for the upcoming
7 year.
8 Q. So if I understand what you're saying,
9 the first officer to pick, the one with the most
03:16:22 10 seniority, wouldn't pick all of his or her
11 vacation for the entire year at that point?
12 A. No.
13 Q. They would just pick one?
14 A. They would pick one, or, if it's
03:16:30 15 available early on, you're allowed to pick a whole
16 period -- it's broken down into two picks per
17 period. So if it was available, a senior officer
18 could presumably pick a whole period if it's not
19 taken already.
03:16:42 20 Q. Okay.
21 A. But most generally, everybody takes a
22 half a pick which is a two-week pick.
23 Q. Then it continues that rotation until
24 everybody has filled out the form with whatever

Page 90

1 their request is for that year?
2 A. Right. So the third time through I
3 believe in 2016 was when my vacation days were
4 exhausted. So then when it goes past me and it
03:17:06 5 comes back down to where my spot would be again
6 for the fourth time, it would skip me because I
7 don't have any vacation days left.
8 It would keep going through that
9 process until everybody has used the appropriate
03:17:16 10 vacation days.
11 Q. Until they filled out the form?
12 A. Not until they filled out the form;
13 until everybody's vacation days are used up or
14 thereabouts. If you have a couple extra, somebody
03:17:26 15 will tack -- a supervisor will tack it on to the
16 end of one of your picks or something like that
17 which is usually customary.
18 Q. You don't mean used up in the sense of
19 actually taken, but used up in the sense of being
03:17:36 20 put on the form?
21 A. Right, on the sheet. It's almost like
22 a draft, if you will.
23 Q. Okay. So once then that sheet is
24 completed, what's the next step?

Page 91

1 A. Once the sheet is completed, then
2 everybody knows where they stand for the following
3 year, and the supervisors will provide that to
4 Deputy Chief Castellan and it's basically set in
03:17:58 5 stone for the following year.
6 Q. And is the next step after that
7 somebody completes a calendar that shows what the
8 days are?
9 A. Well, like I explained earlier, usually
03:18:10 10 the upcoming period, the schedule will come out or
11 it will be available to the patrol officers
12 roughly ten days to two weeks before the period
13 starts, seven to ten days, something like that.
14 But I think that -- and don't quote me because I'm
03:18:22 15 not a supervisor, I believe what they do at the
16 start of the year once the vacation picks are
17 finalized, they do go in there and they put in all
18 of the vacation picks. So if you're looking --
19 Q. I don't want you to guess on something.
03:18:34 20 So you think that they put it in a
21 calendar, but you don't see that until shortly
22 before that period of time?
23 A. Right. We don't have access to the
24 calendar. The only time we see that calendar is

Page 92

1 through our supervisors or it's posted in the CSO
2 office during that particular period.
3 (Scatchell Ex No. 14 was marked as
4 of 1/9/18.)
03:19:06 5 BY MR. FOWLER:
6 Q. Showing you what's been marked as
7 Exhibit 14, is this the vacation sheet that you
8 were just referring to?
9 A. Yes.
03:19:16 10 Q. And this is for the officers on
11 Lieutenant DiMaio and Sergeant Maiello's shift?
12 A. Correct.
13 Q. And that included you for 2017?
14 A. Yes.
03:19:26 15 Q. So by this, you would be putting down
16 the periods that you're requesting vacation for
17 for 2017?
18 A. Correct.
19 Q. Show me where -- so if I understand you
03:19:50 20 correctly, in the 11th period, October 12th
21 through 25th, that was you?
22 A. The one next to Thull, yes.
23 Q. And the nine days plus two new days,
24 what does that mean?

23 (Pages 89 to 92)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 93

1    A.  So do you see the three above my name?

2    Q.  Yes.  What's that mean?

3    A.  That indicates which pick it was.  So

4  that would have been the third trip through the

03:20:18  5  order of seniority and that was my final pick.  So

6  as such, to complete the pick, it would have been

7  an 11-day pick.  I only had 9 vacation days in my

8  theoretical bank at that time.  So they, as in a

9  supervisor, always offer you the opportunity to

03:20:34  10  complete the pick with new days.  I was approached

11  by I believe Lieutenant DiMaio if I wanted to

12  complete that pick with new days, and I said to

13  him yes.

14      So before the 2017 calendar year even

03:20:50  15  began, I was down the two new days.  So I started

16  that year with essentially eight new days which

17  was agreed upon and I was fine with that.

18    Q.  So in a particular period, let's -- if

19  I understand this correctly, your first pick then

03:21:02  20  was this period December 13th through December

21  20th, right?

22    A.  December 7th through December 20th.

23    Q.  I'm sorry.  You're exactly right.

24      So December 7th through December 20th,

Page 94

1  that's your first pick?

2    A.  Yes.

3    Q.  And that's designated as the number one

4  circled above your name, right?

03:21:16  5    A.  Correct.  So my first 9 vacation days

6  out the 30 that I get go to that pick.

7    Q.  Is the 9 days covering that entire

8  period?

9    A.  Correct.

03:21:26  10    Q.  How is it that 9 days covers that

11  14-day period?

12    A.  With your regular days off in between.

13  So I don't have the exact calendar in front of me,

14  but, for example, if you want, let me take a look

03:21:40  15  at that.

16      (Scatchell Ex No. 15 was marked as

17        of 1/9/18.)

18  BY MR. FOWLER:

19    Q.  So handing you what's been marked as

03:22:02  20  Exhibit 15 --

21    A.  Yes.

22    Q.  -- you were explaining that if you look

23  at this calendar, it shows how the use of 9 days

24  covers that 14-day period.  So explain that to me.

Page 95

1    A.  Correct.  So starting December 7th

2  would be my first regular day off of that period.

3  December 8th is a regular day off.  So you

4  wouldn't use vacation time for those days because

03:22:22  5  you're already off.  So you start counting the

6  vacation days based on the days you're supposed to

7  be at work -- or scheduled to be at work, I should

8  say.

9      So if you start at December 9th, that's

03:22:32  10  one, two, three, four, five, six, going to

11  December 14th.  So that's six days.  Then that

12  carries me into my next set of regular days off

13  which would be 15, 16, and 17.  Then 18, 19, and

14  20 were days I'm scheduled to be at work, so that

03:22:50  15  would be vacation day 7, 8, and 9.

16    Q.  Okay.  You're filling out Exhibit 14 at

17  the beginning of the year when you've got 30 days,

18  correct?

19    A.  Correct.

03:23:04  20    Q.  And so just to be clear, you're first

21  pick was the period of December 7th through the

22  20th of 2017, your second pick was February 2nd

23  of 2017, and your third pick was the period of

24  October 12th through 25th of '17; is that right?

Page 96

1    A.  Correct.  And I didn't have a fourth

2  pick because I was out of days.

3    Q.  And this is what you're picking at the

4  beginning of -- actually in the end of the prior

03:23:36  5  year?

6    A.  Correct.  And then this little notation

7  means that it was already approved, everything was

8  approved, and I believe that comes from Deputy

9  Chief Castellan.  He could shed some light on

03:23:48  10  that.

11    Q.  So what happens if -- you're doing this

12  10, 11, 12 months in advance.  What happens if as

13  of December of 2017 you have already used some of

14  your vacation days for that year?

03:24:02  15    A.  You would not use -- you're not allowed

16  to use vacation days as like: Hey, Lieutenant --

17  paraphrasing, of course -- I want tomorrow off.

18  Could I use a vacation day?  That's not allowed.

19      This is the only scope in which you're

03:24:18  20  allowed to use your vacation days is through this

21  process.

22    Q.  Okay.

23      (Scatchell Ex No. 16 was marked as

24        of 1/9/18.)

24  (Pages 93 to 96)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMPLLIS 001660

## Page 97

BY THE WITNESS:

    A. Are we moving on from this (indicating)?

BY MR. FOWLER:

03:24:34    Q. Yes.

    A. Could I inquire as to why I was listed as injured for the last two days of the pick now that we've clarified the nine days?

    Q. Not from me.

03:24:46    MR. COOPER: Let the record reflect he's looking at Exhibit 15. He's pointing to a column in 15.

    MR. FOWLER: Okay.

BY MR. FOWLER:

03:25:02    Q. All right. So at the beginning of the year, one of the reasons why you sought vacation time in October and December is that you're a hunter, right?

    A. Not limited to, but it would probably

03:25:18  be the primary reason, sure.

    Q. You're a hunter?

    A. I am a hunter, yes.

    Q. Showing you what's been marked as Exhibit 16, you recognize this as airline tickets

## Page 98

that you purchased?

    A. Yes.

    Q. Now, when did you purchase these tickets?

03:26:12    A. I'm not entirely sure.

    Q. This document shows: On hold, Purchase by November 22, 2017, right?

    A. Right. Again, I'm not entirely sure. I don't handle any of my own travel arrangements.

03:26:28  My mother is very good with that stuff. I outsource everything to her.

    Q. This trip was to -- ultimately to Portland and then back?

    A. Correct.

03:26:38    Q. Did you go on this trip?

    A. Yes.

    Q. When did you leave?

    A. Well, that's the return.

    MR. COOPER: My client's looking at the

03:26:48  document.

BY THE WITNESS:

    A. I don't see my departure date from O'Hare in here. I only see the Portland portion.

BY MR. FOWLER:

## Page 99

    Q. Okay. Now, this shows: On hold, Purchase by November 22nd. Does that communicate to you that you purchased this ticket sometime shortly before November 22nd?

03:27:12    A. I would assume so. I'm not positive. Again, outsourced to my mother.

    Q. So let's talk about your 2017 vacation time. It's February, the year moves along, and now comes vacation time in October.

03:27:34    A. Okay.

    Q. Part of the reason for that vacation was for hunting season, right?

    A. Part of it, yes.

    Q. During hunting season, you go out every

03:27:44  day?

    A. I wouldn't say every day, but it varies by week, depending on weather and other conditions.

    Q. Hunting season, we're talking about

03:27:52  goose hunting in October and November?

    A. Goose and duck. We'll call it waterfowl.

    Q. So starting -- your vacation started -- strike that.

## Page 100

Your vacation started October 12th, right?

    A. Yes, I believe so.

    Q. When does hunting season start?

03:28:36    A. It varies every year.

    Q. When did it start in 2017?

    Q. What state are you referring to?

    Q. Illinois.

    A. Illinois would have been October 20th

03:28:46  or maybe the 21st.

    Q. Did you go hunting in any state other than Illinois in 2017?

    A. Yes.

    Q. Where?

03:28:54    A. Wisconsin.

    Q. Okay. So let's start talking about when you went on vacation on October 12th. What's the first hunting trip you did?

    A. I had several hunting trips before that

03:29:10  point.

    Q. But I'm talking about October 12th.

    A. From October 12th on?

    Q. Yes.

    A. I might have went to Wisconsin during

25 (Pages 97 to 100)

## Page 101

1  that time duck hunting. I'm not entirely
2  positive.
3     Q.  As you sit here today, what was the
4  first hunting trip you recall?
03:29:26  5     A.  As of when?
6     Q.  As of after October 12th.
7     A.  I believe it to be when I went to
8  Wisconsin duck hunting.
9     Q.  Duck hunting and goose hunting is both
03:29:38  10  with a 12 gauge?
11     A.  No.
12     Q.  What do you use for duck?
13     A.  You can use any gauge.
14     Q.  What do you use for duck?
03:29:46  15     A.  It depends by day.  So some days I use
16  a 20 gauge.  Some days I use a 28 gauge.  Some
17  days I use a 12 gauge.  Some days I use a 410.
18  Some days I use a 16 gauge.  It just depends.
19     Q.  During October of 2017, what gauges did
03:30:00  20  you use?
21     A.  Most likely 12 and 20.
22     Q.  During October of 2017, you also went
23  goose hunting?
24     A.  It would have been -- again, we'll call

## Page 102

1  it waterfowl because you have the opportunity to
2  take ducks and geese in the same hunt.
3     Q.  What gauge shotgun did you use when you
4  were goose hunting?
03:30:20  5     A.  You use the same one for ducks and
6  geese.  So if I go out there on any particular
7  day, I'm using that gun no matter for ducks or
8  geese.  It's not as if I'm alternating guns.
9     Q.  You're using a 410 for geese?
03:30:32  10     A.  I've done it.
11     Q.  Okay.  The 12 gauge -- well, as you
12  progress lower in the numbers, you've mentioned a
13  410, 28 --
14     A.  Yes.
03:30:44  15     Q.  -- 20, 16, 12 --
16     A.  Yes.  I've shot all of them this year.
17     Q.  Did you shoot anything bigger than a 12
18  gauge?
19     A.  No.  The only gauge that would be
03:30:54  20  bigger than 12 is a 10 gauge, and anybody that
21  needs a 10 gauge shouldn't be hunting.
22     Q.  And as you go lower in the numbers, the
23  size of the round increases, right?
24     A.  As you go lower, yes.

## Page 103

1     Q.  And with the size of the round, the
2  amount of recoil increases, correct?
3     A.  That's not necessarily true.  It
4  depends on the gun.  It depends if it's
03:31:16  5  gas-operated or inertia-operated.  It just all
6  depends.
7     Q.  So let's focus on the 12 gauge and 20
8  gauges that you've used in 2017.
9     A.  Okay.
03:31:30  10     Q.  What model of 12 gauge do you use?
11     A.  Benelli Super Black Eagle II; Benelli
12  Super Black Eagle I; Winchester Super X 3;
13  Browning Auto 5, the newer model.
14     Q.  Anything else?
03:31:58  15     A.  Winchester SX 3, 12 and 20 that would
16  be.
17     Q.  Anything else?
18     A.  Nope, not to my recollection.
19     Q.  What 20 gauge shotguns have you used
03:32:16  20  this year?
21     A.  Winchester SX 3 would be the 20.
22     Q.  No other 20s?
23     A.  No.
24     Q.  Did your doctor know you were shooting

## Page 104

1  a 12 gauge?
2     A.  She knows I hunt, yes.
3     Q.  Did she know you were shooting a 12
4  gauge in October and November and December of
03:32:50  5  2017?
6     A.  It wouldn't have been pertinent for my
7  doctor to know that in October.
8     Q.  Does that mean no?
9     A.  It means it wasn't discussed because I
03:32:58  10  wouldn't have talked to my doctor for some time in
11  October of 2017.
12     Q.  Okay.  So in November of 2017, did you
13  tell your doctor that you were shooting a 12
14  gauge?
03:33:08  15     A.  It never came up in conversation, no.
16     Q.  In December of 2017, did you tell your
17  doctor you were shooting a 12 gauge?
18     A.  I don't believe it ever came up in the
19  conversation.  Actually in December, I almost
03:33:24  20  exclusively used only a 20 gauge.
21     Q.  Why is that?
22     A.  Less recoil, less -- all my guns are
23  inertia-operated that I use which makes the recoil
24  down to almost nothing.

