# VMP-JJS
# BATES NUMBERED PAGES

# Melrose Park Police Department
# General Order – Sick Days & Attendance

Issuing Authority:     **Sam C. Pitassi, Chief of Police**
Revised & Distributed: **February 22nd, 2008**
Annual Review Date:    **January**

## DEFINITIONS

**Attendance –** Regular attendance is each officer's personal responsibility. An unsatisfactory attendance record can affect an officer's advancement, evaluation, and job performance. Sick days put added stress on fellow officers. An officer's continual abuse of sick days can create a hostile work environment.

**Authority – "Collective Bargaining Agreement" :** The current collective bargaining agreement between the Village of Melrose Park and organized labor union representing the members of the Village of Melrose Park Police Dept. Relative to the contract effective January 1st, 2008 the matter involving sick days was referred to police administration to handle as part of management rights. This policy was created to insure a clear understanding and compliance.

**Sick Days –** granted specifically for illness, whether the officers, their spouse or child(ren). Sick days are not intended to be used for any other reason.

## PURPOSE

The Purpose of this policy is to set guidelines for "Sick Days" by officers of the Melrose Park Police Department. Officers are also cautioned that the use of sick days will be continually monitored and reviewed for abuse.

## POLICY (SICK DAYS)

A total of six (6) sick days per calendar year are allowed for officers who have been working for the "Department" for more than one (1) year. Sick Days are earned at the rate of one half day per month for a total of six (6) per year. Sick days are only available to the extent that they have accrued. Sick days are limited to (6) per year and are not bankable or accumulated. As an incentive for no sick days used, officers will receive compensation of a maximum of thirty (30) days extra payroll before "official" retirement. No check will be issued in lieu of these days off.

## PROCEDURE

When a sick day is necessary, the officer must call and speak to their direct supervisor, for that shift, at the beginning of the shift, and advise of the problem. This is a requirement for every sick day used. In cases of extended illness lasting three (3) or more consecutive days, a Doctors authorization stating the number of days an officer is to remain off work must be submitted to the Chief of Police. In these cases a Doctors authorization for return to work is required, stating date of return and submitted to the Chief of Police.



# MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi • Director of Police

TO:      LT. JOHN SCARPELLI

FROM:      SAM C. PITASSI, DIRECTOR OF POLICE

DATE:      MAY 1, 2017

RE:      ASSIGNMENT CHANGE

EFFECTIVE MAY 8, 2017, YOU WILL ASSIGNED TO 4-12 SHIFT STATION SUPERVISOR. YOUR DUTIES WILL BE OUTLINED AT A LATER DATE. YOUR DAYS OFF ARE SATURDAY AND SUNDAY AND WILL RECEIVE HOLIDAYS OFF.

RESPECTFULLY SUBMITTED,

Director of Police

SAM C. PITASSI
DIRECTOR OF POLICE

VMP/JJS 927

7:27 ✈     ᴵᴵᴵ LTE 🔋

🔒 mychart.dupagemd.net   ↻

Letter Details        🖨

DuPage Medical Group     DMG INTERNAL MEDICINE - ELMHURST,
· WE CARE FOR YOU ·            BRUSH HILL
           133 Brush Hill Road
           Suite 401
           Elmhurst IL 60126
           630-932-9420

November 9, 2017

To whom it may concern:

I am the primary care physician for your employee, Mr. John Scatchell. He was seen and evaluated by myself in the office for an acute musculoskeletal condition that has not yet resolved. He remains on active treatment and has been advised to continue to rest at home. Please excuse the patient from work until further notice.

Thank you for you understanding and cooperation. Please call with any remaining questions.

Sincerely,

Maryam N. Sandoval, MD

*This letter was initially viewed by John A Scatchell II at 11/9/2017 4:30 PM.*

BACK TO THE LETTERS LIST

<    >       ⬆       📖       ⧉

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1557

**Section 5.3 – Sick Leave**

(a)    Sick Leave Accumulation – On January 1st of each year of this Agreement, each officer shall be credited six (6) sick days.  Sick days can be taken only to the extent that they are accrued.  Sick days will not accrue while an employee is on leave pursuant to the Family and Medical Leave Act ("FMLA"), the Public Employee Disability Act ("PEDA"), Military Leave, Extended Leave, or Long-Term Leave, but will resume upon the officer's return to work on a regular basis.  Accrued sick days may be carried over into subsequent year.  No more than thirty (30) sick days may be accumulated at any time.  Unused sick days will be forfeited, and the bargaining member shall not receive any compensation in any form for forfeited sick days.  If at retirement an officer has accumulated thirty (30) sick days, the officer shall be awarded fifteen (15) additional days for a total of forty-five days.

(b)    Public Employee Disability Act – A Officer who is placed on sick leave as a result of an injury or illness contracted in the line of duty shall be entitled to full pay for one (1) year pursuant to the terms of the Public Employee Disability Act ("PEDA"), 5 ILCS 345/1 et seq.

(c)    Extended Leave – An officer who is placed on sick leave as a result of a injury or illness **not** contracted in the line of duty, except that resulting from an injury or illness incurred in the course of employment outside of the Officer's employment with the Village, may be entitled to leave with full pay for a maximum of *ninety (90) days (three calendar months)* ("Extended Leave"), subject to approval by the Chief of Police, but only after the officer has exhausted all accumulated sick leave, subject to approval by the Chief of Police, but only after the officer has exhausted all accumulated sick leave.  After an officer has been on Extended Leave for *ninety (90) days (three calendar months)*, the Village may offer him a light duty work assignment, if available.

(d)    Long-Term Leave – In the event that a Officer exhausts his *three-month* leave pursuant to Subsection 5.3(c) above, the Officer may apply for long-term leave, not to exceed six (6) calendar months ("Long-Term Leave").  A Review Board composed of (1) representative from the Police Department, who shall be designated by the Lodge, one (1) representative of the Village who shall be designated by the Village, and one (1) representative of the Fire Department, who shall be designate by the Fire Department (Review Board), shall have jurisdiction over applications for Long-Term Leave and shall render a decision whether to grant or deny the application pursuant to any policies and/or procedures adopted by the Review Board with respect to Long-Term Leave applications, provided that the Review Board shall not inquire into any particular case until the officer has been on sick leave for at least *three (3) calendar months*.

(e)    Sick Leave Department Order – The use and accumulation of sick days shall be exclusively determined by the Chief of Police in the form of a written Order applicable to all officers governed by this Contract.  The Order shall remain in effect until revoked, modified or amended by a subsequent written order of the Chief of Police.  Sick days are accumulated at six (6) days per year.  Thirty (30) days is the maximum sick days an officer may accumulate.

5

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1562

**BEFORE THE BOARD OF FIRE AND POLICE COMMISSIONERS
OF THE VILLAGE OF MELROSE PARK, ILLINOIS**

IN THE MATTER OF CHARGES    )
AGAINST OFFICER JOHN SCATCHELL  )   No. 18-1
                           )

### STATEMENT OF CHARGES

Sam C. Pitassi (hereafter "Director Pitassi"), Director of Police of the Village of Melrose Park, Illinois ("Village"), and Deputy Chief Michael Castellan ("Deputy Chief Castellan") make the following statement of charges against Officer John A. Scatchell of the Melrose Park Police Department. Director Pitassi and Deputy Chief Castellan respectfully request that the Board of Fire and Police Commissioners of the Village (hereafter "Board") set a hearing date on said charges and take appropriate action in accordance with the provisions of 65 ILCS 5/10-2.1-17 and the Rules and Regulations of the Board of Fire and Police Commissioners of the Village.

1.     Director Pitassi at all times relevant to bringing these charges was and is the duly appointed Director of Police of the Village of Melrose Park.

2.     Deputy Chief Castellan at all times relevant to bringing these charges was and is a duly appointed Deputy Chief of Police of the Village of Melrose Park, and is authorized to act on behalf of the Director of Police in this matter.

3.     Officer John A. Scatchell ("Ofc. Scatchell") is a duly appointed member of the Melrose Park Police Department and is an Officer as that term is defined in the Board's Rules and Regulations.

4.     The Melrose Park Police Department has a very generous sick leave provision – full pay for six months for conditions that originated off duty and "An officer who is placed on sick leave as a result of an injury or illness contracted in the in [sic] line of duty shall be entitled to full pay for one (1) year."

Documents\4846-7526-3583.v1-3/27/18

1

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

5.     Ofc. Scatchell was hired as a police officer for the Village of Melrose Park on September 26, 2012 and he received MPPD's Standard Operating Procedures and rules when he was hired.

6.     In February 2015 Ofc. Scatchell reported that he was injured in an altercation and he reportedly suffered from a cervical strain to his upper back and lower neck. Ofc. Scatchell was off work from February 5, 2015 until he was released to work full duty effective April 24, 2015.

7.     After February 2015, Ofc. Scatchell was not injured further while at work.

8.     On or about July 24, 2017, Vito Scavo obtained a Waterfowl Outfitter's License on behalf of an entity named "I Decoy M Guide Service" for 2017-2018, listing Ofc. Scatchell as an employee and "Guide" for the Company. Ofc. Scatchell never sought or received permission to accept secondary employment with I Decoy M Guide Service.

9.     Mr. Scavo is a convicted felon. Ofc. Scatchell is aware that Mr. Scavo is a felon and is prohibited from possessing a firearm. In fact, possession of a firearm by a felon in Illinois is a Class 3 felony with a mandatory minimum 2-year prison sentence in Illinois, and is therefore a serious crime.

10.    Ofc. Scatchell is an avid hunter. He scheduled vacation for October 2017 to correspond with the beginning of waterfowl hunting season, and during that period he frequently went waterfowl hunting with Mr. Scavo.

11.    Waterfowl hunting is typically done with a shotgun and shotguns have significant recoil affecting the shooter's shoulder, upper back and neck area.

12.    Ofc. Scatchell was on approved vacation and/or "time due" from October 13, 2017 to November 8, 2017.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1567

13.     According to Ofc. Scatchell, in late October or early November, 2017, after he had been on vacation for at least ten days, and while he was on vacation, he felt pain in his back which he claims related to his February 2015 work-related injury

14.     On November 9, 2017, Ofc. Scatchell presented a note from Dr. Maryam Sandoval reporting that Ofc. Scatchell "was seen and evaluated … for an acute musculoskeletal condition that has not yet resolved.  He remains on active treatment and has been advised to continue to rest at home.  Please excuse the patient from work until further notice."

15.     Ofc. Scatchell did not tell his physicians that he was hunting during his medical leave or ask about whether hunting with a shotgun was consistent with the medical restrictions.

16.     In contravention to his doctor's orders, Ofc. Scatchell frequently went hunting for waterfowl during the period of his medical leave, usually carrying heavy equipment and shotguns.

17.     On November 19, 2017, Ofc. Scatchell asked his supervisor for time off on December 21, 22, 26, 27, 28, 29, 30 and 31st to travel to Mexico.  On December 4, 2017, the request was denied because Ofc. Scatchell was on medical leave.

18.     On October 6, 2017, Ofc. Scatchell obtained air travel arrangements for he and Mr. Scavo to travel to and from Harlingen, Texas, between December 26-30, 2018.

19.     On or about November 18, 2017, Ofc. Scatchell obtained air travel arrangements to travel to and from Washington from December 17 to December 22, 2017.

20.     Ofc. Scatchell went on the trip to Washington as he had scheduled and his activities there included waterfowl hunting.  Director Pitassi and Deputy Chief Castellan believe that Ofc. Scatchell also took his planned trip to Mexico in late December 2017.

21.     On November 20, 2017, Ofc. Scatchell, Mr. Scavo and others were hunting from

Documents\4846-7526-3583.v1-3/27/18

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1568

a small boat and they were observed by Illinois Conservation Police with Mr. Scavo possessing a firearm and actively shooting over a prolonged period. When the boat returned to the shore, the Conservation Police Officer met and interviewed the group, including Ofc. Scatchell, who showed his Melrose Park Police Department badge and identified himself as a Melrose Park police officer and said that "he could not say if he saw Scavo shoot or not" and "[w]e are all in law enforcement here, we all know what's going on." Ofc. Scatchell knew that the Conservation Police Officer stated that he saw Mr. Scavo possessing and firing a shotgun, knew that the Conservation Police Officer did not believe Ofc. Scatchell's denials and knew that the conduct would constitute a felony, but Ofc. Scatchell did not report the contact with the Conservation Police Officer to his supervisors.

22. On November 27, 2017, Ofc. Scatchell presented a note from Dr. Sandoval stating that "has been advised to resume light exercises and may walk outside of his home. However, he is not able to return to his full time work pending completion and review of ordered tests." During the ensuing period, Ofc. Scatchell did not merely engage in "light exercises" or "walk outside of his home," but instead continued hunting activities on virtually a daily basis.

23. On December 8, 2017, Director Pitassi and Deputy Chief Castellan issued a notice to Ofc. Scatchell, informing him of the investigation into his conduct and scheduling an "interrogation" of Ofc. Scatchell. Ofc. Scatchell did not appear as ordered, and a new Notice was issued on December 20, 2017.

24. On December 15, 2017, Ofc. Scatchell presented a note from Dr. Sandoval stating that Ofc. Scatchell's "ongoing medical problem ... has improved but not resolved. Based on recent test results, the patient has been referred to a specialist and his appointment is still pending. In the meantime, he may return to light duty employment pending the consultant input.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1569

His prior arranged travel plans are deemed safe and should not affect his ongoing medical problems." However, Ofc. Scatchell had not told Dr. Sandoval about the details of his travel plans, including his plan to go hunting.

25.    On January 8, 2018, Dr. Sandoval issued a work restriction limiting Ofc. Scatchell to "Desk duty such as typing and paperwork" "but he should not carry or wear heavy equipment (ex. body armour) until seen by a specialist."

26.    On January 9, 2018, Ofc. Scatchell participated in an interrogation regarding the investigation being conducted into his conduct. During the interrogation, Ofc. Scatchell was dishonest in some of his responses. For example, Ofc. Scatchell claimed that after feeling pain in his neck and back in early November 2017 he took extensive time off of hunting, he denied carrying two shotguns during his hunting trips in November 2017, he denied seeing Mr. Scavo possessing or firing a shotgun on November 20, 2018, -he denied that his shotguns had a recoil that could have affected his alleged neck or back injury, he falsely reported the findings of the Conservation Officer on November 20, 2017, and he falsely reported the dates he was working a side-job (when he claims that he noticed a reinjury). Each of these statements was false.

27.    During the interrogation, Ofc. Scatchell's attorney agreed that Ofc. Scatchell would sign a release for the Village to obtain his medical records.

28.    On January 10, 2018, Ofc. Scatchell was given a work restriction from Dr. Dalip Pelinkovic, limiting him to sedentary work and no lifting more than ten pounds for six weeks.

29.    After multiple communications between the Village's attorney and Scatchell's attorney about the medical release, on February 13, 2018, Director Pitassi issued a written order to Ofc. Scatchell to sign a medical release attached to the Order, and he was "further ordered not to hinder or interfere, in any way, with the medical providers regarding their submission of such

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1570

records." Rather than sign the release as instructed by Director Pitassi, Ofc. Scatchell instead (through his attorney/sister) signed a limited release applicable only to Dr. Sandoval and excluding any medical records from any other provider, including the specialist identified by Dr. Sandoval, and excluding any correspondence relating to Ofc. Scatchell.

30.     Despite Ofc. Scatchell's failure to comply with Director Pitassi's order, MPPD submitted the signed release to the medical providers and as of March 23, 2018, no documents have been provided. Director Pitassi and Deputy Chief Castellan therefore believe that Ofc. Scatchell has interfered with the production of his medical records, also in violation of the direct order he was given on February 13, 2018.

### COUNT I – Abuse of Sick Leave

31.     Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-30 above as though fully set forth herein.

32.     MPPD's Policy Manual Rule 340.5.5(c) prohibits excessive absenteeism or abuse of leave privileges. Further, Section 1014.2 provides, "Sick leave is not considered vacation, and abuse of sick leave may result in discipline and/or denial of sick-leave benefits. Employees on sick leave shall not engage in other employment or self-employment, or participate in any sport, hobby, recreational or other activity which may impede recovery from the injury or illness."

33.     Ofc. Scatchell's actions constituted an abuse of sick leave.

### COUNT II – Failure to Report Contact with Another Law Enforcement Agency

34.     Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-33 above as though fully set forth herein.

35.     MPPD's Policy Manual contains a Law Enforcement Code of Ethics, which includes, in part, the statement that "I will cooperate with all legally authorized agencies and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1571

their representatives in the pursuit of justice."

36.     MPPD's Policy Manual Rule 340.5.9(a) requires offices to promptly and fully report activities on his/her part or the part of any other member where such activities resulted in contact with any other law enforcement agency or that may result in criminal prosecution.

37.     Ofc. Scatchell violated MPPD's rule by failing to report his contact with the Illinois Conservation Police on November 20, 2017.

## COUNT III – False Report to MPPD

38.     Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-37 above as though fully set forth herein.

39.     MPPD's Policy Manual Rules 340.5.8(a), (c) and (D) prohibit officers from failing to disclose or misrepresenting material facts during the course of any work-related investigation.

40.     Ofc. Scatchell violated MPPD's rules through his false statements to MPPD during its investigation of his conduct, including the following:  a) he took an extensive period of time off of hunting after noticing pain in his back in late October or early November 2017; b) he never carried two shotguns during the period of October to December 2017; c) his statement that he did not see Mr. Scavo possessing a firearm or shooting on November 20, 2017; d) that his shotguns did not have a recoil that could have affected his alleged neck or back injury; he falsely reported the findings of the Conservation Officer on November 20, 2017; and he falsely reported the dates he was working a side-job (when he claims that he noticed a reinjury).

## COUNT IV – Providing False Information to Another Law Enforcement Agency

41.     Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-40 above as though fully set forth herein.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1572

42.     MPPD's Policy Manual Rule 340.5.8(i) prohibits officers from engaging in any act, on- or off-duty, that brings discredit to MPPD.

43.     Pursuant to MPPD's Policy Manual Section 340.2 and 340.4, officers must follow MPPD guidelines both on and off duty.

44.     Rule 200.3.3 of MPPD's Policy Manual requires officers to "respond to and make a good faith and reasonable effort to comply with the lawful order of superior officers and other proper authority" and Section 340.3 provides that officers "shall comply with lawful directives and orders from any department supervisor or person in a position of authority, absent a reasonable and bona fide justification."

45.     Ofc. Scatchell violated MPPD rules by not cooperating with and providing knowingly false information to a Conservation Police Officer on November 20, 2017.

### COUNT V – Violating MPPD Rules in Communications with Conservation Police

46.     Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-45 above as though fully set forth herein.

47.     MPPD's Policy Manual prohibits officers from "using or disclosing one's status as a member of the Melrose Park Police Department in any way that could reasonably be perceived as an attempt to gain influence or authority for non-department business or activity."

48.     Ofc. Scatchell violated MPPD rules by showing his badge and identifying himself as a Melrose Park Police Officer to the Conservation Police Officer on November 20, 2017, and stating, "We are all in law enforcement here, we all know what's going on."

### COUNT VI – Disobeying Lawful Order Regarding Medical Records

49.     Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-48 above as though fully set forth herein.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1573

50.     Ofc. Scatchell disobeyed a lawful order from his supervisors by refusing to sign the medical release as instructed, and instead signing a modified version that did not adequately address all of the records that are relevant to his medical condition.

51.     Upon information and belief, Ofc. Scatchell has also disobeyed a lawful order by interfering with the production of his medical records.

### COUNT VII – Disobeying Lawful Order Regarding Time Off to Travel During Medical Leave

52.     Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-51 above as though fully set forth herein.

53.     Ofc. Scatchell disobeyed a lawful order by traveling to Washington from December 17-22, 2017.

54.     Upon information and belief, Ofc. Scatchell disobeyed a lawful order by traveling to Harlingen, Texas from December 26-30, 2017.

### COUNT VIII – Conduct Unbecoming

55.     Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-54 above as though fully set forth herein.

56.     MPPD's Policy Manual Rule 340.5.9(m) prohibits conduct unbecoming an officer, on- or off-duty when the conduct is "contrary to good order, efficiency or morale, or tends to reflect unfavorably upon this department or its members."

57.     Ofc. Scatchell's activities constitute conduct unbecoming an officer, in violation of MPPD's rules.

### COUNT IX – Violating State Law

58.     Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-57 above as though fully set forth herein.

9

Documents\4846-7526-3583.v1-3/27/18

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1574

59.     MPPD's Policy Manual Section 340.5.1 requires officers to comply with federal, state, local or administrative laws, rules or regulations.

60.     In assisting Mr. Scavo in possessing and firing a shotgun, Ofc. Scatchell violated state law, rules or regulations, and in violating state law, Ofc. Scatchell violated MPPD rules.

### COUNT X – Association with a Known Felon

61.     Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-60 above as though fully set forth herein.

62.     MPPD's Policy Manual Rule 340.5.4 prohibits officers from "Associating on a personal, rather than official basis with persons who demonstrate recurring involvement in serious violations of state or federal laws after the member knows, or reasonably should know of such criminal activities, except as specifically directed and authorized by this department" and section 1050.2(e) provides "Except as required in the performance of official duties or, in the case of immediate relatives, employees shall not develop or maintain personal or financial relationships with any individual they know or reasonably should know … is a convicted felon … or who engages in serious violations of state or federal laws."

63.     Ofc. Scatchell's association with Mr. Scavo constitutes a violation of MPPD's rules.

### COUNT XI – Secondary Employment Without Authorization

64.     Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-63 above as though fully set forth herein.

65.     MPPD's Policy Manual Section 1040.2 requires officers to obtain "prior written approval of the Chief of Police" before engaging in outside employment and Section 1040.5

Documents\4846-7526-3583.v1-3/27/18

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1575

requires further that officers on disability leave or modified/light duty must seek permission for outside employment.

66.    By failing to seek authorization to accept employment as a Guide with I Decoy M Guide Service, Ofc. Scatchell violated MPPD rules.

## COUNT XII – Conduct Unbecoming and Violation of Law

67.    Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-66 above as though fully set forth herein.

68.    On or about November 13, 2017, Deputy Chief Castellan received an anonymous report that Ofc. Scatchell "is calling in sick when, in fact, he is not" and that instead, "He is out HUNTING every morning."  As a result, MPPD initiated surveillance of Ofc. Scatchell to attempt to determine if there was any validity to the anonymous report.  The surveillance was conducted by an experienced police officer and was conducted frequently over the course of the next month.

69.    During the course of the surveillance, Ofc. Scatchell's vehicle was frequently observed travelling at incredibly high rates of speed, sometimes exceeding 100 mph and frequently ignoring stop signs, including within Melrose Park Village limits.

70.    By either driving in the foregoing manner, or allowing another to drive in that manner while he was a passenger, and by identifying himself as an MPPD officer to avoid State Police action, Ofc. Scatchell has violated MPPD Rules.

WHEREFORE, Director Pitassi and Deputy Chief Castellan respectfully request that a hearing be held before the Board of Fire and Police Commissioners of the Village of Melrose Park and that the Board terminate the employment of Officer John Scatchell as a police officer of the Village of Melrose Park.  This request is made pursuant to the Board's Rules and Regulations

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1576

requires further that officers on disability leave or modified/light duty must seek permission for outside employment.

66.     By failing to seek authorization to accept employment as a Guide with I Decoy M Guide Service, Ofc. Scatchell violated MPPD rules.

### COUNT XII – Conduct Unbecoming and Violation of Law

67.     Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-66 above as though fully set forth herein.

68.     On or about November 13, 2017, Deputy Chief Castellan received an anonymous report that Ofc. Scatchell "is calling in sick when, in fact, he is not" and that instead, "He is out HUNTING every morning."  As a result, MPPD initiated surveillance of Ofc. Scatchell to attempt to determine if there was any validity to the anonymous report.  The surveillance was conducted by an experienced police officer and was conducted frequently over the course of the next month.

69.     During the course of the surveillance, Ofc. Scatchell's vehicle was frequently observed travelling at excessively high rates of speed and frequently ignoring traffic signs and signals, including within Melrose Park Village limits.

70.     By either driving in the foregoing manner, or allowing another to drive in that manner while he was a passenger, Ofc. Scatchell has violated MPPD Rules.

WHEREFORE, Director Pitassi and Deputy Chief Castellan respectfully request that a hearing be held before the Board of Fire and Police Commissioners of the Village of Melrose Park and that the Board terminate the employment of Officer John Scatchell as a police officer of the Village of Melrose Park.  This request is made pursuant to the Board's Rules and Regulations

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1577

as well as the provisions of 65 ILCS 5/10-2.1/17.

Dated: March 27, 2018

By: _____
Sam C. Pitassi
Chief of Police
Village of Melrose Park

By: _____
Michael Castellan
Deputy Chief of Police
Village of Melrose Park

Joseph M. Gagliardo
Jeffrey S. Fowler
Laner Muchin, Ltd.
515 North State Street - Suite 2800
Chicago, Illinois 60654
(312) 467-9800
(312) 467-9479 Fax

12

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1578

## BEFORE THE BOARD OF FIRE AND POLICE COMMISSIONERS
## OF THE VILLAGE OF MELROSE PARK, ILLINOIS

IN THE MATTER OF CHARGES      )
AGAINST OFFICER JOHN SCATCHELL   )

## AMENDED STATEMENT OF CHARGES

Sam C. Pitassi (hereafter "Director Pitassi"), Director of Police of the Village of Melrose Park, Illinois ("Village"), and Deputy Chief Michael Castellan ("Deputy Chief Castellan") make the following statement of charges against Officer John A. Scatchell of the Melrose Park Police Department. Director Pitassi and Deputy Chief Castellan respectfully request that the Board of Fire and Police Commissioners of the Village (hereafter "Board") set a hearing date on said charges and take appropriate action in accordance with the provisions of 65 ILCS 5/10-2.1-17 and the Rules and Regulations of the Board of Fire and Police Commissioners of the Village.

1.     Director Pitassi at all times relevant to bringing these charges was and is the duly appointed Director of Police of the Village of Melrose Park.

2.     Deputy Chief Castellan at all times relevant to bringing these charges was and is a duly appointed Deputy Chief of Police of the Village of Melrose Park, and is authorized to act on behalf of the Director of Police in this matter.

3.     Officer John A. Scatchell ("Ofc. Scatchell") is a duly appointed member of the Melrose Park Police Department and is an Officer as that term is defined in the Board's Rules and Regulations.

4.     The Melrose Park Police Department has a very generous sick leave provision – full pay for six months for conditions that originated off duty and "An officer who is placed on sick leave as a result of an injury or illness contracted in the in [sic] line of duty shall be entitled to full pay for one (1) year."

1

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1952

5.    Ofc. Scatchell was hired as a police officer for the Village of Melrose Park on September 26, 2012 and he received MPPD's Standard Operating Procedures and rules when he was hired.

6.    In February 2015 Ofc. Scatchell reported that he was injured in an altercation and he reportedly suffered from a cervical strain to his upper back and lower neck. Ofc. Scatchell was off work from February 5, 2015 until he was released to work full duty effective April 24, 2015.

7.    After February 2015, Ofc. Scatchell was not injured further while at work.

8.    On or about July 24, 2017, Vito Scavo obtained a Waterfowl Outfitter's License on behalf of an entity named "I Decoy M Guide Service" for 2017-2018, listing Ofc. Scatchell as an employee and "Guide" for the Company. Ofc. Scatchell never sought or received permission to accept secondary employment with I Decoy M Guide Service.

9.    Mr. Scavo is a convicted felon. Ofc. Scatchell is aware that Mr. Scavo is a felon and is prohibited from possessing a firearm. In fact, possession of a firearm by a felon in Illinois is a Class 3 felony with a mandatory minimum 2-year prison sentence in Illinois, and is therefore a serious crime.

10.    Ofc. Scatchell is an avid hunter. He scheduled vacation for October 2017 to correspond with the beginning of waterfowl hunting season, and during that period he frequently went waterfowl hunting with Mr. Scavo.

11.    Waterfowl hunting is typically done with a shotgun and shotguns have significant recoil affecting the shooter's shoulder, upper back and neck area.

12.    Ofc. Scatchell was on approved vacation and/or "time due" from October 13, 2017 to November 8, 2017.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1953

13. According to Ofc. Scatchell, in late October or early November, 2017, after he had been on vacation for at least ten days, and while he was on vacation, he felt pain in his back which he claims related to his February 2015 work-related injury

14. On November 9, 2017, Ofc. Scatchell presented a note from Dr. Maryam Sandoval reporting that Ofc. Scatchell "was seen and evaluated ... for an acute musculoskeletal condition that has not yet resolved. He remains on active treatment and has been advised to continue to rest at home. Please excuse the patient from work until further notice."

15. Ofc. Scatchell did not tell his physicians that he was hunting during his medical leave or ask about whether hunting with a shotgun was consistent with the medical restrictions.

16. In contravention to his doctor's orders, Ofc. Scatchell frequently went hunting for waterfowl during the period of his medical leave, usually carrying heavy equipment and shotguns.

17. On November 19, 2017, Ofc. Scatchell asked his supervisor for time off on December 21, 22, 26, 27, 28, 29, 30 and 31st to travel to Mexico. On December 4, 2017, the request was denied because Ofc. Scatchell was on medical leave.

18. On October 6, 2017, Ofc. Scatchell obtained air travel arrangements for he and Mr. Scavo to travel to and from Harlingen, Texas, between December 26-30, 2018.

19. On or about November 18, 2017, Ofc. Scatchell obtained air travel arrangements to travel to and from Washington from December 17 to December 22, 2017.

20. Ofc. Scatchell went on the trip to Washington as he had scheduled and his activities there included waterfowl hunting. Director Pitassi and Deputy Chief Castellan believe that Ofc. Scatchell also took his planned trip to Mexico in late December 2017.

21. On November 20, 2017, Ofc. Scatchell, Mr. Scavo and others were hunting from

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1954

a small boat and they were observed by Illinois Conservation Police with Mr. Scavo possessing a firearm and actively shooting over a prolonged period. When the boat returned to the shore, the Conservation Police Officer met and interviewed the group, including Ofc. Scatchell, who showed his Melrose Park Police Department badge and identified himself as a Melrose Park police officer and said that "he could not say if he saw Scavo shoot or not" and "[w]e are all in law enforcement here, we all know what's going on." Ofc. Scatchell knew that the Conservation Police Officer stated that he saw Mr. Scavo possessing and firing a shotgun, knew that the Conservation Police Officer did not believe Ofc. Scatchell's denials and knew that the conduct would constitute a felony, but Ofc. Scatchell did not report the contact with the Conservation Police Officer to his supervisors.

22.     On November 27, 2017, Ofc. Scatchell presented a note from Dr. Sandoval stating that "has been advised to resume light exercises and may walk outside of his home. However, he is not able to return to his full time work pending completion and review of ordered tests." During the ensuing period, Ofc. Scatchell did not merely engage in "light exercises" or "walk outside of his home," but instead continued hunting activities on virtually a daily basis.

23.     On December 8, 2017, Director Pitassi and Deputy Chief Castellan issued a notice to Ofc. Scatchell, informing him of the investigation into his conduct and scheduling an "interrogation" of Ofc. Scatchell. Ofc. Scatchell did not appear as ordered, and a new Notice was issued on December 20, 2017.

24.     On December 15, 2017, Ofc. Scatchell presented a note from Dr. Sandoval stating that Ofc. Scatchell's "ongoing medical problem ... has improved but not resolved. Based on recent test results, the patient has been referred to a specialist and his appointment is still pending. In the meantime, he may return to light duty employment pending the consultant input.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1955

His prior arranged travel plans are deemed safe and should not affect his ongoing medical problems." However, Ofc. Scatchell had not told Dr. Sandoval about the details of his travel plans, including his plan to go hunting.

25.     On January 8, 2018, Dr. Sandoval issued a work restriction limiting Ofc. Scatchell to "Desk duty such as typing and paperwork" "but he should not carry or wear heavy equipment (ex. body armour) until seen by a specialist."

