**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN SCATCHELL, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-3989 |
| | ) | |
| vs. | ) | |
| | ) | Honorable Charles R. Norgle, Sr |
| VILLAGE OF MELROSE PARK, | ) | |
| RONALD M SERPICO, SAM C. PITASSI, | ) | Honorable Michael T. Mason |
| MICHAEL CASTELLAN, and | ) | |
| STEVE ROGOWSKI | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS PITASSI, CASTELLAN, AND ROGOWSKI'S MEMORANDUM OF**
**LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

This case is about a retired Village of Melrose Park police lieutenant and former union

president, John Scatchell, who claims that he was subjected to retaliation at the end of his career.

The main thrust of his suit is that he spoke out in support a fellow officer, Kyll Lavalais, who

challenged an order issued by his superiors to establish residency within the Village of Melrose

Park as required by Village ordinance. Scatchell brings a claim under 42 U.S.C. § 1983 and the

First Amendment against the Director of Police Sam Pitassi and Deputy Chiefs Michael

Castellan and Steven Rogowski.[1]

Notwithstanding his allegations, however, Scatchell admitted in his deposition that he

remained neutral and never expressed a viewpoint on the Lavalais matter. Further, although he

---

[1] Scatchell also brings a claim under 42 U.S.C. § 1981 (via 42 U.S.C. § 1983) (Count II) and a section 1983 conspiracy claim (Count IV). These claims are also directed at the Village of Melrose Park and Mayor Ron Serpico. To avoid duplication of arguments, Defendants Pitassi, Castellan, and Rogowski adopt and incorporate the Village and Serpico's arguments as if fully set forth herein.

claims that he was subjected to various retaliatory acts, he did not sustain any materially adverse employment harm or injury. He never received discipline or any loss of rank, pay or benefits. In fact, he retired voluntarily after 32 years of service with a robust pension. Finally, he cannot meet his burden of showing causation. Either there was no protected activity preceding any alleged retaliatory act; or the individual Defendants were not aware of any such activity; or, the alleged retaliation did not immediately precede the protected activity as required to infer causation. Defendants also presented legitimate, nonretaliatory explanations for each of the purported adverse actions, and there is no evidence inferring that those explanations are dishonest. Accordingly, there are no genuine issues of material fact requiring a jury trial, and Defendants are entitled to judgment in their favor as a matter of law.

## ARGUMENT

### DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AS TO SCATCHELL'S FIRST AMENDMENT RETALIATION CLAIM (COUNT I)

To prove a § 1983 First Amendment retaliation claim, Scatchell must produce evidence (1) that he engaged in protected activity; (2) that he sustained an adverse employment action; and (3) that the protected activity was a substantial or motivating reason behind the alleged retaliation. *See Kidwell v. Eisenhauer,* 679 F.3d 957, 964 (7th Cir. 2012). The same standards apply to association claims based on expressive association. *See Gregorich v. Lund*, 54 F.3d 410, 415 (7th Cir. 1995); *Griffin v. Thomas*, 929 F.2d 1210, 1213 (7th Cir. 1991). As discussed below, there are no triable issues of fact as to these three elements.

### A. Scatchell did not engage in protected speech or expressive association relating to the Lavalais matter.

The threshold issue is whether Scatchell spoke out as a citizen on a matter of public concern. *See Ulrey v. Reichhart,* 941 F.3d 255, 259 (7th Cir. 2019). If this Court finds that he did not engage in protected speech, then he cannot prevail. *See Olendzki v. Rossi,* 765 F.3d 742, 746

(7th Cir. 2014). Whether a public employee's speech is protected under the First Amendment is a question of law. *Graber v. Clarke*, 763 F.3d 888, 894 (7th Cir. 2014). To establish protected speech, a public employee must speak out on "a topic related to 'political, social, or other concern to the community.'" *Olendzki,* 765 F.3d at 748 (*quoting, Connick v. Meyers,* 461 U.S. 138, 146 (1983)); *Griffin*, 929 F.2d at 1213 (applying *Connick* test to expressive association claim). This is determined by the content, form, and context of the statement. *Id.* Content is the most important factor. *Graber*, 763 F.3d at 895. While the motive of the speaker is relevant, it is not dispositive; the inquiry is whether the speaker intended to bring a wrongdoing to light. *Kubiak v. City of Chicago,* 810 F.3d 476, 483 (7th Cir. 2016); *Gregorich*, 54 F.3d at 415.

The fact that a public employee associates or communicates as a union official does not automatically warrant First Amendment protection. *Olendzki,* 765 F.3d at 747. While union activity broadly touches on matters of public concern, "subject matter alone does not convey constitutional protection." *Nagle v. Village of Calumet City,* 554 F.3d 1106, 1123 (7th Cir. 2009); *see, also, Graber,* 763 F.3d at 895. The plaintiff must point out the precise statement in the record that warrants protection. *Olendzki*, 765 F.3d at 747. Unexpressed viewpoints or unuttered thoughts will not suffice. *Wernsing v. Thompson,* 423 F.3d 732, 752 (7th Cir. 2005) ("otherwise unprotected speech does not suddenly attain protected status simply because it is animated by a viewpoint which, if actually expressed, might itself merit First Amendment protection.").

