**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS PITASSI, CASTELLAN, AND ROGOWSKI'S MEMORANDUM FOR
SUMMARY JUDGMENT**

TABLE OF CONTENTS

INTRODUCTION…..                                                                                      1

STANDARD…                                                                                            2

SUMMARY JUDGMENT SHOULD BE DENIED AS TO PLAINTIFF'S 1983 CLAIM..        2

THE PLAINTIFF PARTICIPATED IN CONSTITUTIONALLY PROTECTED SPEECH OF

PUBLIC CONCERN….                                                                                    2

PLAINTIFF SUFFERED ADVERSE ACTION….                                                      10

    a.   Promotion Recinded….                                              10
    b.   Explosive…                                                        11
    c.   Station Supervisor Demotion…                                      12

CONTINUED ADVERSE ACTIONS AFTER EEOC CHARGES FILED….                      13

    a.   Investigation of Scatchell, Jr.…                                  13


CAUSATION/MOTIVATING FACTOR….                                                          15

PRETEXT…..                                                                                           21

    a.   Tabled Promotion..                                                21
    b.   Scatchell's Continued Support of Lavalais Further Ignites Blatant Discriminatory          21
       Motives..
    c.   Reassignment…                                                     26
    d.   Anonymous Letter Regarding Scatchell, Sr.…                        23
    e.   Anonymous Letter Leading to Scatchell, Jr. Investigation…        23

CONCLUSION…                                                                                          24

**TABLE OF CASES**

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)....                                                    2

*Bekker v. Humana Health Plan, Inc.*, 229 F. 3d 662, 669 (7th Cir. 2000)...                                   2

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67, 126 S. Ct. 2405....                          7,13

2414, 165 L. Ed. 2d 345 (2006)...

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405,                                 7, 15

165 L. Ed. 2d 345 (2006)....

*Ceballos v. Garcetti*, 361 F.3d 1168, 1174 (9th Cir. 2004), rev'd and remanded, 547 U.S.                     9
410, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006)....

*Collins v. State of Illinois,* 830 F.2d 692, 703 (7th Cir.1987).....                                        12

*Connick v. Meyers*, 461 U.S. 138, 146 (1983)....                                                           3, 9

*Dahm v. Flynn*, 60 F.3d 253 (7th Cir.1994)....                                                              12

*Dahm* at 257. *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)...                             12

*DeGuiseppe v. Vill. of Bellwood*, 68 F.3d 187, 192 (7th Cir. 1995)...                                       10

*EEOC v. Sears Roebuck & Co.*, 233 F. 3d 432, 436 (7th Cir. 2000).....                                        2

*First National Bank of Arizona v. Cities Services Co.*, 391 U.S. 253, 288-289 (1968)...                      2

*Graber v. Clarke,* 763 F.3d 888, 895 (7th Cir. 2014)....                                                     8

*Hird-Moorhouse v. Belgian Mission to United Nations*, No. 03-cv-9688 (RWS) 2010 WL
3910742...                                                                                                    22

*Keyser v. Sacramento City Unified Sch. District,* 265 F.3d 741, 747 (9th Cir.2001)....                       9

*Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012)...                                                17

*Kramarski v. Vill. of Orland Park*, No. 00 C 2487, 2002 WL 1827637, at *12 (N.D. Ill. Aug. 9,
10

*Lewis v. City of Boston*, 321 F.3d 207, 219 (1st Cir.2003)....                                              16

*Massey v. Johnson*, 457 F.3d 711 (7th Cir. 2006)..                                              16, 19, 23, 25

2002)...

*McArdle v. Peoria Sch. Dist. No. 150*, 833 F. Supp. 2d 1020,   2
1026 (C.D. Ill. 2011), aff'd, 705 F.3d 751 (7th Cir. 2013)…

*McDonnell v. Cisneros,* 84 F.3d 256, 258–59 (7th Cir. 1996).   12

*Moretto v. Tazewell Cty. Sheriff's Office*, No. 14-CV-1433-MMM,   6, 8
2019 WL 690546, at *9
(C.D. Ill. Feb. 19, 2019), No. 14-CV-1433-MMM, 2019 WL 2291449
(C.D. Ill. May 29, 2019)….

*Pettengel v. Scoot*, 369 F. Supp.3d 882, 900 (N.D. Ill. 2019)….   9

*Power v. Summers*, 226 F.3d 815, 821 (7th Cir. 2000)….   11

*Reynolds v. City of Chicago*, 296 F.3d 524, 530 (7th Cir. 2002)….   4

*Smith v. Fruin* 28 F.3d 646, 649 n.3 (7th Cir. 1994)….   10

*Texas v. Johnson,* 491 U.S. 397, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989)….   5

*Thompson v. N. Am. Stainless,* LP, 562 U.S. 170, 174, 131 S. Ct. 863, 868, 178 L. Ed. 2d 694
(2011)….   14

*Valentino v. Village of South Chicago Heights,* 575 F.3d 664, 670 (7th Cir.2009)….   2

*Wheeler v. Piazza*, 364 F. Supp. 3d 870 (N.D. Ill. 2019)….   3, 10, 18,21

*Wilcox v. Allstate Corp.,* No. 11 C 814, 2012 WL 6569729, at *7 (N.D. Ill. Dec. 17, 2012)…. 13

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| JOHN SCATCHELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case. No. 2018-CV-03989 |
| v. | ) | |
| | ) | Judge John F. Kness |
| VILLAGE OF MELROSE PARK, | ) | |
| RONALD M SERPICO, SAM C. PITASSI, | ) | Magistrate Judge Jeffery |
| MICHAEL CASTELLAN, and | ) | Cummings |
| STEVE ROGOWSKI | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS PITASSI, CASTELLAN, AND ROGOWSKI'S MEMORANDUM FOR SUMMARY JUDGMENT

NOW COMES the Plaintiff, John Scatchell, by and through his attorneys, Disparti Law Group, P.A., submits the following memorandum of law in opposition to Defendants' Motion for Summary Judgment.

## INTRODUCTION

The Plaintiff, John Scatchell ("Plaintiff" or "Scatchell") was employed as a police officer with the Village of Melrose Park Police Department from February 15, 1985 through the date of his retirement on June 8, 2018. (PSOF ¶1). After working for the Village of Melrose Park ("Village" or "VMP") for 33 years, Scatchell became the target of retaliation. Sam Pitassi ("Pitassi"), Michael Castellan ("Castellan"), and Steve Rogowski ("Rogowski") (collectively "Defendants" and "individual defendants") all acted as agents of the Village of Melrose Park and engaged in the conduct complained of while acting under the color of law. The Plaintiff alleges that the individual defendants violated 42 U.S.C. § 1983 by depriving the Plaintiff's First Amendment Rights of Speech and Association. The Defendants also violated 42 U.S.C. § 1981 through retaliation against Plaintiff's protected conduct under §1981 and Title VII when the Plaintiff supported, both personally and through his attorney daughter Gianna Scatchell, Lavalais's position opposing the residency order, his grievance, and his arbitration forcing Lavalais to reestablish residency in the Village of Melrose Park, Illinois, despite being the sole

1

African-American officer on the force and hired under an affirmative action-based consent decree. The Plaintiff also alleges Defendants violated 42 U.S.C. § 1983 that he was the object of a conspiracy to retaliate and embarrass him, through targeting his son, John Scatchell, Jr ("Scatchell, Jr.") for termination. These actions were taken to deprive the Plaintiff of his first amendment rights. However, the individual defendants' memorandum only specifically addresses the Plaintiff's first count based on § 1983 First Amendment deprivation of speech and association. To the extent Defendants assert any additional arguments relating to other counts by and through the Village and Serpico, the Plaintiff incorporates Plaintiff's separate summary judgment response briefs as if fully set forth herein. Further, the Plaintiff would direct the Court to Plaintiff's Response to Defendants' Motion for Summary Judgment regarding responses.