26 (Pages 101 to 104)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMP/LUS 001662

## Page 105

```
          1    Q.  Now, you received Exhibit 2 on or about
          2  December 8, 2017, right?
          3    A.  Correct.
          4    Q.  And you were aware from Exhibit 2 —
03:34:02  5  I'll take that back.
          6    A.  (Tendering document.)
          7    Q.  — that you had an interrogation
          8  scheduled for —
          9    A.  The 19th.
03:34:12 10    Q.  — the 19th of December?
         11    A.  Yes.
         12    Q.  You didn't show up for that, did you?
         13    A.  No, I did not.
         14    Q.  And why not?
03:34:18 15    A.  Because I was in Washington as I
         16  believe my attorney spoke with you about, and we
         17  again in good faith coordinated with you with my
         18  itinerary which I was not required to furnish and
         19  I had a pre-approved vacation that was covering
03:34:38 20  those days and I went on my vacation as I
         21  originally planned.
         22    Q.  Did any supervisor or manager excuse
         23  you from attending the interrogation on December
         24  19th?
```

## Page 106

```
          1    A.  I never —
          2      MR. COOPER:  Wait a second.
          3      MR. FOWLER:  I'll ask the question
          4  differently.
03:34:52  5  BY MR. FOWLER:
          6    Q.  Did you talk to any supervisor or
          7  manager who excused you from attending the
          8  interrogation on December 19th?
          9      MR. COOPER:  Well, the supervisor
03:35:04 10  didn't plan it or notice it up.  So I'm
         11  thinking of the statute.  So I don't have it in
         12  front of me.  Can you ask it another way?
         13  BY MR. FOWLER:
         14    Q.  Prior to December 19th, did any
03:35:18 15  supervisor or manager tell you that you didn't
         16  have to be there on December 19th?
         17      MR. COOPER:  I'm still confused there.
         18  Your office noticed up the deposition — I'm
         19  sorry, the interrogation.
03:35:36 20  BY MR. FOWLER:
         21    Q.  The question to you:  Prior to December
         22  19th, did any supervisor or manager tell you that
         23  you didn't have to be there?
         24    A.  I don't recall anybody from the
```

## Page 107

```
          1  Department specifically saying that I didn't have
          2  to be there.
          3    Q.  Now, since November 9th of 2015, you
          4  own a silver Ford Raptor?
03:35:58  5    A.  State the date again.
          6    Q.  Since November 9, 2015.
          7    A.  Incorrect.
          8    Q.  Okay.  What vehicles have you owned
          9  since November 9, 2015?
03:36:08 10    A.  A 2014 Raptor SVT, red not gray, and
         11  then a 2017 SVT Raptor in light gray and that was
         12  purchased in March of this year.
         13    Q.  March of —
         14    A.  Of 2017.  I apologize.  Still getting
03:36:30 15  used to 2018.
         16    Q.  You also own a boat?
         17    A.  I do.
         18    Q.  What kind of boat do you own?
         19    A.  An Express boat, I believe is the
03:36:40 20  brand.  It's a duck hunting boat.
         21    Q.  Describe the boat for us.
         22    A.  It's a jon boat, a flat bottom with a
         23  permanent blind affixed to it which is something
         24  used for concealment when you're duck hunting, and
```

## Page 108

```
          1  it's got a surface-drive motor which allows to you
          2  go in places that you normally wouldn't with a
          3  regular outboard motor.
          4    Q.  That boat is about 14 feet long?
03:37:12  5    A.  No.
          6    Q.  How long is it?
          7    A.  17.  And with the blind, it's
          8  approximately 21.
          9    Q.  You also own an SUV, don't you?
03:37:26 10    A.  Are you referring to the Suburban that
         11  I sold?
         12    Q.  Okay.  You had — at some time you had
         13  a Suburban?
         14    A.  I think it was a '97 Suburban which I
03:37:38 15  no longer own.
         16    Q.  When did you sell it?
         17    A.  Sometime over the summer.  I'm not
         18  entirely sure.  I'd have to look at my documents.
         19    Q.  Did the person you sold it to allow you
03:37:48 20  to still use it in the fall of 2017 for duck
         21  hunting?
         22    A.  No.
         23    Q.  You also own a white trailer?
         24    A.  I do.
```

27 (Pages 105 to 108)

CONFID NTIAL - SUBJECT TO PROTECTIVE ORDER

## Page 109

1    Q.  What's the purpose of that trailer?

2    A.  To store decoys and hunting equipment.

3    Q.  During the November/December of 2017

4  timeframe, you also regularly drove Mr. Scavo's

03:38:20  5  black Ford F-150?

6    A.  I did.

7    Q.  Mr. Scavo is the former chief of police

8  of the Village of Melrose Park?

9    A.  He is -- well, Jaconetti was after him

03:38:28  10  and then Chief Pitassi, Director Pitassi.

11    Q.  And you're aware that Mr. Scavo is a

12  convicted felon?

13    A.  Yes.

14    Q.  How long have you known Mr. Scavo?

03:38:42  15    A.  I would say probably as long as I can

16  remember being alive, so at least 20 years.

17    Q.  Were you on the Department when he was

18  chief?

19    A.  No, I was not.

03:38:54  20    Q.  And you traded trucks with him for

21  several weeks, didn't you?

22    A.  Every year we do the same thing.

23    Q.  Why did you do that?

24    A.  He liked to drive my truck when we go

## Page 110

1  hunting. And if I'm not going, he still goes. I

2  like to let him use my truck because my truck is

3  an off-road truck. It's designed to go off-road.

4  So what's mine is his.

03:39:18  5    Q.  You said if you're not going, he takes

6  your truck?

7    A.  Correct.

8    Q.  But even if you are going, he still

9  takes your truck, doesn't he?

03:39:26  10    A.  Correct.

11    Q.  Now, are you familiar with a company

12  called IDecoy Guide Service?

13    A.  Now defunct company, yes.

14    Q.  When was it defunct?

03:39:38  15    A.  Approximately August or September of

16  this year. There's no revenue to be stated for

17  this calendar year -- or last calendar year.

18    Q.  When you say "August or September of

19  this year," you mean 2017?

03:39:50  20    A.  2017, yes. Most of the scope of what

21  we're talking about is 2017. So if I say "this

22  year," I apologize, but we're talking about 2017.

23    Q.  Okay. You have a role with -- or did

24  you have a role with IDecoy Guide Services?

## Page 111

1    A.  I was listed as a guide, yes.

2    Q.  What did that mean, to be listed as a

3  guide?

4    A.  That means that I have a certificate

03:40:16  5  from the State of Illinois which authorizes me to

6  bring people hunting and they could pay me a fee.

7  Or I don't have to charge a fee, but I can take

8  hunters every day if I so choose. You have to

9  outline what properties and whatnot, but it's an

03:40:32  10  official document from the Illinois Department of

11  Conservation.

12    Q.  When did you first become affiliated

13  IDecoy Guide Services?

14    A.  We started it in 2016 and ended it in

03:40:48  15  2017.

16    Q.  When you say "we started it," who is

17  the "we"?

18    A.  Myself and Mr. Scavo.

19    Q.  And who owned the company?

03:40:56  20    A.  It's not -- I mean, I don't believe it

21  was owned, but it's Vito's company, Mr. Scavo's

22  company, and I was just in there in the capacity

23  to guide with him.

24    Q.  During 2016, did you receive any money

## Page 112

1  as a result of guiding for --

2    A.  I don't recall. I believe there were

3  several dates that we received money and that

4  would have been -- there's documentation you have

03:41:20  5  to provide to the state, and I believe it's 10 to

6  14 days of the regular season ending, and we did

7  that. So as far as what specific or how much

8  money, I can't even state accurately.

9    Q.  During 2017, did you receive any monies

03:41:36  10  from -- as a result of the guide services through

11  that company?

12    A.  No.

13    Q.  You said earlier that there's a

14  process -- strike that.

03:41:50  15    I was asking you questions earlier

16  about a process for receiving approval for

17  secondary employment. Do you remember that?

18    A.  Correct.

19    Q.  Did you ever receive approval for

03:42:00  20  working as a guide for IDecoy Guide Services?

21    A.  I did not consider it to be work.

22    Q.  Why not?

23    A.  I didn't make any revenue off of it.

24    Q.  Any other reason?

L.A. Court Reporters, L.L.C.
312-419-9292
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMP/LIS 001664

Page 113

| | |
|---|---|
| 1 | A. Any revenues that were generated |
| 2 | through IDecoy Guide Service would have gone back |
| 3 | to hunting equipment. |
| 4 | Q. So my question was: Did you receive |
| 03:42:28 5 | approval from anybody to do guide service for that |
| 6 | company? |
| 7 | A. I don't believe so. I'm not positive |
| 8 | on that. I know I have a secondary employment |
| 9 | form that's been filled and approved by |
| 03:42:44 10 | Director Pitassi. |
| 11 | Q. Now, the materials that the guide |
| 12 | service used, sometimes that -- some of those |
| 13 | materials are your own, right? |
| 14 | A. Yes. |
| 03:42:54 15 | Q. Like the trailer that you mentioned? |
| 16 | A. Correct. |
| 17 | Q. The decoys? |
| 18 | A. Correct. |
| 19 | Q. The Suburban, you used that for the |
| 03:43:02 20 | guide service? |
| 21 | A. Sure, but not for guiding people. It's |
| 22 | just for everyday use -- or it was for everyday |
| 23 | use, I should say. |
| 24 | Q. For towing a trailer? |

Page 114

| | |
|---|---|
| 1 | A. Correct. |
| 2 | Q. You kept the trailer parked down |
| 3 | somewhere around Ottawa during hunting season? |
| 4 | A. Incorrect. |
| 03:43:16 5 | Q. Where did you park it at? |
| 6 | THE WITNESS: Am I required to disclose |
| 7 | that? |
| 8 | MR. COOPER: Let's take a moment. |
| 9 | (WHEREUPON, a recess was had.) |
| 03:43:24 10 | (Scatchell Ex No. 17 was marked as |
| 11 | of 1/9/18.) |
| 12 | BY MR. FOWLER: |
| 13 | Q. Showing you what's been marked as |
| 14 | Exhibit 17 -- |
| 04:03:48 15 | A. Okay. |
| 16 | Q. -- you mentioned earlier with respect |
| 17 | to your trip to Portland, the document that I |
| 18 | showed you earlier was the return trip? |
| 19 | A. Correct. |
| 04:03:54 20 | Q. This is the trip going to Portland, |
| 21 | right? |
| 22 | A. Yes. |
| 23 | Q. This shows that the ticket was issued |
| 24 | on or about November 18, 2017? |

Page 115

| | |
|---|---|
| 1 | A. Where are you seeing that? |
| 2 | Q. Middle of the first page, issue date. |
| 3 | A. Okay. Yes, I believe so then. |
| 4 | Q. You believe it was issued on or about |
| 04:04:12 5 | November 18, 2017? |
| 6 | A. Yes, uh-huh. |
| 7 | Q. What was the purpose of that trip? |
| 8 | A. Recreation, trip with my grandfather. |
| 9 | Q. What did you do in Portland with your |
| 04:04:22 10 | grandfather? |
| 11 | A. Sightseeing, a little bit of hunting, |
| 12 | just basically kind of took in an area where I've |
| 13 | never been. |
| 14 | Q. What kind of hunting did you do in |
| 04:04:34 15 | Portland? |
| 16 | A. Duck or goose. |
| 17 | Q. Most of your hunting is waterfowl? |
| 18 | A. Yes -- well, I wouldn't say that, but I |
| 19 | would say a good portion. |
| 04:04:44 20 | Q. We were talking about the location of |
| 21 | your trailer. |
| 22 | A. Yes. |
| 23 | Q. That trailer was used as part of the |
| 24 | guide service, right? |

Page 116

| | |
|---|---|
| 1 | A. At one point or another, sure. |
| 2 | Q. You used the trailer for hunting in |
| 3 | 2017, too, right? |
| 4 | A. Yes. |
| 04:05:14 5 | Q. In November of 2017? |
| 6 | A. Most likely, yes. |
| 7 | Q. And the trailer isn't stored at your |
| 8 | home in Melrose Park, is it? |
| 9 | A. Correct, it's not. |
| 04:05:24 10 | Q. Where is it stored? |
| 11 | A. In the vicinity of the Oswego area. |
| 12 | Q. There are a couple of different |
| 13 | locations where you go hunting frequently in the |
| 14 | Ottawa area? |
| 04:05:44 15 | A. No, not Ottawa. |
| 16 | Q. Oswego? |
| 17 | A. Yes. |
| 18 | Q. One of them is a lake? |
| 19 | A. If you want to call it a lake. I would |
| 04:05:56 20 | just more or less call it a waterhole. I mean, |
| 21 | it's a man-made pond. |
| 22 | Q. And when you go there, you use your |
| 23 | boat? |
| 24 | A. Correct. Sometimes, not all the time. |

29 (Pages 113 to 116)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## Page 117

1    Q.  You keep the boat stored in that area
2  as well?
3    A.  Sometimes, not all the time.
4    Q.  When you keep the boat stored there, is
04:06:14  5  it hooked up to a vehicle?
6    A.  When it's stored there?  No.
7    Q.  So if you're going to go hunting with
8  the boat, you would drive there, hook it up to a
9  vehicle, drive it to the water?
04:06:26  10    A.  No.
11    Q.  Okay.  Walk me through the process of
12  how you use the boat when you're hunting on the
13  water.
14    A.  If we have the boat there, the boat is
04:06:36  15  going to be already in the water before we go
16  hunting that day.  So it's going to be in the
17  water for the duration of the season.
18    Q.  When you say if we go hunting there,
19  who is "we"?
04:06:44  20    A.  Any of my usual friends that I go
21  hunting with.  I don't care to name them all.
22    Q.  Mr. Scavo is one of the ones that you
23  go hunting with?
24    A.  He comes with, yes.

## Page 118

1    Q.  You're aware that, as a felon, it's
2  illegal for him to possess a firearm?
3    A.  Correct.
4    Q.  You're aware that, as a felon, it's
04:07:04  5  illegal for him to go hunting?
6    A.  That's not true.
7    Q.  Well, let me be more accurate.  As a
8  felon, it's illegal for him to actually use a
9  firearm in hunting, isn't it?
04:07:12  10    A.  I believe so.
11    Q.  You said that one of the first hunting
12  trips that you did in 2017 was to Wisconsin?
13    A.  No.  That was one of the first hunting
14  trips that you asked from the range of October
04:07:38  15  12th onward.
16    Q.  Fair enough.  From October 12th onward,
17  the first trip was in Wisconsin?
18    A.  Correct, to my recollection.
19    Q.  So let me be a little more specific
04:07:48  20  then.  You said that sometime in late October or
21  early November that you felt some pain in your
22  neck and back?
23    A.  Correct.
24    Q.  As of that point in time, how many

## Page 119

1  times have you been out hunting in the fall of
2  2017?
3    A.  From the point that my back and neck
4  started to hurt?
04:08:08  5    Q.  Yes.
6    A.  I really couldn't give you an accurate
7  guess on that.
8    Q.  More than one?
9    A.  Absolutely.
04:08:16  10    Q.  More than five?
11    A.  Most likely.
12    Q.  More than ten?
13    A.  Perhaps.
14    Q.  More than 20?
04:08:20  15    A.  I don't think so.
16    Q.  Let's talk about the hunting activities
17  for just a moment.
18    A.  Okay.
19    Q.  When you're hunting — well, let me be
04:08:30  20  clear.
21    The hunting that you did in the fall
22  of 2017 up until today, has that all been
23  waterfowl?
24    A.  No.