26.     On January 9, 2018, Ofc. Scatchell participated in an interrogation regarding the investigation being conducted into his conduct. During the interrogation, Ofc. Scatchell was dishonest in some of his responses. For example, Ofc. Scatchell claimed that after feeling pain in his neck and back in early November 2017 he took extensive time off of hunting, he denied carrying two shotguns during his hunting trips in November 2017, he denied seeing Mr. Scavo possessing or firing a shotgun on November 20, 2018, -he denied that his shotguns had a recoil that could have affected his alleged neck or back injury, he falsely reported the findings of the Conservation Officer on November 20, 2017, and he falsely reported the dates he was working a side-job (when he claims that he noticed a reinjury). Each of these statements was false.

27.     During the interrogation, Ofc. Scatchell's attorney agreed that Ofc. Scatchell would sign a release for the Village to obtain his medical records.

28.     On January 10, 2018, Ofc. Scatchell was given a work restriction from Dr. Dalip Pelinkovic, limiting him to sedentary work and no lifting more than ten pounds for six weeks.

29.     After multiple communications between the Village's attorney and Scatchell's attorney about the medical release, on February 13, 2018, Director Pitassi issued a written order to Ofc. Scatchell to sign a medical release attached to the Order, and he was "further ordered not to hinder or interfere, in any way, with the medical providers regarding their submission of such

5

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1956

records." Rather than sign the release as instructed by Director Pitassi, Ofc. Scatchell instead (through his attorney/sister) signed a limited release applicable only to Dr. Sandoval and excluding any medical records from any other provider, including the specialist identified by Dr. Sandoval, and excluding any correspondence relating to Ofc. Scatchell.

30.     Despite Ofc. Scatchell's failure to comply with Director Pitassi's order, MPPD submitted the signed release to the medical providers and as of March 23, 2018, no documents have been provided.   Director Pitassi and Deputy Chief Castellan therefore believe that Ofc. Scatchell has interfered with the production of his medical records, also in violation of the direct order he was given on February 13, 2018.

## COUNT I – Abuse of Sick Leave

31.     Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-30 above as though fully set forth herein.

32.     MPPD's Policy Manual Rule 340.5.5(c) prohibits excessive absenteeism or abuse of leave privileges.  Further, Section 1014.2 provides, "Sick leave is not considered vacation, and abuse of sick leave may result in discipline and/or denial of sick-leave benefits.  Employees on sick leave shall not engage in other employment or self-employment, or participate in any sport, hobby, recreational or other activity which may impede recovery from the injury or illness."

33.     Ofc. Scatchell's actions constituted an abuse of sick leave.

## COUNT II – Failure to Report Contact with Another Law Enforcement Agency

34.     Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-33 above as though fully set forth herein.

35.     MPPD's Policy Manual contains a Law Enforcement Code of Ethics, which includes, in part, the statement that "I will cooperate with all legally authorized agencies and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1957

their representatives in the pursuit of justice."

36. MPPD's Policy Manual Rule 340.5.9(a) requires offices to promptly and fully report activities on his/her part or the part of any other member where such activities resulted in contact with any other law enforcement agency or that may result in criminal prosecution.

37. Ofc. Scatchell violated MPPD's rule by failing to report his contact with the Illinois Conservation Police on November 20, 2017.

## COUNT III – False Report to MPPD

38. Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-37 above as though fully set forth herein.

39. MPPD's Policy Manual Rules 340.5.8(a), (c) and (D) prohibit officers from failing to disclose or misrepresenting material facts during the course of any work-related investigation.

40. Ofc. Scatchell violated MPPD's rules through his false statements to MPPD during its investigation of his conduct, including the following: a) he took an extensive period of time off of hunting after noticing pain in his back in late October or early November 2017; b) he never carried two shotguns during the period of October to December 2017; c) his statement that he did not see Mr. Scavo possessing a firearm or shooting on November 20, 2017; d) that his shotguns did not have a recoil that could have affected his alleged neck or back injury; he falsely reported the findings of the Conservation Officer on November 20, 2017; and he falsely reported the dates he was working a side-job (when he claims that he noticed a reinjury).

## COUNT IV – Providing False Information to Another Law Enforcement Agency

41. Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-40 above as though fully set forth herein.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1958

42.  MPPD's Policy Manual Rule 340.5.8(i) prohibits officers from engaging in any act, on- or off-duty, that brings discredit to MPPD.

43.  Pursuant to MPPD's Policy Manual Section 340.2 and 340.4, officers must follow MPPD guidelines both on and off duty.

44.  Rule 200.3.3 of MPPD's Policy Manual requires officers to "respond to and make a good faith and reasonable effort to comply with the lawful order of superior officers and other proper authority" and Section 340.3 provides that officers "shall comply with lawful directives and orders from any department supervisor or person in a position of authority, absent a reasonable and bona fide justification."

45.  Ofc. Scatchell violated MPPD rules by not cooperating with and providing knowingly false information to a Conservation Police Officer on November 20, 2017.

## COUNT V – Violating MPPD Rules in Communications with Conservation Police

46.  Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-45 above as though fully set forth herein.

47.  MPPD's Policy Manual prohibits officers from "using or disclosing one's status as a member of the Melrose Park Police Department in any way that could reasonably be perceived as an attempt to gain influence or authority for non-department business or activity."

48.  Ofc. Scatchell violated MPPD rules by showing his badge and identifying himself as a Melrose Park Police Officer to the Conservation Police Officer on November 20, 2017, and stating, "We are all in law enforcement here, we all know what's going on."

## COUNT VI – Disobeying Lawful Order Regarding Medical Records

49.  Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-48 above as though fully set forth herein.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1959

50.     Ofc. Scatchell disobeyed a lawful order from his supervisors by refusing to sign the medical release as instructed, and instead signing a modified version that did not adequately address all of the records that are relevant to his medical condition.

51.     Upon information and belief, Ofc. Scatchell has also disobeyed a lawful order by interfering with the production of his medical records.

### COUNT VII – Disobeying Lawful Order Regarding Time Off to Travel During Medical Leave

52.     Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-51 above as though fully set forth herein.

53.     Ofc. Scatchell disobeyed a lawful order by traveling to Washington from December 17-22, 2017.

54.     Upon information and belief, Ofc. Scatchell disobeyed a lawful order by traveling to Harlingen, Texas from December 26-30, 2017.

### COUNT VIII – Conduct Unbecoming

55.     Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-54 above as though fully set forth herein.

56.     MPPD's Policy Manual Rule 340.5.9(m) prohibits conduct unbecoming an officer, on- or off-duty when the conduct is "contrary to good order, efficiency or morale, or tends to reflect unfavorably upon this department or its members."

57.     Ofc. Scatchell's activities constitute conduct unbecoming an officer, in violation of MPPD's rules.

### COUNT IX – Violating State Law

58.     Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-57 above as though fully set forth herein.

Documents\4846-7526-3583.v1-10/24/18

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1960

59. MPPD's Policy Manual Section 340.5.1 requires officers to comply with federal, state, local or administrative laws, rules or regulations.

60. In assisting Mr. Scavo in possessing and firing a shotgun, Ofc. Scatchell violated state law, rules or regulations, and in violating state law, Ofc. Scatchell violated MPPD rules.

## COUNT X – Association with a Known Felon

61. Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-60 above as though fully set forth herein.

62. MPPD's Policy Manual Rule 340.5.4 prohibits officers from "Associating on a personal, rather than official basis with persons who demonstrate recurring involvement in serious violations of state or federal laws after the member knows, or reasonably should know of such criminal activities, except as specifically directed and authorized by this department" and section 1050.2(e) provides "Except as required in the performance of official duties or, in the case of immediate relatives, employees shall not develop or maintain personal or financial relationships with any individual they know or reasonably should know … is a convicted felon … or who engages in serious violations of state or federal laws."

63. Ofc. Scatchell's association with Mr. Scavo constitutes a violation of MPPD's rules.

## COUNT XI – Secondary Employment Without Authorization

64. Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-63 above as though fully set forth herein.

65. MPPD's Policy Manual Section 1040.2 requires officers to obtain "prior written approval of the Chief of Police" before engaging in outside employment and Section 1040.5

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1961

requires further that officers on disability leave or modified/light duty must seek permission for outside employment.

66.     By failing to seek authorization to accept employment as a Guide with I Decoy M Guide Service, Ofc. Scatchell violated MPPD rules.

## COUNT XII – Conduct Unbecoming and Violation of Law

67.     Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-66 above as though fully set forth herein.

68.     On or about November 13, 2017, Deputy Chief Castellan received an anonymous report that Ofc. Scatchell "is calling in sick when, in fact, he is not" and that instead, "He is out HUNTING every morning."  As a result, MPPD initiated surveillance of Ofc. Scatchell to attempt to determine if there was any validity to the anonymous report.  The surveillance was conducted by an experienced police officer and was conducted frequently over the course of the next month.

69.     During the course of the surveillance, Ofc. Scatchell's vehicle was frequently observed travelling at excessively high rates of speed and frequently ignoring traffic signs and signals, including within Melrose Park Village limits.

70.     By either driving in the foregoing manner, or allowing another to drive in that manner while he was a passenger, Ofc. Scatchell has violated MPPD Rules.

## COUNT XIII – Disobeying a Direct Order

71.     Director Pitassi and Deputy Chief Castellan refer to and incorporate by reference the allegations in paragraphs 1-70 above as though fully set forth herein.

72.     On Monday, October 22, 2018, a hearing was scheduled to consider charges against Ofc. Scatchell and he was present in that hearing.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1962

73.     On Monday, October 22, 2018, at the Village Community Center at 900 North 25th Street, Melrose Park, after reaffirming a Garrity notice that had previously been issued to, and signed by, Ofc. Scatchell, Deputy Chief Castellan issued a direct order to Ofc. Scatchell to take the witness stand and answer questions but Ofc. Scatchell refused to obey any part of that order. He refused to take the witness stand or answer any questions whatsoever.

74.     Ofc. Scatchell's conduct in refusing to answer questions during the BOFPC hearing was insubordinate.

75.     Ofc. Scatchell's conduct on October 22, 2018, constituted some substantial shortcoming which renders continuance in employment in some way detrimental to the discipline and efficiency of the public service and something which the law and sound public opinion recognize as cause for the officer no longer occupying his position, and therefore constitutes cause for termination as that term is defined in the Rules and Regulations of the Board of Fire and Police Commissioners of the Village of Melrose Park.

WHEREFORE, Director Pitassi and Deputy Chief Castellan respectfully request that a hearing be held before the Board of Fire and Police Commissioners of the Village of Melrose Park and that the Board terminate the employment of Officer John Scatchell as a police officer of the Village of Melrose Park. This request is made pursuant to the Board's Rules and Regulations as well as the provisions of 65 ILCS 5/10-2.1/17.

Dated:  October 25, 2018

By: _____
Sam C. Pitassi
Chief of Police
Village of Melrose Park

By: _____
Michael Castellan
Deputy Chief of Police
Village of Melrose Park

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1963

Joseph M. Gagliardo
Jeffrey S. Fowler
Laner Muchin, Ltd.
515 North State Street - Suite 2800
Chicago, Illinois 60654
(312) 467-9800
(312) 467-9479 Fax

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 1964

impeachment as a prior inconsistent statement, that is not the only use. Although the transcript was not a deposition, it was akin to one in this context. Illinois law provides, pursuant to Illinois Supreme Court Rule 212, that a discovery deposition can be used for various reasons, such as an admission, if it is otherwise admissible as an exception to the hearsay rule, as a substitute for an affidavit, or if a deponent whose evidence deposition has not been taken is unable to appear because of death or infirmity. The Board believes that it was entitled to consider the transcript of the interrogation pursuant to the spirit of Supreme Court Rule 212 particularly because Respondent refused to make himself available to Petitoner's questioning.

## RULING

The Board finds, based upon the evidence, the materials submitted, and the surrounding facts and circumstances, that, Petitioner has established by a preponderance of the evidence guilt on the charges contained in Counts 1,2, 3(partial),4, 8, 9, 11 & 13.

By reasons of the findings of fact and of guilt herein, cause exists for the discharge of the Respondent from his position as a police officer in the Village of Melrose Park..

IT IS HEREBY ORDERED that the Respondent, John Scatchell, be and is hereby discharged and removed from his position as a police officer with the Village of Melrose Park, Illinois as of the 7ᵗʰ day of December, 2018.

Dated at Melrose Park, Illinois, this 6ᵗʰ _____ day of December, 2018.

Being Members of the Board of Fire and Police Commissioners of the Village of Melrose Park, Cook County, Illinois

Page 7 of 7

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



CONFIDENTIAL

## John A Scatchell

10/31/2017 3:00 PM   Office Visit
MRN: GE11793006

Description: 28 year old male  Provider: Sandoval, Maryam, MD  Department: Brush Hill Im

## Scanning Cover Sheet

Click to print Barcode Encounter Cover Sheet for scanning

## Scatchell, John A

MRN: GE11793006
Description: 28 year old male

**Office Visit** 10/31/2017
DMG INTERNAL MEDICINE -
ELMHURST, BRUSH HILL

Provider: Sandoval, Maryam, MD (Internal Medicine)
Primary diagnosis: Neck fullness
Reason for Visit: Neck Pain

### Reason for Visit

Neck Pain

### Progress Notes

Sandoval, Maryam, MD (Physician) • Internal Medicine

John A Scatchell is a 28 year old male.
CC:
Patient presents with:
Neck Pain

**HPI:**
28 yo male who was asked to be seen for acute visit.  Accompanied by his parents.
Pt reports waking up with severe right sided neck pain 3 days ago with radiation to shoulder, down arms to
finger tips.  Associated with numbness and tingling.  Unable to recall any kind of trauma, heavy lifting,
pushing or pulling.  Has been very relaxed and on vacation.  Has a very firm, comfortable mattress and
pillow.
Additionally, has noticed bulging of muscles in his neck as compared to the left side. Pain free while flat in
bed.  Worse with movement.
No fevers or chills.  No sore throat, cough, ear pressure or rash.
Was being treated with Stelara injections but with resolution of his skin changes, injections were stopped
over 2 months ago.

| Current Outpatient Prescriptions: | | | |
|---|---|---|---|
| predniSONE 20 MG Oral Tab | Take 1 tablet (20 mg total) by mouth 2 (two) times daily. | Disp: 14 tablet | Rfl: 0 |
| FLUTICASONE PROPIONATE 50 MCG/ACT Nasal Suspension | USE 1 SPRAY NASALLY TWICE DAILY AS NEEDED FOR RHINITIS | Disp: 1 Bottle | Rfl: 5 |
| Montelukast Sodium 10 MG Oral Tab | Take 1 tablet (10 mg total) by mouth daily. | Disp: 30 tablet | Rfl: 1 |
| Fexofenadine HCl (ALLEGRA ALLERGY) 180 MG Oral Tab | Take 180 mg by mouth daily. | Disp: | Rfl: |

**Past Medical History:**

| Diagnosis | Date |
|---|---|
| • Allergic rhinitis | |

**Social History:**

EXHIBIT # CHEP's 1
WIT: SANDOVAL
DATE: 10-2-18

MPD/SCATCHELL 383

Smoking status: Never Smoker

Smokeless tobacco: Never Used
Alcohol use: No



## REVIEW OF SYSTEMS:
**GENERAL HEALTH:** No fever. No chills. No diaphoresis
**ENT:** No sore throat or congestion
**RESPIRATORY:** No shortness of breath. No cough. No wheezing
**CARDIOVASCULAR:** No chest pain. No palpitations.
**GI:** No abdominal pain. No diarrhea. No constipation. No N/V. Appetite good
**MS:** Right sided neck pain with radiation down right arm to finger tips
**PSYCH:** No anxiety. No depression.
**SKIN:** No lesions. No rash.

## EXAM:
BP 107/65 | Pulse 99 | Temp 98 °F (36.7 °C) | Wt 228 lb (103.4 kg) | BMI 34.67 kg/m²
**GENERAL:** Young male, pain with head movement. No distress otherwise
**HEENT:** Normocephalic, no visual deficits, no pharyngeal exudates
**NECK:** No lymphadenopathy or masses palpable
**LUNGS:** Clear to auscultation bilaterally. No wheezes. No crackles.
**CARDIO:** S1 S2, regular, no S3, no murmurs
**MS:** No vertebral tenderness, right paracervical tenderness and right neck fullness without
lymphadenopathy or reproducible pain
**NEURO:** Normal triceps and biceps reflexes in bilateral upper ext
No tremors or weakness noted.
**SKIN:** No rash. No suspicious lesions.

## ASSESSMENT AND PLAN:

Diagnoses and all orders for this visit:

**Cervical radiculopathy with**
**Neck fullness**
No reproducible tenderness or lymphadenopathy.
Positional pain which is radiating most consistent with cervical nerve impingement.
No superimposed infectious sx's or findings noted.
In light of hx of stelara use (but cessation 2 months ago), will check labs including ESR and CBC.
Hold off on imaging.
One week course of prednisone.
If not better, may need to pursue imaging.
Asked pt to call with any change in sx's and with update.
No heavy lifting, pushing or pulling. Will be on vacation until 11/9.

**Other orders**
- INFLUENZA REFUSED DMG
- predniSONE 20 MG Oral Tab; Take 1 tablet (20 mg total) by mouth 2 (two) times daily.


Annual Physical due on 12/09/1990
Influenza Vaccine(1) due on 09/01/2017
Annual Depression Screen due on 01/12/2018


**Orders Placed This Encounter**
CBC With Differential With Platelet

**MPD/SCATCHELL 384**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Comp Metabolic Panel (14)
Sed Rate, Westergren (Automated)
INFLUENZA REFUSED DMG

CONFIDENTIAL

**Meds & Refills for this Visit:**
Signed Prescriptions

predniSONE 20 MG Oral Tab

Sig: Take 1 tablet (20 mg total) by mouth 2 (two) times daily.

| | Disp | Refills |
|---|---|---|
| | 14 tablet | 0 |

**Imaging & Consults:**
INFLUENZA REFUSED DMG

Maryam Sandoval, MD

## Instructions

After Visit Summary (Printed 10/31/2017)

## Additional Documentation

Vitals: BP 107/65 Pulse 99 Temp 98 °F (36.7 °C) Wt 228 lb BMI 34.67 kg/m² BSA 2.16 m²

More Vitals

Flowsheets: Custom Formula Data, DMG TEMP FOR BP BPA COMPARE

Encounter Info: Billing Info, History, Allergies, Detailed Report

## Encounter Status

Electronically signed by Sandoval, Maryam, MD on 10/31/17 at 9:20 PM

## Additional Encounter Details

Scanning Cover Sheet
All Scans
Questionnaire Details
Referral Information
Elm Time Out
Administrative Information
Coding Query

## SmartForms

No SmartForms are associated with this patient.

## Infusion Orders

No relevant orders to display.

## Medication Waste Documentation

MPD/SCATCHELL 385

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2140

## Orders Placed

CBC WITH DIFFERENTIAL WITH PLATELET (Resulted 10/31/2017, Abnormal)
COMP METABOLIC PANEL (14) (Resulted 10/31/2017)
SED RATE, WESTERGREN (AUTOMATED) (Resulted 10/31/2017)
OFFICE/OUTPT VISIT,EST,LEVL III



## Medication Changes
As of 10/31/2017 3:59 PM

| | Refills | Start Date | End Date |
|---|---|---|---|
| Added: predniSONE 20 MG Oral Tab | 0 | 10/31/2017 | 11/7/2017 |

Take 1 tablet (20 mg total) by mouth 2 (two) times daily. - Oral
**Calcipotriene**
Discontinued: Calcipotriene 0.005 % External Solution (Patient discontinued)
Discontinued: CALCIPOTRIENE 0.005 % External Cream (Patient discontinued)
Discontinued: Clindamycin Phosphate 1 % External Lotion (Patient discontinued)
**Clobetasol Propionate**
Discontinued: Clobetasol Propionate 0.05 % External Cream (Duplicate therapy)
Discontinued: Clobetasol Propionate 0.05 % External Solution (Patient discontinued)

## Visit Diagnoses

Neck fullness R22.1
Cervical radiculopathy M54.12

## Immunizations Given

Not given: Influenza Vaccine Refused Deferred (Patient Refused)

# John A Scatchell

1/12/2017 1:00 PM   Office Visit
MRN: GE11793006

Description: 28 year old male  Provider: Sandoval, Maryam, MD  Department: Brush Hill Im

## Scanning Cover Sheet

Click to print Barcode Encounter Cover Sheet for scanning

# Scatchell, John A

MRN: GE11793006
Description: 28 year old male

**Office Visit 1/12/2017**     Provider: Sandoval, Maryam, MD (Internal Medicine)
DMG INTERNAL MEDICINE -      Primary diagnosis: Guttate psoriasis
ELMHURST, BRUSH HILL          Reason for Visit: Rash

## ⚕ Reason for Visit

Rash

## Progress Notes

Sandoval, Maryam, MD (Physician) • Internal Medicine

John A Scatchell is a 28 year old male.
CC:

**MPD/SCATCHELL 386**

# CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Scatchell, John A (MR # GE11793006)                    Encounter Date: 03/10/2015

I sent you the note via MyChart. Let me know if you need a note to return to        3:53 PM   
work too.
Hope you continue to feel better with rest and the new medications.
These neck problems can drag on for weeks but should definitely improve over the next
week.
Keep me posted.

Dr. S

Last read by John A Scatchell at 5:02 PM on 11/9/2017.

CONFIDENTIAL

Cozzi, Karen, CMA routed this conversation to Sandoval, Maryam, MD        3:31 PM   

John A Scatchell  to Maryam Sandoval, MD

   I'm not sure, I still haven't improved much. Last night I felt better and today        11:35 AM
not so much. Maybe until Friday and see how I feel as the week progresses?

Sandoval, Maryam, MD  to John A Scatchell

I would be happy to give you a note.                    11:28 AM   
Do you want to shoot for a return next week?
Mon? Tuesday? Later?
Just write me back ASAP and I will draft the letter and send it to you via MyChart.

Best,
Dr. Sandoval

Last read by John A Scatchell at 11:29 AM on 11/9/2017.

EXHIBIT # CHRES 2
WIT: SANDOVAL
DATE: 10-2-18

November 8, 2017

Gibson, Regina routed this conversation to Sandoval, Maryam, MD        9:39 AM   

Gibson, Regina

Note                    9:38 AM   

From: John A Scatchell
To: Sandoval, Maryam, MD
Sent: 11/7/2017  9:24 PM CST
Subject: Visit Follow-up Question

Hi Dr, sorry we've been playing phone tag the last day or so. I picked up both
prescriptions and started those this evening. Would it be possible to have a note for        MS 021

Scatchell, John A (MR # GE11793006) Printed by Biggs, Fay K. [7313] at 5/22/18 2:4...    Page 20 of 66

Scatchell, John A (MR # GE11793006)  Encounter Date: 03/10/2015

work? I am supposed to return to work on Thursday the 9th. As of now I'm still in a lot
of pain and have been using the heating pad often. The swelling has gone down a
little, but it is still visible and the numbness/tingling sensation has been more
prevalent in recent days down my right shoulder and arm.



November 7, 2017

John A Scatchell to Maryam Sandoval, MD

 Hi Dr, sorry we've been playing phone tag the last day or so. I picked up both    9:24 PM
prescriptions and started those this evening. Would it be possible to have a note for
work? I am supposed to return to work on Thursday the 9th. As of now I'm still in a lot
of pain and have been using the heating pad often. The swelling has gone down a little,
but it is still visible and the numbness/tingling sensation has been more prevalent in
recent days down my right shoulder and arm.

## Additional Documentation

Encounter Info:    Billing Info, History, Allergies, Detailed Report

## Communications

Letter sent to John A Scatchell
Sent 11/9/2017

## Encounter Status

Closed by Sandoval, Maryam, MD on 11/9/17 at 3:53 PM

## Additional Encounter Details

Scanning Cover Sheet
All Scans
Questionnaire Details
Administrative

## Orders Placed

None

## Medication Renewals and Changes

As of 11/9/2017 3:53 PM

None

## Visit Diagnoses

None

# John A Scatchell

11/6/2017   Telephone
MRN: GE11793006

Description: 28 year old male  Provider: Sandoval, Maryam, MD  Department: Highland Internal MMS 022

Scatchell, John A (MR # GE11793006) Printed by Biggs, Fay K. [7313] at 5/22/18 2:4...    Page 21 of 66

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2143

Name: John A. Scatchell | DOB: 12/9/1988 | MRN: GE11793006 | PCP: MARYAM SANDOVAL, MD

## Letter Details

**DuPage Medical Group**
WE CARE FOR YOU

DMG INTERNAL MEDICINE - ELMHURST,
BRUSH HILL
133 Brush Hill Road
Suite 401
Elmhurst IL 60126
630-832-2020

**CONFIDENTIAL**

November 9, 2017

To whom it may concern:

I am the primary care physician for your employee, Mr. John Scatchell. He was seen and evaluated by myself in the office for an acute musculoskeletal condition that has not yet resolved. He remains on active treatment and has been advised to continue to rest at home. Please excuse the patient from work until further notice.

Thank you for you understanding and cooperation. Please call with any remaining questions.

Sincerely,

Maryam N. Sandoval, MD

*This letter was initially viewed by John A Scatchell at 11/9/2017 4:30 PM.*

MyChart® licensed from Epic Systems Corporation © 1999 - 2016

EXHIBIT *CHERS 3*
WIT: *SANDOVAL*
DATE: *10-2-18*

VMP/SCATCHELL JR 120

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Scatchell, John A (MR # GE11793006)                    Encounter Date: 03/10/2015

Cozzi, Karen, CMA routed this conversation to Sandoval, Maryam,     11/21/17 3:24 PM
MD

**Cozzi, Karen, CMA**

Note                                                               11/21/17 3:24 PM

From: John A Scatchell
To: Sandoval, Maryam, MD
Sent: 11/21/2017  2:07 PM CST
Subject: Visit Follow-up Question

Hi Dr Sandoval,

I just wanted to touch base with you. I still have a considerable amount of pain,
particularly if I don't take any pills for a prolonged period of time. The numbness in
my right arm comes and goes all day. Also if I move my neck too fast or too far, I get
a quick shooting sensations down my whole arm. I haven't been engaged in really any
activity at all except stretches and have been applying heat/cold around the clock.

John A Scatchell  to Maryam Sandoval, MD

Hi Dr Sandoval,                                                    11/21/17 2:07 PM

I just wanted to touch base with you. I still have a considerable amount of pain,
particularly if I don't take any pills for a prolonged period of time. The numbness in my
right arm comes and goes all day. Also if I move my neck too fast or too far, I get a
quick shooting sensations down my whole arm. I haven't been engaged in really any
activity at all except stretches and have been applying heat/cold around the clock.

## Additional Documentation

Encounter Info:   Billing Info, History, Allergies, Detailed Report

## Encounter Status

Closed by Sandoval, Maryam, MD on 11/21/17 at 3:56 PM

## Additional Encounter Details

Scanning Cover Sheet
All Scans
Questionnaire Details
Administrative

EXHIBIT Chess 4
WIT: SANDOVAL
DATE: 10-2-18

## Orders Placed

EMG/NCV TEST(S), PHYSIATRY (DMG) Authorized

MS 018

Scatchell, John A (MR # GE11793006) Printed by Biggs, Fay K. [7313] at 5/22/18 2:4...   Page 17 of 66

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2145

Scatchell, John A (MR # GE11793006)                    Encounter Date: 03/10/2015

Best,
Dr. Sandoval

Last read by John A Scatchell at 12:47 PM on 11/27/2017.

---

Cozzi, Karen, CMA routed this conversation to Sandoval, Maryam, MD        7:12 AM 

---

**Cozzi, Karen, CMA**

📄 Note                                                                7:12 AM 

From: John A Scatchell
To: Sandoval, Maryam, MD
Sent: 11/26/2017 9:52 PM CST                          
Subject: Visit Follow-up Question

Hi Dr Sandoval,

I scheduled my appointment the day you messaged me. The earliest that they could
get me in at any of their locations is December 4th, so that's the date I took. Would it
be possible to get an updated Dr's note for work that allows me to do light exercise? I
feel the best after I stretch and then ally heat/cold. The last few days has been better
on the pain, but the numbness still persists.

    Thanks



EXHIBIT # *Hiers* 5
WIT: *SANDOVAL*
DATE: 10-2-18

---

                              November 26, 2017

 John A Scatchell  to Maryam Sandoval, MD

┌─────────────────────────────────────────────────────────────────┐
│ Hi Dr Sandoval,                                         9:52 PM   │
│                                                                   │
│ I scheduled my appointment the day you messaged me. The earliest  │
│ that they could get me in at any of their locations is December   │
│ 4th, so that's the date I took. Would it be possible to get an    │
│ updated Dr's note for work that allows me to do light exercise? I  │
│ feel the best after I stretch and then ally heat/cold. The last   │
│ few days has been better on the pain, but the numbness still      │
│ persists.                                                         │
│                                                                   │
│ Thanks                                                            │
└─────────────────────────────────────────────────────────────────┘

---

**Additional Documentation**

Encounter Info:  Billing Info, History, Allergies, Detailed Report

**Communications**

---

                                                          **MS 016**

Scatchell, John A (MR # GE11793006) Printed by Biggs, Fay K. [7313] at 5/22/18 2:4...   Page 15 of 66

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

                                                          VMP/JJS 2146

Scatchell, John A (MR # GE11793006)     Encounter Date: 03/10/2015

# John A Scatchell
11/27/2017 Patient Email
MRN: GE11793006
Description: 28 year old male  Provider: Sandoval, Maryam, MD  Department: Brush Hill Im

# Scatchell, John A
MRN: GE11793006
Description: 28 year old male

**Patient Email 11/27/2017**     Provider: Sandoval, Maryam, MD (Internal Medicine)
DMG INTERNAL MEDICINE -
ELMHURST, BRUSH HILL

## Conversation: Visit Follow-up Question     (Newest Message First)

Sandoval, Maryam, MD

 Note     11/27/17 6:28 PM

Already called pt and sent new letter.

Cozzi, Karen, CMA routed this conversation to Sandoval, Maryam,     11/27/17 1:17 PM
MD



Cozzi, Karen, CMA

 Note     11/27/17 1:17 PM

From: John A Scatchell
To: Sandoval, Maryam, MD
Sent: 11/27/2017 12:43 PM CST
Subject: Visit Follow-up Question

Hi Dr Sandoval,

Sorry to be a bother. I was hoping to remain off work and be able to exercise lightly
(walking/stretching/light cardio) until the results of the test on the 4th. Light duty at
work would entail me sitting around all day and doing almost nothing. I did light duty
the last time I was hurt a few years ago and sitting around all day in a chair made me
feel worse.



EXHIBIT CHIEF's 6
WIT SANDOVAL
DATE: 10-2-19

John A Scatchell  to Maryam Sandoval, MD

     Hi Dr Sandoval,     11/27/17 12:43 PM

Sorry to be a bother. I was hoping to remain off work and be able to exercise lightly
(walking/stretching/light cardio) until the results of the test on the 4th. Light duty at
work would entail me sitting around all day and doing almost nothing. I did light duty

MS 014

Scatchell, John A (MR # GE11793006) Printed by Biggs, Fay K. [7313] at 5/22/18 2:4...  Page 13 of 66

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2147

Name: John A. Scatchell | DOB: 12/9/1988 | MRN: GE11793006 | PCP: MARYAM SANDOVAL, MD

## Letter Details

**DuPage Medical Group**
WE CARE FOR YOU

**DMG INTERNAL MEDICINE - LOMBARD, HIGHLAND AVENUE**
2340 Highland Avenue, Suite 210
Lombard IL 60148
630-932-2020

November 27, 2017

To whom it may concern:

I am the primary care physician for your employee, Mr. John Scatchell.

The patient remains under my care for an ongoing medical problem which has improved but not resolved. He has been advised to resume light exercises and may walk outside of his home. However, he is not able to return to his full time work pending completion and review of ordered tests.

Thank you for your understanding and cooperation. Please call with any remaining questions.