In 2016, both Village ordinance and the collective bargaining agreement ("CBA") with the Fraternal Order of Police Lodge 19 ("FOP") required police officers to reside within the jurisdictional limits of the Village (Defs. Jt. SOF, ¶¶ 10-13). The Village began enforcing the ordinance after learning that some employees were violating it, including Sgt. Kyll Lavalais (*Id.* ¶¶ 14-16). On September 1, 2016, Sgt. Lavalais was ordered to establish residency within one

year (*Id.* ¶¶ 17-18). Lavalais filed grievances under the CBA, claiming that he was exempt from having to live within the Village under a 1987 consent decree; those grievances were denied; and, he then asked the FOP to file for grievance arbitration (*Id.* ¶¶ 19-20). At the time of this request, Scatchell was FOP president (*Id.* ¶ 21).

Lavalais' arbitration request was first presented to the FOP executive board on September 30, 2016, and then to the membership at later meetings in the fall of 2016 (Defs. Jt. SOF, ¶¶ 23-24). Scatchell remained neutral and never took a position or expressed any viewpoint for or against Lavalais' request (*Id.* ¶ 25). The FOP meeting minutes are consistent with Scatchell's admission. None reflect any statement or viewpoint by Scatchell (*Id.* ¶ 24). The mere fact that he presided as union president over the FOP meetings does not afford him First Amendment protection. He must identify the precise statement that warrants First Amendment protection – which he has failed to do. *See Olendzki,* 765 F.3d at 748-749 (affirming summary judgment for employer because plaintiff failed to identify the precise statement he made at a labor management meeting); *Nagle,* 554 F.3d at 1124 (affirming summary judgment for public employer because employee failed to provide details about statements he made at a labor management meeting).[2] This he has not done.

Instead, Scatchell co-opts statements made by others. He points to a November 10, 2016 email that the FOP attorney sent to the Village attorneys (First Am. Compl., ¶¶ 20-21). However, the email does not contain or attribute any statement to him (Defs. Jt. SOF, ¶¶ 33-34). The email cannot be the basis for First Amendment protection. *See Hauenschild v. City of Harvey*, 2006 WL 3523754 *3 (N.D. Ill. 2006) (holding that letter written by an attorney and not written by

---

[2] Scatchell did not express any viewpoint to Pitassi, Castellan or Rogowski about the Lavalais matter (Defs. Jt. SOF, ¶¶ 22, 31). Nor were they aware of any such alleged statements made by Scatchell (*Id.* ¶¶ 30-32).

plaintiff cannot be the basis for First Amendment protection). Scatchell also cites to an email sent by the Village attorney to the FOP attorney on November 22, 2016, accusing the FOP attorney of "having taken an adverse position to the village and have (sic) twice threatened suit against the Village over two separate matters" (First Am. Compl., ¶ 38; Defs. Jt. SOF, ¶ 35). Scatchell admitted in his deposition that the November 22nd email referred to an adverse position taken by the *FOP attorney*, and further admitted that he did not know anything about the referenced "threatened suits" (Defs. Jt. SOF, ¶ 36).

Scatchell points to a declaration dated January 5, 2017, that he signed in relation to a lawsuit filed by Lavalais against the Village (Defs. Jt. SOF, ¶ 40). Although he claims to have signed the declaration "as an official for FOP Lodge 19 … and as the Lodge's highest-ranking member" this alone does not blanket any statements with First Amendment protection. *Olendzki,* 765 F.3d at 747; *Graber,* 763 F.3d at 895. To merit protection as union speech, it must be sanctioned by the union, and it must address a matter of public concern. *Olendzki,* 765 F.3d at 747-748. The overall objective or point of the statements should be examined in determining whether they discussed matters of public concern. *Meade v. Moraine Valley Comm. College,* 770 F.3d 680, 684 (7th Cir. 2014); *Kristofek v. Village of Orland Hills,* 832 F.3d 785, 794 (7th Cir. 2016). When Scatchell signed the January 5th declaration, he was no longer the FOP president (Defs. Jt. SOF, ¶¶ 38-39). There is no evidence that the declaration was sanctioned by the FOP, and it contained no advocacy statement by Scatchell. He merely confirmed factually that the FOP was not made aware of a consent decree when the FOP entered into the collective bargaining agreement. The declaration does not express any particular viewpoint on a matter of public concern. *See Wernsing*, 423 F.3d at 752, 754 (holding that plaintiffs' emails were not

5

considered protected speech because they articulated no particular viewpoint, grievance or complaint).

Scatchell also cites to an affidavit that he signed on March 7, 2017, in relation to a lawsuit filed by the FOP with the Illinois Labor Relations Board (Defs. Jt. SOF, ¶ 42). In that affidavit, which Scatchell signed as a former FOP official, he merely verified that Lavalais had been active in the FOP. Like the January 5th declaration, he did not express any viewpoint relating to a matter of public concern.