## STANDARD

Summary judgment cannot be granted if there is a genuine issue of material fact. Substantive law identifies what facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of fact exists only when a reasonable jury could find for the nonmoving party based on the record as a whole. *Bekker v. Humana Health Plan, Inc.*, 229 F. 3d 662, 669 (7th Cir. 2000). A nonmoving party cannot survive summary judgment with merely a scintilla of evidence supporting its position. *EEOC v. Sears Roebuck & Co.*, 233 F. 3d 432, 437 (7th Cir. 2000). "It is true that the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-249 (1986) (citing *First National Bank of Arizona v. Cities Services Co.*, 391 U.S. 253, 288-289 (1968).

## SUMMARY JUDGMENT SHOULD BE DENIED AS TO PLAINTIFF'S 1983 CLAIM

To establish a prima facie case of unlawful First Amendment retaliation under Section 1983, a public employee must present a genuine issue of material fact that (1) he engaged in constitutionally protected speech; (2) he suffered a deprivation likely to deter him from exercising her First Amendment rights; and (3) his speech was a motivating factor in her employer's adverse action. *Valentino v. Village of South Chicago Heights,* 575 F.3d 664, 670 (7th Cir.2009). *McArdle v. Peoria Sch. Dist. No. 150*, 833 F. Supp. 2d 1020, 1026–27 (C.D. Ill. 2011), aff'd, 705 F.3d 751 (7th Cir. 2013) Retaliation need not be monstrous to be actionable

under the First Amendment; it need *merely create the potential* for chilling public employee speech on matters of public concern. U.S. Const. Amend. 1. *Wheeler v. Piazza*, 364 F. Supp. 3d 870 (N.D. Ill. 2019). *Even minor forms* of retaliation can support a First Amendment claim, for they have may have just as much of a chilling effect on speech as more drastic measures. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq. *Wheeler v. Piazza*, 364 F. Supp. 3d 870 (N.D. Ill. 2019)

## THE PLAINTIFF PARTICIPATED IN CONSTITUTIONALLY PROTECTED SPEECH OF PUBLIC CONCERN

Scatchell, Sr. has presented sufficient evidence to present a triable issue of face as to whether he engaged in constitutionally protected speech. The First Amendment to the United States Constitution guarantees the Plaintiff's right to speak on matters of public concern free from retaliation. The plaintiff engaged in protected speech on matters of public concern, including, but not limited to publicly opposing race discrimination in the Lavalais matter, advocating for union and labor rights on behalf of a fellow officer, *to wit*, Kyll Lavalais, and opposing questionable pension spending.

Defendants agree that to establish protected speech, a public employee must speak out on "a topic related to 'political, social, or other concern to the community.'" (*Olendzki*, 765 F.3d at 748 (quoting, *Connick v. Meyers*, 461 U.S. 138, 146 (1983). Melrose requires its police officers, firefighters, and other employees to live within Village limits unless the employee is *exempt* pursuant to MP Ordinance §2.52.090.

> The residency requirement shall not apply to or be imposed upon any employee of the village that is a member of a minority class of persons and was hired as a result of the judicial decree and order entered by the court in cause number 85C 10493 of the United States District Court for the Northern District of Illinois. (Ord. 298 § 18, 1997). MP Ordinance §2.52.090

Remedying the lack of representation of the communities that the police serve has been a long standing issue of public concern[1]. The public has continually sought

---

[1] https://www.eeoc.gov/advancing-diversity-law-enforcement "Today, our country is in the midst of an unprecedented national conversation on community-police relations."

employment of minorities in various local government and public agencies. These issues of public concern have undeniably continued today[2].

The Village of Melrose Park was specifically found to have engaged in a pattern of recruitment and hiring practices which discriminate against black applicants by a decree in the Northern District of Illinois in 1987. (PSOF¶ 199)  Other courts have similarly noted that "[a]ddressing the concerns of race and affirmative action. "Many courts, however, including our own have at least left open a small window for forms of discrimination that are supported by compelling public safety concerns, such as affirmative action in the staffing of police departments and correctional institutions". *Reynolds v. City of Chicago*, 296 F.3d 524, 530 (7th Cir. 2002).

On September 1, 2016, Director Pitassi and Deputy Chief Castellan ordered Sergeant Lavalais to establish residency within the Village limits.  (PSOF¶ 17) In response, Lavalais filed grievances pursuant to the CBA stating that he was exempt from this residency requirement pursuant to the 1987 federal consent decree and ordinance. (PSOF¶ 19)  On September 30, 2016, the Plaintiff and FOP Executive Board held an emergency meeting to discuss Lavalais' request for grievance arbitration, but did not vote due to requesting an extension to obtain additional documentation. (PSOF¶ 23). The FOP met later in October, November, and December regarding this issue. (PSOF¶ 24).

There is a genuine issue of fact as to whether or not Pitassi, Castellan, and Rogowski were aware of Scatchell's support of Lavalais.'The Plaintiff's position and support of Lavalias was well known within the police force. (¶SOF¶ 200). Officer Rogowski, admitted that meetings were always held at the police station and meeting topics were often discussed among the officers outside of meeting times. (PSOF¶ 201) In fact, he admitted that the meetings and minutes were posted on a bulletin, located next to a locker room door that he and other officers had to use multiple times per day. (PSOF¶ 201) Officer DiMaio testified that he learned of Lavalais' grievance because the minutes were posted on the FOP ("Fraternity of Police") board. (PSOF¶ 201) According to Officer Natale's recollection, the FOP had not arbitrated a grievance at least in the past ten (10) years, making this a significant issue within the police department.

---

[2] See the deaths of George Floyd, Trayvon Martin, Sandra Bland, and Philando Castile.  All of the above died after being subjected to policing that invoked concerns of communities regarding being over-policed by officers and ethnically homogenous police departments whose ethnicities and composition don't reflect that of the communities they serve.

(PSOFP 202) Rogowski also testified to the fact that officers discussed meeting topics and issues generally, even if not present in meetings. (PSOF¶ 200) Defendant Serpico confirmed the rarity of arbitration, stating it hasn't happened in recent memory, certainly not since he held the position of mayor. (PSOF¶ 202) As the "smartest guy in the department" it is objectively difficult to accept Defendants' stories, including Rogowski and Castellan, that they were not aware of the Plaintiff's public position and support of officer Lavalais' grievances until the 2017 arbitration hearings. (PSOF¶¶ 32,58) The Defendants' knowledge of the Plaintiff's statements, position, and support of Lavalais' grievance, arbitration, and complaints is a genuine issue of fact to be reviewed by a jury.

The Plaintiff and FOP, retained counsel, Plaintiff's daughter, Gianna Scatchell, to advise on the issue (PSOF¶ 253) Conduct may be sufficiently imbued with elements of communication to fall within scope of First and Fourteenth Amendments. U.S.C.A. Const.Amends. 1, 14. *Texas v. Johnson*, 491 U.S. 397, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989). In deciding whether particular conduct possesses sufficient communicative elements to bring First Amendment into play, it is necessary to determine whether there was an intent to convey a particularized message and whether *likelihood* was great that message would be understood by those who viewed it. U.S.C.A. Const. Amend. 1. *Id*. The First Amendment literally forbids the abridgment only of "speech," but we have long recognized that its protection does not end at the spoken or written word. *Id*. Taking actions in furtherance of protecting Lavalias' rights for arbitration is a form of speech. Particularly, if the context of the circumstances are considered, it is likely that others, including the Defendants, understood the Plaintiff's actions as support of Lavalais. The fact that arbitration was admittedly a nearly nonexistent occurrence in itself signaled a shift in the way things were being done, particularly in support of Melrose Park's only African-American officer. The writing was on the wall as the Plaintiff's actions denoted his stance.