## Page 120

1    Q.  What other than — what hunting other
2  than waterfowl have you done?
3    A.  In October — or actually, I'm sorry,
4  in September, I would have been —
04:08:54  5    Q.  I'm going to stop you.  I don't care
6  about that.
7    A.  All right.
8    Q.  I want to focus on from the time that
9  you started feeling pain again in your back and
04:09:04  10  neck.
11    A.  Okay.
12    Q.  Since that time, what kind of hunting
13  have you done?
14    A.  Mostly waterfowl.  And from the range
04:09:14  15  of when I started to feel the injury to the last
16  day that I hunted would have been somewhere around
17  I would say at least ten days between hunting.  So
18  my belief is not that it occurred by hunting, if
19  that's the connection you're trying to make.
04:09:32  20    Q.  So if I understand what you're saying
21  is you hadn't been hunting for at least ten days
22  when you first started feeling pain?
23    A.  Correct.
24    Q.  And then once you started feeling pain,

30 (Pages 117 to 120)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMP/LIS 001566

## Page 121

```
          1    you continued to do hunting, right?
          2        A.  I wouldn't say that. I would say that
          3    when I started to feel pain, I took an abnormal
          4    amount of days off from hunting to what my usual
04:09:54  5    would be as per my doctor's request to rest and I
          6    did that. So if I felt any better or whatever, I
          7    would go.
          8        But mostly -- like before, I explained
          9    to you that I gained 50 pounds and I was cooped up
04:10:12 10    in the house for multiple days at a time and I
         11    wanted to get out, just exercise my legs, walk, be
         12    there with the guys, blow goose call, work my dog.
         13        You know, hunting, to explain it to
         14    somebody who doesn't do it, it's more the
04:10:28 15    experience than what you're going to kill. We may
         16    kill a lot. We may kill a little. But my
         17    experience, the fun I get out of it, is being with
         18    my friends, watching the birds work, cooing the
         19    birds, and watching the dogs work. The shooting
04:10:44 20    is probably the least part of it that I enjoy out
         21    of all of it.
         22        Q.  Since you started feeling pain in your
         23    neck and back in November-ish of 2017, have you
         24    done any hunting other than waterfowl?
```

## Page 122

```
          1        A.  No.
          2        Q.  The two types of -- let me ask the
          3    question differently.
          4        How many different types of waterfowl
04:11:08  5    hunting do you do? You mentioned the boat.
          6        A.  On water and on land.
          7        Q.  Okay. When you're hunting on water,
          8    you mentioned earlier that the boat is in the
          9    water in the beginning of the season?
04:11:20 10        A.  Correct.
         11        Q.  Walk me through the process of what you
         12    do physically when you're going to be hunting on
         13    water, starting from the time you pull into --
         14        A.  So a normal day, we pull up to the spot
04:11:36 15    where the boat is parked and walk from the truck
         16    to the boat. On a normal day, we'll carry several
         17    items to the boat and put it storage bins where
         18    everything can go.
         19        And since my injury, the only thing
04:11:52 20    that I've really been carrying would be my calls
         21    which would weigh a pound and my weapon
         22    because I'm required to carry my weapon because
         23    it's in my possession at all times. And other
         24    than that, I mean, walking to the duck boat, I
```

## Page 123

```
          1    wouldn't be carrying anything else.
          2        Q.  You sometimes carry two weapons?
          3        A.  No, never.
          4        Q.  So you carry stuff, you generically,
04:12:20  5    you and others who are going with you to the boat?
          6        A.  Correct.
          7        Q.  Put it in the boat?
          8        A.  Correct.
          9        Q.  Take the boat out onto the water
04:12:28 10    somewhere?
         11        A.  Right.
         12        Q.  And you're typically doing that very
         13    early morning, aren't you?
         14        A.  It depends. It could be early morning.
04:12:36 15    It could be mid-morning. It could be afternoon.
         16        Again, hunting fluctuates based on the
         17    weather, based on what the birds are doing, the
         18    migration paths. There's so many variables that
         19    come into play.
04:12:48 20        Q.  How long are you in the boat on
         21    average?
         22        A.  One to two hours, maybe three at the
         23    maximum.
         24        Q.  Now, the boat, you said earlier, was a
```

## Page 124

```
          1    17-foot jon boat?
          2        A.  Correct.
          3        Q.  About six-foot wide?
          4        A.  Roughly.
04:13:06  5        Q.  It doesn't have lounge chairs?
          6        A.  It's got very comfortable chairs.
          7        Q.  Doesn't have a bed?
          8        A.  It does not have a bed. That would be
          9    awesome, though, if it did.
04:13:18 10        Q.  It kind of would be.
         11        And then after the one to two hours
         12    that you referred to, you take it back to shore?
         13        A.  Correct.
         14        Q.  Unload it?
04:13:26 15        A.  Unload the things that we brought in
         16    that day. Most of the equipment that we're going
         17    to use during the hunt is already in there.
         18        Q.  Carry the equipment back to the truck?
         19        A.  No. In a typical day, I would carry my
04:13:40 20    gun back to the truck and my duck and goose calls.
         21        Q.  And then you take the truck back home?
         22        A.  Correct.
         23        Q.  So does that accurately and completely
         24    describe the process of hunting waterfowl when
```

L.A. Court Reporters, L.L.C.
312-419-9292
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMP/LJS 001667

## Page 125

1    you're using the boat?
2        A.   To explain it here, yes, I believe so.
3        Q.   So now let's talk about when you're
4    hunting from land.
04:14:04  5        A.   Okay.
6        Q.   Walk me through that process.
7        A.   A very similar process; we meet
8    somewhere, drive the truck and trailer to a field,
9    and bring our equipment to the blind, decoys get
04:14:18 10    set out, and then we hunt.
11        Q.   So driving the truck and trailer, if
12    the trailer is parked in that area, the first
13    thing you need to do is hook up the trailer?
14        A.   No. It's already hooked up.
04:14:28 15        Q.   Hooked up to a truck that's there?
16        A.   Correct, most of the time.
17        Q.   What truck is there?
18        A.   Right now, there isn't a truck there.
19        Q.   Well, what truck was there in November
04:14:38 20    and December of 2017?
21        A.   I'm not sure if we used Roger's
22    truck – or I'm not sure whose truck we used.
23    You'd have to specify dates. We use multiple
24    trucks.

## Page 126

1        Q.   Who is Roger?
2        A.   A friend that we hung with, and he also
3    has decoys and stuff there.
4        Q.   So the trailer that you have has a
04:14:54  5    bunch of decoys in it?
6        A.   Correct.
7        Q.   So you would take the vehicle and the
8    trailer out into the middle of the field?
9        A.   Out to where our blind is. It's a pit
04:15:04 10    blind which I believe Deputy Chief Castellan is
11    familiar with. He helped dig several of them.
12        Q.   So you would then spread out the decoys
13    around the pit blind?
14        A.   Yes.
04:15:16 15        Q.   Can you describe what a pit blind is?
16        A.   Basically it's either a wood or steel
17    box in the ground which has benches and backrests
18    and a platform which you can stand up and shoot
19    out of and the top of it is level with the ground.
04:15:30 20        So when you're standing in it, you're
21    basically – well, I'm a shorter guy, but you'd be
22    about here and you're looking out (indicating).
23        Q.   You're referring to about chest-height
24    when you say "about here"?

## Page 127

1        A.   Yes, I'm sorry. For the record, about
2    chest-height.
3        Q.   So you go out. And the pit is already
4    dug at the beginning of the season?
04:15:44  5        A.   Yes. A lot of them have been dug for
6    15, 20 years, perhaps.
7        Q.   So you go out, spread out all the
8    decoys, go in the pit, and do hunting. How long
9    are you in the pit?
04:16:04 10        A.   Same thing as with the water, one to
11    two hours, maybe three.
12        Q.   At the end of that period, you retrieve
13    the truck and trailer, load up all of the decoys?
14        A.   Correct.
04:16:14 15        Q.   Return them and then you go home,
16    right?
17        A.   Correct.
18        Q.   Anything else about the process of
19    hunting from land that we haven't talked about?
04:16:28 20        A.   Not to my recollection. I mean, it's
21    pretty simple stuff.
22        Q.   So you said earlier that you reported
23    the injury sometime early November, right?
24        A.   I believe it would be, yeah, early

## Page 128

1    November-ish.
2        Q.   So I want to talk about that time
3    forward.
4        A.   Okay.
04:16:52  5        Q.   How about the time period of November
6    9th through the 12th?
7        A.   Honestly I can't tell you if I did or
8    didn't. I wouldn't be able to tell you exact date
9    ranges. I mean, I know I went hunting in
04:17:08 10    November. I don't know what days.
11        Q.   November 13th, did you go hunting?
12        A.   I don't recall if I did or didn't. I
13    might have. I'm not sure.
14        Q.   November 14th, did you go hunting?
04:17:18 15        A.   Again, don't recall. I might have. I
16    might not. I'm not sure.
17        Q.   But isn't it true when you go hunting
18    out in the Oswego area, your typical pattern is to
19    leave your house somewhere in the 4:00 o'clock
04:17:30 20    hour in the morning?
21        A.   It depends every day, but in that time
22    of year, you could probably set your watch by it
23    which I know some people have.
24        Q.   November 14th, isn't it true that you

32  (Pages 125 to 128)

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

VMPLLS 001668

Page 129

1   left the house prior to 4:50 a.m. to go hunting?
2       A.  You could say that.  I'm not sure what
3   days I went, but you could say I probably left
4   some days before 4:50.
04:17:52  5       Q.  If your IPass records show that you
6   were hunting -- or that your truck went through
7   the Oswego area on the morning of November 14th,
8   would you have any reason to disagree with that?
9       A.  If it shows that, most likely I was
04:18:08  10  there or it could have been Vito taking my truck.
11  Again, we trade trucks, as I've stated.  As me
12  personally driving every day -- or driving a car,
13  I should say, every day, I was driving his car for
14  a while.  We do that every year.
04:18:22  15      Q.  November 15th, you went hunting, didn't
16  you?
17      A.  I'm not sure.  Again, you're putting
18  dates out there that I'm not positive about.
19      Q.  Any reason to disagree that you left
04:18:32  20  your house before 4:45 a.m. on November 15th?
21          MR. COOPER:  Well, objection, asked and
22  answered.  He said he doesn't know.
23          MR. FOWLER:  I'm asking a more detailed
24  question.

Page 130

1   BY THE WITNESS:
2       A.  You're asking me about date ranges.
3   We're talking two months ago.  Do you remember
4   what you ate for breakfast on November 15th?
04:18:52  5   BY MR. FOWLER:
6       Q.  Remember, this is an opportunity for me
7   to ask you questions.
8       A.  I'm aware, but I'm just positing how
9   ridiculous it sounds to somebody that goes very
04:19:02  10  frequently to say did you go on this particular
11  day two months after the fact.
12      Q.  Do you have any reason to disagree that
13  you left your house before 4:45 a.m. on November
14  15th to go hunting?
04:19:14  15         MR. COOPER:  Objection, asked and
16  answered.  I'm willing to get you this
17  information.  In other words, I'll meet with
18  my client, we'll check his calendar.  I mean,
19  he can check it now.  If he can't, we'll get
04:19:22  20  it.
21  BY MR. FOWLER:
22      Q.  Do you have a calendar with you?
23      A.  I don't keep days in my calendar of
24  when I went hunting.  But if you have my IPass

Page 131

1   records which apparently you do, you could say for
2   a pretty good certainty that I was out of my
3   house.
4       Q.  November 16th, you left the house at
04:19:40  5   4:15 a.m. to go hunting, didn't you?
6       A.  Again, you're specifying dates that I
7   can't attest to without -- I mean, without looking
8   at camera footage or anything like, I don't know.
9       Q.  Any reason to disagree that you went
04:19:56  10  hunting on November 16th?
11      A.  Well, define "hunting."
12      Q.  Any reason to disagree that you went
13  out on a hunting trip on November 16th where you
14  brought a shotgun?
04:20:08  15         MR. COOPER:  Objection, asked and
16  answered.
17  BY MR. FOWLER:
18      Q.  You can answer.
19      A.  I mean, there's been days where I don't
04:20:14  20  bring a shotgun.  There's been days where I go out
21  and I just call.
22      Again, you're asking questions about
23  something that occurred perhaps two months ago.
24  Maybe it did.  Maybe it didn't.  I don't know the

Page 132

1   specifics of that day.
2       Q.  So as you sit here today, you just
3   don't know one way or the other?
4       A.  I don't recall.  That's what I'm
04:20:32  5   telling you.
6       Q.  Are there any documents that you can
7   think of -- strike that.
8       Are there any documents whatsoever that
9   would refresh your recollection as to what dates
04:20:42  10  you went hunting?
11      A.  I mean, if you have IPass records of me
12  going westbound on I-88 which I do often when I'm
13  hunting, it's a safe bet to say that I went out
14  with the guys.
04:20:56  15      Now, what I did on that day or any of
16  that -- I mean, the scope of an IPass means that
17  my truck went through there.  Like I said, there's
18  been days when Vito goes without me and takes my
19  truck.  There's been days when other friends take
04:21:08  20  my truck and go without me.  I have no problem
21  with that.  That doesn't bother me.
22      Q.  Other than IPass, is there anything
23  else that you can think of that might refresh your
24  recollection as to when you went hunting?

33  (Pages 129 to 132)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMP/LIS 001669

## Page 133

1    A.  Not that I can recall.

2    Q.  Do you have any text messages or email

3  communications with any of your friends about

4  hunting dates?

04:21:28  5    A.  Most of our conversations occur via

6  phone, like phone calls. I mean, you'll have me

7  calling people that I've hung with, but what

8  occurred during those conversations, I don't know.

9    Q.  When you go out waterfowl hunting early

04:22:02  10  in the morning, it's your practice to go to

11  7-Eleven first and get a coffee?

12    A.  Sometimes. It depends.

13    Q.  Any reason to disagree that you stopped

14  at a 7-Eleven around 4:15 a.m. on November 16th?

04:22:16  15    MR. COOPER: Objection, asked and

16  answered.

17  BY MR. FOWLER:

18    Q.  You can answer.

19    A.  I may have been. I may not have been.

04:22:24  20  I mean, a typical day, sometimes I go to 7-Eleven,

21  or if I'm running late, I'll stop at Dunkin Donuts

22  on the way. It varies.

23    Q.  So if I go through these dates one by

24  one, is there any particular day as you sit here

## Page 134

1  today that you know for sure that you went hunting

2  or you know for sure you didn't? And I'll break

3  that down. I'll do it a piece at a time.

4    A.  Okay.

04:22:46  5    Q.  Since November 9th of 2017 --

6    A.  Okay.

7    Q.  -- is there any particular day that you

8  know for sure that you went hunting?

9    A.  Any particular day? I -- in the range

04:23:00  10  of November?

11    Q.  Since November 9th.

12    A.  Since November? I could say I've gone

13  recently. I wouldn't be able to recall the days.

14    Q.  Since November 9th of 2017, are there

04:23:14  15  any dates that you can say definitively you did

16  not go hunting?

17    A.  Definitively, no.

18    Q.  Are there any documents that would

19  refresh your recollection as to what days you did

04:23:28  20  or did not go hunting since November 9, 2017?

21    A.  Aside from the IPass records that you

22  have, none that come to mind.

23    Q.  Who is Richard Bono?

24    A.  A hunting friend.

## Page 135

1    Q.  Who is Roger Grivetti?

2    A.  Hunting friend.

3    Q.  And Roger Grivetti has a son, correct?

4    A.  That's correct.

04:23:54  5    Q.  And he goes hunting with you guys?

6    A.  He's got two sons and they both go

7  hunting.

8    Q.  Let's talk about November 20th of 2017.

9    A.  Okay.

04:24:06  10    Q.  Was there an occasion that -- do you

11  remember November 20, 2017?

12    A.  I remember the day in question, sure.

13    Q.  Okay. Tell me what happened on that

14  day.

04:24:20  15    A.  Do you have particular questions you

16  want to ask?

17    Q.  Sure. What time did you leave your

18  house that morning?

19    A.  Somewhere in the 4:00-something range

04:24:28  20  most likely.

21    Q.  Where did you go?

22    A.  To the same spot where we duck hunt.

23    Q.  With whom?

24    A.  Most likely that day I probably drove

## Page 136

1  with Vito and Rick; Richard, as you called him.

2    Q.  Bono?

3    A.  Correct.

4    Q.  You left Melrose Park and went there in

04:24:48  5  your truck?

6    A.  Correct.

7    Q.  And when you say got there, you were

8  doing water hunting that day from the boat?

9    A.  Correct.

04:24:58  10    Q.  So you left the house somewhere in the

11  4:00 o'clock hour?

12    A.  I would guess, yeah.

13    Q.  What time did you get to the Oswego

14  area?

04:25:06  15    A.  I mean, I'd have to look at a

16  sunrise/sunset calculator, but usually we arrive

17  for duck hunting somewhere between a half hour to

18  15 minutes before shooting time. Legal shooting

19  time is a half hour before sunrise.

04:25:22  20    Q.  So fair to say that you got to the area

21  where you're going to be hunting then 45 minutes

22  to an hour before sunrise?

23    A.  Roughly, roughly.

24    Q.  When you got there, what did you do?

L.A. Court Reporters, L.L.C.
312-419-9292

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMP/LJS 001670

## Page 137

1  A.  Same thing I described to you earlier
2  which would be pull up by the boat, park, carry
3  the equipment or whoever carries the equipment. I
4  carry my own gun, my calls, and maybe a box of
04:25:48  5  shells.
6  Q.  And you said it was the three of you.
7  Did you meet anybody that day?
8  A.  Yes.
9  Q.  Where did you meet him at?
04:25:54  10  A.  At that location.
11  Q.  Who did you meet?
12  A.  Roger Grivetti who you spoke of before
13  and his son.
14  Q.  Which son?
04:26:02  15  A.  Is it imperative to include a juvenile
16  in this?
17  Q.  How old is he?
18  A.  12.
19  Q.  The older son or younger son?
04:26:12  20  A.  Younger.
21  Q.  You met them near the boat?
22  A.  Correct.
23  Q.  You guys got on the boat?
24  A.  Yep.