Sincerely,

Maryam N. Sandoval, MD

CONFIDENTIAL

*This letter was initially viewed by John A Scatchell at 11/27/2017 6:19 PM.*

MyChart® licensed from Epic Systems Corporation © 1999 - 2016

EXHIBIT CRIEF'S 7
WIT: SANDOVAL
DATE: 10-2-18

Scatchell Dep Ex No. 10
for ID, as of 11/9/18

**VMP/SCATCHELL JR 121**

## CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2148

Scatchell, John A (MR # GE11793006)

Concentric needle EMG reveals evidence of increased insertional activity, membrane irritability, in the right deltoid where recruitment is slightly diminished

Conclusion

No root pattern is identified, EMG testing findings of this electrodiagnostic study are limited to the right deltoid and suggestive of possible partial right C5 and/or C6 root irritability

Plan  F/u Dr Sandoval

- - - - - - - - - - - - - - - - - -
Ellen Voronov, M.D.



## Instructions
After Visit Summary (Automatic SnapShot taken 12/4/2017)

## Additional Documentation
Vitals:          Wt 228 lb (103.4 kg) BMI 34.67 kg/m² BSA 2.16 m²   More Vitals
Flowsheets:      Custom Formula Data
Encounter Info:  Billing Info, History, Allergies, Detailed Report

## Communications
Chart Routed to Sandoval, Maryam, MD

## Encounter Status
Electronically signed by Voronov, Ellen I, MD on 12/4/17 at 10:46 PM

## Encounter Reviewed By
Sandoval, Maryam, MD  on 12/5/2017 12:26 PM

## Additional Encounter Details
Scanning Cover Sheet
All Scans
Questionnaire Details
Referral Information
Elm Time Out
Administrative Information
Coding Query



EXHIBIT *CHEE 8*
WIT: *SANDOVAL*
DATE: *10-2-18*

## SmartForms
No SmartForms are associated with this patient.

## Infusion Orders
No relevant orders to display.

**MS 095**

Scatchell, John A (MR # GE11793006) DOB: 12/09/1988 Printed by [11996] at 7/25/18 8:51 AM

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



## ADMINISTRATIVE NOTICE/WARNING TO OFFICER JOHN SCATCHELL, JR.

### RE: INVESTIGATION OF JANUARY 9, 2018

1.    We received information that you may have been involved in a situation where a felon was in possession of and used a firearm.  We are conducting an investigation into the allegations that were reported to us.

2.    You are hereby advised that you are given immunity from criminal prosecution on the basis of your answers to the questions you are asked today. Stated another way, nothing you say in this investigation will be given to any Illinois or federal law enforcement agents or offices.

3.    Additionally, nothing that you say during the interrogation today can or will be used against you in any criminal proceeding.

4.    ~~This is not to say that the matter will or will not be referred to the appropriate law enforcement officials for investigation and/or prosecution in their discretion. Only that~~ your statements will not be disclosed to them at any time or in any investigation or criminal proceeding.

5.    Having been given immunity as set forth above, you are hereby warned that because of that immunity, you may not refuse to answer the questions on the ground that the answers may incriminate you. Accordingly, if you refuse to answer the questions, you will be subject to discipline up to and including your dismissal for insubordination for failing to comply with our directive that you answer our questions related to this investigation.

I acknowledge receiving the above notice and warning, and state that I fully understand what it says and means, and that I am not under any mental impairment or disability.

Dated: 1/9/18

_____
John Scatchell, Jr.



Dep Ex No. 1
for ID, as of 1/9/18

EXHIBIT Chief's A
WIT:
DATE: 10-22-16
Nick D. Bowes, CSR

CHIEF'S EXHIBIT ___

4822-0747-1450.v1-1/5/18

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2151

## Page 1

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )


IN RE THE MATTER OF:

THE INTERROGATION OF JOHN SCATCHELL,

Officer of the Melrose Park

Police Department.


THE INTERROGATION OF OFFICER

JOHN SCATCHELL, taken before CORDELIA BUSSE WERT,

a licensed Certified Shorthand Reporter of the

State of Illinois, License No. 84-2985, taken at

the Melrose Park Village Hall, 1000 North 25th

Avenue, Multi-Purpose Room, Melrose Park,

Illinois, on the 9th day of January, 2018, at

1:46 p.m.

## Page 2

```
 1   PRESENT:
 2
 3     LANER MUCHIN, LTD., By:
       MR. JEFFREY S. FOWLER
 4     515 North State Street, Suite 2800
       Chicago, Illinois 60654
 5     (312) 467-9800
       jfowler@lanermuchin.com
 6
         Appeared on behalf of the Village of
 7     Melrose Park;
 8   FRATERNAL ORDER OF POLICE, By:
       MR. CHRISTOPHER COOPER
 9     Legal Defense Plan Attorney
       LAW OFFICE OF CHRISTOPHER COOPER, INC.
10     79 West Monroe Street, Suite 1213
       Chicago, Illinois 60603
11     (312) 473-2968
       cooperlaw3234@gmail.com
12
         Appeared on behalf of Officer Scatchell.
13
14
15
     ALSO PRESENT: Mr. Sam C. Pitassi, Director
16       Deputy Chief Steven Rogowski
         Deputy Chief Michael Castellan
17       Mr. Raul Rodriguez, FOP Lodge 19
18
19
20
21
22
23
24
```

## Page 3

```
 1               INDEX
 2   JOHN SCATCHELL              EXAMINATION
 3     By Mr. Fowler          4
 4
 5            EXHIBITS
 6     NUMBER              MARKED FOR ID
 7   Scatchell Exhibit
 8     No. 1               4
 9     No. 2               5
10     No. 3               11
11     No. 4               12
12     No. 5               13
13     No. 6               17
14     No. 7               19
15     No. 8               36
16     No. 9               49
17     No. 10              52
18     No. 11              63
19     No. 12              70
20     No. 13              78
21     No. 14              92
22     No. 15              94
23     No. 16              96
24     No. 17              114
```

## Page 4

```
 1              MR. FOWLER: This is the interview of
 2   John Scatchell being conducted pursuant to
 3   notice and pursuant to the Police Officer
 4   Disciplinary Act.
 5   01:45:58        Mark this as Exhibit No. 1,
 6   please.
 7              (Scatchell Ex No. 1 was marked as of
 8   1/9/18.)
 9   BY MR. FOWLER:
10   01:46:22  Q.  Officer Scatchell, prior to starting, I
11   had a conversation with your attorney.  I had
12   tendered to him a document.  He asked for a couple
13   of changes on it.  I have just marked that
14   document as Exhibit 1 and tendered it to you.
15   01:46:36        Is that your signature on the lower
16   right side?
17        A.  Yes, it is.
18        Q.  Okay.  You understand that you have
19   been instructed -- that you are required to answer
20   01:46:46  the questions that we ask you today?
21        A.  Yes.
22        Q.  Okay.  Largely I'm going to go through
23   a chronology of what's happened, but I wanted to
24   do a couple of things first.
```

1 (Pages 1 to 4)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2199

## Page 5

```
           1              (Scatchell Ex No. 2 was marked as of
           2         1/9/18.)
           3    BY MR. FOWLER:
           4         Q.   I show you what's been marked as
01:47:22   5    Exhibit 2.
           6              Do you recognize this as a memo that
           7    you received on or about December 8, 2017?
           8         A.   Yes, I do.
           9         Q.   When did you receive this?
01:47:34  10         A.   December 8th, I believe.
          11         Q.   How did you receive it?
          12         A.   Via Department email and then an
          13    officer served me at the door, at my front door.
          14         Q.   Who was the officer?
01:47:46  15         A.   Officer Nocita, Investigator Nocita.
          16         Q.   Now, when you received the letter, did
          17    you read it?
          18         A.   Yes.
          19         Q.   Okay.
01:47:52  20         A.   I had already read it prior to him.
          21         Q.   You had read it by email --
          22         A.   Correct.
          23         Q.   -- when you received it by email?
          24         A.   Correct.
```

## Page 6

```
           1         Q.   Then you understood that -- and you
           2    understand by this memo that you also have been
           3    ordered to answer the questions that I ask you,
           4    right?
01:48:08   5         A.   Correct.
           6         Q.   And you're required to answer them
           7    truthfully and as accurately as you can?
           8         A.   Correct.
           9         Q.   The letter asks you to bring documents
01:48:18  10    with you responsive to these issues.
          11              Did you bring any documents with you?
          12         A.   Yes.
          13         Q.   What documents did you bring?
          14         A.   Pertinent SOPs, copies of this that you
01:48:32  15    guys sent me, and then various doctor notes
          16    (indicating).
          17              MR. FOWLER:  Chris, do you mind if I
          18    come around to see them instead of handing
          19    them to me?
01:48:42  20              MR. COOPER:  Well, if you understand
          21    what these are, we can hand them to you.
          22    BY MR. FOWLER:
          23         Q.   Let me see what they are.
          24         A.   (Tendering folder.)
```

## Page 7

```
           1         Q.   There's one document here that I'm not
           2    familiar with and I think it may be pertinent.  So
           3    give me just a second.
           4              What I would like to do is to take out
01:50:44   5    these two pages of what you've brought and mark it
           6    so that we'll all have a copy of it (indicating).
           7              MR. COOPER:  Let me see.
           8              MR. FOWLER:  (Tendering documents.)
           9              MR. COOPER:  Well, my intuition tells
01:51:12  10    me that that's not the best approach at this
          11    time.
          12              If you want his medical records --
          13              MR. FOWLER:  Are you willing for him to
          14    sign a release so that we can get all of his
01:51:26  15    medical records?
          16              MR. COOPER:  At some point in time but
          17    not today.  I mean, you took the words right
          18    out of my mouth.
          19              MR. FOWLER:  But at some point in
01:51:36  20    time --
          21              MR. COOPER:  You can't do it today.
          22    But if you want to ask him questions as to
          23    this document, first of all, it's my position
          24    he can't answer the question because he's not
```

## Page 8

```
           1    a physician.
           2              MR. FOWLER:  Well, he'll be able to
           3    answer whatever he can.  If he can't answer,
           4    then he'll tell me that.
01:52:10   5              MR. COOPER:  I think it's proper for
           6    you to ask questions based on the document, I
           7    don't see a problem, but I don't think it's
           8    proper for these documents to go into
01:52:30   9    evidence.  I would object to the document
          10    being entered into evidence.
          11              MR. FOWLER:  Well, it's not -- well,
          12    recognize that this is an investigative
          13    proceeding.  It's not going into evidence.
01:52:38  14              Are you willing to give me the
          15    document?  That's really what I was looking
          16    for.
          17              MR. COOPER:  No.  I'm willing to allow
          18    you to ask questions from the document today.
          19    Now, whether we call it evidence or material
01:52:50  20    for the purpose of an interrogation, no, I
          21    will not allow this document to become part
          22    of the record of today's proceedings.
          23    However, I will hand you the document and
          24    you're welcome to ask questions.
```

2 (Pages 5 to 8)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2200

**Page 9**

|  |  |
|---|---|
| | 1  MR. FOWLER: Okay. |
| | 2  BY MR. FOWLER: |
| | 3  Q.  So, Officer Scatchell, do you |
| | 4  understand that the letter that I've handed you |
| 01:53:14 | 5  marked as Exhibit 2, the second page, the third |
| | 6  paragraph, says:  You're ordered to bring and |
| | 7  present any relevant evidence, documents, photos, |
| | 8  materials or recordings with you to this meeting |
| | 9  so that such information, if appropriate and |
| 01:53:28 | 10  relevant, can be considered as part of the |
| | 11  investigation, including, but not limited to, your |
| | 12  medical records relating to your medical leave |
| | 13  since November 9, 2017, and your recreational |
| | 14  activities during the period that you've been on |
| 01:53:42 | 15  leave since November 9, 2017, and your |
| | 16  participation or involvement in potential illegal |
| | 17  activities by a known felon on or about November |
| | 18  20, 2017, and your contact with any other law |
| | 19  enforcement agencies that may lead to criminal |
| 01:53:58 | 20  prosecution on or about November 20, 2017; you |
| | 21  understood that in the letter? |
| | 22  A.  Correct. |
| | 23  Q.  And in light of that instruction, the |
| | 24  only documents that you brought are those that |

**Page 10**

|  |  |
|---|---|
| | 1  you've tendered to me today? |
| | 2  A.  Correct. |
| | 3  Q.  But you're not willing to provide me |
| | 4  with copies of or allow me to keep the documents |
| 01:54:22 | 5  that you've tendered today? |
| | 6  MR. COOPER:  I, as an attorney, advise |
| | 7  you that -- and he's here listening to me, |
| | 8  that it's my recommendation as his attorney |
| | 9  that he disallow you from copying any of the |
| 01:54:38 | 10  documents in that packet today.  And if you |
| | 11  want those documents, it's necessary that the |
| | 12  Village follow the proper procedure which |
| | 13  would be, one, to obtain a release, and he |
| | 14  will sign a release. |
| 01:54:54 | 15  MR. FOWLER:  Okay. |
| | 16  BY MR. FOWLER: |
| | 17  Q.  So my question is:  Since this is the |
| | 18  interview of you today -- |
| | 19  A.  Right. |
| 01:55:02 | 20  Q.  -- are you going to follow Mr. Cooper's |
| | 21  advice and not allow me to have these documents or |
| | 22  copies of these documents today? |
| | 23  A.  Yes, I am.  I'm following my attorney's |
| | 24  advice. |

**Page 11**

|  |  |
|---|---|
| | 1  MR. FOWLER:  Mark this one, please. |
| | 2  (Scatchell Ex No. 3 was marked as of |
| | 3  1/9/18.) |
| | 4  BY MR. FOWLER: |
| 01:55:26 | 5  Q.  Showing you what's been marked as |
| | 6  Exhibit 3, did you receive this letter? |
| | 7  A.  Yes, I did. |
| | 8  Q.  When did you receive it? |
| | 9  A.  On or about the 20th of December. |
| 01:55:36 | 10  Q.  How did you receive it? |
| | 11  A.  Email and also served at the front |
| | 12  door. |
| | 13  Q.  By whom? |
| | 14  A.  Detective Gvist. |
| 01:55:46 | 15  Q.  And when you received it, you read it? |
| | 16  A.  Yes. |
| | 17  Q.  And you understood by this letter, |
| | 18  you're also instructed to answer the questions |
| | 19  that I ask you today truthfully and accurately? |
| 01:55:56 | 20  A.  Yes. |
| | 21  Q.  Do you have any medical or |
| | 22  psychological condition that makes you incapable |
| | 23  of participating in this interview today? |
| | 24  A.  Not to my knowledge. |

**Page 12**

|  |  |
|---|---|
| | 1  Q.  Are there any physical limitations that |
| | 2  we need to accommodate for you today? |
| | 3  A.  I'm comfortable. |
| | 4  Q.  If at any time in the process you |
| 01:56:18 | 5  determine that you are uncomfortable, will you let |
| | 6  me know that? |
| | 7  A.  I will. |
| | 8  Q.  When did you become employed by the |
| | 9  Village of Melrose Park Police Department? |
| 01:56:32 | 10  A.  2012. |
| | 11  Q.  When you became employed by the |
| | 12  Village, you became aware that the Village had |
| | 13  standard operating procedures? |
| | 14  A.  Yes. |
| 01:56:42 | 15  Q.  How did you become aware of that? |
| | 16  A.  They gave me a written copy of it which |
| | 17  I signed. |
| | 18  (Scatchell Ex No. 4 was marked as of |
| | 19  1/9/18.) |
| 01:57:04 | 20  BY MR. FOWLER: |
| | 21  Q.  Showing you what's been marked as |
| | 22  Exhibit 4, do you recognize that? |
| | 23  A.  Yes, I do. |
| | 24  Q.  What is it? |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2201

Page 13

```
         1      A.   It's a standard operating procedure
         2   form which I signed off on.
         3      Q.   And that's your signature on the
         4   document?
01:57:16 5      A.   Yes, it is -- well, actually there's no
         6   signature, just my name.
         7      Q.   Okay.  You put your name there?
         8      A.   Yes.
         9      Q.   And you received this in or about
01:57:24 10  September of 2012?
        11      A.   Yes.
        12          (Scatchell Ex No. 5 was marked as of
        13          1/9/18.)
        14   BY MR. FOWLER:
01:57:42 15     Q.   Showing you what's been marked as
        16   Exhibit No. 5, what is that?
        17      A.   A Melrose Park employee acknowledgement
        18   form.
        19      Q.   Is that your name on the document?
01:57:52 20     A.   Yes, it is.
        21      Q.   Is that your signature on the document?
        22      A.   Yes, it is.
        23      Q.   Did you sign this on or about August
        24   31, 2012?
```

Page 14

```
         1      A.   Yes.
         2      Q.   And by signing this document, were you
         3   acknowledging that you had received a copy of the
         4   Melrose Park employee procedures?
01:58:10 5      A.   Yes.
         6      Q.   You're aware that the Village of
         7   Melrose Park has procedures relating to reporting
         8   injuries when they occur?
         9      A.   Yes.
01:58:18 10     Q.   And you're aware that Melrose Park has
        11   procedures relating to obtaining permission for
        12   secondary employment?
        13      A.   Yes.
        14      Q.   You're aware that there are procedures
01:58:30 15  regarding restrictions during the use of sick
        16   time?
        17      A.   Yes.
        18      Q.   You're aware of procedures requiring
        19   you to report contact with law enforcement?
01:58:40 20     A.   Yes.
        21      Q.   You're aware that there's ethics rules?
        22      A.   Yes.
        23      Q.   You're aware that there's rules
        24   restricting or prohibiting associating with
```

Page 15

```
         1   felons?
         2      A.   I'm not aware of that.
         3      Q.   Okay.  You're aware that you're
         4   required to be truthful during investigations?
01:58:56 5      A.   Yes.
         6      Q.   Any reason to believe that any of the
         7   rules that I just mentioned that you said you were
         8   aware of do not apply to you?
         9      A.   Well, you stated that it says felons,
01:59:10 10  and the verbiage in the SOP says persons who
        11   exhibit a recurring pattern of violating state and
        12   federal laws.  It does not say felons.
        13      Q.   Okay.  The question that I asked you,
        14   though, was:  With respect to the policies that
01:59:22 15  you said you were aware of --
        16      A.   Uh-huh.
        17      Q.   -- do you have any reason to believe
        18   that those policies do not apply to you?
        19      A.   No, I don't.
01:59:30 20     Q.   You started in 2012, and at some
        21   point within a short time after that, you were
        22   injured at work?
        23      A.   Yes.
        24      Q.   What was that injury?
```

Page 16

```
         1      A.   Well, which -- I'm not sure which
         2   injury you're --
         3      Q.   The first injury you had.
         4      A.   On the job?
02:00:00 5      A.   Yes.
         6      A.   That would have been, I believe,
         7   February of 2014.
         8      Q.   Tell us about that injury.
         9      A.   I got in a physical altercation with a
02:00:12 10  subject who was mentally unstable at Gottlieb
        11   Hospital.  He was told not to enter the building
        12   and he proceeded to try to enter the building
        13   after making physical and verbal threats to
        14   nurses.  So myself and my partner performed a
02:00:28 15  take-down of him.
        16          At that time I did not feel anything,
        17   but several hours later, my back and neck area
        18   were throbbing.  Then I notified at the time
        19   Lieutenant Rogowski the follow day, I believe, and
02:00:42 20  I told him the following day I couldn't move.  I
        21   had severe restriction of my neck and severe pain.
        22   Then at that time I notified my superior officer
        23   which would have been Lieutenant Rogowski, not
        24   deputy chief.
```

4 (Pages 13 to 16)

L.A. Court Reporters, L.L.C.
312-419-9292

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2202

## Page 17

1  Q. I think you said that that was February
2  of 2014?
3  A. Yes, I believe it was.
4  Q. Could it have been 2015?
02:01:02  5  A. It could have been, yes.
6  Q. Okay.
7  (Scatchell Ex No. 6 was marked as of
8  1/9/18.)
9  BY MR. FOWLER:
02:02:38  10  Q. I'm now handing you what's been marked
11  as Exhibit 6.
12  Do you recognize this form?
13  A. I recognize it from recent.
14  Q. Is this the employer's first report of
02:02:56  15  injury concerning the injury that you just talked
16  about?
17  A. Yes.
18  Q. This shows a date of report of 2/6 of
19  2015. Does your refresh your recollection as to
02:03:06  20  when that injury occurred?
21  A. That seems correct, yes.
22  Q. Okay. So rather than '14, it was '15?
23  A. Correct.
24  Q. Now, you were telling us that as a

## Page 18

1  result of that incident, you were injured. How
2  were you injured?
3  A. I sustained injuries to my neck and
4  back region. I'm not entirely sure how I was
02:03:26  5  injured because I'm not a doctor, but I know that
6  at some point during the proceedings with the
7  subject that we encountered was when I sustained
8  an injury because I felt perfectly fine before and
9  then slightly thereafter is when I felt pain.
02:03:40  10  Then the following day, I had severe pain and loss
11  of motion.
12  Q. As a result of that injury, you
13  reported it to the Department, your supervisor?
14  A. Yes, I did.
02:03:48  15  Q. Who did you report it to?
16  A. Lieutenant Rogowski.
17  Q. And you then sought medical treatment?
18  A. Yes, I did.
19  Q. And the doctor put you off work for a
02:03:58  20  while?
21  A. Yes, she did.
22  Q. You then went back and saw the doctor
23  several different times?
24  A. Yes.

## Page 19

1  Q. Do you remember which doctor it was?
2  A. I saw Nurse Practitioner Paulette
3  Feiereisel. As per the HMO, you have to see a
4  nurse practitioner first. Then I saw Dr. Sandoval
02:04:14  5  who's my primary care physician.
6  (Scatchell Ex No. 7 was marked as of
7  1/9/18.)
8  BY MR. FOWLER:
9  Q. Showing you what's been marked as
02:04:50  10  Exhibit 7, this is a group exhibit with a bunch of
11  different pages, and I want to go through them one
12  at a time.
13  A. Okay.
14  Q. The first pages, that's — there's a
02:05:00  15  note dated February 15th from Paulette Feiereisel,
16  NP. That's the nurse practitioner you just
17  referred to?
18  A. February 5th.
19  MR. COOPER: February 5th.
02:05:10  20  BY MR. FOWLER:
21  Q. Okay. That's the nurse practitioner
22  you just referred to?
23  A. Yes.
24  Q. You obtained this note and submitted it

## Page 20

1  to your supervisor?
2  A. Yes, I did.
3  Q. The next page that's marked 110 on the
4  bottom, can you tell me what that is, please?
02:05:28  5  A. This is a To/From from myself to Chief
6  Pitassi in short explaining the incident, not with
7  all details but with pertinent details.
8  Q. And is that your signature?
9  A. It is.
02:05:42  10  Q. The next page that's on the bottom
11  right marked 111, what is that?
12  A. Another note from Nurse Practitioner
13  Feiereisel.
14  Q. You obtained this on or about February
02:05:52  15  9, 2015?
16  A. Yes.
17  Q. You submitted it to your supervisor
18  around then?
19  A. Yes.
02:05:58  20  Q. The next page marked 112, can you tell
21  me what this one is?
22  A. Another note from Nurse Practitioner
23  Feiereisel.
24  Q. Dated February 12, 2015?

5 (Pages 17 to 20)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2203

## Page 21

1    A. Yes.

2    Q. And you obtained this on or about February 12th?

4    A. Yes.

02:06:14  5    Q. Submitted it to your supervisor on or about February 12th?

7    A. Yes.

8    Q. That was to Lieutenant Rogowski?

9    A. Yes.

02:06:20  10    Q. The next page, tell us what that is, please.

12    A. Another note from Nurse Practitioner Feiereisel dated February 17th.

14    Q. This is the page that's marked 113 on the bottom, right?

02:06:32  15

16    A. Yes.

17    Q. Dated February 17, 2015?

18    A. Yes.

19    Q. You obtained this on or about February 17, 2015?

02:06:38  20

21    A. Yes.

22    Q. And when you obtained it, did you provide it to your supervisor?

24    A. Yes.

## Page 22

1    Q. And that was to Lieutenant Rogowski?

2    A. Yes.

3    Q. The next page dated February 20, 2015, marked 114 on the bottom, can you tell me what this is?

02:06:54  5

6    A. Another note from Nurse Practitioner Feiereisel.

8    Q. You obtained this on or about February 20, 2015?

02:07:02  10    A. Yes.

11    Q. And when you obtained it, you provided it to your supervisor on or about that date?

13    A. Yes.

14    Q. The next page marked 115 on the bottom, can you tell us what this page is, please?

02:07:12  15

16    A. Another note from Nurse Practitioner Feiereisel.

18    Q. This is dated March 2nd of 2015, correct?

02:07:20  20    A. Yes.

21    Q. You obtained this on or about March 2, 2015?

23    A. Yes.

24    Q. Did you provide it to your supervisor?

## Page 23

1    on or about that date?

2    A. Yes.

3    Q. And that was to Lieutenant Rogowski?

4    A. Yes.

02:07:30  5    Q. The next page is marked 116 on the bottom. Can you tell me what that is?

7    A. Another note from Nurse Practitioner Feiereisel.

9    Q. And that's dated March 9, 2015?

02:07:42  10    A. Yes.

11    Q. You obtained it on or about March 9, 2015?

13    A. Yes.

14    Q. When you obtained it, did you provide it to your supervisor?

02:07:48  15

16    A. Yes.

17    Q. That was to Lieutenant Rogowski?

18    A. Yes.

19    Q. The next page is marked 117 on the bottom.

02:07:54  20

21    A. Okay.

22    Q. And it shows a date of March 23, 2015, correct?

24    A. Yes.

## Page 24

1    Q. Did you obtain this on or about March 23, 2015?

3    A. Yes.

4    Q. When you obtained it, did you provide it to your supervisor?

02:08:06  5

6    A. Yes.

7    Q. And that was to Lieutenant Rogowaki?

8    A. Yes.

9    Q. The last page in this set is marked 118. Do you see that?

02:08:16  10

11    A. Yes.

12    Q. It's dated April 2, 2015?

13    A. Yes.

14    Q. Can you tell us what this page is?

02:08:22  15    A. Another note from Nurse Practitioner Feiereisel.

17    Q. And when you obtained this, you provided it to your supervisor?

02:08:30  19    Q. To Lieutenant Rogowski?

21    A. Yes.

22    Q. Okay. This note says: Starting April 4th, John can return to work light duty for four hours a day for one week.

6 (Pages 21 to 24)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2204

## Page 25

1 The "John" refers to you, right?
2    A. Yes.
3    Q. Then six hours a day for one week and
4 then eight hours a day for one week. He may
02:08:46 5 return to full unrestricted duty April 24, 2015,
6 right?
7    A. Yes.
8    Q. I read that correctly?
9    A. Yes.
02:08:52 10    Q. Did you return to full unrestricted
11 duty on or about April 24, 2015?
12    A. I believe I did.
13    Q. The injury itself, you said that it was
14 to your neck and back?
02:09:02 15    A. Correct.
16    Q. What part of your neck and back?
17    A. I'm not a doctor, but it was to my
18 upper back and lower neck.
19    Q. What was your understanding of the
02:09:10 20 nature of the injury?
21    Q. Can you quantify that?
22    Q. What did the doctors tell you?
23    A. They told me that I had a partially
24 bulging disc in one of my discs, I'm not sure

## Page 26

1 which disc; I had spinal stenosis; and several
2 other words that I don't know what they mean or
3 what they are.
4    Q. And that's what they told you at the
02:09:32 5 time?
6    A. Yes.
7    Q. Did you see anyone other than the nurse
8 practitioner in early 2015?
9    A. I believe I did.
02:09:38 10    Q. Who did you see?
11    A. An MRI doctor, x-ray doctor,
12 specialist. I'm not sure of names or any of that.
13 That would be in my medical record.
14    Q. After April 2, 2015, what was the next
02:10:22 15 communication you had with anyone with the Melrose
16 Park Police Department management?
17 And let me be clear on this: You're a
18 patrol officer, right?
19    A. Yes.
02:10:36 20    Q. You have a sergeant?
21    A. Sergeant, lieutenant.
22    Q. The sergeant is a member of the union,
23 right?
24    A. Yes – well, we don't have a union. We

## Page 27

1 have an FOP, but yes.
2    Q. Okay. So sergeant, lieutenant, deputy
3 chief, and the director of police; is that the
4 chain?
02:10:50 5    A. Correct. At that time it would have
6 been chief of police.
7    Q. Okay. So who have been your sergeants
8 since April of 2015?
9    A. Let's see. I had Sergeant Rieger, he's
02:11:08 10 now a lieutenant; Sergeant Schillinger, he's the
11 most recent one. As far as sergeants, that's the
12 extent of who I can remember.
13    Q. Who have been your lieutenants since
14 April of 2015?
02:11:26 15    A. Rieger, Rogowski, Maiello, DiMaio.
16    Q. How do you spell Maiello?
17    A. M-A-I-E-L-L-O.
18    Q. You said DiMaio?
19    A. Yes.
02:11:38 20    Q. How do spell that?
21    A. D-E-M-A-I-O, I believe.
22    Q. Okay. Anybody else?
23    A. That's all I can recall.
24    Q. Okay.

## Page 28

1    A. I'm sorry. And Sergeant Lavalais for a
2 brief period of time.
3    Q. And the deputy chiefs have been who?
4    A. Castellan and Rogowski.
02:12:00 5    Q. And either chief or director of police?
6    A. Pitassi.
7    Q. You said you returned to work full
8 unrestricted duty on or about April 24, 2015,
02:12:20 9 right?
10    A. Yes.
11    Q. Starting on April 25th of 2015, tell me
12 every conversation or communication you've had
13 with Sergeant Rieger relating to your neck or
14 back.
02:12:36 15    A. I don't recall ever having any
16 conversation with any supervisor after I furnished
17 that note.
18    Q. Ever?
19    A. Maybe in unrelated talk, like not in a
02:12:48 20 capacity of officer to supervisor, maybe in a
21 friendly basis. But as far as anything official,
22 the last document that I furnished would be this
23 and that was the last official conversation I had
24 with anybody.

7 (Pages 25 to 28)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2205

Page 29

```
      1    Q.  Okay.  And then includes up
      2  through 2017?
      3    A.  To my recollection right now, yes.
      4    Q.  So you're saying up through today, the
02:13:10  5  last conversation you had with any supervisor or
      6  manager at the Department in any kind of formal
      7  sense was April --
      8    A.  Regarding that injury?
      9    Q.  Regarding your neck or back.
02:13:22 10    MR. COOPER:  Which injury?
     11  BY THE WITNESS:
     12    A.  You're rolling all the injuries into
     13  one.
     14  BY MR. FOWLER:
02:13:26 15    Q.  Okay.  That's what I'm trying to figure
     16  out.
     17    A.  Okay.
     18    Q.  The neck or back injury that you had in
     19  February of 2015 --
02:13:34 20    A.  Uh-huh.
     21    Q.  -- that's what we've been talking
     22  about, right?
     23    A.  Yes.
     24    Q.  So --
```

Page 30

```
      1    A.  Relating to that, the last official
      2  conversation I had was when I furnished this note
      3  to I believe then Lieutenant Rogowski.
      4    Q.  Okay.  So I want to focus a minute on
02:13:50  5  your use of the term "official conversation."
      6    A.  Okay.
      7    Q.  Other than official conversations, as
      8  you sit here today, do you recall any unofficial
      9  conversations with any manager or supervisor about
02:14:00 10  the injuries that's noted in Exhibit 6?
     11    A.  I don't recall ever discussing it with
     12  anybody, it could have occurred, but at this time,
     13  I don't recall.
     14    Q.  Fair enough.
02:14:14 15      After April 24, 2015, were you ever
     16  injured again on the job?
     17    A.  On the job?  Well, my belief is that
     18  the current injury stems from this injury.  But as
     19  far as something that was reported during my
02:14:36 20  eight-hour shift, no.
     21    Q.  Since April 24, 2015, you have not
     22  reported any injury that was work related to your
     23  managers or supervisors at the Police Department;
     24  is that fair?
```

Page 31

```
      1    A.  I wouldn't say that's fair.  I --
      2    MR. COOPER:  Wait.
      3  BY MR. FOWLER:
      4    Q.  What is the next occasion then that you
02:14:56  5  had any communications with a supervisor at the
      6  Department about your neck or back injury?
      7    A.  Around, I would say -- well, let me
      8  see.  Can I take a look at this?
      9    Q.  Sure.
02:15:12 10    MR. COOPER:  Let the record reflect my
     11  client is looking at his notes that he
     12  brought with him, or documents.
     13  BY THE WITNESS:
     14    A.  I believe the last conversation I had
02:15:30 15  regarding any kind -- or the first conversation I
     16  had, I should say, regarding any kind of new
     17  injury or recurring injury from the past would
     18  have been in the range of late October/early
     19  November while I was still on vacation, approved
02:15:46 20  vacation.
     21  BY MR. FOWLER:
     22    Q.  Of 2017?
     23    A.  Yes.
     24    Q.  How did that conversation take place?
```

Page 32

```
      1    A.  I spoke with Lieutenant Maiello on the
      2  phone and notified him that I was experiencing
      3  severe discomfort in my neck, severe pain, very
      4  similar to what I went through in 2015.
02:16:06  5    Q.  Anybody else on the line?
      6    A.  Nobody else was on the line.  There was
      7  someone else present, but I don't think that's
      8  relevant.
      9    Q.  You said the conversation took place on
02:16:16 10  the phone.  Who called who?
     11    A.  I called Lieutenant Maiello to notify
     12  him.
     13    Q.  Do you remember what date that was?
     14    A.  I do not.
02:16:24 15    Q.  During that conversation, you said that
     16  somebody else was present in the same location you
     17  were?
     18    A.  Yes.
     19    Q.  Who was that person?
02:16:30 20    A.  Officer Menolascino.
     21    Q.  How do you spell the name?
     22    A.  M-E-N-O-L-A-S-C-I-N-O.
     23    Q.  Where were you when the conversation
     24  took place?
```

8  (Pages 29 to 32)

L.A. Court Reporters, L.L.C.
312-419-9292

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2206

## Page 33

1    A. Driver's seat of my car, my truck.

2    Q. So you were on your cell phone?

3    A. No. I was on Bluetooth, over the

4    speaker.