Scatchell claims that he engaged in protected speech when he filed an EEOC complaint in September of 2017 (First Am. Compl., ¶ 145; Defs. Jt. SOF, ¶¶ 192-193). However, employee grievances, even if they concern discrimination, are not matters of public concern. *See Pettengell v. Scott,* 369 F. Supp.3d 882, 900 (N.D. Ill. 2019); *Briscoe v. Vill. of Vernon Hills,* No. 15 C 10761, 2016 U.S. Dist. LEXIS 68459, at *6-7 (N.D. Ill. May 25, 2016); *Kramarski v. Vill. of Orland Park*, Case No. 00 C 2487, 2002 U.S. Dist. LEXIS 14662, at *34-36 (N.D. Ill. Aug. 8, 2002); *Figueroa v. City of Chi.*, Case No. 97 C 8861, 1999 U.S. Dist. LEXIS 3417, at *24-27 (N.D. Ill. Mar. 10, 1999).

Finally, Scatchell claims that he engaged in protected speech by offering to testify for Lavalais at the arbitration hearing (First Am. Compl., ¶ 145). But the hearing never took place and Scatchell never testified (Defs. Jt. SOF, ¶ 45). Offering to testify is not testimony. The First Amendment does not protect non-expressive conduct. *Doe v. City of Lafayette,* 377 F.3d 757, 763 (7th Cir. 2004).

### B. Scatchell did not sustain any adverse employment action.

To establish a § 1983 First Amendment retaliation claim, the claimed retaliatory act must be sufficiently adverse to deter the exercise of free speech. *Hutchins v. Clarke,* 661 F.3d 947, 956 (7th Cir. 2011); *Powers v. Summers,* 226 F.3d 815, 820-821 (7th Cir. 2000) (denial of a raise

of a few hundred dollars as punishment for speaking out is unlikely to deter the exercise of free speech). While the retaliation need not be monstrous to be actionable, it must be sufficient to deter an ordinary person from exercising First Amendment rights. *Wheeler v. Piazza,* 364 F. Supp.3d 870, 878 (N.D. Ill. 2019). A plaintiff must show that the defendant "took some action with materially adverse consequences to him." *DeGuiseppe v. Village of Bellwood*, 68 F.3d 187, 192 (7th Cir. 1995). "To be considered materially adverse a change in the circumstances of employment 'must be more than disruptive than a mere inconvenience or an alteration of job responsibilities.' And it certainly must be adverse in the sense that the employee is made worse off by it." *Id.* (citation omitted). Trivial or *de minimus* actions do not suffice. *Pieczynski v. Duffy,* 875 F.2d 1331, 1333 (7th Cir. 1989). "[W]hen the asserted injury is truly minimal, [the court] can resolve the issue as a matter of law." *Douglas v. Reeves,* 964 F.3d 643, 647 (7th Cir. 2020).

Scatchell has not met even this low bar. He alleged that "he retired in June of 2018 as a result of the ongoing, hostile retaliatory work environment." (First. Am. Compl., ¶ 72). However, he did not come to work in the 9 months preceding his retirement due to taking combined, successive sick leave and vacation time (Defs. Jt. SOF, ¶¶ 115-116). He cannot point to any alleged relevant retaliatory act that took place in that 9-month period. He also admitted in his deposition that he would have had to retire anyway that year due to the Village's mandatory retirement ordinance (Defs. Jt. SOF, ¶¶ 151-153).[3] Moreover, the circumstances of his retirement were hardly adverse. His salary at retirement was $111,000, which translated into a $80,000 plus lifetime annual pension (with 3% annual increases), and he was paid all accrued pay and benefits upon retirement (Defs. Jt. SOF, ¶¶ 148-150).

---

[3] Defendant Castellan was also forced to retire at age 62 pursuant to the same ordinance applied to Scatchell (Defs. Jt. SOF, ¶ 8).

Scatchell claims that he was constructively demoted when Pitassi assigned him to the station supervisor position (First Am. Compl., ¶¶ 62-71). However, he admitted in his deposition that he did not lose any rank, salary, or benefits as a result of the assignment (Defs. Jt. SOF, ¶ 74). He also conceded that he could leave the building and respond to calls on the street, and he could serve as a backup shift supervisor when needed (*Id.* ¶¶ 82-83, 107). The new position even accommodated his private plumbing business. Pitassi told Scatchell that his hours were flexible, and he gave him permission to start his shift later in the afternoon so he could finish up plumbing jobs during the day (*Id.* ¶¶ 72, 85-88). Pitassi also allowed him to conduct two private depositions relating to his plumbing business in the station supervisor's office (*Id.* ¶ 89).

While Scatchell referred to the station supervisor office colloquially as "the hole," he conceded that the physical condition of the office was not materially different than the office that he had just previously occupied as a shift supervisor (Defs. Jt. SOF, ¶¶ 97-99).[4] Furthermore, in assigning Scatchell to the station supervisor office, Director Pitassi acted consistently with past practice: previous station supervisors had occupied "the hole" as well as Deputy Chief Rogowski who was assigned to "the hole" when he was promoted to deputy chief in 2016 (*Id.* ¶¶ 94-96). In actuality, Pitassi treated Scatchell better than his predecessor station supervisors. He permitted Scatchell to make significant improvements to the station supervisor office, including the installation of a 40-inch flat screen TV, a recliner chair, a refrigerator, and Hawaiian blinds (*Id.* ¶¶ 100-102).[5] The office was also equipped with a desk, chairs, computer, phone and cable TV service (*Id.* ¶ 103).