On or about November 10, 2016, the Plaintiff took the position that he and the FOP, through counsel, opposed the order requiring Lavalais to reestablish residency and seriously contemplated arbitration of Lavalais' grievance. (PSOF¶ 203) While the Defendants opine that Scatchell "never took a position" they are taking a very narrow position on his expression of speech, which the Plaintiff articulated on varied occasions through statements and actions. The combination of those statements and actions, taken objectively, demonstrate that his position was clearly communicated again and again. "The public concern element is satisfied if the speech can

*fairly be said to relate* to a matter of political, social, or other concern to the community, rather than merely a personal grievance of interest only to the employee." *Gustafson*, 290 F.3d at 907 (internal citation omitted). *Moretto v. Tazewell Cty. Sheriff's Office*, No. 14-CV-1433-MMM, 2019 WL 690546, at *9 (C.D. Ill. Feb. 19, 2019), No. 14-CV-1433-MMM, 2019 WL 2291449 (C.D. Ill. May 29, 2019)

 The Plaintiff testified that Sam Pitassi knew his continued personal position and support of Lavalais' grievance while discussing it in Pitassi's office on or before December of 2016. During this exchange the Plaintiff recalls Pitassi's reaction, "You believe this fuckin nigger? I can't believe he wants this…This nigger is out of his mind." (PSOF 211)  Pitassi continued, "He wants to sue. He don't want to live here." (PSOF¶ 211)  The Plaintiff responded, "He's a member of the FOP…if we have the right to right to represent him I will back him one hundred percent to go to the arbitration."(PSOF¶ 211) The Plaintiff further explained with clarity, "I told him ten times." (PSOF¶ 211) Days later, on December 20, 2016, the Plaintiff approved Kyll Lavalais' residency grievance to be set for arbitration.

 On January 5, 2017, the Plaintiff submitted a signed declaration referencing the action to bring the CBA to conform to the current consent decree to include officer Lavalais. (PSOF¶ 40) The Defendants argue that the January 5, 2017, declaration and March 7, 2017, affidavit did not express a view point relating to a matter of public concern. However, they ignore that the Plaintiff's speech need to only be *fairly* said to *relate* to a matter of political, social, or other concern to the community.  The January 5, 2017, declaration clearly communicated the intent to fairly represent Lavalias by conforming to the consent decree. The March 3, 2017 communication is titled, "AFFIDAVIT IN *SUPPORT* OF CHARGE AGAINST LABOR ORGANIZATION." (PSOF¶ 42) In this affidavit, Plaintiff stated that he believed Lavalais's grievance and arbitration to be meritorious. (PSOF¶214) Both documents were clearly statements related to and on the subject of Lavalais' grievance and his ability to be heard on a matter of public concern.  There is no specific incantation of language, nor a defined sequence phases necessary to meet the broad standard established by the court that speech is "related" to a matter of public concern.

 On September 15, 2017 and September 25, 2017, Scatchell filed a complaint and amended complaint with the Equal Employment Opportunity Officer ("EEOC") for retaliation. (SOF, ¶¶192, 193)  In late October and early November of 2017, the Defendants received the

charges and became aware of their contents. (PSOF¶233) The complaint presented charges for retaliation regarding his opposition to unlawful and discriminatory practices. Title VII depends for its enforcement upon the cooperation of employees who are willing to *file complaints and act as witnesses. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67, 126 S. Ct. 2405, 2414, 165 L. Ed. 2d 345 (2006)(emphasis added) The EEOC charges were based on his participation in protected activity, including but not limited to opposing racial discrimination of Lavalais, signing a declaration in support of Lavalais' filing, being demoted, being passed up for promotion, and harassment of himself and his family. The Plaintiff participated in protected activity not only when he supported Lavalais' grievances and claims, but also when Plaintiff himself filed his own EEOC complaint. (SOF¶ 195)

The Plaintiff's conduct and speech have consistently conveyed his position and intent in addressing officer Lavalais' grievances, regardless of the Defendants views. The Defendants point out that the speaker's intent may be considered, specifically if intending to bring wrongdoing to light. (Def SJ, p.3) Here, the Plaintiff's declaration and affidavit in support of Lavalais are relevant. (SOF¶¶ 40, 42) In his deposition, the Plaintiff noted that when he originally received information about Lavalais' grievance, via note on his desk, the FOP had not received any prior record of his requests over the preceding eight (8) months from the Village. (PSOF¶ 226) The Plaintiff immediately called an emergency FOP meeting in October of 2016 regarding Lavalais. (PSOF¶ 23) The Plaintiff's intent was just as he stated to Pitassi, "He's a member of the FOP…if we have the right to right to represent him I will back him one hundred percent to go to the arbitration."(PSOF¶ 211) Further, the Plaintiff's Declaration on January 5, 2017, indicated his desire to conform to the previously established consent decree. (PSOF¶40)

The Plaintiff openly voted to hire legal counsel, Gianna Scatchell, to further address arbitration for Lavalais and to allow due process to take place, demonstrating his commitment to properly assert Lavalais' right to be heard, even if it required a rare arbitration. (PSOF¶227) The Plaintiff was also speaking on a matter of public concern by participating in the vote. Here, Lavalais' grievance was not a matter that specifically impacted the Plaintiff as an employee. In this case, we have Scatchell, a white officer, standing up for the only African-American officer in the VMP police department. While directly concerning Lavalais, it was matter rooted in overarching public concern beyond the Plaintiff's personal interests. Further, as noted at the

outset, hiring and retaining the only African-American officer is a matter or general public concern as acknowledged by the mayor. (PSOF¶ 256)

The Defendants erroneously ask the court to take a narrow view of the Plaintiff's ability to participate in protected speech by asserting that his position as FOP president at the time precludes First Amendment protections. Although the First Amendment does not protect a public employee's expressions made pursuant to his or her official responsibilities, if the public employee is speaking in his or her capacity as a union representative, they are speaking as citizens. *Graber v. Clarke*, 763 F.3d 888, 895 (7th Cir. 2014). *Moretto v. Tazewell Cty. Sheriff's Office*, No. 14-CV-1433-MMM, 2019 WL 690546, at *8 (C.D. Ill. Feb. 19, 2019), reconsideration denied, No. 14-CV-1433-MMM, 2019 WL 2291449 (C.D. Ill. May 29, 2019).

The Defendants seem to argue opposing perspectives, never sticking to one or the other. Just the same, the Plaintiff would then be making engaging in protected speech as a private citizen. Here, even if the court accepted the Defendants' limited perspective that Scatchell spoke only as the FOP president (which Plaintiff does not), he spoke from an elected capacity that is outside the Plaintiff's essential duties as a lieutenant. His position as a member of the police department and as FOP president are mutually exclusive as demonstrated by the election of Raul Rodriguez as president in December 13, 2016. (PSOF¶¶ 38-39) The Plaintiff continued to occupy the position police officer after the election. Defendants also take the opposite position regarding the Plaintiff's signed declaration, stating that he was no longer the FOP president on January 5, 2017 so his speech was not under the protection of union speech or sanctioned by the FOP. (SJ Memo, p.5) Ultimately, the oppositional perspectives create a genuine issue of fact regarding the Plaintiff's speech.