## Page 138

1  Q.  What time was it when you got on the
2  boat?
3  A.  Like I said, probably roughly
4  15 minutes or so before shooting time.
04:26:28  5  Q.  So roughly 45 minutes or so before
6  sunrise?
7  A.  Right.  Yeah, about there.
8  Q.  You take -- what did you do next?
9  A.  We pull up to a spot we decide to hunt
04:26:40  10  based on what the wind is that day and then
11  basically everybody throws out the decoys, not me
12  because I control where the boat is going.  So all
13  I'm doing is holding a switch and then everybody
14  else is throwing out the decoys while I keep the
04:26:54  15  boat steady with the switch.
16  Q.  So you're driving the boat?
17  A.  That day, I was.
18  Q.  From the front or from the back?
19  A.  From the rear.
04:27:02  20  Q.  You said that the boat has a blind
21  built into it?
22  A.  Yeah, permanent.
23  Q.  How tall is the blind?
24  A.  It's kind like a goose pit, but if

## Page 139

1  you're sitting down, I would say that the top
2  level of the blind would come to here on me,
3  around my chin area (indicating).
4  Q.  So you're holding your hands to your
04:27:22  5  neck?
6  A.  Roughly to my chin area.
7  Q.  So your head is pretty much over the
8  top of the blind all the time?
9  A.  I wouldn't say that because it's an
04:27:30  10  enclosed blind.  So you're sitting in the middle
11  of it, and your point of view, obviously you see
12  the top of the blind here so you can see
13  everything out in front of you (indicating).
14  Q.  I guess my question is:  Unless you're
04:27:46  15  ducking down into the boat for something, then
16  your head and your eyes are over the top of the
17  blind most of the time?
18  A.  Correct.  You wouldn't need to duck
19  down for anything.
04:27:58  20  Q.  Because you're hunting, you need your
21  eyes to be able to see around the boat and in the
22  sky, right?
23  A.  Right.
24  Q.  So as you're hunting on November 20th,

## Page 140

1  you're in the back of the boat that day?
2  A.  Yes.
3  Q.  Where was Mr. Grivetti?
4  A.  Next to me.
04:28:16  5  Q.  Where was his son?
6  A.  Next to him which is always the case.
7  Q.  And you said the other one was Roger?
8  A.  No.  Richard.
9  Q.  Richard.  I'm sorry.
04:28:26  10  Where was Richard?
11  A.  Next to Roger.
12  Q.  And where was Mr. Scavo?
13  A.  At the other end of the boat, front end
14  of the boat with his dog.
04:28:34  15  Q.  Did you move the boat around during
16  that period of time that you were hunting?
17  A.  I'm confused.
18  Q.  How long were you hunting from the boat
19  that day?
04:29:04  20  A.  I can't tell you.  Maybe two, three
21  hours.  I'm not sure.
22  Q.  What was your role during those two to
23  three hours?
24  A.  During those two or three hours, I sat

35  (Pages 137 to 140)

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

VMP/JJS 001671

## Page 141

1  on my end of the boat which is where the motor is
2  and looked out and looked in front of us to see if
3  there was any birds. If there were, I would call
4  at them. And then if there was any birds that
04:29:24  5  would decoy, we would shoot at them.
6     Q. You yourself, you were hunting that
7  day, right?
8     A. That day, I was, yes.
9     Q. Anything unusual happen during those
04:29:42  10  two or three hours while you're hunting on the
11  water?
12     A. During the two to three hours on the
13  water? No.
14     Q. During those two to three hours on that
04:29:48  15  day, did you get any waterfowl?
16     A. Yes.
17     Q. How many?
18     A. Not sure. I remember this part
19  distinctly that we did not get what we call a kill
04:30:02  20  limit. We didn't kill a limit that day. We were
21  just short which the limit would be four ducks --
22  or four mallard ducks per guy. So that would have
23  been 16 on that day; for myself, Roger, Rick, and
24  Roger's son. We were short of that.

## Page 142

1     Q. Who else was shooting that day?
2     A. Myself, Roger, Rick, and Roger's son.
3     Q. Did Mr. Scavo shoot that day?
4     A. To my knowledge, no.
04:30:34  5     Q. When you say "to your knowledge," what
6  do you mean?
7     A. To what I was able to witness with my
8  own two eyes, no.
9     MR. COOPER: Well, let me intervene. I
04:30:42  10  thought the reason that my client was
11  summoned here was because of an allegation
12  that Mr. Scavo discharged a firearm. I did
13  meet with my client to discuss this
14  interrogation and discuss his knowledge. So
04:30:58  15  that's the basis for his response.
16  BY MR. FOWLER:
17     Q. Did Mr. Scavo have possession of a
18  firearm on the boat that day?
19     A. To my knowledge, no. To what I was
04:31:06  20  able to witness, no.
21     Q. Then when you returned to the shore
22  that day, the group of you were approached by a
23  conservation officer, right?
24     A. Yes.

## Page 143

1     Q. And so what happened when the
2  conservation officer approached you guys?
3     A. We've dealt with this conservation
4  officer several times before. I mean, he's maybe
04:31:34  5  a 20, 25-year vet. He knows the gentleman who
6  used to own the land, and he passed away
7  unfortunately.
8     Myself and Vito have had many
9  conversations with him over the years. He comes
04:31:46  10  and checks on us one or twice a year. Usually he
11  knows that we don't do anything that would even be
12  of questionable legality.
13     And on that particular day, when he
14  first walked up, his first statement to us that I
04:32:04  15  remember was: Oh, wow, you got all the ducks
16  separated. I like that.
17     In Illinois, if I have three ducks and
18  he has four ducks and you have three ducks,
19  they're all supposed to be separate. You can't
04:32:16  20  party hunt. So everybody has to have their own
21  birds.
22     He checked us that day. He checked
23  that and went through the usual routine as to what
24  he checks us on.

## Page 144

1     Q. So as best you can recall, he walked
2  up, and he said: Oh, good, you got the ducks
3  separated. What's the next thing he said?
4     A. He said: All right. Can I see
04:32:40  5  everybody's license, which is typical. Everybody
6  provided their license including Vito.
7     At that point, he goes: Okay. Who's
8  got guns? And everybody -- which all the guns
9  were cased, unloaded. Everybody took their guns
04:32:58  10  out of their cases and he looked at each gun.
11     He says: Okay. Now show me that the
12  gun can't hold more than three shells in the
13  tube -- or, I'm sorry, more than two shells in the
14  tube, because you're limited to three shells per
04:33:08  15  gun. You can't shoot any more than three for
16  waterfowl in Illinois, or I think federally.
17     So you take one shell, two shells, and
18  then when you go to put the third one in, if you
19  have a plug in your gun which you're required to
04:33:20  20  by law, you can't. It's impossible.
21     And he did that for all four of us that
22  had guns that day. He said: Okay. Can I see
23  your shells? So he looked at our shells because
24  all your shotgun shells are required to be

L.A. Court Reporters, L.L.C.
312-419-9292
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMP/JJS 001672

## Page 145

1    nontoxic and they're not.

2        Then he said to me: Is this your boat?

3        I said: Yes, it is.

4        He gets in the boat. He says: All

04:33:42  5    right. I need to look at some stuff.

6        He looked at some compartments, not

7    entirely sure what he was looking for, didn't find

8    anything that was pertinent or anything like that.

9        Then he said to me: Okay. There's

04:33:52  10   five people on the boat. Do you have five

11   lifejackets? Provided him that.

12       Do you have a fire extinguisher on

13   board? I provided him that. Do you have a

14   troweable device? I provided him that. And I

04:34:04  15   believe he asked to see my boater's registration,

16   and I provided him that.

17       That was the extent of the initial

18   interaction with him.

19   Q.   You referred to Vito. Is that Mr.

04:34:14  20   Scavo?

21   A.   Yes.

22   Q.   And what happened next?

23   A.   And next he had a private conversation

24   with Vito after he checked everything.

## Page 146

1    Q.   When you say "private conversation"

2    with Mr. Scavo, how did that take place?

3    A.   He just stated: Hey, can I talk to you

4    over here?

04:34:34  5        They walked away, and myself, Roger,

6    Rick, and Roger's son went about talking about

7    either the day's hunt or whatever we were talking

8    about.

9    Q.   Could you hear what was said between

04:34:42  10   the conservation officer and Mr. Scavo?

11   A.   No, I could not.

12   Q.   What happened after that -- or how long

13   did they talk?

14   A.   Maybe ten minutes, something like that.

04:34:52  15   Q.   What happened after that ten minutes?

16   A.   I observed Vito walking back towards me

17   with kind of a dejected type of look and that

18   bothered me because -- I mean, Vito's like a

19   father to me. You asked me the extent of my

04:35:08  20   relationship with him and he's -- not that he's

21   blood, but he's the closest thing to it and we

22   share a lot with each other. I mean, it's not

23   like we're just hunting buddies. We spend time

24   together all the time.

## Page 147

1        I just saw a look in his eyes. So I

2    approached -- when he walked back, I approached

3    the conservation officer and I showed him my badge

4    and stated to him: Hey, we're all law enforcement

04:35:34  5    here. What's the conversation about? What's

6    going on?

7        And then at that point, he began his

8    interview of me.

9    Q.   Were you talking with him in the

04:35:42  10   presence of all of the others?

11   A.   No. Individually.

12   Q.   You and he walked off a ways just as he

13   had with Mr. Scavo?

14   A.   Correct.

04:35:48  15   Q.   Okay. During the time that you were

16   with the conservation officer, what did you say

17   and what did he say?

18   A.   Paraphrasing because, again, this was a

19   while ago, but he asked me -- what did he say? He

04:36:02  20   says to me: Are you familiar with Mr. Scavo?

21       I said: Yes. He's like a father to

22   me.

23       He goes: So you know his

24   circumstances?

## Page 148

1        And I said: Which is?

2        That he can't possess a gun. Again,

3    I'm paraphrasing.

4        I said something to the effect of:

04:36:18  5    Yeah, I'm definitely aware of that.

6        He gave me a look, a blank look, like:

7    Are you going to say that he didn't possess a gun

8    today?

9        And I said: Absolutely not. That was

04:36:30  10   my belief that he didn't possess a gun that day.

11       He stated to me that -- well, Mr. Scavo

12   stated to me for ten minutes, or however long the

13   time period was, that he possessed a gun.

14       I said to him: That was your

04:36:44  15   conversation with him. I don't know what he said

16   to you, but if that did occur, and I don't believe

17   Mr. Scavo would put himself in that situation, I

18   didn't see it.

19       And he said to me: You didn't see it?

04:36:56  20   You're in the boat with him.

21       And I said: Yeah, but I'm 15 feet to

22   his right.

23       And he said: You're 15 feet to his

24   right?

L.A. Court Reporters, L.L.C.
312-419-9292

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/ LIS 001672

## Page 149

1    I said: It's a 17-foot boat. I'm in
2    the back. He's two feet from the front. That's
3    15 feet.
04:37:10   4    He goes: Okay. And then he basically
5    stated to me: Are you sure you want to say what
6    you're saying?
7    And I said: That's what I observed. I
8    didn't observe anybody shoot a duck.
9    And to quantify what occurs during a
04:37:22   10   duck hunt, when birds come in, single bird or
11   multiple birds come in, one person — well, myself
12   and Vito will call. We'll blow call, or Roger
13   will, too. And one person calls the shot is which
14   is to mean that one person says: Okay. Now let's
04:37:38   15   shoot them.
16   So you come up — you know, somebody
17   will say: Let's shoot them. You come up, shoot,
18   and there could be — it's almost like
19   pandemonium. There's ducks going in every
04:37:48   20   direction.
21   When you shoot, you shoot your zone
22   which means basically you're shooting straight in
23   front of you, 45 degrees on either side, which
24   means you're always safe. You're not shooting

## Page 150

1    over somebody's head. You're not shooting behind
2    your back or some stupid stuff. You're shooting
3    out in front of you in this little zone. So when
4    you come up and shoot, you're focus is only on
04:38:12   5    this zone.
6    So then you shoot, then birds drop, and
7    your gun is empty after three shots. Typically
8    what happens if there's multiple birds, there's
9    going to be three, four, five dead birds and then
04:38:24   10   there's going to be a cripple. We call them a
11   cripple. That's terminology in the hunting world.
12   Basically it refers to a duck that's still alive
13   that's been downed, but state law requires you to
14   dispatch them immediately. And not only state
04:38:40   15   law, but it's for our own dog safety because if a
16   live duck gets out, you send a dog, the live duck
17   can evade a dog. It can dive. It can swim
18   faster. So the typical procedure would be: Live
19   duck, shoot them immediately.
04:38:54   20   This is — anybody that's ever duck
21   hunted over water, that's standard. If the duck's
22   on the water still alive, which we indicate it's
23   still alive by its head is still up, you keep
24   shooting until you have no more shells or until

## Page 151

1    the duck's dead. That's the gist of it.
2    So when we shoot, my focus is only on
3    what I'm shooting and making sure I'm safe.
04:39:22   4    Q.  We were talking about your conversation
5    with the conservation officer.
6    A.  Correct.
7    Q.  Is there anything else that you and he
8    said in that conversation?
9    A.  Like I said, he stated to me,
04:39:28   10   paraphrasing: Is that what you want to go with?
11   And I stated: That's what I observed
12   and that's what I'm telling you.
13   He says: Okay. He moved on from me,
14   and that was the end of our interaction for the
04:39:40   15   day.
16   Q.  Did you have any other conversation
17   with him after that?
18   A.  After that, no.
19   Q.  After that conversation with the
04:39:50   20   conservation officer, you were aware that the
21   conservation officer said that he saw Mr. Scavo
22   shooting that day?
23   A.  He said that he believed he saw that.
24   Q.  And you knew that that day, right?

## Page 152

1    A.  I'm sorry?
2    Q.  You knew that that day?
3    A.  I knew what that day?
4    MR. COOPER:  Objection, asked and
04:40:10   5    answered.
6    BY MR. FOWLER:
7    Q.  You understood on November 20th that
8    the DNR officer believed that Mr. Scavo was
9    engaged in illegal conduct, right?
04:40:26   10   A.  He believed that, yes, and he stated
11   that to me.
12   Q.  So after that trip — strike that.
13   You're aware that as a police officer
14   for the Village of Melrose Park you have an
04:40:42   15   obligation to report to your supervisors any
16   interactions with law enforcement that could lead
17   to further action, right?
18   A.  I was not aware of that because there's
19   no action that was pending against me to my
04:40:56   20   knowledge, nothing criminal on that day or any
21   questionable integrity on that day in my
22   estimation.
23   Q.  You were aware that the conservation
24   officer didn't believe you, weren't you?

38  (Pages 149 to 152)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 001674

Page 153

1    A.  I'm not aware of that.  I think that he
2  wanted me to say whatever he wanted me to say, but
3  I'm not aware that -- I mean, he can't attest to
4  what my own two eyes saw, and he was -- the
04:41:16    5  position of where he was watching us, he couldn't
6  positively discern who anybody was.
7    Q.  He was challenging your statement when
8  you said you didn't see Mr. Scavo shoot, right?
9    A.  I would say that's a fair assessment.
04:41:30    10    Q.  Now, after that conversation with the
11  conservation officer, did you report that
12  communication to any of your supervisors at the
13  Department?
14    A.  No, I did not.  I didn't deem it
04:41:42    15  necessary.
16    Once again, I don't believe that
17  anything I did was of questionable integrity or
18  illegality.
19    Q.  You were aware that that situation
04:42:00    20  could result in criminal prosecution against Mr.
21  Scavo, weren't you?
22    A.  I believe that if he thinks he saw him
23  shoot which he stated to me, I don't know what his
24  procedure is.  We have our own procedures here.