02:16:48    5    Q. Using your cell phone?

6    A. Yes, hands-free.

7    Q. So if you were Bluetooth on the

8    speaker, then Officer Menolascino heard not only

9    your part of the conversation, but he could also

02:17:04   10    hear what Lieutenant Maiello was saying as well,

11    right?

12    A. Yes.

13    Q. Okay. So you recall -- you said that

14    that conversation took place late October/early

02:17:12   15    November?

16    A. Somewhere in there. I'm not sure of

17    the exact date.

18    Q. What was it that caused you to make

19    that phone call?

02:17:18   20    A. I wanted to notify Lieutenant Maiello

21    that I was experiencing an injury and I'm going to

22    followup with a doctor, and the capacity that

23    Officer Menolascino was involved was we were

24    together and he also wanted to speak to Lieutenant

## Page 34

1    Maiello about something unrelated. So he was

2    present for the conversation and I was fine with

3    him hearing our conversation.

4    Q. During that conversation, tell me --

02:17:48    5    and you're saying that whatever Officer

6    Menolascino was talking about is unrelated to you?

7    A. Correct.

8    Q. Okay. So I don't want to hear about

9    that part. What I want to hear about is you.

02:17:56   10    A. Uh-huh.

11    Q. With respect to you, tell me everything

12    that you said and everything that Lieutenant

13    Maiello said in that conversation.

14    A. Well, some time has elapsed. We can

02:18:06   15    agree on that. So I wouldn't be able to tell you

16    exactly what was said.

17    I can paraphrase which was basically:

18    Hey, Lou, how are you? I just wanted to let you

19    know that I'm experiencing -- what I told him

02:18:18   20    which was I have severe discomfort in my neck,

21    severe pain, and I'm going to followup with a

22    doctor.

23    Q. Did you say anything else?

24    A. He said: Okay. And he says: Just

## Page 35

1    when you hear something -- or something along

2    those lines -- just followup with me, good luck

3    with the doctor, something along those lines.

4    Q. Anything else?

02:18:38    5    A. Not that I can recall at this time.

6    Q. As of the time of that conversation,

7    how long had you been on vacation?

8    A. Maybe a week and a half, two weeks.

9    I'm not entirely sure.

02:18:52   10    Q. During that week and a half or

11    immediately prior to you feeling that -- let me

12    ask it differently.

13    When you felt the pain, how long was it

14    before you called Lieutenant Maiello?

02:19:02   15    A. Two, three days, maybe.

16    Q. In the period of time before when that

17    pain started, was there any physical activity that

18    you engaged in that you attribute as a basis to

19    the injury?

02:19:16   20    A. No.

21    Q. When was it that you first noticed

22    feeling the pain?

23    A. I was actually working a side job at

24    Cinemark with another lieutenant who was off-duty

## Page 36

1    at the time, Lieutenant Urso, and I had mentioned

2    to him that I feel some discomfort in my neck. I

3    don't know why. I mean, I haven't done anything.

4    I just mentioned that to him in casual

02:19:44    5    conversation, very similar to the injury in 2015:

6    Discomfort, sleep, wake up the next day, severe

7    pain, severe discomfort.

8    Q. Okay. Then how long was it before you

9    went to see a doctor?

02:20:00   10    A. Almost immediately after talking with

11    Lieutenant Maiello. I'm not sure of the exact

12    date that that was, but the earliest available

13    date I was able to get an appointment, I took.

14    I believe as soon as I hung up with Lieutenant

02:20:14   15    Maiello, I contacted my physician to make an

16    appointment.

17    (Scatchell Ex No. 8 was marked as of

18    1/9/18.)

19    BY MR. FOWLER:

02:20:50   20    Q. All right. Showing you what's been

21    marked as Exhibit 8, this is -- well, you tell me

22    what this is.

23    A. A doctor's note from my primary care

24    physician, Sandoval, she's a doctor.

9 (Pages 33 to 36)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2207

## Page 37

1    Q.  You received this -- well, you did
2  receive this letter, right?
3    A.  Yes.
4    Q.  You received it on or about November 9,
02:21:12  5  2017?
6    A.  Yes.
7    Q.  When you received it, what did you do
8  with it?
9    A.  I gave it to my immediate supervisor
02:21:18  10  which -- I believe Lieutenant Maiello was on
11  vacation, so I most likely gave it to Sergeant
12  Schillinger, but I'm not positive.
13    Q.  Do you believe as you sit here today
14  that this is the first note that you received
02:21:32  15  after feeling pain in your neck in or about
16  October/November of 2017?
17    A.  Yes.
18    Q.  So you think that the onset of the pain
19  came sometime/days before November 9, 2017?
02:21:46  20    A.  Yes.
21    Q.  Then does that suggest to you that your
22  conversation with Lieutenant Maiello that you
23  referred to a few minutes ago was early November
24  of 2017?

## Page 38

1    A.  Yes.
2    Q.  Okay. So early November of 2017, you
3  have a conversation with Lieutenant Maiello by
4  phone?
02:22:08  5    A.  Yes.
6    Q.  You went to see a doctor?
7    A.  Yes.
8    Q.  You got the note that's marked
9  Exhibit 8?
02:22:12  10    A.  Yes.
11    Q.  What's the next thing that happened
12  relating to your medical condition or your back?
13    A.  Let me look at my note.
14    So I believe after this note, my doctor
02:22:26  15  wanted to play it cautious because I already had
16  undergone x-rays and MRI imaging in 2015. So she
17  didn't want to expose me right away to radiation
18  if she thought that it was something that may be
19  able to be resolved through medication.
02:22:40  20    So she put me on an aggressive steroid
21  and I'm not sure what other pills and told me to
22  followup with her in a couple days and see how I
23  felt. That kind of went on for maybe a week or so
24  or maybe more than that. I'm not sure what the

## Page 39

1  timeframe is.
2    After that, the pain was still
3  persisting. The numbness was still persisting.
4  So at that point, she made arrangements for me to
02:23:08  5  go do a -- I'm not sure of the name of the test.
6  Basically they test the nerves in your arms, your
7  spine, your neck. So I did that. And then after
8  that, I did an MRI.
9    Q.  When did you do the -- the test that
02:23:22  10  you're referring to is -- have you ever heard that
11  called as a nerve conduction test?
12    A.  No.
13    Q.  Okay. The nerve test that you're
14  referring to, when was that?
02:23:34  15    A.  Maybe -- I'm not positive. It might
16  have been early December or late November. I'm
17  not -- I think -- I believe it was early
18  November -- I'm sorry, early December.
19    Q.  So November 9th, your doctor says
02:23:48  20  contact her in a couple of days and see how you're
21  feeling, correct?
22    A.  Correct. And I was in constant contact
23  with her.
24    Q.  So a couple of days go by, you contact

## Page 40

1  her. How did you contact her?
2    A.  Via phone or it might have been through
3  MyChart but most likely through phone.
4    Q.  Okay. Whatever that contact method
02:24:06  5  was, you said you're still hurting?
6    A.  Correct.
7    Q.  What's the next thing that happened
8  after that?
9    A.  She said: Let's continue with the
02:24:14  10  pills and see if it resolves on its own, and she
11  told me to just try to rest and take the pills.
12    Q.  Okay. Now, her note says: Has been
13  advised to continue to rest at home, on Exhibit 8.
14  Do you see that?
02:24:32  15    A.  Yes, I see that.
16    Q.  And that's what she told you?
17    A.  She told me to get rest. She didn't
18  say to continue to rest at home. She didn't say
19  those exact words. She said just try to rest it.
02:24:40  20    Q.  When you received Exhibit 8, did you
21  read it?
22    A.  I did.
23    Q.  And then you gave it to your
24  supervisor, right?

10 (Pages 37 to 40)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2208

Page 41

| | | |
|---|---|---|
| | 1 | A. Yes. |
| | 2 | Q. And you gave it to your supervisor on |
| | 3 | or about November 9th? |
| | 4 | A. Yes. |
| 02:24:56 | 5 | Q. So we're moving forward a couple of |
| | 6 | dates. She said she wants you to continue that |
| | 7 | treatment? |
| | 8 | A. Uh-huh. |
| | 9 | Q. What's the next thing that happened |
| 02:25:06 | 10 | related to your neck or back? |
| | 11 | A. I continued to relay information to her |
| | 12 | that nothing was improving at all and that I |
| | 13 | didn't like taking the pills because all that made |
| | 14 | me do was sleep, all I did was get drowsy and go |
| 02:25:20 | 15 | to sleep, and it really did nothing to numb the |
| | 16 | pain or nothing like that. It just put me to |
| | 17 | sleep. |
| | 18 | So I told her I'd like to figure out |
| | 19 | how we can move forward and resolve this injury in |
| 02:25:32 | 20 | the most time-efficient way possible. |
| | 21 | And being that I'm on an HMO, she made |
| | 22 | the recommendation then for me to go for this — I |
| | 23 | believe she referred to it as an EMG test. She |
| | 24 | made the recommendation, and it took some time for |

Page 42

| | | |
|---|---|---|
| | 1 | the HMO to approve it. Then once they did, I went |
| | 2 | for that test. |
| | 3 | Q. After November 9th of 2017 when you |
| | 4 | gave Exhibit 8 to your supervisor, what's the next |
| 02:26:02 | 5 | contact you had with any manager or supervisor at |
| | 6 | the Police Department? |
| | 7 | A. Probably a week later, I checked in |
| | 8 | with either Lieutenant Maiello or Sergeant |
| | 9 | Schillinger weekly. |
| 02:26:14 | 10 | Q. Why weekly? |
| | 11 | A. That was just something I felt was |
| | 12 | honorable on my part and just to keep them in the |
| | 13 | loop. |
| | 14 | Q. You're aware that the SOP requires you |
| 02:26:24 | 15 | to contact the Department every three days? |
| | 16 | A. I'm not aware of that. |
| | 17 | Q. Did you check? |
| | 18 | A. Did I check? |
| | 19 | Q. What the rules were about how often you |
| 02:26:34 | 20 | were supposed to report when you're on sick leave? |
| | 21 | A. No. |
| | 22 | Q. So the first conversation that you had |
| | 23 | after November 9th with either Maiello or |
| | 24 | Schillinger, as you sit here today, do you recall |

Page 43

| | | |
|---|---|---|
| | 1 | that conversation? |
| | 2 | A. Which conversation are you — |
| | 3 | Q. The first one that you had with either |
| | 4 | one of them. |
| 02:26:52 | 5 | A. With Lieutenant Maiello, the one where |
| | 6 | I explained I was with Menolascino at the time? |
| | 7 | Q. Okay. Let's go back in the chronology. |
| | 8 | A. Okay. |
| | 9 | Q. You had the phone conversation with |
| 02:27:02 | 10 | Lieutenant Maiello before you went to see a |
| | 11 | doctor, correct? |
| | 12 | A. Correct. |
| | 13 | Q. You went to see the doctor? |
| | 14 | A. Yes. |
| 02:27:08 | 15 | Q. You got the November 9th note? |
| | 16 | A. Yes. |
| | 17 | Q. You gave that to your supervisor? |
| | 18 | A. Yes. |
| | 19 | Q. You said about a week later, you talked |
| 02:27:14 | 20 | to one of your supervisors? |
| | 21 | A. Yes. |
| | 22 | Q. Which one? |
| | 23 | A. I'm not positive. I believe it might |
| | 24 | have been Schillinger, but it could have been |

Page 44

| | | |
|---|---|---|
| | 1 | either of them. Like I said, I was in contact |
| | 2 | with them weekly and I don't know that they |
| | 3 | requested that kind of timeframe. They just — |
| | 4 | what was stated to me was when you hear something |
| 02:27:30 | 5 | or something changes, keep us in the know. And |
| | 6 | even though nothing was changing, I was still |
| | 7 | keeping them in the know. |
| | 8 | Q. So that conversation would have been a |
| | 9 | week after November 9th, right? |
| 02:27:40 | 10 | A. Roughly. |
| | 11 | Q. So somewhere around November 16th? |
| | 12 | A. Roughly. |
| | 13 | Q. Okay. During that conversation — and |
| | 14 | I understand you said you don't recall exactly who |
| 02:27:50 | 15 | you spoke to? |
| | 16 | A. Uh-huh. |
| | 17 | Q. But you said it was one of those two, |
| | 18 | correct? |
| | 19 | A. Yes. |
| 02:27:54 | 20 | Q. During that conversation, what did you |
| | 21 | say to them and what did whoever it was say back |
| | 22 | to you? |
| | 23 | A. I just said that the doctor put me on |
| | 24 | steroids and they're trying to do this medicinally |

11 (Pages 41 to 44)

L.A. Court Reporters, L.L.C.
312-419-9292

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2209

Page 45

1  rather than go through any kind of imaging, and
2  they said: Okay. If anything changes, let us
3  know.
4  Q. What is the next communication you had
02:28:14  5  with any supervisor or manager at the Department
6  relating to your back or neck or your attendance?
7  A. It would have been somewhere around the
8  20-something, the early 20s of November.
9  Q. Okay. Do you remember who that
02:28:30  10  conversation was with?
11  A. I do not.
12  Q. How did that conversation take place?
13  A. Same as the last one.
14  Q. By phone?
02:28:36  15  A. Yes.
16  Q. You called them?
17  A. Yes.
18  Q. During that conversation, what did you
19  say and what did they say?
02:28:42  20  A. I said that my injury is still the same
21  and we're continuing to evaluate it medicinally as
22  opposed to imaging.
23  Q. During that conversation in the early
24  November 20s period that you referred to, was

Page 46

1  anybody else on the line?
2  A. No.
3  Q. During the conversation on or about
4  November 16th, was anybody else on the line?
02:29:04  5  A. No.
6  Q. After this conversation that you had in
7  the early November 20s timeframe that you referred
8  to, what's the next conversation you had with any
9  manager or supervisor at the Department?
02:29:16  10  A. Would have been late November/early
11  December, extrapolate a week from whatever
12  supposed date and there you are.
13  Q. Did you have a conversation with
14  Sergeant Schillinger on or about November 27,
02:29:34  15  2017, about taking some vacation days?
16  A. Not about vacation days.
17  Q. Did you text Sergeant Schillinger on or
18  about November 19, 2017?
19  A. Yes, I believe so.
02:29:52  20  Q. Do you sill have that text?
21  A. I may. I may not. I'm not positive.
22  Q. Okay. I'm going to instruct you do not
23  delete that if you do have it. Understood?
24  A. Okay.

Page 47

1  Q. You texted him a message. What was the
2  point of texting him?
3  MR. COOPER: Jeff, it would be great if
4  we could see that document.
02:30:12  5  MR. FOWLER: He's already seen it.
6  MR. COOPER: Well, we can see it again.
7  MR. FOWLER: It was part of his
8  personnel file.
9  MR. COOPER: It's a big file.
02:30:24  10  Go ahead and read it (indicating).
11  BY THE WITNESS:
12  A. Okay. I've seen this.
13  BY MR. FOWLER:
14  Q. So you sent him a text message on or
02:30:42  15  about November 19th, right?
16  A. I believe so, or around that date.
17  Q. What did that text message say?
18  A. I believe it says: Hey, can you give
19  me a call, or something like that.
02:30:50  20  Q. He called you?
21  A. Yes.
22  Q. Anybody else on the line?
23  A. No.
24  Q. During that conversation, what did you

Page 48

1  say and what did he say?
2  A. I followed up with him based on a
3  conversation I've had with him repeated times over
4  the year and Lieutenant Maiello where I stated
02:31:06  5  that I would like to have time-due days for a
6  certain date range which I believe is outlined in
7  that letter and I had verbal consent from them
8  that that would be okay when the time came to put
9  in for those days which is seven to ten days
02:31:22  10  before that period starts.
11  So throughout the year, we had
12  conversations about that, and I believe November
13  19th would have been roughly or around that date
14  range when the next period schedule would come out
02:31:36  15  and I'm allowed to put in for my compensatory
16  time.
17  Q. What I'm asking is: In that phone
18  conversation with Sergeant Schillinger on or about
19  November 19th, what did you say and what did he
02:31:44  20  say?
21  A. I said: Hey, Sarge -- paraphrasing, of
22  course, because I don't remember exact words. I
23  said something to the effect of: Hey, Sarge, just
24  following up with you about those days I asked you

12 (Pages 45 to 48)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2210

Page 57

1    restrictions than you did?

2        A.   Correct.

3        Q.   And that caused you to go back to your

4    doctor, right?

02:47:18   5        A.   Correct.  And I asked her could you

6    more -- or, I'm sorry, could you clarify in

7    more -- in a little bit more detail as to what my

8    restrictions are.

9        Q.   So I'm going to do this two ways:

02:47:30   10   First, I want to talk about the conversation with

11   the doctor.

12       A.   Okay.

13       Q.   That was Dr. Sandoval?

14       A.   Correct.

02:47:38   15       Q.   At her office?

16       A.   To my recollection, yes.

17       Q.   Anybody else present in the room?

18       A.   No.

19       Q.   That conversation took place on or

02:47:46   20   about November 27th?

21       A.   Roughly, yeah.

22       Q.   During that conversation, what did you

23   say and what did she say?

24       A.   I told her that there's some word going

Page 58

1    around that your note was interpreted -- the first

2    note, the November 9th note, was interpreted to

3    mean that I'm essentially bedridden or forbidden

4    to leave my house because it said:  Rest at home,

02:48:08   5    and that was, what I was told, interrupted as

6    stay home.

7        Q.   Did you tell her anything else?

8        A.   I may have.  I do not recall at this

9    time.

02:48:18   10       Q.   How did Dr. Sandoval respond?

11       A.   She said:  That is 110 percent not my

12   intention with that letter.

13       Q.   What else did she say?

14       A.   She said that she would write another

02:48:32   15   note and clarify what she meant, and then the rest

16   of our conversation was typical doctor-patient

17   stuff.

18       Q.   What do you mean by that?

19       A.   Well, she was talking to me about what

02:48:44   20   the next procedure is with my medical condition,

21   and from there on, nothing pertained to the Police

22   Department.

23       Q.   And then you said that she gave you the

24   note.  That's the one that we talked about,

Page 59

1    Exhibit 10?

2        A.   Yes.

3        Q.   During that conversation, did you tell

4    Dr. Sandoval that you were going hunting?

02:49:04   5        A.   It may have came up.  I'm not sure.

6             I asked her if I was allowed to do

7    light exercises, and she said:  Yes.  She said:

8    You can go about doing your everyday life.  They

9    can't restrict you from doing your everyday life

02:49:18   10   as long as you're not doing anything that I would

11   deem to cause you further injury or further

12   aggravation to the injury.

13       Q.   Did you give her any details about what

14   your everyday physical activities were?

02:49:30   15       A.   Yeah.  I told her that I walk around a

16   lot and that really was my only form of exercise

17   since this injury started which, for the record,

18   started -- the injury started somewhere in late

19   October, as I stated earlier.  At that time I

02:49:48   20   weighed 186 pounds.  Okay?  Today -- or at my most

21   recent medical examination, I think was

22   228 pounds, and my scale today says 236 pounds.

23             So I'm roughly 50 pounds heavier just

24   during the course of this injury because I haven't

Page 60

1    been able to do any kind of exercise like I would

2    normally do, like my usual repetitions and going

3    to the gym and stuff like that, and I would never

4    go to the gym at this point out of fear of action

02:50:26   5    by my administration.

6        Q.   Did you tell Dr. Sandoval anything else

7    about what your daily physical activities were?

8        A.   I told her I like to walk around.  I

9    like to do light exercise.  She didn't ask me to

02:50:38   10   elaborate and I didn't.

11       Q.   Anything else?

12       A.   No.

13       Q.   What is the next communication that you

14   had with any supervisor or manager at the Police

02:50:50   15   Department relating to your neck, back, or

16   attendance at work?

17       A.   Following November 27th?

18       Q.   Yes.

19       A.   I believe I stated earlier which would

02:51:02   20   have been when I was going for the EMG test, early

21   December.

22       Q.   And who was that conversation with?

23       A.   Again, either Lieutenant Maiello or

24   Sergeant Schillinger.

15  (Pages 57 to 60)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2213

## Page 109

1  Q. What's the purpose of that trailer?

2  A. To store decoys and hunting equipment.

3  Q. During the November/December of 2017

4  timeframe, you also regularly drove Mr. Scavo's

03:38:20  5  black Ford F-150?

6  A. I did.

7  Q. Mr. Scavo is the former chief of police

8  of the Village of Melrose Park?

9  A. He is -- well, Jaconetti was after him

03:38:28  10  and then Chief Pitassi, Director Pitassi.

11  Q. And you're aware that Mr. Scavo is a

12  convicted felon?

13  A. Yes.

14  Q. How long have you known Mr. Scavo?

03:38:42  15  A. I would say probably as long as I can

16  remember being alive, so at least 20 years.

17  Q. Were you on the Department when he was

18  chief?

19  A. No, I was not.

03:38:54  20  Q. And you traded trucks with him for

21  several weeks, didn't you?

22  A. Every year we do the same thing.

23  Q. Why did you do that?

24  A. He liked to drive my truck when we go

## Page 110

1  hunting. And if I'm not going, he still goes. I

2  like to let him use my truck because my truck is

3  an off-road truck. It's designed to go off-road.

4  So what's mine is his.

03:39:18  5  Q. You said if you're not going, he takes

6  your truck?

7  A. Correct.

8  Q. But even if you are going, he still

9  takes your truck, doesn't he?

03:39:26  10  A. Correct.

11  Q. Now, are you familiar with a company

12  called IDecoy Guide Service?

13  A. Now defunct company, yes.

14  Q. When was it defunct?

03:39:38  15  A. Approximately August or September of

16  this year. There's no revenue to be stated for

17  this calendar year -- or last calendar year.

18  Q. When you say "August or September of

19  this year," you mean 2017?

03:39:50  20  A. 2017, yes. Most of the scope of what

21  we're talking about is 2017. So if I say "this

22  year," I apologize, but we're talking about 2017.

23  Q. Okay. You have a role with -- or did

24  you have a role with IDecoy Guide Services?

## Page 111

1  A. I was listed as a guide, yes.

2  Q. What did that mean, to be listed as a

3  guide?

4  A. That means that I have a certificate

03:40:16  5  from the State of Illinois which authorizes me to

6  bring people hunting and they could pay me a fee.

7  Or I don't have to charge a fee, but I can take

8  hunters every day if I so choose. You have to

9  outline what properties and whatnot, but it's an

03:40:32  10  official document from the Illinois Department of

11  Conservation.

12  Q. When did you first become affiliated

13  IDecoy Guide Services?

14  A. We started it in 2016 and ended it in

03:40:48  15  2017.

16  Q. When you say "we started it," who is

17  the "we"?

18  A. Myself and Mr. Scavo.

19  Q. And who owned the company?

03:40:56  20  A. It's not -- I mean, I don't believe it

21  was owned, but it's Vito's company, Mr. Scavo's

22  company, and I was just in there in the capacity

23  to guide with him.

24  Q. During 2016, did you receive any money

## Page 112

1  as a result of guiding for --

2  A. I don't recall. I believe there were

3  several dates that we received money and that

4  would have been -- there's documentation you have

03:41:20  5  to provide to the state, and I believe it's 10 to

6  14 days of the regular season ending, and we did

7  that. So as far as what specific or how much

8  money, I can't even state accurately.

9  Q. During 2017, did you receive any monies

03:41:36  10  from -- as a result of the guide services through

11  that company?

12  A. No.

13  Q. You said earlier that there's a

14  process -- strike that.

03:41:50  15  I was asking you questions earlier

16  about a process for receiving approval for

17  secondary employment. Do you remember that?

18  A. Correct.

19  Q. Did you ever receive approval for

03:42:00  20  working as a guide for IDecoy Guide Services?

21  A. I did not consider it to be work.

22  Q. Why not?

23  A. I didn't make any revenue off of it.

24  Q. Any other reason?

28 (Pages 109 to 112)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2226

## Page 113

1    A.  Any revenues that were generated
2 through IDecoy Guide Service would have gone back
3 to hunting equipment.
4    Q.  So my question was:  Did you receive
03:42:28  5 approval from anybody to do guide service for that
6 company?
7    A.  I don't believe so.  I'm not positive
8 on that.  I know I have a secondary employment
9 form that's been filled out and approved by
03:42:44 10 Director Pitassi.
11    Q.  Now, the materials that the guide
12 service used, sometimes that -- some of those
13 materials are your own, right?
14    A.  Yes.
03:42:54 15    Q.  Like the trailer that you mentioned?
16    A.  Correct.
17    Q.  The decoys?
18    A.  Correct.
19    Q.  The Suburban, you used that for the
03:43:02 20 guide service?
21    A.  Sure, but not for guiding people.  It's
22 just for everyday use -- or it was for everyday
23 use, I should say.
24    Q.  For towing a trailer?

## Page 114

1    A.  Correct.
2    Q.  You kept the trailer parked down
3 somewhere around Ottawa during hunting season?
4    A.  Incorrect.
03:43:16  5    Q.  Where did you park it at?
6       THE WITNESS:  Am I required to disclose
7       that?
8       MR. COOPER:  Let's take a moment.
9       (WHEREUPON, a recess was had.)
03:43:24 10       (Scatchell Ex No. 17 was marked as
11       of 1/9/18.)
12 BY MR. FOWLER:
13    Q.  Showing you what's been marked as
14 Exhibit 17 --
04:03:48 15    A.  Okay.
16    Q.  -- you mentioned earlier with respect
17 to your trip to Portland, the document that I
18 showed you earlier was the return trip?
19    A.  Correct.
04:03:54 20    Q.  This is the trip going to Portland,
21 right?
22    A.  Yes.
23    Q.  This shows that the ticket was issued
24 on or about November 18, 2017?

## Page 115

1    A.  Where are you seeing that?
2    Q.  Middle of the first page, issue date.
3    A.  Okay.  Yes, I believe so then.
4    Q.  You believe it was issued on or about
04:04:12  5 November 18, 2017?
6    A.  Yes, uh-huh.
7    Q.  What was the purpose of that trip?
8    A.  Recreation, trip with my grandfather.
9    Q.  What did you do in Portland with your
04:04:22 10 grandfather?
11    A.  Sightseeing, a little bit of hunting,
12 just basically kind of took in an area where I've
13 never been.
14    Q.  What kind of hunting did you do in
04:04:34 15 Portland?
16    A.  Duck or goose.
17    Q.  Most of your hunting is waterfowl?
18    A.  Yes -- well, I wouldn't say that, but I
19 would say a good portion.
04:04:44 20    Q.  We were talking about the location of
21 your trailer.
22    A.  Yes.
23    Q.  That trailer was used as part of the
24 guide service, right?

## Page 116

1    A.  At one point or another, sure.
2    Q.  You used the trailer for hunting in
3 2017, too, right?
4    A.  Yes.
04:05:14  5    Q.  In November of 2017?
6    A.  Most likely, yes.
7    Q.  And the trailer isn't stored at your
8 home in Melrose Park, is it?
9    A.  Correct, it's not.
04:05:24 10    Q.  Where is it stored?
11    A.  In the vicinity of the Oswego area.
12    Q.  There are a couple of different
13 locations where you go hunting frequently in the
14 Ottawa area?
04:05:44 15    A.  No, not Ottawa.
16    Q.  Oswego?
17    A.  Yes.
18    Q.  One of them is a lake?
19    A.  If you want to call it a lake.  I would
04:05:56 20 just more or less call it a waterhole.  I mean,
21 it's a man-made pond.
22    Q.  And when you go there, you use your
23 boat?
24    A.  Correct.  Sometimes, not all the time.

29 (Pages 113 to 116)

L.A. Court Reporters, L.L.C.
312-419-9292

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2227

## Page 117

1  Q.  You keep the boat stored in that area
2  as well?
3  A.  Sometimes, not all the time.
4  Q.  When you keep the boat stored there, is
04:06:14  5  it hooked up to a vehicle?
6  A.  When it's stored there?  No.
7  Q.  So if you're going to go hunting with
8  the boat, you would drive there, hook it up to a
9  vehicle, drive it to the water?
04:06:26  10  A.  No.
11  Q.  Okay.  Walk me through the process of
12  how you use the boat when you're hunting on the
13  water.
14  A.  If we have the boat there, the boat is
04:06:36  15  going to be already in the water before we go
16  hunting that day.  So it's going to be in the
17  water for the duration of the season.
18  Q.  When you say if we go hunting there,
19  who is "we"?
04:06:44  20  A.  Any of my usual friends that I go
21  hunting with.  I don't care to name them all.
22  Q.  Mr. Scavo is one of the ones that you
23  go hunting with?
24  A.  He comes with, yes.

## Page 118

1  Q.  You're aware that, as a felon, it's
2  illegal for him to possess a firearm?
3  A.  Correct.
4  Q.  You're aware that, as a felon, it's
04:07:04  5  illegal for him to go hunting?
6  A.  That's not true.
7  Q.  Well, let me be more accurate.  As a
8  felon, it's illegal for him to actually use a
9  firearm in hunting, isn't it?
04:07:12  10  A.  I believe so.
11  Q.  You said that one of the first hunting
12  trips that you did in 2017 was to Wisconsin?
13  A.  No.  That was one of the first hunting
14  trips that you asked from the range of October
04:07:38  15  12th onward.
16  Q.  Fair enough.  From October 12th onward,
17  the first trip was in Wisconsin?
18  A.  Correct, to my recollection.
19  Q.  So let me be a little more specific
04:07:48  20  then.  You said that sometime in late October or
21  early November that you felt some pain in your
22  neck and back?
23  A.  Correct.
24  Q.  As of that point in time, how many

## Page 119

1  times have you been out hunting in the fall of
2  2017?
3  A.  From the point that my back and neck
4  started to hurt?
04:08:08  5  Q.  Yes.
6  A.  I really couldn't give you an accurate
7  guess on that.
8  Q.  More than one?
9  A.  Absolutely.
04:08:16  10  Q.  More than five?
11  A.  Most likely.
12  Q.  More than ten?
13  A.  Perhaps.
14  Q.  More than 20?
04:08:20  15  A.  I don't think so.
16  Q.  Let's talk about the hunting activities
17  for just a moment.
18  A.  Okay.
19  Q.  When you're hunting -- well, let me be
04:08:30  20  clear.
21  The hunting that you did in the fall
22  of 2017 up until today, has that all been
23  waterfowl?
24  A.  No.