---

[4] Unlike Scatchell's prior shift supervisor office, however, the station supervisor office had windows (*Id.* ¶ 93).

[5] Scatchell was reimbursed for the cost of the blinds and everything else that he paid for on his own he took with him when he retired (Defs. Jt. SOF, ¶ 106).

Scatchell was not the only person assigned to the station supervisor position. Director Pitassi assigned Scatchell and Lieutenant Dino DiMaio to station supervisor positions on the same date (Defs. Jt. SOF, ¶¶ 70, 72). Both had the same rank and approximately the same time in service, and both had just previously served as shift supervisors (*Id.* ¶ 73). Like Scatchell, DiMaio's salary, rank, and benefits did not change with the assignment (*Id.* ¶ 74). Both were also treated the same with respect to overtime (*Id.* ¶ 84). Further, Pitassi did not give either any written job duties, and both were assigned to the same office ("the hole") (*Id.* ¶¶ 81, 92).

DiMaio never complained about the assignment. Rather, he welcomed it and did not view it as an adverse employment action, demotion, or punishment (Defs. Jt. SOF, ¶¶ 79, 109-110). DiMaio even came back early from an extended sick leave to take the position because "it was such a sweet deal." (*Id.* ¶¶ 75, 80). The simultaneous assignment of DiMaio, who did not view the assignment as adverse, shows that an ordinary person would not feel deterred in exercising any First Amendment rights because of the assignment.

In an effort to manufacture retaliatory acts, Scatchell cobbles together unrelated incidents and claims that he was subjected to harassment in how he was treated. For starters, he claims that Deputy Chief Castellan did nothing to investigate an officer who allegedly swore at Scatchell and another lieutenant and left work without permission (Defs. Jt. SOF, ¶¶ 143-144). Castellan never investigated the incident because the officer went on medical leave and eventually resigned from his employment with a non-duty related pension (*Id.* ¶¶ 145-146). Scatchell admitted that the incident did not cause him (Scatchell) any injury or harm (*Id.* ¶ 147).

Scatchell also alleged that Deputy Chief Rogowski failed to thoroughly and objectively investigate an incident involving fireworks discharged on Scatchell's driveway (First Am.

Compl., ¶¶ 52-57). [6] Yet, he admitted that Rogowski reviewed the investigative reports prepared by the responding officers, attempted to interview potential witnesses, spoke with Scatchell, Rogowski closed the case for lack of any leads (Defs. Jt. SOF, ¶¶ 130-140). Scatchell conceded that Rogowski wrote *a true and accurate* report (*Id.* ¶ 138).[7]

Scatchell also cites to a conversation he had with Pitassi in which Pitassi presented him with an anonymous letter which accused Scatchell of absenteeism (Defs. Jt. SOF, ¶¶ 117-118). Pitassi never investigated the anonymous letter because he didn't think much of it (*Id.* ¶ 121). He had no concerns or problems with Scatchell's attendance or job performance and no reason to investigate or discipline him for absenteeism (*Id.*). While he admittedly told Scatchell in the meeting that "the eyes of Texas are on you," he just wanted to let Scatchell know about the letter and that someone was apparently watching him (*Id.* ¶¶ 119-120). Even if Scatchell took offense to the statement, it is simply too isolated and trivial to amount to an adverse employment action. *See Lifton v. Bd. of Educ.,* 416 F.3d 571, 576, n.3 (7th Cir. 2005); *DeGuiseppe*, 68 F.3d at 192; *see, also, Stephens*, 569 F.3d at 790 (holding that trivial harms, petty slights, and minor annoyances do not give rise to materially adverse action necessary to sustain a retaliation claim).

At that same meeting, Pitassi also presented Scatchell with a sworn citizen's complaint ("Morales Complaint") which accused Scatchell of racial profiling and other misconduct during a traffic stop (Defs. Jt. SOF, ¶¶ 117, 123). Pitassi directed Rogowski to investigate it (*Id.* ¶ 124). Rogowski never completed the investigation because Scatchell went on sick leave in October of

---

[6] Scatchell alleged that his "house was hit with 3-quarter sticks of dynamite." This is pure exaggeration. Scatchell told the responding officer, Lido Graziani, that someone had discharged "fireworks," and in fact, Graziani observed "fireworks debris *not dynamite* on the driveway (Defs. Jt. SOF, ¶¶ 127-129, 134).

[7] In his deposition, Scatchell implied that he was treated poorly because of an altercation between one of the officers who responded to the fireworks incident had a verbal altercation with an off-duty officer. However, this too was investigated by Rogowski, and the off-duty officer was disciplined for his misconduct (Defs. Jt. SOF, ¶¶ 141-142).

2017, and he never returned to work prior to his retirement in June of 2018 (*Id.* ¶ 125). Scatchell was never disciplined or threatened with discipline (*Id.* ¶ 126). These circumstances, like the anonymous letter, are insufficient to deter protected speech. *See DeGuiseppe*, 68 F.3d at 192 (action must be adverse in the sense that employee is made worse off by it).