Under "*Connick*, speech that is protected by virtue of its content does not lose that protection simply because the speech is directed to other employees of that governmental employer rather than to members of the public. 461 U.S. at 147–49, 103 S.Ct. 1684. "In particular, we have repeatedly held that speech exposing official wrongdoing is no less deserving of First Amendment protection because the public employee reported the misconduct to his supervisors rather than to the news media…("It would be absurd to extend First Amendment protection only to those whistle-blowers who immediately appear on the local news.")"; *Ulrich,* 308 F.3d at 979 ("[T]he public employee does not forfeit his protection against governmental retaliation because he chose to press his cause internally."); *Keyser v. Sacramento City Unified*

8

*Sch. District,* 265 F.3d 741, 747 (9th Cir.2001) (holding that employees did not forgo First Amendment protection when they met with the School District's board for the purpose of charging that their supervisor's evaluation practices violated District policy and that he was misusing federal funds)." *Ceballos v. Garcetti,* 361 F.3d 1168, 1174 (9th Cir. 2004), <u>rev'd and remanded,</u> 547 U.S. 410, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006)

Additionally, on March 3, 2017, the Plaintiff signed and submitted an affidavit in support of Kyall Lavalais's charge with the State of Illinois Labor Relations Board related to his residency requirement grievance. (PSOF¶ 42) The plaintiff, referencing Pitassi's knowledge stated, "I know he knew I signed it...because of Dino DiMaio called me because his name was in there....Because they all go to breakfast at Café 23. , and like again I said, Melrose Park is a small town....Everybody talks." (PSOF¶ 215) Referencing the knowledge of all three individual defendants stated, "I believe they all knew" (PSOF¶215) Officer DiMaio testified that officers, including Deputy Chief Castellan and Director Pitassi, would join him as they too frequent Café 23. (PSOF¶215)

John Scatchell's speech was not made in self-interest, nor limited to private interest. The Defendants' narrow definition of "public concern" is contrary to well established precedent. In their narrow view, citing *Petttengell,* interpreted it to suggest "employee grievances, even if they concern discrimination, are not matters of public concern." *Pettengel v. Scoot,* 369 F. Supp.3d 882, 900 (N.D. Ill. 2019). (Def SJ memo p.6) This is misleading and distinguished from the case at hand upon further review of the court's rulings and facts. The First Amendment retaliation discussion in *Pettengel* does not hold the Defendants' blanket interpretation that employee grievances, regardless of topic, would never rise to a level of "public concern", nor do any of the associated cases cited by Defendants. The *Pettenge*l court evaluating the facts stated, " In *Denius,* plaintiff contended that his employer requiring him to sign a waiver of his attorney-client privilege as a condition of his employment violated his First Amendment rights of speech, association and petition.' *Pettengell v. Scott,* 369 F. Supp. 3d 882, 899 (N.D. Ill. 2019) The court explained, "Plaintiffs' actions in hiring private counsel to represent them in their disciplinary proceedings and their filing of claims with the IDHR and EEOC were motivated by and a consequence of their private, internal employment matters with the Sheriff's Office." *Pettengell v. Scott,* 369 F. Supp. 3d 882, 900 (N.D. Ill. 2019) The court focused simply on the Plaintiff's right to hire counsel for internal investigations and personal matters, which presents facts and

arguments on the opposite spectrum of the case at present. Scatchell's statements and actions were far reaching, rooted beyond any personal matter. The remaining cases, evaluating each factually, arrive at the conclusion that the private nature of the claims asserted rarely rise to a level of public concern. The Seventh Circuit has held unequivocally that speech relating *only to the effect an employer's action has on the speaker* is not shielded by the First Amendment, since it rarely involves a matter of public concern. *Kramarski v. Vill. of Orland Park*, No. 00 C 2487, 2002 WL 1827637, at \*12 (N.D. Ill. Aug. 9, 2002). This does not apply to the current case.

## PLAINTIFF SUFFERED ADVERSE ACTION

On a claim for First Amendment retaliation, the question is simply whether the allegedly retaliatory action, or pattern of actions, would be sufficient to deter an ordinary person from engaging in the First Amendment activity in the future. U.S. Const. Amend. 1. *Wheeler v. Piazza*, 364 F. Supp. 3d 870 (N.D. Ill. 2019). "Retaliation need not be monstrous to be actionable under the First Amendment; *it need merely create the potential for chilling* employee speech on matters of public concern." *DeGuiseppe v. Vill. of Bellwood*, 68 F.3d 187, 192 (7th Cir. 1995) *Wheeler v. Piazza*, 364 F. Supp. 3d 870, 877–78 (N.D. Ill. 2019). The Seventh Circuit has expressly rejected the notion that plaintiffs alleging retaliation for constitutionally protected speech under § 1983 must allege the same kind of "adverse employment action" as required to state a claim under Title VII or other federal antidiscrimination suits. *Power v. Summers*, 226 F.3d 815, 821 (7th Cir. 2000) *Wheeler v. Piazza*, 364 F. Supp. 3d 870, 878 (N.D. Ill. 2019). As the court explained in *Smith*, "even minor forms of retaliation can support a First Amendment claim, for they have may have just as much of a chilling effect on speech as more drastic measures." *Smith v. Fruin* 28 F.3d 646, 649 n.3 (7th Cir. 1994). " '[A] campaign of petty harassment' and 'even minor forms of relation,' *'diminished responsibility, or false accusations'* " can be actionable under the First Amendment." *Power*, 226 F.3d at 821 (citing *DeGuiseppe*, 68 F.3d at 192) *Wheeler v. Piazza*, 364 F. Supp. 3d 870, 878 (N.D. Ill. 2019)

### Promotion Rescinded

On November 10, 2016, Scatchell, sent notice of the intent to arbitrate for Lavalais, disputing the Village's position on the issue. (PSOF¶20) On November 11, 2016, less than 24 hours after the Village of Melrose Park publically circulated an agenda naming Scatchell as Deputy Chief, Scatchell's promotion was rescinded. (PSOF¶ 55) Leading up to this moment, the Plaintiff and Mayor Serpico had many conversations regarding the Mayor support of Plaintiff's

promotion. Plaintiff was told by Mayor Serpico he would be promoted. (PSOF¶, 48, 51) There was never a competitive process in place for the Deputy Chief position. (PSOF¶ 206). The board has no prior history of voting against the mayor's recommendations. (PSOF¶ 207) The board has essentially never voted against the mayor. (PSOF¶ 207) Further, Serpico as Mayor, claims he did not have to consult anyone before recommending a Deputy Chief, nor did he. (PSOF¶208) On November 14, 2016, three (3) days later, there was a new meeting agenda, proposing Defendant Rogowski as the new deputy chief. (PSOF¶57) There is an understanding between the Defendants behind the scenes. Going against these relationships has consequences. While Defendants would like the court to believe the 'tabling" of Plaintiffs promotion was some unexplained mystery or business as usual, the totality of circumstances indicate an adverse action that was a lesson in loyalty from the top down.