Page 154

1  He's in a totally different county with a totally
2  different jurisdiction with totally different
3  SOPs.  So I don't know what his intentions were.
4  He didn't state that to me and I didn't ask him.
04:42:24    5    Q.  I didn't ask you any intentions.  What
6  I asked was:  You were aware that the situation
7  could result in criminal prosecution of Mr. Scavo,
8  weren't you?
9    A.  I wasn't aware that it could.  I
04:42:32    10  mean --
11    Q.  You were not aware that it could or --
12    A.  Let me rephrase.
13    I wasn't aware that the situation that
14  occurred was going to result in -- well, I don't
04:42:42    15  where it was going to go after that.  I'm not --
16    Q.  I understand.
17    A.  I'm not the DNR officer.  So it's out
18  of my hands.
19    Q.  But the question I asked you was:
04:42:52    20  Could it result in prosecution?
21    MR. COOPER:  Objection, speculation.
22  He's not DNR.  He's not a lawyer.
23  BY THE WITNESS:
24    A.  Again, like I said, it occurred in

Page 155

1  Kendall County.  I'm a police officer in Cook
2  County.  There's different regulations, different
3  SOPs, different levels of what an officer
4  determines to be his own -- what's the word I'm
04:43:16    5  looking for -- whether he wants to prosecute or
6  not.  I mean, that's his decision.
7    So I have no idea as to where it could
8  have went after that.  But once again, it wasn't
9  my concern.
04:43:28    10    Q.  On the next day, November 21st, did you
11  go hunting?
12    A.  I don't believe I did.
13    Q.  November 22nd, did you go?  That would
14  have been the day before Thanksgiving, if that
04:43:42    15  helps you.
16    A.  Maybe.  I'm not positive.
17    Q.  November 23rd, you went hunting, right?
18  Thanksgiving Day?
19    A.  I can't remember, to be honest with
04:43:54    20  you.  I know where I went for dinner.  I don't
21  remember if I went hunting.
22    Q.  After the November 20th incident, are
23  there any days that you can identify as you sit
24  here today that you either did or did not go

Page 156

1  hunting?
2    A.  I could say I went yesterday.
3    Q.  Where did you go yesterday?
4    A.  Same place, not water, fields.
04:44:42    5    MR. FOWLER:  All right.  Give us a few
6  minutes.
7    (WHEREUPON, a recess was had.)
8    MR. FOWLER:  Back on the record.
9  BY MR. FOWLER:
04:52:36    10    Q.  Is there anything else that you would
11  like the chief or deputy chief to take into
12  account as they're deciding what to do with
13  respect to the allegations against you?
14    MR. COOPER:  Boy, I wasn't expecting
04:52:50    15  that.  I need two seconds.
16    (WHEREUPON, a brief recess was had.)
17    MR. COOPER:  I think it's in my
18  client's best interest not to say anything in
19  response to the last question.
04:54:26    20    MR. FOWLER:  Is that so?
21    MR. COOPER:  And that's not to disobey
22  an order.
23  BY MR. FOWLER:
24    Q.  Well, you're the one testifying, right,

## Page 157

1    rather than him?

2    A. My statement would be I don't have

3    anything further to add to this.

4    MR. COOPER: You don't see that as

04:54:40 5   disobeying an order?

6    MR. FOWLER: I do not.

7    MR. COOPER: Okay. Now, what we did

8    talk about, as to the medical records you

9    asked for —

04:54:46 10   MR. FOWLER: Let me cover that with —

11    MR. COOPER: Oh, sure.

12    MR. FOWLER: So as we talked about, I

13    am going to ask for his medical records. I'm

14    going to ask for a medical release so that I

04:54:56 15   can get the medical records. As a result of

16    that, it is very possible that I may need to

17    recall him and ask him some more questions

18    after I see those.

19    So the bottom line to that is I'm

04:55:06 20   not saying today that I'm done. I'm not

21    going to make a decision on that until after

22    I see those documents.

23    I will send you a medical release

24    in the next day or so, Chris.

## Page 158

1    MR. COOPER: Okay. Do you want the

2    DuPage medical records that we have?

3    MR. FOWLER: I assume that they'll be

4    part of the complete medical records.

04:55:28 5   THE WITNESS: I believe so.

6    MR. FOWLER: And if you want to send me

7    something in terms of a protective order or a

8    protective agreement —

9    MR. COOPER: Right.

04:55:34 10   MR. FOWLER: — I'm happy to look at

11    it. I will represent to you that obviously

12    whatever I receive will be kept confidential,

13    but if you want to send me something, I'm

14    happy to look at it.

04:55:44 15   MR. COOPER: I can write something up.

16    All right. So I will be holding

17    the blue folder with a couple pages from the

18    medical records, and we both agree that I'm

19    going to take this with me and that there

04:55:56 20   will not be an allegation that my client

21    disobeyed an order.

22    MR. FOWLER: And just to be completely

23    clear, when you're referring to the "blue

24    folder," you're referring to the documents

## Page 159

1    that your client brought with him today and

2    that you showed me earlier?

3    THE WITNESS: Right.

4    MR. COOPER: And there were a couple of

04:56:10 5   pages which represent prior medical records.

6    MR. FOWLER: And you, Mr. Cooper, are

7    going to retain possession of all of those

8    documents?

9    MR. COOPER: Well, my client and I

04:56:18 10   will, both. We share.

11    MR. FOWLER: You're not going to lose

12    them?

13    MR. COOPER: Well, let's hope not.

14    THE WITNESS: I picked a blue folder so

04:56:26 15   it's very easy to remember.

16    MR. FOWLER: All right. So we are done

17    for today.

18    MR. COOPER: All right. I mean, here

19    is my sense: I would love to say we object

04:56:36 20   to the continuation of the interrogation

21    because the statute doesn't allow for that,

22    but I trust that when the Department

23    interrogates a police officer, it does so for

24    reasonable reasons and that its lawyers won't

## Page 160

1    prolong the interrogation. So I trust you

2    right now.

3    MR. FOWLER: Excellent speech. Thank

4    you.

04:56:56 5   MR. COOPER: All right. The court

6    reporter wants to know and make sure that you

7    gets paid, right? I understand.

8    THE REPORTER: Mr. Cooper, Mr. Fowler

9    is ordering the transcript to be transcribed.

04:57:10 10   Would you like a copy?

11    MR. COOPER: I do want a copy. We'll

12    get that on the record.

13    (WHEREUPON, the interrogation was

14    concluded at 4:57 p.m.)

15

16

17

18

19

20

21

22

23

24

40 (Pages 157 to 160)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VMP/JJS 001676

# EXHIBIT 42





# MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi • Director of Police

To: LT Mark Rieger #08

From: OFC Scatchell #23

Date: 07 APR 18

Reference: Grievance

At this time, I, Officer John A. Scatchell #23, submit to my immediate supervisors certain grievable issues. This is in compliance with Step 1 of the Grievance process pursuant to Article 4 (the Grievance and Arbitration Section) of the Collective Bargaining Agreement ("CBA"). Article 4 states in relevant part,

> [a]ny dispute over meaning or application of the terms of this Agreement shall be subject to binding arbitration. There shall be no strikes while this Agreement is in effect. Grievable issues are only those issues relevant to the interpretation of this Collective Bargaining Agreement.

> In interpreting and applying this Agreement, the Association, the Employer, and the Arbitrator shall consider the terms of this Agreement in light of past practice of the parties over the duration of their collective bargaining relationship.

At this time, I am grieving the following issues:

1. In the course of my employment, I received certain updated Melrose Park PD Standard Operating Procedures ("SOP"). I received these SOP's in the form of a CD-ROM. In exchange for the aforementioned CD-ROM, I was ordered to sign and date an acknowledgement that I received a copy and understood the contents. This was without ever having had an opportunity to view the contents of the CD-ROM or an opportunity to review a paper version of the updated SOP's. Furthermore, upon reviewing the contents of the SOP's in both CD-ROM and paper form, there were no tracked changes of a nearly 500-page document. Several changes in the SOP's



# MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi + Director of Police

violate the CBA and established past practices of the MPPD.

2. I was unilaterally issued an order that imposed restrictions on my pre-approved vacation pick. This pick was my first choice of vacation pick and covered the dates of December 7th-20th, 2017. Such changes violated established past practices and prevailing rights as set forth in the CBA *(See Holidays/Vacations, Personal Days, and Sick Leave Sections of the CBA)*.

3. I was not compensated during the 2017 calendar year for my birthday *(See Personal Days Section of the CBA)*.

4. My status was changed in the computer scheduling system and on printed copies of the MPPD work schedule for the week of December 7th, 2017. Someone with access to the system altered my vacation days (12/19/2017 and 12/20/2017). Without my knowledge or consent, these dates were changed from vacation days to sick days ("injured"). Such changes violated established past practices and prevailing rights set forth in the CBA *(See Holidays/Vacations Section of the CBA)*.

5. I was ordered to sign a medical release on two (2) occasions, with specific deadlines. This order violated my constitutional rights, my right to privacy, my rights pursuant to the Family Medical Leave Act, past practices of the Melrose Park Police Department, and the CBA. I provided doctors notes as requested. Instead of requesting a physician illness certification, that would certify the seriousness and parameters of my injury, I was ordered to sign an expansive release requiring that I authorize MPPD to obtain an overly broad array of medical disclosures that are not relevant to their investigation.

6. The CBA guarantees equal protection and uniform application of disciplinary matters. This department has violated this protection by applying discipline, investigation, and punishment disproportionately to certain officers/supervisors. The result is unjustified disparate impact and disparate treatment of certain officers.

**1 North Broadway + Melrose Park, Illinois 60160 + (708) 344-8409**
**www.mppd.com**

2



# MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi • Director of Police

7. MPPD illegally and without justification acquired personal information on my mother's iPass transponder. This was done in an attempt to use the ill-gotten information against me in disciplinary matters. I do not know the extent of these records or if these were the only records that were unlawfully accessed.

By this grievance, pursuant to the CBA, I request a meet and confer (discussion), as to the foregoing, with my immediate supervisor. My goal is to attempt to resolve the issue with my immediate supervisor as outlined in the CBA.

Respectfully submitted,

OFC John Scatchell Jr. #23

CC SGT Cacciatore #15



# MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi • Director of Police

TO:   Ofc. John Scatchell #23
FR:   Lt. Mark G. Rieger #8
DA:  April 10th, 2018
RE:  Grievance

Ofc. Scatchell,

Thank you for responding to my inquiry regarding whether or not you had a
grievance to initiate. I understood your response to mean that you had more
than one. I therefore requested that you provide it to me in writing, so that I
could clearly understand those grievable issues. You later provided me the
attached (3) page document.

Having read your documents, the following paragraphs are my response;

1.) I observed that your reference of Article 4, specifically 4.1- Grievable
Issues, failed to include the last assertion of that paragraph which
states, "General Village Employment Policies, Management Rights
and S.O.P. are not grievable issues."

2.) I interpret your listed "1" issue to state that several changes in the
SOP's violate the CBA and established past practices of the MPPD.
Having concluded that this is your grievance, you failed to provide
which particular changes in the SOP you are referring to that violate
our CBA and I fail to recognize what particular relevance they have to
our CBA.

3.) I interpret your listed "2" issue to state that you were unilaterally
issued an order that imposed restrictions on your pre-approved
vacation pick. I fail to recognize how the particular restriction is
relevant to Article 5 of our CBA.

4



# MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi • Director of Police

4.) I interpret your listed "3" issue to state that you were not compensated during the 2017 calendar year for your birthday. I am not certain if you mean this to say that you were not paid, or that you did not receive your birthday off. Either meaning, I cannot answer for that issue at this time.

5.) I interpret your listed "4" issue to state that your vacation days were changed without your consent. I fail to recognize how this particular change is relevant to Article 5 of our CBA.

6.) I interpret your listed "5" issue to state that you were ordered to sign a medical release on (2) occasions and that this order violated the CBA. I fail to recognize how this order is relevant to any Article of our CBA.

7.) I interpret your listed "6" issue to state that your protection and uniform application of disciplinary matters has been violated by applying discipline, investigation, and punishment. I fail to recognize any discipline posed against you at this time, nor grievable relevance of an 'investigation' to any Article of our CBA.

8.) I interpret your listed "7" issue to state that your mothers personal iPass information was unlawfully acquired by the MPPD and was attempted to be used for means of discipline against you. I fail to recognize your mother as a member of the Lodge and any disciplinary matters taken against you at this time, nor its grievable relevance to our CBA.

I conclude that the majority of these issues, excluding only your 3rd, do not have grievable relevance to our CBA, as I interpret them, and I therefore cannot identify what remedies I can instill in resolving these issues.

Respectfully,

Lt. Mark G. Rieger

Attachment (1)

**1 North Broadway • Melrose Park, Illinois 60160 • (708) 344-8409**
**www.mppd.com**

5



# MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi • Director of Police

TO:  Ofc. John Scatchell #23
FR:  Lt. Mark G. Rieger #8
DA:  April 18th, 2018
RE:  Grievance

Ofc. Scatchell,

I have responded to your grievance issues in writing, having concluded that I could not identify any remedies of resolve to those issues which are not relevant to our CBA; the issues are absent any specific requested relief. You later communicated to me that my response was unacceptable.
I then immediately communicated to you that your grievance issues need to proceed to the Chief; this is the Second Step of our CBA.
I have provided the Chief copies of each of our letters. I now encourage you to accelerate your attempt to resolve your grievable issues with the Chief.

I will remain available to you in person at work, by work email and work telephone, extension 6113.

Respectfully,

Lt. Mark G. Rieger

CC: Director Sam C. Pitassi

**1 North Broadway • Melrose Park, Illinois 60160 • (708) 344-8409**
**www.mppd.com**



# MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi ◆ Director of Police

To: Director Pitassi

From: OFC Scatchell #23

Date: May 7th, 2018

Reference: Grievance Supplement

Pursuant to step 2 of the Grievance process outlined in the Collective Bargaining Agreement ("CBA"), I contacted you directly to address my grievance. You stated in a phone conversation that I would have to submit in writing the applicable sections of the CBA that were relevant to each potentially grievable issue. Below you will find my initial grievance statements (numbers 1-7) with the corresponding CBA sections listed underneath each. Additionally, as instructed by the lodge, I have added remedies that I would see fit to resolve this grievance and avoid arbitration.

At this time, I am grieving the following issues:

1. The practice of Receiving revised SOP's on a Disk, without tracked changes, and ordered to sign an Acknowledgement without the Opportunity to Review before Signing:

   a) **Original Grievance:** In the course of my employment, I received specific updated Melrose Park PD Standard Operating Procedures ("SOP"). I received these SOPs in the form of a CD-ROM. In exchange for the CD-ROM, I was ordered to sign and date an acknowledgment that I received a copy and understood the contents without ever having had an opportunity to view the contents of the CD-ROM or a chance to review a paper version of the updated SOP's. Furthermore, upon examining the contents of the SOP's in both CD-ROM and paper form, there were no tracked changes of a nearly 500-page document. Several changes in the SOP's violate the CBA and established past practices of the MPPD.



# MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi • Director of Police

b) Upon information and belief, I received revised SOPs for 2013, 2014, 2015, 2016, and 2017. None of these signed Acknowledgements appear in my Personnel File.

c) **CBA section:** The entire CBA since the SOP's govern the conditions of our employment and we could face discipline for violating any SOP.

d) **Remedy:**

    i. A copy of any new or notable changes to each volume of the SOP's should be provided in both paper and CD-ROM form in the spirit of transparency and open candor. This remedy would put the officers on notice of any changes, so they would not be unwittingly violating the newly added SOP's.

    ii. Count X - "Association with a Known Felon" should be dismissed because the language of Count X was not added to the MPPD SOP's until the 2016 revision. In fact, it appears that the entire scope of how to administer and handle discipline changed from 2015 – 2016 versions of the SOP's. Accordingly, the BOFPC's charge against me for "Association with a Known Felon" should be dismissed.

    iii. I have worked at the MPPD for over five (5) years. During this time, you and many others knew about my relationship with Vito Scavo, the former Melrose Park Police Chief. I am accused of associating with him, yet his name was still attached to relevant documents/orders posted in our department as recently as February 2018, nearly two months after I received the above-mentioned charges. (See: attached building evacuation plan document). Alternatively, Count X should be dropped based on the doctrine of waiver.

2. **Original Grievance:** I was unilaterally issued an order that imposed restrictions on my pre-approved vacation pick. This pick was my first choice of vacation pick and covered the dates of December 7th-20th, 2017. Such changes violated established past practices and prevailing rights as outlined in the CBA.

8



## MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi ◆ Director of Police

a) **CBA section:** *See Sections, 1.1, 2.1, 6.1-6.3 Holidays/Vacations, Personal Days, and Sick Leave Sections of the CBA.*

b) **Remedy:**

> i. This order against travel during a pre-approved vacation pick allowed charges to be brought against me for "Disobeying Lawful Order Regarding Time Off to Travel during a Medical leave." I was well within my rights to travel on the dates of 12/17/17 through 12/22/17. My below listed birthday compensation (see: Grievance Issue #3) and the two vacation days that were removed would have covered the entirety of my trip. Additionally, I brought extra money with on the trip, to ensure that emergency travel would be possible if ordered by the PD.
>
> ii. Count VII - "Disobeying Lawful Order Regarding Time Off to Travel during Medical leave" should be dropped immediately and I should be compensated for the two vacation days that were wrongfully revoked.