## Page 120

1  Q.  What other than -- what hunting other
2  than waterfowl have you done?
3  A.  In October -- or actually, I'm sorry,
4  in September, I would have been --
04:08:54  5  Q.  I'm going to stop you.  I don't care
6  about that.
7  A.  All right.
8  Q.  I want to focus on from the time that
9  you started feeling pain again in your back and
04:09:04  10  neck.
11  A.  Okay.
12  Q.  Since that time, what kind of hunting
13  have you done?
14  A.  Mostly waterfowl.  And from the range
04:09:14  15  of when I started to feel the injury to the last
16  day that I hunted would have been somewhere around
17  I would say at least ten days between hunting.  So
18  my belief is not that it occurred by hunting, if
19  that's the connection you're trying to make.
04:09:32  20  Q.  So if I understand what you're saying
21  is you hadn't been hunting for at least ten days
22  when you first started feeling pain?
23  A.  Correct.
24  Q.  And then once you started feeling pain,

30 (Pages 117 to 120)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2228

## Page 125

1 you're using the boat?

2    A. To explain it here, yes, I believe so.

3    Q. So now let's talk about when you're

4 hunting from land.

04:14:04 5    A. Okay.

6    Q. Walk me through that process.

7    A. A very similar process; we meet

8 somewhere, drive the truck and trailer to a field,

9 and bring our equipment to the blind, decoys get

04:14:18 10 set out, and then we hunt.

11    Q. So driving the truck and trailer, if

12 the trailer is parked in that area, the first

13 thing you need to do is hook up the trailer?

14    A. No. It's already hooked up.

04:14:28 15    Q. Hooked up to a truck that's there?

16    A. Correct, most of the time.

17    Q. What truck is there?

18    A. Right now, there isn't a truck there.

19    Q. Well, what truck was there in November

04:14:38 20 and December of 2017?

21    A. I'm not sure if we used Roger's

22 truck -- or I'm not sure whose truck we used.

23 You'd have to specify dates. We use multiple

24 trucks.

## Page 126

1    Q. Who is Roger?

2    A. A friend that we hung with, and he also

3 has decoys and stuff there.

4    Q. So the trailer that you have has a

04:14:54 5 bunch of decoys in it?

6    A. Correct.

7    Q. So you would take the vehicle and the

8 trailer out into the middle of the field?

9    A. Out to where our blind is. It's a pit

04:15:04 10 blind which I believe Deputy Chief Castellan is

11 familiar with. He helped dig several of them.

12    Q. So you would then spread out the decoys

13 around the pit blind?

14    A. Yes.

04:15:16 15    Q. Can you describe what a pit blind is?

16    A. Basically it's either a wood or steel

17 box in the ground which has benches and backrests

18 and a platform which you can stand up and shoot

19 out of and the top of it is level with the ground.

04:15:30 20 So when you're standing in it, you're

21 basically -- well, I'm a shorter guy, but you'd be

22 about here and you're looking out (indicating).

23    Q. You're referring to about chest-height

24 when you say "about here"?

## Page 127

1    A. Yes, I'm sorry. For the record, about

2 chest-height.

3    Q. So you go out. And the pit is already

4 dug at the beginning of the season?

04:15:44 5    A. Yes. A lot of them have been dug for

6 15, 20 years, perhaps.

7    Q. So you go out, spread out all the

8 decoys, go in the pit, and do hunting. How long

9 are you in the pit?

04:16:04 10    A. Same thing as with the water, one to

11 two hours, maybe three.

12    Q. At the end of that period, you retrieve

13 the truck and trailer, load up all of the decoys?

14    A. Correct.

04:16:14 15    Q. Return them and then you go home,

16 right?

17    A. Correct.

18    Q. Anything else about the process of

19 hunting from on land that we haven't talked about?

04:16:28 20    A. Not to my recollection. I mean, it's

21 pretty simple stuff.

22    Q. So you said earlier that you reported

23 the injury sometime early November, right?

24    A. I believe it would be, yeah, early

## Page 128

1 November-ish.

2    Q. So I want to talk about that time

3 forward.

4    A. Okay.

04:16:52 5    Q. How about the time period of November

6 9th through the 12th?

7    A. Honestly I can't tell you if I did or

8 didn't. I wouldn't be able to tell you exact date

9 ranges. I mean, I know I went hunting in

04:17:08 10 November. I don't know what days.

11    Q. November 13th, did you go hunting?

12    A. I don't recall if I did or didn't. I

13 might have. I'm not sure.

14    Q. November 14th, did you go hunting?

04:17:18 15    A. Again, don't recall. I might have. I

16 might not. I'm not sure.

17    Q. But isn't it true when you go hunting

18 out in the Oswego area, your typical pattern is to

19 leave your house somewhere in the 4:00 o'clock

04:17:30 20 hour in the morning?

21    A. It depends every day, but in that time

22 of year, you could probably set your watch by it

23 which I know some people have.

24    Q. November 14th, isn't it true that you

32 (Pages 125 to 128)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2230

## Page 133

1    A.  Not that I can recall.

2    Q.  Do you have any text messages or email

3  communications with any of your friends about

4  hunting dates?

04:21:28  5    A.  Most of our conversations occur via

6  phone, like phone calls.  I mean, you'll have me

7  calling people that I've hung with, but what

8  occurred during those conversations, I don't know.

9    Q.  When you go out waterfowl hunting early

04:22:02  10  in the morning, it's your practice to go to

11  7-Eleven first and get a coffee?

12    A.  Sometimes.  It depends.

13    Q.  Any reason to disagree that you stopped

14  at a 7-Eleven around 4:15 a.m. on November 16th?

04:22:16  15        MR. COOPER:  Objection, asked and

16  answered.

17  BY MR. FOWLER:

18    Q.  You can answer.

19    A.  I may have been.  I may not have been.

04:22:24  20  I mean, a typical day, sometimes I go to 7-Eleven;

21  or if I'm running late, I'll stop at Dunkin Donuts

22  on the way.  It varies.

23    Q.  So if I go through these dates one by

24  one, is there any particular day as you sit here

## Page 134

1  today that you know for sure that you went hunting

2  or you know for sure you didn't?  And I'll break

3  that down.  I'll do it a piece at a time.

4    A.  Okay.

04:22:46  5    Q.  Since November 9th of 2017 --

6    A.  Okay.

7    Q.  -- is there any particular day that you

8  know for sure that you went hunting?

9    A.  Any particular day?  I -- in the range

04:23:00  10  of November?

11    Q.  Since November 9th.

12    A.  Since November?  I could say I've gone

13  recently.  I wouldn't be able to recall the days.

14    Q.  Since November 9th of 2017, are there

04:23:14  15  any dates that you can say definitively you did

16  not go hunting?

17    A.  Definitively, no.

18    Q.  Are there any documents that would

19  refresh your recollection as to what days you did

04:23:28  20  or did not go hunting since November 9, 2017?

21    A.  Aside from the IPass records that you

22  have, none that come to mind.

23    Q.  Who is Richard Bono?

24    A.  A hunting friend.

## Page 135

1    Q.  Who is Roger Grivetti?

2    A.  Hunting friend.

3    Q.  And Roger Grivetti has a son, correct?

4    A.  That's correct.

04:23:54  5    Q.  And he goes hunting with you guys?

6    A.  He's got two sons and they both go

7  hunting.

8    Q.  Let's talk about November 20th of 2017.

9    A.  Okay.

04:24:06  10    Q.  Was there an occasion that -- do you

11  remember November 20, 2017?

12    A.  I remember the day in question, sure.

13    Q.  Okay.  Tell me what happened on that

14  day.

04:24:20  15    A.  Do you have particular questions you

16  want to ask?

17    Q.  Sure.  What time did you leave your

18  house that morning?

19    A.  Somewhere in the 4:00-something range

04:24:28  20  most likely.

21    Q.  Where did you go?

22    A.  To the same spot where we duck hunt.

23    Q.  With whom?

24    A.  Most likely that day I probably drove

## Page 136

1  with Vito and Rick; Richard, as you called him.

2    Q.  Bono?

3    A.  Correct.

4    Q.  You left Melrose Park and went there in

04:24:48  5  your truck?

6    A.  Correct.

7    Q.  And when you say you got there, you were

8  doing water hunting that day from the boat?

9    A.  Correct.

04:24:58  10    Q.  So you left the house somewhere in the

11  4:00 o'clock hour?

12    A.  I would guess, yeah.

13    Q.  What time did you get to the Oswego

14  area?

04:25:06  15    A.  I mean, I'd have to look at a

16  sunrise/sunset calculator, but usually we arrive

17  for duck hunting somewhere between a half hour to

18  15 minutes before shooting time.  Legal shooting

19  time is a half hour before sunrise.

04:25:22  20    Q.  So fair to say that you got to the area

21  where you're going to be hunting then 45 minutes

22  to an hour before sunrise?

23    A.  Roughly, roughly.

24    Q.  When you got there, what did you do?

L.A. Court Reporters, L.L.C.
312-419-9292

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2232

## Page 137

```
            1      A.  Same thing I described to you earlier
            2   which would be pull up by the boat, park, carry
            3   the equipment or whoever carries the equipment. I
            4   carry my own gun, my calls, and maybe a box of
04:25:48    5   shells.
            6      Q.  And you said it was the three of you.
            7   Did you meet anybody that day?
            8      A.  Yes.
            9      Q.  Where did you meet him at?
04:25:54   10      A.  At that location.
           11      Q.  Who did you meet?
           12      A.  Roger Grivetti who you spoke of before
           13   and his son.
           14      Q.  Which son?
04:26:02   15      Is it imperative to include a juvenile
           16   in this?
           17      Q.  How old is he?
           18      A.  12.
           19      Q.  The older son or younger son?
04:26:12   20      A.  Younger.
           21      Q.  You met them near the boat?
           22      A.  Correct.
           23      Q.  You guys got on the boat?
           24      A.  Yep.
```

## Page 138

```
            1      Q.  What time was it when you got on the
            2   boat?
            3      A.  Like I said, probably roughly
            4   15 minutes or so before shooting time.
04:26:28    5      Q.  So roughly 45 minutes or so before
            6   sunrise?
            7      A.  Right. Yeah, about there.
            8      Q.  You take -- what did you do next?
            9      A.  We pull up to a spot we decide to hunt
04:26:40   10   based on what the wind is that day and then
           11   basically everybody throws out the decoys, not me
           12   because I control where the boat is going. So all
           13   I'm doing is holding a switch and then everybody
           14   else is throwing out the decoys while I keep the
04:26:54   15   boat steady with the switch.
           16      Q.  So you're driving the boat?
           17      A.  That day, I was.
           18      Q.  From the front or from the back?
           19      A.  From the rear.
04:27:02   20      Q.  You said that the boat has a blind
           21   built into it?
           22      A.  Yeah, permanent.
           23      Q.  How tall is the blind?
           24      A.  It's kind like a goose pit, but if
```

## Page 139

```
            1   you're sitting down, I would say that the top
            2   level of the blind would come to here on me,
            3   around my chin area (indicating).
            4      Q.  So you're holding your hands to your
04:27:22    5   neck?
            6      A.  Roughly to my chin area.
            7      Q.  So your head is pretty much over the
            8   top of the blind all the time?
            9      A.  I wouldn't say that because it's an
04:27:30   10   enclosed blind.  So you're sitting in the middle
           11   of it, and your point of view, obviously you see
           12   the top of the blind here so you can see
           13   everything out in front of you (indicating).
           14      Q.  I guess my question is:  Unless you're
04:27:46   15   ducking down into the boat for something, then
           16   your head and your eyes are over the top of the
           17   blind most of the time?
           18      A.  Correct. You wouldn't need to duck
           19   down for anything.
04:27:58   20      Q.  Because you're hunting, you need your
           21   eyes to be able to see around the boat and in the
           22   sky, right?
           23      A.  Right.
           24      Q.  So as you're hunting on November 20th,
```

## Page 140

```
            1   you're in the back of the boat that day?
            2      A.  Yes.
            3      Q.  Where was Mr. Grivetti?
            4      A.  Next to me.
04:28:16    5      Q.  Where was his son?
            6      A.  Next to him which is always the case.
            7      Q.  And you said the other one was Roger?
            8      A.  No.  Richard.
            9      Q.  Richard.  I'm sorry.
04:28:26   10      Where was Richard?
           11      A.  Next to Roger.
           12      Q.  And where was Mr. Scavo?
           13      A.  At the other end of the boat, front end
           14   of the boat with his dog.
04:28:34   15      Q.  Did you move the boat around during
           16   that period of time that you were hunting?
           17      A.  I'm confused.
           18      Q.  How long were you hunting from the boat
           19   that day?
04:29:04   20      A.  I can't tell you.  Maybe two, three
           21   hours. I'm not sure.
           22      Q.  What was your role during those two to
           23   three hours?
           24      A.  During those two or three hours, I sat
```

35 (Pages 137 to 140)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2233

## Page 141

1  on my end of the boat which is where the motor is
2  and looked out and looked in front of us to see if
3  there was any birds. If there were, I would call
4  at them. And then if there was any birds that
04:29:24  5  would decoy, we would shoot at them.
6      Q. You yourself, you were hunting that
7  day, right?
8      A. That day, I was, yes.
9      Q. Anything unusual happen during those
04:29:42  10  two or three hours while you're hunting on the
11  water?
12      A. During the two to three hours on the
13  water? No.
14      Q. During those two to three hours on that
04:29:48  15  day, did you get any waterfowl?
16      A. Yes.
17      Q. How many?
18      A. Not sure. I remember this part
19  distinctly that we did not get what we call a kill
04:30:02  20  limit. We didn't kill a limit that day. We were
21  just short which the limit would be four ducks --
22  or four mallard ducks per guy. So that would have
23  been 16 on that day; for myself, Roger, Rick, and
24  Roger's son. We were short of that.

## Page 142

1      Q. Who else was shooting that day?
2      A. Myself, Roger, Rick, and Roger's son.
3      Q. Did Mr. Scavo shoot that day?
4      A. To my knowledge, no.
04:30:34  5      Q. When you say "to your knowledge," what
6  do you mean?
7      A. To what I was able to witness with my
8  own two eyes, no.
9      MR. COOPER: Well, let me intervene. I
04:30:42  10  thought the reason that my client was
11  summoned here was because of an allegation
12  that Mr. Scavo discharged a firearm. I did
13  meet with my client to discuss this
14  interrogation and discuss his knowledge. So
04:30:58  15  that's the basis for his response.
16  BY MR. FOWLER:
17      Q. Did Mr. Scavo have possession of a
18  firearm on the boat that day?
19      A. To my knowledge, no. To what I was
04:31:06  20  able to witness, no.
21      Q. Then when you returned to the shore
22  that day, the group of you were approached by a
23  conservation officer, right?
24      A. Yes.

## Page 143

1      Q. And so what happened when the
2  conservation officer approached you guys?
3      A. We've dealt with this conservation
4  officer several times before. I mean, he's maybe
04:31:34  5  a 20, 25-year vet. He knows the gentleman who
6  used to own the land, and he passed away
7  unfortunately.
8      Myself and Vito have had many
9  conversations with him over the years. He comes
04:31:46  10  and checks on us one or twice a year. Usually he
11  knows that we don't do anything that would even be
12  of questionable legality.
13      And on that particular day, when he
14  first walked up, his first statement to us that I
04:32:04  15  remember was: Oh, wow, you got all the ducks
16  separated. I like that.
17      In Illinois, if I have three ducks and
18  he has four ducks and you have three ducks,
19  they're all supposed to be separate. You can't
04:32:16  20  party hunt. So everybody has to have their own
21  birds.
22      He checked us that day. He checked
23  that and went through the usual routine as to what
24  he checks us on.

## Page 144

1      Q. So as best you can recall, he walked
2  up, and he said: Oh, good, you got the ducks
3  separated. What's the next thing he said?
4      A. He said: All right. Can I see
04:32:40  5  everybody's license, which is typical. Everybody
6  provided their license including Vito.
7      At that point, he goes: Okay. Who's
8  got guns? And everybody -- which all the guns
9  were cased, unloaded. Everybody took their guns
04:32:58  10  out of their cases and he looked at each gun.
11      He says: Okay. Now show me that the
12  gun can't hold more than three shells in the
13  tube -- or, I'm sorry, more than two shells in the
14  tube, because you're limited to three shells per
04:33:08  15  gun. You can't shoot any more than three for
16  waterfowl in Illinois, or I think federally.
17      So you take one shell, two shells, and
18  then when you go to put the third one in, if you
19  have a plug in your gun which you're required to
04:33:20  20  by law, you can't. It's impossible.
21      And he did that for all four of us that
22  had guns that day. He said: Okay. Can I see
23  your shells? So he looked at our shells because
24  all your shotgun shells are required to be

L.A. Court Reporters, L.L.C.
312-419-9292

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2234

Page 145

```
                 1    nontoxic and they're not.
                 2        Then he said to me: Is this your boat?
                 3        I said: Yes, it is.
                 4        He gets in the boat. He says: All
04:33:42         5    right. I need to look at some stuff.
                 6        He looked at some compartments, not
                 7    entirely sure what he was looking for, didn't find
                 8    anything that was pertinent or anything like that.
                 9        Then he said to me: Okay. There's
04:33:52        10    five people on the boat. Do you have five
                11    lifejackets? Provided him that.
                12        Do you have a fire extinguisher on
                13    board? I provided him that. Do you have a
                14    trowelable device? I provided him. And I
04:34:04        15    believe he asked to see my boater's registration,
                16    and I provided him that.
                17        That was the extent of the initial
                18    interaction with him.
                19    Q.   You referred to Vito. Is that Mr.
04:34:14        20    Scavo?
                21    A.   Yes.
                22    Q.   And what happened next?
                23    A.   And next he had a private conversation
                24    with Vito after he checked everything.
```

Page 146

```
                 1    Q.   When you say "private conversation"
                 2    with Mr. Scavo, how did that take place?
                 3    A.   He just stated: Hey, can I talk to you
                 4    over here?
04:34:34         5        They walked away, and myself, Roger,
                 6    Rick, and Roger's son went about talking about
                 7    either the day's hunt or whatever we were talking
                 8    about.
                 9    Q.   Could you hear what was said between
04:34:42        10    the conservation officer and Mr. Scavo?
                11    A.   No, I could not.
                12    Q.   What happened after that -- or how long
                13    did they talk?
                14    A.   Maybe ten minutes, something like that.
04:34:52        15    Q.   What happened after that ten minutes?
                16    A.   I observed Vito walking back towards me
                17    with kind of a dejected type of look and that
                18    bothered me because -- I mean, Vito's like a
                19    father to me. You asked me the extent of my
04:35:08        20    relationship with him and he's -- not that he's
                21    blood, but he's the closest thing to it and we
                22    share a lot with each other. I mean, it's not
                23    like we're just hunting buddies. We spend time
                24    together all the time.
```

Page 147

```
                 1        I just saw a look in his eyes. So I
                 2    approached -- when he walked back, I approached
                 3    the conservation officer and I showed him my badge
                 4    and stated to him: Hey, we're all law enforcement
04:35:34         5    here. What's the conversation about? What's
                 6    going on?
                 7        And then at that point, he began his
                 8    interview of me.
                 9    Q.   Were you talking with him in the
04:35:42        10    presence of all of the others?
                11    A.   No. Individually.
                12    Q.   You and he walked off a ways just as he
                13    had with Mr. Scavo?
                14    A.   Correct.
04:35:48        15    Q.   Okay. During the time that you were
                16    with the conservation officer, what did you say
                17    and what did he say?
                18    A.   Paraphrasing because, again, this was a
                19    while ago, but he asked me -- what did he say? He
04:36:02        20    says to me: Are you familiar with Mr. Scavo?
                21        I said: Yes. He's like a father to
                22    me.
                23        He goes: So you know his
                24    circumstances?
```

Page 148

```
                 1        And I said: Which is?
                 2        That he can't possess a gun. Again,
                 3    I'm paraphrasing.
                 4        I said something to the effect of:
04:36:18         5    Yeah, I'm definitely aware of that.
                 6        He gave me a look, a blank look, like:
                 7    Are you going to say that he didn't possess a gun
                 8    today?
                 9        And I said: Absolutely not. That was
04:36:30        10    my belief that he didn't possess a gun that day.
                11        He stated to me that -- well, Mr. Scavo
                12    stated to me for ten minutes, or however long the
                13    time period was, that he possessed a gun.
                14        I said to him: That was your
04:36:44        15    conversation with him. I don't know what he said
                16    to you, but if that did occur, and I don't believe
                17    Mr. Scavo would put himself in that situation, I
                18    didn't see it.
                19        And he said to me: You didn't see it?
04:36:56        20    You're in the boat with him.
                21        And I said: Yeah, but I'm 15 feet to
                22    his right.
                23        And he said: You're 15 feet to his
                24    right?
```

37 (Pages 145 to 148)

L.A. Court Reporters, L.L.C.
312-419-9292

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2235

Page 149

```
          1    I said: It's a 17-foot boat. I'm in
          2    the back. He's two feet from the front. That's
          3    15 feet.
          4         He goes: Okay. And then he basically
04:37:10  5    stated to me: Are you sure you want to say what
          6    you're saying?
          7         And I said: That's what I observed. I
          8    didn't observe anybody shoot a gun.
          9         And to quantify what occurs during a
04:37:22  10   duck hunt, when birds come in, single bird or
          11   multiple birds come in, one person -- well, myself
          12   and Vito will call. We'll blow call, or Roger
          13   will, too. And one person calls the shot is which
          14   is to mean that one person says: Okay. Now let's
04:37:38  15   shoot them.
          16        So you come up -- you know, somebody
          17   will say: Let's shoot them. You come up, shoot,
          18   and there could be -- it's almost like
          19   pandemonium. There's ducks going in every
04:37:48  20   direction.
          21        When you shoot, you shoot your zone
          22   which means basically you're shooting straight in
          23   front of you, 45 degrees on either side, which
          24   means you're always safe. You're not shooting
```

Page 150

```
          1    over somebody's head. You're not shooting behind
          2    your back or some stupid stuff. You're shooting
          3    out in front of you in this little zone. So when
          4    you come up and shoot, you're focus is only on
04:38:12  5    this zone.
          6         So then you shoot, then birds drop, and
          7    your gun is empty after three shots. Typically
          8    what happens if there's multiple birds, there's
          9    going to be three, four, five dead birds and then
04:38:24  10   there's going to be a cripple. We call them a
          11   cripple. That's terminology in the hunting world.
          12   Basically it refers to a duck that's still alive
          13   that's been downed, but state law requires you to
          14   dispatch them immediately. And not only state
04:38:40  15   law, but it's for our own dog safety because if a
          16   live duck gets out, you send a dog, the live duck
          17   can evade a dog. It can dive. It can swim
          18   faster. So the typical procedure would be: Live
          19   duck, shoot them immediately.
04:38:54  20        This is -- anybody that's ever duck
          21   hunted over water, that's standard. If the duck's
          22   on the water still alive, which we indicate it's
          23   still alive by its head is still up, you keep
          24   shooting until you have no more shells or until
```

Page 151

```
          1    the duck's dead. That's the gist of it.
          2         So when we shoot, my focus is only on
          3    what I'm shooting and making sure I'm safe.
          4         Q. We were talking about your conversation
04:39:22  5    with the conservation officer.
          6         A. Correct.
          7         Q. Is there anything else that you and he
          8    said in that conversation?
          9         A. Like I said, he stated to me,
04:39:28  10   paraphrasing: Is that what you want to go with?
          11        And I stated: That's what I observed
          12   and that's what I'm telling you.
          13        He says: Okay. He moved on from me,
          14   and that was the end of our interaction for the
04:39:40  15   day.
          16        Q. Did you have any other conversation
          17   with him after that?
          18        A. After that, no.
          19        Q. After that conversation with the
04:39:50  20   conservation officer, you were aware that the
          21   conservation officer said that he saw Mr. Scavo
          22   shooting that day?
          23        A. He said that he believed he saw that.
          24        Q. And you knew that that day, right?
```

Page 152

```
          1    A. I'm sorry?
          2    Q. You knew that that day?
          3    A. I knew what that day?
          4         MR. COOPER: Objection, asked and
04:40:10  5    answered.
          6    BY MR. FOWLER:
          7    Q. You understood on November 20th that
          8    the DNR officer believed that Mr. Scavo was
          9    engaged in illegal conduct, right?
04:40:26  10   A. He believed that, yes, and he stated
          11   that to me.
          12   Q. So after that trip -- strike that.
          13        You're aware that as a police officer
          14   for the Village of Melrose Park you have an
04:40:42  15   obligation to report to your supervisors any
          16   interactions with law enforcement that could lead
          17   to further action, right?
          18   A. I was not aware of that because there's
          19   no action that was pending against me to my
04:40:56  20   knowledge, nothing criminal on that day or any
          21   questionable integrity on that day in my
          22   estimation.
          23   Q. You were aware that the conservation
          24   officer didn't believe you, weren't you?
```

38 (Pages 149 to 152)

L.A. Court Reporters, L.L.C.
312-419-9292

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2236

Page 153

```
         1      A.  I'm not aware of that.  I think that he
         2   wanted me to say whatever he wanted me to say, but
         3   I'm not aware that -- I mean, he can't attest to
         4   what my own two eyes saw, and he was -- the
04:41:16 5   position of where he was watching us, he couldn't
         6   positively discern who anybody was.
         7      Q.  He was challenging your statement when
         8   you said you didn't see Mr. Scavo shoot, right?
         9      A.  I would say that's a fair assessment.
04:41:30 10     Q.  Now, after that conversation with the
        11   conservation officer, did you report that
        12   communication to any of your supervisors at the
        13   Department?
        14      A.  No, I did not.  I didn't deem it
04:41:42 15  necessary.
        16         Once again, I don't believe that
        17   anything I did was of questionable integrity or
        18   illegality.
        19      Q.  You were aware that that situation
04:42:00 20  could result in criminal prosecution against Mr.
        21   Scavo, weren't you?
        22      A.  I believe that if he thinks he saw him
        23   shoot which he stated to me, I don't know what his
        24   procedure is.  We have our own procedures here.
```

Page 154

```
         1   He's in a totally different county with a totally
         2   different jurisdiction with totally different
         3   SOPs.  So I don't know what his intentions were.
         4   He didn't state that to me and I didn't ask him.
04:42:24 5      Q.  I didn't ask you any intentions.  What
         6   I asked was:  You were aware that the situation
         7   could result in criminal prosecution of Mr. Scavo,
         8   weren't you?
         9      A.  I wasn't aware that it could.  I
04:42:32 10  mean --
        11      Q.  You were not aware that it could or --
        12      A.  Let me rephrase.
        13         I wasn't aware that the situation that
        14   occurred was going to result in -- well, I don't
04:42:42 15  where it was going to go after that.  I'm not --
        16      Q.  I understand.
        17      A.  I'm not the DNR officer.  So it's out
        18   of my hands.
        19      Q.  But the question I asked you was:
04:42:52 20  Could it result in prosecution?
        21         MR. COOPER:  Objection, speculation.
        22   He's not DNR.  He's not a lawyer.
        23      BY THE WITNESS:
        24      A.  Again, like I said, it occurred in
```

Page 155

```
         1   Kendall County.  I'm a police officer in Cook
         2   County.  There's different regulations, different
         3   SOPs, different levels of what an officer
         4   determines to be his own -- what's the word I'm
04:43:16 5   looking for -- whether he wants to prosecute or
         6   not.  I mean, that's his decision.
         7         So I have no idea as to where it could
         8   have went after that.  But once again, it wasn't
         9   my concern.
04:43:28 10     Q.  On the next day, November 21st, did you
        11   go hunting?
        12      A.  I don't believe I did.
        13      Q.  November 22nd, did you go?  That would
        14   have been the day before Thanksgiving, if that
04:43:42 15  helps you.
        16      A.  Maybe.  I'm not positive.
        17      Q.  November 23rd, you went hunting, right?
        18   Thanksgiving Day?
        19      A.  I can't remember, to be honest with
04:43:54 20  you.  I know where I went for dinner.  I don't
        21   remember if I went hunting.
        22      Q.  After the November 20th incident, are
        23   there any days that you can identify as you sit
        24   here today that you either did or did not go
```

Page 156

```
         1   hunting?
         2      A.  I could say I went yesterday.
         3      Q.  Where did you go yesterday?
         4      A.  Same place, not water, fields.
04:44:42 5         MR. FOWLER:  All right.  Give us a few
         6   minutes.
         7         (WHEREUPON, a recess was had.)
         8         MR. FOWLER:  Back on the record.
         9      BY MR. FOWLER:
04:52:36 10     Q.  Is there anything else that you would
        11   like the chief or deputy chief to take into
        12   account as they're deciding what to do with
        13   respect to the allegations against you?
        14         MR. COOPER:  Boy, I wasn't expecting
04:52:50 15  that.  I need two seconds.
        16         (WHEREUPON, a brief recess was had.)
        17         MR. COOPER:  I think it's in my
        18   client's best interest not to say anything in
        19   response to the last question.
04:54:26 20        MR. FOWLER:  Is that so?
        21         MR. COOPER:  And that's not to disobey
        22   an order.
        23      BY MR. FOWLER:
        24      Q.  Well, you're the one testifying, right,
```

39 (Pages 153 to 156)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2237

## Page 1

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )


IN RE THE MATTER OF:

THE INTERROGATION OF JOHN SCATCHELL

Officer of the Melrose Park

Police Department.


THE INTERROGATION OF OFFICER

JOHN SCATCHELL, taken before CORDELIA BUSSE WERT,

a licensed Certified Shorthand Reporter of the

State of Illinois, License No. 84-2985, taken at

the Melrose Park Village Hall, 1000 North 25th

Avenue, Multi-Purpose Room, Melrose Park,

Illinois, on the 9th day of January, 2018, at

1:46 p.m.

## Page 2

```
 1   PRESENT:
 2
 3   LANER MUCHIN, LTD., By:
     MR. JEFFREY S. FOWLER
 4   515 North State Street, Suite 2800
     Chicago, Illinois 60654
 5   (312) 467-9800
     jfowler@lanermuchin.com
 6
         Appeared on behalf of the Village of
 7   Melrose Park;
 8   FRATERNAL ORDER OF POLICE, By:
     MR. CHRISTOPHER COOPER
 9   Legal Defense Plan Attorney
     LAW OFFICE OF CHRISTOPHER COOPER, INC.
10   79 West Monroe Street, Suite 1213
     Chicago, Illinois 60603
11   (312) 473-2968
     cooperlaw3234@gmail.com
12
         Appeared on behalf of Officer Scatchell.
13
14
15   ALSO PRESENT: Mr. Sam C. Pisasi, Director
16      Deputy Chief Steven Rogowski
        Deputy Chief Michael Castellan
17      Mr. Raul Rodriguez, FOP Lodge 19
18
19
20
21
22
23
24
```

## Page 3

| | INDEX | |
|---|---|---|
| 1 | | |
| 2 | JOHN SCATCHELL | EXAMINATION |
| 3 | By Mr. Fowler | 4 |
| 4 | | |
| 5 | EXHIBITS | |
| 6 | NUMBER | MARKED FOR ID |
| 7 | Scatchell Exhibit | |
| 8 | No. 1 | 4 |
| 9 | No. 2 | 5 |
| 10 | No. 3 | 11 |
| 11 | No. 4 | 12 |
| 12 | No. 5 | 13 |
| 13 | No. 6 | 17 |
| 14 | No. 7 | 19 |
| 15 | No. 8 | 36 |
| 16 | No. 9 | 49 |
| 17 | No. 10 | 52 |
| 18 | No. 11 | 63 |
| 19 | No. 12 | 70 |
| 20 | No. 13 | 78 |
| 21 | No. 14 | 92 |
| 22 | No. 15 | 94 |
| 23 | No. 16 | 96 |
| 24 | No. 17 | 114 |

## Page 4

```
             1             MR. FOWLER:  This is the interview of
             2   John Scatchell being conducted pursuant to
             3   notice and pursuant to the Police Officer
             4   Disciplinary Act.
01:45:58     5             Mark this as Exhibit No. 1,
             6   please.
             7             (Scatchell Ex No. 1 was marked as of
             8             1/9/18.)
             9   BY MR. FOWLER:
01:46:22    10        Q.  Officer Scatchell, prior to starting, I
            11   had a conversation with your attorney.  I had
            12   tendered to him a document.  He asked for a couple
            13   of changes on it.  I have just marked that
            14   document as Exhibit 1 and tendered it to you.
01:46:36    15             Is that your signature on the lower
            16   right side?
            17        A.  Yes, it is.
            18        Q.  Okay.  You understand that you have
            19   been instructed -- that you are required to answer
01:46:46    20   the questions that we ask you today?
            21        A.  Yes.
            22        Q.  Okay.  Largely I'm going to go through
            23   a chronology of what's happened, but I wanted to
            24   do a couple of things first.
```

1 (Pages 1 to 4)

L.A. Court Reporters, L.L.C.
312-419-9292

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2256

Page 5

1    (Scatchell Ex No. 2 was marked as of
2    1/9/18.)
3    BY MR. FOWLER:
4    Q.  I show you what's been marked as
01:47:22  5    Exhibit 2.
6    Do you recognize this as a memo that
7    you received on or about December 8, 2017?
8    A.  Yes, I do.
9    Q.  When did you receive this?
01:47:34  10    A.  December 8th, I believe.
11    Q.  How did you receive it?
12    A.  Via Department email and then an
13    officer served me at the door, at my front door.
14    Q.  Who was the officer?
01:47:46  15    A.  Officer Nocita, Investigator Nocita.
16    Q.  Now, when you received the letter, did
17    you read it?
18    A.  Yes.
19    Q.  Okay.
01:47:52  20    A.  I had already read it prior to him.
21    Q.  You had read it by email --
22    A.  Correct.
23    Q.  -- when you received it by email?
24    A.  Correct.