Scatchell's final salvo is that his son, John Scatchell, Jr., who was also a Melrose Park police officer, was subjected to an investigation and termination because of his father's alleged protected activity (First Am. Compl., ¶¶ 89-107, 146). However, Scatchell lacks standing to assert this claim. Actionable third-party retaliation claims involve actions against taken against the plaintiff-employee, not the third party. *See Stanek v. St. Charles Community Unit School Dist. No 303*, 783 F.3d 634, 641 (7th Cir. 2015) (*citing, Thompson v. North Amer. Stainless, LP,* 131 S. Ct. 863 (2011)). Scatchell does not allege that he (Scatchell) suffered any adverse employment consequence as a result of the investigation and termination of his son.

**C. Scatchell cannot meet his burden on the issue of causation.**

Whether and to what degree protected speech motivated an alleged adverse employment action "amounts to a causation inquiry." *Massey v. Johnson,* 457 F.3d 711, 716 (7th Cir. 2006). At the summary judgment stage, proving causation is subject to a burden shifting method of resolution. *Kidwell v. Eisenhauer,* 679 F.3d 957, 965 (7th Cir. 2012). The plaintiff carries the initial burden of showing that his speech was a substantial or motivating factor, or in a philosophical sense, a sufficient condition for the alleged retaliatory action. *Id*. If the plaintiff succeeds in carrying that initial burden, the defendant may then rebut the inference of causation raised by plaintiff's evidence by offering alternative explanations for why the action would have been taken even in the absence of the speech. *Id.* In that event, the burden shifts back to the

plaintiff to present evidence showing that the defendant's explanation was a pretext for retaliation, i.e. that a jury could infer that the explanation was a lie. *Id.*; *Massey,* 457 F.3d at 717.

Scatchell's forced retirement claim is specious. He did not work for the 9 months preceding his retirement (Defs. Jt. SOF, ¶¶ 115-116). He does not claim that he engaged in any First Amendment protected activity or that any materially adverse employment harm or injury happened to him in that 9-month period. There is simply no causal connection between his decision to retire and any alleged protected speech or association. Indeed, the last time that he claimed to have engaged in protected activity was the filing of his EEOC charge in September of 2017 – almost 8 months before he submitted his retirement letter. This is too large a gap to infer causation. *See Kidwell,* 679 F.3d at 966-977 (holding that 5-week to 2-month gap between alleged retaliatory acts and protected activity did not meet causation requirement).

Scatchell's "constructive demotion" claim also falls short. He claims that he was assigned to the station supervisor position on May 1, 2017 in retaliation for speaking out at a pension board meeting on April 17, 2017 against the lateral transfer of Officer Peter Caira into the pension fund (First Am. Compl., ¶ 62).[8] However, the mere fact that protected speech precedes an adverse employment action does not establish causation. *Graber,* 763 F.3d at 899; *see, also, Taylor v. Cook County,* 442 F. Supp.3d 1031, 1051 (N.D. Ill. 2020). Suspicious timing, alone, is insufficient. *Kidwell,* 679 F.3d at 966; *McGreal*, 850 F.3d at 313. "The reason is obvious: '[s]uspicious timing may be just that – suspicious – and a suspicion is not enough to get past a motion for summary judgment.'" *McGreal, id.* (*quoting, Loudermilk v. Best Pallet Co.,* 636 F.3d 312, 315 (7th Cir. 2011)). To make this argument work, the alleged retaliatory act must "'follow[]

---

[8] For purposes of summary judgment only, Defendants concede that the pension meeting statements constituted constitutionally protected speech.

close on the heels of the protected expression.'" *Id.; Daza v. Indiana,* 941 F.3d 303, 309 (7th Cir. 2019). The Seventh Circuit has defined this to mean *a few days*. *Kidwell,* 679 F.3d at 966-977 (emphasis added).

The assignment did not "come on the heels" of the pension meeting speech as it occurred weeks, not a few days later. Even if the timing was suspicious, more is required. *Daza,* 941 F.3d at 309. While Scatchell spoke to Pitassi and Castellan right after the pension meeting (Defs. Jt. SOF, ¶ 65), Scatchell points to nothing about that conversation that infers a causal link between the assignment and the pension meeting. *See Taylor*, 442 F. Supp.3d a 1051 (holding that plaintiff pointed to no evidence linking employer's alleged political animus toward plaintiff with the decision to terminate plaintiff's employment).

Nor could Scatchell argue that there was a causal connection between the station supervisor assignment and his union activity and/or purported support of Lavalais either at FOP meetings or through the January or March affidavits. First, Defendants Pitassi, Castellan and Rogowski were not aware of any such purported protected speech or association (Defs. Jt. SOF, ¶¶ 30-32, 40-44). Even if they had such knowledge, and the months long gap in time between the purported speech/association and the alleged retaliatory assignment is too large to infer causation. *See Kidwell,* 679 F.3d at 966-977.