### Explosive Incident

On December 16, 2016, at 1:11 a.m., explosives of some degree went off at the Plaintiff's residences, resulting in a "shots fired" call. (SOF, 17) Plaintiff who reported the incident, noticed that some newly-elected FOP Board members and off duty officers were visibly standing outside on the porch, no more than a block away. (PSOF¶ 212) The Plaintiff noted that officers including Chiappetta, Natale, Nocita, and Espinosa had a prior history of throwing bombs onto lawns during the late night, early morning hours. (PSOF¶212) When the responding officer inquired whether officer Chiappetta witnessed the incident he responded, "Who the fuck do you think you are? You come calling me. You're a fucking cunt, cunt, cunt. Fuck you. Bring John. Don't fuck with me because you don't know what I can do and who I am." (PSOF¶ 141, 212)

Defendant Rogowski, as then Deputy Chief in charge of investigations, was tasked with investigating the incident per Defendant Pitassi's direction. (PSOF¶ 137) Rogowski's action and inaction shows his demonstrated willful ignorance in investigating the Plaintiff's harassment. Rogowski's willful failure to take basic investigative measures was part of the collaborative efforts to punish the Plaintiff for speaking out in favor of Lavalais. There were never photos taken of the premises or crime scene. (PSOF¶ 213) At no time was any physical evidence was retrieved from the Plaintiff's home, even with presence of an evidence technician on scene, or at any time thereafter. (PSOF¶ 213) There was an objective neglect in evidence collection, especially considering Rogowski was aware of a report of debis present outside the Plaintiff's home. The explosion was so loud that the responding officer Panzani heard it two blocks away.

There was no attempt to interview any of the members of the Scatchell family who were present that night. (PSOF¶213). Rogowski's efforts demonstrated an acquiescence of wrongdoing. His investigation certainly does not pass the smell test for protecting a fellow officer or his family from harassment and danger. Being made Deputy Chief by defendant Serpico motivated Rogowski to help perpetuate Scatchell's harassment for speaking against wrongdoing.

### Station Supervisor Demotion

Adverse employment action has been defined quite broadly in this circuit. "[A]dverse job action is not limited solely to loss or reduction of pay or monetary benefits. It can encompass other forms of adversity as well." *Collins v. State of Illinois*, 830 F.2d 692, 703 (7th Cir.1987). For example, in *Collins* the employee was placed in a new department where her supervisors didn't even know what her job entailed. *Id*. Her office was taken away from her, and she was assigned to a desk outside her supervisor's office, where a receptionist would typically sit. She also lost her phone, business cards, and listing in professional directories and publications. *Id*. The court in *Collins* found these changes to constitute adverse employment action. *Id*. Likewise, in *Dahm v. Flynn*, 60 F.3d 253 (7th Cir.1994), the Court found "a dramatic downward shift in skill level required to perform job responsibilities can rise to the level of an adverse employment action...." *Dahm* at 257. Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)

On May 1, 2017, Director Pitassi reassigned the Plaintiff to the station supervisor position. (SOF, 69) Along with the reassignment of position came a new office known as "the hole." (PSOF¶ 216) Defendant Rogowski confirmed the office Plaintiff was assigned to is known as the "hole" by he and other officers. (PSOF¶ 216). The physical office space was known to be dilapidated, fitting its reputation as a punishment. (PSOF¶217) Rogowski agreed that the office "had seen better days." (PSOF¶ 217) The Plaintiff described the office as "filthy," with cigarette covered soot on walls, missing pieces of the ceiling, walls with holes, missing and non-functioning blinds, and windows that didn't open. (PSOF¶ 217) The Plaintiff didn't have access to the computer login information in the office, even after repeatedly requesting it from the I.T. department. (PSOF¶ 220) The Plaintiff continued to complain to Pitassi. (PSOF¶220)

Reassignment of duties may constitute retaliatory discrimination, the level of retaliation depends on whether it is materially adverse to reasonable employee. "Title VII retaliation provision contains a materiality requirement and objective standard; thus, provision requires showing that *reasonable employee* would have found employer's challenged action materially

adverse, i.e. that challenged action could well dissuade reasonable employee from protected conduct." Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a). *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) Here, the only component that matters is whether the Plaintiff, as a *reasonable* employee, understood the action as adverse. It should be noted, Castellan, as an employee himself, understood the reassignment to be adverse as he was heard boasting to other officers how he took all of Scatchell's power away "demoted, sentenced to the hole, and stripped of all his responsibilities". (PSOF¶ 218) Castellan continued, "We got him voted out of the FOP. He no longer has a shift. He has no men. He has no job description. He's in the hole until he retires." (PSOF¶218) The Plaintiff was never given job responsibilities, repeatedly contacting Pitassi every couple weeks. (PSOF¶220) Pitassi responding, "We're working on it." (PSOF¶220)

Scatchell's responsibilities were diminished, if not eliminated. The rank of lieutenant is often the highest ranking supervisor at the station. (PSOF¶221 The Plaintiff on his regular rotation often had twelve (12) to fourteen (14) officers reporting to him. (PSOF¶ 221) However, the station supervisor position does not regularly supervise a shift. (PSOF¶ 221) Pitassi admitted that he never provided any documents outlining Plaintiffs new duties. (PSOF¶ 219) Nor did Pitassi give any verbal directives providing Plaintiffs job duties, if any. (PSOF¶219) Pitassi confirmed that the Plaintiff did not supervise shifts in his new position. (PSOF¶ 222) Pitassi eventually told Scatchell not to go on calls. (PSOF¶ 223) Pitassi, ultimately resigned Scatchell to stay in office during his tour as station supervisor. Rogowski confirmed Scatchell never received any documents outlining his job duties. (PSOF¶ 223)

### CONTINUED ADVERSE ACTIONS AFTER EEOC CHARGES FILED

On September 15, 2017, the Plaintiff filed an EEOC charges alleging retaliation. This only made Plaintiff's employment experience worse. The Defendants tactics of retaliation became more cunning and insidious.

### <u>Investigation of Scatchell, Jr.</u>

Retaliation also came through the investigation and termination Plaintiff's son, John Scatchell, Jr. ("Scatchell, Jr.") It is well established that adverse action against a third party may be construed as an adverse action against the original complainant. "Third-party reprisals are not categorically excluded from operation of Title VII's anti retaliation provision." *Wilcox v. Allstate Corp.*, No. 11 C 814, 2012 WL 6569729, at *7 (N.D. Ill. Dec. 17, 2012). "[I]t is obvious that a

reasonable worker might be dissuaded from engaging in protected activity if she knew that her fiancé would be fired. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174, 131 S. Ct. 863, 868, 178 L. Ed. 2d 694 (2011)

On November 13, 2017, the termination of Scatchell's son was sparked by an "anonymous" letter outside Castellans office. The Uniform Police Officers Act lays out standard operating procedure ("SOP") for complaints against officers to be sworn. (PSOF¶ 238) Castellan testified that he understood its purpose to make sure there are no false allegations against police officers. (PSOF¶ 234) The letter was unsworn and contained no dates, times, locations, or information that may give rise to a "reasonable suspicion" that Scatchell was abusing sick time. PSOF¶235) However, the letter remained anonymous despite the presence of a camera system outside Castellans office. (PSOF¶ 159) Castellan admitted that he never reviewed the tape to determine the author's identity to satisfy the SOP under the Uniform Police Officers Act, though he had full access on his computer. (PSOF¶237) Defendant Castellan offered no reasoning why he didn't review the tapes, stating "I just didn't." (PSOF¶237)

When asked about the internal investigation process Defendant Castellan stated, "*There has to be a document that sets the wheels in motion*." (PSOF¶138) This premise combined with the Castellan's willful blindness created the unverified motivation to investigate Scatchell, Jr. The letter was purposely allowed to remain anonymous even though going to the source was as easy as looking at the camera system on Castellan's computer. Ignoring this basic investigative step allowed the Defendants' conspiracy of retaliation and harassment of the Plaintiff, through his son Scatchell, Jr., to move forward unchecked and without delay.