3. **Original Grievance:** I was not compensated for the 2017 calendar year for my birthday *(See Personal Days Section of the CBA).*

   a) **CBA section:** 5.2

   b) **Remedy:** I receive my 2017 birthday compensation during the 2018 calendar year.

4. **Original Grievance:** My status was changed in the computer scheduling system and on printed copies of the MPPD work schedule for the week of December 7th, 2017. Someone with access to the system altered my vacation days (12/19/2017 and 12/20/2017). Without my knowledge or consent, these dates were changed from vacation days to sick days ("injured"). Such changes violated established past practices and general rights outlined in the CBA.

   a) **CBA section:** *See Holidays/Vacations Section of the CBA Section 5.1.*

**1 North Broadway ◆ Melrose Park, Illinois 60160 ◆ (708) 344-8409**
**www.mppd.com**

9



## MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi ▪ Director of Police

    **b) Remedy:** See: Remedy proposed in Grievance Issue #2 section b(ii).

5. **Original Grievance:** I was ordered to sign a medical release on two (2) occasions, with specific deadlines. This order violated my constitutional rights, my right to privacy, my rights according to the Family Medical Leave Act, past practices of the Melrose Park Police Department, and the CBA. I provided doctors notes as requested. Instead of requesting a physician illness certification, that would certify the seriousness and parameters of my injury, I was ordered to sign an expansive release requiring that I authorize MPPD to obtain an overly broad array of medical disclosures that are not relevant to their investigation

    **a) CBA Section:** 5.3

    **b) Remedy:**

        i. I spoke with lodge representatives about the above-stated issue in February 2018 and they, in turn, spoke with you and the Village's attorney (Fowler). Fowler and my attorneys then spoke and seemingly agreed that my attorneys would draft a revised release, which would be decided upon by the Village's attorneys. When this release was drafted and signed, the Village's attorneys then submitted that release to a medical provider to attempt to acquire my pertinent medical records. When the medical provider did not disclose those records to the Village, I was further charged with "Disobeying Lawful Order Regarding Medical Records." The documents not being disclosed was solely the fault of the Village's attorneys, who failed to adhere to simple rules/templates outlined by the medical provider to acquire such documents. Additionally, in the charging document I was accused of interfering with the production of the medical records. The Villages attorney's put me in a "lose-lose" situation by asking my attorneys to have me contact my medical provider to ask why the documents had not yet been furnished. This occurred through phone correspondence on or about March 13th, 2018. I did not call my medical provider out of fear that my contact alone would constitute interference.

**1 North Broadway ▪ Melrose Park, Illinois 60160 ▪ (708) 344-8409**
**www.mppd.com**

10



## MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi ✦ Director of Police

My attorneys advised the Village's attorneys to have one of their employees reach out to the medical provider. I believe that no matter how I handled this request by the Village's attorneys, I would have been charged with the above-listed charge.

    ii. Count VI – "Disobeying Lawful Order Regarding Medical Records" should be dropped immediately.

6. **Original Grievance:** The CBA guarantees equal protection and uniform application of disciplinary matters. This department has violated this protection by applying discipline, investigation, and punishment disproportionately to certain officers/supervisors. The result is unjustified disparate impact and disparate treatment of certain officers.

    a) **CBA section:** 1.1, 2.1, and 2.2

    b) **Remedy:** There are only two remedies that I see fit. First, discipline is applied uniformly and proportionate to the charges brought. Additionally, I am entitled to a fair and impartial tribunal. I only wish to be treated fairly. Before December 8, 2017, I was never disciplined. In fact, I have never been issued a verbal or written warning. To my knowledge, only one other officer has faced a formal interrogation/charges for disciplinary matters not relating to residency under this administration. This is despite the fact that far more egregious acts/investigations were conducted within the department ranks and no charges were brought. The fact that the first step in perceived misconduct is to interrogate, charge, and move to terminate shows unjust and retaliatory action by the investigating bodies involved (you and Deputy Chief Castellan). I believe this is on account of your adverse relationships with my father, LT. John J Scatchell, as well as your former Chief, Vito R. Scavo. Secondly, my proposed remedy is to dismiss all of the charges against me, as this has been a fishing expedition and a witch hunt from day one.

7. **Original Grievance:** MPPD illegally and without justification acquired personal information on my mother's iPass transponder. This was done in an attempt to use the ill-gotten information against me in disciplinary matters. I do not know the extent of these records or if these were the only records that were unlawfully accessed.

### 1 North Broadway ✦ Melrose Park, Illinois 60160 ✦ (708) 344-8409
### www.mppd.com

Ⅶ



## MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi ♦ Director of Police

a) **CBA section:** 1.1, 2.1, and 2.2

b) **Remedy:** The illegally obtained "evidence" be excluded or suppressed, and the subsequent charges relating said illegally obtained "evidence" be dismissed.

By this grievance, according to the CBA, I request a meet and confer (discussion), as to the foregoing, with you, Director Pitassi. My goal is to attempt to resolve the issue with you, Director Pitassi, as outlined in the CBA.

Respectfully submitted,

OFC John Scatchell Jr. #23

**1 North Broadway ♦ Melrose Park, Illinois 60160 ♦ (708) 344-8409**
**www.mppd.com**

12



**Ofc Scatchell grievance**
1 message

**John Scatchell Jr** <jscatchelljr@melroseparkpd.com>                                        Mon, May 7, 2018 at 2:50 AM
Reply-To: jscatchelljr@melroseparkpd.com
To: mrieger@melroseparkpd.com, gcacciatore@melroseparkpd.com

Hello Lt. and Sgt., I am submitting this grievance to you both per my conversation with Sgt Cacciatore on 06 MAY 18. I have
also left the original signed copy of this document on your desk in the supervisor's office. Thank you for your time and
consideration in this matter.

Regards,

Officer Scatchell #23

📄 (?ui=2&ik=d428fd1a58&view=att&th=16339951e5d96515&attid=0.1&disp=attd&safe=1&zw) **DOC452.PDF**
86K

l3



# MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi ▪ Director of Police

To: LT Mark Rieger #08

From: OFC Scatchell #23

Date: 06 MAY 18

Reference: Grievance

At this time, I, Officer John A. Scatchell #23, submit to my immediate supervisors, a grievable issue. This is in compliance with Step 1 of the Grievance process and pursuant to Article 4 (the Grievance and Arbitration Section) of the Melrose Park Police Department's Collective Bargaining Agreement ("CBA"), which states in relevant part:

> Any dispute over meaning or application of the terms of this Agreement shall be grievable and shall be subject to binding arbitration as specified in this Article. There shall be no strikes while this Agreement is in effect. Grievable issues are only those issues relevant to the interpretation of this Collective Bargaining Agreement. *(Sec. 4.1)*.

Section 5.3 of the MPPD CBA outlines the sick leave policy by stating that:

> an employee who is sick for more than three (3) consecutive sick days, as a result of illness or a non-duty injury, may apply for extended leave by filling out a completed Extended Leave Request Attending Physician's Statement (Form 5.3b1) and an Employee Medical Certification Release (Form 5.3b1). *See 2014 CBA § 5.3 (b)* at 5.

> An officer who is placed on sick leave as a result of an injury or illness contracted in the in line of duty shall be entitled to full pay for one (1) year. An officer, who is placed on sick leave as a result of any other disability, except that resulting from an injury incurred in the course of other employment, shall be entitled to full pay for six (6) months ... *See 2014 CBA § 5.3 (b)* at 5.

> When the employee returns to work, he or she will complete an Absence Due to Short Illness Form (Form 5.3a). This form will be approved by the employee's supervisor and forwarded to the Records Unit. *See 2014 CBA § 5.3 (b)* at 1.

> A three-panel Review Board shall oversee the application of the Sick Leave Policy specified in the foregoing subsection, provided that the Review Board <u>shall not inquire into any particular case until the officer has been on sick leave for at least one (1) month.</u> (Emphasis added) *See 2014 CBA § 5.3 (c)*.

### 1 North Broadway ▪ Melrose Park, Illinois 60160 ▪ (708) 344-8409
### www.mppd.com

14



## MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi • Director of Police

Upon information and belief, no Review Board convened to determine that my injury had violated the sick leave policy. I received no notice that such a Board was reviewing my claim and no such board requested more information from my treating physicians or me. I began my sick leave on November 9th, 2017. I was never given or ordered to submit the medical certification form or any Family Medical Leave Act notices.

Instead, the Statement of Charges against me allege that on or about November 13, 2017, Deputy Chief Castellan received an "anonymous report" that I was allegedly violating the Sick Leave policy. Upon further information and belief, on or about November 14, 2017, Deputy Chief Castellan began his own investigation by hiring an "experienced police officer" to begin surveilling me. This surveillance "was frequently conducted over the next month." This was only four (4) days into my sick leave.

Furthermore, an anonymous tip without anything more is not the proper basis for probable cause. It is a direct violation of Section 3.8 (b) of the Uniform Peace Officers' Disciplinary Act which states: "Anyone filing a complaint against a sworn peace officer must have the complaint supported by a sworn affidavit." See (50 ILCS 725).

On or about December 7, 2017, I began my department approved vacation. At that point, I was on sick leave for approximately 28 days. I was not scheduled to return to work until 12/21/17. The next day, I was notified that I was being formally investigated for allegedly violating the sick leave policy by Deputy Chief Castellan.

According to the December 8th, 2017 notice of interrogation/formal investigation, Director Pitassi and Deputy Chief Castellan are listed as the sole investigators for the MPPD. Therefore, Director Pitassi and Deputy Chief Castellan violated section 5.3 (c) of the 2014-2017 CBA by deviating from the process outlined pursuant to the CBA.

By this grievance, and pursuant to the CBA, I request a meet and confer (discussion), as to the foregoing, with my immediate supervisor. My goal is to attempt to resolve the issue with my immediate supervisor as outlined in the CBA.

Bearing this in mind, an "anonymous report" to Deputy Chief Castellan, as the lone reason for conducting an investigation, albeit an improper investigation, is not valid whatsoever. No sworn affidavits have ever been mentioned or brought up to date to back up this "anonymous report" and therefore the whole investigation should be deemed improper and should be stricken entirely. Formally, I move that the following remedy of a dismissal of the Sick Leave Abuse charges against me be supplemented by a dismissal of all subsequent charges that emerged from this improper investigation ("fruit of the poisonous tree.")



# MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi ✦ Director of Police

Respectfully submitted,

OFC John Scatchell Jr. #23

CC SGT Cacciatore #15

**1 North Broadway ✦ Melrose Park, Illinois 60160 ✦ (708) 344-8409**
**www.mppd.com**

ly



## MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi • Director of Police

TO: Ofc. John Scatchell #23
FR: Director Sam Pitassi
DA: May 14, 2018
RE: Grievance

Ofc. Scatchell,

I am responding to your May 7th Memo to me concerning your apparent desire to advance your April 7, 2018 Grievance to Step 2 of the Grievance process. Under Section 4.3 of the CBA, if you were not satisfied by your supervisor's response, you had five days to "proceed to the second step." The CBA provides further that "[t]he time limits set forth in this Article may be extended for reasonable periods only if an aggrieved Officer is unavailable to participate in the grievance process and such participation would materially assist in settlement."

Your supervisor responded initially on April 9, 2018, and on April 18, 2018, your supervisor notified you, in writing, that you needed to advance the grievance to Step 2 if you wished to pursue it further. You have not claimed that you were "unavailable to participate in the grievance process" and so by waiting until May 7, your "grievance" is now untimely and it is accordingly denied on that basis.

Because your grievance is untimely, I have no obligation to address the substance, but even if I did, it would not change the result – I would deny your grievance on the substance as well, and I write here to explain my reasoning both to you and to the FOP.

1.      Item 1 of your "Grievance Supplement" challenges the distribution and content of the SOPs. Section 4.1 of the CBA provides that "Grievable issues are only those issues relevant to the interpretation of this Collective Bargaining Agreement. General Village Employment Policies, Management Rights and S.O.P. are not grievable issues." Because your grievance relates to SOPs, which is specifically excluded from the grievance process, and because distribution and content of the SOPs are not part of the CBA and therefore cannot be "relevant to the interpretation of this" CBA, the issue you raise is not grievable, and was therefore properly denied by Lt. Rieger.

17



# MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi • Director of Police

In addition, I note that the relief you seek regarding this issue is dismissal of one of the Counts in the Charges against you now pending before the Board of Fire and Police Commissioners ("BOFPC"). Chapter VI, Section 2(g) of the BOFPC's Rules provide that "objections to the sufficiency of written charges must be filed or made prior to or at the hearing before the Board." A grievance is not the proper venue. (I note that this same issue applies to your points 2, 4, 5, 6 and 7.)

2.    Item 2 in your "Grievance Supplement" relates to vacation during the period of December 7-20, 2017. First, simply picking vacation dates does not guarantee that those dates may be taken off. For example, in your case, you used some of the time available during the year and so it was not available as "vacation" during the December 7-20 period. Second, you claimed to have incurred an exacerbation of a work-related injury, and it was therefore entirely appropriate for your supervisors to insist that you comply with medical restrictions. Finally, Lt. Rieger's response was entirely correct – you have received the benefit of your holidays and vacation days and so your "grievance" does not involve the interpretation of the CBA and the provisions you cited in your Memo have nothing to do with this issue.

3.    Item 3 claims that you were not compensated in 2017 for your birthday. We have not been able to locate any records where you sought to use your birthday in 2017, and our practice has been that it must be requested, and if not, it is waived. If you present documents showing that you, in fact, requested to use your 2017 birthday day, please send me copies and I will consider the issue further. Otherwise, this aspect of the grievance was properly denied.

4.    Item 4 claims that the "computer scheduling system" was changed concerning your schedule on 12/19/17 and 12/20/17 and you claim that this "violated established past practices and general rights outlined in the CBA." I disagree. Management must have the ability to modify the schedule based upon actual usage of time due and what remains available. Moreover, because the practice does not violate a specific provision of the CBA, it is not grievable and was therefore properly denied by Lt. Rieger. In any event, the issue is moot because I am not pursuing charges against you for not reporting for duty on those dates.

18



# MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi • Director of Police

5.    Item 5 complains about being required to sign a medical release, citing Section 5.3 of the CBA.  The issue regarding substantiation of the need for leave is not addressed in Section 5.3, so there is nothing there to "interpret" and it was therefore properly denied by Lt. Rieger.  Moreover, because you claimed that the absence was due to an exacerbation of a work-related injury, and because the injury itself is doubtful based upon your activities during that period, the Village is entitled to more information than what you provided.

6.    Item 6 seeks to grieve the imposition of discipline against you, but this issue is premature in that you have not yet been subjected to discipline, and Lt. Rieger therefore properly denied this issue as well.

7.    Finally, item 7 complains about our acquisition of your mother's IPASS information.  Here again, nothing about this issue requires the interpretation of the CBA and Lt. Rieger therefore properly denied this issue as not grievable.

Because your "Grievance Supplement" is untimely, and also because none of the issues you raise have any merit whatsoever, I do not think that it would be a productive use of time to discuss them in person and therefore I will not schedule a meeting with you concerning these issues.

Director of Police

Sam C. Pitassi

**1 North Broadway • Melrose Park, Illinois 60160 • (708) 344-8409**
**www.mppd.com**

L9



**Scatchell Grievance files**
1 message

**John Scatchell Jr** <jscatchelljr@melroseparkpd.com>
Reply-To: jscatchelljr@melroseparkpd.com
To: mvfoplodge19@gmail.com

Tue, May 15, 2018 at 5:24 PM

FOP Lodge 19,

Attached are the files in chronological order as they pertain to each grievance document.

Intial Grievance (4/7/18)

Rieger Response (4/10/18)

Initial Grievance Supplement to move to Step 2 (5/7/18)

Evacuation Plan document attached to above Supplement (5/7/18)

Director's Response to Supplement (5/14/18)

Second Grievance (5/7/14)

I don't believe the application of the "5 day" allotment in the CBA that Director Pitassi refers to in his response applies to me, but rather my immediate supervisor. LT Rieger responded within the 5 days, that is not contested. I do not believe I was bound by any 5 day timeline to advance the grievance to step 2. Director Pitassi responded within the 10 days allotted to him, that also is not contested.