Page 6

1    Q.  Then you understood that -- and you
2    understand by this memo that you also have been
3    ordered to answer the questions that I ask you,
4    right?
01:48:08  5    A.  Correct.
6    Q.  And you're required to answer them
7    truthfully and as accurately as you can?
8    A.  Correct.
9    Q.  The letter asks you to bring documents
01:48:18  10    with you responsive to these issues.
11    Did you bring any documents with you?
12    A.  Yes.
13    Q.  What documents did you bring?
14    A.  Pertinent SOPs, copies of this that you
01:48:32  15    guys sent me, and then various doctor notes
16    (indicating).
17    MR. FOWLER:  Chris, do you mind if I
18    come around to see them instead of handing
19    them to me?
01:48:42  20    MR. COOPER:  Well, if you understand
21    what these are, we can hand them to you.
22    BY MR. FOWLER:
23    Q.  Let me see what they are.
24    A.  (Tendering folder.)

Page 7

1    Q.  There's one document here that I'm not
2    familiar with and I think it may be pertinent.  So
3    give me just a second.
4    What I would like to do is to take out
01:50:44  5    these two pages of what you've brought and mark it
6    so that we'll all have a copy of it (indicating).
7    MR. COOPER:  Let me see.
8    MR. FOWLER:  (Tendering documents.)
9    MR. COOPER:  Well, my intuition tells
01:51:12  10    me that that's not the best approach at this
11    time.
12    If you want his medical records --
13    MR. FOWLER:  Are you willing to have him
14    sign a release so that we can get all of his
01:51:26  15    medical records?
16    MR. COOPER:  At some point in time but
17    not today.  I mean, you took the words right
18    out of my mouth.
19    MR. FOWLER:  But at some point in
01:51:36  20    time --
21    MR. COOPER:  You can't do it today.
22    But if you want to ask him questions as to
23    this document, first of all, it's my position
24    he can't answer the question because he's not

Page 8

1    a physician.
2    MR. FOWLER:  Well, he'll be able to
3    answer whatever he can.  If he can't answer,
4    then he'll tell me that.
01:52:10  5    MR. COOPER:  I think it's proper for
6    you to ask questions based on the document, I
7    don't see a problem, but I don't think it's
8    proper for these documents to go into
9    evidence.  I would object to the document
01:52:30  10    being entered into evidence.
11    MR. FOWLER:  Well, it's not -- well,
12    recognize that this is an investigative
13    proceeding.  It's not going into evidence.
14    Are you willing to give me the
01:52:38  15    document?  That's really what I was looking
16    for.
17    MR. COOPER:  No.  I'm willing to allow
18    you to ask questions from the document today.
19    Now, whether we call it evidence or material
01:52:50  20    for the purpose of an interrogation, no, I
21    will not allow this document to become part
22    of the record of today's proceedings.
23    However, I will hand you the document and
24    you're welcome to ask questions.

2  (Pages 5 to 8)

L.A. Court Reporters, L.L.C.
312-419-9292

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2257

## Page 9

```
              1        MR. FOWLER: Okay.
              2    BY MR. FOWLER:
              3        Q.  So, Officer Scatchell, do you
              4    understand that the letter that I've handed you
01:53:14      5    marked as Exhibit 2, the second page, the third
              6    paragraph, says:  You're ordered to bring and
              7    present any relevant evidence, documents, photos,
              8    materials or recordings with you to this meeting
              9    so that such information, if appropriate and
01:53:28     10    relevant, can be considered as part of the
             11    investigation, including, but not limited to, your
             12    medical records relating to your medical leave
             13    since November 9, 2017, and your recreational
             14    activities during the period that you've been on
01:53:42     15    leave since November 9, 2017, and your
             16    participation or involvement in potential illegal
             17    activities by a known felon on or about November
             18    20, 2017, and your contact with any other law
             19    enforcement agencies that may lead to criminal
01:53:58     20    prosecution on or about November 20, 2017; you
             21    understood that in the letter?
             22        A.  Correct.
             23        Q.  And in light of that instruction, the
             24    only documents that you brought are those that
```

## Page 10

```
              1    you've tendered to me today?
              2        A.  Correct.
              3        Q.  But you're not willing to provide me
              4    with copies of or allow me to keep the documents
01:54:22      5    that you've tendered today?
              6        MR. COOPER: I, as an attorney, advise
              7    you that -- and he's here listening to me,
              8    that it's my recommendation as his attorney
              9    that he disallow you from copying any of the
01:54:38     10    documents in that packet today.  And if you
             11    want those documents, it's necessary that the
             12    Village follow the proper procedure which
             13    would be, one, to obtain a release, and he
             14    will sign a release.
01:54:54     15        MR. FOWLER: Okay.
             16    BY MR. FOWLER:
             17        Q.  So my question is: Since this is the
             18    interview of you today --
             19        A.  Right.
01:55:02     20        Q.  -- are you going to follow Mr. Cooper's
             21    advice and not allow me to have these documents or
             22    copies of these documents today?
             23        A.  Yes, I am.  I'm following my attorney's
             24    advice.
```

## Page 11

```
              1        MR. FOWLER: Mark this one, please.
              2        (Scatchell Ex No. 3 was marked as of
              3        1/9/18.)
              4    BY MR. FOWLER:
01:55:26      5        Q.  Showing you what's been marked as
              6    Exhibit 3, did you receive this letter?
              7        A.  Yes, I did.
              8        Q.  When did you receive it?
              9        A.  On or about the 20th of December.
01:55:36     10        Q.  How did you receive it?
             11        A.  Email and also served at the front
             12    door.
             13        Q.  By whom?
             14        A.  Detective Gvist.
01:55:46     15        Q.  And when you received it, you read it?
             16        A.  Yes.
             17        Q.  And you understood by this letter,
             18    you're also instructed to answer the questions
             19    that I ask you today truthfully and accurately?
01:55:56     20        A.  Yes.
             21        Q.  Do you have any medical or
             22    psychological condition that makes you incapable
             23    of participating in this interview today?
             24        A.  Not to my knowledge.
```

## Page 12

```
              1        Q.  Are there any physical limitations that
              2    we need to accommodate for you today?
              3        A.  I'm comfortable.
              4        Q.  If at any time in the process you
01:56:18      5    determine that you are uncomfortable, will you let
              6    me know that?
              7        A.  I will.
              8        Q.  When did you become employed by the
              9    Village of Melrose Park Police Department?
01:56:32     10        A.  2012.
             11        Q.  When you became employed by the
             12    Village, you became aware that the Village had
             13    standard operating procedures?
             14        A.  Yes.
01:56:42     15        Q.  How did you become aware of that?
             16        A.  They gave me a written copy of it which
             17    I signed.
             18        (Scatchell Ex No. 4 was marked as of
             19        1/9/18.)
01:57:04     20    BY MR. FOWLER:
             21        Q.  Showing you what's been marked as
             22    Exhibit 4, do you recognize that?
             23        A.  Yes, I do.
             24        Q.  What is it?
```

3 (Pages 9 to 12)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2258

REPORT OF PROCEEDINGS, 10/02/2018

Page 26

1 BY MR. FOWLER:
2    Q.    To both arms or just one?
3    A.    Just one side.
4    Q.    Which arm?
5    A.    Right side.
6    Q.    And what did he tell you about when
7 that had -- when the onset was?
8        MR. COOPER:  Can I have a continuing
9 objection to any question asked of the witness to
10 testify as to what John Scatchell said to her?  It
11 may make sense that the record shows that this is a
12 continuing objection so that I don't interrupt the
13 witness too many times.
14       MR. O'CONNOR:  It's up to Mr. Fowler if he
15 wants to agree to a continuing objection on that.
16       MR. FOWLER:  I don't think that the statement
17 is objectionable.  But if he wants to have a
18 continuing objection, just so that we don't
19 interrupt the flow, that's fine with me.
20       MR. COOPER:  All right.  And just so that the
21 record's clear, it is respondent's position that
22 this witness cannot testify as to what he said to
23 her and that her testimony as to what he allegedly
24 said to her constitutes hearsay.

Page 27

1    MR. O'CONNOR:  There's an exception to the
2 hearsay for purposes -- or statements made for
3 purposes of obtaining medical treatment is my
4 opinion of the law.  But the Board makes the
5 decisions on the objections.
6    CHAIRMAN ESPOSITO:  Well, I understand that
7 to be different too.  Anything that he said
8 directly to you I don't think would be hearsay.
9       Go ahead.
10   THE WITNESS:  May I refer to the formal
11 notes?
12   MR. FOWLER:  You certainly may.
13   THE WITNESS:  I don't have the details.
14       Would you mark this, please?
15       Let's do it -- do you want it as --
16 the exhibits as the name of the witness Exhibit 1
17 or just a running chronology of ours?
18   MR. O'CONNOR:  The latter.
19   MR. FOWLER:  Then let's say Chief's Exhibit 1.
20       (Chief's Exhibit No. 1 was
21       marked for identification
22       10/02/2018.)
23 BY MR. FOWLER:
24   Q.    Handing the witness what's been marked

Page 28

1 as Chief's Exhibit 1.
2    Q.    Can you tell the Board what that
3 document is?
4    A.    This is a copy of my progress notes of
5 the day I saw John.
6    Q.    And these are notes that you prepared
7 in the ordinary course of business?
8    A.    Correct.
9    Q.    These are documents that are maintained
10 by DuPage Medical Group in the ordinary course of
11 business?
12   A.    Yes.
13   Q.    And does this refresh your recollection
14 as to what Officer Scatchell said to you about the
15 cause of his -- the injury that he came in to see
16 you about?
17   A.    I don't recall, and I did not document
18 a cause.
19   Q.    If you'll look in the notes under HPI,
20 it says, "Accompanied by his parents."  That refers
21 to Officer Scatchell?
22   A.    Right.
23   Q.    That's his?
24   A.    Correct.

Page 29

1    Q.    And then it says "PT reports."  PT
2 refers to Officer Scatchell?
3    A.    Patient, correct.
4    Q.    "... reports waking up with severe
5 right-sided neck pain three days ago with radiation
6 to shoulder down arms to fingertips."  Did I read
7 that correctly?
8    A.    Correct.
9    Q.    Is that what he reported to you?
10   A.    That's what he told me.
11   Q.    And then he also told you associated
12 with numbness and tingling?
13   A.    Yes.
14   Q.    And then he also told you that he was
15 unable to recall any kind of trauma, heavy lifting,
16 pushing, or pulling and that he's been very relaxed
17 and on vacation?
18   A.    Yes.
19   Q.    Is that what he told you?
20   A.    Yes.
21   Q.    Then during that visit, did you come to
22 have his weight taken?
23   A.    Yes.
24   Q.    What was Officer Scatchell's weight on

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2315

REPORT OF PROCEEDINGS, 10/02/2018

Page 30

1 October 31st, 2017?

2    A.   228 pounds.

3    Q.   Did you ask Officer Scatchell anything

4 else about what he's been doing on vacation?

5    A.   I did not.

6    Q.   Did he tell you anything about what he

7 was doing on vacation?

8    A.   I do not recall it, and I did not

9 document it.

10    Q.   Then directing your attention to on or

11 about November 7th of 2017. Did you receive some

12 electronic communications from Officer Scatchell?

13    MR. COOPER: Objection; hearsay. For one

14 thing, Mr. Hearing Officer, the issue -- or Board

15 Members, I'm sorry, when Mr. Scatchell is seeking

16 medical attention, it's a whole other thing when

17 he's communicating with his physician. That

18 communication isn't in her medical office, and it

19 shouldn't be treated as if he's writing her because

20 he's seeking some sort of medical treatment. He's

21 simply communicating with his physician.

22    MR. FOWLER: I think that the objection to

23 the extent that he's given that explanation is

24 premature. The only thing I asked is did she

Page 31

1 receive a written communication. She hasn't

2 testified about what the context is. And I think

3 the testimony as to the context is going to show

4 that it is something that is appropriate to be

5 heard. And in addition to the fact that it's

6 covered by the medical treatment exception. This

7 is a statement of a party opponent. This is an

8 admission against interest. For all of those

9 reasons, this is not hearsay.

10    CHAIRMAN ESPOSITO: I would agree with that.

11    MR. COOPER: It wouldn't be an admission

12 against interest because he is present, although

13 he's not physically here right now. Which rules

14 are we using? I mean, it's a statement of a party

15 opponent. Are we using Board rules? Are we using

16 federal or state civil procedure -- or rules of

17 evidence? I'm sorry. We've had this --

18    MR. O'CONNOR: Well, a statement of a party

19 opponent is recognized as an exception to the

20 hearsay rule under both federal and state law.

21    MR. COOPER: Just that we've had one or more

22 colloquies in this setting in which the issue is,

23 you know, which set of rules do we use. I mean, I

24 think hearsay is generally accepted. Statement of

Page 32

1 a party opponent is perhaps, you know, somewhat out

2 of the ordinary. Is it applicable in this setting?

3    MR. O'CONNOR: Well, I don't know that it's a

4 statement of a -- I mean, it doesn't have to be a

5 statement against interest if it's a statement of a

6 party opponent. And Mr. Scatchell is a party

7 opponent. So it doesn't have to be against his

8 interest. I don't know whether it is or not. I

9 haven't heard what it is. And I don't know -- for

10 all I know, it's for purposes of seeking medical

11 diagnosis or treatment. We're not there yet.

12    MR. COOPER: We're not there yet.

13    MR. O'CONNOR: We're not there yet.

14    MR. FOWLER: Okay to proceed?

15    CHAIRMAN ESPOSITO: Go ahead. Proceed.

16 BY MR. FOWLER:

17    Q.   So the question I asked is did you

18 receive an electronic communication or communications

19 from Officer Scatchell on or about November 7th?

20    A.   Yes.

21    Q.   And --

22    MR. COOPER: I've been handed a copy of --

23 I'm going to object to any questioning of the

24 witness as to text or email-type communications

Page 33

1 between my client and the physician on the grounds

2 that it is hearsay and doesn't qualify as seeking

3 medical treatment. Seeking medical treatment is

4 you show up at your physician's office and say, My

5 back hurts, my neck hurts, and you ask for some

6 sort of treatment.

7    CHAIRMAN ESPOSITO: We have to disagree with

8 you. I think even when you do -- if I were feeling

9 ill and I called my doctor, that would be because

10 I'm ill, not because I just want to communicate

11 with my doctor. I think she has better things to

12 do than just talk to John Scatchell about his

13 personal life or whatever.

14    So go ahead.

15 BY MR. FOWLER:

16    Q.   Dr. Sandoval, does part of your

17 treatment of your patients also include giving

18 directions to them as to what activities they

19 can and cannot do in order to maximize their

20 recuperation? Do you tell them what medical

21 restrictions they should follow?

22    A.   It depends. Specifically if asked or

23 if I know that they have an employment that

24 requires heavy activities, depending on what kind

Urlaub Bowen & Associates, Inc.   312-781-9586

## CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2316

REPORT OF PROCEEDINGS, 10/02/2018

Page 34

1 injury that was sustained, yes.

2    Q.   And likewise, as part of that, as part

3 of your regimen as a physician in issuing

4 restrictions, you would, when requested, issue

5 notes to employers limiting a patient's physical

6 activities?

7    A.   Yes.

8         (Chief's Exhibit No. 2 was

9         marked for identification

10        10/02/2018.)

11 BY MR. FOWLER:

12   Q.   Handing you what's been marked as

13 Chief's Exhibit 2. Can you tell the Board what

14 this is, please?

15   MR. COOPER:  Is this 2, the emails?

16   MR. FOWLER:  Just to be clear on the record,

17 Chief's Exhibit 2 is Bates marked MS021 and MS022.

18   THE WITNESS:  A series of communications

19 involving the note that was requested for his work.

20 BY MR. FOWLER:

21   Q.   So let's look first -- and this is in

22 reverse chronological order, right? So that the

23 most recent thing is on the front page at the top?

24   A.   Yes.

Page 35

1    Q.   Okay. So looking back at the second

2 page, there's two -- and to my reading, it's the

3 same thing. One inside kind of a word bubble, and

4 then that same language is repeated on the bottom

5 of the first page going into the second page; is

6 that right?

7    A.   Yes.

8    Q.   And is that what you understood Officer

9 Scatchell was communicating to you?

10   A.   Yes.

11   Q.   And you understood that as of the time

12 that he wrote this -- which you understood to be

13 November 7th, 2017; is that right?

14   A.   Yes.

15   Q.   And that as of November 7th, he was

16 saying to you, "I'm still in a lot of pain and have

17 been using the heating pad often. The swelling has

18 gone down a little, but it is still visible and the

19 numbness/tingling sensation has been more prevalent

20 in recent days down my right shoulder and arm."

21        You understood that that's what he

22 was communicating to you?

23   A.   Yes.

24   Q.   And he was asking you for a note

Page 36

1 because -- to his employer because he was scheduled

2 to return to work Thursday, the 9th, right?

3    A.   Correct.

4    Q.   Okay. Then sometime after that,

5 there's another communication that he sent to you

6 that's in the middle of the first page; is that

7 right?

8    A.   Yes.

9    Q.   And that's one where he says -- you had

10 sent him a message saying you'd be happy to give

11 him a note. And then he responded, "I'm not sure.

12 I still haven't improved much. Last night I felt

13 much better and today not so much." And he goes

14 on.

15        That's what he wrote to you?

16   A.   Yes.

17   Q.   And as a result of that communication,

18 you prepared a note for his employer; isn't that

19 right?

20   A.   Yes.

21        (Chief's Exhibit No. 3 was

22        marked for identification

23        10/02/2018.)

24

Page 37

1 BY MR. FOWLER:

2    Q.   Handing you what's been marked as

3 Chief's Exhibit 3. Other than the writing on the

4 lower right where it says "Scatchell" and there's a

5 stamp there, other than that writing and the Bates

6 writing on the lower right, is this a true and

7 accurate copy of the note that you prepared on or

8 about November 9th, 2017 at Officer Scatchell's

9 request?

10   A.   It is.

11   Q.   And why did -- you said in this note

12 that, "He remains on active treatment."

13        "He" is Officer Scatchell?

14   A.   Yes.

15   Q.   "... and has been advised to continue

16 to rest at home." Is that what you advised him to

17 do?

18   A.   Yes.

19   Q.   Why did you advise him to continue to

20 rest at home?

21   A.   Because through the communication he

22 had with me, he was telling me that he was still

23 not feeling back to normal, he was still having

24 symptoms, he wasn't well. And I didn't want him to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2317

REPORT OF PROCEEDINGS, 10/02/2018

Confidential
Page 38..41

**Page 38**

1 aggravate the situation any more.

2    Q.   Then directing your attention to

3 November 21st of 2017. Did you receive an

4 electronic communications from Officer Scatchell

5 on that date?

6    A.   I did.

7        (Chief's Exhibit No. 4 was

8        marked for identification

9        10/02/2018.)

10 BY MR. FOWLER:

11    Q.   Handing you what's been marked as

12 Chief's Exhibit 4. If you'd like rather than hold

13 these, you can set these here. That's fine.

14        Would you tell the Board what

15 Chief's Exhibit 4 is, please?

16    A.   It is another communication via my

17 chart, which is an email system.

18    Q.   And, again, this is a document

19 that's -- what was the purpose of this note?

20 Was it for medical care and treatment?

21    A.   An update on how he was doing.

22    Q.   And this system that you refer to,

23 that's the system that DuPage Medical Group uses

24 to maintain medical records?

**Page 39**

1    A.   Yes.

2    Q.   And you use it to maintain medical

3 records?

4    A.   Yes.

5    Q.   So there's two entries here. The same

6 as we saw before, on the first page, there's a --

7 something that says "note" underneath the name

8 Karen Cozzi, and then there's a line that says John

9 A. Scatchell to Maryam Sandoval, MD.

10        And you are Maryam Sandoval, MD,

11 right?

12    A.   Yes.

13    Q.   You understood that this was a

14 communication from Officer Scatchell to you?

15    A.   Yes.

16    Q.   And he said in this note, "I still have

17 considerable amount of pain particularly if I don't

18 take any pills for prolonged period of time. The

19 numbness in my right arm comes and goes all day.

20 Also, if I move my neck too fast or too far, I get

21 a quick shooting sensation down my whole arm. I

22 haven't been engaged in really any activity at all

23 except stretches and have been applying heat/cold

24 around the clock."

**Page 40**

1        Is that what he wrote to you?

2    A.   Yes.

3    Q.   Were you aware during this time that he

4 was out hunting every day or many days?

5        MR. COOPER: Objection.

6        MR. FOWLER: Let me reask the question.

7        MR. COOPER: Hold on. I want to make my

8 objection.

9        MR. FOWLER: I withdraw the question.

10        CHAIRMAN ESPOSITO: Reask your question.

11 BY MR. FOWLER:

12    Q.   Were you aware that he was out hunting?

13        MR. COOPER: Objection; leading, irrelevant,

14 speculation.

15        CHAIRMAN ESPOSITO: Sustained.

16        Go ahead.

17 BY MR. FOWLER:

18    Q.   The next communication that you had

19 from Officer Scatchell, when was it?

20    A.   November 27th.

21    Q.   Is it possible that you had a

22 communication from him on November 26th?

23    A.   I do not recall that.

24

**Page 41**

1        (Chief's Exhibit No. 5 was

2        marked for identification

3        10/02/2018.)

4 BY MR. FOWLER:

5    Q.   Okay. Handing you what's been marked

6 as Chief's Exhibit 5. Will you take a minute and

7 look at that. And then I'll ask you a question

8 after you've looked at it.

9    A.   (Reviewing exhibit.)

10        I'm ready.

11    Q.   Does that refresh your recollection

12 as to whether you received a communication from

13 Officer Scatchell on November 26th, 2017?

14    A.   It does.

15    Q.   And is this document a copy of your

16 notes or chart showing the communication that you

17 received from Officer Scatchell on or about

18 November 26th, 2017?

19    A.   Yes.

20    Q.   And just to be clear, toward the bottom

21 two-thirds of the document under the date that's

22 marked November 26th, there's a line that says,

23 John A. Scatchell to Maryam Sandoval, MD, and then

24 underneath that it says, "Hi, Dr. Sandoval," and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2318

**Page 14**

1  (Recess taken.)
2  MR. FOWLER: We have one more procedural or
3  housekeeping issue. It's a stipulation that Vito
4  Scavo has been subpoenaed to testify here in this
5  hearing. I believe that the parties are prepared
6  to stipulate that if called to testify he would
7  refuse to answer any questions and would instead
8  assert his rights under the Fifth Amendment.
9  MR. COOPER: So the point is he's not coming.
10  CHAIRMAN ESPOSITO: Okay.
11  MR. O'CONNOR: Well, yeah, but you agree that
12  that's -- you stipulate that if called that would
13  be his testimony?
14  MR. COOPER: I do.
15  MR. O'CONNOR: Okay.
16  CHAIRMAN ESPOSITO: Okay.
17  MR. FOWLER: With that, we're prepared to
18  make opening statement.
19  CHAIRMAN ESPOSITO: All right.
20  MR. FOWLER: If you want opening statement,
21  or we can just go straight to the first witness
22  since you've read the charges.
23  CHAIRMAN ESPOSITO: What are you comfortable
24  with?

**Page 15**

1  MR. FOWLER: Either way.
2  CHAIRMAN ESPOSITO: I don't think we need an
3  opening statement. I think we can just start with
4  the --
5  COMMISSIONER CAPUTO: Let's go.
6  CHAIRMAN ESPOSITO: I think we know what the
7  charges are.
8  MR. FOWLER: Very well. In that case, we
9  could call Officer Scatchell.
10  MR. COOPER: Two things.
11  Officer Scatchell has a right not to
12  incriminate himself. So Officer Scatchell will not
13  take the stand.
14  And then there was one other issue I
15  want to raise.
16  MR. FOWLER: Is there another issue you want
17  to raise now?
18  MR. COOPER: Yeah. One second. We're
19  looking at something on the computer.
20  CHAIRMAN ESPOSITO: Are Mr. and Mrs. Scatchell
21  going to be witnesses? Are they listed as
22  witnesses?
23  MR. COOPER: Oh, hi.
24  No. No, they're not.

**Page 16**

1  CHAIRMAN ESPOSITO: They're not witnesses.
2  Okay. So they could stay.
3  MR. COOPER: So it's my understanding that
4  there was not notice of this hearing, so it's our
5  position that the Open Meetings Act has been
6  violated. Not much more I can offer, but I do
7  think it's necessary --
8  CHAIRMAN ESPOSITO: This is not a -- this is
9  not a regular meeting. This is a continuance of
10  the hearing that was scheduled ahead of time. So I
11  don't think we have to post that. I believe in our
12  bylaws, our laws, we have to post meetings that are
13  regularly scheduled meetings. But a continuance of
14  this nature I don't believe it needs to be
15  scheduled.
16  Okay. Any other complaints?
17  MR. COOPER: No.
18  CHAIRMAN ESPOSITO: Thank you.
19  Go ahead, Mr. Fowler.
20  MR. FOWLER: We call Officer Scatchell.
21  And I would remind Officer Scatchell
22  that on January 9th, he was specifically given a
23  Garrity warning where he was required to answer
24  questions, ordered to answer questions, and was

**Page 17**

1  given the appropriate Garrity warning at the time.
2  And I would ask Deputy Chief
3  Castellan to now verbally renew the Garrity warning
4  that Officer Scatchell was given on January 9th,
5  2018.
6  MR. COOPER: So the --
7  MR. FOWLER: Just before -- is that correct,
8  Deputy Chief?
9  DEPUTY CHIEF CASTELLAN: Yes, it is.
10  MR. COOPER: So the Garrity has no
11  applicability to an administrative hearing. And
12  that's something that would have to be briefed.
13  It's not something I can explain in the next three
14  or four minutes. It is something I have briefed in
15  the past.
16  There's no applicability of Garrity
17  to this proceeding. He has a Fifth Amendment right
18  not to incriminate himself. And the only party --
19  or let me rephrase it. The only one who can call
20  him as a witness is me. Not Mr. Fowler. I have
21  yet to make a decision as to whether or not Officer
22  Scatchell will give testimony. But he will not
23  take the stand at this point.
24  And it's sort of a double-edged

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2358

HEARING, 10/22/2018                                      Page 18..21

Page 18

1  sword for the Melrose Park Police Department
2  because if the police department takes the position
3  it's going to fire him for not giving testimony,
4  it'll be reversed, and it'll be back.
5          If the police department takes the
6  right position, and that is wait to see if I call
7  him as a witness, things will be fine, meaning that
8  the police department sensed that -- or its
9  position that it wants to have some sort of
10 strength in the circuit or the appellate court,
11 that strength may still be there, but if -- so in
12 some ways, I'm actually hoping that there's an
13 order right now for him to take the stand.
14         MR. FOWLER: We're happy to comply with that.
15             Deputy Chief Castellan, would you
16 give Officer Scatchell an order to take the stand
17 and answer questions pursuant to his Garrity
18 warning?
19         DEPUTY CHIEF CASTELLAN: John.
20         OFFICER SCATCHELL: Yes.
21         DEPUTY CHIEF CASTELLAN: I order you to take
22 the stand and answer all questions truthfully and
23 honestly.
24         OFFICER SCATCHELL: At this time I assert my

Page 19

1  Fifth Amendment right.
2          MR. FOWLER: In light of the assertion of the
3  Fifth Amendment right in that this is a civil
4  proceeding, the rule of law is that the Board is
5  entitled to take the Fifth Amendment right against
6  him, to use it as an inference against him, and to
7  assume that all of the charges are therefore true.
8  Based upon that and based upon his refusal to obey
9  a direct order right in your presence, we would
10 suggest that there's nothing else needed in this
11 hearing and that he be discharged effective today.
12         MR. COOPER: And under Illinois law, that's
13 just not accurate. And, again, this isn't
14 something we can resolve right now. In the past
15 when this has come up, we filed briefs.
16             And it's a pretty extraordinary
17 process. I have never known of an officer being
18 forced to testify. If an officer is forced to
19 testify, he's reinstated fairly quickly by the
20 Circuit Court.
21         MR. FOWLER: Obviously we disagree with
22 counsel on the law.
23         MR. O'CONNOR: Okay. So, Chris, if he's
24 right on the law, you brief it out and he's right

Page 20

1  on the law, then you agree that there's no need for
2  further evidence?
3          MR. COOPER: Sure. But he's not right on the
4  law, because I've been down this road before.
5          MR. O'CONNOR: Mr. Fowler, you believe you're
6  right on the law?
7          MR. FOWLER: I do.
8          MR. O'CONNOR: So what do you want to do? Do
9  you want to brief this? And we'll find out, and if
10 you're right, then the charges are deemed admitted.
11         MR. FOWLER: I would be happy to brief this,
12 and perhaps since --
13         MR. O'CONNOR: It's not for me to say.
14             Do you have other witnesses you want
15 to call for the rest of tonight?
16         MR. FOWLER: I just let them leave. I can
17 call them back.
18             But at this point, I think it
19 probably makes most sense for the parties to brief
20 this and present their written briefs tomorrow when
21 we resume at 5:30.
22         MR. COOPER: That's not enough time. This is
23 a big deal. And when this issue has been briefed,
24 it takes a lot of time.

Page 21

1          MR. O'CONNOR: Well, I know, Chris, it might
2  be a big deal, but if you've got a case that says
3  what you say it does, and you've got a case that
4  says opposite, then it doesn't seem like it would
5  be too much. I mean, you don't have to do a brief.
6  It maybe could be a formal letter, This case
7  compels that the Board rule in my favor, and you
8  say that, This case compels the Board rule in my
9  favor. I mean, how much time are you looking for?
10 A couple days? Because it's not going to be a
11 month.
12         MR. COOPER: Last time I filed a brief like
13 this, it was about 16 pages.
14         MR. O'CONNOR: Well, just give us that brief.
15         MR. COOPER: I know. I can switch things
16 around.
17         MR. O'CONNOR: It's up to the Board.
18         COMMISSIONER CAPUTO: How much time do you
19 need, Chris?
20         MR. COOPER: Couple days.
21         COMMISSIONER CAPUTO: Couple days? If we go
22 tomorrow, and Wednesday enough, or do you want to
23 come Thursday?
24         MR. COOPER: I mean, we just -- the way I see

Urlaub Bowen & Associates, Inc.   312-781-9586

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2359

 *Garrity*

## ADMINISTRATIVE NOTICE/WARNING TO OFFICER JOHN SCATCHELL, JR.

### RE: INVESTIGATION OF JANUARY 9, 2018

1.    We received information that you may have been involved in a situation where a felon was in possession of and used a firearm.  We are conducting an investigation into the allegations that were reported to us.