In any event, there was a legitimate, nonretaliatory explanation for the station supervisor assignment. Reinstituting the station supervisor position was part of a restructuring plan that had been in the works for months. Pitassi and Castellan began discussing the restructuring plan at least as early as January of 2017 (Defs. Jt. SOF, ¶ 67).[9] Part of the restructuring was to cut the number of lieutenants per shift from two to one and reinstitute the station supervisor position

---

[9] Rogowski was not involved in the decision to assign Scatchell to the station supervisor position, and he knew nothing about Scatchell's pension board statements (*Id. ¶¶* 64, 66, 70).

which had been filled by lieutenants in the past but not recently through attrition (*Id.* ¶¶ 67-69). Of the two lieutenants on his patrol shift, Scatchell was chosen to fill the station supervisor position because the other lieutenant, Lt. Urso, had more years in service as a lieutenant (Defs. Jt. SOF, ¶¶ 77-78). The record contains no evidence rebutting the veracity or honesty of this plan. *See McGreal*, 850 F.3d at 314 (affirming summary judgment because plaintiff-employee failed to meet his burden apart from suspicious timing showing that alternative explanations were untrue); *Massey*, 457 F.3d at 719 (affirming summary because plaintiff failed to come forward with evidence that defendants were lying when they cited economic constraints and downsizing as explanations for termination).

Moreover, Scatchell was not singled out for assignment to the station supervisor position. Pitassi also assigned another lieutenant, Dino DiMaio, to the same position for the same reasons and on the same terms (Defs. Jt. SOF, ¶¶ 70, 72, 75-76). Neither DiMaio nor Scatchell received any written job duties, and both shared the same office ("the hole") (*Id.* ¶¶ 81, 92). Both assumed specific duties: Scatchell inspected building conditions and recommended repairs to Pitassi; and, DiMaio took care of car repairs and also reported building conditions and equipment repairs (*Id.* ¶¶ 90-91). Both had access to a computer in the office (*Id.* ¶¶ 103-105).[10] Both were assigned department vehicles and could leave the office and respond to calls on the street (*Id.* ¶¶ 107-108, 112-113). While Scatchell alleges that he was excluded from shift supervisor meetings conducted by Deputy Chief Castellan (First Am. Compl., ¶ 67c), DiMaio testified that he did not attend those meeting either (Defs. Jt. SOF, ¶ 111).

There is simply no evidence that suggests or infers that the assignment of Scatchell to the station supervisor position was retaliatory in any way. Indeed, while Scatchell claims that he was

---

[10] Although Scatchell claims he was not given a passcode to access the computer, he admitted that he never followed up with the IT personnel after the first few weeks (Defs. Jt. SOF, ¶ 104).

subjected to retaliation because of his support of Lavalais, it is undisputed that DiMaio was a vocal objector of the Lavalais grievance arbitration (Defs. Jt. SOF, ¶ 114). This fact alone undercuts any causal connection between the assignment and any alleged protected activity.

Scatchell also claims that the decision to pass him over for the deputy chief position was retaliatory. However, that decision was made by Mayor Serpico and the Board of Trustees (Defs. Jt. SOF, ¶¶ 46-61). Pitassi, Castellan, and Rogowski had nothing to do with it. (*Id.* ¶¶ 56, 61). Absent personal involvement in the alleged constitutional deprivation, there is no section 1983 liability. *See Stephens v. Erickson,* 569 F.3d 779, 788 (7th Cir. 2009) (affirming summary judgment for individual defendant because plaintiff failed to demonstrate triable issue of fact as to whether defendant controlled, influenced, or played a role in promotional decision).

Also, the decision to table Scatchell's promotion occurred on November 14, 2016 (Defs. Jt. SOF, ¶ 55). Scatchell admitted in his deposition that he did not take any position and remained neutral on the Lavalais matter at FOP meetings, and that he never expressed any personal viewpoint or opinion on the matter to Pitassi, Castellan, or Rogowski (*Id.* ¶¶ 25, 30-32). These Defendants did not attend any FOP meetings and were not aware of any statements, viewpoints, or positions allegedly made by Scatchell relating to the Lavalais matter (*Id.* ¶ 30). Thus, even had Scatchell taken a position at one of the FOP meetings, these Defendants had no knowledge of it. Absent knowledge of protected speech or association, there can be no causal link to an adverse action. *See Daza v. Indiana,* 941 F.3d 303, 309 (7th Cir. 2019); *McGreal v. Village of Orland Park,* 850 F.3d 308, 313 (7th Cir. 2017); *Hall v. Babb,* 389 F.3d 758, 762 (7th Cir. 2004).

Scatchell also challenges the manner in which Defendants conducted several investigations, i.e., the "dynamite" incident, an officer's alleged insubordination, a sworn

citizen's complaint, and the disciplinary incident involving his son. Such claims necessarily fail. The Seventh Circuit has "long noted that challenges to the manners in which employees conduct these investigations are generally misspent." *Marshall v. Ind. Dep't of Corr.,* 973 F.3d 789, 793 (7th Cir. 2020). The courts "are not a super-human-resources department, judging whether the investigation was exemplary." *Id.*

In any event, Director Pitassi directed Deputy Chief Rogowski to investigate the "dynamite" incident even though the responding officers had already conducted an on-scene investigation and could not identify the perpetrator (Defs. Jt. SOF, ¶¶ 127-140). Scatchell admitted that Rogowski's investigative report was true and accurate (*Id.* ¶ 138). The insubordination incident investigation never got off the ground, because the accused officer went on medical leave and never returned to work (*Id.* ¶¶ 143-147). Further, Scatchell cannot point to any protected activity (at least any that Pitassi, Castellan, or Rogowski knew about) that preceded these two events.