On same day, Defendant Pitassi directed Castellan to have officer Caira – the very officer that Scatchell opposed at the pension meeting, to investigate. (PSOF¶ 160). Scatchell previously voiced his opposition to adding Caira to the pension. (PSOF¶246) Officer Caira conducted 219 hours of surveillance of Scatchell Jr. that had no limits or parameters according to Castellan. (SOF, 161). Caira also did not investigate the origin of the letter to satisfy any SOP under the Uniform Police Officers Act. (SOF, 162). Instead, he used significant resources and time to investigate the merits of the "anonymous" letter.

Ultimately, the investigation found that Scatchell, Jr. was in contact with his friend Vito Scavo, who allegedly operated a hunting guide business. (SOF, 167). Scatchell, Jr. was eventually terminated on December 7, 2018 for failing to report contact with Vito Scavo. (SOF,

14

177) In fact, Defendant Pitassi confirmed that the only officer terminated by the Police Board since he had been appointed chief or director in 2006 as a result of an investigation by the police department was John Scatchell, Jr. (PSOF¶ 239)

Castellan was also asked to review SOP Section 240.5.4, subsection (e) under "Relationships" (PSOF¶ 240)

"Associating on a personal, rather than official bias with persons who demonstrate recurring involvement in serious violations of state or federal laws after the member knows, or reasonably should know of such criminal activities, except as specifically directed and authorized by this department." SOP 340, §340.5.4 (e)

The violation of associating with a felon was selectively enforced against the Plaintiff. The Defendants only follow policy when it suits them, weaponizing policies whenever they can in retaliation against the Plaintiff, attempting to hide their pre-textual actions. During Castellan's deposition he reviewed photos. Castellan was asked to review a photo of five (5) officers together. (PSOF¶ 241) He identified Defendant Castellan's nephew, Giovanni Castellan in the picture with Gary Montino, a known convicted felon. (PSOF¶241) Defendant Castellan identified another photo which also included his nephew associating with Gary Montino, a known to be guilty of a felony. (PSOF¶ 241) In a third photo, Castellan identified himself associating with Ric Cervone, whom Castellan knew was a then convicted felon. (PSOF¶ 242) Castellan when on further to admit that he occasionally spoke to Cervone on the phone. Castellan also identified himself in a photo associating with Gary Montino. (PSOF¶ 243) Each individual Defendant is on record as having multiple phone conversations with Gary Montino in extensive phone records. (PSOF¶P 242,257, 258) Castellan stated that in his opinion Subsection (e) prohibits contact with convicted felons. (PSOF¶ 243) Predictably, in direct contradiction to his own reasoning, he didn't feel any part of the policy or conduct was violated. (PSOF¶ 243)

## CAUSATION/MOTIVATING FACTOR

A genuine issue of material fact exists as to whether there is a causal link between the expressions and adverse action. To establish a causal link between the protected expression and a subsequent adverse action by the employer, as required to prove a First Amendment retaliation action, the public employee must show that the protected expression was a substantial *or* motivating factor in the employer's decision. U.S.C.A. Const.Amend. 1. *Massey v. Johnson*, 457 F.3d 711 (7th Cir. 2006) A "motivating factor," for purpose of establishing a causal link between

15

a public employee's protected expression and a subsequent adverse action taken by employer, as required to prove a First Amendment retaliation claim, *does not amount to a but-for* factor or to the only factor, but is *rather a factor* that motivated the employer's action. U.S.C.A. Const.Amend. 1. *Massey v. Johnson*, 457 F.3d 711 (7th Cir. 2006) Moreover, as in other contexts where motivation is at issue, the plaintiffs are not required to come forward with direct evidence or "the so-called smoking gun." *Lewis v. City of Boston,* 321 F.3d 207, 219 (1st Cir.2003). Circumstantial proof, such as the timing of events or the *disparate treatment* of similar individuals, may be sufficient to establish the defendant's retaliatory motive. *Culver v. Gorman & Co.,* 416 F.3d 540, 545–46 (7th Cir.2005). *Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006).

The Melrose Park Police Department follows a paramilitary structure. (PSOF¶231) It is important to note that the Village of Melrose Park government, particularly the police department, operates similarly to a paramilitary force. This generally means, much like our own military, orders come from the top down. All personnel are expected to follow orders and the chain of command. Pitassi, as Director of Police, is the highest ranking police official, reporting only to the mayor. (PSOF¶ 231) Deputy Chief Rogowski, agreeing regarding the Village of Melrose Park's paramilitary environment explained, "Similar to the normal military where there's a rank structure. There's a command structure. There's a unity of command best case." (PSOF¶ 231) There is an expectation at the Village Of Melrose Park that officers follow the chain of command. *Id.* The Mayor, working in concert with high ranking police officers of Village of Melrose Park, including the individual defendants, worked in such a way as to discriminate against the Plaintiff. The impact of the decades of experience and entrenchment within this unwritten ideology cannot be overstated.

There has been a history of discriminatory practices that have roots in the ideals and attitudes of the leadership that have continued to allow this discrimination to materialize when possible. Here, it materialized after supporting the only African-American officer on the police department against selective enforcement of a residency requirement against decree. The Defendants are well versed in the undercurrent of unofficial codes of conduct that are implemented within the law enforcement culture. The Defendants are also well aware how to manipulate official codes to enforce the unofficial codes which they perceive to be broken. This is demonstrated in their investigations, appointments, and behaviors. These codes of conduct and

16

loyalty extend beyond law enforcement ranks to civilian appointees such as the mayor or director of police. Defendant Serpico and individual Defendants operated very much like a general and his subordinates. Village of Melrose Park police have an almost gang-like history, embodying the old adage "you're either with us or against us." Here, the Plaintiffs' position and protected speech fell on the "against us" side of this sentiment.

This understanding and loyalty is deeply rooted in the underpinnings of the Defendants' social and professional system. The Defendants in this case worked closely together and socialized outside of the department throughout their decades of occupying various positions in their careers. Because the Defendants socialize personally, they regularly and unofficially share knowledge of various events, including Plaintiff's public positions.. (PSOF¶230) Scatchell, though experience, is keenly aware of how information travels and how orders, including punishments, are unofficially distributed. (PSOF¶ 230) While the individuals often claim they were unaware events and statements, a reasonable factfinder could find their ignorance and innocence is unlikely. As such, there are genuine facts at issue.

After Lavalis' requested an arbitration for his grievance, John Scatchell proactively sought to entertain any rights that may exist for officer Lavalias though an attorney, his daughter, Gianna Scatchell. Gianna Scatchell in asserting Scatchell's position on this matter communicated to the Village attorneys, "The residency requirement shall not apply to or be imposed upon any employee of the village that is a member of the minority class of persons and was hired as a result of the judicial decree and order entered by the court in cause number 85 C 10493 of the United States District Court for the Northern District of Illinois." (PSOF¶ 33, 34) Favoring the lone African-American officer was met with opposition consistent with the underlying attitudes of the highest positions within the police department. Rogowski when asked if the racial composition of the police force should reflect that of the local municipality, he stated, "Personally I do not agree with that…I don't see a need for that…" (PSOF¶ 261)

The Defendants point out that for suspicious-timing argument alone to give rise to an inference of causation, the plaintiff must demonstrate that "an adverse employment action follows close on the heels of protected expression…" *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) However, the court also admits "there can be *no set legal rule* for determining whether an adverse employment action falls "close on the heels" of protected activity because such a determination "depends on context." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir.