Additionally in his response, Director Pitassi cites outdated Board of Police and Fire Commissioners statutes as his reason to not recognize my proposed remedies. I am not asking anything of the Board of Police and Fire in any of my documents. I am asking Director Pitassi, who has been referred to in all Department issued documents as one of the investigating bodies into my situation along with Deputy Chief Castellan. My stance is that, as investigator, he can drop charges at any time and that does not relate to the BOFPC.

Regarding the status of my second grievance, to my knowledge it is at Step 2. I spoke with LT Rieger on Today's date and he stated that the issue/document had been presented to Director Pitassi. On May 12th, I explained to LT Rieger that I do not expect him to reasonably be able to resolve this issue and he agreed to forward it to the Director for Step 2. When a response is received regarding that grievance, I will provide it to you ASAP. I view my proposed remedy in the second grievance in the same light as the first grievance. I am asking Director Pitassi as the lead or one of the investigating bodies to drop the appropriate charge(s) against me. This is not a request to the BOFPC.

I have also attached the following department issued documents:

Notice of Interrogation (12/08/17)

Notice of Interrogation 2 (12/20/17)

Statement of Charges (03/27/18) - note my council did not receive this until 04/04/18

Notice of Hearing (04/03/18) - also received on 04/04/18

Thank you for your time and consideration in this matter,

Ofc. John A. Scatchell #23

**10 attachments**

20



**Evacuation Plan.JPG**
464K

(?ui=2&ik=d428fd1a56&view=att&th=16365e8a6ad1717a&attid=0.4&disp=inline&safe=1&zw)

(?ui=2&ik=d428fd1a56&view=att&th=16365e8a6ad1717a&attid=0.1&disp=attd&safe=1&zw) **Initial Grievance 07 APR 18.pdf**
103K

(?ui=2&ik=d428fd1a56&view=att&th=16365e8a6ad1717a&attid=0.2&disp=attd&safe=1&zw) **Rieger Response  10 APR 18.pdf**
709K

(?ui=2&ik=d428fd1a56&view=att&th=16365e8a6ad1717a&attid=0.3&disp=attd&safe=1&zw) **Grievance Supp 07 MAY 18.PDF**
169K

(?ui=2&ik=d428fd1a56&view=att&th=16365e8a6ad1717a&attid=0.5&disp=attd&safe=1&zw) **Director Response 14 MAY 18.pdf**
1967K

(?ui=2&ik=d428fd1a56&view=att&th=16365e8a6ad1717a&attid=0.6&disp=attd&safe=1&zw) **Second Grievance 2 07 MAY 18.PDF**
86K

(?ui=2&ik=d428fd1a56&view=att&th=16365e8a6ad1717a&attid=0.7&disp=attd&safe=1&zw) **Notice of Interrogation 08 DEC 17.pdf**
98K

(?ui=2&ik=d428fd1a56&view=att&th=16365e8a6ad1717a&attid=0.8&disp=attd&safe=1&zw) **Notice of Interrogation 20 DEC 17.pdf**
108K

(?ui=2&ik=d428fd1a56&view=att&th=16365e8a6ad1717a&attid=0.9&disp=attd&safe=1&zw) **Statement of Charges 27 MAR 18.pdf**
494K

(?ui=2&ik=d428fd1a56&view=att&th=16365e8a6ad1717a&attid=0.10&disp=attd&safe=1&zw) **Notice of Hearing 03 APR 18.pdf**
641K

21



## MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi • Director of Police

TO: Ofc. John Scatchell #23
FROM: Director Sam C. Pitassi
DATE: May 24, 2018
RE: May 7th 2018 Sick Leave Policy Grievance

Ofc. Scatchell,

I am responding to your May 6th Grievance Memo (sent by email May 7th), concerning Section 5.3 of the CBA and your contention that the Charges against you violate that provision. Although the Grievance was directed to your Supervisors, I am responding because the Grievance challenges my action in issuing the Charges against you.

As a preliminary matter, I consider your Grievance to be untimely. You were aware of the investigation concerning your abuse of sick time as of December 8, 2017, your sick leave ended on January 9, 2018, and the Charges were issued on March 27, 2018. Your Grievance, submitted six months after becoming aware of the investigation, 11 weeks after you returned from sick leave and six weeks after the Charges were issued against you, is therefore untimely.

Wholly aside from the matter of being untimely, your Grievance is substantively deficient.

First, the Grievance purports to rely upon the terms of the "2014 CBA §5.3". That CBA expired on December 31, 2017, more than four months before your Grievance was submitted. (I also note that much of the language you "quoted" was not contained in the 2014 CBA.)

Second, the current agreement between the Village and your Union provides for a Review Board mechanism only when the Officer applies for a "Long-Term Leave" and the Review Board then has "jurisdiction over applications for Long-Term Leave and shall render a decision whether to grant or deny the application…" (CBA §5.3(d)). You did not apply for an Extended Leave pursuant to the terms of the 2018 CBA and, therefore, the Review Board mechanism you rely upon in your Grievance did not apply to your absence.

Next, even if the 2014 CBA applied here, and it does not, the Review Board's role was to consider the duration of the leave. The Charges filed against you did not relate to the duration of the leave. Instead, the Charges against you include Count I, based upon

### 1 North Broadway • Melrose Park, Illinois 60160 • (708) 344-8409
### www.mppd.com

22



## MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi ♦ Director of Police

MPPD's Policy Manual Rule 340.5.5(c) which prohibits abuse of leave privileges and Section 1014.2, which provides, "Employees on sick leave shall not… participate in any sport, hobby, recreational or other activity which may impede recovery from the injury or illness." Your Doctor had ordered you to "rest at home" but you disregarded that limitation and engaged in a "sport, hobby, recreational or other activity" on a frequent basis during your medical leave. The language of the CBA simply does not apply your misconduct during sick leave.

Moreover, this result is fully consistent with both the 2014 and 2018 CBAs which expressly provide that "General Village Employment Policies, Management Rights and S.O.P. are not grievable issues." (See CBA §4.1)

Finally, your Grievance complains about the fact that an investigation was initiated based upon an anonymous report, referring to the Uniform Peace Officer's Disciplinary Act. That Act does not require a sworn complaint before the initiation of an internal investigation. More to the point though, pursuant to §4.1 of the CBA, "Grievable issues are only those issues relevant to the interpretation of [the] Collective Bargaining Agreement." Because there is nothing in the CBA concerning the initiation of internal investigations for violations of the Department's "Employment Policies, Management Rights and S.O.P." and because the CBA expressly provides that issues concerning "Employment Policies, Management Rights and S.O.P." are "not grievable issues," there is no basis for your Grievance regarding the investigation.

For all of the foregoing reasons, your May 6th Grievance is denied.

Sam C. Pitassi
Director of Police

23

3/5/2019



**Fwd: Director Response to Scatchell Grievance 2**
1 message

**From:** FOP LODGE19 <mvfoplodge19@gmail.com>
**Date:** May 30, 2018 at 11:58:42 PM CDT
**To:** jscatchelljr@melroseparkpd.com
**Cc:** "Hagerty, Ryan" <rah@ulaw.com>
**Subject: Re: Director Response to Scatchell Grievance 2**

John,

As we discussed earlier today we can meet at the station along with the lodge attorney, Ryan Hagerty on Tuesday, June 5th at 3:00pm to discuss the options going forward. I talked to Ryan and he thinks the meeting should take about two hours to go over everything. I will there along with, president Raul Rodriguez, and Ryan. Please contact me immediately if something changes and you can not make the meeting. Raul said that we can use his office

Thanks,

Dennis

On Thu, May 24, 2018 at 6:07 PM John Scatchell Jr <jscatchelljr@melroseparkpd.com> wrote:
FOP Lodge 19,.

Attached you will find Director Pitassi's response to my most recent grievance. Once again I take issue with all of the denials cited within. There is nothing that dictates the timeliness in regards to filing a grievance. Also I brought forth grievance concerns on an unrelated matter to the lodge at the February meeting and I was told I could not file grievances until discipline has been levied. I consider formal charges to be discipline. Also the Director's response states that I am no longer governed by the 2014 CBA, although the incident and investigation in question occurred under the time frame of the old contract. I strongly disagree with his stance and, therefore, everything cited regarding the 2018 CBA should be deemed moot. Additionally, the Director's description of the role of the review board under the 2014 CBA is purely his opinion. I seek to have an arbitrator rule on this and the entire grievance in it's totality. Also I find the Director's description of Lodge 19 as a "union" suspicious, considering for 44 years he has known that the lodge is not considered a union, but rather a benevolent association. Please provide me with any updates you have regarding this grievance, or the grievance we discussed in person and via email on 15 MAY 18.

Thank you for your time and consideration in this matter,

Ofc John A. Scatchell #23

25





# MELROSE PARK POLICE DEPARTMENT

## Sam C. Pitassi • Director of Police

**To:** Director Pitassi

**From:** Ofc. Scatchell #23

**Date:** 27 JUN 18

**Reference:** Ofc. Peter A. Caira

In summary, but not in verbatim or in its entirety, in late May I learned of Caira's involvement in an MPPD internal investigation, of which I was the topic. Several times since that discovery, Caira has attempted to engage me in conversation, including in the east stairwell of MPPD at close proximity. This has made me feel increasingly uncomfortable every time. On 12 JUN 18 between 16:00 and 16:30, I was in the back lot of MPPD. Caira exited the MPPD through the east exit and proceeded to walk towards me. He addressed other officers with different greetings, before drawing eye contact with me. Upon both of us making eye contact with each other, he winked at me. There is simply no basis for any relationship with myself and Caira to justify a wink. This is sexual harassment. I felt extremely uncomfortable, as well as harassed and intimidated. In my opinion, the act was sexual in nature. This action by Caira has caused me undue stress and mental anguish, as the very person who sought to strip me of my livelihood is now winking at me.

This all culminated on 26 JUN 18 between 16:00 and 16:30, when I went to the 7/11 convenient store while on duty to procure necessary hydration supplies for the then-current tour of duty. Upon walking into the store, I immediately observed then off-duty Ofc. Caira at the lottery machine, located just to the right of the entrance. Once I had entered, Caira addressed me with some type of uncomfortable greeting that I cannot recall verbatim. I replied to him something to the effect of: "look dude, you and I have nothing to discuss." Caira answered (paraphrasing): "I just tried to say hi." I responded to Caira with something along the lines of "well don't say hi to me ever again." I feel that my past responses to Caira are warranted, as I do not desire to have any relationship with him. I am always prepared to have a professional relationship with him to accomplish the goals of MPPD.

Respectfully submitted,

OFC John Scatchell Jr. #23

1 North Broadway • Melrose Park, Illinois 60160 • (708) 344-8409
www.mppd.com

26

3/5/2019



# Fwd: John Scatchell Grievance

**From:** John Scatchell <jscatch88@gmail.com (mailto:jscatch88@gmail.com)>
**Date:** February 20, 2019 at 3:05:49 PM CST
**To:** JROCHE@FOP.ORG (mailto:JROCHE@FOP.ORG)
**Subject:** John Scatchell Grievance

To whom it may concern,

I was discharged from Melrose Park PD on December 6th of 2018. I was a dues paying member of the FOP Labor Council at that time. In January of 2019, through my attorneys, I requested that I be compensated for my 2019 paid time off that I had accrued (vacation days, personal days, sick days). Also I contacted the president of Fop Lodge 19, Dennis Natale, to arrange for payment to remain a member of the FOP Labor. I was told that you would not allow that, since I am currently not a member of any police department (pending litigation).

At Melrose Park PD, an officer works the previous year for the ensuing years vacation/Comp time. I was credited as having worked from 1/1/18 through 12/6/18 for that calendar year. As such I should be entitled to 93.1% of my comp time that I earned for the 2019 Calendar year. At my tier of seniority, I would have earned 30 vacation days, 10 personal days, and 6 six days for an entire year worked or 46 days of paid time off. I would like to file a grievance with the union, as I was a member during the time frame that I earned the aforementioned comp time.

Also do you have any update on my previous grievances that you had taken over?

Thank you for your time and consideration in this matter,

John A. Scatchell
(708) 906-1188

27

# EXHIBIT 43



# MELROSE PARK POLICE DEPARTMENT

## Sam C. Pitassi ◆ Chief of Police

To:     Officer John Scatchell #23

From:  Director of Police Sam Pitassi and Deputy Chief Michael Castellan

Date:   December 8, 2017

RE:     Notice of Interrogation/Formal Investigation Re: Potential
        Violation of Sections 340.5.2(a), 340.5.4(d) and (e), 340.5.5(c),
        340.5.8(d), 340.5.8(i), 340.5.9(a), (h) and (m) and 1014.2 of the
        Police Department's Policy Manual

Dear Officer Scatchell:

The Village of Melrose Park ("Village") is conducting a Formal Investigation ("Investigation") as to whether you have violated Sections 340.5.2(a), 340.5.4(d) and (e), 340.5.5(c), 340.5.8(d), 340.5.8(i), 340.5.9(a), (h) and (m) and 1014.2 of the Police Department's Policy Manual, which could lead to your suspension of more than 24 duty hours, removal or discharge. In particular, the Village is investigating whether you abused sick leave by participating in recreational activities (ex. hunting) during your sick leave, and that in doing so, you engaged in hunting activities with a known felon and when caught by the Conservation Police on November 20, 2017, you were deceptive and sought to use your position as a Melrose Park police officer to avoid criminal charges being brought.

As part of this Formal Investigation, your interrogation has been scheduled for December 19, 2017, at 9:30 a.m., in the Courtroom at the Melrose Park Police Department. You are ordered to attend and participate in this Interrogation as set forth below.

If the information and evidence gathered during the course of our Investigation, including any admissions made by you during this Interrogation, establish violations of the foregoing provisions, this will be the basis for filing charges seeking your removal, discharge, or suspension from duty in excess of 24 hours.

Director Pitassi and Deputy Chief Castellan will be in charge of the investigation and the Interrogation will be conducted by Jeffrey S. Fowler, one of the Village's attorneys. The other people who will be present include Joseph M. Gagliardo (attorney for the Village), and a court reporter to transcribe the Interrogation. Director Pitassi and/or Deputy Chief Castellan will also be present on behalf of the Department during the Interrogation.

**1 North Broadway ◆ Melrose Park, Illinois 60160 ◆ (708) 344-8409**

**www.mppd.com**

Dep Ex No. 2
for ID, as of 1/9/18

**CHIEF'S EXHIBIT ___**

A record of the Interrogation shall be made and a complete transcript or copy shall be made available to you without charge. The record may be electronically recorded. You have the right to counsel of your choosing who may be present to advise you at any stage before or during this Interrogation. You also have a right to have a union representative present during the Interrogation. Any statements, admissions or confessions you make as part of this investigation may be used as evidence of misconduct or as the basis for charges seeking suspension, removal, or discharge.

During the Interrogation, you will have reasonable periods for rest and personal necessities upon request. During the Interrogation, you will not be subject to professional or personal abuse, including offensive language. In addition, you will have the opportunity to present any evidence or information that you have in response to the allegations.

You are ordered to bring and present any relevant evidence, documents, photos, materials or recordings with you to this meeting so that such information, if appropriate and relevant, can be considered as part of the Investigation, including, but not limited to, your medical records relating to your medical leave since November 9, 2017, your recreational activities during the period that you have been on medical leave (since November 9, 2017), your participation or involvement in potential illegal activities by a known felon on or about November 20, 2017, and your contact with any other law enforcement agency(ies) that may lead to criminal prosecutions on or about November 20, 2017.

Finally, by this letter, I am again ordering you to fully cooperate with the Investigation and to answer all questions truthfully and completely. Please be advised that your failure to fully cooperate or to answer questions truthfully and completely may result in disciplinary action taken against you up to and including termination.