2.    You are hereby advised that you are given immunity from criminal prosecution on the basis of your answers to the questions you are asked today. Stated another way, nothing you say in this investigation will be given to any Illinois or federal law enforcement agents or offices.

3.    Additionally, nothing that you say during the interrogation today can or will be used against you in any criminal proceeding.

4.    ~~This is not to say that the matter will or will not be referred to the appropriate law enforcement officials for investigation and/or prosecution in their discretion. Only that~~ your statements will not be disclosed to them at any time or in any investigation or criminal proceeding.

5.    Having been given immunity as set forth above, you are hereby warned that because of that immunity, you may not refuse to answer the questions on the ground that the answers may incriminate you. Accordingly, if you refuse to answer the questions, you will be subject to discipline up to and including your dismissal for insubordination for failing to comply with our directive that you answer our questions related to this investigation.

I acknowledge receiving the above notice and warning, and state that I fully understand what it says and means, and that I am not under any mental impairment or disability.

Dated: 1/9/18                              _____
                                           John Scatchell, Jr.

                                           Dep Ex No. 1
                                           for ID, as of 1/9/18

EXHIBIT *Chief's*
WIT:
DATE: 10-22-18
Nick D. Bowen, CSR

4822-0747-1450.v1-1/5/18                    CHIEF'S EXHIBIT ___

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

REPORT OF PROCEEDINGS, 10/25/2018                                Page 2..5

---

**Page 2**

1  APPEARANCES:
2       LANER MUCHIN, by
        MR. JEFFREY S. FOWLER and
3       MR. JOSEPH M. GAGLIARDO
        (515 North State Street, Suite 2800
4       Chicago, Illinois  60654-4688
        312.494.5360
5       jfowler@lanermuchin.com
        jgagliardo@lanermuchin.com)
6           appeared on behalf of Chief Pitassi
            and Deputy Chief Castellan and the
7           Village of Melrose Park;
8  LAW OFFICE OF CHRISTOPHER COOPER, INC., by
   MR. CHRISTOPHER C. COOPER
9       (79 West Monroe Street, Suite 1213
        Chicago, Illinois  60603
10      312.473.2968
        cooperlaw3234@gmail.com)
11          - and -
   LAW OFFICES OF GIANNA SCATCHELL, PC, by
12  MS. GIANNA SCATCHELL
        (360 West Hubbard Street, Suite 1404
13      Chicago, Illinois  60654
        gia@lawiirm.gs)
14          appeared on behalf of the respondent.
15
16          * * * * * * *
17
18
19
20
21
22
23
24

---

**Page 3**

1       CHAIRMAN ESPOSITO:  Call the meeting to order.
2       Roll call.
3       Pat Esposito.
4       COMMISSIONER CAPUTO:  Mike Caputo.
5       COMMISSIONER RAUZI:  Mark Rauzi.
6       CHAIRMAN ESPOSITO:  Everybody else here
7  please identify themselves for the court reporter.
8       MR. COOPER:  Good afternoon, members of the
9  Commission.  Christopher Cooper on behalf of
10 Officer John Scatchell with the Fraternal Order of
11 Police, the respondent.
12      MR. FOWLER:  Jeffrey Fowler and Joseph
13 Gagliardo as counsel for the deputy chief, chief,
14 and Village of Melrose Park, Deputy Chief Michael
15 Castellan, Director of Police Sam Pitassi, and our
16 colleague, Paralegal Denise Kato.
17      CHAIRMAN ESPOSITO:  Okay.  With that we'll
18 get started.
19      Okay.  We have read each side's
20 brief and have a few questions.
21      First, Mr. Cooper, do you believe
22 that your client does not have to take the stand
23 as an adverse witness in Mr. Fowler's case?
24      MR. COOPER:  I believe he does not have to

---

**Page 4**

1  take the stand, right.  And I cite to Gardner
2  versus Broderick, and I cite to a bevy of Illinois
3  case law.
4       CHAIRMAN ESPOSITO:  That's in your brief,
5  right?
6       MR. COOPER:  Right.
7       CHAIRMAN ESPOSITO:  Right.
8       Is it your intention -- Mr. Fowler,
9  is it your intention to call Sergeant Scatchell in
10 your case?
11      MR. O'CONNOR:  Officer.  Did you say
12 "sergeant"?
13      CHAIRMAN ESPOSITO:  I mean Officer Scatchell.
14 I'm sorry.  Officer Scatchell.
15      MR. FOWLER:  It was, in fact, our intention.
16 We did call him on Monday, and he refused to even
17 to take the stand.
18      If I can have a minute.  In going to
19 that issue, on Monday, I made the oral motion that
20 Officer Scatchell be discharged based upon his
21 conduct and also based upon the adverse inference.
22      I would respectfully request leave
23 to file either instanter or nunc pro tunc an
24 amended statement of charges adding count 13, which

---

**Page 5**

1  is a count based upon the conduct on Monday,
2  October 22nd.
3       Also, just -- I understand that --
4  I was handed by Mr. Cooper just before we walked
5  in a brief that he submitted that in addition to
6  addressing the Garrity issue that he also addressed
7  the adverse inference issue.  And I'd like to
8  submit a brief to the Board on the adverse
9  inference issue as well.  I have four copies.
10      And finally, since the briefs all
11 reference a document that Officer Scatchell had
12 already submitted to the Board in his answer to the
13 charges, just as a courtesy to the Board, I am
14 handing up what's been marked as Chief's Exhibit
15 12, which is a copy of his answer and the
16 interrogation transcript which he submitted with
17 the answer back in March.
18      CHAIRMAN ESPOSITO:  Okay.
19      MR. COOPER:  Respondent objects to any
20 amendment of charges.  It would be an incredible
21 abuse of discretion by this Board to allow for
22 amended charges.  Officer Scatchell has not had an
23 opportunity to prepare for the defense of the
24 additional charge.  We essentially have to go back

---

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2370

HEARING, 11/09/2018                                    Page 130..133

Page 130

1 state.

2    Q.   Okay.  And is it true that one of your
3 duties is to make sure that when people do go
4 hunting they follow hunting rules?

5    A.   Correct.

6    Q.   Okay.  So there came a point in time
7 when Sergeant Wollgast perhaps assigned you or told
8 you that you should be on the lookout for a person
9 who may be discharging a firearm and that he's a
10 convicted felon?

11    A.   Correct.

12    Q.   Okay.  And at some point you discovered
13 that there was some truth to that, correct?

14    A.   Correct.

15    Q.   Okay.  So I want to go back in time.
16 Over the years -- let me back up.

17         How long have you been a conservation
18 officer?

19    A.   I've been a conservation police officer
20 since January 3rd of 2000.

21    Q.   Okay.  You look really young.

22    A.   I've been a police officer since 1993.

23    Q.   Well, see, some of us age very well.
24 Me and him, right?  Okay.  We're all chuckling.

Page 131

1    CHAIRMAN ESPOSITO:  And the Board.

2 BY MR. COOPER:

3    Q.   So at some point before the matter for
4 which you're here today, you've seen my client,
5 Officer John Scatchell, correct?

6    A.   I don't necessarily recall seeing
7 Officer Scatchell before that day, no.

8    Q.   Okay.

9    A.   I may have.  But I don't recall.

10    Q.   Okay.  And there came a point in time
11 when you did some surveillance and you saw Vito
12 Scavo discharge a weapon?

13    A.   Correct.

14    Q.   Or someone -- did you know he was Vito
15 Scavo at the time you saw him discharge the weapon?

16    A.   Yeah.  I had checked Mr. Scavo on
17 occasions before this day at that location.

18    Q.   Oh, really?

19    A.   I knew who I was looking at, yeah.

20    Q.   Okay.  Okay.  Okay.  And at any point
21 in time did you see my client, who's sitting here
22 right alongside me, did you see him hand Mr. Scavo
23 a firearm?

24    A.   No, I did not.

Page 132

1    Q.   Okay.  Isn't it true that there came a
2 point when you realized that a man by the name of
3 Mr. Bono had given Vito Scavo the firearm you saw
4 him discharge?

5    A.   That's what I was told by Mr. Bono, yes.

6    Q.   Okay.  All right.  And at the time that
7 you observed Mr. Scavo discharge the firearm -- and
8 you're welcome to look at your report if you need
9 it; I have it to refresh your memory -- you were
10 how far away from Mr. Scavo?

11    A.   Like I mentioned in my report, using
12 the Google measuring tool, I was approximately 230
13 yards away.

14    Q.   230 yards away?

15    A.   Right.

16    Q.   Okay.  And as a conservation officer,
17 you're familiar with the different types of
18 hunting?

19    A.   Yes.  Oh, yes.

20    Q.   Okay.  So why don't you describe this
21 type of hunting and the boat that's used by the
22 people who engage in it?

23    A.   Okay.  The group was waterfowl hunting.

24    Q.   Okay.

Page 133

1    A.   They were out on a quarry, lake, pond.

2    Q.   Sure.

3    A.   And the boat was covered in grass,
4 reeds, whatever, that had a frame, metal frame
5 structure, at least I believe -- yeah, it was
6 metal.

7    Q.   Okay.

8    A.   That was built up from the sides of the
9 boat, the gunnels of the boat, and then kind of
10 came to kind of like a point like on a house.  And
11 one section of it, I think it lifts back.  Some
12 lift down and others lift back.  I think this one
13 was able to lift back to expose the hunters when
14 the birds came in; then they could shoot.

15    Q.   Okay.  And when this -- is it a tarp
16 that you lift back?

17    A.   No.  It's a full frame that's still
18 covered in the grass and reeds that's on a -- is
19 made in such a way that they can just -- it kind of
20 lifts up and back.

21    Q.   And the whole idea is camouflage?

22    A.   Correct.

23    Q.   So the birds are that smart?  I'm
24 asking because I'm not a hunter.  The birds are

Urlaub Bowen & Associates, Inc.   312-781-9586

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2426

Page 138

1 identified himself, I mean, he wasn't doing
2 anything wrong; he was doing what we as cops do?
3      A.   Correct.
4      Q.   Okay.  And my client expressed himself
5 by saying, Hey, we're all law enforcement here,
6 right?  That's what you wrote and that's what --
7 you wrote in the report, something --
8      A.   That was part of what he told me, yeah.
9      Q.   Right.
10          Now, at the time you're talking with
11 my client, and this is very crucial, did you say to
12 my client, I'm going to cause Mr. Scavo to be
13 arrested?
14     A.   I don't believe I ever said that.
15     Q.   Okay.  So you never told Mr. Scavo --
16 and I'm not criticizing you, but at no point did
17 you tell -- I'm sorry, Mr. Scatchell -- Officer
18 Scatchell what your intentions were?
19     A.   No.
20     Q.   Okay.  So Officer Scatchell would not
21 know that ultimately you were doing your job and
22 notify the state's attorney?
23     A.   I don't know --
24     Q.   How he would know.

Page 139

1      A.   -- what he would know what I was
2 thinking, no.
3      Q.   All right.  One moment, please.
4          One last question.  Again, and I'm
5 not a hunter.  I understand in this type of hunting
6 people bring dogs along.  Is that your experience?
7      A.   (Nodding.)
8      Q.   When the men in the boat start
9 discharging at the birds, do you know how a
10 dog reacts?
11     A.   It depends on the dog.
12     Q.   Okay.  Is it --
13     A.   Some dogs -- most hunting dogs are used
14 to it, and they don't really respond.  If they're
15 well trained, they don't leave or move until
16 they're told.
17     MR. COOPER:  Okay.  I have nothing further
18 for you at this time.  Mr. Fowler may have
19 questions for you.
20     MR. FOWLER:  Thank you, sir.
21          CROSS EXAMINATION
22 BY MR. FOWLER:
23     Q.   So I don't think Mr. Cooper asked
24 specifically.  This was November 20th of last year

Page 140

1 that you saw Mr. Scavo and Mr. Scatchell on a boat?
2      A.   I believe so.  Whatever I put on my
3 report.  I can't remember the exact date.
4     MR. FOWLER:  Okay.  Do you have a copy of the
5 report?
6     THE WITNESS:  I do in my back pocket.
7     MR. FOWLER:  Tell you what.
8     MR. COOPER:  You're going to give him --
9     MR. FOWLER:  I'm going to show it to him, but
10 I'm showing it to you first.
11     MR. COOPER:  Okay.  To refresh his memory?
12     MR. FOWLER:  Yes.
13     MR. COOPER:  Did you establish that -- did
14 you -- I may have started daydreaming because it's
15 late.  Did he already say his memory is exhausted?
16     MR. FOWLER:  He said --
17     CHAIRMAN ESPOSITO:  He said he didn't
18 remember the date.
19     MR. COOPER:  That's close enough.  I'll
20 accept that.
21     CHAIRMAN ESPOSITO:  His memory is exhausted.
22 Like ours.
23 BY MR. FOWLER:
24     Q.   So I'm handing you a document that's

Page 141

1 been marked as Petitioner's Exhibit 14.
2          Do you recognize that as your
3 report?
4      A.   That is my report.
5      Q.   All right.  And take a look at that for
6 a moment, and then when you're ready, let us know
7 whether that refreshes your recollection as to the
8 date.
9      A.   Yes, it does.
10     Q.   All right.  And the date was
11 November 20th?
12     A.   Correct.
13     Q.   The -- on November 20th, what time of
14 day were you doing surveillance of Mr. Scavo and
15 Mr. Scatchell and the others in the boat?
16     A.   I got out to that location a little bit
17 before 7:00 o'clock.
18     Q.   And then how long did you do
19 surveillance on them?
20     A.   I went back to my squad somewhere
21 around 9:00.  This is all approximate, but pretty
22 close.
23     Q.   So an hour and a half to two hours
24 watching them in the boat with binoculars?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2428

Page 142

1    A.   Correct.
2    Q.   During that period of time that you saw
3 Mr. Scavo shooting?
4    A.   I did.
5    Q.   You also saw Officer Scatchell shooting?
6    A.   I did.
7    Q.   How many different times did you see
8 Officer Scavo -- or Mr. Scavo shooting that day?
9    A.   I don't recall for sure, but I think
10 four, five, six, seven. Several.
11   Q.   Spread out throughout the course of the
12 time?
13   A.   Correct. As birds came in.
14   Q.   And then when they came to the boat --
15 or when they came to shore, you met them at the
16 shore, right?
17   A.   Correct.
18   Q.   When you met them at the shore, before
19 you took Mr. Scavo aside, did you do an inspection
20 of the boat?
21   A.   I did do an inspection of the boat.
22 I can't remember whether I did it at the very
23 beginning or at the end of the encounter.
24   Q.   Okay. If you'd like to take a look at

Page 143

1 your report, please feel free.
2    A.   Yes. At the beginning of the
3 encounter.
4    Q.   All right. So looking at your report
5 refreshes your recollection?
6    A.   Yes, it does.
7    Q.   And so when they came to shore, did you
8 do an inspection of the boat right away?
9    A.   I did.
10   Q.   What did you find?
11   A.   That he did not have a type IV
12 throwable or workable fire extinguisher.
13   Q.   And when you say "he," who is "he"?
14   A.   Officer Scatchell.
15   Q.   And that's because it was his boat,
16 right?
17   A.   Correct. He identified himself as the
18 owner of the boat and he was operating -- more
19 importantly, it doesn't matter whether he was
20 opening -- or the owner of the boat. He was the
21 one -- he was the operator of the boat.
22   Q.   And that was a violation, right?
23   A.   Correct. Both of those are minor
24 equipment violations for a boat.

Page 144

1    Q.   You didn't write him a citation,
2 though; you just told him about it?
3    A.   Correct.
4    Q.   Then you took Mr. Scavo aside?
5    A.   I did.
6    Q.   And Mr. Scavo admitted to you that he
7 was shooting on November 20th, didn't he?
8    A.   Yes, he did.
9    Q.   Then -- well, strike that.
10        Ultimately Mr. Scavo was cooperative
11 with you?
12   A.   Yes.
13   Q.   All right. You came back to the group,
14 and then you took the others out one by one and
15 were chatting with each of them?
16   A.   Correct.
17   Q.   At some point you talked with Officer
18 Scatchell?
19   A.   I did.
20   Q.   Anybody else present at that time?
21   A.   They were all in the general area, but
22 we had our own -- we were separate from the group,
23 and we had what I would consider a private
24 conversation, yes.

Page 145

1    Q.   During that conversation, what did you
2 say and what did Officer Scatchell say to you?
3    A.   I had asked him if he had saw Mr. Scavo
4 shoot. And he said that he could not say whether
5 he did or did not.
6    Q.   What did you say back?
7    A.   I let him know that I have observed him
8 for however long I had and asked him again, or
9 something similar, rephrased my question, reasked
10 my question. And his response was, We're all law
11 enforcement here. We know what's going on, or
12 something very similar to those words. I couldn't
13 tell you exactly.
14   Q.   What did you take that statement to
15 mean?
16   A.   My belief at that time, and continues
17 to be my belief, was that he knew that Mr. Scavo
18 was shooting, but he wasn't going to tell me that.
19 Because he knew Mr. Scavo couldn't -- it would be
20 my assumption and at that time was my assumption
21 that he knew that Mr. Scavo couldn't have the
22 firearm because of his legal status.
23   Q.   Did you communicate to Officer
24 Scatchell that you didn't believe him when he

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2429

**Page 146**

1 said he didn't see him shooting?

2     A.   I honestly don't recall whether I did

3 or not. I don't think that I did, but I may have.

4     **Q.   But that kind of attitude, that tone,**

5 **didn't you say something like, You're going to go**

6 **with that story? something like that?**

7     A.   I don't recall for sure. I don't know.

8     **Q.   Please take a look at your report.**

9     A.   Yes. Yes, I did.

10     **Q.   And how did Officer Scatchell respond**

11 **to that?**

12     A.   He, again, said, I -- he again said

13 that I -- he could not tell me one way or the other

14 whether Mr. Scavo was shooting or not.

15     **Q.   You said that Mr. Scavo was cooperative**

16 **with you.**

17     A.   At the end he was. Initially he was

18 denying it. But at the end he admitted to

19 everything and was very cooperative.

20     **Q.   During that one-on-one interview with**

21 **Officer Scatchell, was he cooperative with you?**

22     MR. COOPER: Objection; asked and answered.

23 He already said he was cooperative.

24     CHAIRMAN ESPOSITO: I don't remember that

**Page 147**

1 part.

2         Answer the question.

3     THE WITNESS: Excuse me?

4     CHAIRMAN ESPOSITO: Answer the question.

5     THE WITNESS: I don't believe he was being

6 truthful with me. He was polite and answered

7 questions, but I don't believe he was being

8 truthful.

9     MR. FOWLER: Okay. That's all I have.

10         REDIRECT EXAMINATION

11 BY MR. COOPER:

12     **Q.   Is it true, Officer, that sometimes we**

13 **will ask people questions and we form an opinion as**

14 **you have that someone knows something they're not**

15 **telling us something?**

16     A.   Yes.

17     **Q.   But it's also the case -- I'm sure**

18 **I've mistakenly arrested a person. I'm sure it**

19 **happened -- it's happened to all of us.**

20         **Isn't it possible that he didn't**

21 **know?**

22     A.   I'm not going to say 100 percent that

23 it was impossible that he did not know that

24 Mr. Scavo was in possession of a firearm or shot,

**Page 148**

1 no. I cannot say --

2     **Q.   It could go either way?**

3     A.   I can't say 100 percent. But I could

4 say I wouldn't have been in a boat that long, in

5 that small a boat --

6     **Q.   And not know?**

7     A.   -- heard that many shots and not known

8 myself.

9     MR. COOPER: Okay. That's fair enough. All

10 right. Nothing further. Thank you very much.

11     MR. FOWLER: Can I have just a minute?

12     CHAIRMAN ESPOSITO: Sure.

13     MR. FOWLER: That's all.

14     COMMISSIONER CAPUTO: Thank you.

15     CHAIRMAN ESPOSITO: Thank you.

16         (Witness excused.)

17     MR. COOPER: Give me a moment here. We'll

18 see who else is out in the hallway.

19         (Brief pause.)

20     MR. COOPER: Okay. I have to regroup and

21 find ...

22     MR. FOWLER: Can we go back on the record for

23 a minute?

24     MR. COOPER: Yes.

**Page 149**

1     MR. FOWLER: All right. I'm tendering to the

2 Board Petitioner's Exhibit 14. It was not --

3     MR. COOPER: That's absurd.

4     MR. FOWLER: It was not --

5     MR. COOPER: That is absurd.

6     MR. FOWLER: It's offered into evidence --

7     MR. COOPER: That is getting around -- he

8 rested. That is absolute hearsay. And we don't do

9 that in the law.

10     MR. FOWLER: Can I finish my point before I

11 get interrupted again, please?

12     CHAIRMAN ESPOSITO: Go ahead.

13     MR. FOWLER: There was an offer of proof.

14 In order for the record to be complete, the

15 document is being -- sorry, not an offer of proof.

16 The document was marked for the purpose of the

17 witness refreshing his recollection. Because the

18 document was marked, it was reviewed, it's being

19 submitted solely for that purpose. It's not being

20 offered into evidence. It wasn't offered into

21 evidence. It's just for a complete record.

22     MR. COOPER: We don't do that in the United

23 States. We just don't. It's hogwash. And right

24 now the wool is being pulled over your eyes. He

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2430

Administrative   Agency: Melrose Park PD    Incident #: 201600028440    Case_Nr:
Report No. 2   Entered: 01/19/2017 10:43   By Officer: MP7442 Melrose Park S Rogowski

20 DEC 16 1615 hours: Spoke to listed witness PANZANI who related he resides at
. On the night of the incident at he was lying in bed with his wife Charese
Panzani F/W         when he heard three loud reports he believed to be gunshots in the
area. He said his wife phoned 911 to report the sounds. He further stated that he didn't see
any suspects and did not speak to any responding officers.

23 DEC 16 On 21 Dec 16 at 1810 hours the listed victim SCATCHELL contacted me by
text asking about the case status. Set up a time to meet with him the morning of 22 DEC
16.

22 DEC 16 at about 0945 hours I contacted the victim by text to get a location to meet.
Victim said he preferred to meet during the morning of 23 DEC 16 at would call back.

23 DEC 16 Met with Victim in my office. Said that his surveillance cameras didn't
pickup any useful evidence. When asked about the witness he spoke earlier about he
provided his neighbor Leonard LNU at         a M/B. Victim stated he wishes to
seek criminal complainants against the offender(s).

26 DEC 16 1320 hrs rang door bell at         without answer

30 DEC 16 1520 hrs rang door bell at         without answer Vehicle Q56 5517 in
driveway

04 JAN 17 0830 hrs sent letter to Leonard McNeal at        . name located on
Thomson Reuter search. No response from McNeal as of 0111617

CASE INACTIVE NO NEW LEADS.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2567

## Re: Criminal Investigation Status inquiry

From: "" <jscatchell@melroseparkpd.com>
Date: 02/17/2017 12:05
To: srogowski@melroseparkpd.com

Steve,
No one ever came out to interview the neighbors or anyone else within my household. Secondly what action or discipline was taken against Chiappetta for the Assault as I was a victim, I am presently a Lt. for the Melrose Park Police Dept and also at the time of the Assault, I have been a Police Officer for 32 years,
A Melrose Park resident for 55 years. I would appreciate a little common courtesy as a fellow officer but none apparently had been considered.
I thank you and in closing I would of handled this in a different way due to the factors involved present & past History with several of the individuals.

Thanks Lt. John Scatchell.

On Mon, 23 Jan 2017 13:22:07 -0500, srogowski@melroseparkpd.com wrote:

John,

In response to your inquiry of about the criminal investigation status of 16-28440 & 16-28441

16- 28440 shots fired/fireworks complaint the status is inactive no evidence or known witnesses.

16-28441 assault has been closed and a separate internal investigation of Department Conduct Violations was commenced and adjudicated.

Thanks
Steve

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VMP/JJS 2583

EEOC Form 161 (11/16)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: John Scatchell<br>C/O Law Offices Of Gianna Scatchell<br>360 W. Hubbard, #1404<br>Chicago, IL 60654 | From: Chicago District Office<br>500 West Madison St<br>Suite 2000<br>Chicago, IL 60661 |
|---|---|

|  | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 440-2017-06168 AMENDED | Michael Solomon,<br>Investigator | (312) 869-8097 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

|  | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
|---|---|
|  | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
|  | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
|  | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| X | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
|  | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
|  | Other (briefly state) |

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

Julianne Bowman                    3/6/18

Enclosures(s)

Julianne Bowman,
District Director

(Date Mailed)

cc:  Ronald M. Serpico, Mayor
VILLAGE OF MELROSE PARK
1 N. Broadway
Melrose Park, IL 60160

VMP/JJS 2782



# MELROSE PARK POLICE DEPARTMENT

### Sam C. Pitassi • Director of Police

TO:      LT. DINO DIMAIO

FROM:    SAM C. PITASSI. DIRECTOR OF POLICE

DATE:    MAY 1, 2017

RE:       ASSIGNMENT CHANGE

EFFECTIVE MAY 8, 2017, YOU WILL ASSIGNED TO DAY SHIFT STATION SUPERVISOR. YOUR DUTIES WILL BE OUTLINED AT A LATER DATE. YOUR DAYS OFF ARE SATURDAY AND SUNDAY AND WILL RECEIVE HOLIDAYS OFF.

RESPECTFULLY SUBMITTED,

SAM C. PITASSI
DIRECTOR OF POLICE

**1 North Broadway • Melrose Park, Illinois 60160 • (708) 344-8409**

**www.mppd.com**

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

VILLAGE OF MELROSE PARK
COOK COUNTY, ILLINOIS

ORDINANCE NO. 2190

AN ORDINANCE AMENDING THE VILLAGE OF MELROSE
PARK MUNICIPAL CODE BY ADOPTING SECTION 2.60.180 AND
SECTION 2.64.180 ESTABLISHING A MANDATORY
RETIREMENT AGE FOR POLICE OFFICERS AND
FIREFIGHTERS EMPLOYED BY THE VILLAGE OF MELROSE
PARK, FOR THE VILLAGE OF MELROSE PARK, COUNTY OF
COOK, STATE OF ILLINOIS.

ADOPTED BY THE
PRESIDENT AND BOARD OF TRUSTEES
OF THE
VILLAGE OF MELROSE PARK

THIS 11TH DAY OF DECEMBER 2017

RONALD M. SERPICO, Village President
MARY ANN PAOLANTONIO, Village Clerk

Board Of Trustees

ANTHONY J. PRIGNANO
ARTURO J. MOTA
MARY RAMIREZ TACONI
JAIME ANGUIANO
ANTHONY N. ABRUZZO
LOUIS "SONNY" NICOTERA

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

Published by authority of the
President and Board of Trustees
Of the Village of Melrose Park,
Cook County, Illinois on
This 12TH day of DECEMBER 2017

VMP/JJS 2893

ORDINANCE NO. 2190

**AN ORDINANCE AMENDING THE VILLAGE OF MELROSE PARK MUNICIPAL CODE BY ADOPTING SECTION 2.60.180 AND SECTION 2.64.180 ESTABLISHING A MANDATORY RETIREMENT AGE FOR POLICE OFFICERS AND FIREFIGHTERS EMPLOYED BY THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS.**

\*　　\*　　\*　　\*　　\*

**WHEREAS,** the Village of Melrose Park, County of Cook, State of Illinois (the "Village") is a duly organized and existing municipality and unit of local government created under the provisions of the laws of the State of Illinois, and is operating under the provisions of the Illinois Municipal Code, and all laws amendatory thereof and supplementary thereto, with full powers to enact ordinances and adopt resolutions for the benefit of the residents of the Village; and

**WHEREAS,** the Village President (the "President"), the Honorable Ronald M. Serpico, the Village Clerk, the Honorable Mary Ann Paolantonio, having taken office on May 8, 2017 and the Board of Trustees of the Village (the "Village Board"), the Honorable Anthony J. Prignano, Arturo J. Mota, Mary Ramirez Taconi, Jaime Anguiano, Anthony N. Abruzzo, and Louis "Sonny" Nicotera, having taken office on May 8, 2017, constitute the duly elected, qualified and acting officials of the Village; and

**WHEREAS,** the Village is a home rule unit of local government as is provided by Article VII, Section 6 of the Illinois Constitution of 1970, and as a home rule unit of local government, the Village may exercise any power and perform any function pertaining to its government and affairs; and

1

**WHEREAS,** Illinois law, specifically Section 10-2.1-17 of the Illinois Municipal Code, 65 ILCS 5/10-2.1-7, provides that the mandatory retirement age for police officers and firefighters is age sixty-five (65) unless the municipality, by ordinance, elects to change the mandatory age of retirement to not less than sixty (60) years old; and

**WHEREAS,** the President and the Village Board (collectively, the "Corporate Authorities") of the Village find that the establishment of a mandatory retirement age benefits the public safety of the residents and guests of the Village; and

**WHEREAS,** the Corporate Authorities further find that it is in the best interest of the Village and its residents to change the mandatory age of retirement to sixty-two (62) years of age for all police officers and firefighters, except those police officers and firefighters holding the rank of Chief, or who have not achieved at least thirty (30) years of serviceable credit; and

**WHEREAS,** in light of the foregoing, the Corporate Authorities have determined that it is in the best interest of the Village and its residents to adopt Section 2.60.180 and Section 2.64.180 of the Village of Melrose Park Municipal Code (the "Village Code") as set forth herein;

**NOW, THEREFORE, BE IT ORDAINED** by the President and Board of Trustees of the Village of Melrose Park, County of Cook, State of Illinois, as follows:

**ARTICLE I.**
**IN GENERAL**

**Section 01. Incorporation Clause.**

All of the recitals hereinbefore stated as contained in the preambles to this Ordinance are full, true and correct, and the Village Board does hereby, by reference, incorporate and make them part of this Ordinance as legislative findings.

2

**Section 02.   Purpose.**

The purpose of this Ordinance is to adopt Section 2.60.180 and Section 2.64.180 of the Village Code to establish a mandatory age of retirement to sixty-two (62) years of age for all police officers and firefighters, except those police officers and firefighters holding the rank of Chief (or Director) is (1) a retiree and (2) operates under a contractual relationship with the Village, or who have not achieved at least thirty (30) years of serviceable credit.

**Section 03.   Invocation of Authority.**

This Ordinance is adopted pursuant to the authority granted to the Village by the Constitution of the State of Illinois and the Illinois Compiled Statutes and as a valid exercise of its home rule powers.

**Section 04.   State Law Adopted.**

All applicable provisions of the Illinois Compiled Statutes, including the Illinois Municipal Code, as may be amended from time to time, relating to the purposes of this Ordinance are hereby incorporated herein by reference.

**Sections 05 - 09.   Reserved.**

**ARTICLE II.**
**ADOPTION OF SECTION 2.60.180 AND SECTION 2.64.180 OF THE VILLAGE OF MELROSE PARK MUNICIPAL CODE**

**Section 10.00    Adoption of Section 2.60.180.**

That Section 2.60.180 of the Village Code is hereby adopted, notwithstanding any provision, ordinance, resolution or Village Code section to the contrary, by adopting Section 2.60.180, which shall have the following title:

3

VMP/JJS 2896

### Section 2.60.180 – Maximum Age/Duty to Give Notice

**Section 11.00    Adoption of Section 2.60.180 Maximum Age/Duty to Give Notice.**

That Section 2.60.180 of the Village Code is hereby adopted, notwithstanding any provision, ordinance, resolution or Village Code section to the contrary, by adopting the following language:

**2.60.180–Police Officers - Maximum Age/Duty to Give Notice.**

A. Except for the Chief of Police, where such Chief (or Director) is (1) a retiree and (2) operates under a contractual relationship with the Village, every sworn member of the police department ("member") who has attained the age of sixty-two (62) years shall be retired from the police department immediately except that a member of the police department who has not achieved thirty (30) years of pension creditable service may remain a member of the police department until the date the member achieves his or her thirtieth (30th) year of pension creditable service.