Scatchell cites to the conversation that he had with Pitassi in September 2017 about the anonymous letter concerning his absenteeism and the Morales sworn citizen's complaint investigation (First Am. Compl., ¶ 86; Defs. Jt. SOF, ¶ 117). But Scatchell cannot point to any purported First Amendment speech or expressive association that immediately preceded that conversation. The last purported First Amendment activity was April 17, 2017 when he spoke out at the pension meeting (Defs. Jt. SOF, ¶¶ 62-66). Alleged retaliatory acts that take place months after alleged protected speech alone do not infer causation. *Kidwell,* 679 F.3d at 966-977. Further, he admitted that the conversation occurred before he filed his EEOC charge (Defs. Jt. SOF, ¶ 195).

In any event, the author of the anonymous letter accused Scatchell of not being present at work, and that he could be seen driving around town and at stores and restaurants during his shift (Defs. Jt. SOF, ¶ 118). Scatchell admitted that he often left the station in his personal truck during his shift to go home for dinner, to the store for supplies, or to eat at restaurants (Defs. Jt. SOF, ¶ 107). His conduct could certainly create the impression to third parties that he was not engaged in police department business even though he was on duty. Merely letting Scatchell know about the anonymous letter and how it appeared to third parties, as Pitassi did, is reasonable.

Morales was a citizen who submitted a complaint under penalty of perjury (Defs. Jt. SOF, ¶ 123). Any reasonable chief of police would investigate such a complaint. Rogowski obtained supplemental reports from several officers who witnessed the interaction between Scatchell and Morales, but he could not complete the investigation because Scatchell never returned to work through the date of his retirement (Defs. Jt. SOF, ¶¶115-116, 124-125). There is no evidence that infers that Rogowski's investigation was dishonest or a lie.

Even if this Court finds that Scatchell has standing to assert his claim about his son, it should find that there is no causal connection between Senior's alleged protected activity and the investigation into and termination of Junior's employment.[11] The last time Scatchell allegedly exercised any First Amendment right was mid-April of 2017 when he spoke out at the pension meeting (Defs. Jt. SOF, ¶¶ 62-66). The investigation into Junior started 7 months later on November 13, 2017 (*Id.* ¶¶ 159-160). Such a large gap in time does not support an inference of causation. *Kidwell,* 679 F.3d at 966-977.

---

[11] The investigation and charges were brought by Pitassi and Castellan (Defs. Jt. SOF, ¶¶ 158-159, 172). Rogowski had no personal involvement these events.

Scatchell claims that the investigation was initiated by Pitassi because he (Scatchell) had filed an EEOC charge in September of 2017 (First Am. Compl., ¶ 145). Even if the EEOC charge constituted protected First Amendment activity (which it does not as previously argued), neither Pitassi nor Castellan knew about the EEOC charge at the time the investigation into Junior started (Defs. Jt. SOF, ¶ 197). Absent evidence of such knowledge, no jury could conclude that the investigation was motivated by the EEOC charge. *See Daza,* 941 F.3d at 309.

In any event, Pitassi and Castellan investigated and brought disciplinary charges against Junior for genuine reasons (Defs. Jt. SOF, ¶¶ 154-156, 158-172). While the impetus for the investigation was an anonymous letter, the investigation and its findings were "forward looking" and did not rely on the circumstances cited in the letter (Defs. Jt. SOF, ¶ 162). Further, the investigator, Tony Caira, was given autonomy and discretion in how he conducted the investigation (*Id.* ¶ 161). Defendants could therefore reasonably rely on the investigation in bringing termination charges. *See Swetlik v. Crawford*, 738 F.3d 818, 829 (7th Cir. 2013) (affirming summary judgment on First Amendment retaliation claim because defendants could reasonably rely on supported findings of independent investigator). Furthermore, despite being given a *Garrity* warning,[12] Junior also refused a direct order at the hearing to answer questions, and this led to an amended disciplinary charge of insubordination independent of Caira's investigation and the anonymous letter (Defs. Jt. SOF, ¶ 175).

The decision to terminate Junior's employment was made after a full-blown evidentiary hearing before the Melrose Park Police and Fire Commission (Defs. Jt. SOF, ¶¶ 173-177). The Board found just cause to fire Junior based on evidence that was overwhelming and unrebutted

---

[12] A *Garrity* warning, based on *Garrity v. New Jersey*, 385 U.S. 493 (1967), is a warning issued to police officers when ordered by a superior to answer questions about their official duties as a condition of their employment that the information they provide cannot be used against them in any criminal proceeding.

(*Id.* ¶¶ 176). The decision has been affirmed by a Cook County judge on administrative review (*Id.* ¶ 178). Based on the evidence, no rational jury could conclude that the termination decision was based on some retaliatory motive related to Scatchell Sr.

One final point bears mentioning. Defendants took Junior's deposition and asked him questions about his misconduct. He repeatedly took the 5th Amendment (136 times) and refused to provide any answers (Defs. Jt. SOF, ¶ 179). This Court should draw an adverse inference against Scatchell due to Junior's silence.