17

2012) Here, there are consecutive adverse actions that occur after and between the Plaintiff's protected speech. Taking in the context and history of discrimination within the case, there is more than just the suspicious timing of one incident. Instead there are a multitude adverse actions that more than suspiciously began and continued as the Plaintiff spoke out and took action to oppose discrimination. However, revocation of promotion after Scatchell's position was on the agenda set the tone for what would be a litany of adverse actions to follow.

For First Amendment retaliation, a court may infer causality from the *suspicious* timing of allegedly retaliatory actions and the protected speech; however, for the court to draw such an inference, a plaintiff must demonstrate that the retaliatory action came close on the heels of the protected expression and that the person who imposed the adverse action knew of that protected expression. U.S. Const. Amend. 1. *Wheeler v. Piazza*, 364 F. Supp. 3d 870 (N.D. Ill. 2019) With the certainty of Plaintiff's promotion looming, the promotion was suddenly "tabled" with no discussion regarding the reason, a historical anomaly. (PSOF¶ 55). Three days later, there was a new meeting agenda, proposing Defendant Rogowski as the new deputy chief. (PSOF¶ 57) This was a clear message that taking an opposing position to the powers that be held consequences. Loyal officers such as Defendant Rogowski stood to benefit, which he did. As *quid pro quo*, Rogowski worked with the other Defendants to discourage and drive out the Plaintiff in retaliation for going against how things are done in the Village of Melrose Park.

The Plaintiff testified that Pitassi knew his personal position on Lavalais' grievance while discussing it in Pitassi's office on or before December of 2016. (PSOF¶211) After Pitassi's tirade of racial slurs, the Plaintiff stated "He's a member of the FOP…if we have the right to right to represent him I will back him one hundred percent to go to the arbitration."(PSOF¶211) There is no doubt there was an animus of discrimination that made up the underpinnings of the sudden and consistent adverse actions administered by the Defendants. The consequences for going against the culture of the department continued to materialize from the individuals under the Mayor's command. Pitassi, Rogowski, and Castillan, acting in concert, would further the punishment for speaking against the historical will of the Mayor and group.

On December 16, 2016, at 1:11 a.m., explosives of some degree went off at the Plaintiff's residence, resulting in a "shots fired" call. (PSOF¶ 17) The Plaintiff, reporting the incident, noticed that some newly-elected FOP Board members and off duty officers, with a history of such antics, were visibly standing outside on the porch, no more than a block away. (PSOF¶ 212)

Again, this occurred fresh on the heels of Plaintiff's position on Lavalais and loss of the promotion. At no time was physical evidence retrieved from the Plaintiff's home, even with presence of an evidence technician on scene, or at any time thereafter. (PSOF¶ 213) A reasonable fact finder could find, officer Rogowski, aware of the underlying punishment being administered, purposefully conducted a lack luster investigation by the lowest standards, falling well short of his reputation as being "the *smartest* person in the police department." (PSOF¶, 58)

Shortly thereafter, on January 5, 2017, the Plaintiff submitted a signed declaration in support of litigation filed by Lavalais against the Village in federal court. (PSOF¶ 40). On March 3, 2017, the Plaintiff also signed and submitted an affidavit in support of Kyall Lavalais's charge with the State of Illinois Labor Relations Board related to his residency requirement grievance. (PSOF¶ 41) The Plaintiff, referencing Pitassi's knowledge stated, "I know he knew I signed it…because of Dino DiMaio called me because his name was in there….Because they all go to breakfast at Café 23. , and like again I said, Melrose Park is a small town….Everybody talks." (PSOF¶ 215) Knowing the ways of the town and department, Scatchell continued, "I believe they all knew" (PSOF¶ 215) Officer DiMaio confirmed Scatchell's sentiments, testifying that officers, including Deputy Chief Castellan and Director Pitassi, had a history of frequenting Café 23, joining him and others. (PSOF¶ 215)

Circumstantial proof, such as the *timing of events* or the disparate treatment of similar individuals, may be sufficient to establish the public employer's retaliatory motive, for purpose of a First Amendment retaliation claim. U.S.C.A. Const.Amend. 1. *Massey v. Johnson*, 457 F.3d 711 (7th Cir. 2006). The consistent and ongoing actions were geared toward the goal of removing the Plaintiff by any means necessary, including forcing him to retire by stripping away his duties without recourse. Defendant Castellan, as an employee himself, understood the reassignment to be adverse as he was heard boasting to other officers how they took all of Scatchell's power away. Castellan stating, "*We* got him voted out of the FOP. He no longer has a shift. He has no men. He has no job description. He's in the hole until he retires." (PSOF¶ 218) Castellan was aware of the holistic effort that was being perpetrated.

Pitassi testified that even as the Director of Police he continued to also hold the powers held by the Chief of Police. (PSOF¶ 220) When the Plaintiff asked for to be assigned responsibilities, Pitassi, having the combined power of two positions, would only respond,

"We're working on it." (PSOF¶ 220) Defendant Pitassi, continued to keep the Plaintiff in "the hole" as punishment for speaking out against discrimination.

The Defendants were willing to do whatever it took to get the Plaintiff to either retire or have him relieved of his duties. On August 30, 2017, Scatchell was falsely accused of misconduct during a traffic stop outside of his home. (PSOF¶123) Scatchell stopped a driver that was travelling at a high rate of speed that almost collided with the Plaintiff's vehicle. Later the driver filed a complaint for mistreatment. (PSOF¶ 123) Pitassi assigned Deputy Chief Rogowski to investigate the citizen's complaint. (PSOF¶ 124) On September, 18, 2017, via email, Rogowski offered to appear in court for the complainant, which he did, indeed speaking with the prosecutor to arrange a new court date. (PSOF¶ 260) Here, Rogowski took steps beyond his internal investigative role to keep the civil complaint alive against the Plaintiff, even if it meant appearing in court for Mr. Morales. However, Rogowski's extraordinary efforts were in vein as the Plaintiff remained on sick leave through the date of his retirement in June of 2018.

As the Plaintiff continued to assert his rights against retaliation and discrimination, so too would the Defendants continue to push back. Scatchell, still out on sick leave, continued to engage in protected activity though filing charges. On September 11, 2017, the Plaintiff filed his EEOC charges for retaliation, making Plaintiff's employment experience worse. (PSOF¶ 192). On September 25, 2017, Plaintiff also filed his amended EEOC charge. (PSOF¶193). Like their relationships. Defendants' tactics continued to extend beyond the walls of the station.

Since he was not in the station, they found other ways to poke and prod Scatchell. On October 26, 2017, one day after EEOC charge was received, Melrose Park director of HR, Christine Piemonte, called Plaintiff asking if he would hire her felon brother, against the association with felon rules and secondary employment disclosure. (Def SJ, Ex. 2, Piemonte affidavit). Scatchell at the time was not conducting a business upon which to hire employees, so the attempted set up failed.

The Defendants' next move was to reach the Plaintiff through the investigation and termination Plaintiff's son, John Scatchell, Jr. ("Scatchell, Jr.") Purposely allowing the letter to remain "anonymous." Castellan admitted that he never reviewed the tape to determine who the anonymous person was in order to satisfy the SOP under the Uniform Police Officers Act, though he had full access on his computer. (PSOF¶ 159) Castellan stating "I just didn't." (PSOF¶ 237) Castellan, continuing the pattern of Rogowski, made investigative decisions that make no

rational sense in light of the procedures set in place. The only one rational explanation is the letter created an unverified open season to investigate and terminate Scatchell, Jr. without limit applying policies Castellan would not enforce against himself or favored officers. (PSOF¶ 161)

## PRETEXT

If the public employer produces evidence that it would have taken an adverse action against public employee even in the absence of his protected expression, the employee then must persuade a fact-finder that the employer's proffered reasons were pre-textual and that retaliatory animus was the real reason for the adverse action. U.S.C.A. Const.Amend. 1. *Massey v. Johnson*, 457 F.3d 711 (7th Cir. 2006)

## Tabled Promotion

Beyond suspicious timing, Serpico's reasoning for denial of Scatchell's promotion does not add up. Serpico stated he intended for the Plaintiff to retire soon after his appointment to save money by replacing him with an officer with far less years on the job, "helping the pension". (PSOF¶ 210) However, the opposite happened, promoting defendant Rogowski, an officer since 1997 and lieutenant since 2004. (PSOF¶ 57) Scatchell was replaced due to Rogowski's loyalty to the mayor was rewarded with the promotion, regardless of the consequences to the pension.