Very truly yours,

Sam Pitassi
Director of Police

Michael Castellan
Deputy Chief of Police

# EXHIBIT 44



# MELROSE PARK POLICE DEPARTMENT

## Sam C. Pitassi ♦ Chief of Police

To:     Officer John Scatchell

From:   Director of Police Sam Pitassi and Deputy Chief Michael Castellan

Date:   December 20, 2017

RE:     Notice of Interrogation/Formal Investigation Re: Potential
        Violation of Sections 340.5.2(a), 340.5.4(d) and (e), 340.5.5(c),
        340.5.8(d), 340.5.8(i), 340.5.9(a), (h) and (m) and 1014.2 of the
        Police Department's Policy Manual

Dear Officer Scatchell:

0 you know, the Village of Melrose Park ("Village") is conducting a Formal Investigation ("Investigation") as to whether you have violated Sections 340.5.2(a), 340.5.4(d) and (e), 340.5.5(c), 340.5.8(d), 340.5.8(i), 340.5.9(a), (h) and (m) and 1014.2 of the Police Department's Policy Manual, which could lead to your suspension of more than 24 duty hours, removal or discharge. In particular, the Village is investigating whether you abused sick leave by participating in recreational activities (ex. hunting) during your sick leave, and that in doing so, you engaged in hunting activities with a known felon and when caught by the Conservation Police on November 20, 2017, you were deceptive and sought to use your position as a Melrose Park police officer to avoid criminal charges being brought. In addition, the Village will investigate the circumstances of your failure to appear for the interrogation that had been set for December 19, 2017.

As part of this Formal Investigation, your interrogation has been rescheduled for January 9, 2018, at 1:30 p.m., in the Multi-Purpose Room in the Village Hall, 1000 North 25th Avenue, Melrose Park, Illinois. You are ordered to attend and participate in this Interrogation as set forth below.

If the information and evidence gathered during the course of our Investigation, including any admissions made by you during this Interrogation, establish violations of the foregoing provisions, this will be the basis for filing charges seeking your removal, discharge, or suspension from duty in excess of 24 hours.

Director Pitassi and Deputy Chief Castellan will be in charge of the investigation and the Interrogation will be conducted by Jeffrey S. Fowler, one of the Village's attorneys. The other people who will be present include Joseph M. Gagliardo (attorney for the Village), and a court reporter to transcribe the Interrogation. Director Pitassi and/or Deputy Chief Castellan will also be present on behalf of the Department during the Interrogation.

**1 North Broadway ♦ Melrose Park, Illinois 60160 ♦ (708) 344-8409**

**www.mppd.com**

Dep Ex No. 3
for ID, as of 1 9 18

CHIEF'S EXHIBIT ___

A record of the Interrogation shall be made and a complete transcript or copy shall be made available to you without charge. The record may be electronically recorded. You have the right to counsel of your choosing who may be present to advise you at any stage before or during this Interrogation. You also have a right to have a union representative present during the Interrogation. Any statements, admissions or confessions you make as part of this investigation may be used as evidence of misconduct or as the basis for charges seeking suspension, removal, or discharge.

During the Interrogation, you will have reasonable periods for rest and personal necessities upon request. During the Interrogation, you will not be subject to professional or personal abuse, including offensive language. In addition, you will have the opportunity to present any evidence or information that you have in response to the allegations.

You are ordered to bring and present any relevant evidence, documents, photos, materials or recordings with you to this meeting so that such information, if appropriate and relevant, can be considered as part of the Investigation, including, but not limited to, your medical records relating to your medical leave since November 9, 2017, your recreational activities during the period that you have been on medical leave (since November 9, 2017), your participation or involvement in potential illegal activities by a known felon on or about November 20, 2017, and your contact with any other law enforcement agency(ies) that may lead to criminal prosecutions on or about November 20, 2017.

Finally, by this letter, I am again ordering you to fully cooperate with the Investigation and to answer all questions truthfully and completely. Please be advised that your failure to fully cooperate or to answer questions truthfully and completely may result in disciplinary action taken against you up to and including termination.

Very truly yours,

Sam Pitassi
Director of Police

Michael Castellan
Deputy Chief of Police

# EXHIBIT 45

HEARING, 11/09/2018                              Page 50..53

Page 50

1    CHAIRMAN ESPOSITO: But he was not here. He
2  was not sitting there. He could have came up, sat
3  in the chair, and said, I'm not answering the
4  question. Fine.
5      THE WITNESS: I understand that. It's my
6  opinion that if you -- all the legal wrangling that
7  were going on, for him -- from just moving and
8  getting up --
9      CHAIRMAN ESPOSITO: No. Well, that's your
10 opinion. You weren't here.
11     THE WITNESS: I agree. I'm only going by the
12 transcripts that I read.
13     CHAIRMAN ESPOSITO: Go ahead. Next question.
14     MR. COOPER: Nothing further at this time.
15     Thank you, Chief.
16     MR. FOWLER: I'm sorry. Did -- you're
17 finished?
18     CHAIRMAN ESPOSITO: Yeah, he's finished.
19     CROSS EXAMINATION
20 BY MR. FOWLER:
21   Q.   Did you review the indictment against
22 Mr. Scavo?
23   A.   I did not.
24   Q.   Why not?

Page 51

1    A.   It was never given to me.
2    Q.   So your opinion is based solely upon
3  the documents that were given to you; is that what
4  you're saying?
5    A.   Correct.
6    Q.   And those documents were given to you
7  solely by the respondent here, right?
8    A.   That's correct.
9    Q.   You testified, I think at least twice,
10 that you had the opportunity to interview Officer
11 Scatchell.
12   A.   I did.
13   Q.   How long did that -- how many times did
14 you interview him?
15   A.   Once through a telephone conversation.
16 Maybe twice early on. I may have talked to him on
17 the phone. And then we talked again today.
18   Q.   And never in person before today?
19   A.   No.
20   Q.   The first time on the telephone, how
21 long did that conversation last?
22   A.   I don't recall.
23   Q.   Did he answer questions for you?
24   A.   I don't know if we talked about the

Page 52

1  allegations in general or if he specifically
2  answered questions. I may have just -- I may asked
3  him things to the amount of what the Village of
4  Melrose Park's directives said or didn't say or
5  things like that.
6    Q.   How long did that first conversation
7  last?
8    A.   I already answered that. I don't
9  recall.
10   Q.   During that first conversation, anybody
11 else on the line?
12   A.   No.
13   Q.   Tell the Board exactly what he said
14 to you and what you said to him during that
15 conversation.
16   A.   I really don't recall.
17   Q.   And the second conversation, when did
18 that take place?
19   A.   There was a conversation yesterday, a
20 very short conversation.
21   Q.   I'm sorry?
22   A.   It was a very short conversation
23 yesterday evening.
24   Q.   Anybody else on the line?

Page 53

1    A.   No.
2    Q.   During that conversation, what did he
3  say to you and what did you say to him?
4    A.   I basically told him that I am going
5  to be very impartial on this. And I told him I
6  thought that there were some violations here that
7  are credible. And I told him I can see him getting
8  anywhere from a 10- to 30-day suspension without
9  pay. But I certainly didn't see anything here that
10 would be tantamount to him losing his job.
11   Q.   Anything else?
12   A.   Not that I recall.
13   Q.   So I think you said to the Board that
14 part of what he said to you helped form your
15 opinions in this case.
16   A.   Let me go back. I asked him about his
17 relationships with Scavo.
18   Q.   Anything else?
19   A.   Very candid, I -- I see something other
20 than these allegations here. And I asked him if
21 there could be anything else that may be driving
22 this event. Because it just seems like something
23 that was, by police administrative standards,
24 rather common, yet minor has blossomed into a very

FILED DATE: 8/26/2019 2:37 PM  2018CH16150

# EXHIBIT 46

Deposition of    HEARING, 10/22/2018

FILED DATE: 8/26/2019 2:27 PM    2018CH16150

Page 14

1         (Recess taken.)
2       MR. FOWLER:  We have one more procedural or
3   housekeeping issue.  It's a stipulation that Vito
4   Scavo has been subpoenaed to testify here in this
5   hearing.  I believe that the parties are prepared
6   to stipulate that if called to testify he would
7   refuse to answer any questions and would instead
8   assert his rights under the Fifth Amendment.
9       MR. COOPER:  So the point is he's not coming.
10      CHAIRMAN ESPOSITO:  Okay.
11      MR. O'CONNOR:  Well, yeah, but you agree that
12  that's -- you stipulate that if called that would
13  be his testimony?
14      MR. COOPER:  I do.
15      MR. O'CONNOR:  Okay.
16      CHAIRMAN ESPOSITO:  Okay.
17      MR. FOWLER:  With that, we're prepared to
18  make opening statement.
19      CHAIRMAN ESPOSITO:  All right.
20      MR. FOWLER:  If you want opening statement,
21  or we can just go straight to the first witness
22  since you've read the charges.
23      CHAIRMAN ESPOSITO:  What are you comfortable
24  with?

Page 15

1       MR. FOWLER:  Either way.
2       CHAIRMAN ESPOSITO:  I don't think we need an
3   opening statement.  I think we can just start with
4   the --
5       COMMISSIONER CAPUTO:  Let's go.
6       CHAIRMAN ESPOSITO:  I think we know what the
7   charges are.
8       MR. FOWLER:  Very well.  In that case, we
9   could call Officer Scatchell.
10      MR. COOPER:  Two things.
11          Officer Scatchell has a right not to
12  incriminate himself.  So Officer Scatchell will not
13  take the stand.
14          And then there was one other issue I
15  want to raise.
16      MR. FOWLER:  Is there another issue you want
17  to raise now?
18      MR. COOPER:  Yeah.  One second.  We're
19  looking at something on the computer.
20      CHAIRMAN ESPOSITO:  Are Mr. and Mrs. Scatchell
21  going to be witnesses?  Are they listed as
22  witnesses?
23      MR. COOPER:  Oh, hi.
24          No.  No, they're not.

Page 16

1       CHAIRMAN ESPOSITO:  They're not witnesses.
2   Okay.  So they could stay.
3       MR. COOPER:  So it's my understanding that
4   there was not notice of this hearing, so it's our
5   position that the Open Meetings Act has been
6   violated.  Not much more I can offer, but I do
7   think it's necessary --
8       CHAIRMAN ESPOSITO:  This is not a -- this is
9   not a regular meeting.  This is a continuance of
10  the hearing that was scheduled ahead of time.  So I
11  don't think we have to post that.  I believe in our
12  bylaws, our laws, we have to post meetings that are
13  regularly scheduled meetings.  But a continuance of
14  this nature I don't believe it needs to be
15  scheduled.
16          Okay.  Any other complaints?
17      MR. COOPER:  No.
18      CHAIRMAN ESPOSITO:  Thank you.
19          Go ahead, Mr. Fowler.
20      MR. FOWLER:  We call Officer Scatchell.
21          And I would remind Officer Scatchell
22  that on January 9th, he was specifically given a
23  Garrity warning where he was required to answer
24  questions, ordered to answer questions, and was

Page 17

1   given the appropriate Garrity warning at the time.
2           And I would ask Deputy Chief
3   Castellan to now verbally renew the Garrity warning
4   that Officer Scatchell was given on January 9th,
5   2018.
6       MR. COOPER:  So the --
7       MR. FOWLER:  Just before -- is that correct,
8   Deputy Chief?
9       DEPUTY CHIEF CASTELLAN:  Yes, it is.
10      MR. COOPER:  So the Garrity has no
11  applicability to an administrative hearing.  And
12  that's something that would have to be briefed.
13  It's not something I can explain in her next three
14  or four minutes.  It is something I have briefed in
15  the past.
16          There's no applicability of Garrity
17  to this proceeding.  He has a Fifth Amendment right
18  not to incriminate himself.  And the only party --
19  or let me rephrase it.  The only one who can call
20  him as a witness is me.  Not Mr. Fowler.  I have
21  yet to make a decision as to whether or not Officer
22  Scatchell will give testimony.  But he will not
23  take the stand at this point.
24          And it's sort of a double-edged

Urlaub Bowen & Associates, Inc.    312-781-9586

FILED DATE: 8/26/2019 2:27 PM 2018CH16150

Deposition of   HEARING, 10/22/2018

Page 18

1 sword for the Melrose Park Police Department
2 because if the police department takes the position
3 it's going to fire him for not giving testimony,
4 it'll be reversed, and it'll be back.
5        If the police department takes the
6 right position, and that is wait to see if I call
7 him as a witness, things will be fine, meaning that
8 the police department sensed that -- or its
9 position that it wants to have some sort of
10 strength in the circuit or the appellate court,
11 that strength may still be there, but if -- so in
12 some ways, I'm actually hoping that there's an
13 order right now for him to take the stand.
14       MR. FOWLER: We're happy to comply with that.
15       Deputy Chief Castellan, would you
16 give Officer Scatchell an order to take the stand
17 and answer questions pursuant to his Garrity
18 warning?
19       DEPUTY CHIEF CASTELLAN: John.
20       OFFICER SCATCHELL: Yes.
21       DEPUTY CHIEF CASTELLAN: I order you to take
22 the stand and answer all questions truthfully and
23 honestly.
24       OFFICER SCATCHELL: At this time I assert my

Page 19

1 Fifth Amendment right.
2        MR. FOWLER: In light of the assertion of the
3 Fifth Amendment right in that this is a civil
4 proceeding, the rule of law is that the Board is
5 entitled to take the Fifth Amendment right against
6 him, to use it as an inference against him, and to
7 assume that all of the charges are therefore true.
8 Based upon that and based upon his refusal to obey
9 a direct order right in your presence, we would
10 suggest that there's nothing else needed in this
11 hearing and that he be discharged effective today.
12       MR. COOPER: And under Illinois law, that's
13 just not accurate. And, again, this isn't
14 something we can resolve right now. In the past
15 when this has come up, we filed briefs.
16       And it's a pretty extraordinary
17 process. I have never known of an officer being
18 forced to testify. If an officer is forced to
19 testify, he's reinstated fairly quickly by the
20 Circuit Court.
21       MR. FOWLER: Obviously we disagree with
22 counsel on the law.
23       MR. O'CONNOR: Okay. So, Chris, if he's
24 right on the law, you brief it out and he's right

Page 20

1 on the law, then you agree that there's no need for
2 further evidence?
3        MR. COOPER: Sure. But he's not right on the
4 law, because I've been down this road before.
5        MR. O'CONNOR: Mr. Fowler, you believe you're
6 right on the law?
7        MR. FOWLER: I do.
8        MR. O'CONNOR: So what do you want to do? Do
9 you want to brief this? And we'll find out, and if
10 you're right, then the charges are deemed admitted.
11       MR. FOWLER: I would be happy to brief this,
12 and perhaps since --
13       MR. O'CONNOR: It's not for me to say.
14       Do you have other witnesses you want
15 to call for the rest of tonight?
16       MR. FOWLER: I just let them leave. I can
17 call them back.
18       But at this point, I think it
19 probably makes most sense for the parties to brief
20 this and present their written briefs tomorrow when
21 we resume at 5:30.
22       MR. COOPER: That's not enough time. This is
23 a big deal. And when this issue has been briefed,
24 it takes a lot of time.

Page 21

1        MR. O'CONNOR: Well, I know, Chris, it might
2 be a big deal, but if you've got a case that says
3 what you say it does, and you've got a case that
4 says opposite, then it doesn't seem like it would
5 be too much. I mean, you don't have to do a brief.
6 It maybe could be a formal letter, This case
7 compels that the Board rule in my favor, and you
8 say that, This case compels the Board rule in my
9 favor. I mean, how much time are you looking for?
10 A couple days? Because it's not going to be a
11 month.
12       MR. COOPER: Last time I filed a brief like
13 this, it was about 16 pages.
14       MR. O'CONNOR: Well, just give us that brief.
15       MR. COOPER: I know. I can switch things
16 around.
17       MR. O'CONNOR: It's up to the Board.
18       COMMISSIONER CAPUTO: How much time do you
19 need, Chris?
20       MR. COOPER: Couple days.
21       COMMISSIONER CAPUTO: Couple days? If we go
22 tomorrow, and Wednesday enough, or do you want to
23 come Thursday?
24       MR. COOPER: I mean, we just -- the way I see

BOFPC 0915



X47

; EXHIBIT __

2-PE 01-11/ PE03

Capture 4



2-PE 01-11/ PE03

Capture 5



2-PE 01-11/ PE05

DSC00466



DSC00155



2-PE 01-11/ PE09



DSC00179

2-PE 01-11/ PE10



**2-PE 01-11/ PE11**

DSC00281



DSC00302



DSC00303





12-02-2017 Sat 05:07:14

Camera 02

3-PE A-E/ PE E / OUTISDE

711 17 12 02 0507d