B. It shall be the affirmative duty of every member of the police department to notify, in writing, the Chief of Police sixty (60) days before he or she attains the age of sixty-two (62). The notice must also include a statement that the member has reached thirty (30) years of creditable service. The Chief of Police shall report to the Village President and the Chairman of the Board of Fire and Police Commissioners each such notice received by him or her. However, the failure of a member to file the notice shall not affect the member's retirement. Each member who has not filed such notice and has reached sixty-two (62) years of age and has achieved thirty (30) years of creditable service shall be retired.

C. The age in a member's application for employment shall be conclusive evidence of the member's age.

**Section 12.00    Adoption of Section 2.64.180.**

That Section 2.64.180 of the Village Code is hereby adopted, notwithstanding any provision, ordinance, resolution or Village Code section to the contrary, by adopting Section 2.64.180, which shall have the following title:

4

VMP/JJS 2897

### Section 2.64.180 – Maximum Age/Duty to Give Notice.

**Section 13.00    Adoption of Section 2.64.180 Maximum Age/Duty to Give Notice.**

That Section 2.64.180 of the Village Code is hereby adopted, notwithstanding any provision, ordinance, resolution or Village Code section to the contrary, by adopting the following language:

**2.64.180– Firefighters - Maximum Age/Duty to Give Notice**

A. Except for the Fire Chief, where such Chief (or Director) is (1) a retiree and (2) operates under a contractual relationship with the Village, every uniformed service member of the fire department ("member") who has attained the age of sixty-two (62) years shall be retired from the fire department immediately except that a member of the fire department who has not achieved thirty (30) years of pension creditable service may remain a member of the fire department until the date the member achieves his or her thirtieth (30th) year of pension creditable service.

B. It shall be the affirmative duty of every member of the fire department to notify, in writing, the Fire Chief sixty (60) days before he or she attains the age of sixty-two (62). The notice must also include a statement that the member has reached thirty (30) years of creditable service. The Fire Chief shall report to the Village President and the Chairman of the Board of Fire and Police Commissioners each such notice received by him or her. However, the failure of a member to file the notice shall not affect the member's retirement. Each member who has not filed such notice and has reached sixty-two (62) years of age and has achieved thirty (30) years of creditable service shall be retired.

C. The age in a member's application for employment shall be conclusive evidence of the member's age.

**Section 14.00 Other Actions Authorized.**

The officers, employees and/or agents of the Village shall take all action necessary or reasonably required to carry out, give effect to and consummate the amendments contemplated by this Ordinance and shall take all action necessary in conformity therewith including, without limitation, the execution and delivery of any and all documents required to be delivered in connection with this Ordinance. All acts previously taken to effectuate the terms of this

5

VMP/JJS 2898

Ordinance are hereby ratified.

**Sections 15.00.    Reserved.**

### ARTICLE III
### HEADINGS, SAVINGS CLAUSES,
### PUBLICATION, EFFECTIVE DATE

**Section 16.00    Headings.**

The headings for the articles, sections, paragraphs and sub-paragraphs of this Ordinance are inserted solely for the convenience of reference and form no substantive part of this Ordinance nor should they be used in any interpretation or construction of this Ordinance.

**Section 17.00    Severability.**

The provisions of this Ordinance are hereby declared to be severable and should any provision, clause, sentence, paragraph, sub-paragraph, section or part of this Ordinance be determined to be in conflict with any law, statute or regulation by a court of competent jurisdiction, said provision, clause, sentence, paragraph, sub-paragraph, section or part shall be excluded and deemed inoperative, unenforceable and as though not provided for herein, and all other provisions shall remain unaffected, unimpaired, valid and in full force and effect. It is hereby declared to be the legislative intent of the Village Board that this Ordinance would have been adopted had not such unconstitutional or invalid provision, clause, sentence, paragraph, sub-paragraph, section or part thereof been included.

**Section 18.00    Superseder.**

All code provisions, ordinances, resolutions and orders, or parts thereof, in conflict herewith are, to the extent of such conflict, hereby superseded.

6

VMP/JJS 2899

**Section 19.00    Publication.**

A full, true and complete copy of this Ordinance shall be published in pamphlet form or in a newspaper published and of general circulation within the Village as provided by the Illinois Municipal Code, as amended.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

7

VMP/JJS 2900

**Section 20.0   Effective Date.**

This Ordinance shall be in full force and effect upon passage, approval and publication, as provided by law.

On The Individual Poll And Voice Vote Of The Board of Trustees:

AYE VOTES:          Trustee Mota, Trustee Taconi, Trustee Anguiano,
                    Trustee Abruzzo, Trustee Nicotera

NAY VOTES:

ABSTAIN:

ABSENT:             Trustee Prignano

SO PASSED, ADOPTED, APPROVED AND ENACTED IN AND AT THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS, THIS ELEVENTH DAY OF DECEMBER, 2017 A.D.

APPROVED:

RONALD M. SERPICO
VILLAGE PRESIDENT

ATTEST:

Mary Ann Paolantonio
Village Clerk

*(SEAL)*

Recorded in the Municipal Records:  December 11, 2017
Published in Pamphlet Form:  December 12, 2017

8

VMP/JJS 2901

Sep 26 16 05:11p     Christopher Smith                    630-378-4639              p.6



September 1, 2016

*Writer's Direct Dial:* (312) 494-5360

**VIA E-MAIL & U.S. MAIL**

Christopher Cooper
Ricard Vazquez
Law Office of Christopher Cooper, Inc.
79 West Monroe Street, Suite 1213
Chicago, IL 60603

     Re:  Kyle Lavalais

Dear Mr. Cooper:

     I am writing on behalf of Chief of Police Sam Pitassi and Deputy Chief Michael Castellan because you represent Officer Kyle Lavalais concerning his residency.

     The Collective Bargaining Agreement (CBA) governing Officer Lavalais' employment with the Village of Melrose Park contains the explicit requirement that:  "Each officer must maintain residency three (3) months after completion of their probationary period totaling 15 months."  As you know, Officer Levalais was interviewed regarding his residency on June 15, 2016, where you were his representative, and he admitted that he lives in Bolingbrook.  We acknowledge that the Village Ordinance contains an exception and that Officer Lavalais argues that the exception in the residency Ordinance applies to him.  However, there is no such exception in the CBA.  Moreover, Illinois law is clear that the language in a CBA is controlling over language in a Village Ordinance.  See 5 ILCS 315/15(b) ("any collective bargaining contract between a public employer and a labor organization executed pursuant to this Act shall supersede any contrary statutes, charters, ordinances, rules or regulations relating to wages, hours and conditions of employment and employment relations adopted by the public employer or its agents").  Accordingly, Officer Lavalais must restablish and maintain residency within the Village.

     Since Officer Lavalais has completed his probationary period much longer than three months ago, under the CBA he is required to be a resident.  Nevertheless, rather than pursue disciplinary action against Officer Lavalais at this time, the Chief of Police and Deputy Chief Castellan are giving Officer Lavalais an opportunity to comply with the requirement voluntarily.

     Accordingly, Chief Pitassi and Deputy Chief Castellan hereby Order Officer Lavalais to reestablish residency within the Village of Melrose Park within one year from the date of this

EX. 2

VMP/JJS 2930

Christopher Cooper
Ricard Vazquez
September 1, 2016
Page 2

letter. If he does not agree to comply with this Order, he will be subject to disciplinary action, up to and including discharge.

Further, Chief Pitassi and Deputy Chief Castellan hereby order Officer Lavalais to acknowledge this Order, in writing, within thirty days, and communicate his intention to comply with the Order. If he does not do so, the offer to give him one year to reestablish residency will be considered withdrawn and Officer Lavalais will be subject to charges for insubordination and for violation of the residency requirement.

Please feel free to call me if you (or Officer Lavalais) have any questions or would like to discuss this further. Otherwise, the Village expects Officer Lavalais to reestablish residency within the Village on or before September 1, 2017.

Sincerely,

Jeffrey S. Fowler

JSF:jd

cc:     Chief Sam Pitassi (via email)
        Deputy Chief Michael Castellan (via email)

STATE OF ILLINOIS
COUNTY OF COOK
VILLAGE OF MELROSE PARK                    OCTOBER 11, 2016

### MINUTES OF THE MEETING OF THE
### PRESIDENT AND BOARD OF TRUSTEES
### OF THE VILLAGE OF MELROSE PARK

The regular meeting of the Village President, Ronald M. Serpico and the Village Board

of Trustees was held on the evening of October 11, 2016 at 6:00 p.m., in the First Floor Meeting

Room of the Police Department, One North Broadway (Broadway & Main Street), Melrose Park,

Illinois 60160.

**CALL TO ORDER:**

The Village President, the Honorable Ronald M. Serpico led the meeting in the Pledge of

Allegiance, and thereafter called the meeting to order.

**ROLL CALL:**

Upon the roll call by the Village Clerk, the following Trustees answered present, ,

Anthony J. Prignano, Arturo Mota, Mary Ramirez Taconi, Jaime Anguiano, Anthony Abruzzo

and Louis Nicotera. There hereby was a quorum as declared by the Village President.

Also present were the Village Clerk Mary Ann Paolantonio and Village Attorney James

Vasselli Esq., of the law firm, Del Galdo Law Group, Attorneys for the Village of Melrose Park.

**VOTE ON CATEGORIES TO APPROVE OF CONSENT AGENDA:**

The Village President requested that the Village Clerk present the Categories to Approve

the Consent Agenda to the Village Board.

After the Village Board offered no questions or comments the Village President asked

for an omnibus vote to approve of the categories of said Agenda. It was so moved by Trustee

Prignano to approve of the categories of said Agenda. Trustee Taconi seconded the motion. The

Village President directed that the roll be called for a vote upon the motion.

On the roll were Trustees: Prignano, Mota, Taconi, Anguiano, Abruzzo and Nicotera.

On the Voice Vote of the Board of Trustees:

1

AYE VOTES: Trustees: Prignano, Mota, Taconi, Anguiano, Abruzzo and Nicotera.

NAY VOTES: None.

ABSTAIN: None.

ABSENT: None.

Therefore, all in favor, six (6), opposed none (0). Whereupon the Village President declared the motion carried.

**VOTE TO APPROVE OF CONSENT AGENDA:**

The Village President requested that the Village Clerk present the Consent Agenda to the Village Board. After the Village Board offered no questions or comments the Village President asked for an omnibus vote to approve of said Agenda. It was so moved by Trustee Abruzzo to approve of said Agenda. Trustee Mota seconded the motion. The Village President directed that the roll be called for a vote upon the motion.

On the roll were Trustees: Prignano, Mota, Taconi, Anguiano, Abruzzo and Nicotera.

On the Voice Vote of the Board of Trustees:

AYE VOTES: Trustees: Prignano, Mota, Taconi, Anguiano, Abruzzo and Nicotera.

NAY VOTES: None.

ABSTAIN: None.

ABSENT: None.

Therefore, all in favor, six (6), opposed none (0). Whereupon the Village President declared the motion carried.

**CONSIDERATION OF PRIOR MEETING MINUTES:**

- Consideration of the September 26, 2016 President & Board of Trustees Meeting Minutes.

**NEW BUSINESS:**

-Authorization to Negotiate a Public Use Agreement for a Billboard Along the South Right-of-Way of North Avenue, West of 25th Street.

VMP-JJS 3355

<u>**BUILDING PERMITS & VILLAGE LICENSES:**</u>

> **VILLAGE LICENSES:**
>
> -My Dog's Groomer – 2209 West Division
>
> -Lot 1 Auto Sales – 2090 North Mannheim Road
>
> -Divina's Flower Shop – 134 North 19th Avenue
>
> -Iconic Group Inc. – 9200 West North Avenue (Toys R Us)
>
> -UniStaff, Inc. – 2410 West North Avenue
>
> -Liberty Tax Service – 2205 West Lake Street
>
> **VILLAGE PERMITS:**
>
> -1329 North 31st Avenue – Exterior Remodeling
>
> -1202 Helen Drive – Interior Remodeling

<u>**LEGISLATION:**</u>

<u>**ORDINANCE #2056:**</u> **AN ORDINANCE PROVIDING FOR THE TERMINATION OF THE JOYCE BROS. STORAGE AND VAN COMPANY REDEVELOPMENT PROJECT AREA AND THE DISSOLUTION OF THE SPECIAL TAX ALLOCATION FUND FOR THE JOYCE BROS. STORAGE AND VAN COMPANY TIF ON DECEMBER 31, 2016.**

<u>**ORDINANCE #2057:**</u> **AN ORDINANCE PROVIDING FOR THE TERMINATION OF THE 9TH STREET AND NORTH AVENUE SHOPPING CENTER REDEVELOPMENT PROJECT AREA AND THE DISSOLUTION OF THE SPECIAL TAX ALLOCATION FUND FOR THE 9TH STREET AND NORTH AVENUE TIF ON DECEMBER 31, 2016.**

<u>**ORDINANCE #2058:**</u> **AN ORDINANCE AUTHORIZING AND APPROVING THE EXECUTION OF A CONSTRUCTION ENGINEERING AGREEMENT FOR FEDERAL PARTICIPATION REGARDING THE RECONSTRUCTION OF NORTH AVENUE TO**

VMP-JJS 3356

LEMOYNE STREET ON 15TH AVENUE IN THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS.

ORDINANCE #2059: AN ORDINANCE AUTHORIZING AND APPROVING THE EXECUTION OF A PRELIMINARY ENGINEERING SERVICES AGREEMENT FOR FEDERAL PARTICIPATION REGARDING THE REPLACEMENT OF THE BRIDGE ON 15TH AVENUE OVER SILVER CREEK, FOR THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS.

ORDINANCE #2060: AN ORDINANCE AUTHORIZING AND APPROVING THE EXECUTION OF A PROPOSAL FOR AN ENGINEER REGARDING THE 17TH AVENUE AND BROADWAY AVENUE BRIDGE REPLACEMENT PROJECT – PHASE 1, IN THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS.

ORDINANCE #2061: AN ORDINANCE AUTHORIZING AND APPROVING A PROPOSAL REGARDING THE DIVISION STREET PARKING LOT, FOR THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS.

ORDINANCE #2062: AN ORDINANCE AUTHORIZING AND APPROVING A LOCAL PUBLIC AGENCY AGREEMENT AND ANY AMENDATORY DOCUMENTS THERETO FOR FEDERAL PARTICIPATION REGARDING THE 15TH AVENUE RECONSTRUCTION PROJECT, FOR THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS.

RESOLUTION #24-16: A RESOLUTION AUTHORIZING THE EXECUTION OF A CDBG SUBRECIPIENT AGREEMENT, FOR THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS.

COMMUNICATIONS:

-Veteran's Park District's Request for Street Closure on Hirsch Street between 15th and 16th Avenues from 4:00pm until 8:00pm on October 28th and 29th for their annual Fright Night Fest and Haunted House.

4

VMP-JJS 3357

**COMMITTEE OR DEPARTMENT REPORTS:**

-Street Department

-Police Department

-Fire Department

-Sewer & Water Department

All reports are on file and available for inspection in the Office of the Village Clerk.

**PUBLIC PARTICIPATION:**

The Village President then called for questions or comments from the general public in attendance at the meeting. No questions or comments at this time from the general public.

**ADJOURNMENT:**

The Village President stated that there appeared to be no further business before the Board of Trustees. Trustee Abruzzo made a motion that the meeting be adjourned. Trustee Prignano seconded the motion. The Village President called for ayes and nays on the motion.

AYE VOTES:   Trustees: Prignano, Mota, Taconi, Anguiano, Abruzzo and Nicotera.

NAY VOTES: None.

ABSTAIN:      None.

ABSENT:       None.

Therefore, all in favor, six (6), opposed none (0). Whereupon the Village President declared the motion carried. Meeting adjourned.

So recorded at the Village of Melrose Park, County of Cook, State of Illinois, this 11th day of October 2016 A.D.

(SEAL)                    _____

Mary Ann Paolantonio, Village Clerk

5

VMP-JJS 3358

STATE OF ILLINOIS
COUNTY OF COOK
VILLAGE OF MELROSE PARK                              NOVEMBER 14, 2016

### MINUTES OF THE MEETING OF THE
### PRESIDENT AND BOARD OF TRUSTEES
### OF THE VILLAGE OF MELROSE PARK

The regular meeting of the Village President, Ronald M. Serpico and the Village Board

of Trustees was held on the evening of November 14, 2016 at 6:00 p.m., in the First Floor

Meeting Room of the Police Department, One North Broadway (Broadway & Main Street),

Melrose Park, Illinois 60160.

**CALL TO ORDER:**

The Village President, the Honorable Ronald M. Serpico led the meeting in the Pledge of

Allegiance, and thereafter called the meeting to order.

**ROLL CALL:**

Upon the roll call by the Village Clerk, the following Trustees answered present, Arturo

Mota, Mary Ramirez Taconi, Jaime Anguiano, Anthony Abruzzo and Louis Nicotera. There

hereby was a quorum as declared by the Village President. The Village President declared

Anthony J. Prignano absent.

Also present were the Village Clerk Mary Ann Paolantonio and Village Attorney James

Vasselli Esq., of the law firm, Del Galdo Law Group, Attorneys for the Village of Melrose Park.

**VOTE ON CATEGORIES TO APPROVE OF CONSENT AGENDA:**

The Village President requested that the Village Clerk present the Categories to Approve

the Consent Agenda to the Village Board.

After the Village Board offered no questions or comments the Village President asked

for an omnibus vote to approve of the categories of said Agenda. It was so moved by Trustee

Mota to approve of the categories of said Agenda. Trustee Anguiano seconded the motion. The

Village President directed that the roll be called for a vote upon the motion.

On the roll were Trustees: Mota, Taconi, Anguiano, Abruzzo and Nicotera.

1

On the Voice Vote of the Board of Trustees:

AYE VOTES:  Trustees: Mota, Taconi, Anguiano, Abruzzo and Nicotera.

NAY VOTES:  None.

ABSTAIN:      None.

ABSENT:       Trustee Anthony J. Prignano.

Therefore, all in favor, five (5), opposed none (0). Whereupon the Village President declared the motion carried.

## VOTE TO APPROVE OF CONSENT AGENDA:

The Village President requested that the Village Clerk present the Consent Agenda to the Village Board. After the Village Board offered no questions or comments the Village President asked for an omnibus vote to approve of said Agenda. It was so moved by Trustee Mota to approve of said Agenda. Trustee Anguiano seconded the motion. The Village President directed that the roll be called for a vote upon the motion.

On the roll were Trustees: Mota, Taconi, Anguiano, Abruzzo and Nicotera.

On the Voice Vote of the Board of Trustees:

AYE VOTES:  Trustees: Mota, Taconi, Anguiano, Abruzzo and Nicotera.

NAY VOTES:  None.

ABSTAIN:      None.

ABSENT:       Trustee Anthony J. Prignano.

Therefore, all in favor, five (5), opposed none (0). Whereupon the Village President declared the motion carried.

## CONSIDERATION OF PRIOR MEETING MINUTES:

- Consideration of the October 24, 2016 President & Board of Trustees Meeting Minutes.

## NEW BUSINESS:

- Introduction and Presentation of the Fiscal Year 2017 Municipal Budget

2

VMP-JJS 3372

- Police Department Promotions: Lieutenant John Scatchell to Deputy Chief

The Village President requested that said item of New Business be Tabled at this time. It was so moved by Trustee Mota to Table said item of New Business. Trustee Taconi seconded the motion. The Village President directed that the roll be called for a vote upon the motion.

On the roll were Trustees: Mota, Taconi, Anguiano, Abruzzo and Nicotera.

On the Voice Vote of the Board of Trustees:

AYE VOTES:   Trustees: Mota, Taconi, Anguiano, Abruzzo and Nicotera.

NAY VOTES:  None.

ABSTAIN:     None.

ABSENT:      Trustee Anthony J. Prignano.

Therefore, all in favor, five (5), opposed none (0). Whereupon the Village President declared the motion carried.

## BUILDING PERMITS & VILLAGE LICENSES:

### VILLAGE LICENSES:

-Universe Carrier, Inc. – 1600 North De Prizio Drive

-Elizabeth's Home Day Care – 1311 North 19th Avenue

-Rigo's Auto Repair – 1401 North 25th Avenue

-Coco's – 1419 North 15th Avenue

### VILLAGE PERMITS:

-None at This Time.


## LEGISLATION:

## ORDINANCE #2069:   AN ORDINANCE REVISING THE ZONING MAP OF THE VILLAGE OF MELROSE PARK, FOR THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS.

3

VMP-JJS 3373

**ORDINANCE #2070:** AN ORDINANCE AUTHORIZING AND APPROVING THE PURCHASE OF CERTAIN MOTOR VEHICLES (FOUR SQUAD CARS), FOR THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS.

**ORDINANCE #2071:** AN ORDINANCE AMENDING CHAPTER 15.04 AND CHAPTER 15.12 REGARDING THE ELCTRICAL, BUILDING AND BUILDING RELATED CODES OF THE VILLAGE OF MELROSE PARK MUNICIPAL CODE, FOR THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS.

**ORDINANCE #2072:** AN ORDINANCE APPROVING A CONTRACT BETWEEN THE VILLAGE OF MELROSE PARK AND SITEONE LANDSCAPE SUPPLY, LLC, FOR THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS.

**RESOLUTION #26-16:** A RESOLUTION DETERMINING THE APPROPRIATENESS FOR CLASS 6b STATUS PURSUANT TO THE COOK COUNTY REAL PROPERTY ASSESSMENT CLASSIFICATION ORDINANCE FOR CERTAIN REAL PROPERTY LOCATED AT 2700 WEST DIVISION STREET, IN THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS.

**COMMUNICATIONS:**

-None at This Time.

**COMMITTEE OR DEPARTMENT REPORTS:**

-Fire Department

All reports are on file and available for inspection in the Office of the Village Clerk.

**PUBLIC PARTICIPATION:**

The Village President then called for questions or comments from the general public in attendance at the meeting. No questions or comments at this time from the general public.

VMP-JJS 3374

**ADJOURNMENT:**

The Village President stated that there appeared to be no further business before the Board of Trustees. Trustee Abruzzo made a motion that the meeting be adjourned. Trustee Taconi seconded the motion. The Village President called for ayes and nays on the motion.

AYE VOTES:    Trustees: Mota, Taconi, Anguiano, Abruzzo and Nicotera.

NAY VOTES:  None.

ABSTAIN:      None.

ABSENT:       Trustee Prignano.

Therefore, all in favor, five (5), opposed none (0). Whereupon the Village President declared the motion carried. Meeting adjourned.

So recorded at the Village of Melrose Park, County of Cook, State of Illinois, this 14th day of November 2016 A.D.

(SEAL)                         _____

                                        Mary Ann Paolantonio, Village Clerk

VMP-JJS 3375

STATE OF ILLINOIS
COUNTY OF COOK
VILLAGE OF MELROSE PARK                         NOVEMBER 28, 2016

### MINUTES OF THE MEETING OF THE
### PRESIDENT AND BOARD OF TRUSTEES
### OF THE VILLAGE OF MELROSE PARK

The regular meeting of the Village President, Ronald M. Serpico and the Village Board

of Trustees was held on the evening of November 28, 2016 at 6:00 p.m., in the First Floor

Meeting Room of the Police Department, One North Broadway (Broadway & Main Street),

Melrose Park, Illinois 60160.

**CALL TO ORDER:**

The Village President, the Honorable Ronald M. Serpico led the meeting in the Pledge of

Allegiance, and thereafter called the meeting to order.

**ROLL CALL:**

Upon the roll call by the Village Clerk, the following Trustees answered present, Arturo

Mota, Mary Ramirez Taconi, Jaime Anguiano, Anthony Abruzzo and Louis Nicotera. There

hereby was a quorum as declared by the Village President. The Village President declared

Trustee Anthony J. Prignano absent.

Also present were the Village Clerk Mary Ann Paolantonio and Village Attorney James

Vasselli Esq., of the law firm, Del Galdo Law Group, Attorneys for the Village of Melrose Park.

**VOTE ON CATEGORIES TO APPROVE OF CONSENT AGENDA:**

The Village President requested that the Village Clerk present the Categories to Approve

the Consent Agenda to the Village Board.

After the Village Board offered no questions or comments the Village President asked

for an omnibus vote to approve of the categories of said Agenda. It was so moved by Trustee

Abruzzo to approve of the categories of said Agenda. Trustee Anguiano seconded the motion.

The Village President directed that the roll be called for a vote upon the motion.

On the roll were Trustees: Mota, Taconi, Anguiano, Abruzzo and Nicotera.

1

VMP-JJS 3379

On the Voice Vote of the Board of Trustees:

AYE VOTES:    Trustees: Mota, Taconi, Anguiano, Abruzzo and Nicotera.

NAY VOTES:    None.

ABSTAIN:      None.

ABSENT:       Trustee Prignano.

Therefore, all in favor, five (5), opposed none (0). Whereupon the Village President declared the motion carried.

## VOTE TO APPROVE OF CONSENT AGENDA:

The Village President requested that the Village Clerk present the Consent Agenda to the Village Board. After the Village Board offered no questions or comments the Village President asked for an omnibus vote to approve of said Agenda. It was so moved by Trustee Mota to approve of said Agenda. Trustee Taconi seconded the motion. The Village President directed that the roll be called for a vote upon the motion.

On the roll were Trustees: Mota, Taconi, Anguiano, Abruzzo and Nicotera.

On the Voice Vote of the Board of Trustees:

AYE VOTES:    Trustees: Mota, Taconi, Anguiano, Abruzzo and Nicotera.

NAY VOTES:    None.

ABSTAIN:      None.

ABSENT:       Trustee Prignano.

Therefore, all in favor, five (5), opposed none (0). Whereupon the Village President declared the motion carried.

## CONSIDERATION OF PRIOR MEETING MINUTES:

- Consideration of the November 14, 2016 President & Board of Trustees Meeting Minutes.

2

VMP-JJS 3380

**NEW BUSINESS:**

-Police Department Promotions: Sergeant Nunzio Maiello to Lieutenant

A motion was made by Trustee Mota to approve of said Promotion. Trustee Abruzzo seconded the motion. The Village President directed that the roll be called for a vote upon the motion.

On the roll were Trustees: Mota, Taconi, Anguiano, Abruzzo and Nicotera.

On the Voice Vote of the Board of Trustees:

AYE VOTES:   Trustees: Mota, Taconi, Anguiano, Abruzzo and Nicotera.

NAY VOTES:  None.

ABSTAIN:      None.

ABSENT:       Trustee Prignano.

Therefore, all in favor, five (5), opposed none (0). Whereupon the Village President declared the motion carried.

-Police Officer Sam Chiappetta to Sergeant.

A motion was made by Trustee Abruzzo to approve of said Promotion. Trustee Mota seconded the motion. The Village President directed that the roll be called for a vote upon the motion.

On the roll were Trustees: Mota, Taconi, Anguiano, Abruzzo and Nicotera.

On the Voice Vote of the Board of Trustees:

AYE VOTES:   Trustees: Mota, Taconi, Anguiano, Abruzzo and Nicotera.

NAY VOTES:  None.

ABSTAIN:      None.

ABSENT:       Trustee Prignano.

Therefore, all in favor, five (5), opposed none (0). Whereupon the Village President declared the motion carried.

3

-The Appointment of Officer Peter A. Caira to the Police Department (Lateral Hire)

A motion was made by Trustee Abruzzo to approve of said Promotion. Trustee Taconi seconded the motion. The Village President directed that the roll be called for a vote upon the motion.

On the roll were Trustees: Mota, Taconi, Anguiano, Abruzzo and Nicotera.

On the Voice Vote of the Board of Trustees:

AYE VOTES:   Trustees: Mota, Taconi, Anguiano, Abruzzo and Nicotera.

NAY VOTES:  None.

ABSTAIN:       None.

ABSENT:        Trustee Prignano.

Therefore, all in favor, five (5), opposed none (0). Whereupon the Village President declared the motion carried.

-Lieutenant Steve Rogowski Promoted to Deputy Chief

A motion was made by Trustee Abruzzo to approve of said Promotion. Trustee Nicotera seconded the motion. The Village President directed that the roll be called for a vote upon the motion.

On the roll were Trustees: Mota, Taconi, Anguiano, Abruzzo and Nicotera.

On the Voice Vote of the Board of Trustees:

AYE VOTES:   Trustees: Mota, Taconi, Anguiano, Abruzzo and Nicotera.

NAY VOTES:  None.

ABSTAIN:       None.

ABSENT:        Trustee Prignano.

Therefore, all in favor, five (5), opposed none (0). Whereupon the Village President declared the motion carried.

VMP-JJS 3382

## BUILDING PERMITS & VILLAGE LICENSES:

### VILLAGE LICENSES:

-Lyndon D. Taylor M. D. – 1419 West Lake Street

-JBG Auto Services – 1401 North 25th Avenue

### VILLAGE PERMITS:

-1711 West North Avenue – Remodel

-2525 West Armitage- Demolition

## LEGISLATION:

**ORDINANCE #2073:** AN ORDINANCE ADOPTING THE ANNUAL BUDGET FOR THE FISCAL YEAR 2017, FOR THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS.

**ORDINANCE #2074:** AN ORDINANCE AMENDING CHAPTER 5.124 OF THE VILLAGE OF MELROSE PARK MUNICIPAL CODE REGARDING TOBACCO DEALERS, FOR THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS.

**ORDINANCE #2075:** AN ORDINANCE AMENDING CHAPTERS 3.20 AND 5.04 OF THE VILLAGE OF MELROSE PARK MUNICIPAL CODE REGARDING AMUSEMENT AND VENDING MACHINES, FOR THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS.

**RESOLUTION #27-16:** A RESOLUTION APPOINTING THE MEMBERS OF THE FINANCE COMMITTEE AND THE PERSONNEL COMMITTEE, OF THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS.

VMP-JJS 3383

**RESOLUTION #28-16:** A RESOLUTION APPOINTING TRUSTEE LIAISONS TO VARIOUS COMMITTEES AND BOARDS, OF THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS.

**RESOLUTION #29-16:** A RESOLUTION AUTHORIZING AND APPROVING A CONTRACT BETWEEN THE VILLAGE OF MELROSE PARK AND THE ILLINOIS DEPARTMENT OF TRANSPORTATION (IDOT) REGARDING CONSTRUCTION ON STATE HIGHWAYS, FOR THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS.

**RESOLUTION #30-16:** A RESOLUTION EXTENDING THE TERM OF CERTAIN APPOINTED OFFICERS, EMPLOYEES AND OFFICIALS, FOR THE VILLAGE OF MELROSE PARK, COUNTY OF COOK, STATE OF ILLINOIS.

**COMMUNICATIONS:**

-None at This Time.

**COMMITTEE OR DEPARTMENT REPORTS:**

-Planning & Zoning Board

All reports are on file and available for inspection in the Office of the Village Clerk.

**OLD OR UNFINISHED BUSINESS:**

-None at this time.

**PUBLIC PARTICIPATION:**

The Village President then called for questions or comments from the general public in attendance at the meeting. No questions or comments at this time from the general public.

**ADJOURNMENT:**

The Village President stated that there appeared to be no further business before the Board of Trustees. Trustee Abruzzo made a motion that the meeting be adjourned. Trustee Taconi seconded the motion. The Village President called for ayes and nays on the motion.

VMP-JJS 3384

AYE VOTES:  Trustees: Mota, Taconi, Anguiano, Abruzzo and Nicotera.

NAY VOTES:  None.

ABSTAIN:    None.

ABSENT:     Trustee Prignano.

Therefore, all in favor, five (5), opposed none (0).  Whereupon the Village President declared the motion carried.  Meeting adjourned.

So recorded at the Village of Melrose Park, County of Cook, State of Illinois, this 28th day of November 2016 A.D.

(SEAL)                      _____

                            Mary Ann Paolantonio, Village Clerk

7

VMP-JJS 3385