Courts in the Seventh Circuit have allowed adverse inferences to be imputed from third parties who share a "relationship of loyalty" or an "identity of interests" with the named party. *See, e.g., First Midwest Bank v. City of Chi.*, 337 F. Supp. 3d 749, 776-77 (N.D. Ill. 2018); *Malibu Media, LLC v. Tashiro*, 2015 U.S. Dist. LEXIS 64281, at *70 (S.D. Ind. 2015); *Fujisawa Pharm. Co. v. Kapoor*, 1999 U.S. Dist. LEXIS 11381, at *30 (N.D. Ill. 1999). "The closer the bond, whether by reason of blood, friendship or business, the less likely the non-party witness would be to render testimony in order to damage the relationship." *LiButti v. United States*, 107 F.3d 110, 124 (2d Dist. 1997); *See, also, State Farm Mut. Auto Ins. Co. v. Abrams,* 2000 WL 574466 *22 (N.D. Ill. 2000) (collecting cases). A father-son relationship easily qualifies under this test, particularly in this case where Junior's incident plays so prominently in Senior's lawsuit (First Am. Compl., ¶¶ 89-139).

Summary judgment is appropriate when, after drawing permissible inferences from a person's silence, the evidence entitles the moving party to judgment as a matter of law. *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 394 (7th Cir. 1995). "Before an adverse inference may be drawn from a party's refusal to testify in a civil case, there must be independent corroborative evidence to support the negative inference beyond the invocation of the privilege." *Kontos v.*

19

*Kontos*, 968 F. Supp. 400, 408 (S.D. Ind. 1997). *See also Sebastian v. City of Chi.*, 2008 U.S. Dist. LEXIS 60570, at *121 (N.D. Ill. 2008) ("[A] moving party must introduce actual independent, material evidence that the elements of the party's case exist; he cannot rely solely on the adverse inference associated with the invocation of the Fifth Amendment right."); *State Farm Mut. Auto. Ins. Co. v. Abrams*, 2000 U.S. Dist. LEXIS 6837, *18-19 (N.D. Ill. 2000) ("An adverse inference drawn against a party invoking the Fifth Amendment privilege is ordinarily insufficient to support summary judgment in the absence of other independent, material and probative evidence."); *see, also, SEC v. Kahn*, 2002 U.S. Dist. LEXIS 9819, at *13 (N.D. Ill. 2002); *Clancy v. Coyne*, 244 F. Supp. 2d 894, 899 (N.D. Ill. 2002); *Orange v. Burge*, 2008 U.S. Dist. LEXIS 73528, at *23 (N.D. Ill. 2008).

More than half of the factual allegations made in the First Amended Complaint (88 out of 139 paragraphs) relate to Junior. Defendants were entitled to discover information from Junior to contest this claim. Scatchell should not reap the benefit of Junior's silence. This Court should draw an adverse inference against Scatchell and reject any argument that the investigation into and termination of Junior was motivated by Scatchell's purported speech.

## **CONCLUSION**

For the foregoing reasons, Defendants Sam Pitassi, Michael Castellan, and Steven Rogowski, are entitled to summary judgment.

Respectfully submitted,

**s/Michael D. Bersani**
MICHAEL D. BERSANI, ARDC No. 06200897
HERVAS, CONDON & BERSANI, P.C.
333 Pierce Rd., Suite 195
Itasca, Illinois 60143
333 Pierce Rd., Suite 195, Itasca, Illinois 60143
*Attorney for Pitassi, Castellan, and Rogowski*
mbersani@hcbattorneys.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JOHN SCATCHELL, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-3989 |
| | ) | |
| vs. | ) | |
| | ) | Honorable Charles R. Norgle, Sr |
| VILLAGE OF MELROSE PARK, | ) | |
| RONALD M SERPICO, SAM C. PITASSI, | ) | Honorable Michael T. Mason |
| MICHAEL CASTELLAN, and | ) | |
| STEVE ROGOWSKI | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2021, I electronically filed the foregoing ***Defendants' Memorandum of Law in Support of their Motion for Summary Judgment*** with the Clerk of the District Court for the Northern District of Illinois, using the CM/ECF system, which will send notification to the following CM/ECF participants:

TO:   Gianna Rochelle Scatchell, Cass Thomas Casper, Disparti Law Group, 121 West Wacker Drive, Suite 2300, Chicago, IL 60601; gia@dispartilaw.com; casper@dispartilaw.com

Jeffrey Fowler, Laner Muchin, 515 N. State St #2800, Chicago, IL, jfowler@lanemuchin .com

K. Austin Zimmer, Cynthia Grandfield, Timothy Martin Woerner, Del Gado Law Group, 141 South Harlem Ave, Berwyn, IL 60402, zimmer@dlglawgroup.com; grandfield@dlglawgroup.com; woerner@dlglawgroup.com

<div style="margin-left:40%">

s/Michael D. Bersani
MICHAEL D. BERSANI, ARDC No. 06200897
HERVAS, CONDON & BERSANI, P.C.
333 Pierce Rd., Suite 195
Itasca, Illinois 60143
630-773-4884
*Attorney for Sam C. Pitassi, Michael Castellan, and Steven Rogowski*
mbersani@hcbattorneys.com

</div>

21