## Scatchell's continued support of Lavalais further ignites blatant discriminatory motives

It bears repeating, Plaintiff recalls Pitassi's reaction to Lavalais's request, "You believe this fuckin nigger? I can't believe he wants …This nigger is out of his mind." (PSOF¶211) Pitassi, as one of the highest ranking officers of the Village Melrose Park, demonstrated the blatant discrimination and animus within the Defendants' conduct.

## Reassignment

While only two months after Scatchell's promotion was rescinded, the Defendants argue that the reassignment was an objective measure related to simple restructuring. They first assert Pitassi and Castellan began discussing the restructuring plan at least as early as January of 2017. (PSOF¶ 249) If this is believed, by their own admission it would place the discussion soon after the Plaintiffs' protected speech in regarding Lavalais' grievance in December, and fresh on the heels of Scatchell's supporting declaration on January 5, 2017.

The Defendants next argue that because others, including officer DiMaio, were also assigned to the position that it was not intended as retaliation or adverse action. (Def SJ, p. 14)

However, the Plaintiff set out instances with other officers that runs contrary to such arguments. The Plaintiff and others knew this was where officers were sent as punishment. The Plaintiff pointed out that officer DiMiao was in trouble because "he had a lot of lawsuits in his career…I was on a call with him one time. He had a baton. He almost took my head off swinging it at somebody, and the guy just had open heart surgery and he was hitting him on the scars." (PSOF¶ 250) Lieutenant "Pots" was supposed to retire once his son Billy Pots, Jr. got on, and when he didn't leave, he said he wasn't leaving, that s when they took him off his shift and they put him in the hole." (PSOF¶ 250)

The Plaintiff continued, "Lieutenant Caliendo wanted to be Chief for his whole career, that's all he ever wanted. He had reached out to other people from outside the village and the town…and he stepped on a lot of people's toes to try to get to that." (PSOF¶250) Plaintiff when discussing the reasons he retired detailed that the day he was assigned to "the hole" he was demoted, stripped of his dignity, self-esteem, and responsibilities. (PSOF¶ 251) Defendant Rogowski confirmed that since the Plaintiff and officer DiMaio were placed in the station supervisor position there have not been any more appointments to the position after the Plaintiff retired. (PSOF¶ 252) The Defendants' arguments that the station supervisor position was not an inherent punishment does not hold water in light of the context and their own admissions as to it being unoccupied since.

It is well-settled that "reorganization may not be used as pretext to remove or demote a particular employee, particularly where that employee is a member of a protected class." *Hird-Moorhouse v. Belgian Mission to United Nations*, No. 03-cv-9688 (RWS) 2010 WL 3910742 at *5 (S.D.N.Y. Oct. 5, 2010). Here, there is a myriad of circumstantial evidence supporting the conclusion that Scatchell's transfer to Station Supervisor was motivated in part by his complaints against the VMP's treatment of Lavalais and frivolous pension spending (Caira), not restructuring the MPPD. Since Scatchell retired from the MPPD in April 2018, the MPPD has only maintained one station supervisor, leaving Scatchell's position unfilled. (PSOF¶252) Additionally, Pitassi told Scatchell that he was not allowed to go on police calls anymore, nor was he allowed to leave the station. (PSOF¶ 223) At the same time, DiMaio testified that Pitassi never ordered him to stay off calls or remain in the station even though a citizen complained that DiMaio had punched him in the chest when he went on a police call while station supervisor. (PSOF¶ 247) These facts contradict Defendants' asserted, non-retaliatory reason for transferring

22

Scatchell to station supervisor. On this basis alone, summary judgment may be denied as material questions of fact exist as to the reason for Scatchell's transfer. Defendant's motivation for transferring Scatchell was pretext. Here, there is a strong temporal proximity between Scatchell's continued support of Lavalais (March 2017 declaration) and his statement at the Pension meeting (mid-April 2017). (PSOF¶ 214)

### Anonymous Letter Regarding Scatchell, Sr.

The Defendants rely on *Marshall*, challenging the manner in which employees conduct investigations. The real question is why the investigations were conducted in the first place and the circumstances in which they arose. The investigations were used as a form of constant harassment to discourage the Plaintiff's speech and to force him to out of the police force. The scrutiny of the investigative veracity denotes the intentional neglect they were given, as Defendants only used them as a tool of harassment.

On September 15, 2017, the Plaintiff filed his EEOC charge, naming the Defendants. (PSOF¶ 192) Days later, Pitassi called Scatchell in his office do discuss an "anonymous" letter regarding his whereabouts while on duty. (PSOF, ¶117-119) Pitassi threatened that "the eyes of Texas are on you." (PSOF¶ 119). Pitassi instructed the Plaintiff to stop responding to police calls on the street. (¶SOF¶ 223) The letter was used to further restrict and remove the Plaintiff's ability to perform duties and to incite fear of being "watched."

### Anonymous Letter Leading to Scatchell, Jr. Investigation

One month after receiving Scatchell's EEOC charge, three weeks after he went on sick leave, someone slid another anonymous note under Castellan's door. (PSOF¶ 159). On the very same day, Defendant Pitassi directed Castellan to "look into" the note. (PSOF¶ 160). Castellan immediately assigned officer Caira to investigate, giving him unlimited resources and time. (PSOF¶ 161) Castellan, understanding the purpose of the Uniform Police Officer Act to avoid false allegations, completely disregarded that the letter was unsworn and contained no dates, times, locations, or information that may give rise to a "reasonable suspicion." (PSOF¶ 234) He admitted that he never reviewed the tape to satisfy the standard procedures under the Uniform Police Officers Act, though he had full access on his computer. (PSOF¶¶ 159, 237)

This consistent conduct is directly at odds with investigatory common sense and is totally disingenuous as an objective basis for the unlimited investigation time afforded to officer Caira. Caira, tasked with the investigation, also didn't investigate the origin of the letter. (PSOF¶ 162).

This "anonymous letter" excuse became a pattern of behavior used to cloak the pretext of their actions. Castellan noted that he had *never* had an anonymous letter in his career, twelve (12) of which he has served in his current position as Deputy Chief. (PSOF¶ 248) The Defendants want us to believe the sudden and suspicious pattern of anonymous letters appearing related to the Plaintiff are coincidence. This does not pass the smell test, which a jury could and would determine there is pretext to discrimination.

When reflecting on his retirement the Plaintiff explained the segregation imposed by the defendants. (PSOF ¶224) Officers were instructed not to speak to him or his family. (PSOF¶ 224) The Plaintiff was told by other officers that no one could come see him because "there's a bounty on your head." (PSOF¶ 224)

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment should be DENIED.

Respectively submitted,

*/s/NaVarrio D. Wilkerson*
Disparti Law Group, P.A.
121 W. Wacker Dr., suite 2300
Chicago, IL 60601
One of Plaintiff's Attorneys
navarrio@dispartilaw.com